**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| | : |
| HEDGEYE RISK MANAGEMENT, LLC, | : |
| | :    Civil Action No. 1:21-cv-03687 |
| Plaintiff, | : |
| v. | :    **JURY TRIAL DEMANDED** |
| | : |
| DARIUS DALE, | : |
| | : |
| Defendant. | : |
| | : |

## <u>COMPLAINT</u>

Plaintiff Hedgeye Risk Management, LLC ("Hedgeye") brings this suit against Defendant Darius Dale ("Dale"), and alleges:

### SUMMARY OF THE ACTION

1.      Hedgeye brings this complaint to prevent the further trade secret misappropriation by a departing senior employee.  Defendant Darius Dale was a Managing Director and shared in the profits of Hedgeye until he resigned on Sunday, March 28, 2021.  That Sunday morning he copied dozens of computer files comprising gigabytes of information from his company computer to a private Dropbox account.  Mr. Dale has begun using those files, sophisticated financial models refined by Hedgeye over more than 10 years, in a competing business that he created prior to his departure from Hedgeye, actively promoted on social media within days, and

launched products from, less than a month after leaving Hedgeye. What is more, Mr. Dale took Hedgeye's client list and is pitching his new business directly to Hedgeye's clients.

2.      This action is based upon Dale's: (1) Violation of the Defend Trade Secret Act, 18 U.S.C. § 1836, *et seq.*; (2) Common Law Misappropriation; (3) Breach of Contract; (4) Conversion; and (5) Unfair Competition.

## PARTIES

3.      Hedgeye is a Delaware limited liability company with its principal place of business located at 1 High Ridge Park, Stamford, CT 06905.

4.      Defendant Darius Dale is an individual who resides at 134 East 22nd Street, Apt 508, New York, NY 10010.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.

6.      This Court has supplemental jurisdiction over the other claims asserted herein pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Dale resides in New York, New York, which is located in the Southern District of New York. Venue is also proper because a substantial part of the events giving rise to the claim occurred here and a substantial part of the property that is subject of the action is situated here. Specifically, the misappropriated trade secret and confidential information was accessed, viewed, and downloaded by Dale in this District. Hedgeye is informed and believes that its trade secret and

2

confidential information resides in this District on one or more hard drives or other electronic devices in Dale's possession.

## FACTUAL BASIS OF THE CLAIMS

**BACKGROUND**

8.     Hedgeye was founded over 13 years ago by CEO Keith McCullough and President Michael Blum.  Hedgeye met its mission to create something that didn't then exist: hedge fund-quality research for everyday investors.  But Hedgeye also has evolved into the premier unbiased and uncompromised investment research house among the world's institutional investors.  Its institutional customer base advises over $10 trillion in assets.  The Hedgeye team features some of the world's most well-qualified and highly regarded research analysts, with extensive experience.  It continues to grow with 65 full-time employees, 35 of which are research analysts and institutional sales professionals.

9.     Hedgeye commands both breadth and depth in its unique research offering.  The firm's flagship offering is macro-economic risk management with fundamental research coverage across nearly 20 sectors, including Restaurants; Consumer Staples; Retail; Gaming, Leisure & Lodging; Financials; Housing; Healthcare; Industrials; Materials; Technology; Communications; REITS; Demography; China; Cannabis; Legal Catalysts and Policy.

10.     Since 2013, Hedgeye has been broadcasting HedgeyeTV over the Internet from its primary studio in Stamford, CT.  Through its rapidly growing subscriber base and marketing channels (including social media), Hedgeye reaches an audience of over 500,000 investors predominantly in the United States and also in nearly 100 countries around the world.

11.     Hedgeye develops and uses proprietary financial models that are critical to Hedgeye's business.  Hedgeye's "Growth, Inflation & Policy" model, or GIP, is a core model

that was developed and iterated upon by Hedgeye's Founder & CEO McCullough over his many years of experience as a portfolio manager to major hedge funds on Wall Street. Upon starting Hedgeye in 2008, McCullough and his team formalized and productized the GIP Model and it became one of the core products of the new firm.

**Defendant Darius Dale**

12.     Defendant Darius Dale was hired by Hedgeye as a junior analyst in the summer of 2009, fresh after graduating with a Bachelor of Arts from Yale. By early 2010, Hedgeye was focused on teaching Mr. Dale its research process and methodology, and various skills such as Excel spreadsheet modelling, statistics and probability theory, fractal mathematics, and more. In due course, Mr. Dale's primary responsibility was helping productize and market the GIP Model, and he had daily responsibility for ensuring data was updated and outputs were produced and published to Hedgeye's subscribers.

