# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HEDGEYE RISK MANAGEMENT, LLC

    Plaintiff-Counterdefendants,

    v.

DARUYS DALE, STEVEN LAMAR, 42 MACRO LLC, NADINE TERMAN, and SOLSTEIN CAPITAL LLC

    Defendants-Counterclaimants

No. 21-cv-3687 (ALC) (RWL)

AFFIRMATIVE DEFENSES
AND COUNTERLCLAIMS

Defendants Nadine Terman ("Terman") and Solstein Capital, LLC ("Solstein") (together with Terman the "Terman Defendants") by their undersigned attorneys, for their affirmative defenses to the third amended complaint of Plaintiff Hedgeye Risk Management, LLC ("Hedgeye" or "Plaintiff"), state as follows:

## FIRST AFFIRMATIVE DEFENSE

The complaint fails to state a claim upon which relief may be granted for the reasons stated in the Terman Defendants' memorandum in support of their motion to dismiss, incorporated here by reference.

## SECOND AFFIRMATIVE DEFENSE

This Court lacks personal jurisdiction over the Terman Defendants.

## THIRD AFFIRMATIVE DEFENSE

The liability asserted in the complaint against the Terman Defendants is secondary and dependent on proof of primary liability against co-defendants Darius Dale and Steven Lamar. The Terman Defendant incorporate by reference the affirmative defenses of their co-defendants, which individually and collectively establish a defense to primary liability.

1

<u>FOURTH AFFIRMATIVE DEFENSE</u>

Plaintiff is barred from asserting claims based on or arising out of their purported contractual relationships with the Terman Defendants, because of Plaintiff's own breaches of those contracts.

<u>FIFTH AFFIRMATIVE DEFENSE</u>

The Terman Defendants were entitled to access the material Plaintiff claims to have been misappropriated by virtue of its contracts with Plaintiff.

<u>SIXTH AFFIRMATIVE DEFENSE</u>

Plaintiff's claims are barred in whole or in part, by the statute of limitations, or the equitable doctrine of laches.

<u>SEVENTH AFFIRMATIVE DEFENSE</u>

Plaintiff's tortious interference claims fail because the Terman Defendants did not act with an improper motive or by improper means.

<u>EIGHTH AFFIRMATIVE DEFENSE</u>

Plaintiff's tortious interference claims fail because the Terman Defendants did not engage in an independent wrong.

<u>NINTH AFFIRMATIVE DEFENSE</u>

Plaintiff's tort claims are barred because the Terman Defendants' actions were justified.

<u>TENTH AFFIRMATIVE DEFENSE</u>

Plaintiff's claims are barred because the Terman Defendants' alleged tortious conduct was too remote or indirect.

<u>ELEVENTH AFFIRMATIVE DEFENSE</u>

Plaintiff's claims are barred, in whole or in part, because the claims asserted are

duplicative.

TWELVTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because it cannot bring tort or other claims for damages for obligations that arise under or are defined by a contract.

THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claim for tortious interference with contract fails because the Terman Defendants did not engage in any improper conduct after formation of the alleged contract.

FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's damages were caused by its own conduct.

FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because, as described in detail in the accompanying counterclaims, Plaintiff acted in bad faith.

SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff waived the right to seek recovery, or is estopped from seeking recovery, through its conduct.

SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's recovery is barred, in whole or in part, due to its failure to mitigate damages.

**COUNTERCLAIMS**

Defendants Nadine Terman ("Terman") and Solstein Capital, LLC ("Solstein") (together with Terman "Counterclaimants") by their undersigned attorneys, for their counterclaims against Plaintiff Hedgeye Risk Management, LLC ("Hedgeye" or "Plaintiff"), state as follows:

## NATURE OF THE COUNTERCLAIMS

1.      These counterclaims arise from the illegal conduct of Plaintiff Hedgeye.  As directed by its key principals, Keith McCullough ("McCullough") and Michael Blum ("Blum"), Hedgeye pursued a vindictive campaign of defamation and character assassination against Terman and her investment firm, Solstein.

2.      Hedgeye made its false and defamatory statements with the objective of harming Terman and Solstein's business. And Hedgeye successfully interfered in Solstein's and Terman's business relationships with clients and business partners, coupling its reputational smears against Counterclaimants with direct and indirect threats of retaliation against others who would continue to do business with Solstein and Terman.

3.      Hedgeye also brought baseless legal claims against Terman and Solstein that it knew lacked legal merit and that were based on factual allegations it knew were false.

4.      Hedgeye brought these frivolous claims not because it sought legally available damages as relief – Hedgeye knows it suffered no losses cognizable in law – but instead to achieve illegitimate and collateral objectives. These objectives include gagging Terman's regular contributions on the popular CNBC investment news network, appearances that enraged McCullough, who bears a deep, longstanding animus against the network and its contributors. It also involved exploiting the existence of this legal case against Terman and Solstein in a desperate effort to bolster its settlement leverage in a failing lawsuit it brought against co-defendants Darius Dale, 42 Macro, and Steven Lamar, asserting misappropriation of non-existent "trade secrets" that Hedgeye can neither coherently explain nor qualify after a year and a half.

5.      Before Hedgeye turned its ire against Counterclaimants, Solstein had subscribed to Hedgeye's services, paying $420,000 from 2017-2021. However, Counterclaimants signed up for

those services based on Hedgeye's false pretenses, false representations, and key omissions. Most troubling, Hedgeye's "Real Time Alerts" ("RTAs") stock trading recommendations facilitated trading ahead of subscribers in the recommended stock.  By the time Solstein and other subscribers received many of these RTAs, the recommended trading opportunity was gone, because of the unusual sharp price movements and trading volume in the recommended security outside of normal trading patterns in the preceding minutes of the RTA.

