UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HEDGEYE RISK MANAGEMENT, LLC

     Plaintiff,

    v.

NADINE TERMAN and SOLSTEIN CAPITAL, LLC
    Defendants.

No. 21-cv-03687-ALC-RWL

**MEMORANDUM OF LAW OF IN OPPOSITION TO PLAINTIFF HEDGEYE'S
MOTION TO DISMISS COUNTERCLAIMS**

**PRESS KORAL LLP**
641 Lexington Avenue, 13th Floor
New York, NY 10022
Telephone: (212) 520-8270
Facsimile: (646) 365-3084
jkoral@presskoral.com

## TABLE OF CONTENTS

**Page:**

I.    **Preliminary Statement**.................................................................................1

II.   **Factual Background**....................................................................................2

III.  **Discussion**..................................................................................................4

    A.    Legal Standard .......................................................................................4

    B.    The Counterclaims State a Claim for Fraudulent Inducement to Contract.............5

        1.    The Counterclaims Plead Material Misstatements of Fact With Particularity............................................................................................5

        2.    The Counterclaims Properly Allege Intent ................................................7

        3.    The Counterclaims Properly Allege Reasonable Reliance .........................8

    C.    Hedgeye's Article III Standing Objection is Meritless.............................9

    D.    The Counterclaims State Valid Claims for Defamation .........................12

        1.    The Defamatory Statements Were Stated by Hedgeye as Fact, Not Opinion ..............................................................................................12

        2.    Counterclaimants Need Not Plead Actual Malice, But Have Done So .....15

    E.    Tortious Interference.............................................................................17

    F.    Malicious Prosecution ..........................................................................18

IV.   **Conclusion** ................................................................................................19

## **TABLE OF AUTHORITIES**

**Cases**

*Am. Tissue, Inc. v. Donaldson*, 351 F. Supp. 2d 79, 90 (S.D.N.Y. 2004) ..................................... 12

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ................................................................... 6

*Biro v. Condé Nast*, 883 F. Supp. 2d 441, 461 (S.D.N.Y. 2012) ................................................. 16

*Brookhaven Town Conservative Comm. v. Walsh*, 258 F. Supp. 3d 277, 286 (E.D.N.Y. 2017).. 10

*Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 182-83 (2d Cir. 2000) ..................................... 19

*Cereus Prod. Dev., Inc. v. Boom LLC*, 2015 WL 3540827, at *4 (S.D.N.Y. June 5, 2015) .......... 6

*Chigirinskiy v. Panchenkova*, \2015 WL 1454646, at *16 (S.D.N.Y. Mar. 31, 2015) .................. 6

*Contemporary Mission v. N.Y. Times Co.*, 842 F.2d 612, 617 (2d Cir. 1988)............................. 17

*GateGuard, Inc. v. Amazon.com Inc.*,2023 WL 2051739, at *13 (S.D.N.Y. Feb. 16, 2023) ....... 20

*GeigTech E. Bay LLC v. Lutron Elecs. Co.*, 2019 U.S. Dist. LEXIS 59319, (S.D.N.Y. 2019).... 15

*Genger v. Genger*, 144 A.D.3d 581, 582, (1st Dept. 2016)............................................................. 7

*Gertz v. Robert Welch*, 418 U.S. 323, 344 (1974) ........................................................................ 18

*Giuffre v. Maxwell*, 2017 U.S. Dist. LEXIS 64405, at *23 (S.D.N.Y. Mar. 27, 2017) ............... 15

*In re Weiss Research, Inc. et al.*, Admin Proceeding 3-12341, Release 2525 (June 26, 2006)...... 8

*Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012) .................. 10

*Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 n.7 (2d Cir. 2006)........................................... 16

*Lowe v. S.E.C.*, 472 U.S. 181, 204 (1985) ..................................................................................... 8

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 557 (1992) ................................................................... 12

*Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) .......................................................................... 6

*Pandozy v. Tobey*, No. 06-cv-12885 (CM), 2007 WL 3010333, at *2 (S.D.N.Y. Oct. 11, 2007) 15

*Pasqualini v. MortgageIT, Inc.*, 498 F. Supp. 2d 659, 670 (S.D.N.Y. 2007) ............................... 19

*Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co.*, 420 F. Supp. 3d 123 (S.D.N.Y. 2019) .. 7, 11

*PKG Grp., LLC v. Gamma Croma, S.p.A.*, 446 F. Supp. 2d 249, 251 (S.D.N.Y. 2006) ............. 20

*Prickett v. New York Life Ins. Co.*, 896 F. Supp. 2d 236, 246 (S.D.N.Y. 2012)........................... 10

*Robertson v. Doe*, 2010 U.S. Dist. LEXIS 151305, at \*4 (S.D.N.Y. May 11, 2010).................. 18

*Sparrow Fund Mgmt. v. MiMedx Grp., Inc.*, 2018 U.S. Dist. LEXIS 224028 (S.D.N.Y. 2018).. 17

