**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**HEDGEYE RISK MANAGEMENT, LLC,**

                              **Plaintiff,**

          -against-

**DARIUS DALE, et al.,**

                              **Defendants.**

**21-cv-3687 (ALC)(RWL)**

**OPINION & ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Hedgeye Risk Management, LLC ("Hedgeye" or "the Company") brings this

action against Defendants Darius Dale ("Dale"), Stephen Lamar ("Lamar"), 42 Macro LLC ("42

Macro") (collectively, the "Dale Defendants") and Defendant Nadine Terman ("Terman") and

Solstein Capital, LLC ("Solstein Capital") (collectively, the "Terman Defendants") for

(1) Violation of the Defend Trade Secret Act ("DTSA"); (2) Common Law Misappropriation;

(3) Breach of Contract; (4) Intentional Interference with Contractual Relations; (5) Breach of

Contract; (6) Tortious Interference with Contract; and (7) Unfair Competition.  Currently pending

before the Court are Defendants' motions to dismiss the complaint pursuant to Fed. R. Civ. P.

12(b)(6).  (ECF Nos. 330, 334.)  For the reasons that follow, Defendants' motions are both

**GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

### I.    Factual Background

The following facts are drawn from the Third Amended Complaint ("TAC", ECF No. 325-

1), and assumed to be true for the purpose of addressing the motions.

1

A.  The Parties

Hedgeye is a financial research fund founded in 2008 with institutional and individual investor clients who subscribe in order to receive Hedgeye's investment research and recommendations based on Hedgeye's alleged proprietary financial modeling.  (TAC ¶¶ 14, 44.)

The Dale Defendants consist of Dale, Lamar, and their company—42 Macro.  (TAC ¶ 97–100.)  Dale is a former Managing Director at Hedgeye who resides in New York.  (TAC ¶¶ 2, 18.) Lamar is a retail investor who previously subscribed to Hedgeye's products and services.  (TAC ¶¶ 70–71.)  Lamar is the C.E.O. of RAMAL, Inc., a founding member in 42 Macro, and Lamar allegedly serves as 42 Macro's manager.  (TAC ¶¶ 98, 100.)  42 Macro is registered in California with its principal place of business in California.  (TAC ¶ 4.)

The Terman Defendants consist of Terman and Solstein Capital.  Terman is the founder, C.E.O. and C.I.O. of Solstein Capital, a California-based investment firm.  (TAC ¶ 58.)  Both Terman and Solstein Capital are former subscribers to Hedgeye's services, and allegedly assisted Dale in founding 42 Macro and currently subscribe to 42 Macro's services.  (TAC ¶¶ 59–63, 95–96.)

B.  Dale's Employment at Hedgeye

Hedgeye hired Dale as a junior analyst out of college in 2009.  (TAC ¶ 19.)  Over the years, Dale ascended through the Company's ranks, and he was eventually promoted to a role as a Managing Director in 2017.  (TAC ¶ 21.)  In 2019 became one of Hedgeye's most highly compensated employees.  (*Id.*)  As a Managing Director, Dale was responsible for managing the customer relationship with Defendants Terman and Solstein Capital, among other responsibilities. (TAC ¶ 18.)

When he was hired, Dale agreed to the terms of an employment letter agreement (the "Employment Agreement").  (TAC ¶ 24.)  The Employment Agreement prohibited Dale from disclosing confidential Hedgeye information.  (TAC ¶ 25.)  It also prohibited Dale from engaging in any business activity that was competitive with Hedgeye while he was still employed by the Company.  (TAC ¶ 26.)  A non-solicitation clause also prohibited Dale from soliciting any employee, client, or customer of Hedgeye while working for Hedgeye and for a period of six months after termination of his employment.  (TAC ¶ 27.)  "Dale [also] agreed not to disclose confidential information, 'including without limitation, financial information . . . and proprietary investment and trading strategies of" Hedgeye before or after his employment."  (TAC ¶ 25.) "Dale [also] agreed not to compete or prepare to compete with Hedgeye during his employment…[and] not to solicit any of Hedgeye's customers during, or for six months after, his employment."  (*Id.*)  Finally, Dale "agreed that all inventions, discoveries, ideas, programs, notes, charts, and other materials that he created during the course of his employment were to be deemed 'works made for hire' and belonged to Hedgeye."  (*Id.*)

Dale was also bound by the terms of Hedgeye's Code of Ethics, which acknowledged that every employee owes "a duty of loyalty to the Firm" and reaffirmed that Dale could only use confidential information for authorized purposes.  (TAC ¶ 28.)  Attestations to the Code of Ethics were completed on a yearly basis.  (TAC ¶ 29.)

   C.  Hedgeye's Trade Secrets

Hedgeye alleges that Defendants misappropriated three categories of its proprietary and confidential information.  First, as a fundamental component of its business, Hedgeye develops and uses a proprietary financial model, called its Growth, Inflation & Policy, or "GIP" model, to generate investment recommendations for its subscribers and clients.  (TAC ¶¶ 17, 34–37.)  These

models are predominantly contained in Microsoft Excel spreadsheets. (TAC ¶ 35.) The "proprietary models allow Hedgeye to develop both a highly accurate real-time assessment of near-term economic and inflation momentum, as well as a high-probability scenario for where growth and inflation are likely to trend over the next twelve months." (TAC ¶ 38.) Hedgeye provides the "output models" derived from its models to its subscribers but alleges that the underlying proprietary algorithm is not available to them. (TAC ¶ 36.) Hedgeye alleges that its models give it a competitive advantage because they are secret, and no other firm can claim that it uses Hedgeye's methodology to achieve the same results as it does. (TAC ¶ 42.)

Second, Hedgeye also alleges that its customer lists, comprising of institutional and retail investors, constitute trade secrets. (TAC ¶¶ 44, 49.) Hedgeye alleges that its customer lists are valuable because they reflect Hedgeye's selection of customers, which is a specialized market. (TAC ¶ 46.) It also alleges that it creates particularized lists so that it can distribute curated content to those subsets of clients. (TAC ¶ 48.)

Third, Hedgeye alleges that in the course of business, it maintains certain "notebooks" that are used "to document whether certain securities are trending bullish or bearish based on Hedgeye's proprietary market signals". (TAC ¶¶ 50–51.) These allegedly constitute trade secrets because "they contain a daily, systematic recording of carefully curated macroeconomic data regarding investable securities, commodities, currencies, and indices. This collection of economic data is annotated with Hedgeye's trend signals, notes regarding specific Hedgeye clients' interest therein; and the means for communicating the results of Hedgeye's economic analysis methodology. which also constitute trade secrets." (*Id.*)

To protect this confidential information, Hedgeye requires that its employees sign agreements acknowledging that they agree not to disclose confidential information. (TAC ¶ 52.)

Hedgeye also maintains a written Code of Ethics which requires all Hedgeye employees to acknowledge that they owe a duty of loyalty to the firm and that they may only use confidential information for authorized purposes.  (TAC ¶ 53.)  Hedgeye also alleges that it exercises IT controls over its trade secrets through password-protection, virtual private networks, and permission-based access.  (TAC ¶ 55.)

###### D. Defendants' Alleged Misappropriation of Hedgeye's Confidential Information and Trade Secrets

Plaintiff alleges that beginning in or around 2020, Dale began to make "more vocal complaints" about his compensation and expressed privately and publicly that he had built Hedgeye by himself.  (TAC ¶¶ 85–87.)  At a meeting on February 9, 2021, Dale demanded higher compensation.  (TAC ¶ 87.)  At a subsequent meeting on March 11, 2021, Hedgeye informed Dale that it would increase his bonus and salary such that he would be one of the most highly compensated employees at Hedgeye, which apparently did not satisfy Dale's concerns.  (TAC ¶¶ 88–89.)  Dale informed Hedgeye that he would soon be leaving the company.  (TAC ¶ 89.)

