UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HEDGEYE RISK MANAGEMENT, LLC

    Plaintiff-Counterdefendants,

    v.

DARIUS DALE, STEVEN LAMAR, 42 MACRO LLC,
NADINE TERMAN, and SOLSTEIN CAPITAL LLC

    Defendants-Counterclaimants

No. 21-cv-3687 (ALC) (RWL)

**SECOND AMENDED
COUNTERCLAIMS**

Defendants Nadine Terman ("Terman") and Solstein Capital, LLC ("Solstein") (together with Terman the "Counterclaimants") by their undersigned attorneys, hereby incorporate their answer and affirmative defenses to the third amended complaint of Plaintiff Hedgeye Risk Management, LLC ("Hedgeye" or "Plaintiff"), as filed on January 31, 2023, at ECF 461, and state their second amended counterclaims as follows:

**NATURE OF THE COUNTERCLAIMS**

1. These counterclaims arise from the illegal conduct of Plaintiff Hedgeye. As directed by its key principals, Keith McCullough ("McCullough") and Michael Blum ("Blum"), Hedgeye pursued a vindictive campaign of defamation and character assassination against Terman and her investment firm, Solstein.

2. Hedgeye made its false and defamatory statements with malice and with the intent of harming Terman and Solstein's business. Hedgeye successfully interfered in Solstein's and Terman's business relationships with clients and business partners, coupling its deceitful smears against Counterclaimants with direct and indirect threats of retaliation against others who would continue to do business with Solstein and Terman.

1

3.      Hedgeye's campaign of vituperation successfully sought to gag Terman's regular contributions on the popular CNBC investment news network, appearances that enraged McCullough, who bears a deep, longstanding animus against the network and its contributors. Hedgeye then cynically exploited its shameless lies about Terman and Solstein to frighten and then poach Solstein clients, encouraging them to switch their money from Solstein to an investment advisor affiliated with Hedgeye and owned by McCullough.

4.      Before Hedgeye turned its ire against Counterclaimants, Solstein had subscribed to Hedgeye's services, paying $420,000 from 2017-2021. However, Counterclaimants signed up for those services based on Hedgeye's false pretenses, false representations, and material omissions.

5.      Most troubling, while Hedgeye innocently portrayed itself as industry "white hat," free of any of the tawdry conflicts of interest that tarnished other industry players, its self-portrayal as a purely independent provider of financial advice that did not trade itself was a blatant lie. Hedgeye personnel, led by CEO McCullough, regularly traded securities simultaneously recommended in its "Real Time Alerts" ("RTAs"), often obtaining a better price for themselves than what was recommended to subscribers. Because the whole reason that Solstein did business with Hedgeye was due to Solstein's belief in the firm's independence and freedom from conflicts, Solstein never would have signed up for Hedgeye's services had it known the sordid truth.

6.      Hedgeye's improper conduct has caused significant harm to Terman and Solstein. In addition to over $420,000 paid to Hedgeye for its services based on fraudulent inducement, Counterclaimants have suffered severe reputational harm, loss of business revenue in excess of $3.4 million and loss of business opportunities worth millions of dollars more.

**PARTIES**

7.      Terman is a resident of Los Altos, California. She is a co-founder and a Managing Member of Solstein.

8.      Solstein is a limited liability company registered in the state of Delaware. Its principal offices are located in California and its members are all citizens of California or Florida.

9.      Hedgeye is a Delaware limited liability company with its principal place of business located at 1 High Ridge Park, Stamford, CT 06905. On information and belief, Hedgeye's members are citizens of the states of Connecticut, New York, and/or Nevada. On information and belief, Hedgeye's members are not citizens of California or Florida.

**JURSDICTION AND VENUE**

10.      This Court has subject matter jurisdiction under 28 U.S.C. §1332(a) because Counterclaimants are citizens of California and Florida, Plaintiff is a citizen of other states, and the amount in controversy exceeds $75,000.

11.      This Court also has subject matter jurisdiction under 28 U.S.C. §1367 because the counterclaims are sufficiently related to the claims in the action within original jurisdiction.

12.      This Court has personal jurisdiction over Plaintiff because Plaintiff consented to the jurisdiction of this Court by filing its own actions against Counterclaimants.

**FACTUAL ALLEGATIONS**

**A. Solstein's Business**

13.      Solstein is an SEC-registered investment adviser that provides investment advisory services on a discretionary basis to a private fund and separately managed clients, such as high net worth individuals, family offices, and institutions.

3

14.     Solstein was founded as an independent investment firm in 2010. Its co-founders and current Managing Members are Terman, J.C. Torres, and Sandra Southworth. Collectively, they have over 70 years of investment experience. In 2011, they launched the firm's first investment vehicle.

15.     Solstein sources the majority of its investment ideas and themes through the views, perspectives and experiences of its Managing Members. Starting with only $5 million dollars in Assets Under Management ("AUM") in August 2011, Solstein over the next decade worked hard to grow the firm, which now manages hundreds of millions of dollars for its clients.

16.     Solstein and its principals have been leaders supporting diversity initiatives in the industry, launching the conference that has become 100WF's Global FundWomen Week, spearheading Bloomberg's Diversity Drives Returns events, participating in Bloomberg's New Voices program, and participating in CNBC's NEXT program. Terman has served as keynote speaker for Bloomberg's annual diversity conference.

17.     In 2019, Terman began appearing on Bloomberg and CNBC (after participating in their New Voices and NEXT programs, which seek to train and increase diverse participation across their media platforms.) Terman and Solstein have been consistently committed to furthering diversity in the investment industry and encouraging participation and leadership roles from professionals with diverse backgrounds.

18.     Beginning in February 2021, Terman became a regular paid contributor on the CNBC show "Fast Money," an hour-long program airing each weekday in the key 5PM - 6PM Eastern time slot, covering key market events of the day. Terman typically appeared on Fast Money once or twice per week. She also made occasional appearances on other CNBC shows, including Closing Bell and Options Action.

19.     Terman's CNBC appearances were a key driver of brand awareness for Solstein and for her personally. They gave her and Solstein exposure to hundreds of thousands of viewers that they would not otherwise have had access to, and because the CNBC media properties have global reach and post clips to globally available social media, it gave them access to people from all over the world.

20.     The CNBC relationship also led to invitations to other industry events and opportunities, further expending Solstein's reach.

**B. Solstein Was Fraudulently Induced Into Subscribing to Hedgeye**

21.     For compensation, Hedgeye provides investment advice to others and issues reports and analyses regarding securities.

22.     In 2017, Solstein entered into a services agreement with Hedgeye (the "Agreement").

23.     The Agreement required Hedgeye to deliver Solstein a copy of Hedgeye's Form ADV before execution and Hedgeye provided a copy of its March 2017 ADV before the Agreement was executed on July 1, 2017.

24.     Prior to executing the Agreement, Counterclaimants reviewed the March 2017 Form ADV, and descriptions of Hedgeye services on Hedgeye's website. Counterclaimants also discussed Hedgeye's offerings with Hedgeye personnel, including Keith McCullough. During those discussions, Mr. McCullough emphasized Hedgeye's independence and lack of conflicts of interest as compared to other industry participants, including that fact that Hedgeye personnel did not trade in securities recommended or covered by Hedgeye.

25.     As discussed in detail below, in connection with the execution of the Agreement, Hedgeye made materially false representations to induce Counterclaimants into entering into the

Agreement, as well as omitted to disclose facts necessary in order to make its representations not materially misleading.

### i.        Misrepresentations About Hedgeye's RTA Front-Running

26.        Hedgeye made materially misleading statements and omissions concerning RTAs, a key service that was a critical material inducement for Counterclaimants in executing the Agreement.

27.        Prior to the execution of the Agreement on July 25, 2017, Counterclaimants reviewed Hedgeye's disclosures concerning RTAs on the Hedgeye website.

28.        The website described RTAs "an indispensable trading tool" and "a must have signaling tool to help guide your decision-making." Most importantly for Counterclaimants, Hedgeye touted its status as "an independent research firm" and represented that "We have no conflicts of interest like a trading desk and don't run any money."

29.        Hedgeye further repeated and elaborated on these representations of independence in Item 8 of its Form ADV for March 2017, which Counterclaimants reviewed and relied on prior to executing the Agreement:

**Research Process, Methods of Analysis and Strategies**: Hedgeye was founded on principles of transparency, accountability, and trust and a belief that traditional investment firms are often highly conflicted, such that their interests do not align with those of their clients. Hedgeye believe [sic] this to be largely the case in the brokerage industry, which only gets paid when their customers execute transactions . . .Hedgeye makes top quality professional research available at a fee, thereby removing the inherent conflict of the brokerage pay model, and not tying the fee to investment performance, thus removing the

6

need to correlate our research ideas with what "the smart money" is doing or to show "window dressing" quarterly performance.

30. The March 2017 ADV also contains a section entitled "Interest in Client Transactions," which stated that "The Firm's policy is designed to reasonably prevent any employees from trading in a security in which the Firm is actively covering. Hedgeye employees, and the Firm itself, are permitted to invest with third-party managers, including managers who are Hedgeye subscribers, subject to compliance procedures or restrictions, as appropriate."

