UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HEDGEYE RISK MANAGEMENT, LLC

     Plaintiff,

    v.

DARIUS DALE, et al.,
    Defendants.

No. 21-CV-3687 (ALC) (RWL)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS NADINE TERMAN AND
SOLSTEIN CAPITAL LLC'S MOTION FOR SUMMARY JUDGMENT**

**PRESS KORAL LLP**
641 Lexington Avenue, 13th Floor
New York, NY 10022
Telephone: (212) 520-8270
Facsimile: (347) 342-3882
jkoral@presskoral.com

## TABLE OF CONTENTS

**Page:**

I.  Introduction ...................................................................................................................1

II. Summary of Relevant Facts ............................................................................................2

    A.  Solstein Subscribes to Hedgeye and Terman Meets Darius Dale ...........................2

    B.  Dale Resigns from Hedgeye and Informs Terman 10 Days Later ..........................3

    C.  Dale Proceeds to Start His Own Firm, 42 Macro ...................................................4

    D.  Hedgeye's GIP Model And the Evidence Concerning Terman's Access to that Model's Outputs ....................................................................................................4

    E.  Hedgeye "Fires" Solstein and Terman as Subscribers ...........................................6

    F.  The Court's Prior Order on Terman and Solstein's Motion to Dismiss .................6

III. Argument .......................................................................................................................8

    A.  The DTSA Claim Against Nadine Terman Lacks Factual or Legal Support .........8

        1.  Hedgeye Lacks a Protectable Trade Secret and Failed to Take Reasonable Measures to Keep Their Purported Confidential Information Secret ..........9

        2.  There is No Evidence of Misappropriation by Terman ...............................9

    B.  Common Law Misappropriation ..........................................................................11

    C.  The Tortious Interference Claim Against Nadine Terman Lacks Factual or Legal Support ......................................................................................................12

        1.  There is No Evidence That Nadine Terman Knew the Terms of Dale's Contract Prior to the Alleged Tortious Acts ..............................................12

        2.  There Is No Evidence of An Intentional Act by Terman to Induce Dale to Breach His Employment Contract ...........................................................13

        3.  There Is No Evidence of an Independent Wrong......................................14

        4.  There is No Evidence of Damages.............................................................15

    D.  No Evidence Supports the Breach of Contract Claim Against Solstein ...............15

Conclusion ..........................................................................................................................18

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) ............................................. 8

*Azima v. Del Rosso*, 2021 US Dist. LEXIS 237463, at *29 (M.D.N.C. Aug. 9, 2021) ............... 11

*Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 909 (9th Cir. 2008) ........................... 13

*Broidy Cap. Mgmt. LLC v. Muzin*, 2020 WL 1536350, at *13 (D.D.C. Mar. 31, 2020), *aff'd*, 12 F.4th 789 (D.C. Cir. 2021) ................................................................................................. 11

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) ...................... 11

*Honey Bum, LLC v. Fashion Nova, Inc*., No. 2:20-CV-11233-RGK-AS, 2022 WL 385185, at *4 (C.D. Cal. Jan. 6, 2022) ................................................................................................. 12

*In re Lehman Bros. Sec. & ERISA Litig.*, 131 F. Supp. 3d 241, 249 (S.D.N.Y. 2015) ................. 8

*In re Thelen LLP*, 736 F.3d 213, 220 (2d Cir. 2013)) ................................................................. 12

*Integrated Corp. Rels., Inc. v. Bidz, Inc*., No. CV094028269S, 2009 WL 2962374, at *5 (Conn. Super. Ct. Aug. 14, 2009) ................................................................................................. 16

*Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1148, 470 P.3d 571, 580 (Cal. 2020) ...... 12

*Manbro Energy Corp. v. Chatterjee Advisors*, *LLC*, No. 20 CIV. 3773 (LGS), 2021 WL 2037552, at *3 (S.D.N.Y. May 21, 2021) ....................................................................... 12

*Meadowbrook Ctr., Inc. v. Buchman*, 149 Conn. App. 177, 189, 90 A.3d 219, 228 (2014) ........ 18

*Nevada DeAnza Fam. Ltd. P'ship v. Tesoro Ref. & Mktg. LLC*, 474 F. Supp. 3d 1087, 1095 (N.D. Cal. 2020) ................................................................................................................. 13,14

*Power Integrations, Inc. v. De Lara*, No. 20-CV-410-MMA (MSB), 2020 WL 1467406, at *22 (S.D. Cal. Mar. 26, 2020) ................................................................................................. 14

*Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425, 451 (S.D.N.Y. 2012) ...................................... 11

*Scott v. Gen. Iron & Welding Co*., 171 Conn. 132, 137 (Conn. 1976) ...................................... 16

*Steves & Sons, Inc. v. Jeld-Wen, Inc*., 271 F Supp 3d 835, 840-43 (E.D. Va. 2017) ................. 11