13.     Mr. Dale was handsomely compensated. Each year, he was given raises and annually increasing bonuses. Year in and year out, Mr. Dale's base and bonus compensation would be at, or near, the very top of his peer group. By 2013, Hedgeye had accepted Mr. Dale as an equity holder in Hedgeye's parent company through a phantom equity plan, making Mr. Dale one of the youngest equity holders in Hedgeye's history. Over time, Mr. Dale was awarded enough equity to become the largest holder of phantom equity at Hedgeye.

14.     Mr. Dale was promoted to Director in 2015 and Managing Director in 2017. By 2019, Mr. Dale was one of the highest paid employees at Hedgeye, earning the second highest bonus at the firm. His compensation exceeded that of his colleagues, many of whom had vastly more experience in the finance industry. In 2020, Mr. Dale was the fifth highest paid employee at Hedgeye, when taking into consideration base salary, bonus and ownership distributions.

4

15.     Mr. Dale's compensation, bonuses and promotions were made on the basis of his merit to the research team, notwithstanding certain instances of poor judgment and disruption.

**Employment Agreements And Access To Hedgeye's Trade Secrets**

16.     All employees, including Mr. Dale, were required to sign agreements acknowledging that the information to which they would be exposed at Hedgeye was proprietary and confidential.  Employees were required to agree not to disclose such information to anyone outside Hedgeye at any time either during or after their employment.

17.     Hedgeye's network is password protected, and each employee is required to use a password to access the network.  Further, access to specific directories, folders and files is permission-based.  All the proprietary and confidential information taken by Mr. Dale was information that Hedgeye required to be stored on its network drive.  That network drive is password protected and requires a secure VPN login to access remotely.  Hedgeye is not aware of any prior breach of confidentiality concerning its proprietary and confidential information.

**Defendant's Employment Agreements**

18.     Mr. Dale initially was hired pursuant to an employment letter agreement dated July 17, 2009.  That agreement was replaced by an employment agreement dated March 8, 2010 ("Employment Agreement").

19.     Pursuant to Mr. Dale's Employment Agreement, Mr. Dale agreed not to disclose confidential information, "including without limitation, financial information . . . and proprietary investment and trading strategies of" Hedgeye before or after his employment.  Mr. Dale also agreed not to compete or prepare to compete with Hedgeye during his employment.  Mr. Dale also agreed not to solicit any of Hedgeye's customers during, or for six months after, his employment.  He further agreed that all inventions, discoveries, ideas, programs, notes, charts,

and other materials that he created during the course of his employment in any way related to the business were to be deemed "works made for hire" and belonged to Hedgeye.  Mr. Dale has breached each of these agreements.

20.    As part of Mr. Dale's Employment Agreement, he also agreed that, while employed, he would "not to engage in any employment, business or activity that is in any way competitive with the business or proposed business of the Company of its affiliates."  He also agreed not to "assist any other person or organization in competing (directly or indirectly) with the Company or any of its affiliates, or in preparing to engage in competition with the business or proposed business of the Company or any of its affiliates."

21.    As a condition of his employment, Mr. Dale also was bound by Hedgeye's Code of Ethics, which was distributed to Mr. Dale and all employees.  The Code of Ethics acknowledges that Mr. Dale owes "a duty of loyalty to the Firm," and reaffirms that he "must only use Firm confidential information for authorized purposes."

22.    Each employee, including Mr. Dale, also was required to submit an annual "Year End Attestation" certifying his or her compliance with Hedgeye's Code of Ethics.  In Mr. Dale's 2020 Year End Attestation, executed on January 5, 2021, Mr. Dale certified that he had received, read, and understood the Code of Ethics, and that he "will comply with the letter and spirit of the Code of Ethics fully."

23.    As part of his Employment Agreement, Mr. Dale also agreed that all "inventions, discoveries, ideas, computer programs, programs based upon or developed from computer programs, including any improvements, codes, system documentation, technical data, drawings, flow charts, prototypes, design specifications, and any other documentation, notes and materials" made by him during the course of his employment and "in any way related to any business in

which the Company is engaged . . . shall be deemed to be 'works made for hire' pursuant to applicable law and shall belong to the Company.

24.     As Managing Director, Mr. Dale was Hedgeye's largest holder of phantom equity and worked closely with Hedgeye's CEO, Keith McCullough.  Mr. Dale operated with virtually no supervision and was afforded a tremendous amount of autonomy.  As a result of his role, Hedgeye entrusted Mr. Dale with unfettered access to nearly all of Hedgeye's proprietary and confidential information and trade secrets.