6.      Hedgeye's improper conduct has caused significant harm to Terman and Solstein. In addition to over $420,000 paid to Hedgeye for its services based on fraudulent inducement, Counterclaimants have suffered reputational harm, loss of business revenue in excess of $3.4 million and loss of business opportunities worth millions of dollars more.

## PARTIES

7.      Terman is a resident of Palo Alto, California. She is a co-founder and a Managing Member of Solstein.

8.      Solstein is a limited liability company registered in the state of Delaware. Its principal offices are located in California and its members are all citizens of California or Florida.

9.      Hedgeye is a Delaware limited liability company with its principal place of business located at 1 High Ridge Park, Stamford, CT 06905. On information and belief, Hedgeye's members are citizens of the states of Connecticut and/or New York. On information and belief, Hedgeye's members are not citizens of California or Florida.

5

## JURSDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. §1332(a) because Counterclaimants are citizens of California and Florida, Plaintiff is a citizen of other states, and the amount in controversy exceeds $75,000.

11.     This Court also has subject matter jurisdiction under 28 U.S.C. §1367 because the counterclaims are sufficiently related to the claims in the action within original jurisdiction.

12.     This Court has personal jurisdiction over Plaintiff because Plaintiff consented to the jurisdiction of this Court by filing its own actions against Counterclaimants.

## FACTUAL ALLEGATIONS

### A.  Solstein's Business

13.     Solstein is an SEC-registered investment adviser that provides investment advisory services on a discretionary basis to a private fund and separately managed clients, such as high net worth individuals, family offices, and institutions.

14.     Solstein was founded as an independent investment firm in 2010. Its co-founders and current Managing Members are Terman, J.C. Torres, and Sandra Southworth. Collectively, they have over 70 years of investment experience. In 2011, they launched the firm's first investment vehicle.

15.     Solstein sources the majority of its investment ideas and themes through the views, perspectives and experiences of its Managing Members. Starting with only $5 million dollars in Assets Under Management ("AUM") in August 2011, Solstein over the next decade worked hard to grow the firm, which now manages hundreds of millions of dollars for its clients.

16.     Solstein and its principals have been leaders supporting diversity initiatives in the industry, launching the conference that has become 100WF's Global FundWomen Week,

spearheading Bloomberg's Diversity Drives Returns events, participating in Bloomberg's New Voices program, and participating in CNBC's NEXT program.  Terman has served as keynote speaker for Bloomberg's annual diversity conference.

17.    In 2019, Terman began appearing regularly on Bloomberg and CNBC (after participating in their New Voices and NEXT programs, which seek to train and increate diverse participation across their media platforms.) Terman and Solstein have been consistently committed to furthering diversity in the investment industry and encouraging participation and leadership roles from professionals with diverse backgrounds.

18.    Beginning in February 2021, Terman became a regular paid contributor on the CNBC show "Fast Money," an hour-long program airing each weekday in the key 5PM - 6PM Eastern time slot, covering key market events of the day.  Terman typically appeared on Fast Money once or twice per week. She also made occasional appearances on other CNBC shows, including Closing Bell and Options Action.

19.     Terman's CNBC appearances are a key driver of brand awareness for Solstein and for her personally. They gave her and Solstein exposure to hundreds of thousands of viewers that they would not otherwise have had access to, and because the CNBC media properties have global reach and post clips to globally-available social media, it gave them access to people from all over the world.

20.    The CNBC appearance also led to invitations to other industry events and opportunities, further expending Solstein's reach.

**B.  Solstein Was Fraudulently Induced Into Subscribing to Hedgeye**

21.    Hedgeye provides research services and investment recommendations to individual and institutional investors.

22.     In 2017, Solstein executed a services agreement with Hedgeye (the "Agreement").

23.     Solstein entered into the Agreement relying on Hedgeye's representations that Hedgeye was complying with applicable regulatory requirements and that it had disclosed all conflicts of interest. Those representations were incorporated in the Agreement, under which Solstein acknowledged receipt of Hedgeye's Form ADV before execution.

24.     Each year Solstein received additional, revised Hedgeye Form ADVs (the "ADVs"), as filed each year by Hedgeye and required to be distributed to clients.

25.     However, Hedgeye's ADVs contained materially false representations and key omissions about Hedgeye and its regulatory compliance. They also mispresented and failed to disclose blatant conflicts of interest between Hedgeye and its affiliates on the one hand, and subscribers such as Solstein on the other.

26.     Had the ADVs accurately and properly disclosed the truth, including Hedgeye's conflicts of interest and the facilitation of trading ahead of subscribers and had Counterclaimants been aware that certain material Hedgeye representations had been materially false, Counterclaimants would not have agreed to execute the Agreement and purchase Hedgeye services.

27.     Form ADV requires disclosure of conflicts of interest. Hedgeye's ADVs failed to disclose critical and material conflicts of interest. They also contained affirmative misrepresentations of these conflicts.

28.     Hedgeye's most egregious conduct is its advance facilitation of trading in the securities it recommends, a practice that allows for lucrative financial benefits for Hedgeye insiders, affiliates, business partners, and/or select clients, but renders many of those alerts effectively useless and potentially damaging for other "non-insider" subscribers.

8

29.    Hedgeye tells its subscribers that its RTAs are "an indispensable trading tool" that "takes our research team's basket of top long and short ideas and helps you risk manage them like a portfolio manager." A key selling point is that the RTAs are supposed to identify the best trading opportunities ("the juiciest stock and ETF ideas") in real time. The RTA discloses a recommended security, a buy or sell recommendation, a recommended price, and a time stamp.