*Steinhilber v. Alphonse*, 68 N.Y.2d, 283, 292 (N.Y. 1986) ......................................................... 16

*Travelex Currency Servs., Inc. v. Puente Enters., Inc.,* 449 F. Supp. 3d 385 (S.D.N.Y. 2020) ... 11

**Rules**

Fed. R. Civ. P. 8 ....................................................................................................................... 7,11

Fed. R. Civ. P. 9(b) ...................................................................................................................... 7

Fed. R. Civ. P.12(b) ................................................................................................................... 6,9

Defendants Nadine Terman ("Terman") and Solstein Capital, LLC ("Solstein", and collectively with Terman, the "Terman Defendants") respectfully submit this memorandum of law in opposition to the motion to dismiss counterclaims (the "Motion") filed by Hedgeye Risk Management, LLC ("Hedgeye").

## I.    PRELIMINARY STATEMENT

From 2017 to 2021, Counterclaimants paid $420,000 in research fees to Hedgeye, who apparently regarded them as respected clients. But in January 2021, Nadine Terman took a fateful step: she accepted an offer to make weekly appearances on a CNBC show. That stoked the immediate fury of Hedgeye CEO Keith McCullough and his fellow true believers at the company, who harbor a bizarre but intense vendetta against CNBC. Hedgeye immediately sought to cut ties with Ms. Terman and find ways to strike back. Their retaliation has been vindictive, cruel, and unrelenting; it has far overstepped the bounds of legality.

Hedgeye's initial shot against Counterclaimants was to twist evidence of a few friendly and innocuous contacts between Terman and Darius Dale and concoct meritless claims against her. Hedgeye's purpose was not to seek legal redress but to help shape a media narrative and cause harm to the Solstein business. In pursuit of these aims, Hedgeye and its executives issued a continuing stream of defamatory attacks against Counterclaimants on a variety of public platforms. They also deliberately targeted Solstein customers, exploiting the confusion resulting from their false narrative to poach two of them for its investment affiliate. And they successfully put pressure on CNBC to suspend Ms. Terman until this case could be resolved, even as they pursued litigation tactics in this case designed to prolong any such resolution.

While defending themselves against Hedgeye's legal attacks and participating in discovery in this action, Counterclaimants came to understand the fraudulent nature of key aspects of Hedgeye's business. They learned that Hedgeye was not the "independent" research

1

provider it claims to be. Rather, it provides customized advice and special access to preferred customers and suffers from multiple conflicts of interest, including its incestuous and conflicted relationship with an affiliated investment advisor. Realizing that they had been duped by Hedgeye and in response to Hedgeye's defamatory campaign, they filed the Counterclaims.

Hedgeye's motion to dismiss the Counterclaims is meritless. Ignoring the relevant standards on a motion to dismiss, Hedgeye bickers over factual contentions and willfully misconstrues the allegations of the Counterclaims. Its attack on the fraudulent inducement claims ignores the elaborate exposition of Hedgeye's many misrepresentations and the detailed explanation of how and why Counterclaimants relied on those representations in forking over $400,000 of fees to Hedgeye. Its inexplicable Article III challenge to private civil claims over a contract brought by a party to that contract lacks any connection to known legal doctrine and precedent. Its attempt to suggest that its defamatory statements be deemed mere opinion founders on the relevant legal standard (which it fails to mention) and the simple reality that it made straightforward statements of fact, not opinion. It also misstates the relevant law of tortious interference and misconstrues the nature of those claims. For those reasons and others as set forth below, the Motion should be denied.

## II.    FACTUAL BACKGROUND

The relevant facts are set forth in the First Amended Counterclaims ("FAC"). Counterclaimants subscribed to Hedgeye services beginning in 2017 and renewed each quarter. FAC ¶¶ 25, 33. But these subscription decisions were based on false pretenses: Hedgeye deceived Counterclaimants into the false belief that it was a mere research "newsletter"-type service bereft of conflicts of interest. FAC ¶¶ 72, 81-82. When Nadine Terman accepted a position to provide weekly appearances on a CNBC show, Hedgeye's CEO Keith McCullough

was infuriated. McCullough and other Hedgeye personnel went on the attack against Terman and Solstein, including a long series of defamatory statements made to the general public, and ultimately successful targeted efforts to poach Solstein customers and force Terman off CNBC. FAC ¶¶ 85-105.

Hedgeye correctly observes that Hedgeye held itself out to be offering "purely independent research" and provided Counterclaimants a copy of its Form ADV that purported to corroborate that representation. Motion at 2-3. Unfortunately, as the Counterclaims allege, that representation was false. In reality, Hedgeye provides bespoke and personal investment advice to preferred (and high paying) clients. FAC ¶¶ 73-75. It also placed key executives at the personal disposal of an affiliated investment group, Sierpinski Capital Management ("SCM"). FAC ¶ 61. Hedgeye further concealed key conflicts of interests, including the SCM relationship. FAC ¶¶ 35, 38, 59-69, 80-82. These misrepresentations were significant, because had they been known, Counterclaimants would not have assumed the reputational and potential regulatory risk of dealing with Hedgeye. FAC ¶¶ 28-32, 36-37, 82.