After this meeting, Dale allegedly "began a thoroughly planned theft of Hedgeye's intellectual property" with Lamar and Terman.  (TAC ¶¶ 89, 92.)  The alleged plan was for Lamar to finance and manage a competing venture which would then sell services to former Hedgeye clients, like Terman and Solstein Capital, at a cheaper rate than the price offered by Hedgeye.  (TAC ¶ 78.)  Defendants allegedly knew that Dale had entered into employment contracts that prevented him from competing with Hedgeye, but Lamar and Terman still "encouraged and assisted Dale in stealing Hedgeye confidential information and trade secrets, promising him direct and indirect compensation for doing so."  (TAC ¶ 81.)

Terman also aided Dale by "direct[ing] Dale to simultaneously update all his various social media at once and to have content ready to public as soon as 42 Macro went public."  Terman also

advised Dale that Hedgeye might claim ownership rights over intellectual property he built while in Hedgeye's employ (TAC ¶ 113), and suggested that Dale secure legal advice about the intellectual property (TAC ¶ 114). She also allegedly gave Dale feedback on negotiating the terms of his Hedgeye departure, and the public statements he would make after departing, and informed him that he should remove personal information from his laptop before his departure. (TAC ¶¶ 137, 143, 153).

On March 21, 2021, Hedgeye sent Dale a proposed separation agreement which contained clauses relating to Hedgeye's trade secrets and confidential information, as well as non-solicitation and con-competition clauses. (TAC ¶ 90.) Dale told Hedgeye he had concerns with the draft agreement, and the parties exchanged various further revisions of the agreement. (TAC ¶ 91.) Plaintiff alleges that "Dale's negotiations were being orchestrated by Hedgeye subscribers Lamar and Terman / Solstein Capital." (TAC ¶ 91.) Specifically, Plaintiff alleges that while Dale was employed with Hedgeye, Terman give him "constant and extensive feedback and advice on how they would launch and promote 42 Macro on Twitter, LinkedIn, and by email." (TAC ¶ 94.) Plaintiff further alleges that "Terman also supported the launch of 42 Macro and has an interest in the venture's success. At a minimum, Terman and Solstein Capital finance 42 Macro by paying subscription fees. Terman knew and intended that by supporting 42 Macro, she would damage Hedgeye." (TAC ¶ 95.)

On March 24, 2021, while he was still employed by Hedgeye, Dale established his new company—42 Macro—with Lamar as a co-founder, and updated his social media accounts to reflect that he was the founder and C.E.O. of the new company. (TAC ¶¶ 97, 98, 103.) Plaintiff alleges that "[t]he sole business of 42 Macro is to profit from Hedgeye's misappropriated confidential information and trade secrets." (TAC ¶ 101.)

Dale formally resigned from Hedgeye on March 28, 2021.  (TAC ¶ 108.)  But, before doing so, Plaintiff alleges that "Defendants copied numerous files constituting Hedgeye's proprietary and confidential information and trade secrets" to assist them in starting 42 Macro.  (TAC ¶ 116.)  On March 28, 2021, Defendants allegedly "copied dozens of computer files comprising gigabytes of information from Dale's work computer to his private Dropbox account in the cloud" which consisted predominantly of Hedgeye trade secrets, including its "proprietary and highly confidential financial models and Excel[] files."  (TAC ¶ 117–118.)  This confidential information also included a copy of a file named "PRICE VOLUME VOLATILITY.xlsx" which was also simultaneously "destroyed" on Hedgeye's own servers.  (*Id.* ¶ 120.)  Dale also allegedly took several screenshots of confidential and proprietary Excel spreadsheets.  (TAC ¶ 124.)  While Dale was still working at Hedgeye, Terman and Lamar invited Dale to edit a Dropbox folder entitled "42 Macro" that contained examples of financial models that could be used for the new company.  (TAC ¶ 112.)  Plaintiff alleges that an excel file was uploaded to the Dropbox folder by Terman that contained the words "Hedgeye" and "US_&_Global_GIP_Models."  (TAC ¶ 129.)  Plaintiff alleges that all Defendants accessed Dale's personal Dropbox account in the days leading up to his official resignation.  (TAC ¶ 125.)  Defendants also allegedly uploaded over 11,000 contacts from Hedgeye's master list of contacts into Dale's personal Dropbox before his departure and stole Plaintiff's confidential notebooks for use as source files for 42 Macro to compete with Hedgeye.  (TAC ¶¶ 117, 155–159.)

## II.  Procedural History

This case was first filed against Defendant Dale on April 26, 2021.  (Compl., ECF No. 1.)  Hedgeye also filed a motion for a temporary restraining order ("TRO") and preliminary injunction ("PI") against Dale.  (ECF No. 10.)  The Court granted the TRO and scheduled a hearing on the

PI.  (ECF No. 13.)  The TRO order directed Dale to deliver to Hedgeye certain computer files as outlined in Plaintiff's order.  (ECF No. 13.)  Believing that Dale was failing to comply with the TRO, Plaintiff filed a motion for civil contempt and expedited discovery on April 30, 2021.  (ECF No. 21.)  At the PI hearing, the Court denied Hedgeye's motion for preliminary injunction but granted Hedgeye's request for expedited discovery to review Dale's source models and to take his deposition.  (May 24, 2021 Tr., ECF No. 55.)  The matter was referred to Judge Lehrburger for general pre-trial management on June 3, 2021 and the parties have been proceeding with discovery. (ECF No. 53.)

Hedgeye filed an Amended Complaint on August 20, 2021, asserting claims against Defendants Dale, Lamar and 42 Macro for (1) violations of the Defend Trade Secrets Act, 18 U.S.C. Section 1836 et seq.; (2) common law misappropriation of trade secrets; (3) breach of contract; (4) intentional interference with contract; and (5) unfair competition.  (Am. Compl., ECF No. 92.)  After seeking leave from the Court (ECF No. 302), Hedgeye filed a Third Amended Complaint ("TAC") which added claims against additional Defendants Terman and Solstein Capital and consolidated this action with Hedgeye's separate case against the Terman Defendants at 22-cv-01113 *Hedgeye Risk Management, LLC v. Terman et al*.  (TAC, ECF No. 325-1.)[1]

The Dale Defendants and Terman Defendants each filed motions to dismiss on September 6, 2022.  (ECF Nos. 330, 334.)  Plaintiff filed memorandum in opposition to both motions on September 20, 2022.  (Pl.'s Terman Opp'n, ECF No. 344; Pl. Dale Opp'n, ECF No. 345.)  The

---

[1] The Terman Defendants filed an Amended Answer asserting counterclaims against Hedgeye for (1) fraud in the inducement; (2) tortious interference with contract; (3) tortious interference with prospective economic relationships; (4) defamation; and (5) malicious prosecution.  (ECF No. 485.)  Hedgeye filed a motion to dismiss the counterclaims on May 19, 2023.  (ECF No. 542.)  The motion was fully submitted as of July 14, 2023 and will be decided in a separate opinion and order.

Dale Defendants and the Terman Defendants filed replies in further support of their motions on September 27, 2022.  (Terman Reply, ECF No. 350; Dale Reply, ECF No. 351.)