31. Counterclaimants reviewed these representations in the March 2017 ADV and relied on their truth in agreeing to execute the Agreement.

32. These statements in the March 2017 ADV were repeated in subsequent Form ADVs, including those issued by Hedgeye on April 2, 2018 and March 29, 2019, which Counterclaimants also reviewed. In addition, the March 29, 2019 ADV represented that: "Hedgeye does not manage portfolios, neither for its own accounts or on behalf of its Institutional Subscribers, and employees are restricted in trading their personal accounts" and that "The Firm's policy is designed to reasonably prevent any employees from trading in a security which the Firm is actively covering."

33. Counterclaimants relied on the representations in the April 2, 2018 ADV in deciding to renew the Agreement on a quarterly basis from April 2018 onwards. Counterclaimants relied on the representations in the March 29, 2019 ADV in deciding to renew the Agreement on a quarterly basis from March 2019 onwards. Had Counterclaimants known those representations to be false, they would not have renewed the Agreement and would have cancelled it instead.

34. Hedgeye has regularly confirmed to the general public its claims that Hedgeye personnel refrain from trading in securities recommended or covered by the firm. For example, as

recently as May 30, 2023, Hedgeye reiterated in a tweet that its trading policy "prohibits ALL Hedgeye employees (not just analysts) from trading stocks we cover. Our analysts are unconflicted. We make the best stock calls we can, for our subscribers, not for our own accounts." These statements echoed identical oral statements made by Hedgeye to Counterclaimants in 2017, prior to the execution of the Agreement, the representations made on Hedgeye's website as of July 2017, and the statements made in the March 2017 ADV that Counterclaimants reviewed.

35.    Prior to the execution of the Agreement, Counterclaimants also had access to reports of a lawsuit brought by Hedgeye against Carmine Perone in 2014. As reported by Business Insider, on May 9, 2014, the lawsuit brought defamation claims against Pirone for falsely characterizing McCullough's trading activity. The Business Insider article reported Hedgeye's claims that: "Hedgeye's terms of service and McCullough have addressed that. McCullough doesn't trade. No one at Hedgeye does. The company is an 'actionable investment research; agency, aka a tip sheet, not a fund with a portfolio.' And it claims to hold transparency in high esteem." The article went on to add, again based on information obtained from Hedgeye, that: "Hedgeye doesn't run any money. The employees there spend their time analyzing and researching markets, not buying and selling."

36.    Around the time of the Pirone dispute, on or about March 2014, McCullough released an explanatory YouTube video to the public about RTAs, currently available to view at https://www.youtube.com/watch?v=DirMwo9EqsQ as of the filing of this pleading. The stated purpose of the video was to explain "what is real-time alerts?" McCullough described them primarily as a "timing product." He then stated that RTAs were not a "portfolio," explaining that "I don't run a portfolio. That would be a conflict of interest." McCullough further continued: "We give you the signal at the same time that our institutional customers get the signal."

37.     Counterclaimants were familiar with the statements expressed by McCullough in the YouTube video, because Nadine Terman had heard McCullough express the same words orally many times before executing the Agreement in July 2017. McCullough often discussed Hedgeye's lack of conflicts as a key differentiating factor from its competitors, and emphasized the fact that he and other Hedgeye principals did not trade securities that Hedgeye covered and recommended. Counterclaimants believed those representations, and their belief in Hedgeye's independence and lack of conflicts was a key motivating factor that piqued their interest in company's offerings and induced them to sign the Agreement.

38.     Counterclaimants reviewed and relied on the representations by Hedgeye concerning its independence, its freedom from trading conflicts of interest, and its policy of forbidding Hedgeye personnel from trading in securities recommended or covered by the company. These representations were highly material to Counterclaimants, who would not have executed the Agreement (or renewed it for subsequent quarterly terms) had they not believed those representations to be true. It was essential to Counterclaimants that the advice received from Hedgeye be independent and free from bias and that was especially true for the RTAs.

39.     For Counterclaimants, RTAs were a key inducement to enter into the Agreement, because, as represented by Hedgeye on its website, they provided the ability to get immediate ("real-time") notifications of opportunities to acquire (or sell) securities in which Solstein might be interested in at particularly attractive prices. Indeed, that was the very aspect of RTAs that Hedgeye touted to Counterclaimants and others on its website in 2017, that "it is a signaling and timing process," reiterating the claim in the March 2014 YouTube video that RTAs were a "timing product."

40.     Counterclaimants would not have been interested in RTAs or Hedgeye's services generally if it believed that Hedgeye personnel traded the same securities recommended in RTAs. Had Solstein known that to be true, it would undermine the very purpose of the RTAs for Counterclaimants, because it would mean Hedgeye personnel would have an incentive to secure the best prices for themselves ahead of the RTAs or to use the RTAs as a mechanism for moving the market for their personal advantage. In that case, Counterclaimants would lack confidence that the RTAs represented Hedgeye's true view as to optimal timing for the recommended trades, rendering the service useless for its intended purpose.

41.     In addition to Counterclaimants' concerns about the integrity of the RTAs, Solstein would not have entered in the Agreement if it believed that Hedgeye personnel traded the same securities recommended in RTAs, because such conduct was contrary to Solstein's own business principles, including its principle of providing conflict-free, independent advice to its own investors. It was also important to Counterclaimants that suppliers of research services such as Hedgeye accurately and truthfully disclose any conflicts of interest.

42.     At the time it executed the Agreement in 2017, however, Counterclaimants accepted and relied on Hedgeye's representations of its independence and lack of conflicts. Solstein further accepted and relied on those representations from 2017 through 2021 in making thousands of trades based on Hedgeye RTAs. Solstein never would have made those trades absent Hedgeye's assurance that the RTAs represented independent and conflict-free advice.

43.     Counterclaimants also accepted and relied on Hedgeye's representations of its independence and lack of conflicts when it agreed to renew its Agreement with Hedgeye on a quarterly basis from 2017 through 2021. Had it known the truth, Counterclaimants would not have renewed the services, and would have cancelled them instead.

44.     Unfortunately, Hedgeye's representations were false and misleading. In reality, Hedgeye personnel, and CEO Keith McCullough in particular, traded the very same securities recommended in RTAs on a massive scale. In many cases, McCullough and others at Hedgeye placed front-running trades in advance of RTAs and obtained a superior price than that recommended in the RTA.

45.     For example, during the time Solstein subscribed to Hedgeye's services, there were more than 1900 occasions where Hedgeye personnel traded a security that had been recommended by Hedgeye in an RTA within a 48-hour period, *and* where the Hedgeye employee received a more advantaged price than the RTA price. More than 1300 of those incidents involved McCullough.

46.     On over 100 occasions, McCullough traded in a security on one day, and then recommended the same security to Hedgeye subscribers on the following day, for a less favorable price. That conduct not only constituted unequivocal front-running of Hedgeye subscribers by the company's CEO, it also made a mockery of Hedgeye's claims, reviewed and relied upon by Solstein before executing the Agreement and renewing it on a quarterly basis, that RTAs were a critically useful timing tool reflecting Hedgeye's best judgment about when to time certain trades.

47.     On over 1000 other occasions, McCullough made trades in the same security recommended by a Hedgeye RTA on *the same day* as the RTA was released, and he received a better price.

48.     In many cases, the conflicted trades made by McCullough and others at Hedgeye were made in RTA recommended securities that normally were thinly traded. Thus, the release of the RTA would be expected to have the effect, and often did have the effect, of causing material movements in the security price, thus further advantaging the personal trading positions of McCullough and others at Hedgeye.

49. Had Solstein knew that McCullough and others intended to and did trade in securities recommended by Hedgeye RTAs, they would not have entered into the Agreement, nor would they have renewed the Agreement each quarter.

50. Given the sheer scale of the McCullough and Hedgeye front-running and conflicted trading in RTAs and given their regular and steady occurrence, Hedgeye knew full well that the representations made about conflicts, independence and trading by employees, in the 2017-2019 ADVs, on its website since 2017, in the 2014 YouTube video, in the representations made to Business Insider and in oral communications with Counterclaimants, were false and misleading, and it made those statements with the intent of deceiving potential subscribers generally, and Counterclaimants in particular.

### ii. Misrepresentations About Advantaged Trading in RTAs

51. In addition to the egregious front-running of Hedgeye RTAs by Hedgeye insiders, Hedgeye made another critical misrepresentation about the functioning of RTAs.

52. As discussed above, Hedgeye's website and McCullough personally emphasized that the essence of the RTA product and the source of its value to subscribers was its usefulness as a timing product. For example, in the March 2017 website copy reviewed by Counterclaimants, Hedgeye represented that an RTA "is a signaling and timing process." Counterclaimants relied on these representations in agreeing to subscribe to Hedgeye's services and then in agreeing to renew those services each subsequent quarter. Counterclaimants used RTAs heavily in determining *when* to buy or sell certain securities, relying on Hedgeye's touting of RTAs as an effective timing signal.