*United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002 (9th Cir. 2014) ...... 12

*Ville Fabricating, Inc. v. Tarter*, 2019 US Dist LEXIS 50373 (E.D. Ky. Mar. 26, 2019) ........... 11
**Statutes**

18 U.S.C. § 1839(5) ................................................................................................... 8, 10

## I.  INTRODUCTION

This case is striking for the mismatch between the expansive allegations made by Plaintiff Hedgeye Risk Management LLC ("Hedgeye") in its Fifth Amended Complaint ("FAC") and the weakness of the evidentiary support for those allegations revealed by discovery. The FAC breathlessly narrates a tale about a supposed plot to steal the "core proprietary financial models that underlie Hedgeye's flagship products and services." It accuses Defendant Nadine Terman ("Terman") of active involvement in this scheme, insisting that she knowingly acquired Hedgeye's trade secrets.

The evidence makes a mockery of Hedgeye's grandiose claims. Terman never received or even glimpsed any of the "source files" that Hedgeye claims as trade secrets. Instead, she regularly received "output files" that are sent routinely to all Hedgeye subscribers, and which Hedgeye admits are not trade secrets. She also received two illegible and unsolicited screenshots from Defendant Darius Dale ("Dale"), neither of which she understood or used in any way, and neither of which contains or discloses Hedgeye's confidential information or trade secrets.

Hedgeye also seeks to resuscitate a previously dismissed claim alleging that Terman tortiously interfered with Dale's employment contract with Hedgeye. But Terman never knew about the terms of that contract until April 1, 2021, days after Dale's employment definitively ended. And as the Court previously held, it is undisputed that Dale announced his decision to quit Hedgeye well before his initial phone call with Terman and that he told Terman the decision had already been made before Terman ever said a word to him on that subject.

Hedgeye's contract claim against Defendant Solstein Capital LLC ("Solstein") is equally unsubstantiated. Hedgeye contends that Solstein "solicited" Dale to work for a company called Longbow. But the evidence only shows that Dale expressed to Terman his interest in working for Longbow, a company months away from operation, and that Longbow's majority holder Steven

Lamar ("Lamar") provided Terman his "thoughts" about providing Dale some equity in Longbow at some future date. No offer was ever made, no equity transferred, and Dale never worked with Longbow. Instead, as the FAC itself states, Dale formed his own business under the 42 Macro name, with no participation from Solstein.

## II.    SUMMARY OF RELEVANT FACTS

The complete set of facts relevant to this motion are set forth in the accompanying Rule 56.1 Statements of the Terman Defendants, as well the Rule 56.1 Statement filed by co-defendants Darius Dale, Steven Lamar and 42 Macro. A summary of some of the key facts follows.

### A.    Solstein Subscribes to Hedgeye and Terman Meets Darius Dale

Defendant Solstein is an independent SEC-registered investment adviser founded in 2010. It provides investment advisory services on a discretionary basis to a private fund and separately managed accounts of clients. (Terman and Solstein Rule 56.1 Statement ("R56.1") 3-1). Its co-founders and current Managing Members are Defendant Nadine Terman, as well as J.C. Torres, and Sandra Southworth. Both Solstein as an entity and Terman personally are heavily involved in diversity initiatives in the financial industry. (R56.1 ¶ 3-2).

In 2017, Solstein entered into a written subscription agreement with Hedgeye (the "Services Agreement"). (R56.1 ¶ 3-3). Among other provisions, the Services Agreement provides Solstein access to an online research portal defined as the "Website." (R56.1 ¶ 3-4). The Services Agreement further indicated that "Subscriber's access to the Website will be subject to the Terms of Service for Web Service . . . available on the Website." (*Id*.). The Terms of Service were not annexed to the Services Agreement. They could only be accessed by searching for them on the Hedgeye website. (R56.1 ¶ 3-5).

2

At the time of the Services Agreement and continuing through at least the end of the 2019, Terman had cordial relationships with Hedgeye. Terman and Solstein invited Hedgeye personnel to attend events where they could meet potential subscribers, and Hedgeye was appreciative of those opportunities. (R56.1 ¶ 3-8). Terman enjoyed a particularly strong relationship with Darius Dale, who she believed was Hedgeye's best analyst for macro research. (R56.1 ¶ 3-9).