25.     Hedgeye personnel would occasionally ask Mr. Dale to generate an output model for their use.  But Mr. Dale controlled the active source models on his desktop and no other employee had access to Hedgeye's most current versions of those models.  Source models were not shared internally or externally, meaning Mr. Dale had sole access.  Even the client-facing output models were provided only under a limited license and could not be republished pursuant to Hedgeye's service agreement (for institutional clients), disclaimers and website Terms of Service (for retail or mass market subscribers).

**Hedgeye's Proprietary and Confidential Information and Trade Secrets**

26.     Hedgeye is a publisher of financial market and economic analysis.  Hedgeye develops and uses proprietary financial models that facilitate insights and recommendations after incorporating and weighing a vast number of carefully selected data points.  These models are critical to Hedgeye's business.

27.     Hedgeye's "source models" are dynamic market and economic analysis engines built into Excel spreadsheets.  The spreadsheets use APIs (Application Programming Interfaces) to dynamically gather virtually real-time financial marketplace and economic data from a number of sources.  Hedgeye selects dozens of discrete data points from a near-infinite number

of potential inputs from virtually every country in the world.  The proprietary source models then apply mathematical formulas that Hedgeye has developed to carefully weigh, combine, and analyze the data, and feed the results to "output models."  Hedgeye sells to its subscribers investment recommendations and comprehensive financial market and economic research and analysis based on its models, and it shares the output models with certain institutional subscribers.

28.     Subscribers who receive the output models cannot access the source models on which they are based.  Subscribers cannot, for example, view the underlying methodology that goes into the source models, update the output models, etc.  Subscribers do not have access to or visibility into how Hedgeye's algorithms work or derive information.

**Hedgeye's Development Of Its Proprietary And Confidential Information**

29.     Hedgeye has spent over 13 years developing its models.  The models are the product of Hedgeye's investment of many millions of dollars, as well as years of intensive work, troubleshooting, continuously improving and innovating, as well as working closely with its customers.

30.     Hedgeye's competitive advantage arises from the secrecy of its source models because no other competitor employs the same proprietary methods.  For example, to model GDP (Gross Domestic Product), Hedgeye uses a traditional base model but then models GDP and inflation "stochastically" applying probability theory, whereas most of its competition uses much more basic linear regressions and deterministic models.

31.     Hedgeye's "Growth, Inflation & Policy" model, or GIP, is Hedgeye's core model, and employs 30 uniquely curated and back-tested economic data points to which Hedgeye assigns varying weights.  Back-testing is a gold standard by which models are applied

retroactively, and their predictive results are measured with the benefit of hindsight.  No other competitor uses those same Hedgeye data points, or uses data points in the same way with the same weighting.  It took Hedgeye many years and significant investment of resources to derive the mix of indicators to where they are today.  Hedgeye's models also dynamically re-weigh the 30 data points for "marginal rate of change" impact; in essence, the model continually retrains itself based on the curated source data.  Only the most senior analysts at Hedgeye, such as Mr. Dale prior to his departure, would understand how to do this.

32.     As another example, Hedgeye's inflation model is built on proprietary commodity price sample data "baskets" that Hedgeye built and that no one else has or uses.  Competitors' inflation models analyze entirely different baskets of data, resulting in entirely different results.

33.     Finally, Hedgeye gains a marked competitive advantage because its source models have a number of other features, and employ a number of other methodologies, that are proprietary to Hedgeye and represent important changes and improvements to the traditional features and methodologies of competitors' models.

**Hedgeye's Confidential Client Information**

34.     Hedgeye has hundreds of institutional investor clients who pay significant amounts of money to subscribe to Hedgeye's research.  Hedgeye has thousands more paying retail investor subscribers to its one-to-many newsletter and podcast research.  Most or all of the institutional investors do not want third parties to know about their engagement with Hedgeye; Hedgeye's standard institutional service agreement offers such institutional subscribers a promise that Hedgeye will not disclose their identity.

35.     Hedgeye has assembled various customer lists over a period of years, through the expenditure of substantial time and money including personal solicitation.  It would take years to develop the lists from scratch.

36.     Hedgeye's customer lists are particularly valuable because they reflect Hedgeye's selection of customers constituting a specialized market; that is, buy-side investors who are interested in particular investment services such as dynamic investment models and daily podcasts, their interest level, and the amount they wish to pay for such research.

37.     Mr. Dale was responsible for sending out a weekly "Rise & Grind" e-mail to approximately 1,600 names (about 300-400 Hedgeye institutional subscribers in total).  That list was further curated to include only particular contacts who did a certain minimum amount of business with Hedgeye; in other words, the list was curated to contain contact information for what had proven to be Hedgeye's most engaged and lucrative subscribers, and had opted to receive higher level of engagement on Hedgeye's models.