30.    In many instances, however, by the time a Hedgeye subscriber receives the RTA, the proposed trading price is no longer available, because, on information and belief, Hedgeye insiders, affiliates, business partners or select clients avail themselves of the trading opportunity before other subscribers can take advantage of the RTA.

31.    Each RTA bears a time stamp. However, there is a delay of several minutes between the RTA time stamp and the receipt of that alert in the inbox of a Hedgeye subscriber. As a result of that delay, many trade alerts recommended by Hedgeye to its paying subscribers could not be executed by the subscribers on the terms indicated in the alert because of intervening price movements against the subscriber.

32.    In many cases, the intervening price movements are extreme and far out of proportion with normal trading patterns for the security.

33.    By way of example, on September 7, 2022, at 12:25 PM, Hedgeye issued an RTA recommending the sale of security Krispy Kreme ("DNUT") at $12.16. The typical subscriber would receive that RTA several minutes later, no later than 12:27 PM. However, by the time, the subscriber received the RTA, the selling opportunity had been lost, with the price having already plunged from $12.16 to $11.95.



34.    In addition to the unexplained sharp price movements, the affected securities also may experience unusually high trading volume spikes in the minutes after an RTA was stamped but before it was received by most subscribers.  For example, immediately after Hedgeye stamped the DNUT alert, trading volume increased from a few thousand shares per minute to over 120,000 shares. Approximately 180,000 DNUT shares had traded between the time Hedgeye stamped the RTA and certain subscribers received notice in their email boxes.

35.    The trading ahead that occurred in DNUT is not unusual. Review of historical RTAs indicates that it occurs for many Hedgeye alerts, resulting in price and volume charts with similar spikes and volumes.

36.    Hedgeye actively markets its RTAs.  Hedgeye often publishes a subset of performance data that is advantageous to Hedgeye and is misleading to clients and potential clients.

The time periods marketed are inconsistent and often do not include all historical data, without qualification.

37.     Hedgeye has set up the RTAs in such a way as to provide motive, means and opportunity to facilitate trading ahead of ordinary subscribers.

38.     On information and belief, one of the beneficiaries of these RTAs is Sierpinski Capital Management, LP ("Sierpinski"). Sierpinski and Hedgeye are under the common ownership and control of McCullough, Hedgeye's CEO. After Sierpinski's former CIO left the firm in the fall of 2021, McCullough is the only named investment professional on Sierpinski's ADV in Sections A and B, suggesting he is the de facto CIO of Sierpinski. Blum is the President of both entities, meaning that both are under common operational direction. Hedgeye has repeatedly marketed Sierpinski to subscribers.

39.     On information and belief, another beneficiary of these RTAs is McCullough, who regularly refers to his capital as a "McCullough Family Office" or "MOFO" or "PA".

40.     In 2021, Hedgeye made changes in its Code of Ethics governing employee trading practices, raising the question of whether the extreme and irregular trading patterns around its recommended securities contributed to the change.

41.     Hedgeye's undisclosed conflicts of interest and facilitation of trading ahead of subscribers significantly compromised the value and usefulness of their services, and had Solstein known the true facts, it would not have executed the Agreement and it would not have continued to purchase services from Hedgeye through 2021.  Moreover, Solstein's clients may have been harmed by these conflicts of interest and unethical practices.

42.     The ADVs also contained material misstatements and omissions concerning Hedgeye's compliance with state and federal securities regulations.

11

43.     Notable among these compliance shortfalls is Hedgeye's failure to register with required state or federal securities regulators. Hedgeye is only registered as an investment adviser in one state, Connecticut.  Because Hedgeye has numerous clients in many other states, it should have registered either with the SEC or individually with all states that have state registration requirements for investment advisors with customer thresholds in the state. Hedgeye has not done so.

44.     Hedgeye also claims in its ADVs not be subject to registration under the Advisers Act of 1940 on the ground that it is solely engaged in research and "[p]ublication of periodicals or newsletters." However, Counterclaimants have since learned that Hedgeye is not entitled to this "newsletter" exception. First, Hedgeye's work for and marketing of Sierpinski is inconsistent with the exception. Sierpinski's ADV filing demonstrates that its portfolio construction, research effort, and investment process is based on Hedgeye products and services and Hedgeye principals historically have marketed Sierpinski to its media viewers.  Second, Hedgeye is not simply providing a newsletter-like service to its subscribers.  It advises on preferred position sizes for specific securities, without regard to individual financial situation and risk tolerances. It also provides selected institutional clients with one-on-one access to research analysts and senior management of Hedgeye that discuss information outside the scope of Hedgeye's published research.

45.     By falsely claiming entitlement to the newsletter exception, Hedgeye is able to circumvent marketing rules it otherwise would have to follow.

46.     Hedgeye's ADVs have historically misrepresented other material facts, including, among others, falsely representing that it did not recommend position sizes from 2017-2021, when

in fact it was doing so, and falsely representing that its fundamental analysis was not designed to generate specific security Buy and Sell recommendations, when in fact it was doing so.

47.     Had Solstein known the true facts about Hedgeye's misconduct, it would not have executed the Agreement and it would not have continued to purchase services from Hedgeye through 2021.

### C. Hedgeye's Turns Hostile Towards Terman and Solstein Because of Terman's Involvement with CNBC

48.     Prior to Terman's appearances on CNBC, Hedgeye and its principals viewed her positively and even hosted interviews with her on their Hedgeye TV platform.

49.     However, Terman's appearances on CNBC prompted harsh responses from Hedgeye, most notably from its CEO Keith McCullough.