Counterclaimants were also deceived about a key Hedgeye service known as Real-Time Alerts ("RTAs"). These alerts consisted of email messages from Hedgeye recommending that named securities be bought or sold at particular prices. FAC ¶¶ 39-40. Hedgeye aggressively marketed these alerts to Counterclaimants and other subscribers, as a tool to effectively time trades, and Counterclaimants attempted to use them in this recommended manner. FAC ¶¶ 39-40, 47, 51 The unfortunate result were hundreds of costly trade executions, because despite prompt responses to the RTAs, Counterclaimants found themselves trading behind others who were somehow able to execute trades virtually instantaneously with the release of the RTAs. FAC ¶ 47. Hedgeye was aware of this problem but concealed it for years before making a partial

confession in an online disclosure, buried deep in its website, and first posted only a week before Counterclaimants were unceremoniously booted off Hedgeye's platform. Counterclaimants never saw it. FAC ¶¶ 49-54.

For illustrative purposes, the Counterclaims include a chart showing the typical trading pattern of RTAs, with huge numbers of orders causing large price movements within the first minute the RTAs are posted. FAC ¶ 44. The example used is from 2022, because of the ease of obtaining a graphical depiction for that trade at the time of filing, and not because Counterclaimants traded on that specific RTA (they did not). However, the Counterclaims clearly allege that the example trade is illustrative of the historical RTA trades Counterclaimants did make, and affirmatively avers that Counterclaimants suffered adverse executions on at least hundreds of such trades. FAC ¶¶ 46-47.


## III.  DISCUSSION

### A.    Legal Standard

Upon a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the counterclaimant need only plead only "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The reviewing court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the counterclaimant's favor. *See Cereus Prod. Dev., Inc. v. Boom LLC*, No. 14 CIV. 4292 PAC, 2015 WL 3540827, at *4 (S.D.N.Y. June 5, 2015). While a plaintiff or counterclaimant must state claims that are plausible, "[p]lausibility is distinct from probability, and 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable.'" *Chigirinskiy v. Panchenkova*, No. 14-CV-4410 JPO, 2015 WL 1454646, at *16 (S.D.N.Y. Mar. 31, 2015) (*quoting Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014)).

**B.      The Counterclaims State a Claim for Fraudulent Inducement to Contract**

A claim for fraudulent inducement involves a knowing misrepresentation of material fact, intent to deceive another party, inducement of that party to act on the misrepresentation and resulting injury. *Genger v. Genger*, 144 A.D.3d 581, 582, (1st Dept. 2016). Although the "the circumstances constituting fraud or mistake" must be pled with particularity, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally. Fed. R. Civ. P. 9(b). In addition, Rule 8 notice pleading standards apply to allegations of reliance. *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 420 F. Supp. 3d 123, 148 (S.D.N.Y. 2019).

**1.      The Counterclaims Plead Material Misstatements of Fact With Particularity**

The Counterclaims describe and explain, in exhaustive detail, a series of material misrepresentations and omissions made by Hedgeye in connection with its contract with Counterclaimants. These include, among others:

- Hedgeye represented that it was not subject to registration under the Advisors Act of 1940 because it was solely engaged in research and the publication of newsletters. However, this claim of entitlement to a publisher's exemption was false. Rather than provide standardized, one-to-many research to all customers, as the publisher exception requires, Hedgeye aggressively marketed individualized access to analysts for a premium price, advised individual investors on preferred position sizes, and provided direct, bespoke investment advice to SCM about how best to implement Hedgeye "ideas." FAC ¶¶ 72-76. Senior Hedgeye analysts (including McCullough) regularly spoke to individual subscribers and SCM on the phone, with no effective restrictions on the scope of the advice to be

offered. *Id.*[1] These misrepresentations were critical because Counterclaimants would not have agreed to do business with a partner in the industry that flouted securities regulations. FAC ¶¶ 29-30.

- Hedgeye made numerous false representations concerning RTAs. Hedgeye marketed RTAs as a tool for making timely trades on Hedgeye's best ideas, allowing an individual subscriber to trade "like a portfolio manager" and to "**EFFECTIVELY TIME [YOUR] TRADES**." FAC ¶¶ 39, 51 (emphasis in original marketing material). In reality, Hedgeye knew that many subscribers would not and did not receive the proposed trading prices in the RTAs because other subscribers were trading ahead of them.  Hedgeye did not disclose that knowledge until burying a "product disclaimer" on its website on February 22, 2021, shortly before terminating Solstein as a client. *Id.* ¶¶ 49-53. Hedgeye also falsely represented that its employees were barred from trading securities that the firm recommended, even though it knew and permitted employees to trade in Exchange Traded Funds (ETFs) recommended in Hedgeye alerts. *Id.* ¶ 57. Hedgeye also published misleading performance data concerning RTAs that deceived subscribers, including Solstein. *Id.* ¶ 58.