## STANDARD OF REVIEW

When resolving a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citations omitted).  Thus, "[t]o survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

### I.  Motion to Seal

As a preliminary matter, the Court will review the pending motion to seal that was filed in connection with the Dale Defendants' motion.

A presumption of public access to judicial documents exists under both the common law and the First Amendment.  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 124 (2d Cir. 2006).  A "judicial document" is "a filed item that is 'relevant to the performance of the judicial function and useful in the judicial process.'"  *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016) (quoting *Lugosch*, 435 F.3d at 119).  To overcome the presumption of public access over a judicial document, the court must make "specific, on the

record findings" that sealing (1) is necessary "to preserve higher values," and (2) "is narrowly tailored to serve that interest." *Lugosch*, 435 F.3d at 120 (citation omitted).  "[B]road allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test [for sealing judicial documents]." *E.E.O.C. v. Kelley Drye & Warren LLP*, No. 10-cv-655, 2012 WL 691545, at *3 (S.D.N.Y. Mar. 2, 2012).

The Dale Defendants seek to file three exhibits attached to its motion to dismiss under seal. (ECF No. 332.)  The stated reason for the sealing is that the documents have been designated "Confidential" or "Highly Confidential" pursuant to the parties' protective order.  (*Id.*)  However, "[t]he mere existence of a confidentiality agreement . . . does not demonstrate that sealing is necessary." *Church Ins. Co. v. ACE Prop. & Casualty Ins. Co.*, No. 10-CV-698 (RJS), 2010 WL 3958791, at *3 (S.D.N.Y. Sept. 23, 2010) (quoting *Mut. Marine Off., Inc. v. Transfercom Ltd.*, No. 08-cv-10367 (PGG), 2009 WL 1025965, at *5 (S.D.N.Y. Apr. 15, 2009)); *see also Tromblee v. New Yor*k, No. 19-CV-00638 (BKS) (CFH), 2022 WL 17266979, at *4 (N.D.N.Y. Nov. 29, 2022) ("[B]road citations to [a] Protective Order do not satisfy *Lugosch* and are, in any event, insufficient to overcome the presumption of access as the mere existence of a confidentiality order says nothing about whether complete reliance on the order to avoid disclosure [is] reasonable.") (internal citations omitted).  Thus, having articulated no basis for sealing beyond the parties' confidentiality agreement and protective order, the Court finds that the Dale Defendants' motion does not meet the burden for sealing and the motion is **denied**.

## II.     Count I: Defend Trade Secrets Act (All Defendants)

The DTSA creates a private right of action for plaintiffs to bring claims for the misappropriation of trade secrets in federal court.  18 U.S.C. § 1836(b).  To prevail on a claim under the DTSA, "a party must show an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had

reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." *Kraus USA, Inc. v. Magarik*, No. 17-CV-6541, 2020 WL 2415670, at *4 (S.D.N.Y. May 12, 2020); *accord Zirvi v. Flatley*, 433 F. Supp. 3d 448, 464 (S.D.N.Y. 2020), *aff'd*, 838 F. App'x 582 (2d Cir. 2020).

Defendants collectively argue that the TAC fails to allege (i) the existence of an actual trade secret, (ii) that Hedgeye took reasonable measures to keep this information secret, (iii) that Defendants actually misappropriated any information and (iv) that Plaintiff suffered any damages from the alleged misappropriation. (ECF No. 333 at 16–20; ECF No. 335 at 16–20.) The Court will address each of Defendants' arguments in turn, but for the reasons that follow, Defendants' motions to dismiss Plaintiff's claim under the DTSA are **denied** as to Defendants Dale, Lamar and Terman and **granted** as to Defendants Solstein Capital and 42 Macro.

A. Hedgeye's Trade Secrets

Under the DTSA, information is a "trade secret" if

> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). "The question of whether or not [information] is a trade secret is generally a question of fact." *A.F.A Tours, Inc. v. Whitchurch*, 937 F.2d 82, 89 (2d Cir. 1991). On a motion to dismiss, a court will sustain pleadings "so long as they provide sufficient detail that the defendant can identify the trade secret(s) at issue." *Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 423 (S.D.N.Y. 2021).

The Court finds that Plaintiff adequately identifies the trade secrets at issue.  "A 'trade secret' is 'any formula, pattern, device, or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it.'"  *MedQuest Ltd. v. Rosa*, No. 21-CV-5307 (PGG), 2023 WL 2575051, at *3 (S.D.N.Y. Mar. 20, 2023) (citing *Pauwels v. Deloitte LLP*, No. 19-CV-2313 (RA), 2020 WL 818742, at *3 (S.D.N.Y. Feb. 19, 2020)).  Hedgeye asserts that Defendants misappropriated three categories of trade secrets: (i) proprietary financial models, (ii) curated customer lists, and (iii) notebooks reflecting curated macroeconomic data used to evaluate certain securities.  (TAC ¶¶ 33–49.)

Although the Terman Defendants argue that these financial models amount to nothing more than excel spreadsheets "that are filled with ordinary, publicly availably economic data, combined using simple averaging formulas" (ECF No. 335 at 19), the TAC alleges more, and asserts that these spreadsheets reflect Hedgeye's own proprietary analysis and weighing of market data, the output of which provide insight into the market.  (TAC ¶¶ 33–38.)  The TAC explains how this information was collated, curated, and developed, how they are essential to Hedgeye's business model, and how the information is crucial to allowing Hedgeye to compete on the market by virtue of it not being widely known.  (TAC ¶¶ 39–49.)  Indeed, Hedgeye alleges that its entire business is predicated on its ability to process and analyze market data for its subscribers based on its proprietary algorithm.  (TAC ¶¶ 33, 48.)  Moreover, the TAC even identifies specific files and documents that were allegedly misappropriated.  (*See, e.g.*, TAC ¶ 120).  Hedgeye's notebooks are also alleged to be trade secrets because they reflect Hedgeye's estimation of future market performance.  (TAC ¶¶ 50–51.)  These allegations are sufficiently specific and give Defendants adequate notice of the trade secrets that Plaintiff alleges were misappropriated to survive a motion

to dismiss.  *See ExpertConnect, L.L.C. v. Fowler*, No. 18-CV-4828 (LGS), 2019 WL 3004161, at

*4 (S.D.N.Y. July 10, 2019); *see also Tesla Wall Sys., LLC v. Related Cos., L.P.*, No. 17 Civ. 5966,

2017 WL 6507110, at *9 (S.D.N.Y. Dec. 18, 2017).

Even customer lists, which may reflect otherwise publicly available data, may be trade

secrets.  A list that was "'developed by a business through substantial effort and kept in confidence

may be treated as a trade secret ... provided the information it contains is not otherwise readily

ascertainable'".  *Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 566 (S.D.N.Y. 2016) (quoting

*N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 46 (2d Cir. 1999)).  This is what Plaintiff has

alleged here.  (TAC ¶¶ 44–49.)  These allegations are sufficient for the TAC to allege that

Hedgeye's customer lists constitute trade secrets for the purpose of a motion to dismiss.  *See Paz

Systems, Inc. v. Dakota Group Corp.,* 514 F. Supp. 2d 402, 408 (E.D.N.Y. 2007) (finding customer

information and financial data were trade secrets); *see also M&A Metals, Inc. v. Fina*, No. 21-

CV-5570 (PKC)(PK), 2023 WL 2734794, at *5 (E.D.N.Y. Mar. 31, 2023) ("As the case law makes

clear, customer lists may, in appropriate circumstances, come within the broad definition of secrets

under the DTSA.")