53. However, in many instances, by the time a Hedgeye subscriber received the RTA, the proposed trading price was no longer available. Instead of receiving the proposed trading price,

Counterclaimants received a less favorable price, while others trading ahead of that subscriber receive the superior price.

54.    Each RTA bears a time stamp. However, there is a delay of several minutes between the RTA time stamp and the receipt of that alert in the inbox of a Hedgeye subscriber. As a result of that delay, many trade alerts recommended by Hedgeye to Counterclaimants could not be executed by the subscribers on the terms indicated in the alert because of intervening price movements against the subscriber.

55.    In many cases, the intervening price movements and trading volumes were extreme and far out of proportion with normal trading patterns for the security.

56.    As an illustrative example showing graphically the extent of the impact, on September 7, 2022, at 12:25 PM, Hedgeye issued an RTA recommending the sale of security Krispy Kreme ("DNUT") at $12.16. The typical subscriber would receive that RTA several minutes later, no later than 12:27 PM. However, by the time the subscriber received the RTA, the selling opportunity had been lost, with the price having already plunged from $12.16 to $11.95.



57.     In addition to the unexplained sharp price movements, the affected securities also may experience unusually high trading volume spikes in the minutes after an RTA was stamped but before it was received by most subscribers.  For example, immediately after Hedgeye stamped the DNUT alert, trading volume increased from a few thousand shares per minute to over 120,000 shares. Approximately 180,000 DNUT shares had traded between the time Hedgeye stamped the RTA and certain subscribers received notice in their email boxes.

58.     Although the DNUT example is a single RTA from a single day, it represents a common and typical pattern going back many years, including prior to 2017, and during the 2017-2021 when Solstein subscribed to Hedgeye's services and renewed them on a quarterly basis. Review of historical RTAs indicates that it occurs for many Hedgeye alerts, resulting in price and volume charts with similar spikes and volumes.

59.    Counterclaimants were among the subscribers that were victimized by this practice. Counterclaimants often timed trades in securities in which they were interested based on their receipt of an RTA from Hedgeye. By way of example, in the over 500 instances in which they did so during 2020 and 2021, they often received a price materially worse than the proposed trading price, because others had traded ahead of them.  Over 70% of the time during this period, Counterclaimants received a worse price, and around half of the time, Counterclaimants received a materially worse price. The average loss from the change in price in the materially worse instances was worse than negative 1.5 percent.

60.    Hedgeye was aware that many paying subscribers were not receiving real-time alerts in sufficient time to take advantage of the price disclosed in the alert and were being disadvantaged in relation to others also trading on that same alert.

61.    On or about February 22, 2021, Hedgeye added a new "product disclaimer" to its website relating to RTAs (the "RTA Notice").

62.    The information contained in the RTA Notice was never provided to Counterclaimants, and Counterclaimants were never informed that the language in the RTA Notice had been added to a webpage buried in the Hedgeye website. Nor were Counterclaimants informed of the availability of "third-party applications" used to transmit RTAs.

63.    Elsewhere in the RTA Notice, Hedgeye admits to knowing that some subscribers are disadvantaged and can be exploited by other subscribers who enjoy a timing advantage in trading RTAs. Hedgeye admits that "[s]ubscribers may experience delays between the time an Alert is issued on the Product Website and when the subscriber receives the Email Notification or App Notification ("Latency Periods")." It further admits that "Latency Periods may exceed several

minutes and Latency Periods may differ across Third-Party Platforms or as between Email Notifications and App Notifications."

64.    At the time the RTA Notice was added to website in late February 2021, Counterclaimants had already paid for Hedgeye services for the first quarter of 2021. Hedgeye terminated all services to Counterclaimants, effective April 1, 2021.

65.    In any event, although the RTA Notice acknowledged that subscribers could be victimized because of long "Latency Periods," it misled subscribers in failing to disclose other serious problems with RTAs.

66.    Notably, as the DNUT example indicates, trading on RTAs may commence nearly instantaneously after the time stamp of the alert.  Given the time it takes to read and then enter a trade based on an alert, such trading would not be possible for ordinary subscribers regardless of how they receive the alerts (through email notifications, the "App Notifications," or directly through the Hedgeye website) and regardless of how short their "Latency Period" may be. Such trading could only occur if certain insiders or selected subscribers were tipped off in advance or if Hedgeye facilitated such insiders or selected subscribers in using automated trading and technical tools designed to allow rapid processing and trading on RTAs.

67.    Other clients have commented on the practice. On February 12, 2022, @fenderjazz77 wrote on Twitter "The timestamp for RTA's uploaded to their site lag the move on the stock. EVERY TIME. Especially obvious on thinly traded stocks. Creating bagholders out of paid subscribers. I can't think of a more egregious example of front-running."  On the same day, @JohnGudritz wrote "By the time lowly subscribers got the trade, the institutions had moved the stocks. Also, have you noticed that when KM sells 'some' at the top of the range, he will say he sold all of it if the stocks falls hard."  On March 2, 2021 @atiwary wrote "Someone is front running

16

us… (emoji with questioning face) I see the same thing…never get the price quoted on the email alert on RTA in fact in 100% of the cases the price has moved away and I haven't take the trade"

68.     Responding to @norkot2003 on October 19, 2021 questioning whether Hedgeye runs their trades on RTA stocks before posting alerts, Michael Blum wrote "You are wrong. Hedgeye doesn't manage any money and employees are not allowed to trade any equities in the potential coverage universe."  That statement was false and Blum knew it was false, because he had personally made trades for his personal account in securities recommended for RTAs around the same time as the RTA recommendation.

69.     Hedgeye set up the RTAs in such a way as to provide motive, means and opportunity to facilitate trading ahead of ordinary subscribers.

70.     Hedgeye was aware that Hedgeye affiliates, business partners or select clients avail themselves of the trading opportunity before other subscribers can take advantage of the RTAs. For example, Hedgeye was aware the certain institutions used automated platforms to facilitate the ability of the favored recipients to trade ahead of ordinary subscribers on RTAs but did not disclose that fact to Counterclaimants or other subscribers.

71.     One of the beneficiaries of this advantaged trading is Sierpinski Capital Management, LP ("Sierpinski"). Sierpinski and Hedgeye are under the common ownership and control of McCullough, Hedgeye's CEO. After Sierpinski's former CIO left the firm in the fall of 2021, McCullough was the only named investment professional on Sierpinski's ADV in Sections A and B for a period of time, suggesting he was the de facto CIO of Sierpinski. Blum is the President of both entities, meaning that both are under common operational direction. Hedgeye has repeatedly marketed Sierpinski to subscribers and in a few cases, to its own employees.

17

72.    Sierpinski regularly traded RTAs and worked on implemented automated platforms so that it could execute its RTA trades ahead of other Hedgeye subscribers. Hedgeye, as an affiliated entity, was aware of those efforts.

73.    Hedgeye's facilitation of advantaged trading by subscribers using automated platforms contradicted representations it made on its website about RTAs and about its practices in its ADVs.

74.    In its website as of March 2017, Hedgeye represented that an RTA "is a signaling and timing process." Counterclaimants reviewed and relied on that representation in agreeing to sign the Agreement in the belief that Hedgeye's RTAs could be used profitably for timing the optimal moment to trade certain securities in which it had an interest. By omitting to disclose that the timing benefits of RTAs could not be achieved (and would be undermined) by competition from favored Hedgeye affiliates and subscribers using automated platforms, Hedgeye knowingly rendered its statements about RTAs materially misleading. Had Counterclaimants known the truth, they would not have executed the Agreement, or renewed it in subsequent quarters, nor would they have lost thousands of dollars making suboptimal trades based on Hedgeye RTAs.

75.    Similarly, in its March 2017 ADV, Hedgeye represented that it operated on principles of transparency, accountability and trust. Counterclaimants reviewed and relied on that representation in agreeing to sign the Agreement in the understanding that those principles meant that Hedgeye's RTAs could be trusted as the real-time timing tool it was represented to be. However, those representations were false as relates to Hedgeye's implementation of RTAs, because Hedgeye's knowing facilitation of advantaged trading of selected affiliated and favored subscribers, to the disadvantage of others, was the anthesis of transparency, accountability and trust. Had Counterclaimants known the truth, they would not have executed the Agreement, or

renewed it in subsequent quarters, nor would they have lost thousands of dollars making suboptimal trades based on Hedgeye RTAs.

### iii.    Misrepresentations About Conflicts of Interest with Sierpinski

76.    Hedgeye's March 2017 ADV insisted that it "does not manage any assets – neither for itself nor for clients – nor does it co-manage or sub-advise any portfolios." Those representations were repeated in subsequent ADVs. For example, the March 29, 2019 ADV represented that "Hedgeye does not manage portfolios, neither for its own accounts or on behalf of its institutional subscribers" and that does not "manage any assets" or "co-manage any portfolios," concluding that "Hedgeye provides unconflicted, repeatable process and data driven fundamental and macro research."