### B.    Dale Resigns from Hedgeye and Informs Terman 10 Days Later

On March 11, 2021, Dale informed Hedgeye that he was leaving the firm. *See* Rule 56.1 Statement of Defendants Darius Dale, Steven Lamar and 52 Macro LLC ("DDR56.1") at 2-86. Dale's employment agreement with Hedgeye did not contain any provision restricting competition once his employment ended. (DDR56.1 ¶ 2-11). On or around March 15, 2021, Hedgeye commenced negotiations with Dale over the terms of a separation agreement that Hedgeye hoped would include a non-competition covenant. (DDR56.1 ¶ 2-89). Hedgeye General Counsel Anthony Parsio presented a draft separation agreement that set Dale's final day at March 26 or March 31. (DDR56.1 ¶ 2-91). Dale told Parsio that, among other options, he was considering becoming an "independent research provider"—*i.e.*, producing the type of research that Hedgeye, 42 Macro, and numerous other companies sell. (DDR56.1 ¶ 2-89). Parsio advised Dale that "to the extent he was seriously considering going into competition with Hedgeye we would pay him in exchange for a non-compete." (*Id.*).

Also, during March 2021, Solstein was reconsidering the terms of its Hedgeye subscription. Despite the high cost of its subscription, Solstein did not have access to Hedgeye's online discussion board (the "Arena"). (R56.1 ¶ 3-21) On the morning of March 22, 2021 Terman emailed Hedgeye asking how she could get access to the Arena. (R56.1 ¶ 3-22).

When Terman did not get an immediate response, she phoned Dale to discuss the terms

of the Hedgeye subscription and access to the Arena. To her surprise, Dale informed her that he had resigned from Hedgeye two weeks earlier. Terman and Solstein had been previously unaware of Dale's separation from Hedgeye. (R56.1 ¶ 3-23).

### C.      Dale Proceeds to Start His Own Firm, 42 Macro

Terman arranged for a call between Dale and Defendant Steven Lamar, a successful entrepreneur. (R56.1 ¶ 3-23; DDR56.1 ¶ 2-99). Over the next few days Dale, Terman and Lamar kicked around various ideas for Dale's future employment. (R56.1 ¶ 3-25; DDR56.1 ¶ 2-100). Dale expressed some interest in Longbow, a new venture that Lamar had formed with Terman, and at one point Lamar considered the idea of proving Dale some equity in Longbow. (R56.1 ¶ 3-27&28; DDR56.1 ¶ 2-100&109). But Longbow was still in its very early stages and would not launch until August 2022. (R56.1 ¶ 3-29; FAC ¶ 92). Dale never joined Longbow or received equity and that idea was dropped. (R56.1 ¶ 3-29; DDR56.1 ¶ 2-110).

Instead, Dale decided that week to start his own macro research firm, under the rubric "42 Macro." (DDR56.1 ¶ 2-106&107), Terman provided Dale with some assistance and advice on Dale's messaging, website design, logos, and social media. (R56.1 ¶ 3-42-44). But that was the limit of her effective contributions to 42 Macro. (R56.1 ¶ 3-45&47). Terman was copied on emails between Dale and Lamar about pricing but had no contribution to make on that subject. (R56.1 ¶ 3-46). Neither she nor Solstein had any other substantive involvement in the creation or operation of the 42 Macro business. (R56.1 ¶ 3-47). Neither has any financial interest in the company. (*Id.*) They certainly had no knowledge or understanding of the financial models developed and used at 42 Macro. (*Id.*)

### D.      Hedgeye's GIP Model And the Evidence Concerning Terman's Access to that Model's Outputs

Hedgeye's case focuses on certain macroeconomic models that it alleges Dale developed

while employed at the firm. According to the FAC and Hedgeye's trade secrets disclosures, Dale developed a series of Microsoft Excel spreadsheets that contained (among other things) what Hedgeye calls a growth, inflation, and policy ("GIP") model. (DDR56.1 ¶ 2-187). The spreadsheets that contain the parameters or formulas for Dale's models are referred to by Hedgeye as "source files" or "source models." (DDR56.1 ¶ 2-187). Hedgeye also regularly created Microsoft Excel based "output files" for sharing externally that report the output of Dale's models but not their formulas. (R56.1 ¶ 3-35; DDR56.1 ¶ 2-28 & 188). These output files were routinely shared with Hedgeye subscribers, including Solstein. (*Id.*) In this case, Hedgeye contends that the source files are trade secrets but admits that the output files are not. (*Id.*)

With respect to the source files, during his career at Hedgeye, Dale often backed up these files on a personal Dropbox account. (DDR56.1 ¶ 2-42). However, these source files were never shared with Terman. (R56.1 ¶ 3-39; DDR56.1 ¶ 2-176). Neither Terman nor Solstein have ever seen or reviewed a Hedgeye source file. (*Id.*)

Terman and Solstein received GIP output files from Hedgeye on a routine basis, most commonly through a regularly published morning note called "Rise & Grind." (R56.1 ¶ 3-34). On one occasion, on March 27, 2021, Terman shared one of those output files with Dale. (R56.1 ¶ 3-36&37). At that time, according to Hedgeye, Dale was still employed at Hedgeye. (R56.1 ¶ 3-37).