38.     Hedgeye's proprietary and confidential models, along with its customer lists, constitute Hedgeye's trade secrets.

**Defendant Resigns**

39.     Hedgeye management was surprised and disappointed that, during his 2019 annual review, which took place in early 2020, Mr. Dale expressed his view that he was not adequately compensated.  In subsequent months, Mr. Dale's behavior changed.  He started to privately and publicly claim that he was "the inventor of the Quads," a construct used in Hedgeye's proprietary GIP model.  Mr. Dale increasingly declared that he had "built the firm" and increasingly began claiming he invented, and controls, the models that constitute Hedgeye's

intellectual property and trade secrets.  Simultaneously, Mr. Dale expressed increasing and more vocal complaints about his perceived inadequate compensation.

40.     Many at Hedgeye were disappointed with Mr. Dale's attitude.  They knew that Mr. Dale was a college senior, not part of the workforce, when Hedgeye was founded in 2008. Hedgeye's GIP model, the cornerstone of the firm, had been fully developed by the time Mr. Dale was hired, 18 months later, as a junior analyst straight out of school without any work experience.  Management found it absurd and naïve that Mr. Dale would suddenly demand larger compensation and equity participation when he already had been so handsomely compensated for his contributions as a Hedgeye employee.  That Mr. Dale would make such demands by coupling them with specious claims Hedgeye's IP belonged to him only made the demands more inappropriate.

41.     These themes were addressed with Mr. Dale during his 2020 annual review, which took place on February 9, 2021.  At that meeting, Mr. Dale demanded increased compensation and a follow-on meeting took place on March 11, 2021.

42.     At the follow-on meeting, Mr. Dale was informed that his base salary, already one of the very highest at Hedgeye, would again increase and his bonus would be the highest bonus of any employee on the research team.  In fact, Mr. Dale's year-over-year bonus increase would significantly outpace the growth and profitability of the institutional macro business for which he was responsible.

43.     Mr. Dale's expletive-laden reaction to this offer was that he would be leaving Hedgeye.  In the ensuing weeks, while still employed at Hedgeye, Mr. Dale began a thoroughly planned theft of Hedgeye's intellectual property.  Simultaneously, his interactions with Hedgeye became increasingly erratic and threatening.  In one instance he emailed Hedgeye's in-house

counsel stating that would use his standing as "a very reliable source in the dead center of the …
[Hedgeye] community" as "a loaded gun full of uncomfortable truths."

44.     On March 21, 2021, Hedgeye sent Mr. Dale a proposed separation agreement
requesting Mr. Dale to acknowledge Hedgeye's trade secrets and confidential information, as
well as non-solicitation and non-competition components.  Mr. Dale responded that he had
concerns, and Hedgeye responded that it was open to discussion to assure Mr. Dale he could
move forward with future plans he had discussed.

45.     The parties and their attorneys exchanged marked-up drafts of a settlement
agreement, and Mr. Dale removed all portions related to acknowledging Hedgeye's intellectual
property and trade secrets.

46.     On or about March 25, 2021, Hedgeye became aware that Mr. Dale had updated
his LinkedIn profile to say that he is the founder and CEO of 42 Marco LLC, an "online financial
media company specializing in macro risk management," despite the fact Mr. Dale was still
employed by Hedgeye.

47.     On Sunday, March 28, 2021, at approximately 12:30 p.m., Mr. Dale resigned via
email attaching his resignation letter.

48.     On March 31, 2021, Hedgeye again sought Mr. Dale's acknowledgment regarding
Hedgeye intellectual property and trade secrets, but less broadly.  On April 1, 2021, Mr. Dale
wrote to Hedgeye that after careful consideration he has chosen to "eschew Hedgeye's amended
separation proposal."  He acknowledged that "specific algorithms" qualify for trade secret
protection.  Shortly after that, Mr. Dale wrote again saying that "I will have a new counsel reach
out to you soon."

49.     In April, Hedgeye continued to negotiate with Mr. Dale's new attorney.  Mr. Dale's new attorney indicated that a separation agreement must include that Hedgeye release all claims against Mr. Dale.  Hedgeye was not yet aware what claims it might release in such an arrangement and engaged KLDiscovery to undertake a forensic examination of Mr. Dale's activity on his work computer prior to leaving the company.