50.      McCullough had made appearances on CNBC programs as well as other media outlets, but the firm increasingly adopted a tone of paranoid hostility towards mainstream financial news sources.  For example, on March 3, 2022, Daryl Jones of Hedgeye tweeted (and Blum Retweeted): "CNBC CNN FOX News Bloomberg Real Vision Business Insider Zero Hedge All news organizations that have blackballed @Hedgeye…yet we still get bigger and stronger."

51.     Since cutting ties with CNBC, McCullough has consistently and regularly denigrated the network, peppering Hedgeye company communications with extremely insulting attacks against CNBC and its programs.  By way of example, these includes statements by that "CNBC Pumped B.S. Into Your Head For Decades; Time To Dump It," that CNBC shows are akin to a "circus" or a "zoo," and that on-air CNBC talent are "donkeys" or "monkeys."

52.     On information and belief, McCullough and Hedgeye's animus towards CNBC appears to have been motivated at least in part by their belief that Hedgeye competes with the network. Hedgeye's offerings include daily video shows sent to subscribers under the branding

"Hedgeye TV", containing market analysis, research, and opportunities for Q&A with McCullough. Hedgeye views these offerings as competing with CNBC, to the point that in a January 19, 2022 press release, Hedgeye announced that: "If CNBC is the 'Blockbuster [Video] of Wall Street, we're Netflix."

53.    McCullough's appearances on Hedgeye TV regularly contain attacks on and denigrating references to CNBC and its employees and contributors.

54.    McCullough is obsessed with CNBC and its contributors, even though he denigrates them publicly.  He regularly listens to CNBC during his drive to work, which he discusses on Hedgeye media platforms.  Hedgeye also has a large TV screen above the employee workforce that regularly plays CNBC all day long, which often can be seen during its live shows.

55.    Upon learning of Terman's appearances on CNBC, Hedgeye became extremely hostile.  McCullough became more obsessed with Terman, reflecting his obsession with CNBC.

56.    Hedgeye senior officers McCullough and Blum began making defamatory statements about Terman on the Hedgeye TV platform, falsely accusing her of plagiarizing him and using McCullough's ideas, based on her use of generic industry terms such as "implied volatility" and "upside/downside."

57.    McCullough published these false accusations in other forms.  On February 10th, 2022, McCullough tweeted "Her copying my language and process wasn't subtle."

58.    McCullough's accusations, made on the Hedgeye TV platform in his capacity as Hedgeye's CEO, were false. CNBC's Fast Money is a one-hour show that airs an hour after the market close each day and focuses on the most active stocks and news flow of that trading day.  It is an unscripted show, and potential topics were not confirmed until minutes before the contributors would need to connect with CNBC to prepare for the show's start, with actual

14

discussions being impromptu, and with the producer regularly changing show topics during commercial breaks. Accordingly, Terman and her colleague would connect several times each day and propose data and points to be made, if the opportunity arose, but without knowing how the show would progress.

59.    McCullough knew that his accusations of plagiarism against Terman were false. As a former guest on media platforms such as Fox Business, CNBC and Bloomberg, and as a frequent viewer of Fast Money, he was fully aware of shows' focus on the most recent market events and knew that Terman could not be contributing to the show simply by "copying" his process.  He also knew that neither he nor Hedgeye enjoyed any proprietary right or special claim to generic industry terms like "implied volatility," "growth", "inflation", "upside," "downside," or "risk ranges."

60.    For example, McCullough tweeted about Terman that: "There is a CNBC contributor in particular…if you can bear listening to her terrible stock picks, she tries speaking my Quad language" along with a retweet of CaffeineAddict Java/Joe "OK…@KeithMcCullough not sure if you're listening to CNBC but one of analysts just used your "Goldilocks" explanation almost verbatim…someone is a subscriber over there". As McCullough knew when he tweeted this false accusation, he did not invent the use of the "Goldilocks" metaphor for financial markets; the economist David Shulman is commonly given credit for coining the phrase "Goldilocks economy" in an often-cited 1992 article.

61.    Although Hedgeye's CEO falsely accused Terman of plagiarism in allegedly appropriating "my Quad language", Hedgeye's knew that claim to be false.  Hedgeye's own marketing material acknowledges the widespread use of the simplistic Quad framework, which was developed and popularized not by Hedgeye but by "billionaire investor and Bridgewater

15

founder Ray Dalio." As McCullough later admitted on March 30, 2021, The Macro Show: "Getting the Quads is easy. It's a 2 by 2 model. It's a rate of change of growth and inflation…"

62.    Hedgeye's CEO also falsely accused Terman of taking credit for general financial terms. On March 4, 2022 McCullough tweeted "Thank you  People using my #process language is a compliment, unless they're claiming that they made up the language on their own  See @NadineTerman on what not to do-lacks #integrity to the core". When McCullough tweeted this false accusation, he knew that Terman never claimed she originated general financial terms.

63.    Nonetheless, Hedgeye persisted in falsely accusing Terman of imitating Hedgeye's "process." On February 10, 2022 Blum tweeted: "Terman has also continued to promote herself and Solstein Capital on @CNBC using the Hedgeye process implemented through 42 Macro, while aware that Hedgeye does not approve of her doing so without crediting Hedgeye" Blum made this statement even though he knew that Hedgeye approach is not unique, but broadly known and used across the industry with investors creating their own versions of similar work. As McCullough stated on another occasion: "When you put it together with how you play the game…It's not something that someone can actually steal or copy from you. It's something that you can make your own."

64.    McCullough and Hedgeye nonetheless published their false and defamatory statements against Terman out of malice, to harm her business reputation and to harm Solstein's business. They did so to punish Terman and Solstein for their relationship with Hedgeye's perceived business rival, CNBC.