- Hedgeye falsely claimed that it was an entirely independent and disinterested provider of investment research and did not engage in any trading itself. However, from 2019 through

---

[1] The Motion does not deny that such conduct precludes the application of the publisher exemption. In interpreting the exemption, the Supreme Court made a clear distinction between "nonpersonalized publishing activities" covered by the exception and "the business of rendering personalized investment advice, which is not." *Lowe v. S.E.C.*, 472 U.S. 181, 204 (1985). Because Hedgeye often provides direct and specific investment advice to individual subscribers, not in accordance with a regular and fixed schedule, it cannot claim the exemption. *Id.*; *see also In re Weiss Research, Inc. et al.*, Admin Proceeding 3-12341, Release 2525 (June 26, 2006) (SEC order imposing sanctions and a cease-and-desist order where newsletter provided private phone access and premium services to selected subscribers paying higher fees).

2021, Hedgeye's principals owned and controlled SCM, which traded on investment advice received from Hedgeye and McCullough personally, and which solicited Hedgeye personnel as investors. Hedgeye did not disclose the SCM relationship until March 31, 2021, the day before it terminated Solstein as a subscriber. FAC ¶¶ 79-80.

Hedgeye's brief addresses only one of these material misstatements. Hedgeye's relationship with SCM. Hedgeye argues that that the SCM relationship did not exist in 2017, when Solstein originally executed the Agreement. Motion at 6. However, Hedgeye ignores that "Hedgeye's services to Solstein were renewed by Solstein every quarter" until April 1, 2021. FAC ¶ 33. The Counterclaims do not only contend that Hedgeye fraudulently induced the 2017 Agreement, but that these misrepresentations induced each of the subsequent quarterly renewals as well.  FAC ¶ 37; see also FAC ¶¶ 158-59 (alleging that Hedgeye made false representations to induce Terman and Solstein to subscribe *and* "to continue subscribing to such services.")

Hedgeye also ignores that Counterclaimants allege that they relied in 2017 on the truth and accuracy of the representations made in the 2017 Form ADV, including the false representations concerning Hedgeye's entitlement to the publisher's exemption and its lack of conflicts of interest. FAC ¶¶ 28-35. These included false representations of present ***fact***, namely that it was solely engaged in research and the publication of newsletters and not (as was the case in reality) providing customized investment advice to selected clients. FAC ¶¶ 72-78. Counterclaimants, while using an exemplar RTA from 2022, also allege that RTAs were falsely marketed during the period of their Hedgeye subscription and that the trading pattern observed in 2022 occurred historically going back many years. FAC ¶¶ 46, 58.

### 2.    The Counterclaims Properly Allege Intent

Under Rule 12(b), fraudulent intent may be alleged generally. The counterclaims do far more than that. They specifically allege that, among other things: (1) Hedgeye knew that customers

were being disadvantaged by RTAs but made no disclosure until its partial "disclaimer" in early 2021; (2) Hedgeye knew that its employees were permitted to trade Exchange Traded Funds ("ETFs") even if it recommended those same ETFs in an RTA; and (3) the contradictions between the belated Hedgeye disclaimer and its marketing of RTAs are material evidence of Hedgeye's intent to defraud; (4) Hedgeye was further alerted to the problem by customer complaints. FAC ¶¶ 49-57 As for Hedgeye's false representations about its registration status and the SCM relationship, it can fairly be inferred that Hedgeye was aware both of its own interactions with customers and with SCM. FAC ¶¶ 79-80.

Hedgeye cites *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012) as support for its position on intent. But that case held that the intent element of fraud in the inducement could be stated by a mere general allegation of intent not to abide by a contract. Hedgeye then cites two cases for the proposition that a "generalized profit motive" cannot serve as the sole basis for inferring fraudulent intent, *Brookhaven Town Conservative Comm. v. Walsh*, 258 F. Supp. 3d 277, 286 (E.D.N.Y. 2017); *see also Prickett v. New York Life Ins. Co.*, 896 F. Supp. 2d 236, 246 (S.D.N.Y. 2012), neither of which involved fraud in the inducement. In any case, Counterclaims do not rely on or invoke a "generalized profit motive" to support an inference of intent. Rather, as described above, the Counterclaims make specific allegations that Hedgeye knew that the misstatements it made were false.