Additionally, Hedgeye alleges that it took reasonable measures to protect its trade secrets.

While some courts have found that a confidentiality agreement, absent more, may not itself

constitute reasonable measures, courts generally find that where documents are accessible only

through password-protected means and an employee handbook prohibits the misuse of confidential

information, a plaintiff has adequately alleged reasonable measures for purposes of the DTSA.

*See, e.g.*, *ExpertConnect, L.L.C. v. Fowler*, No. 18-CV-4828 (LGS), 2019 WL 3004161, at *4

(S.D.N.Y. July 10, 2019); *see also Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp.*, No.

15-CV-211, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016).  Here, Plaintiff alleges that

Hedgeye employees all signed agreements which required them to keep the information they were exposed to during their employment confidential.  (TAC ¶ 52.)  Employees were also bound by the Company's ethics rules which required them to acknowledge that confidential information could only be used for authorized purposes.  (TAC ¶ 53.)  An employee's attestation to these requirements was updated annually.  (TAC ¶ 54.)  Hedgeye also alleges that confidential information was only disseminated to its employees on a "need-to-know" basis.  (TAC ¶ 55.) Additionally, all confidential information was used and stored only on the company network, which was password protected and required a VPN and login to access remotely.  (*Id.*)  Hedgeye also alleges that some of its information were password protected or stored in permission-based folders or directories.  (TAC ¶ 56.)  These allegations are sufficient at the pleading stage.  *See ExpertConnect, L.L.C.*, 2019 WL 3004161, at *4.

    B.  <u>Misappropriation</u>

"Under the DTSA, a complaint must plead that the defendant misappropriated a trade secret (1) by acquiring a trade secret by improper means, or (2) disclosing or using the trade secret without consent.  *See ExpertConnect, L.L.C.*, 2019 WL 3004161, at *6 (citing  *AUA Private Equity Partners, LLC v. Soto*, No. 17-cv-8035, 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018)).  In other words, the DTSA "contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use."  *AUA Priv. Equity Partners, LLC*, 2018 WL 1684339, at *4 (quoting *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, No. 15-cv-2177 (SI), 2017 WL 1436044, at *4 (N.D. Cal. Apr. 24, 2017)).

Defendants Terman, Solstein Capital, 42 Macro and Lamar essentially argue that the TAC does not specifically allege how they individually misappropriated Hedgeye trade secrets and that the TAC instead simply relies on conclusory allegations and group pleading to attribute Dale's conduct to them.  Generally, courts have held that that conspiracy or secondary liability under the

DTSA is not available as a private right of action, and thus a plaintiff must show "that each defendant individually misappropriated at least one trade secret." *Broidy Cap. Mgmt. LLC v. Muzin*, No. 19-CV-0150 (DLF), 2020 WL 1536350, at *13 (D.D.C. Mar. 31, 2020), *aff'd*, 12 F.4th 789 (D.C. Cir. 2021); *see also Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425, 451 (S.D.N.Y. 2012). Moreover, Federal Rule of Civil Procedure 8 requires "at a minimum" that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order). Thus, "[w]here a complaint "lump[s] all the defendants together in each claim and provid[es] no factual basis to distinguish their conduct, [it] fail[s] to satisfy this minimum standard." *In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 438 (S.D.N.Y. 2019) (quoting *Atuahene*, 10 F. App'x at 34)). With that being said, "[n]othing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant." *Manchanda v. Navient Student Loans*, No. 19CV5121, 2020 WL 5802238, at *2 (S.D.N.Y. Sept. 29, 2020) (citing *Vantone Grp. Ltd. Liab. Co. v. Yangpu NGT Indus. Co.*, 2015 WL 4040882, at *4 (S.D.N.Y. July 2, 2015)). The Court will review the allegations of misappropriation as to each Defendant.

i.    *Dale*

The Court finds that the TAC plausibly alleges that Dale acquired, disclosed, and used trade secrets through improper means by breaching his Employment Agreement and Code of Ethics to copy and wrongfully retain Hedgeye confidential information after he resigned from the company.  To survive a motion to dismiss, a plaintiff may allege misappropriation through either "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent' in specified circumstances." *AUA Priv. Equity Partners, LLC*,

2018 WL 1684339, at *4 (quoting 18 U.S.C. § 1839(5)).  "Improper means" can involve "theft ... [or] breach or inducement of a breach of a duty to maintain secrecy," *id.* (quoting 18 U.S.C. § 1839(6)(A)), including contractual agreements not to disclose or disseminate information, *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 511 (S.D.N.Y. 2017).

Hedgeye alleges that on March 28, 2021, shortly before Dale resigned from Hedgeye, he copied "copied dozens of computer files comprising gigabytes of information from Dale's work computer to his private Dropbox account in the cloud."  (TAC ¶ 117.)  This information allegedly consisted of Hedgeye's confidential and proprietary financial models and excel files.  (TAC ¶ 118–119.)  Plaintiff bolsters these allegations by showing that certain documents, such as "The Price Volume Volatility" document that was saved on Dale's company-issued laptop was also saved on Dale's private DropBox account and deleted from Hedgeye's files.  (TAC ¶¶ 120–121.)  Plaintiff alleges that Defendants uploaded over 11,000 contacts from Hedgeye's master list of contacts into Dale's personal Dropbox before his departure and that he remained in possession of confidential and proprietary notebooks that should have been surrendered to Hedgeye after he left the company.  (TAC ¶¶ 115, 117, 155–159.)  Plaintiff alleges that this information was shared with Defendants Terman and Lamar and used by Dale to help start his new venture—42 Macro—to compete with Hedgeye's existing business.  (TAC ¶¶ 97, 101, 111–134.)  Dale also allegedly used Hedgeye's curated customer lists and trade secrets to convince Hedgeye's clients to subscribe to 42 Macro instead of Hedgeye.  (TAC ¶¶ 152, 155.)  All of this was done in violation of the confidentiality and non-compete provisions in the Employment Agreement and Code of Ethics.  These allegations are sufficient to show misappropriation on the part of Dale.  *See AUA Private Equity Partners, LLC*, 2018 WL 1684339, at *4; *see also ExpertConnect, L.L.C.*, 2019 WL 3004161, at *6 (finding a complaint adequately plead misappropriation where defendants had acquired trade secrets when

they breached their non-disclosure agreements and defendants "disclosed and used [plaintiff's] trade secrets to solicit [plaintiff's] clients without [p]laintiff's consent.")

    ii.    *Terman*

The TAC adequately alleges that Terman misappropriated Hedgeye source files by acquiring them through improper means. Although the DTSA does not define acquisition, courts have construed the term in this context as "the gaining of possession or control over something." *AUA Priv. Equity Partners, LLC*, 2018 WL 1684339, at *5. As stated, a plaintiff may allege misappropriation through "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means…" *Id.* at *4. "Improper means" can involve "theft ... [or] breach or inducement of a breach of a duty to maintain secrecy…" *Id.* Otherwise stated, "a party must show 'an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, *or derived from or through a person who owed such a duty*." *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, No. 15-CV-211 (LGS)(RLE), 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (quoting 18 U.S.C. § 1839(3) (A)–(B) (emphasis added)).

Here, the Plaintiff alleges that Terman "knew that Dale was not authorized to give access to Hedgeye's confidential information and trade secrets to anyone else." (TAC ¶ 130.) Terman allegedly knew that Hedgeye source files constituted proprietary information, but she nonetheless induced Dale to breach his duty of confidentiality to Hedgeye by "promising him direct and indirect compensation for doing so." (TAC ¶¶ 81, 113–114.) This proprietary information was uploaded by Dale to a DropBox folder, which Terman both had access to and edited herself, thus

giving her access and control over Hedgeye's proprietary and confidential information.  (TAC ¶¶ 112, 128–129.)