77.    Counterclaimants reviewed and relied on these representations in Hedgeye ADVs, both in agreeing to execute the Agreement in 2017 and each time they renewed the Agreement each subsequent quarter. Those representations were material to Counterclaimants because of the value they attached to Hedgeye's independence and their insistence on receiving conflict free advice.

78.    However, by at least January 2000, Hedgeye began to manage money through its Sierpinski affiliate. The Sierpinski Capital Onshore Fund LP reported a track record beginning in January 2020, and the Sierpinski Tactical Growth Strategy offered by NorthCoast Asset Management had performance dating back to September 2020.

79.    Sierpinski was not directed to avoid trading in Hedgeye recommended securities. To the contrary, Sierpinski trades exclusively in securities recommended by Hedgeye.

80.    McCullough spoke with Sierpinski on a daily basis about his investment ideas, an extraordinary degree of access far more favorable than that provided to any Hedgeye subscriber.

Many of these contacts involved regular phone conversations that could cover any subject matter, with no monitoring or oversight from Hedgeye compliance.

81.    Hedgeye did not disclose its troubling relationships with Sierpinski until it filed its 2021 ADV on March 31, 2021, the day before it terminated its relationship with Counterclaimants. Yet.  Even after making the disclosures in the 2021 ADV, Hedgeye still failed to disclose that Sierpinski trades exclusively on securities recommended by Hedgeye and had regular communications with McCullough without oversight or control from Hedgeye compliance.

82.    Thus, although Hedgeye prominently marketed itself as an "independent" provider of investment research and contrasts itself with other Wall Street institutions that have proprietary trading arms, McCullough's and Blum's interests in Sierpinski put the lie to that claim. In particular, McCullough, who is also solely responsible for developing Hedgeye's trading ranges and RTAs, has a direct financial interest in the success of Sierpinski's trading portfolio.

83.    The relationships with Sierpinski put the lie to the representations of independence made in the ADVs until the belated partial disclosure in the March 31, 2021 ADV. Had Counterclaimants known the truth, they would have cancelled the Agreement (and not renewed it subsequently) once Sierpinski had been formed in 2019.

### iv.    Misrepresentations About Regulatory Compliance

84.    As a registered investment advisor, it was important to Counterclaimants that suppliers of research services such as Hedgeye were themselves properly registered and in compliance with their regulatory requirements. Counterclaimants would not have executed the Agreement and done business with Hedgeye had they known that Hedgeye was not in proper regulatory compliance.

85.    Hedgeye's ADVs, however, contained material misstatements and omissions concerning Hedgeye's compliance with state and federal securities regulations.

86.    In the March 2017 ADV, Hedgeye represented that it was not registered with federal securities regulators as an investment advisor and only registered as an investment adviser in one state, Connecticut. Hedgeye represented that it did not need to register because it "believes its business fully qualified forth newsletter exemption from registration requirements under the Advisers Act of 1940, as its model is one-to-many distribution of its content."

87.    In furtherance of its position that it was entitled to a newsletter exemption from registration, Hedgeye further explained that it "does not advise individuals on investments or sub-advise on managed portfolios." Similar representations were included in subsequent ADVs, including the April 2, 2018 ADV and the March 29, 2019 ADV.

88.    At the time it was considering entering into the Agreement, and for all subsequent renewals, Counterclaimants reviewed and relied on those ADVs, accepting Hedgeye's assertion that it was exempt from federal registration based on the "newsletter" exemption.

89.    However, in 2021, Counterclaimants learned that Hedgeye was not entitled to the "newsletter" exception and the 2017 ADV (along with subsequent ADVs) had falsely represented that entitlement.

90.    First, Hedgeye is not simply providing a newsletter-like service to its subscribers. It advises on preferred position sizes for specific securities, without regard to individual financial situation and risk tolerances. It also provides specifically timed buy and sell recommendations through its RTAs. These activities are contrary to the newsletter exemption as well as the representations in the 2017 ADV that it "does not recommend position sizes or portfolio allocations" and does not "generate specific Buy and Sell recommendations."

91.     Second, Hedgeye aggressively markets one-on-one access to senior research analysts and senior management of Hedgeye to institutional subscribers willing to pay premium prices for such access. These contacts are often made by telephone and Hedgeye makes no effort to monitor or control the content of such discussions, which can involve matters outside the scope of Hedgeye's published research. Such activities are also inconsistent with the newsletter exemption.

92.     This, Hedgeye's work for, communications with, and marketing of Sierpinski is inconsistent with the newsletter exception. Sierpinski's own 2020 and 2021 ADV filings demonstrate that its portfolio construction, research effort, and investment process is based on Hedgeye products and services and Hedgeye principals historically have marketed Sierpinski to its media viewers. McCullough also spoke regularly with Sierpinski without oversight from Hedgeye.

93.     In summary, Hedgeye is not a provider of a standardized one-to-many information service providing the same research in the same way to all subscribers on a consistent basis, as the newsletter exception would require. Instead, it provides different kinds of information to different subscribers, and operates a business model based on exploiting premium pricing in return for providing customized investment advice to a select clientele. Hedgeye's offerings also are not impersonal and they are not of general and regular circulation, as the newsletter exemption would require. And Hedgeye's recommendations are not disinterested, given its conflicts of interest and affiliation with Sierpinski and internal trading by employees.

94.     By falsely claiming entitlement to the newsletter exception, Hedgeye is able to circumvent marketing and communications rules it otherwise would have to follow.

95.     Hedgeye's ADVs have historically misrepresented other material facts, including, among others, falsely representing that it did not recommend position sizes from 2017-2021, when in fact it was doing so, and falsely representing that its fundamental analysis was not designed to generate specific security Buy and Sell recommendations, when in fact it was doing so. Also, Hedgeye falsely represented that it did not provide investment performance, when in fact it was doing so.

96.     Hedgeye knew that its ADVs contained material misstatements of facts and deliberately omitted to disclose material facts to Counterclaimants and other subscribers that were necessary to make Hedgeye's other statements not misleading. In particular, from at least 2017 through 2021, Hedgeye knew: (a) that it was improperly evading regulatory requirements to register as an investment advisor; (b) that it was not entitled to claim the "newsletter" exemption to registration; (c) that it was recommending position sizes; (d) that its fundamental analysis was designed to generate specific security buy and sell recommendations; and (e) that its design and implementation of real-time alerts facilitated trading ahead of less favored subscribers.

97.     Hedgeye also deliberately omitted and misstated other material facts to Counterclaimants and other subscribers that were necessary to make Hedgeye's other statements not misleading. By claiming that Hedgeye does not manage assets, advise a private fund, or buy or sell securities that it recommends to advisory clients, Hedgeye was able to escape regulatory requirements and reviews covering marketing, soliciting clients, performance attribution, employee trades, and other key functions. Instead, Hedgeye principals had ownership and control of Sierpinski, and provided them regular advice on security selection.

98.    Had Hedgeye disclosed the truth and had Solstein known the true facts about Hedgeye's misconduct and conflicts of interest, it would not have executed the Agreement and it would not have continued to renew the Agreement on a quarterly basis through 2021.

**C. Hedgeye's Turns Hostile Towards Terman and Solstein Because of Terman's Involvement with CNBC**

99.    Prior to Terman's appearances on CNBC, Hedgeye and its principals viewed her positively. Hedgeye personnel often praised Terman and expressed appreciation for her support of Hedgeye. They even hosted interviews with her on their Hedgeye TV platform and spoke at conferences she helped to organize.

100.    In early 2020, shortly after the COVID outbreak, Counterclaimants reduced the level of their Hedgeye subscription as a cost cutting measure. That step did not lead to any deterioration in the Hedgeye relationship, which remained positive.

101.    However, Hedgeye's attitude towards Terman changed radically when she disclosed in early 2021 that she has been hired by CNBC to make regular appearances on its flagship Fast Money program.

102.    McCullough had made appearances on CNBC programs as well as other media outlets, but he and the firm increasingly adopted a tone of paranoid hostility towards mainstream financial news sources, with particular animus towards CNBC.  For example, on March 3, 2022, Daryl Jones of Hedgeye tweeted (and Blum Retweeted): "CNBC CNN FOX News Bloomberg Real Vision Business Insider Zero Hedge All news organizations that have blackballed @Hedgeye…yet we still get bigger and stronger."

103.    Since cutting ties with CNBC, McCullough has consistently and regularly denigrated the network, peppering Hedgeye company communications with extremely insulting attacks against CNBC and its programs. By way of example, these includes statements by that

24

"CNBC Pumped B.S. Into Your Head For Decades; Time To Dump It," that CNBC shows are akin to a "circus" or a "zoo," and that on-air CNBC talent are "donkeys" or "monkeys."

104. McCullough and Hedgeye's animus towards CNBC is motivated at least in part by their belief that Hedgeye competes with the network. Hedgeye's offerings include daily video shows sent to subscribers under the branding "Hedgeye TV," containing market analysis, research, and opportunities for Q&A with McCullough. Hedgeye views these offerings as competing with CNBC, to the point that in a January 19, 2022 press release, Hedgeye announced that: "If CNBC is the 'Blockbuster [Video] of Wall Street, we're Netflix."