Also, sometime around March 22, 2021, Dale sent two screenshots to Terman. One of those is a piece of what Hedgeye refers to in the FAC as a Price Volume Volatility model. (R56.1 ¶ 3-31). No one from Hedgeye was able to identify what this file does or what information it contains. (DDR56.1 ¶ 2-290-296). Terman was never able to read it and had no idea what it was. (R56.1 ¶ 3-32). Dale also sent a screenshot of some notebook pages and again,

Terman was not able to read it and had no idea what it was. (R56.1 ¶ 3-38). When Hedgeye filed the FAC, it filed this screenshot publicly and did not seek redaction. (DDR56.1 ¶ 2-65).

### E.    Hedgeye "Fires" Solstein and Terman as Subscribers

Despite Dale's departure, Solstein nonetheless decided that it would continue subscribing to Hedgeye. (R56.1 ¶ 3-58). Far from seeking to injure Hedgeye, Solstein sought to work amicably with both sides of the "business divorce." (*Id.*). From March 29 through April 1, 2021, Terman had amicable discussions with Hedgeye about future subscription terms, focusing on securing access to the Arena. (R56.1 ¶ 3-58-63). Hedgeye personnel told Terman that to access the Arena, she would have to switch from an institutional subscription to a high-end retail subscription product, Sector Pro and Macro Pro. (R56.1 ¶ 3-32&59). Terman decided to do just that and sent her proposal on April 1, 2021. (R56.1 ¶ 3-63). Unknown to Terman, however, Hedgeye CEO Keith McCullough had already turned against her and directed his subordinates to "fire her." (R56.1 ¶ 3-65). Accordingly, on April 1, 2021, Hedgeye abruptly ceased discussions with Terman and told her that Hedgeye no longer had any interest in providing services to her or Solstein. (R56.1 ¶ 3-64).

### F.    The Court's Prior Order on Terman and Solstein's Motion to Dismiss

On September 29, 2023, the Court issued an opinion and order (the "Order," Dkt. 623) granting in part the motions to dismiss Hedgeye's prior Third Amended Complaint (the "TAC"). The Order dismissed all claims against Solstein. It first dismissed the federal trade secrets and state common law misappropriation claims. It noted that the complaint alleged no facts suggesting that Solstein had misappropriated any Hedgeye trade secrets. Order at 19. It dismissed the claim for tortious interference with Dale's Hedgeye employment agreement because: (1) the TAC failed to allege how Defendants knew the actual terms of that agreement and (2) it was clear from the pleadings that Dale quit of his own accord and not because of any

alleged inducement by Defendants. Order at 26-27. It also dismissed a claim that Solstein breached its Services Agreement with Hedgeye because it did not properly allege that Solstein "solicited" Dale for employment and because Hedgeye's website Terms of Services did not apply absent allegations of misuse of the website. Order 28-29.

As against Nadine Terman, the Court denied the motion to dismiss federal trade secrets and state common law misappropriation claims. The denial was based on Hedgeye's implication that Dale had uploaded GIP model source files to a Dropbox folder that Terman had access to and that Terman allegedly edited those files. *See* Order at 16-17 (citing the TAC at ¶¶ 112, 128–129). The Order dismissed the remaining claims against Terman for the same reason those claims were dismissed against Solstein.

In response to the Order, Hedgeye amended its complaint two more times, with the FAC now the operative complaint. The FAC contained several critical changes as compared to the TAC. Paragraphs 128 and 129 of the TAC, which implied that Dale had shared Hedgeye trade secrets with Terman through his personal Dropbox account, were omitted. That omission was striking, because those were the very allegations the Court relied on in denying Terman's motion to dismiss the trade secret claims. In their place were new allegations conceding the distinction between Dale's personal Dropbox account (to which he allegedly copied various source files) and a separate, shared Dropbox folder Terman created to share certain files with Dale. FAC ¶ 155. The FAC (unlike the TAC) did not allege that Dale and Terman shared any Hedgeye source files. That change was made in the FAC because discovery confirmed that Dale had never shared such files with Terman, either by Dropbox or by any other means.

The FAC also added a few allegations to the tortious interference claims against Terman and the contract claim against Solstein. It added bare allegations that "Terman had knowledge of

[Dale's Hedgeye] Employment Agreement" but without indicating when and how that knowledge was acquired. FAC ¶ 284. It also elaborated on an allegation that "Solstein" had solicited Dale to work for Longbow in violation of the non-solicitation provisions of the Services Agreement. FAC ¶ 298.

III.    **ARGUMENT**

Summary judgment is appropriate where there is a no genuine dispute as to material facts, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Accordingly, if the moving party points to a lack of evidence on essential elements on the non-movant claims, "the non-moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *In re Lehman Bros. Sec. & ERISA Litig.*, 131 F. Supp. 3d 241, 249 (S.D.N.Y. 2015).