**Defendant's Misappropriation of Trade Secrets and Unfair Competition**

50.     While Mr. Dale was still employed at Hedgeye, he expressed interest in how he would control the narrative of his departure on his company Twitter account.  Before he left Hedgeye, he set up a Twitter account for his new company, 42 Macro.  At the same time, he also updated his LinkedIn profile saying he was the founder of 42 Macro.  He also purchased the domain name for his new business while still employed at Hedgeye.

51.     Hedgeye has recovered Mr. Dale's company-issued laptop, mouse, charger, and webcam; however, it has not recovered Mr. Dale's LED ring light for his web camera or his Bloomberg B-Unit, which gave him access to his account.  Mr. Dale also remains in possession of extensive notebooks he was asked to maintain while employed at Hedgeye.

52.     The forensic examination of Mr. Dale's laptop by KLDiscovery makes clear that Mr. Dale copied numerous files constituting Hedgeye's proprietary and confidential information and trade secrets.

53.     First, Mr. Dale copied source models that are Hedgeye's proprietary and confidential information and trade secrets.  For example, Mr. Dale copied the files named, "Global Macro Risk Monitor.xlsx" "US INFLATION Model.xlsx," and "US GROWTH Model.xlsx."  All of those files are Hedgeye source models, and trade secrets.

54.     In fact, Mr. Dale took one critical file that Hedgeye has not been able to recover. In other words, Mr. Dale did not just "copy" that file, he actually destroyed Hedgeye's only copy.  The file, named "PRICE VOLUME VOLATILITY.xlsx," is a dynamic source model which took years to develop, and which contains and constitutes Hedgeye's proprietary and confidential information and trade secrets.

55.     The Price Volume Volatility document was saved locally on Mr. Dale's company-issued laptop.  Mr. Dale accessed the Price Volume Volatility document on his company-issued laptop on March 24, 2021, at 4:10 p.m.  Mr. Dale interacted with a file with the same name on his personal Dropbox account on March 24, 2021 at 6:19 p.m.

56.     After Mr. Dale's resignation, Hedgeye learned that he had not complied with the company policy of saving critical documents, such as Price Volume Volatility document, to the network, rather than his desktop.  When Mr. Dale returned his company issued laptop, the Price Volume Volatility document was missing from both the laptop and network, although Mr. Dale had last accessed it on March 24, 2021, and Hedgeye has been unable to recover its most recent version.

57.     On April 19, 2021, Hedgeye attempted to locate and access the missing Price Volume Volatility document.  It was able to find three copies of auto-recovered versions of the file on Mr. Dale's laptop; however, the files were password-protected.  This was strange because Hedgeye does not typically password protect individual files.  Without the password, Hedgeye has been unable to recover the Price Volume Volatility document. Moreover, the auto-recovered versions are many months old and may not represent the most current version of the Price Volume Volatility document.

58      Mr. Dale also took several screenshots of certain Excel spreadsheets saved on his company-issued laptop.  Several are images of Hedgeye's trade secret source models.

59      Mr. Dale also accessed a personal Dropbox account in the days leading up to his resignation, including the early morning of Sunday, March 28, 2021.  Mr. Dale did not have a company Dropbox account, and was not authorized to copy company files, much less the trade secret source models, into any Dropbox account.  Mr. Dale also cleared his Chrome web browser history the morning of Sunday, March 28, 2021, leaving only a trace of his Dropbox activity.

60      Mr. Dale set up his Dropbox account to contain the same file and folder names as certain Hedgeye files and folders on his company-issued laptop.  In other words, Mr. Dale made it obvious that the files and folders he interacted with through Dropbox were identical to those files and folders saved on his company-issued laptop.  Those files are Hedgeye's proprietary and confidential information and trade secrets.

**Mr. Dale Copied Hedgeye's Proprietary Customer Lists**

61      Mr. Dale also copied a confidential and trade secret files containing curated lists of the names of Hedgeye's highest paying clients at every level of the Macro business.

**Mr. Dale's Social Media**

62      Mr. Dale created the Twitter account @42_Capital_Mgmt on March 22, 2021, while still employed as a Managing Director of Hedgeye.  His profile prematurely stated, "former managing director of Hedgeye."  Mr. Dale later renamed the Twitter account to @42macroDDale.

63      In late March 2021, while still employed at Hedgeye, Mr. Dale updated his Twitter profile to "Founder and CEO of 42Macro."  He posted a Tweet that he was starting his own research business the first business day after his resignation from Hedgeye.  He then posted

"we're live! 42macro.com," and nearly immediately began posting charts, graphs, and commentary regarding his research (including Hedgeye materials).