65.    From March 23, 2021 through April 1, 2021, Terman corresponded with Hedgeye about Solstein's subscription renewal for Hedgeye services, asking for additional information. She had learned that Hedgeye was offering a heavily discounted offering similar to Solsteins'. Also,

16

Solstein was not given access to new offerings to which other subscribers had access. Upon learning the Dale was leaving Hedgeye, Solstein wanted to understand Hedgeye's plan for their macroeconomic offering, which was an important part of Solstein's subscription.

66.     On March 31, 2021, McCullough had already decided to cut Solstein off from Hedgeye's services in retaliation for her CNBC appearances. As McCullough falsely published in a March 30, 2021 email to Blum and Brian Jones "And did Solstein really put us on "hold"? I'll fire her – she literally copied my process (and ideas like DUFRY)."

67.      The following day, April 1, 2021, unaware of Hedgeye's decision to retaliate against her, Terman informed Hedgeye that she had decided to go ahead with the Macro Pro subscription for the next quarter and requested additional subscriptions to four industry sectors under the Hedgeye Sector Pro service.

68.     About an hour later, Hedgeye responded, refusing to honor the subscription request and terminating all existing services to Terman and Solstein.

### D.  Hedgeye's Abuse of Legal Process

69.     On April 26, 2021, Hedgeye filed a federal lawsuit against Darius Dale, principally alleging trade secret misappropriation. The lawsuit was accompanied by a bitter and highly personal social media attack campaign against Dale that continues to this day, using epithets and accusations of criminality in a scorched earth effort to destroy his reputation in the industry.

70.     Hedgeye's conduct extended to posting confidential documents obtained from Dale in discovery on social media platforms.  Hedgeye's President, Michael Blum, justified this conduct by the explanation that he was "chomping at the bit" to reveal the discovery materials to the public and that he had "ran of patience with the lawyers" waiting to receive permission to do so.

71.     Although Hedgeye began its lawsuit against Dale by alleging an emergency requiring expedited treatment, once the lawsuit began to focus on its lack of bona fide trade secrets,

17

Hedgeye reversed its tactics, employing a series of delay tactics to put off the deadline for filing an expert report substantiating its trade alleged secret allegations.

72.    As part of its strategy of divert and delay, Hedgeye also filed a baseless lawsuit against Counterclaimants.

73.    Hedgeye filed the lawsuit against Counterclaimants knowing that the principal allegations were false and that it had no valid legal claims against them.

74.    For example, the original complaint filed against Counterclaimants contained numerous allegations that Hedgeye knew were false based on their receipt and review of discovery materials in the Dale litigation, as well as their internal communications, including but not limited to: (a) falsely accusing them of ownership interests in 42 Macro when Hedgeye knew they held no such interest; (b) falsely accusing them of "inducing" Dale to leave Hedgeye when Hedgeye knew that Dale had previously informed them of his intention to leave over a week before Dale spoke with Terman; (c) falsely accusing them of accessing Hedgeye "source files" based on evidence of a file name that Hedgeye knew to be associated with an output file, not a source file; (d) falsely accusing Solstein of firing Hedgeye as a service provider.

75.    After warnings from Counterclaimants, although Hedgeye's third amended complaint eventually withdrew some of these factual misrepresentations, the damage had been done, and Hedgeye still retained others, including the false allegations of inducing Dale's departure and the false allegations of accessing Hedgeye source files.

76.    Hedgeye did not file the lawsuit against Counterclaimants for the purpose of obtaining redress and relief authorized by law. Hedgeye knew that not only did its lawsuit lack a valid factual and legal basis, but that it had suffered no articulable losses or damages as the result of the conduct falsely alleged in its suit.

18

77.     Hedgeye's true motivation for suing Terman and Solstein was to achieve collateral, illegitimate and extra-legal benefits.

78.     First, Hedgeye knew that suing Terman and Solstein would cause CNBC to suspend Terman's appearances, thereby retaliating against her and punishing her for establishing a relationship with the network they so hated. To ensure this result, Hedgeye created a press release with defamatory falsehoods and highlighted the CNBC name, and Hedgeye deliberately attached an @CNBC/Fast Money to the defamatory statements in made on Twitter about Terman and Solstein.

79.     On February 10th, 2022, Hedgeye tweeted and Blum re-tweeted directly to @CNBC FastMoney a link to their press release with the defamatory and incorrect claims.

80.     Second, fully aware of the legal weaknesses of its trade secret suit against Dale, Hedgeye sought to use the lawsuit against Terman and Solstein to gain settlement leverage against the Dale defendants, threatening them with an expansion of the scope of the lawsuit and further delays in reaching a decision.

81.     Third, because of Hedgeye's animus towards Terman, Hedgeye sought to use the lawsuit against the smaller firm to exhaust its resources and spread false information to existing and potential clients.

### E. Hedgeye's Vicious Campaign of Character Assassination Against Terman and Solstein

82.     Consistent with the extra-legal intent of its lawsuit, Hedgeye further engaged in a social media campaign of character assassination against Terman and Solstein. Hedgeye openly boasted that one purpose of its social media attacks was to harm the Counterclaimants' business and cause client defections.

19

83.    Hedgeye's attacks on Terman and Solstein, which dated back to her first appearance on CNBC the prior year, accelerated after its lawsuit was filed.

84.    Roughly simultaneously with the filing of the lawsuit, Hedgeye released a press release on prnewswire including defamatory statements Hedgeye made despite knowing they were false, accusing Terman of "developing a plan" to "steal Hedgeye's trade secrets," and falsely claiming claimed that Terman and Solstein had "directly accessed" Hedgeye trade secrets.