### 3.    The Counterclaims Properly Allege Reasonable Reliance

Hedgeye wrongly contends that Counterclaimants' fail to plead "any reliance." Motion at 8. In fact, the Counterclaims discuss reliance in detail: they explain that in deciding to purchase Hedgeye services, it was important to Terman and Solstein that the "research and information they received from Hedgeye to be based on independent and honest views of the market and traded securities, unaffected by undisclosed financial interests and activities of Hedgeye itself, its officers,

its agents, and its other business partners" and that absent that belief, they would not have subscribed. FAC ¶¶ 32, 36-37. Counterclaimants also explained that they specifically relied on the accuracy of Hedgeye's representations because "as a registered investment advisor, it was important to Counterclaimants that suppliers of research services such as Hedgeye were themselves properly registered and in compliance with their regulatory requirements." FAC ¶ 29. Such detailed allegations of reliance go far beyond what is required, namely sufficient notice of the claims stated under Rule 8(a). *See Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 420 F. Supp. 3d 123, 148 (S.D.N.Y. 2019) (holding that although Rule 9(b) requires alleging the circumstances of the fraud, reliance allegations are governed by Rule 8).

*Travelex Currency Servs., Inc. v. Puente Enterprises, Inc.,* 449 F. Supp. 3d 385, 399 (S.D.N.Y. 2020), cited by Hedgeye, does not support its position. *Travelex* held that reliance is inherently a fact-specific inquiry that normally is not an appropriate basis for a motion to dismiss. It only addressed reliance because the plaintiff in that case based its reliance theory on the reliance of a third party, a circumstance not present in this case. *Id*. at 399-400.

### C.    Hedgeye's Article III Standing Objection is Meritless

It is difficult to conceive of a more clearcut "case and controversy" than a party to a contract seeking to recover $420,000 of fees paid on the grounds of fraudulent inducement. Yet Hedgeye curiously raises a constitutional standing objection to Counterclaimants' standing to bring their straightforward civil claims. The objection is meritless. Counterclaimants are not bringing a regulatory enforcement action. They are not even bringing fraud claims under the securities laws. They are pursuing a private civil action for fraudulent inducement to enter into a contract. Counterclaimants were parties to that contract and paid hundreds of thousands of dollars of fees to Hedgeye. There is no question that Counterclaimants have standing to pursue

such private civil claims concerning their own contract, and to recover damages in the form of money they actually paid to Hedgeye.

Hedgeye cites no legal authority for the outlandish proposition that a party to a contract might lack constitutional standing to bring a fraudulent inducement action. Indeed, the only case law that appears to touch on that question are bankruptcy matters in which the debtor seeks to recover money owed to creditors, as opposed to fees or costs it paid itself. *See, e.g., Am. Tissue, Inc. v. Donaldson*, 351 F. Supp. 2d 79, 90 (S.D.N.Y. 2004). Such special circumstances are not present here; Counterclaimants are seeking to enforce their own rights and recover fees they paid themselves.

Lacking any authority for standing argument, Hedgeye resorts to citing cases for the general proposition that Article III standing requires plaintiff to allege concrete injury. Such injury is directly alleged in the FAC – Counterclaimants were fraudulently induced by Hedgeye into handing over $420,000 in fees based on false pretenses. Counterclaimants are not NGOs pursuing policy concerns like the plaintiffs in *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 557 (1992). They are private parties that lost money and want to get it back.

Hedgeye's convoluted argument stems from a mischaracterization of the fraudulent inducement claim. Hedgeye contends that Counterclaimants are attempting to stand in the shoes of the SEC and pursue regulatory claims against Hedgeye. Motion at 9. That is simply not so – the Counterclaims do not allege claims for violations of the federal securities laws and do not seek to enforce those laws. Rather the Counterclaims allege that as a factual matter, Hedgeye misrepresented its compliance with the securities laws as part of a contract negotiation, and that misrepresentation (among many others) fraudulently induced Counterclaimants to purchase Hedgeye services. That the facts underlying Counterclaimants' civil claim might also be grounds

for action by governmental law enforcement is irrelevant to Counterclaimants' standing to bring their own claims for their own injuries.

Hedgeye's fact intensive discussion of the Krispy Kreme RTA exemplar trade in the Counterclaims unmasks the true purpose of its quixotic Article III objection – to circumvent the limited scope of Rule 12 motions and indulge their desire to try the factual merits of the RTA allegations through motion practice. Focusing on the Krispy Kreme exemplar trade in Paragraph 44 of the Counterclaims, and apparently not understanding its purely illustrative purpose, Hedgeye first objects that Counterclaimants did not trade that particular RTA and then disputes its analytical significance. Motion at 10-11.

As to Hedgeye's first objection, the Counterclaims address it directly: "Although the DNUT example is a single RTA from a single day, it represents a common and typical pattern going back many years, including the period when Counterclaimants were subscribers. Review of historical RTAs indicates that it occurs for many Hedgeye alerts, resulting in price and volume charts with similar spikes and volumes." FAC ¶ 46. The Counterclaims then allege (and Hedgeye does not and cannot dispute) that Counterclaimants were victimized by that practice and points to at least 500 instances where Counterclaimants received a materially worse trading price. *Id*. ¶ 47. That is more than sufficient concrete injury for Article III purposes.