The cases and arguments raised by Terman do not yield a different result.  In *Frydman v. Verschleiser*, the court found that complaint did not adequately state a claim of a conspiracy to steal trade secretes because the allegations regarding conspiracy were conclusory and there were no plausible allegations that the main actor needed any inducement to steal trade secrets.  172 F. Supp. 3d 653, 674 (S.D.N.Y. 2016).  However, in *Frydman*, the court examined the adequacy of allegations under the Racketeer Influenced and Corrupt Organizations Act, not under the DTSA or common law misappropriation.  Likewise, Terman's argument that the 42 Macro folder on DropBox did not actually contain any Hedgeye trade secrets is also unpersuasive.  This line of reasoning asks the Court to review extrinsic evidence outside of the pleadings and to construe the facts in the light most favorable to the movant instead of the non-movant.  *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (Rule 12(b)(6) "assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it."); *see also Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005) (On a motion to dismiss, the court "assume[s] that all well-pleaded factual allegations are true and draw all reasonable inferences in the plaintiff's favor.")

For these reasons, the Court finds that the TAC's allegations as to Terman, construed in the light most favorable to Plaintiff, are sufficient to show that Terman misappropriated Hedgeye trade secrets within the meaning of the DTSA.

 iii. *Lamar*

The TAC adequately alleges that Lamar misappropriated Hedgeye trade secrets when he acquired and used them as the source files for his 42 Macro.  While Lamar argues that "mere possession" of a trade secret may not be enough to allege disclosure or use of a trade secret, the

TAC does not allege that Lamar merely possessed Hedgeye's trade secrets. Plaintiff alleges that Lamar gained access to Hedgeye's trade secrets when Dale uploaded various Hedgeye source files to his private DropBox, in violation of of Dale's duty of confidentiality to Hedgeye, and that these files were shared with Lamar via DropBox. (TAC ¶¶ 128.) The trade secrets were allegedly used as the basis for the financial models that were used by Lamar and Dale as source files for 42 Macro, their venture that was allegedly created to compete directly with Hedgeye. (TAC ¶¶ 92, 98–100, 112, 118–121, 131.) Thus, drawing all reasonable inferences in Plaintiff's favor, the Court finds that the TAC adequately alleges that Lamar misappropriated Hedgeye confidential and proprietary information when he accessed them on a shared DropBox account and used them as the basis for 42 Macro's business model. These allegations as to Lamar are sufficient to give Lamar notice of the claims against him. *See ExpertConnect, L.L.C.*, 2019 WL 3004161, at *6.

      iv.     *42 Macro and Solstein Capital*

On the other hand, the Court finds that the TAC fails to adequately state any facts suggesting that 42 Macro and Solstein Capital misappropriated Hedgeye trade secrets. "Individual defendants, corporate or otherwise, are entitled to notice of the misappropriations for which [Plaintiff] seeks to hold them liable." *Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425, 451 (S.D.N.Y. 2012). The mere allegation that an individual defendant might control a corporate defendant is not sufficient to allege liability for misappropriation as to the corporate defendant. *Id.* (collecting cases). Accordingly, Plaintiff's claim under the DTSA as to Solstein Capital and 42 Macro are dismissed.

    C.  <u>Damages</u>

Finally, The Court finds that the TAC adequately pleads damages as to its misrepresentation claims. Under the DTSA, a plaintiff may seek damages not only for "actual loss caused by the misappropriation of the trade secret" but also for "any unjust enrichment caused by

the misappropriation of the trade secret that is not addressed in computing damages for actual loss." 18 U.S.C. § 1836(b)(3)(B)(i).  Here, Plaintiff alleges that "Defendants' misappropriation has proximately caused damages to Hedgeye, including but not limited to, loss of profits, goodwill, competitive advantage, and business opportunities."  (TAC ¶¶ 234, 244.)  Furthermore, the TAC explains in detail how the misappropriation unjustly enriched them at Plaintiff's expense, causing Hedgeye to lose goodwill and anticipated profits.  (TAC ¶¶ 186–202.)  For instance, Plaintiff alleges that a number of its customers have switched from Hedgeye to 42 Macro because 42 Macro provides the same services as Hedgeye at a lower cost.  (TAC ¶ 202.)

Accordingly, for the aforementioned reasons, Defendants' motions to dismiss Count I are **granted** as to Defendants 42 Macro and Solstein Capital and **denied** as to Defendants Dale, Lamar and Terman.

### III.    COUNT II: Common Law Misappropriation (All Defendants)[2]

Defendants also move to dismiss Plaintiff's related claim for common law misappropriation.  "To state a claim for misappropriation of trade secrets under New York law, the [c]omplaint must plausibly allege "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."  *ExpertConnect, L.L.C.*, 2019 WL 3004161, at *6 (quoting *Schroeder v. Pinterest Inc.*, 17 N.Y.S.3d 678, 690 (1st Dep't 2015)).

Where a plaintiff has adequately alleged a claim under the DTSA, the corresponding claim for common law misrepresentation is generally also found to be legally sufficient.  *See Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020)  ("The elements for a misappropriation claim under New York law are fundamentally the same.") (citing *N. Atl.*

---

[2] The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

*Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999)); *see also ExpertConnect*, 2019 WL 3004161, at *7 (Because "[t]he requirements are similar," courts have found that a "[c]omplaint sufficiently plead[ing] a DTSA claim ... also states a claim for misappropriation of trade secrets under New York law.")  Thus, the Court finds that the TAC states a claim of common law misrepresentation as to Defendants Terman and Lamar.  Likewise, because the TAC fails to state a claim under the DTSA as to Defendants 42 Macro and Solstein Capital, it also necessarily fails to state a claim of common law misrepresentation against those Defendants.

Dale separately moves to dismiss Plaintiff's claim for common law misrepresentation for the independent reason that it is duplicative of Plaintiff's claim for breach of contract.  (ECF No. 333 at 20–21.)  "Under New York law, when a valid agreement governs the subject matter of a dispute between parties, claims arising from that dispute are contractual."  *Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 Fed. Appx. 57, 59, 2011 WL 5966373 at *1 (2d Cir. Nov. 30, 2011).  "However, a defendant 'may also breach an independent duty in tort if the defendant goes beyond a mere breach of the contract and acts in such a way that a trier of fact could infer that it willfully intended to harm the plaintiff.'"  *Opternative, Inc. v. Jand, Inc.*, No. 17 CIV. 6936 (JFK), 2018 WL 3747171, at *7 (S.D.N.Y. Aug. 7, 2018) (quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 16 (2d Cir. 2003)).

Having reviewed both causes of actions and the facts underlying both, the Court finds that the common law misappropriation claim is not duplicative of its breach of contract claim.  Although for the common law misappropriation is premised on a breach of Dale's Employment Agreement and Hedgeye's Code of Ethics (TAC, ECF No. 325-1 ¶ 247), Plaintiff has alleged sufficient facts from which a trier of fact could infer willful conduct intended to harm Plaintiff.  Specifically, Plaintiff has alleged that Dale was unhappy with his compensation and that his

behavior became "increasingly erratic and threatening" before he left the Company which could be probative of willful intent to harm Plaintiff.  (AC ¶¶ 87–89.)