105. McCullough's appearances on Hedgeye TV regularly contain attacks on and denigrating references to CNBC and its employees and contributors.

106. McCullough is obsessed with CNBC and its contributors, even though he denigrates them publicly. He regularly listens to CNBC during his drive to work, which he discusses on Hedgeye media platforms. Hedgeye also has a large TV screen above the employee workforce that regularly plays CNBC all day long, which often can be seen during its live shows.

107. Upon learning that Terman would be a regular contributor on CNBC's Fast Money, Hedgeye became extremely hostile. McCullough became more obsessed with Terman, reflecting his obsession with CNBC.

108. In malicious retaliation against Terman, Hedgeye senior officers McCullough and Blum made defamatory statements about Terman on the Hedgeye TV platform, falsely accusing her of plagiarizing him and using McCullough's ideas, based on her use of generic industry terms such as "implied volatility" and "upside/downside."

109. McCullough published these false accusations in other forms.

110.    On February 10th, 2022, McCullough tweeted "Her copying my language and process wasn't subtle."  This accusation, made in McCullough's capacity as Hedgeye's CEO, was false. As McCullough knew based on own appearances on the program, CNBC's Fast Money is a one-hour show that airs an hour after the market close each day and focuses on the most active stocks and news flow of that trading day. It is an unscripted show, and potential topics are not confirmed until minutes before the contributors would need to connect with CNBC to prepare for the show's start, with actual discussions being impromptu, and with the producer regularly changing show topics during commercial breaks. Accordingly, Terman and her colleague would connect several times each day and propose data and points to be made, if the opportunity arose, but without knowing how the show would progress. Thus, it would not be possible for Terman to copy Hedgeye processes and ideas on Fast Money.

111.    McCullough knew that his accusations of plagiarism against Terman were false. As a former guest on media platforms such as Fox Business, CNBC and Bloomberg, and as a frequent viewer of Fast Money, he was fully aware of shows' focus on the most recent market events and knew that Terman could not be contributing to the show simply by "copying" his process.  He also knew that neither he nor Hedgeye enjoyed any proprietary right or special claim to generic industry terms like "implied volatility," "growth," "inflation," "upside," "downside," or "risk ranges."

112.    McCullough and Hedgeye personnel made other defamatory statements containing similar false allegations.

113.    For example, McCullough tweeted about Terman that: "There is a CNBC contributor in particular…if you can bear listening to her terrible stock picks, she tries speaking my Quad language" along with a retweet of CaffeineAddict Java/Joe "OK…@KeithMcCullough not sure if you're listening to CNBC but one of analysts just used your 'Goldilocks' explanation

26

almost verbatim…someone is a subscriber over there". As McCullough knew when he tweeted this false accusation, he did not invent the use of the "Goldilocks" metaphor for financial markets; the economist David Shulman is commonly given credit for coining the phrase "Goldilocks economy" in an often-cited 1992 article.

114.    Although Hedgeye's CEO falsely accused Terman of plagiarism in allegedly appropriating "my Quad language," Hedgeye knew that claim was false.  Hedgeye's own marketing material acknowledges the widespread use of the simplistic Quad framework, which was developed and popularized not by Hedgeye but by "billionaire investor and Bridgewater founder Ray Dalio." As McCullough later admitted on March 30, 2021, The Macro Show: "Getting the Quads is easy. It's a 2 by 2 model. It's a rate of change of growth and inflation…"

115.    Hedgeye's CEO also falsely accused Terman of taking credit for general financial terms. On March 4, 2022 McCullough tweeted "Thank you  People using my #process language is a compliment, unless they're claiming that they made up the language on their own  See @NadineTerman on what not to do-lacks #integrity to the core". When McCullough tweeted this false accusation, he knew that Terman never claimed she originated general financial terms.

116.    Nonetheless, Hedgeye persisted in falsely accusing Terman of imitating Hedgeye's "process." On February 10, 2022 Blum tweeted: "Terman has also continued to promote herself and Solstein Capital on @CNBC using the Hedgeye process implemented through 42 Macro, while aware that Hedgeye does not approve of her doing so without crediting Hedgeye" Blum made this statement even though he knew that Hedgeye approach is not unique, but broadly known and used across the industry with investors creating their own versions of similar work. As McCullough stated on another occasion: "When you put it together with how you play the game…It's not

something that someone can actually steal or copy from you. It's something that you can make your own."

117.    Perhaps the most absurd claim that Hedgeye made against Counterclaimants was the false accusation that Terman had copied an investment idea called Dufry, as discussed by Hedgeye researcher Brian McGough in February and March of 2021. Hedgeye falsely claimed that Terman had copied the investment idea in a March 2021 Fast Money appearance on CNBC. For example, in a March 30, 2021 email to Blum and Daryl Jones, McCullough wrote: "And did Solstein really put us on 'hold'? I'll fire her – she literally copied my process (and ideas like DUFRY)."  McCullough repeated this lie on Hedgeye's program The Call and other Hedgeye programming.

118.    Other Hedgeye subscribers picked up on this false accusation and echoed it on Twitter and in other media. For example, Solstein received multiple harassing emails from a Hedgeye subscriber parroting the false claim that she had copied Hedgeye's Dufry investment idea in her CNBC appearance.

119.    The Dufry claims were false. Solstein was a long-time investor in Dufry and other airport-related stocks and had purchased Dufry shares for client portfolios long before Hedgeye mentioned the stock. She discussed the stock on Fast Money only because CNBC selected it from a list of Solstein's portfolio holdings and reached out to Terman, asking her to discuss it on the program.

120.    Hedgeye knew that the Dufry claims were false. They knew that Terman had not viewed McGough's video presentation on Dufry, because their own internal systems that monitored subscriber access confirmed that Terman had not seen the video.

28

121.    Moreover, because they obsessively reviewed video footage of Terman's CNBC appearances, they also knew that there were few material similarities between her presentation and McGough's other than commonplace observations about the Dufry business and widely known information that any analyst would mention. Finally, they also knew that subjects for discussion on Fast Money like Dufry would normally be suggested by CNBC, not by Terman. But despite knowing the Dufry claims were false, they proceeded to publish them with malicious intentions against Terman and Solstein, deliberately amplifying and spreading them among their social media following.

122.    Despite knowing them to be false, McCullough and Hedgeye nonetheless published each and every one of their false and defamatory statements against Terman and Solstein out of malice, to harm Terman's business reputation and to harm Solstein's business. They did so in retaliation against Terman and Solstein for their relationship with Hedgeye's perceived business rival, CNBC.

### Hedgeye Terminates the Relationship with Solstein and Terman

123.    In March 2021, Hedgeye sent an invoice to Counterclaimants for Hedgeye services to be provided in the second quarter of 2021.

124.    Counterclaimants, however, had some concerns about Hedgeye's services. Terman had learned that Hedgeye was providing subscription options that provided services similar to those provided to Solstein but at a significantly discounted price. Also, Solstein was not given access to new services to which other subscribers had access such as "The Arena," even though those subscribers were paying considerably less than Solstein.

125.    On March 22, 2021, Terman called Darius Dale – the person who led Hedgeye's macroeconomic research and Solstein's lead contact at Hedgeye – to address these concerns about

the Hedgeye subscription. To her surprise, Dale informed her that a couple weeks earlier he had given Hedgeye notice of his resignation from the firm.

126.    Terman was troubled to learn Hedgeye had concealed the critical fact of Dale's resignation announcement from Counterclaimants when they sent out the invoice for second quarter services. Hedgeye knew that Counterclaimants subscribed to Hedgeye's macro product, but inexplicably failed to disclose Dale's resignation when requesting payment of the second quarter invoice.

127.    From March 23, 2021 through April 1, 2021, Terman corresponded with Hedgeye about Solstein's subscription renewal for Hedgeye services, asking for additional information. Counterclaimants wanted to understand Hedgeye's plan for their macroeconomic offering, which was an important part of Solstein's subscription.

128.    But by March 31, 2021, McCullough had already decided to cut Solstein off from Hedgeye's services in retaliation for her CNBC appearances.

129.    The following day, April 1, 2021, unaware of Hedgeye's decision to retaliate against her and Solstein, Terman informed Hedgeye that she had decided to go ahead with the Macro Pro subscription for the next quarter and requested additional subscriptions to four industry sectors under the Hedgeye Sector Pro service.

130.    About an hour later, Hedgeye responded, refusing to honor the subscription request and terminating all existing services to Terman and Solstein.

131.    Hedgeye's refusal was yet another violation of its ADV, which discloses that small, registered investment advisors like Counterclaimants are eligible to obtain mass market subscriptions. Hedgeye confounded this wrong by deliberately and falsely alleging in this action that Counterclaimants, not Hedgeye, cancelled the services.

**D. Hedgeye's Targeted Efforts to Poach Solstein Clients**

132. On April 26, 2021, Hedgeye filed a federal lawsuit against Darius Dale, principally alleging trade secret misappropriation. The lawsuit was accompanied by a bitter and highly personal social media attack campaign against Dale that continues to this day, using epithets and accusations of criminality in a scorched earth effort to destroy his reputation in the industry.