A.    **The DTSA Claim Against Nadine Terman Lacks Factual or Legal Support**

A claim for trade secret misappropriation under the DTSA requires a plaintiff to prove that: (1) it possesses a protectable trade secret (2) it took reasonable measures to keep such information secret," (3) that the defendant misappropriated the alleged trade secrets by improperly acquiring, disclosing, or using them; and (4) that the plaintiff suffered damages resulting from the misappropriation. 18 U.S.C. § 1839. Hedgeye cannot establish any of these elements against Terman.

1. **Hedgeye Lacks a Protectable Trade Secret and Failed to Take Reasonable Measures to Keep Their Purported Confidential Information Secret**

Terman joins in full and incorporates by reference the arguments of the Dale Defendants concerning Hedgeye's inability to establish the existence of a protectable trade secret and Hedgeye's failure to take reasonable measures to secure the material it attempts to claim for trade secret protection. Those arguments alone are grounds for granting summary judgment on the trade secrets claims.

2. **There is No Evidence of Misappropriation by Terman**

Even if Hedgeye had identified protectable trade secrets, there is no evidence that Terman misappropriated them. Hedgeye's trade secret claim is based on the theory that Dale downloaded confidential Hedgeye files to his personal Dropbox account and then transmitted those files to Terman. But Dale never transmitted or disclosed such files to Terman. After years of discovery, forensic examinations, and multiple witness depositions, it is undisputed that no evidence exists that Terman ever saw, much less misappropriated, any of the "source files" Hedgeye claims as trade secrets.

Hedgeye instead relies on three pieces of evidence, none of which support its trade secrets claims against Terman. ***First***, Hedgeye points to a document that Terman shared with Dale in a shared Dropbox folder on March 27, 2021. (R56.1 ¶ 3-36). This obviously is not evidence that Dale disclosed confidential information to Terman as Hedgeye contends; the transmission went in the opposite direction from Terman to Dale. The document in question – "Hedgeye_US_&_Global_GIP_Models_&_Nowcast_Summaries" – was a GIP "output file." (R56.1 ¶ 3-36&37). That is, the file is one that contains the output of the GIP model (not its formulas) and was sent as a routine matter to Hedgeye subscribers. (R56.1 ¶ 3-35). Terman regularly obtained copies of such files attached to the daily morning note (entitled "Rise & Grind") that she received as part of Solstein's Hedgeye subscription. (*Id.*) The specific file she placed in

the Dropbox had been attached to a Hedgeye Rise & Grind email sent to her earlier. (R56.1 ¶ 3-37). Hedgeye has admitted that such files are not protected trade secrets. (R56.1 ¶ 3-35). And Hedgeye cannot possibly demonstrate that Terman acted improperly in sharing the file with Dale, because Hedgeye's own complaint alleges that he was still a highly ranked employee of Hedgeye at the time. (R56.1 ¶ 3-37).

*Second*, Hedgeye points to a one-page screenshot Dale sent to Terman on March 22, 2021, which it calls the "Price Volume Volatility model." Hedgeye's attempt to shoehorn this trivial communication into a federal trade secret violation collapses immediately when put in contact with reality. The screenshot is completely unreadable as sent; Terman was unable to read it and had no idea what it was or why Dale sent it. (R56.1 ¶ 3-31&32). She did nothing with it other than forward the message to which it was attached Lamar (who also could not read the screenshot). (*Id*.) Because it is screenshot of a Microsoft Excel file, even if it were readable, there is no way to discern the formulas used to generate the output. Thus, whatever the "Price Volume Volatility model" might be, Hedgeye cannot demonstrate that Terman acquired it by improper means, or that she disclosed or used it with knowledge that it was a trade secret that had been acquired by improper means. 18 U.S.C. § 1839(5).

In addition, as set forth in Rule 56.1 statement of the Dale Defendants, there is no evidence to support Hedgeye's claim that the screenshot reflects any Hedgeye trade secret. Hedgeye's witnesses were unaware of the file's existence until the litigation commenced and were unable to identify what it was or what it contained. (DDR56.1 ¶ Section IX(A)).

*Third*, Hedgeye points to a screenshot of two pages of a notebook sent by Dale to Terman. Again, Terman had no idea what it was or why Dale sent it. (R56.1 ¶ 3-38). No Hedgeye witness explained whether or how the content of the screenshot contained any Hedgeye confidential information. (DDR56.1 ¶ 2-56-59). Indeed, Hedgeye effectively conceded that the notebook pages are neither confidential nor trade secrets, as it filed them on the public docket as an exhibit to the FAC. *See* Dkt. 652-22.

Hedgeye's complaint also references customer lists as claimed trade secrets. But there is no evidence that Terman ever saw a Hedgeye customer list or received a copy of one from Dale. (DDR56.1 ¶ 2-145).