64.     On March 25, 2021, Mr. Dale first used LinkedIn to publicly-announce his two new companies, "42 Macro LLC" and "42 Capital Management."  Mr. Dale refers to 42 Macro LLC as an "online financial media company specializing in macro risk management;" Hedgeye sometimes refers to itself as "an independent investment research and online financial media company."

65.     Mr. Dale has used, and has announced his intention to continue to use, Hedgeye's proprietary and confidential information and trade secrets in connection with his competing business.  For example, on April 23, 2021, Mr. Dale sent a mass email from his new 42 Macro email account.  In the email, Mr. Dale disclosed a Hedgeye proprietary output model and presented financial analysis that is derived from Hedgeye's models.

66.     Mr. Dale also posted a screenshot of one of Hedgeye's weekly Rise & Grind e-mails from March 23, 2021.  Mr. Dale did not have permission to share that e-mail with third parties during his employment at Hedgeye, and certainly not to use it to promote his competitive business.

67.     Multiple tweets by Mr. Dale make clear that he is claiming as his own the proprietary models developed at Hedgeye.  For example, Mr. Dale tweeted that Hedgeye's proprietary GIP model "is merely a conceptual framework," and that "[w]hat powers it are the forecasting and backtesting tools I built many years ago."  All of that, of course, was work made for hire and paid for by Hedgeye.

68.     When asked "What tools are you using to create your models," on April 16, 2021, Mr. Dale responded: "The same one I've been using for the last 12yrs: Microsoft Excel."

69.     Mr. Dale has repeatedly falsely told Hedgeye's customers, and his own prospective customers, that he was the "brains" behind Hedgeye, and that "Firms don't produce research; analysts do."

70.     Mr. Dale emphasized this message in another tweet on April 16, 2021.  When asked "Where can we see how your process will differentiate from Hedgeye?", Mr. Dale responded: "The easiest way to spot the differentiation is that Darius '#Quadzilla' Dale no longer works at Hedgeye.  Firms don't produce research, research analysts produce research for firms."

71.     Similarly, in response to a tweet which stated, "No one does a better job modeling the cycle than Hedgeye," Mr. Dale responded: "…. And the guy who built and maintained all those forecasting tools sweeps and mops the floors at @42macro now. #team42 #onwardandupward."

72.     Given the amount of time and effort required to develop the types of models that Mr. Dale is now presenting on behalf of his new company, Mr. Dale could not possibly have developed them independently and without employing Hedgeye's proprietary and confidential information and trade secrets.  In fact, Mr. Dale admits on his Twitter account that he "built them over 12 years."

**Defendant's Competition And Hedgeye's Irreparable Harm**

73.     On April 23, 2021, Mr. Dale linked to a proprietary Hedgeye document he had copied, and posted on his new Twitter account, @42macroDDale: "Would you like to see forward-looking, actionable insights like these hit your inbox around 8am ET each weekday?  If so, please #subscribe when we go live Monday morning.  Thanks in advance for your support!" "Monday morning," in context, refers to Monday, April 26, 2021.

74.     Mr. Dale's brazen and emphatic declarations of his intention to use Hedgeye trade secrets to compete with Hedegeye already has been successful.  For example, some subscribers confirmed on Twitter their intent to switch from Hedgeye to Dale's new firm.  One user responded to @42macroDDale: "Any hints on timeframe and pricing structure?  I want to plan which of my current subscriptions I am going to cancel to afford yours.  Huge fan!  Can't wait to see what you're cooking up."

75.     Another subscriber wrote: "I've read your posts . . . .  I came to the dance with @Hedgeye and I'll remain loyal to them as long as it works for me.  But, a 2nd opinion and view would be worth a look."  Mr. Dale responded: "Fair enough.  I take no offense to you or anyone else for remaining loyal to my old shop.  Just a reminder, however, the guy that built and maintained all of @hedgeye's macro regime #forecasting tools no longer works there.  I'm sure you recall the Cam Newton era in New England . . . ."

76.     Hedgeye subscribers have already commented on Mr. Dale's competition on Twitter.  For example, one user replied to @42macroDDale and @42macro on April 9, 2021: "Hey DD.  Aren't #thegrind and #the process @Hedgeye terms?  Some of us feel like children of divorce and are confused.  I love you and @KeithMcCullough."

77.     Further, one current Hedgeye institutional client and one former Hedgeye institutional client and current mass market client, informed the company on April 25, 2021, that Mr. Dale has asked them to provide a testimonial and reference for Mr. Dale's new business, 42 Macro.  They received text messages from Mr. Dale asking for the testimonial and reference on April 25, 2021.