85.    This included the false statements in the February 9, 2022 prnewswire press release, stating that:

- "Terman demonstrated a pattern of exploiting her relationship with Hedgeye to misappropriate the firm's intellectual property. After becoming a CNBC contributor in 2020, she was known to use Hedgeye's unique jargon and nomenclature, parrot Hedgeye's market predictions, and reference Hedgeye's research without credit given to Hedgeye."

- "Seeing an opportunity to end Solstein's reliance on Hedgeye in March of 2021, Terman contacted then-Hedgeye Macro Analyst, Darius Dale. Together, they developed a plan to exploit Hedgeye's intellectual property whereby: 1) Dale would steal Hedgeye's trade secrets 2) Dale's and Terman's partner and co-conspirator Steven Lamar would finance and manage the launch of Dale's competing business, "42 Macro" and 3) The competing business would "sell" virtually identical research to Solstein Capital that Solstein had been buying from Hedgeye."

- "Terman, Dale and Lamar launched their competing company, "42 Macro," whose entire business consists of selling research derived from stolen Hedgeye financial

20

models, just days after Dale's resignation. At the same time, Terman ended Solstein's subscription to Hedgeye's research.

86.     In addition, also in the February 9, 2022 press release, Blum went on the record directly to falsely accuse Terman and Solstein of "stealing" and "destroying evidence to conceal wrongdoing," characterizing their conduct as "depraved, egregious, and immoral": "It's shocking how depraved, egregious & immoral the action of these particular individuals were. Stealing is not acceptable when conducting business in our country. Destroying evidence to conceal wrongdoing should not be tolerated in the US legal system."

87.     Hedgeye knew that these statements were false, and the press release was based on falsehoods, when they made them.  Having reviewed the evidence obtained in discovery – and in some cases having improperly disclosed them on social media – Hedgeye knew that there was no evidence that Terman and Solstein had stolen anything or destroyed evidence. Nonetheless, it deliberately made these false statements of fact with malice and the intent to harm Terman and Solstein's reputations and to cause business harm.

88.     Unfortunately, Blum was just getting started.  Over the following weeks, he issued a torrent of false and defamatory statements on Twitter against Terman and Solstein, with the malicious intent of destroying their reputations.  These included:

- On February 11, 2022, Blum tweeted: "Here the smoking gun.  We have the documents in BLACK & WHITE – though they don't want you to see them. Terman advised & actively worked with Dale to destroy evidence of his misconduct prior to Dale's resignation, even offering Solstein's services to help conceal his theft".

21

- On February 24, 2022, Blum published a tweet on the Twitter social media platform, falsely claiming that "On April 26, 2021, Terman and Solstein Capital, through 42 Macro, began publishing content based on models derived from Hedgeye's trade secret source models." Blum knew that Terman and Solstein had no financial interest or control over 42 Macro and that they had never published models containing Hedgeye content.

- The same day, Blum also published another tweet falsely claiming that: "Terman conspired with Dale as to how they might get around that 'technicality' of Hedgeye owning intellectual property."

- The same day, Blum also tweeted "…she & her firm engaged in conduct unimaginable for a trusted-client-conspiring to steal Hedgeye's trade secrets,"

- On February 24, 2022, Blum tweeted and then McCullough retweeted a misleading statement meant to confuse readers and clients "After his extensive copying of @Hedgeye confidential info & trade secrets to his personal Dropbox, Dale & Terman both shared access to a folder in Dropbox named "42 Macro." Terman & Solstein thereby themselves directly acquired Hedgeye's confidential information & trade secrets." Both McCullough and Blum knew that (i) the Dropbox folder was not the same as that on Darius' computer, (ii) confidential files and trade secrets were not saved to the shared Dropbox, and (iii) Solstein has not had access to the files.

- On February 25, 2022, Blum tweeted the false claim that "Terman and Solstein thereby themselves directly acquired Hedgeye's confidential information and trade secrets."

22

- On March 1, 2022, Blum retweeted a tweet from "CaffeineAddict Java/Joe," stating that "When a judge takes your request for a gag order & tells you to pound sand that's a pretty good indication you're full of shit Nefarious & @NadineTerman. He's telling you everyone should know you conspired to hijack @KeithMcCullough model." Blum retweeted the statement without further clarification, even though he knew Terman had made no request for a gag order and that this Court had made no finding of conspiracy or wrongdoing by Terman.

- On March 1, Blum tweeted two links to its press releases and then wrote: "I've posted a lot of the verbatim rulings & complaints w/ evidence. The most important: i) Judge Carter already ruled @Hedgeye is likely to prevail on the merits & ii) Dale repeatedly lied and had to be cautioned by the court." The tweet was followed by a pictorial link to the press release. Blum knew when he made this statement that Judge Carter had not made any ruling concerning Terman and Solstein.

- On March 11, 2022, Blum tweets after stating that Dale's misappropriation is "literally undisputable" about Counterclaimants. Similarly, Dale has produced evidence irrefutably establishing the active participation of Defendants Nadine Terman and her company Solstein Capital."

89. Hedgeye principal McCullough actively joined in the vicious campaign of abuse:

- McCullough retweeted about Terman and Solstein on February 9, "Thieves are never sorry they stole. They are sorry they got caught. What I read today proves that."

- On February 12, 2022, McCullough tweeted "Terman left Blum Capital (where she was a bottom up stock picker, not a Macro investor)… And basically had no

23

research team at Solstein (initially) -then she started using mine…" Solstein has maintained a similar size investment team over its history, contrary to this statement.

- On February 14, 2022, McCullough retweeted "of course anything over 31 is in the "uninvestible bucket" clearly she couldn't say F*ck bucket on @CNBC so she stole the next best HE description (emoji)"

- On February 25, 2022, McCullough retweeted Blum's false claims that Terman and Solstein had "directly acquired" Hedgeye trade secrets from Dale, adding "Shame on you Nadine Terman."