Hedgeye's argument that a 1.7% stock price drop in a mere three-minute period (and more than 1.1% in less than a minute) is not material is both nonsensical – instantaneous losses of that magnitude can be catastrophic for an active trader – and inappropriate for consideration on a motion to dismiss. The full magnitude and significance of Hedgeye's conduct can and will be explored in fact and expert discovery. Moreover, Hedgeye's argument that the chart does not prove "front running" (Motion at 11) misses the point: the Counterclaims do not contend that Hedgeye conducted pre-announcement trading. Rather, they contend that Hedgeye's scheme was to

11

facilitate certain favored parties in executing on the RTAs immediately after their release, thus trading ahead of others, like the Terman Defendants, who suffered from delays. FAC ¶¶ 59-60. The chart confirms this account: trading based on the DNUT alert occurs in extraordinary volumes the same minute the RTA was released, even though other subscribers would not have received the alert until later, much less be able to enter and fully execute a timely trade in that first minute.

### D.    The Counterclaims State Valid Claims for Defamation

#### 1.    The Defamatory Statements Were Stated by Hedgeye as Fact, Not Opinion

The Counterclaims identify many defamatory statements of fact by Hedgeye. These include among others, false accusations by Hedgeye that:

- Nadine Terman "use[d] Hedgeye's unique jargon and nomenclature, parrot[ed] Hedgeye's market predictions, and reference[d] Hedgeye's research without credit given to Hedgeye." FAC ¶ 132.

- Terman and Solstein stole Hedgeye intellectual property and "destroy[ed] evidence to conceal wrongdoing." FAC ¶ 135

- "Terman advised & actively worked with Dale to destroy evidence of his misconduct prior to Dale's resignation, even offering Solstein's services to help conceal his theft." FAC ¶ 137

- Terman and Solstein published content based on models derived from Hedgeye trade secret source models. FAC 137.

- Terman and Solstein accessed Darius Dale's personal Dropbox containing Hedgeye source models. FAC ¶ 137.

- Terman and Solstein "themselves directly acquired Hedgeye's confidential information and trade secrets." FAC ¶ 137.

- Terman and Solstein sought a "gag order" from the District Court. FAC ¶ 137.

- Terman targeted Hedgeye customers. FAC ¶ 138.

- Terman intended to harm Hedgeye by supporting 42 Macro. FAC ¶ 138.

All these statements are specific and unequivocal statements of fact. Either Terman and Solstein stole Hedgeye property, or they didn't. Either they destroyed evidence, or they didn't. Either Terman used Hedgeye research without attribution or she didn't. Either she accessed Darius Dale's personal Dropbox with Hedgeye source models in it or she didn't. And so on. Each of these statements along with the others specifically referenced in the Counterclaims, are plain statements of fact, capable of verification or refutation.

Hedgeye does not controvert that most of the defamatory statements referenced in the Counterclaims are actionable factual statements. Instead, they single out a few statements (or fragments of statements) contained in a February 9, 2022 news release, that they contend are "expressions of opinion."[2] Motion at 12. But because each statement identified in the Counterclaims is a defamatory act, Hedgeye effectively concedes that that the Counterclaims do state valid claims for defamation.

Moreover, none of the three specific statements identified in Hedgeye's motion could credibly be regarded as statements of pure opinion. In assessing the distinction between fact and opinion, courts look to whether specific language at issue has a precise meaning, whether the statement can be objectively characterized as true or false, and the context of the overall communication and the broader social context. *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402

---

[2] In a footnote, Hedgeye suggests that these statements might be protected by "litigation privilege," citing *Pandozy v. Tobey*, No. 06-cv-12885 (CM), 2007 WL 3010333, at *2 (S.D.N.Y. Oct. 11, 2007). Hedgeye was wise to relegate this argument to a footnote. "Litigation privilege" applies to statements made by counsel in a litigation. *Id*. It does not extend to press releases to the media attributed, as here, directly to the company. *Giuffre v. Maxwell*, 2017 U.S. Dist. LEXIS 64405, at *23 (S.D.N.Y. Mar. 27, 2017). *See also GeigTech E. Bay LLC v. Lutron Elecs. Co.*, 2019 U.S. Dist. LEXIS 59319, at *13 (S.D.N.Y. Apr. 4, 2019) (holding that New York rules about litigation privilege do not "permit parties to take advantage of the privilege by instituting a judicial proceeding alleging false and defamatory charges only to then issue a press release publicizing those defamatory allegations"). And litigation privilege certainly does not apply to the gratuitous social media attacks from Hedgeye principals that constitute much of the defamatory statements.

n.7 (2d Cir. 2006) (citing *Steinhilber v. Alphonse*, 68 N.Y.2d, 283, 292 (N.Y. 1986)). In addition, a statement of opinion "that is based on undisclosed facts is potentially actionable because it carries with it an implicit statement of those facts." *Biro v. Condé Nast*, 883 F. Supp. 2d 441, 461 (S.D.N.Y. 2012). *See also Steinhilber*, 68 N.Y.2d at 289-90 ("When, however, the statement of opinion implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, it is a 'mixed opinion' and is actionable.").