Accordingly, for the aforementioned reasons, Defendants' motion to dismiss Plaintiff's claim of common law misrepresentation is **granted** as to Defendants 42 Macro and Solstein Capital and **denied** as to Defendants Dale, Terman and Lamar.

### IV.    Count III: Breach of Contract (Dale)

In Count III, Plaintiff alleges that Dale breached the (1) confidentiality, (2) non-solicitation, (3) non-competition and (4) assignment of rights provisions of the Employment Agreement, as well as the confidentiality provision the Code of Ethics.  (Am. Compl., ECF No. 325-1 ¶¶ 250–260.)  "Under Connecticut law, a breach of contract claim has four elements: (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and (4) damages." *Prysmian Cables & Sys. USA LLC v. ADT Com. LLC*, No. 3:22-CV-836 (VAB), 2023 WL 2712613, at *4 (D. Conn. Mar. 30, 2023) (citing *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291, 87 A.3d 534 (2014)).[3]

For the reasons further outlined below, the Court finds that the TAC adequately alleges a claim of breach of contract for the confidentiality, non-competition, and non-solicitation clauses of the Employment Agreement and Code of Ethics, but fails to state a claim for breach of the assignment of rights provision of the Employment Agreement.

A.    The Confidentiality and Non-Competition Provisions

First, the Court finds that the Amended Complaint adequately alleges a *prima facie* case of breach of contract for breach of the confidentiality provision and non-competition provision of the Employment Agreement and Code of Ethics.

---

[3] The parties agree that Connecticut law governs these contractual claims.

According to the TAC, the Employment Agreement and Code of Ethics (1) prohibited Dale from disclosing confidential information (*id.* ¶ 25), (2) prohibited Dale from competing with Hedgeye while he was employed (*id.* ¶ 26), and (3) provided that all of Dale's work produced during his employment with the Company would belong to the Company (*id.* ¶ 30.)  The Code of Ethics similarly requires that employees owe a "duty of loyalty" to Hedgeye while they are employed and prohibited the unauthorized disclosure of confidential Hedgeye information.  (*Id.* ¶ 28.)

Plaintiff alleges that Dale breached these agreements by, *inter alia*, uploading Hedgeye files to a shared Dropbox account, taking pictures of confidential information with his personal cell phone, and using Hedgeye's confidential and proprietary files as the basis for his competing venture—42 Macro.  (*See, e.g., id.* ¶¶ 112, 115–134.)  This allegedly damaged Hedgeye through loss of profits, goodwill, and business opportunities.  (*See, e.g.*, TAC ¶ 234.)  These allegations, accepted as true for the purposes of the motion, are sufficient for the TAC to survive a motion to dismiss.  Defendant Dale's arguments to the contrary invite the Court to weigh competing  factual inferences, which is not appropriate at this stage in the litigation. *See Glob. Network Commc'ns, Inc.*, 458 F.3d at 155; *see also Nechis*, 421 F.3d at 100.  Likewise, Dale's arguments that the activity described in the TAC amounts to "mere preparatory activity" (ECF No. 333 at 22), are also unpersuasive because it invites the Court to weigh competing inferences from the facts, which it cannot do at this stage at the pleadings.  Thus, Dale's arguments are unavailing and do not warrant dismissal of this claim.

B.  The Non-Solicitation Provision

The Court finds that the TAC adequately states a claim of breach the non-solicitation clauses in the Employment Agreement.  Plaintiff alleges that Dale "agreed that, while employed and for a period of six months afterward, he would not 'hire, engage, offer to hire, divert, entice

away, solicit or in any other manner persuade or attempt to persuade ("Solicitation") any person who is, or was, at any time within the twelve (12) months prior to such Solicitation, an officer, director, employee, agent, consultant, licensor, licensee, customer, or supplier of the Company or any of its affiliates to discontinue, terminate or adversely alter his, her or its relationship therewith." (TAC ¶ 27.)  The TAC alleges that this prohibition was breached when Dale solicited a Hedgeye employee—Collin de Rham—to work for 42 Macro in the Spring of 2021.  (TAC ¶¶ 160–161.)  Although Dale disagrees with the veracity of these allegations, again, on a motion to dismiss where the Court assumes a plaintiff's allegations to be true, the Court cannot entertain different versions of the factual record.  *See Glob. Network Commc'ns, Inc.*, 458 F.3d at 155; *see also Nechis*, 421 F.3d at 100.

Dale further argues that the non-solicitation provision of the Employment Agreement is unenforceable because "a restrictive covenant that prevents an employee from approaching any customer of his former employer, even those with whom he never worked, is overbroad and unenforceable under Connecticut law."  (Dale Mem., ECF No. 333 at 22.)  This argument is also unavailing.

Connecticut, like many other jurisdictions, carefully limits a former employer's ability to restrict an employee's ability to compete, including by soliciting the employer's other employees.

> "By definition covenants not to compete with their employers after termination of their employment restrain trade in a free market…Consequently, these covenants may be against public policy, and, thus are enforceable only if their imposed restraint is reasonable, an assessment that depends upon the competing needs of the parties as well as the needs of the public. These needs include: (1) the employer's need to protect legitimate business interests, such as trade secrets and customer lists (2) the employees need to earn a living and (3) the public's need to secure the employee's presence in a labor pool."

*Deming v. Nationwide Mutual Ins. Co*., 279 Conn. 745, 761 (2006).

Neither party actually analyzes the individual factors in the standard, but on the Court's assessment of the factors, the non-solicitation provision does not appear to be overly broad nor unenforceable. As an initial matter, the non-solicitation provision is explicitly limited to just a six-month period. (TAC ¶ 27.) Dale has put forward no argument that the non-solicitation provision infringed on his ability to earn a living following the end of his employment with Hedgeye or that the provision somehow infringes on the public's need for Dale in the labor pool. By contrast, Hedgeye maintains that the provision safeguards its legitimate business interests of protecting its trade secrets and customer lists. (ECF No. 345 at 22.)

Dale merely argues that the non-solicitation provision is unenforceable because it contains no geographic limitation, relying on *DelVecchio Reporting Servs., LLC v. Edwards* No. CV-166061264S, 2017 WL 3623432, at *18 (Conn. Super. Ct. July 13, 2017)). In *DelVecchio*, the Superior Court of Connecticut found a non-solicitation clause that precluded a former employee from soliciting any clients, including prospective clients, of his former employer for a period of five years with no geographic scope was unreasonable and unenforceable as a matter of law. Those circumstances are distinguishable from those here where Dale is accused of soliciting a Hedgeye employee, not a client or prospective client, and there is no indication that this hampered Dale's ability to gain future employment once he left Hedgeye.

C. The Assignment of Rights Provision

By contrast, the Court finds that the TAC does not adequately plead a breach of the assignment of rights provision in the Employment Agreement. Nowhere in the TAC does Plaintiff explain what the assignment of rights provision says or how it was allegedly violated, beyond conclusory statements that "Dale breached the assignment of rights provision of the Employment Agreement." (TAC ¶ 256.) "Conclusory allegations that a defendant breached an agreement are insufficient to support a breach of contract claim." *Universal Surv. Ctr., Inc. v. Precision Opinion*,

Inc., No. 16-CV-8259 (AKH), 2017 WL 11615247, at *2 (S.D.N.Y. Feb. 8, 2017) (quoting *Frontline Processing Corp. v. Merrick Bank Corp.*, 2014 WL 837050, at *2 (S.D.N.Y. Mar. 3, 2014)).  Accordingly, Plaintiff's claim for breach of the assignment of rights provision of the Employment Agreement is dismissed for failure to state a claim.