133. Hedgeye's conduct extended to posting confidential documents obtained from Dale in discovery on social media platforms. Hedgeye's President, Michael Blum, justified this conduct by the explanation that he was "chomping at the bit" to reveal the discovery materials to the public and that he had "ran of patience with the lawyers" waiting to receive permission to do so.

134. Although Hedgeye began its lawsuit against Dale by alleging an emergency requiring expedited treatment, once the lawsuit began to focus on its lack of bona fide trade secrets, Hedgeye reversed its tactics, employing a series of delay tactics to put off the deadline for filing an expert report substantiating its trade alleged secret allegations.

135. As part of its strategy of divert and delay, Hedgeye also filed a baseless lawsuit against Counterclaimants.

136. Hedgeye filed the lawsuit against Counterclaimants knowing that the principal allegations were false and that it had no valid legal claims against them.

137. For example, the original complaint filed against Counterclaimants contained numerous allegations that Hedgeye knew were false based on their receipt and review of discovery materials in the Dale litigation, as well as their internal communications, including but not limited to: (a) falsely accusing them of ownership interests in 42 Macro when Hedgeye knew they held no such interest; (b) falsely accusing them of "inducing" Dale to leave Hedgeye when Hedgeye knew that Dale had previously informed them of his intention to leave over a week before Dale spoke with Terman; (c) falsely accusing them of accessing Hedgeye "source files" based on evidence of

31

a file name that Hedgeye knew to be associated with an output file, not a source file; (d) falsely accusing Solstein of firing Hedgeye as a service provider. Many of these false allegations were removed or watered down in subsequent amendments, after the reputational damage was already accomplished.

138. Hedgeye did not file the lawsuit against Counterclaimants for the purpose of obtaining redress and relief authorized by law. Hedgeye knew that not only did its lawsuit lack a valid factual and legal basis, but that it had suffered no articulable losses or damages as the result of the conduct falsely alleged in its suit.

139. Hedgeye's true motivation for suing Terman and Solstein was to achieve collateral, illegitimate and extra-legal benefits.

140. First, Hedgeye knew that suing Terman and Solstein would cause CNBC to suspend Terman's appearances, thereby retaliating against her and punishing her for establishing a relationship with the network they so hated. To ensure this result, Hedgeye created a press release with defamatory falsehoods and highlighted the CNBC name, and Hedgeye deliberately attached an @CNBC/Fast Money to the defamatory statements it made on Twitter about Terman and Solstein.

141. As further proof of Hedgeye's intent to interfere with Terman's contractual relationship with CNBC, Hedgeye pre-released its most defamatory statements against Terman to Fox News, before filing the action, in the understanding that CNBC would get notice of the smears through the news story.

142. On February 10th, 2022, Hedgeye tweeted and Blum re-tweeted directly to @CNBC FastMoney a link to their press release with the defamatory and incorrect claims.

143. Second, fully aware of the legal weaknesses of its trade secret suit against Dale, Hedgeye sought to use the lawsuit against Terman and Solstein to gain settlement leverage against the Dale defendants, threatening them with an expansion of the scope of the lawsuit and further delays in reaching a decision.

144. Third, because of Hedgeye's animus towards Terman, Hedgeye sought to use the lawsuit against the smaller firm to exhaust its resources and spread false information to existing and potential clients.

145. Finally, as described further below, Hedgeye intended to use (and did use) its lawsuit against Counterclaimants, to sow dissension and confusion among those Solstein clients who also subscribed to Hedgeye and to induce those clients to abandon Solstein.

### E. Hedgeye's Vicious Campaign of Character Assassination Against Terman and Solstein

146. Consistent with the extra-legal intent of its lawsuit, Hedgeye engaged in a social media campaign of character assassination against Terman and Solstein. Hedgeye openly boasted that one purpose of its social media attacks was to harm the Counterclaimants' business and cause client defections.

147. Hedgeye's attacks on Terman and Solstein, which dated back to her first appearance on CNBC the prior year, accelerated after its lawsuit was filed.

148. Blum, acting in his capacity as a Hedgeye officer, falsely stated in a February 10, 2022 post on the Twitter social media platform that "[i]n March 2021, Terman contacted and spoke to Darius Dale and conspired in a plan by which Dale would steal Hedgeye's trade secrets. Lamar would finance and manage their launch of a competing business, and the competing business would sell to Solstein Capital virtually identical research that Solstein had been buying from

Hedgeye, but at a fraction of the cost. Terman and Solstein would have both Ryan, responsible for running the signaling component of the Hedgeye macro process . . .”

149.    Every one of these claims was false and Blum and Hedgeye knew they were false when the tweet was posted. Not only did Hedgeye know that Terman and Dale did not discuss a plan to steal Hedgeye trade secrets, Hedgeye averred the exact opposite in this very action, correctly alleging that Terman counseled Dale against taking any Hedgeye intellectual property. Hedgeye also knew that 42 Macro did not selling anything to Solstein and that Counterclaimants no longer used Hedgeye services only because Hedgeye had terminated them.

150.    Hedgeye also knew that Ben Ryan, who Blum referred to in his tweet, had never been “responsible for running the signaling component of the Hedgeye macro process.” On the contrary, Hedgeye knew full well (and represented in other contexts) that McCullough alone was responsible for that process and did not share the details with anyone else, including Ben Ryan.

151.    On February 11, 2022, in a ham-fisted effort to induce Terman’s partners at Solstein to act against her, Blum again falsely accused Terman of “IP theft,” in a tweet, stating that: “It is possible that Terman’s partners had no idea of her actions in her capacity as their CIO. Solstein has an opportunity right here to prove this to us. Or maybe they were fully briefed on the IP theft and participated?”

152.    Hedgeye knew that these statements were false, and the Twitter posts and press release were based on falsehoods, when they made them. Having reviewed the evidence obtained in discovery – and in some cases having improperly disclosed them on social media – Hedgeye knew that there was no evidence that Terman and Solstein had stolen anything. Indeed, after discovery was complete and Hedgeye amended its complaint for a fourth time, it removed earlier allegations accusing Terman and Solstein of theft of Hedgeye trade secrets, thereby acknowledging

those accusations were without basis. Nonetheless, Hedgeye deliberately made these false statements in the February 11, 2022 tweet with malice and the intent to harm Terman and Solstein's reputations and to cause business harm.

153.    Unfortunately, Blum was just getting started. Over the following weeks, he issued a torrent of false and defamatory statements on Twitter against Terman and Solstein, with the malicious intent of destroying their reputations. These included:

- On February 24, 2022, Blum published a tweet on the Twitter social media platform, falsely claiming that "On April 26, 2021, Terman and Solstein Capital, through 42 Macro, began publishing content based on models derived from Hedgeye's trade secret source models." Blum knew that Terman and Solstein had no financial interest or control over 42 Macro and that they had never published models containing Hedgeye content.

- The same day, Blum also published another tweet falsely claiming that: "Terman conspired with Dale as to how they might get around that 'technicality' of Hedgeye owning intellectual property." On the contrary, and as admitted in Hedgeye's own complaint, Hedgeye knew that the exact opposite was true; Terman had warned Dale against infringing on Hedgeye intellectual property and advised that he obtain the advice of legal counsel.

- On February 24, 2022, Blum tweeted and then McCullough retweeted a misleading statement meant to confuse readers and clients "After his extensive copying of @Hedgeye confidential info & trade secrets to his personal Dropbox, Dale & Terman both shared access to a folder in Dropbox named "42 Macro." Terman & Solstein thereby themselves directly acquired Hedgeye's confidential information

& trade secrets." Both McCullough and Blum knew that (i) the Dropbox folder was not the same as that on Darius' computer, (ii) confidential files and trade secrets were not saved to the shared Dropbox, and (iii) Solstein did not have access to the files. Hedgeye later amended its complaint in this action in acknowledgement of the truth concerning the Dropbox.

- On February 25, 2022, Blum tweeted the false claim that "Terman and Solstein thereby themselves directly acquired Hedgeye's confidential information and trade secrets." But Blum knew that Terman and Solstein never saw, much less "acquired" the source files that Hedgeye claimed to be its trade secrets, and that the only Hedgeye files they ever saw were the ones Hedgeye itself sent them as subscribers.

- On March 1, 2022, Blum retweeted a tweet from "CaffeineAddict Java/Joe," stating that "When a judge takes your request for a gag order & tells you to pound sand that's a pretty good indication you're full of shit Nefarious & @NadineTerman. He's telling you everyone should know you conspired to hijack @KeithMcCullough model." Blum retweeted the statement without further clarification, even though he knew Terman had made no request for a gag order and that this Court had made no finding of conspiracy or wrongdoing by Terman.

- On March 1, Blum tweeted two links to its press releases and then wrote: "I've posted a lot of the verbatim rulings & complaints w/ evidence. The most important: i) Judge Carter already ruled @Hedgeye is likely to prevail on the merits & ii) Dale repeatedly lied and had to be cautioned by the court." The tweet was followed by a pictorial link to the press release. Blum knew when he made this statement that Judge Carter had not made any ruling concerning Terman and Solstein.