In the absence of any evidence that Terman misappropriated a Hedgeye trade secret, Hedgeye appears to rely on a theory of guilt by association, implying that Terman's friendship and interaction with Dale somehow taints her with the knowledge of Hedgeye information that existed inside Dale's head. But as this Court held in the Order, "conspiracy or secondary liability under the DTSA is not available as a private right of action, and thus a plaintiff must show that each defendant individually appropriated at least one trade secret."  (Order at 14-15 (quoting *Broidy Cap. Mgmt. LLC v. Muzin*, 2020 WL 1536350, at *13 (D.D.C. Mar. 31, 2020), *aff'd*, 12 F.4th 789 (D.C. Cir. 2021), and citing *Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425, 451 (S.D.N.Y. 2012)). The holding is consistent with other courts barring DTSA claims based on conspiracy or secondary liability theories. *See, e.g*. *Steves & Sons, Inc. v. Jeld-Wen, Inc*., 271 F Supp 3d 835, 840-43 (E.D. Va. 2017) (no private right of action under 18 U.S.C. § 1832(a)(5), which prohibits conspiracy to engage in the theft of trade secrets); *Azima v. Del Rosso*, 2021 US Dist. LEXIS 237463, at *29 (M.D.N.C. Aug. 9, 2021) ("Plaintiff [can] not be permitted to advance theories of conspiracy or secondary liability"); *C-Ville Fabricating, Inc. v. Tarter*, 2019 US Dist. LEXIS 50373, at *44 (E.D. Ky. Mar. 26, 2019) ("[T]he DTSA does not create a private right of action for conspiracy to engage in the theft of trade secrets); *see also Arthur J. Gallagher & Co. v. Tarantino*, 2022 WL 4092673, at *18 (N.D. Cal. July 27, 2022) ("courts have uniformly found that stand-alone conspiracy claims are unavailable" for civil claims under the DTSA) (collecting cases).

## B.    Common Law Misappropriation

Hedgeye's common law misappropriation claim cannot be sustained for the same reason it cannot make out a federal trade secret claim. Indeed, the common law claim is even weaker because it requires proof that Terman used the trade secret. *Faiveley Transp. Malmo AB v.*

11

*Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009). As previously explained, Hedgeye's claims against Terman are based entirely on allegations that she received or sent certain material, not that she used them.

### C.    The Tortious Interference Claim Against Nadine Terman Lacks Factual or Legal Support

To state a claim for tortious interference with Dale's employment agreement, Hedgeye must establish, "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Honey Bum, LLC v. Fashion Nova, Inc.*, No. 2:20-CV-11233-RGK-AS, 2022 WL 385185, at *4 (C.D. Cal. Jan. 6, 2022); *see also United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1006 (9th Cir. 2014)).[1] Because Dale's employment was at will, Hedgeye must also show that the interference was independently wrongful: i.e. that beyond the alleged inducement of the breach itself, the alleged conduct was proscribed by some additional, determinable legal standard. *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1148, 470 P.3d 571, 580 (Cal. 2020).

### 1.    There is No Evidence That Nadine Terman Knew the Terms of Dale's Contract Prior to the Alleged Tortious Acts

Hedgeye's tortious interference claim is premised on allegations that Terman knew specific terms of Dale's written employment agreement with Hedgeye. But the first time Terman

---

[1] Defendants' analysis presumes that California law would apply to this claim on the ground that the alleged tortious conduct took place there. *See, e.g., Manbro Energy Corp. v. Chatterjee Advisors, LLC*, No. 20 CIV. 3773 (LGS), 2021 WL 2037552, at *3 (S.D.N.Y. May 21, 2021) (quoting *In re Thelen LLP*, 736 F.3d 213, 220 (2d Cir. 2013). If New York law applies, Plaintiff's burden would be greater as it would have to prove procurement of a breach of contract, not merely a "disruption" of the contractual relationship.

learned about the specific terms of that agreement was on April 1, 2021, when Lamar sent her a copy. (R56.1 ¶ 3-66). By that time, Dale had definitively left Hedgeye's employ, and the employment agreement was no longer in effect.

This Court previously dismissed Hedgeye's claim because Hedgeye failed to allege Terman's knowledge of the employment agreement. Order at 27. *See also Nevada DeAnza Fam. Ltd. P'ship v. Tesoro Ref. & Mktg. LLC*, 474 F. Supp. 3d 1087, 1096 (N.D. Cal. 2020) (holding that defendants must know the "specific terms" of the affected contract). Although the FAC added a bare allegation of knowledge, the same problem remains. The alleged interference occurred during March 21-28, 2021, when Dale was still working at Hedgeye, but Terman did not learn of the allegedly offending contract provisions until April 1. (R56.1 ¶ 3-66).