78.     Mr. Dale has made it abundantly clear that he thinks he is the owner of Hedgeye's proprietary and confidential information and trade secrets, and he intends to use that information

18

to directly compete with Hedgeye by offering the identical services to the identical customers he serviced at Hedgeye.  At a minimum, hundreds of Hedgeye customers are certain to be confused. The financial impact of Mr. Dale's unfair competition would be substantial.  Hedgeye has no adequate remedy at law.

## **FIRST CLAIM**

### **(Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*)**

79.     Plaintiff incorporates by reference the foregoing paragraphs above, as though fully set forth herein.

80.     Hedgeye's trade secrets relate to products or services used, sold, purchased, or transported, or intended for use, sale, purchase, or transcript in interstate commerce across the country and throughout the world.

81.     Hedgeye's trade secrets as described above constitute trade secrets within the meaning of 18 U.S.C. § 1839(3).

82.     Hedgeye's trade secrets that Mr. Dale misappropriated derive economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by Hedgeye's competitors, or to other persons or entities who might obtain economic value from their disclosure or use.

83.     At all relevant times, Hedgeye has taken the above-described reasonable measures to protect the secrecy of its trade secrets that Mr. Dale has misappropriated.

84.     Mr. Dale's actions, as set forth herein, constitute "misappropriation" within the meaning of 18 U.S.C. § 1839(5).

85.     Mr. Dale downloaded Hedgeye's trade secrets by improper means, without Hedgeye's express or implied consent.

86.     Mr. Dale knew or had reason to know at the time he accessed, downloaded, and/or used Hedgeye's trade secrets that they were acquired and maintained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use.

87.     Mr. Dale has failed to return to Hedgeye the trade secrets that he misappropriated. Mr. Dale is retaining and using Hedgeye's trade secrets to compete with and/or otherwise harm Hedgeye.

88.     Mr. Dale's misappropriation has proximately caused damages to Hedgeye, including but not limited to loss of profits, goodwill, competitive advantage, and business opportunities.

89.     Mr. Dale has been unjustly enriched as a further proximate result of his misappropriation of Hedgeye's trade secrets.

90.     Mr. Dale's actions in misappropriating Hedgeye's trade secrets were willful, fraudulent, malicious, and were done with the intent to injure and oppress Hedgeye and improve Mr. Dale's own economic opportunities, thereby justifying an award of punitive damages against Mr. Dale pursuant to 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

91.     Hedgeye is also entitled to temporary, preliminary, and permanent injunctive relief to protect its confidential and trade secret information by: returning Hedgeye's confidential and trade secret files, preserving and preventing Mr. Dale from accessing or in any way using any copies of the files or any files derived therefrom, delivering to his counsel during the pendency of this action any files derived from the files, preserving all evidence, and not using or disclosing any trade secret or other confidential information obtained during his employment by Hedgeye.

## SECOND CLAIM

### (Common Law Misappropriation)

92.     Plaintiff incorporates by reference the foregoing paragraphs above, as though fully set forth herein.

93.     Hedgeye's trade secrets as described above constitute trade secrets within the meaning of the common law.

94.     Hedgeye's trade secrets that Mr. Dale misappropriated derive economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by Hedgeye's competitors, or to other persons or entities who might obtain economic value from their disclosure or use.

95.     At all relevant times, Hedgeye has taken the above-described reasonable measures to protect the secrecy of its trade secrets that Mr. Dale has misappropriated.

96.     Mr. Dale's actions, as set forth herein, constitute "misappropriation" within the meaning of the common law.

97.     Mr. Dale's misappropriation has proximately caused damages to Hedgeye, including but not limited to loss of profits, goodwill, competitive advantage, and business opportunities.

98.     Mr. Dale has been unjustly enriched as a further proximate result of his misappropriation of Hedgeye's trade secrets.

99.     Hedgeye's trade secrets are in continuous use in the operation of Hedgeye's business.

100.    Mr. Dale misappropriated Hedgeye's trade secrets in breach of his Employment Agreement and Hedgeye's Code of Ethics, and through improper means.

101.    Mr. Dale's actions in misappropriating Hedgeye's trade secrets was willful, fraudulent, malicious, and was done with the intent to injure and oppress Hedgeye and improve Mr. Dale's own economic opportunities, thereby justifying an award of punitive damages against Mr. Dale.

102.    Hedgeye is also entitled to temporary, preliminary, and permanent injunctive relief to protect its confidential and trade secret information by: returning Hedgeye's confidential and trade secret files, preserving and preventing Mr. Dale from accessing or in any way using any copies of the files or any files derived therefrom, delivering to his counsel during the pendency of this action any files derived from the files, preserving all evidence, and not using or disclosing any trade secret or other confidential information obtained during his employment by Hedgeye.