- On February 25, 2022, McCullough retweeted a tweet by Blum stating "In other words, Hedgeye's customers were not just targets of Terman, Dale and Lamar, they were the prime targets. Terman knew and intended that by supporting 42 Macro, she would damage Hedgeye."

- On March 1, 2022, McCullough retweeted "Nefarious has teammates…a co-conspirator, I mean Co-CEO @Nadine Terman & an analyst team. Plagiarism & Copy/Paste, they've been central to his platform & research. Integrity unfortunately, failed the recruiting process, reminded him of @KeithMcCullough's "racist team"."

- McCullough falsely tweeted March 3, 2022, that: "We know how valuable my process is. Its why @Nadine Terman was keen to conspire to steal it" in response to Rahul Deodhar's reply to McCullough "That Vol of Vol bit is quite crucial-that is ONE secret sauce (and lots of data streams, tracking wide array of market variables, etc.) each either confirming or not what the markets are telling us.

24

Mandelbrot talked about this a lot." As Hedgeye's marketing has repeatedly confirmed, Benoit Mandelbrot in the 1970's began to make the world aware of fractals, or repeating patterns that occur in nature as well as in various financial returns. In his 2004 book, which McCullough has often mentioned, *The (Mis)behavior of Markets*, Mandelbrot explained the relevance of fractals to trading securities and discussed the idea of volatility clustering. When McCullough posted his March 3, 2022 tweet falsely accursing of Terman of "conspiring to steal" his "process," he knew that the process he referred to was not "his" but rather his repetition of Mandelbrot's published and publicly available ideas.

90.    Each and every one of these statements were made by Hedgeye with the knowledge they were false and the malicious intent to cause injury to the reputations and business of Terman and Solstein.

91.    McCullough and Blum both trumpeted Hedgeye's intent and purpose to force Terman off CNBC.

- On February 9, 2022, McCullough Retweeted "The scumbags they let on @CNBC seem to be getting worse and worse…"

- On February 10th, 2022, Hedgeye Tweeted and Blum Retweeted, "Dear @CNBCFastMoney, We know it's been years since @KeithMcCullough appeared on your show/network. In case you were wondering why so much of what you've been hearing recently sounds like Keith, here's your answer! …you can read all about it (link to Hedgeye press release, picture of Terman).

- On February 10, 2022 McCullough retweeted "Damning evidence. Screwed by an employee and two clients. "Oh what a tangle web we weave when first we practice

25

to deceive" their actions reveal incredible misjudgment and hence terrible advisors. I would hope CNBC will ban Nadine  Case closed"

- On March 3, 2002, Blum boasted that Hedgeye's lawsuit had succeeded in removing Terman and Solstein from CNBC. Blum tweeted "…It appears, that following our suit against Nadine Terman & Solstein Capital, @CNBC has not had her on the air."

- On May 2, 2022, McCullough tweeted "Indeed.  I do not believe she's appeared on CNBC since @mablum proceeded with the evidence"

92.     Each and every one of these statements were made by Hedgeye with the knowledge they were false and the malicious intent to cause injury to the reputations and business of Terman and Solstein.

93.     Hedgeye also threatened Terman and Solstein's existing and potential business partners and clients and pressured them to cease doing business with Counterclaimants, threatening them with retaliation if they did not accede to Hedgeye's demands.

- For example, in response to a Hedgeye subscriber who asked to be kept out of the personal attacks against Terman, Blum threatened retaliation, stating that "[p]eople should be aware of the choices you are making."

- Blum tweeted "I do wonder what Solstein clients' have to say about all of this… (picture of confidential discovery)".

- On February 10, 2022, Blum retweeted "Hey @AndreasSteno, just wanted to give you a heads up on who the "analyst" you were on @RealVision w…@KeithMcCullough & @mablum have watched @RaoulGMI bury his head in response to this, he had NO one else that could match KM's knowledge so he settled

26

for the one that stole it." "What say you @RaoulGMI @ttmygh @AshBennington @RealVision. You talk abt being the honest alternative to MSM. Opine abt their dishonesty lack of accountability, yet consistently bring back Darius Dale who conspired w @NadinTerman, @steve7lamar to hijack @KeithMcCullough models."

- Blum also admitted via Twitter that on February 11, 2022, he had knowingly spread his falsehoods to Solstein clients, boasting that "I've already heard from a Solstein LP who is considering to pull money from the firm."

- On February 11, 2022, Blum tweeted "If you were involved, if you assisted, aided, and/or abetted we are coming after you & you will be publicly exposed."

- On February 9, 2022, Blum gratuitously sent their false and misleading press release about their lawsuit against Terman and Solstein to Raoul Pal, principal of Real Vision. Pal, however, responded by stating that "you do not have the right to demand that we either don't work with a person or remove their content." Blum responded with a tirade replete with blatant lies and extortive threats against Pal if he did business with Terman and Solstein: "However, we are not in a divorce. That matter has essentially been settled by the court. We are now in corporate espionage territory. If you cannot accept that the judge has already resolved the IP theft / misappropriation matter, then we are headed in the wrong direction. … Our complaint against Terman and Solstein Capital is backed by hard evidence uncovered during discovery. We have a conspiracy of highly unethical people who represent the worst of our industry. . . . Its not going to be possible for us to partner with businesses that fail to recognize this."

27

- The statement to Pal that Terman and Solstein had engaged in "corporate espionage" was false and Blum knew it was false. The statement "the judge has already resolved the IP theft / misappropriation matter" was also false. The statement that: "Our complaint against Terman and Solstein Capital is backed by hard evidence uncovered during discovery" was also false. In fact, Blum knew that the 'hard evidence" uncovered during discovery contradicted many key allegations of its complaint against Terman and Solstein.