The first statement identified in Hedgeye's motion is that "Terman demonstrated a pattern of exploiting her relationship with Hedgeye to misappropriate the firm's intellectual property." Motion at 12. This statement contains an unambiguous factual claim – that Nadine Terman misappropriated Hedgeye intellectual property. At the very least, because the statement in context also alludes to undisclosed facts purportedly obtained in discovery earlier in this action, it qualifies as mixed opinion-fact defamation.

Similarly, the second statement raised in Hedgeye brief is the contention that in March 2021, Nadine Terman and Darius Dale developed a plan to steal Hedgeye intellectual property in order to launch a competing business to Hedgeye. Motion at 12. That is a flatly straightforward factual claim: Hedgeye was not expressing a subjective opinion that Terman and Dale developed a plan to steal their trade secrets in March 2021, it stated that it happened as a fact. The same analysis holds for the third statement quoted in Hedgeye's motion, that Nadine Terman was a principal in 42 Macro ("Terman, Dale, and Lamar launched their competing company") and that this company's "entire business consists of selling research derived from stolen Hedgeye financial models." Once again, the statements are presented as flat facts, not opinions.

14

### 2.    Counterclaimants Need Not Plead Actual Malice, But Have Done So

Equally unavailing is Hedgeye's argument that the Counterclaims fail to plead malice. As an initial matter, Counterclaimants were not required to do so. Pleading of actual malice is required only of public figures and Counterclaimants are not public figures, limited or otherwise.

To prevail on a defense of lack of malice, the counter-defendant first bears the burden of establishing that the counterclaimants have : (1) successfully invited public attention to their views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected themselves into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media. *Contemporary Mission v. N.Y. Times Co.*, 842 F.2d 612, 617 (2d Cir. 1988). Hedgeye's brief notably does not attempt to apply these elements, as it is clear that Counterclaimants did not invite public attention into the subject matters of this litigation for any purpose, did not voluntarily inject themselves into the controversies that are subjects of the litigation, and did not assume any position of prominence in the controversy.  The only element raised is Hedgeye's contention that Counterclaimants made regular media appearances on CNBC. Motion at 12, But in fact, as the Counterclaimants allege, Ms. Terman only appeared on CNBC once or twice or week for approximately a single year, before Hedgeye's actions forced her from the air. FAC ¶¶ 21, 124-25, 140, 152. She therefore cannot be said to maintain "continuing access" to the media. And all of these appearances were for the purpose of commenting on daily market events, not addressing the items of controversy at issue in this lawsuit. *Sparrow Fund Mgmt. LP v. MiMedx Grp., Inc.*, No. 18-CV-4921 (PGG) (KHP), 2018 U.S. Dist. LEXIS 224028, at *24-25 (S.D.N.Y. Dec. 14, 2018) (rejecting absence of malice defense where there was no showing that plaintiff invited public attention on the matters in controversy).

In addition, as alleged in the Counterclaims, Hedgeye's defamatory attacks were made for the purpose of forcing Ms. Terman off the air and succeeded in doing so. FAC ¶¶ 124-25, 140, 152. Hedgeye President Michael Blum and Hedgeye itself both tweeted their defamatory press release directly to CNBC and Hedgeye CEO Keith McCullough declared that "I would hope that CNBC will ban Nadine." FAC ¶¶ 140.When CNBC suspended Ms. Terman's appearances in response, Mr. Blum boasted that "…It appears, that following our suit against Nadine Terman & Solstein Capital, @CNBC has not had her on the air." *Id.* This brutal and carefully targeted conduct strikes at the heart of the purposes behind the limited public figure doctrine. The exceptions for public figures exist because of the assumption that they "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Gertz v. Robert Welch*, 418 U.S. 323, 344 (1974). Having deliberately deprived Counterclaimants of their "channels of effective communication" to respond to Hedgeye's unrelenting attacks, it would be grossly unfair and contrary to the purpose of the doctrine to permit Hedgeye to treat Counterclaimants as limited purpose public figures.

*Robertson v. Doe*, 2010 U.S. Dist. LEXIS 151305, at *4 (S.D.N.Y. May 11, 2010), cited by Hedgeye, reinforces why the doctrine does not apply here. In *Robertson*, the court found that Julian Robertson, the legendary billionaire hedge fund manager, whose internationally famous Tiger Management fund gave rise to dozens of notable "Tiger Cub" spinoffs, could be deemed a limited purpose public figure, specifically citing his "funding of a large hedge fund" and "his status as a well-known figure on Wall Street." Although Counterclaimants are justifiably proud of their own brand and strong investment track record, it defies credibility to analogize their public media profile to that of Mr. Robertson.