## V.    Count IV: Tortious Interference (Lamar, 42 Macro, Terman and Solstein Capital)

Next, Defendants move to dismiss Plaintiff's fourth cause of action for tortious interference with contract claim alleged against Lamar, 42 Macro, Terman and Solstein.  The TAC alleges that these defendants knew that Dale and Hedgeye has entered into the Employment Agreement but that they intentionally induced Dale to breach the confidentiality and intellectual property ownership provisions of the Employment Agreement.

To prevail on a claim for tortious interference with a contract, a plaintiff must allege: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of contract without justification; (4) actual breach of the contract; and (5) damages.  *RSM Production Corp. v. Fridman*, 643 F.Supp.2d 382, 405 (S.D.N.Y. 2009) (citing *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006)).  Moreover, "the plaintiff must assert, with respect to each defendant, that the defendant's actions were the 'but for' cause of the alleged breach."  *Id.*  To demonstrate "but for" causation, a plaintiff must show that any breach would not have occurred but for the activities of that defendant.  *Id.*; *see also Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir. 1990) (citing *Special Event Entm't v. Rockefeller Ctr., Inc.*, 548 F.Supp. 72, 78 (S.D.N.Y. 1978)).  A failure by a plaintiff to properly allege any individual element of a tortious interference with a contract claim warrants dismissal.  *RSM Production Corp.*, 643 F.Supp.2d at 405.

The Court finds that Plaintiff fails to state a claim for tortious interference of contract as to the Employment Agreement and Code of Ethics. The allegations are conclusory and lack any factual specificity. (*See* TAC ¶ 263 ("Lamar, 42 Macro, Terman and Solstein had knowledge of the Employment."); *id.* ¶ 264 ("On information and belief, Lamar, 42 Macro, Terman and Solstein knew those employment contracts with Hedgeye prohibited Dale from competing with Hedgeye while still employed.").) The TAC does not provide any factual detail as to how Defendants would have known the actual terms of the Employment Agreement and the Code of Ethics, beyond general speculation that Dale had a general duty of confidentiality with respect to Hedgeye's information. These general and conclusory allegations need not be credited by the Court. *Glob. View Ltd. Venture Cap.*, 288 F. Supp. 2d at 484 ("Even under the liberal pleading standard of Federal Rule of Civil Procedure 8, courts need not credit conclusory allegations, or legal conclusions without factual allegations.") Moreover, Plaintiff does not allege that Defendants were the "but for" causation of Dale breaching the Employment Agreement. Rather, the allegations suggest that Dale quit Hedgeye and decided to form his own competing company because he was unhappy with his compensation at Hedgeye, and not because any of the Defendants induced him to breach any of the relevant agreements.

Accordingly, Defendants' motions to dismiss Plaintiff's claim for tortious interference with contract are **granted** and Count IV is dismissed.[4]

---

[4] The Terman Defendants assert that California law would apply to the tortious interference claim because the alleged tortious acts on the part of the Terman Defendants took place in California. (ECF No. 335 at 20 n.3.) While Plaintiff cites to Second Circuit precedent in support of its claim, it does not directly address the issue of whether California or New York law would apply to this claim. Because of the similarity between the standards, the Court finds that the TAC also fails to state a claim of tortious interference under California law for the same reasons it fails to state a claim under New York law. *See Honey Bum, LLC v. Fashion Nova, Inc.*, No. 2:20-CV-11233-RGK-AS, 2022 WL 385185, at *4 (C.D. Cal. Jan. 6, 2022) ("to state a claim for tortious interference with Dale's employment agreement, Hedgeye must establish, "(1) a valid contract

## VI.     Counts V, VI: Breach of Contract (Solstein Capital), Tortious Interference (Terman)

Plaintiff brings a claim of breach of contract against Solstein Capital based on the "Services Agreement" which it entered into with Hedgeye as its customer and client.  Plaintiff alleges that Solstein Capital breached the "Services Agreement" by (1) "solicitating" Dale while he was an employee of Hedgeye and (2) by misappropriating Hedgeye's confidential information.   (TAC, ECF No. 325-1 ¶ 275–282.)   Plaintiff also alleges that Defendant Terman is liable for Solstein Capital's conduct as its principal.

The Court finds that Plaintiff has not adequately stated a breach of contract claim against Solstein Capital.  To survive a motion to dismiss under Rule 12(b)(6), Plaintiff  must provide "sufficient factual matter" in its complaint to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. 544, 570 (2007).  There must be enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

The TAC contains no factual assertions to supports its allegations that Terman violated the Services Agreement by "soliciting" Dale while he was still employed at Hedgeye.  Plaintiff merely alleges that:

> "Pursuant to the Services Agreement, Solstein Capital was prohibited from soliciting Hedgeye employees during the term of the Services Agreement, or from employing Hedgeye employees for twelve (12) months after the employee's termination. On information and belief, Solstein Capital breached this provision by soliciting Dale while he was still a Hedgeye employee."

---

between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.")

(TAC, ECF No. 325-1 ¶ 277.)  This bare assertion, which does not even include the alleged agreement at issue or even quote any contractual language, does not explain how Solstein Capital's actions violated that provision.  For instance, the TAC does not explain the meaning of "solicitation" within the Services Agreement.  Neither does the TAC allege when, where or how Solstein Capital allegedly "solicited" Dale, beyond conclusory allegations that "each Defendant solicited Dale in this District to breach his employment agreement."  (TAC ¶ 11).  The TAC merely alleges that Terman (Solstein Capital's principal) and Lamar agreed to form a new company called Longbow, that on March 23, 2021 Lamar sent Dale a video describing how Longbow would work, and that on April 4, 2021 Dale allegedly joined Terman and Lamar as a partner in Longbow.  (TAC ¶¶ 162, 167, 171.)  These allegations do not say anything about how *Solstein Capital* allegedly "solicited" Dale to quit Hedgeye to join Longbow, a separate company that is not even alleged to be involved with Longbow.  In fact, the TAC primarily alleges that Dale decided to quit Hedgeye to pursue his own business venture because he was unhappy with his compensation.  Moreover, based on the pleadings, the Services Agreement appears to govern Solstein Capital's usage of Hedgeye's website while using Hedgeye's services, but none of the allegations about misappropriation in the TAC pertain to Solstein Capital's usage of the Hedgeye website.  For instance, Plaintiff alleges that the Services Agreement prohibited Solstein Capital from "Infringing on Hedgeye's intellectual property in using the Website or Services" (TAC ¶ 278), but the TAC does not connect how any of the alleged conduct amounted to a breach the Services Agreement by Solstein Capital based on its usage of the website.  These allegations, ripe with conclusory group pleading, do not allege a cause of action as to Solstein Capital beyond the speculative level, and thus, must be dismissed on that basis.  *See Universal Surv. Ctr., Inc.*, 2017 WL 11615247, at *2; *see also  Radin v. Albert Einstein Coll. of Medicine of Yeshiva Univ.*, No. 04-cv-704, 2005 WL

1214281, at \*10 (S.D.N.Y. May 20, 2005) ("[T]o state a valid claim for a breach of contract, a plaintiff must state when and how the defendant breached the specific contractual promise.").

Likewise, because Plaintiff has failed to state a claim against Solstein Capital for breach of contract, Plaintiff's tortious interference claim against Terman based on the same alleged conduct is also dismissed.  *See Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 627 (S.D.N.Y. 2014).