- On March 11, 2022, Blum tweeted that "the evidence of Dale's misappropriation is literally undisputed" and that "[s]imilarly, Dale has produced evidence irrefutably establishing the active participation of Defendants Nadine Terman and her company Solstein Capital." Blum knew when these statements were made that Dale was hotly disputing Hedgeye's misappropriation claims and that the evidence produced by Dale irrefutably established that Terman and Solstein were not involved in any misappropriation of the alleged Hedgeye property.

154. Hedgeye principal McCullough actively joined in the vicious campaign of abuse:

- McCullough retweeted about Terman and Solstein on February 9, "Thieves are never sorry they stole. They are sorry they got caught. What I read today proves that." As discussed in prior paragraph, McCullough knew that Terman and Solstein never saw, much less "acquired" the source files that Hedgeye claimed to be its trade secrets, and that the only Hedgeye filed they ever saw were the ones Hedgeye itself sent them as subscribers.

- On February 25, 2022, McCullough retweeted Blum's false claims that Terman and Solstein had "directly acquired" Hedgeye trade secrets from Dale, adding "Shame on you Nadine Terman." As discussed above, McCullough and Blum knew these accusations were false.

- On March 1, 2022, McCullough retweeted "Nefarious has teammates…a co-conspirator, I mean Co-CEO @Nadine Terman & an analyst team.  Plagiarism & Copy/Paste, they've been central to his platform & research.   Integrity unfortunately, failed the recruiting process, reminded him of @KeithMcCullough's "racist team."  McCullough knew this statement was false and that

37

Counterclaimants, as investment advisors working for their own clients, had never provided any substantive input to 42 Macro's platform or research.

- McCullough falsely tweeted March 3, 2022, that: "We know how valuable my process is. Its why @Nadine Terman was keen to conspire to steal it" in response to Rahul Deodhar's reply to McCullough "That Vol of Vol bit is quite crucial-that is ONE secret sauce (and lots of data streams, tracking wide array of market variables, etc.) each either confirming or not what the markets are telling us. Mandelbrot talked about this a lot."  As Hedgeye's marketing has repeatedly confirmed, Benoit Mandelbrot in the 1970's began to make the world aware of fractals, or repeating patterns that occur in nature as well as in various financial returns. In his 2004 book, which McCullough has often mentioned, *The (Mis)behavior of Markets*, Mandelbrot explained the relevance of fractals to trading securities and discussed the idea of volatility clustering. When McCullough posted his March 3, 2022 tweet falsely accursing Terman of "conspiring to steal" his "process," he knew that the process he referred to was not "his" but rather his repetition of Mandelbrot's published and publicly available ideas.

- On May 2, 2022, McCullough falsely tweeted that: "Nadine @Nadine Terman tried stealing my '3 Buckets of Volatility too,'" again falsely trying to claim proprietary rights over a common investment concept that predated him and simultaneously falsely accusing Terman of taking the concept when she had not done so.

155.    Each and every one of these statements were made by Hedgeye with the knowledge they were false and with the malicious intent to cause injury to the reputations and business of Terman and Solstein.

156.    McCullough and Blum both highlighted Hedgeye's intent and purpose to force Terman off CNBC.

- On February 9, 2022, McCullough Retweeted "The scumbags they let on @CNBC seem to be getting worse and worse…"

- On February 10th, 2022, Hedgeye tweeted and Blum retweeted, "Dear @CNBCFastMoney, We know it's been years since @KeithMcCullough appeared on your show/network.  In case you were wondering why so much of what you've been hearing recently sounds like Keith, here's your answer!  …you can read all about it (link to Hedgeye press release, picture of Terman).

- On February 10, 2022 McCullough retweeted "Damning evidence. Screwed by an employee and two clients. "Oh what a tangle web we weave when first we practice to deceive" their actions reveal incredible misjudgment and hence terrible advisors. I would hope CNBC will ban Nadine Case closed"

- On March 3, 2002, Blum boasted that Hedgeye's lawsuit had succeeded in removing Terman and Solstein from CNBC. Blum tweeted "…It appears, that following our suit against Nadine Terman & Solstein Capital, @CNBC has not had her on the air."

- On May 2, 2022, McCullough tweeted "Indeed. I do not believe she's appeared on CNBC since @mablum proceeded with the evidence"

157.    Each and every one of these statements were made by Hedgeye with the knowledge they were false and with the malicious intent to cause injury to the reputations and business of Terman and Solstein.

158.    Hedgeye also threatened Terman and Solstein's existing and potential business partners and clients and pressured them to cease doing business with Counterclaimants, threatening them with retaliation if they did not accede to Hedgeye's demands.

- For example, in response to a Hedgeye subscriber who asked to be kept out of the personal attacks against Terman, Blum threatened retaliation, stating that "[p]eople should be aware of the choices you are making."

- Blum tweeted "I do wonder what Solstein clients' have to say about all of this… (picture of confidential discovery)".

- On February 10, 2022, Blum retweeted "Hey @AndreasSteno, just wanted to give you a heads up on who the "analyst" you were on @RealVision w…@KeithMcCullough & @mablum have watched @RaoulGMI bury his head in response to this, he had NO one else that could match KM's knowledge so he settled for the one that stole it." "What say you @RaoulGMI @ttmygh @AshBennington @RealVision.  You talk abt being the honest alternative to MSM.  Opine abt their dishonesty lack of accountability, yet consistently bring back Darius Dale who conspired w @NadinTerman, @steve7lamar to hijack @KeithMcCullough models."

- Blum also admitted via Twitter that on February 11, 2022, he had knowingly spread his falsehoods to Solstein clients, boasting that "I've already heard from a Solstein LP who is considering to pull money from the firm."

- On February 11, 2022, Blum tweeted "If you were involved, if you assisted, aided, and/or abetted we are coming after you & you will be publicly exposed."

40

159.    On February 9, 2022, Blum gratuitously sent Hedgeye's false and misleading press release about their lawsuit against Terman and Solstein to Raoul Pal, principal of Real Vision and an individual who enjoys a significant online following.

160.    Pal responded to Blum's message by stating that "you do not have the right to demand that we either don't work with a person or remove their content."

161.    Pal's response infuriated Blum, who answered back with extortive threats against Pal if he did business with Terman and Solstein, accompanied by a series of bald-faced, malicious lies: "However, we are not in a divorce. That matter has essentially been settled by the court. We are now in corporate espionage territory. If you cannot accept that the judge has already resolved the IP theft / misappropriation matter, then we are headed in the wrong direction. … Our complaint against Terman and Solstein Capital is backed by hard evidence uncovered during discovery. We have a conspiracy of highly unethical people who represent the worst of our industry. . .. Its not going to be possible for us to partner with businesses that fail to recognize this."

162.    Blum knew every single one of these statements to Pal were false when he made them. The statement to Pal that Terman and Solstein had engaged in "corporate espionage" was false and Blum knew it was false. To the contrary, Blum knew that Solstein had no involvement in discussions with Dale about his departure from Hedgeye. Blum also knew that, far from engaging in "corporate espionage" against Hedgeye, Terman never sought, accepted, nor received any claimed Hedgeye trade secrets; had advised Dale to take due care with respect to Hedgeye's claimed property; and further advised Dale to obtain legal counsel to explain to him the scope and extent of Hedgeye's property rights.

163.    Blum's statement "the judge has already resolved the IP theft / misappropriation matter" was also false. At the time, the case against Terman and Solstein was only a few days old

and no substantive proceedings had occurred, much less any judicial resolution. Blum and Hedgeye also knew that in the separate Dale litigation, Hedgeye's trade secret misappropriation claims were very far from being resolved and that whether Hedgeye had any protectible trade secrets at all was a hotly contested issue on which no judgment had been issued. He also knew that although the Court had granted some limited injunctive relief in the Dale litigation, the Court had also rejected Hedgeye's requested injunctions to bar 42 Macro from doing business.

164. Blum's statement that: "Our complaint against Terman and Solstein Capital is backed by hard evidence uncovered during discovery" was also false. In fact, Blum knew that the 'hard evidence" uncovered during discovery contradicted the key allegations of its complaint against Terman and Solstein.

165. Finally, on March 9, 2023, Michael Blum sent out a tweet on behalf of Hedgeye, which he advertised @Hedgeye to be the "NO FRAUD ZONE." The tweet went on to specifically name Nadine Terman as being one of several identified "scoundrels, frauds, thieves, liars & cheats." Blum also named the Twitter handle of Mr. Pal, thus following up on his extortionate threat to attack Pal if he did not cease all relationships with Ms. Terman and Solstein.

166. Blum and Hedgeye knew that the March 9, 2023 tweet was false when it was made. They knew that neither Solstein nor Terman has ever been even accused of fraud, much less engaged in one. They also knew that Solstein and Terman are not and never have been "thieves, liars & cheats." In particular, Hedgeye knew that neither Solstein nor Terman had ever acquired or even seen the Hedgeye source files, client lists or other materials that Hedgeye falsely claims as its trade secrets.