### 2. There Is No Evidence of An Intentional Act by Terman to Induce Dale to Breach His Employment Contract

The most glaring deficiency of Hedgeye's tortious interference claim is apparent from its own pleading: Dale's decision to break with Hedgeye was made by him alone, prior to and without the participation of Terman or any other third party. Dale informed Hedgeye of his decision to resign on March 11, 2021, well before his March 22 call with Terman. (DDR56.1 ¶ 2-86). On March 15, 2021, a full week before he spoke with Terman, Dale told Hedgeye's General Counsel that he was considering becoming an independent research provider. (DDR56.1 ¶ 2-89). On these facts, Hedgeye cannot possibly prove that Terman's "alleged wrongful or unjustified conduct caused the breach." *Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 909 (9th Cir. 2008).

The same analysis applies to Hedgeye's theory that Dale breached confidentiality and intellectual property provisions in his employment contract. Throughout his employment at Hedgeye, Dale allegedly backed up key files to a personal Dropbox account. (DDR56.1 ¶ 2-42).

13

Terman had nothing to do with this conduct, which occurred long before the March 22, 2021 phone call. Indeed, there is no evidence that Terman ever knew about Dale's backups until Hedgeye brought this case.

Hedgeye certainly cannot prove Terman engaged in any "wrongful or unjustified conduct" to induce a breach by Dale, nor can it show (as required) that Terman's "specific purpose" was to interfere with Dale's employment contract. *Nevada DeAnza Fam. Ltd. P'ship v. Tesoro Ref. & Mktg. LLC*, 474 F. Supp. 3d 1087, 1095 (N.D. Cal. 2020). Terman first became aware of the possibility that Dale might possess Hedgeye information when Dale emailed her on March 27, 2021, informing her that he retained copies of the GIP nowcast on his laptop. (R56.1 ¶ 3-55). Thus, to the extent Dale had breached his employment agreement by copying those materials, he had done so before Terman even knew about it. Moreover, Terman did nothing to encourage or induce Dale to retain any Hedgeye information. Precisely, to the contrary, she told Dale to exercise caution and get proper legal advice: "I would just make sure your lawyer gives you advice. If you built something while at their company, technically they own it. So, you would have to give them a copy, I believe." (R56.1 ¶ 3-55). Hedgeye cannot sustain a tortious interference claim when the undisputed evidence shows that Terman actively discouraged, rather than induced, the supposed misconduct.

### 3.    There Is No Evidence of an Independent Wrong

Dale was not subject to a post-employment non-compete agreement. That presents an insurmountable obstacle to Hedgeye's claim because interference with an at will employment relationship requires proof on an independent wrong, above and apart from the breach itself. *Power Integrations, Inc. v. De Lara*, No. 20-CV-410-MMA (MSB), 2020 WL 1467406, at *22 (S.D. Cal. Mar. 26, 2020). Hedgeye has never alleged, much less developed any evidence to support, such an

independent wrong. Thus, even if sufficient evidence existed to support the other elements of its claim, summary judgment would still be warranted on its tortious interference claim.

### 4. There is No Evidence of Damages

Terman joins in full with and incorporates by reference the arguments of co-defendant Steven Lamar with respect to Hedgeye's failure to identify any harm resulting from the alleged tortious interference. In sum, Hedgeye cannot possibly demonstrate injury based on its theory that Terman provided moral support to a decision Dale had already made and would have happened without her involvement. Not surprisingly, Hedgeye has presented no factual or expert evidence of such damages and no fact witness identified any damages.

### D. No Evidence Supports the Breach of Contract Claim Against Solstein

Hedgeye contends that Solstein breached a non-solicitation clause in its Services Agreement with Hedgeye by allegedly "soliciting" Dale to work at a company called Longbow. Summary judgment is warranted on this claim for several reasons.

*First*, and most obviously, there was no solicitation of Dale to work at Longbow. At the time the alleged discussions occurred – late March 2021 – Longbow was still in the conceptual stage. (R56.1 ¶ 3-29) Indeed, the FAC itself concedes that Longbow did not launch its platform until August 2022.[2] (*Id*.) It is also undisputed that Dale was never offered a position at Longbow and never worked there. (*Id*.) Hedgeye cannot sustain a non-solicitation claim based on a job that was never offered in a company that had no operational existence at the time.

---

[2] The Services Agreement had no bar on solicitation after 12 months have passed. Thus, there would be no violation if Dale had been hired to work at Longbow, effective as of its August 2022 launch date.