## THIRD CLAIM

### (Breach of Contract)

103.    Plaintiff incorporates by reference the foregoing paragraphs above, as though fully set forth herein.

104.    Hedgeye and Mr. Dale entered into a valid employment agreement supported by adequate consideration.

105.    Mr. Dale breached the confidentiality provision of the Employment Agreement.

106.    Mr. Dale breached the confidentiality provision of Hedgeye's internal Code of Ethics.

107.    Mr. Dale breached the non-solicitation provision of the Employment Agreement.

108.    Mr. Dale breached the non-competition provision of the Employment Agreement by preparing to compete and competing while he was still employed at Hedgeye.

109.    Mr. Dale breached the assignment of rights provision of the Employment Agreement.

110.    Hedgeye complied with and fulfilled its obligations under the employment agreement, including under the Employment Agreement and the Code of Ethics.

111.    The employment agreement is lawful and binding upon the parties.

112.    Dale has been unjustly enriched as a further proximate result of his breaches.

113.    As a direct and proximate result of Dale's breaches, Hedgeye has sustained and will sustain direct and indirect damages including special and consequential damages.

**FOURTH CLAIM**

**(Conversion)**

114.    Plaintiff incorporates by reference the foregoing paragraphs above, as though fully set forth herein.

115.    The Price Volume Volatility document is Hedgeye company property.

116.    By deleting the Price Volume Volatility document from his company issued computer, and not saving another copy of it on his company issued computer, Mr. Dale has interfered with Hedgeye's rights in the Price Volume Volatility document.

117.    Hedgeye has reason to believe that Mr. Dale has a copy of the Price Volume Volatility document in his possession.

118.    As a direct and proximate result of Mr. Dale's conversion of the Price Volume Volatility document, Hedgeye has sustained and will sustain damages in an amount to be determined at trial.

119.    Mr. Dale has been unjustly enriched as a further proximate result of his misappropriation of Hedgeye's trade secrets.

120.   Mr. Dale's conduct was intentional, willful and malicious thus justifying the award of punitive and/or exemplary damages.

## FIFTH CLAIM

### (Unfair Competition)

121.   Plaintiff incorporates by reference the foregoing paragraphs above, as though fully set forth herein.

122.   By doing the things described above, Mr. Dale has engaged in unfair competition by misappropriating the results of the labor, skill, and expenditures of Hedgeye.

123.   In misappropriating Hedgeye's trade secrets and confidential information, Mr. Dale acted in bad faith, exploiting commercial advantage which belonged exclusively to Hedgeye.

124.   As a direct and proximate result of Dale's unfair competition, Hedgeye has sustained and will sustain damages in an amount to be determined at trial.

125.   Dale has been unjustly enriched as a further proximate result of his unfair competition.

126.   Dale's conduct was intentional, willful and malicious thus justifying the award of punitive and/or exemplary damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Mr. Dale as follows:

1.   For an Order and Judgment which temporarily, preliminary and permanently enjoins Mr. Dale to return to Hedgeye, and to refrain from further misappropriating, any of Hedgeye's proprietary, confidential or trade secret information;

2.   For an order directing Mr. Dale to account for, and to pay over to Hedgeye, all gains, profits and advantages derived by Mr. Dale from the above-described wrongful acts;

3.      For an award of monetary damages sustained by Hedgeye as a result of Mr. Dale's unlawful conduct, in an amount not yet known, but to be proved at trial;

4.      For an order multiplying or otherwise enhancing any award because of Mr. Dale's willful and deliberate wrongdoing described herein;

6.      For an award of punitive damages resulting from Mr. Dale's unlawful conduct, in an amount to be proved at trial;

7.      For an award of costs of this action and its reasonable attorneys' fees incurred herein by Hedgeye as authorized by law; and

8.      For an award of such other and further relief as this Court deems just and proper.


## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands trial by jury on all issues so-triable.


Dated:      April 26, 2021                          /s/ Eric A. Prager_____

                                                    VENABLE LLP
                                                    Eric A. Prager
                                                    1270 Avenue of the Americas
                                                    New York, NY 10020
                                                    Tel.: 212-307-5500
                                                    Fax: 212-307-5598
                                                    eaprager@Venable.com

                                                    Thomas E. Wallerstein
                                                    (*pro hac vice motion forthcoming*)
                                                    101 California Street, Suite 3800
                                                    San Francisco, CA 94111
                                                    Tel: 415-653-3750
                                                    Fax: 415-653-3755
                                                    twallerstein@venable.com
                                                    *Attorneys for* Hedgeye Risk Management,
                                                    LLC