94.    Sure enough, two high net worth Solstein clients did withdraw their accounts from Solstein and one institutional client withdrew a pending $100 million contract with Solstein. The known falsehoods within Hedgeye's filing plus the torrent of false and defamatory press releases, public statements, and known falsehoods published by Hedgeye meaningfully impacted Solstein's business relationships.

**FIRST CAUSE OF ACTION**
**(Fraud in the Inducement – Hedgeye Agreement)**

95.    Counterclaimants repeat and re-allege the allegations contained in all the paragraphs above as though set forth in full herein.

96.    In connection with the Agreement, Hedgeye made false statements and material omission of fact to Terman and Solstein, including:

(a) falsely representing that Hedgeye complied with industry regulations, when it did not;

(b) falsely representing Hedgeye's affiliation with an advisor from 2019-2021;

(c) falsely representing Hedgeye's material conflicts of interest which, upon information and belief, facilitated trading ahead to the disadvantage against Hedgeye subscribers, thus materially degrading the value of its services;

(d) falsely marketing Hedgeye's performance; and

28

(e) falsely representing Hedgeye's services, including position sizing.

97.     Hedgeye knew that the above misrepresentations were false and misleading but made them in order to induce Terman and Solstein to subscribe to Hedgeye's services.

98.     Terman and Solstein relied on Hedgeye's misrepresentation in subscribing to Hedgeye's services. Had Hedgeye told the truth, Terman and Solstein would not have subscribed in the first place, and Solstein would have cancelled its subscription once the truth was known.

99.     As a result of Hedgeye's fraudulent inducement, Terman and Solstein were damaged in the amount of subscriber fees paid to Hedgeye, equaling approximately $420,000. Also, Solstein's clients were damaged due to the conflicts of interest, to an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Tortious Interference with Contract)

100.     Counterclaimants repeat and re-allege the allegations contained in all the paragraphs above as though set forth in full herein.

101.     Hedgeye was aware of Terman's contract to appear as a paid contributor to CNBC. Hedgeye was also aware of at least one client of Solstein who had placed funds with the firm.

102.     As discussed above, Hedgeye deliberately procured the suspension of Terman's appearances by CNBC.

103.     Hedgeye also deliberately procured Solstein clients to pull funds and a contract from Solstein.

104.     In each case, Hedgeye procured the termination without justification, using tortious conduct, and for the sole purpose of inflicting intentional harm on Terman and Solstein. In each case, the third party ended their contractual relationships with Terman and Solstein, respectively, as a result of Hedgeye's interference.

29

105.    As a result, Solstein and Terman have been damaged in an amount to be determined at trial, but in no event less than $3.4 million.

## THIRD CAUSE OF ACTION
### (Defamation)

106.    Counterclaimants repeat and re-allege the allegations contained in all the paragraphs above as though set forth in full herein.

107.    Hedgeye made false statements of fact about Terman and Solstein, as specifically listed in Paragraphs 56-57, 60-63, 66, 84-86, 88-89, 91, and 93 of these counterclaims.

108.    Hedgeye published those statements through official press releases, tweets on the Twitter platform aimed at thousands of followers, and through on-line corporate communications.

109.    Hedgeye made these statements deliberately and maliciously, with knowledge of their falsity, and with the intent to harm Terman and Solstein out of malice.

110.    As a result, Solstein and Terman have had their reputations harmed and suffered the following specific injuries as a direct consequence of Hedgeye's defamation: the loss of the CNBC engagement and the loss of three contracts with a combined investment exceeding $100 million.

111.    Terman and Solstein's monetary damages from Hedgeye's defamatory statements shall be in an amount to be determined at trial, but in no event, less than $5 million.

## FOURTH CAUSE OF ACTION
### (Malicious Prosecution)

112.    Counterclaimants repeat and re-allege the allegations contained in all the paragraphs above as though set forth in full herein.

30

113.    On February 9, 2022, Hedgeye initiated an action against Counterclaimants Terman and Solstein (the "Action").

114.    The Action was brought with malice by Hedgeye, with the knowledge that the Action lacked legal and factual basis, that Hedgeye had no losses or other damages redressable at law, and that the Action had no meaningful chance of success.

115.    Hedgeye brought the Action for malicious, extra-legal purposes, to achieve illegitimate purposes.

116.    Hedgeye dismissed the Action on July 28, 2022.

117.    The Action caused specific and special damages to Terman, including: the loss of Terman's speaking engagement at CNBC and the loss of three of three Solstein contracts and investments worth over $100 million.  On a consequence, Terman and Solstein were monetarily damaged in amount to be determined at trial, but in no event, less than $5 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

a) Enter judgment against Plaintiff-Counter-defendant and in favor of Counterclaimants.

b) Award Counterclaimants their compensatory damages in an amount to be proven at trial.

c) Award Counterclaimants appropriate punitive damages;

d) Award Counterclaimants interest, reasonable costs, attorney's fees, and disbursements;

e) Grant such other relief as it deems necessary and proper.

31

## JURY DEMAND

PLEASE TAKE NOTICE that Counterclaimants demands a trial by jury on all issues so triable.


Dated:  New York, New York
        September 20, 2022

**PRESS KORAL LLP**

By:   /s/ Jason Koral
         Jason M. Koral

641 Lexington Avenue, 13th Floor
New York, NY 10022
tel: (212) 922-1111
fax: (347) 342-3882
cell: (347) 419-0983


*Attorneys for Defendants Nadine Terman and Solstein Capital, LLC*