In any event, the Counterclaims do plead actual malice. Actual malice consists of "subjective awareness of either falsity or probable falsity of the defamatory statement, or acting with reckless disregard of its truth or falsity." *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 182-83 (2d Cir. 2000). It can be established through circumstantial evidence, including the defendants' other acts or statements. *Id*.

Hedgeye concedes that the Counterclaims plead that it acted with actual malice but argue that Counterclaimants "suggest . . . that Hedgeye fully believed and continues to believe its allegedly defamatory statements." Motion at 14. Hedgeye's argument is baseless; the Counterclaims contain no such suggestion and Hedgeye cites no language in support of its argument. On the contrary, the Counterclaims not only plead that Hedgeye made its defamatory statements with actual malice, *see* FAC ¶ 155, they also explain in detail the nature and purposes of Hedgeye's malicious intent. In particular, the Counterclaims explain that Hedgeye deliberately employed damaging falsehoods with the intent of driving Nadine Terman from CNBC, convincing Solstein clients to leave the firm, and poaching Solstein clients for the benefit of its own affiliated investment manager, SCM. FAC ¶¶ 142-155.

### E.    Tortious Interference

Hedgeye presents three arguments against the tortious interference counterclaims. First, they contend that the tortious interference claims are "duplicative" of the defamation claims. But the case they rely on, *Pasqualini v. MortgageIT, Inc.*, 498 F. Supp. 2d 659, 670 (S.D.N.Y. 2007), held exactly the opposite, stating that, "the two causes of action can, in certain circumstances, overlap significantly, and a plaintiff's allegations often appear to satisfy the elements of both torts." *Pasqualini* dismissed both claims not because they were duplicative but because they were time barred, a defense not present here. *Id.* In this case, although certain facts are common to both claims, the legal theories and harm are distinct: Counterclaimants seek redress for the damages

17

caused to their public reputation resulting from defamatory statements in one claim and seek compensation for a targeted effort to interfere with specific contractual relationships on the other claim. Thus, Counterclaimants are not seeking to "dress up" a defamation claim as an interference claim, but rather seeking distinct legal remedies for distinct conduct and injuries.

Hedgeye's ironically boilerplate objection that the interference allegations are "conclusory" is also without basis. Although the Counterclaims do not set forth full contractual terms, they identify the contractual relationships at issue and explain the relevant context. FAC ¶¶ 153-54. Since two of the clients at issue were directly contacted by Hedgeye, such allegations are more than sufficient to put Hedgeye on notice and satisfy the applicable pleading standards.[3]

Finally, the Counterclaims allege improper means. Improper means entails any means that fall below the generally accepted standards of commercial morality, *GateGuard, Inc. v. Amazon.com Inc.*, No. 21-CV-9321 (JGK), 2023 WL 2051739, at *13 (S.D.N.Y. Feb. 16, 2023). Contrary to Hedgeye's argument, improper means include dishonesty in the form of false statements intended to undercut a contracting customer's opinion of the victim. *PKG Grp., LLC v. Gamma Croma, S.p.A.*, 446 F. Supp. 2d 249, 251 (S.D.N.Y. 2006). Here, the Counterclaims easily satisfy this element by establishing that Hedgeye employed a pattern of dishonesty and threats to deprive Counterclaimants of hard-earned contractual relationships.

### F.    Malicious Prosecution

Hedgeye objects that the malicious prosecution claim cannot proceed based on failure to allege favorable termination of a prior civil litigation. But as alleged in the Counterclaims, the prior litigation *Hedgeye v. Terman*, No. 1:22-cv-01113 (S.D.N.Y.) did terminate in the favor of

---

[3] Hedgeye has already taken extensive discovery on these claims, rendering this objection moot.

the Counterclaimants. Hedgeye responds by citing cases for the proposition that the favorable termination must also involve adjudication of the merits of the claim. Counterclaimants respectfully submit that strict application of that requirement would be contrary to public policy, as it would permit litigants to bring improper claims for improper purposes, achieve those improper purposes in whole or in part, and then escape liability through the expedient of a voluntary dismissal. However, if the Court instead accepts Hedgeye's position, then the appropriate remedy is not to dismiss the claim, but to stay it until the merits adjudication of Hedgeye's claims against the Terman Defendants occurs.

## IV.    CONCLUSION

The Terman Defendants respectfully request that Court deny Hedgeye' motion to dismiss the Counterclaims.

Dated:  New York, New York
        June 20, 2023

                                        Respectfully submitted,

                                        **PRESS KORAL LLP**


                                        By: s/ Jason Koral
                                              Jason M. Koral

                                        641 Lexington Avenue, Thirteenth Floor
                                        New York, NY 10022
                                        tel: (212) 520-8270
                                        fax: (646) 365-3084
                                        cell: (917) 881-1347


                                        *Attorneys for Defendants-Counterclaimants Nadine Terman and Solstein Capital LLC*

19