### VII.   Count VII: Unfair Competition (All Defendants)

Plaintiff alleges that Defendants have engaged in unfair competition, alleging that they have "misappropriate[ed] the results of the labor, skill, and expenditures of Hedgeye" and, in doing so, have "Defendants acted in bad faith, exploiting commercial advantage which belonged exclusively to Hedgeye." (TAC ¶¶ 292, 293.)  The Terman Defendants argue that Plaintiff's unfair competition claim is preempted by California's Uniform Trade Secrets Act and that the claim is duplicative of Plaintiff's claim under the DTSA.  (ECF No. 335 at 22–24.)  The Dale Defendants argue that the unfair competition claim should be dismissed because it fails to state sufficient facts as to Defendants Lamar and 42 Macro, it is duplicative of the Plaintiff's breach of contract claim, and because Plaintiff fails to state a claim of misappropriation.  (ECF No. 333 at 14–17, 20–21.)

As an initial matter, Plaintiff does not respond to the arguments made by Solstein Capital and Terman regarding the  unfair competition claim, and thus has conceded them.  *Curry Mgmt. Corp. v. JPMorgan Chase Bank, N.A.*, No. 22-CV-05006-CM, 2022 WL 17342495, at \*3 (S.D.N.Y. Nov. 30, 2022) ("A party may be deemed to concede an argument by failing to address it in an opposition brief.") (citing *AT & T Corp. v. Syniverse Tech., Inc.*, No. 12-cv-1812 (NRB), 2014 WL 4412392, at \*7 (S.D.N.Y. Sept. 8, 2014)).  As such, the claim for unfair competition is dismissed at to Solstein Capital and Terman.

Additionally, because the TAC fails to state a claim of misappropriation under the DTSA as to 42 Macro, it also necessarily fails to state a claim for unfair competition based on the same

conduct.  *See Sci. Components Corp. v. Sirenza Microdevices, Inc.*, No. 3-CV-1851(NGG)(RML), 2006 WL 2524187, at *29 (E.D.N.Y. Aug. 30, 2006) ("Where an unfair competition claim duplicates a claim for misappropriation of trade secrets, the two claims generally rise or fall together.")  Accordingly, Plaintiff's claim for unfair competition against Defendants Terman, Solstein Capital and 42 Macro is also dismissed.

Next, the Court finds that Plaintiff's claim for unfair competition must also be dismissed against Dale because it is duplicative of the claim for breach of contract.  "Where a plaintiff's unfair competition claim is based entirely on the same alleged conduct proscribed by contract, and plaintiff has pled a breach of contract claim, the unfair competition claim" must be "dismissed as duplicative of the breach claim."  *Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*, No. 18-CV-4903 (JMF), 2019 WL 3066328, at *6 (S.D.N.Y. July 12, 2019) (citing *Bytemark, Inc. v. Xerox Corp.*, 342 F. Supp. 3d 496, 508 (S.D.N.Y. 2018)).  Like Plaintiff's claim for breach of contract, Plaintiff's unfair competition claim alleges that Dale "has engaged in unfair competition by misappropriating the results of the labor, skill, and expenditures of Hedgeye."  (TAC, ECF No. 325-1 ¶ 292.)  This is the same alleged conduct that underlies Plaintiff's breach of contract claim, and Plaintiff fails to articulate an independent duty, other than violation of any of the agreements at issue, which could form an independent basis for this tort claim.  Accordingly, Plaintiff's unfair competition claim as to Dale is also dismissed.

Finally, the Court finds that the TAC does not state a claim of unfair competition as to Defendant Lamar.  "To state a claim of unfair competition, "a plaintiff must allege that a defendant (1) misappropriated plaintiff's labor, skills, expenditures or good will, and (2) displayed some element of bad faith in doing so."  *ExpertConnect, L.L.C.,* 2019 WL 3004161, at *9 (quoting *Schroeder v. Pinterest Inc.*, 17 N.Y.S.3d 678, 693 (2015)).  The first element of unfair competition

is satisfied, because, as previously discussed, the TAC adequately alleges that Lamar misappropriated Hedgeye confidential and proprietary data for use in his new venture—42 Macro. However, the TAC does not allege that Lamar acted in bad faith, beyond conclusory allegations. (*See* TAC ¶ 293 ("In misappropriating Hedgeye's trade secrets and confidential information, Defendants acted in bad faith, exploiting commercial advantage which belonged exclusively to Hedgeye.")) "[B]ad faith can be established by a showing of fraud, deception, or an abuse of a fiduciary or confidential relationship." *Schroeder*, 17 N.Y.S.3d at 693 (citing *Big Vision Private, Ltd. v. E.I. du Pont de Nemours & Co.*, 610 Fed. Appx. 69, 70 (2d Cir. 2015)). "Bad faith is an essential element of an unfair competition claim", *Fung-Schwartz v. Cerner Corp.*, No. 17-CV-233 (VSB), 2019 WL 4393022, at *8 (S.D.N.Y. Sept. 13, 2019), but the TAC fails to allege how Lamar acted in bad faith to misappropriate Hedgeye's trade secrets. *See Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*, No. 18-CV-4903 (JMF), 2019 WL 3066328, at *6 (S.D.N.Y. July 12, 2019) (dismissing an unfair competition claim where "there [wa]s no plausible allegation that [defendant] acted in bad faith by obtaining access to plaintiff's business [information] through fraud or ... abuse of a ... confidential relationship[.]") (internal citations and quotations omitted). Accordingly, the Court finds that the TAC fails to adequately allege a claim of unfair competition as to Defendant Lamar.

For the reasons stated above, Defendants' motions are **granted** and Plaintiff's claim for unfair competition is dismissed as to all Defendants.

## VIII.   Leave to Amend

In the event that the Court grant any part of Defendants' motions to dismiss, Plaintiff requests leave to amend the complaint. "It is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so

requires."). Although Defendants argue that leave to replead should be denied because Plaintiff has already amended the operative complaint twice, neither of those amendments had the benefit of a ruling from this Court. *See Bookends & Beginnings LLC v. Amazon.com, Inc.*, No. 21-CV-2584 (GHW)(VF), 2022 WL 4586213, at *3 (S.D.N.Y. Sept. 29, 2022) (citing *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015)). Accordingly, Plaintiff is granted leave to replead within **21 days** of this opinion and order.

## CONCLUSION

For the foregoing reasons, the Defendants' motions are **DENIED IN PART** and **GRANTED IN PART** as follows:

- Count I for Violations of the DTSA is **dismissed** as to Defendants 42 Macro and Solstein Capital and **sustained** as to Defendants Dale, Lamar and Terman;

- Count II for Common Law Misappropriation is **dismissed** as to Defendants 42 Macro and Solstein Capital and **sustained** as to Defendants Dale, Lamar and Terman;

- Count III for Breach of Contract against Defendant Dale is **sustained** for breach of the confidentiality, non-competition and non-solicitation provisions of the Employment Agreement and Code of Ethics and **dismissed** as to claim for breach of the assignment of rights provision of the Employment Agreement;

- Count IV for Tortious Interference with Contract against Defendants Lamar, 42 Macro, Terman and Solstein Capital is **dismissed**;

- Count V for Breach of Contract against Defendant Solstein Capital is **dismissed**;

- Count VI for Tortious Interference with Contract against Defendant Terman is **dismissed**;

- Count VII for Unfair Competition against all Defendants is **dismissed.**

The Clerk of Court is respectfully requested to terminate the pending motions at ECF Nos. 330, 334 and 332 and to unseal the documents at ECF No. 333.

**SO ORDERED.**

**Dated: September 29, 2023**
**New York, New York**

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**