167. Unfortunately, Hedgeye's campaign of character assassination had its intended effect of seriously harming the Counterclaimants' business. To begin with, CNBC ceased

providing any further appearance dates for Terman, either on Fast Money or any other CNBC program, in response to Hedgeye's attacks on Terman and Solstein. Bloomberg also ceased scheduling Terman as well, at the same time and for the same reasons.

168.    Hedgeye also exploited its false and malicious allegations to poach Solstein clients for the benefit of its Sierpinski investment affiliate, inducing the clients to break their relationships with Solstein and recommending that they put their money into the investment vehicle for Sierpinski.

169.    In particular, two Solstein clients contacted Hedgeye after reviewing the prnewswire press release. Instead of declining to comment or correcting their false allegations, Hedgeye doubled down on their false allegations against Counterclaimants and encouraged the clients to break their agreements with Solstein. In response, the two clients renounced their agreements with Solstein and pulled all their funds. Hedgeye then encouraged the clients to place their money with North Coast Asset Management, the investment vehicle providing a Sierpinski-supplied investment portfolio solution.

170.    Hedgeye's false allegations against Counterclaimants also caused another institutional client to withdraw from an agreed $100 million contract with Solstein. In addition, Solstein lost at least one another opportunity for an institutional client agreement of similar magnitude.

171.    In each and every instance, the false and defamatory statements made by Hedgeye against Terman and Solstein were made with the knowledge they were false and the malicious intent to cause injury to the reputations and business of Terman and Solstein. Hedgeye acted with malice to retaliate against Solstein and Terman, both for Terman's decision to appear as a

contributor on CNBC's Fast Money and because she gave friendly advice to Dale after Dale decided to leave Hedgeye.

## FIRST CAUSE OF ACTION
### (Fraud in the Inducement – Hedgeye Agreement)

172.    Counterclaimants repeat and re-allege the allegations contained in all the paragraphs above as though set forth in full herein.

173.    In connection with the Agreement, Hedgeye made false statements and material omissions of fact to Terman and Solstein in its ADVs, its website, its social media posting, its oral communications with Counterclaimants, and other outlets discussed above. Those misrepresentations included:

(a) falsely representing that Hedgeye complied with industry regulations when it did not;

(b) falsely representing that Hedgeye was entitled to invoke the "newsletter" exemption to federal registration, when it was not.

(c) falsely representing Hedgeye's affiliation with Sierpinski from 2019-2021 and omitting to disclose required conflicts of interest with respect to Sierpinski;

(d) on and after March 31, 2021, continuing to omit material disclosures about conflicts of interest with Sierpinski.

(e) falsely representing and omitting required disclosures of Hedgeye's material conflicts of interest which included, upon information and belief, conflicted trading and front-running of RTAs and knowing facilitation of advantaged trading of RTAs by favored subscribers to the detriment of other Hedgeye subscribers.

174.    Hedgeye knew that the above misrepresentations and omissions were false and misleading when they were made but made them to induce Terman and Solstein to subscribe to Hedgeye's services and to continue subscribing to such services.

175.    Terman and Solstein relied on Hedgeye's misrepresentations and omissions in subscribing to Hedgeye's services. Had Hedgeye told the truth, Terman and Solstein would not have subscribed in the first place, and Solstein would have cancelled its subscription once the truth was known.

176.    As a result of Hedgeye's fraudulent inducement, Terman and Solstein were damaged in the amount of subscriber fees paid to Hedgeye, equaling approximately $420,000. Also, Solstein's clients were damaged due to the conflicts of interest, to an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Tortious Interference with Contract)

177.    Counterclaimants repeat and re-allege the allegations contained in all the paragraphs above as though set forth in full herein.

178.    Hedgeye was aware of Terman's contract to appear as a paid contributor to CNBC. Terman informed Hedgeye when she secured the CNBC slot and McCullough acknowledged his awareness in internal emails discussing Terman's appearance.

179.    McCullough had appeared as a paid contributor to CNBC in the past in a very similar capacity to Terman. He therefore knew and understood the nature of the contractual relationship between Terman and CNBC, including the basic contractual terms. He also had a good understanding of how CNBC interacted with contributors like Terman and what would cause CNBC to suspend such a relationship.

180.    As discussed above, Hedgeye deliberately procured the suspension of Terman's appearances by CNBC. Hedgeye did so by falsely accusing Terman of participating in the theft of trade secrets, accusing Terman of spreading the allegedly stolen IP on the CNBC network itself, and then spreading all those accusations widely in social media channels. Based on McCullough's

knowledge of how CNBC operated with respect to its contributors, Hedgeye knew that such conduct would prompt CNBC to suspend Terman. As discussed above, Hedgeye's understanding was correct, and their conduct caused CNBC to suspend Terman's appearances indefinitely.

181. Hedgeye procured the breach of Terman's contract with CNBC without justification, using tortious conduct, and for the sole and malicious purpose of inflicting intentional harm on Terman and Solstein. As a result, CNBC suspended its contractual relationships with Terman, because of Hedgeye's interference.

182. But for Hedgeye's conduct, Terman would still be actively appearing on CNBC

183. Hedgeye was also aware of two clients of Solstein who had entered into agreements to place funds with the firm. Hedgeye became aware of the clients because, as discussed above, the clients communicated directly with Hedgeye and informed Hedgeye of the contractual relationships.

184. Upon learning of the client's contractual relationships with Solstein, Hedgeye deliberately sought to procure the clients to pull their funds from Solstein, using false, malicious and defamatory statements about Solstein to procure the breach. Hedgeye did so out of malice, and to retaliate against Solstein and Terman for what they perceived as their friendship with Darius Dale and Steven Lamar.

185. Hedgeye's ploy worked and their false narrative induced the two Solstein clients to breach their contracts, break their relationship with Solstein, and pull all their money from the firm.

186. But for Hedgeye's conduct, Solstein would not have lost the client relationships.

187. As a result of the tortious act described above, Solstein and Terman have been damaged in an amount to be determined at trial, but in no event less than $3.4 million.

46

## THIRD CAUSE OF ACTION

### (Tortious Interference with Prospective Economic Relationships)

188.    Counterclaimants repeat and re-allege the allegations contained in all the paragraphs above as though set forth in full herein

189.    Hedgeye was aware of Terman's business relationships with CNBC, Bloomberg, and with at least two of Solstein's business clients.

190.    Hedgeye deliberately procured the suspension of Terman's appearances on CNBC and Bloomberg.

191.    Hedgeye also deliberately procured Solstein clients to pull funds and a contract from Solstein.

192.    Hedgeye also deliberately procured the loss or suspension of institutional client relationships and agreements with two other parties, each equal to or in excess of $100 million.

193.    In each case, Hedgeye procured the terminations without justification, using tortious conduct, and for the sole and malicious purpose of inflicting intentional harm on Terman and Solstein. In each case, the third party ended or suspended their business relationships with Terman and Solstein, respectively, as a result of Hedgeye's interference.

194.    But for Hedgeye's conduct, Solstein would not have lost the client relationships and would still be actively appearing on CNBC and Bloomberg.

195.    As a result, Solstein and Terman have been damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Defamation)

196.    Counterclaimants repeat and re-allege the allegations contained in all the paragraphs above as though set forth in full herein.

197.    Hedgeye made false statements of purported fact about Terman and Solstein, as specifically described in Paragraphs _____ of these counterclaims, among others.

198.    Hedgeye published those statements through official press releases, tweets on the Twitter platform aimed at thousands of followers, and through on-line corporate communications.

199.    Hedgeye made these statements deliberately and maliciously, with knowledge of their falsity, and with the intent to harm Terman and Solstein out of malice.

200.    As a result, Solstein and Terman have had their reputations harmed and suffered the following specific injuries as a direct consequence of Hedgeye's defamation: the loss of the CNBC appearance, the loss of Bloomberg appearances, and the loss of at least three contracts with a combined investment exceeding $100 million.

201.    Terman and Solstein's monetary damages from Hedgeye's defamatory statements shall be in an amount to be determined at trial, but in no event, less than $5 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

    a)  Enter judgment against Plaintiff-Counter-defendant and in favor of Counterclaimants.

    b)  Award Counterclaimants their compensatory damages in an amount to be proven at trial.

    c)  Award Counterclaimants appropriate punitive damages;

d) Award Counterclaimants interest, reasonable costs, attorney's fees, and disbursements;

e) Grant such other relief as it deems necessary and proper.

## JURY DEMAND

PLEASE TAKE NOTICE that Counterclaimants demand a trial by jury on all issues so triable.

Dated: New York, New York
         April 26, 2024

PRESS KORAL LLP

By:    /s/ Jason Koral
            Jason M. Koral

641 Lexington Avenue, 13th Floor
New York, NY 10022
tel: (212) 922-1111
fax: (347) 342-3882
cell: (347) 419-0983

*Attorneys for Defendants Nadine Terman and Solstein Capital, LLC*

49