The evidence that Hedgeye invokes consists of exploratory conversations between Dale, Lamar and Solstein where Longbow is mentioned. The fact that Longbow came up in these conversations is neither surprising nor suspicious: Lamar and Terman had recently formed the Longbow entity in January 2021 and Dale was considering starting his own new company. (R56.1 ¶ 3-27-39). The documents do not show any "solicitation" by Terman. Rather they show that Dale expressed interest in Longbow, FAC Exhibit E ("[H]e wants to join Longbow"), but that his actual plan was to form his own macro research firm. *Id*. They also show that Lamar contemplated offering Dale some equity in the Longbow venture and that he jotted down his "thoughts" on the matter to Terman. *Id*. as Exhibit F. But such free-form conceptual discussion hardly rises to the level of solicitation and certainly not solicitation of Dale by Terman.

***Second***, there is no evidence that ***Solstein*** engaged in any solicitation. The limited discussions that did mention Longbow in some way involved Dale, Terman, and Lamar. At no point in these discussions did Terman propose hiring Dale to work at or with Solstein. (R56.1 ¶ 3-29). With one exception, none of the discussions involved Terman's co-managing members at Solstein and there is no indication that Terman was acting on behalf of Solstein in a representative capacity. The one exception – the document attached to the FAC as Exhibit E – refutes Hedgeye's claim. It shows that Solstein did not solicit Dale to do anything but that he expressed his own interest in the Longbow venture. It also shows Solstein understood what Dale had told Terman contemporaneously – that Dale's plan was to start his own macro research firm, not to become an employee of Solstein.

***Third***, the non-solicitation clause, because it impacts competition, is subject to the same restrictions applicable to non-compete covenants in employment contracts. *Integrated Corp. Rels., Inc. v. Bidz, Inc*., No. CV094028269S, 2009 WL 2962374, at *5 (Conn. Super. Ct. Aug.

14, 2009). In particular, it cannot be enforced unless "the covenant protects a legally recognized interest and that the restraint is reasonable in scope and has been implemented for valid reasons." *Id*. *See also Scott v. Gen. Iron & Welding Co*., 171 Conn. 132, 137 (Conn. 1976) (defining criteria for evaluating reasonableness of restrictive covenants). Hedgeye's claim against Solstein is an unreasonable restraint as a matter of law. Hedgeye's employment contract with Dale included no post-employment restriction on competition and thus Hedgeye had no legitimate expectation that Dale would not compete against them. It is not reasonable for Hedgeye to attempt to impose restrictions on Dale through the back door using subscriber contracts to which Dale was not a party. In addition, Solstein is a California-based investment advisor that does not compete with Connecticut-based Hedgeye, a supposed research firm. Hedgeye thus can point to no legally recognized interest it could have in restricting Solstein's hiring decisions.

Finally, the FAC improperly restates previously dismissed claims that Solstein breached certain prohibitions contained in Hedgeye's website terms of service, relating to infringing or modifying intellectual property or reverse engineering content. None of these supposed prohibitions are contained in the Services Agreement. (R56.1 ¶ 3-3) Rather, Hedgeye alleges that the agreement incorporates by reference the terms of service of Hedgeye's website, which in turn refer to capitalized defined terms and contain vague prohibitions against "reverse engineering," and "modifying or creating derivative works." (R56.1 ¶ 3-5&6). As the Court previously held, to the extent these website terms of service are intelligible, they clearly relate to copyright violations or other harm ***to the website*** and have no relevance or application to Hedgeye's allegations in this case. Order at 29.

Hedgeye also failed to provide any proof on the basic elements of its claim. In particular, Hedgeye's corporate witness Michael Blum admitted that the firm had no evidence that Solstein

violated the Terms of Service. (R56.1 ¶ 3-7). He further admitted that the Terms of Service were not included in the Services Agreement and could only be found by searching on Hedgeye's website. (R56.1 ¶ 3-5). Although Hedgeye produced various versions of its Terms of Service, no witness confirmed which version existed when the Services Agreement was executed or whether it was accessible by Solstein at the time. (R56.1 ¶ 3-6).

Hedgeye also cannot demonstrate damages from the breach. Hedgeye fails to adduce any evidence of the causal link between Defendants' action and any concrete loss of profit, customer goodwill, or business opportunity. *See Meadowbrook Ctr., Inc. v. Buchman*, 149 Conn. App. 177, 189, 90 A.3d 219, 228 (Conn. 2014) (explaining that causation in contract claims is measured by "whether those injuries were foreseeable to the defendant and naturally and directly resulted from the defendant's conduct"). No Hedgeye witness was able to identify any harm resulting from Solstein's conduct, and no Hedgeye expert witness presented any damages analysis on this claim.

## CONCLUSION

For the reasons stated above, Defendants respectfully requests that the Court grant their motion to for summary judgment and discuss all claims against them with prejudice.

Dated: New York, New York
      October 25, 2024

Respectfully submitted,

**PRESS KORAL LLP**

By:    /s/ Jason Koral
        Jason M. Koral

641 Lexington Avenue, 13th Floor
New York, NY 10022
tel: 917-881-1347
fax: (347) 342-3882

*Attorneys for Defendants Terman and Solstein*

18