UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HEDGEYE RISK MANAGEMENT, LLC

Plaintiff,

v.

DARIUS DALE, et al.,
Defendants.

No. 21-cv-3687 (ALC) (RWL)

**DEFENDANTS NADINE TERMAN AND SOLSTEIN CAPITAL LLC'S RULE 56.1 STATEMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**PRESS KORAL LLP**
641 Lexington Avenue, 13th Floor
New York, NY 10022
Telephone: (212) 520-8270
Facsimile: (347) 342-3882
jkoral@presskoral.com

Pursuant to Local Rule 56.1 and Rule 2.E of this Court's Individual Practices, Defendants Nadine Terman ("Terman") and Solstein Capital, LLC ("Solstein") join in full and incorporate the Statement of Undisputed Material Facts submitted by Darius Dale, Steven Lamar and 42 Macro LLC (collectively, the "Dale Defendants") in support of their Motion for Summary Judgment. Terman and Solstein further submit the following additional Statement of Undisputed Material Facts in support of their Motion for Summary Judgment.

For the purposes of this statement, the following abbreviations and exhibit designations are used for cited depositions transcripts:

- Deposition of Michael Blum, taken May 27, 2022: "Blum 2022 Depo Tr." (Exhibit ("Ex.") 2)
- Deposition of Michael Blum, taken February 17, 2023: "Blum 2023 Depo Tr." (Ex. 3)
- Deposition of Darius Dale, taken June 15, 2021: "Dale 2021 Depo Tr." (Ex. 5).
- Deposition of Christian Drake, taken June 15, 2022 ("Drake Depo Tr.") (Ex. 8).
- Deposition of Steven Lamar, taken November 30, 2022 ("Lamar Depo Tr.") (Ex. 13).
- Deposition of Keith McCullough, taken February 2, 2023: "McCullough 2023 Depo Tr." (Ex. 17)
- Deposition of Joshua Steiner, dated June 16, 2022 ("Steiner Depo Tr.") (Ex, 20).
- Deposition of Nadine Terman, taken December 1, 2022: "NT 2022 Depo Tr." (Ex. 21).

In addition, certain exhibits cited herein have been designated as exhibits to the Rule 56.1 Statement of the Dale Defendants. To avoid unnecessary duplication, this Statement refers to and

incorporates those exhibits as designated by the Dale Defendants. Exhibits cited in this Statement and not cited in the Dale Defendants' statement begin at Exhibit 101.

**A. Terman and Solstein**

3-1. Solstein is an SEC-registered investment adviser that provides investment advisory services on a discretionary basis to a private fund and separately managed clients. (Declaration of Nadine Terman in Support of Motion for Summary Judgment, dated October 25, 2024 ("NT Dec.") at ¶ 3).

3-2. Solstein was founded as an independent investment firm in 2010. Its co-founders and current Managing Members are Terman, J.C. Torres, and Sandra Southworth. (NT Dec at ¶¶ 3-4).

**B. Solstein Subscribes to Hedgeye**

3-3. In early 2017, Solstein entered into a services agreement with Hedgeye (the "Services Agreement"). (Ex. 301, HE0306642)

3-4. Among other provisions, the Services Agreement provided Solstein access to an online research portal defined as the "Website." The Services Agreement further indicated that "Subscriber's access to the Website will be subject to the Terms of Service for Web Service . . . available on the Website." *Id.*

3-5. The Terms of Service were not annexed to the Services Agreement. They could only be accessed by searching for them on the Hedgeye website. (*Id.*, Ex. 3, Blum 2023 Depo Tr. 179:15-180:6).

3-6. Hedgeye produced a file in discovery entitled "HEDGEYE TERMS OF SERVICE1_june_25_2014.docx." but no Hedgeye witness identified it as the website terms of service in force as of the date of execution of the Services Agreement. (Ex. 302, HE0375333; Ex.

3, Blum 2023 Depo Tr. 181:23-183:9).

3-7. Hedgeye's Rule 30(b)(6) corporate witness was unable to identify any violation of the Hedgeye Terms of Service by Solstein or Terman. (Ex. 3, Blum 2023 Depo Tr. 183:10-185:15).

3-8. Terman enjoyed cordial relationships with Keith McCullough and others at Hedgeye from 2017 through at least 2019. (Ex. 17, McCullough 2023 Depo Tr. 305:20-23). Terman and Solstein invited Hedgeye personnel to attend events where they could meet potential subscribers, and Hedgeye was appreciative of those opportunities. (*Id.* at 307:6-21); (Ex. 303 (HE0351692)).

3-9. Terman enjoyed a particularly strong relationship with Darius Dale, who she believed was Hedgeye's best analyst of macroeconomic trends and developments. Dale's affiliation with Hedgeye was an important factor leading her to continue Solstein's subscription with Hedgeye from year-to-year. (NT Dec at ¶ 7, Ex. 21, NT 2022 Depo Tr. 173:16-174:10) (recounting when Dale made the correct call on the direction of the market at the outset of the COVID pandemic and McCullough did not).

**C. <u>Solstein Hires Ben Ryan</u>**

3-10. At the time Solstein subscribed to Hedgeye's services in 2017, Ben Ryan was working as an analyst for the company. (Ex. 17, McCullough 2023 Depo Tr. 287:2-289:12)

3-11. Ryan had no input into the GIP model. He provided some inputs that Keith McCullough used to calculate risk ranges but he did not calculate risk ranges himself. The inputs consisted of price, volume and volatility information that could be obtained from Bloomberg. (Ex. 17, McCullough 2023 Depo Tr. 292:17-293:21).

3-12. Ryan's employment at Hedgeye terminated on or about December 14, 2018. (Ex.

304 (HE0373118)). Ryan relocated to California. (Ex. 17, McCullough 2023 Depo Tr. 290:8-14).

3-13. Ryan approached Rui Yang, a colleague of Solstein, at a conference an expressed interest in getting a job with Solstein. Yang informed Solstein of Ryan's interest, and following a discussion with Ryan, he was hired at Solstein in a marketing role. (NT Dec at ¶ 9; Ex. 21, NT 2022 Depo Tr. 147:20-148:21).

3-14. On March 5, 2019, Terman wrote an email to Dale informing him that Ben Ryan had joined Solstein. (Ex. 305 (HE0352185)).

3-15. McCullough was pleased to learn that Ryan had been hired by Solstein. In response to Ryan's email, McCullough responded: "Hey Ben – this is awesome news, congrats!" *Id.* In April 2019, he emailed Terman: "DD and I couldn't be happier that Ben is working for you." (Ex. 306 (HE0352700)).

3-16. Hedgeye believed that Ryan's employment with Solstein was a benefit to Hedgeye because it would help Hedgeye recruit more subscribers. The same day McCullough emailed Terman to describe how pleased he was that Solstein had hired Ryan, he wrote an internal email stating: [redacted] (Ex. 307 (HE0353947)).

3-17. At no point prior to filing the lawsuit against Terman and Solstein did anyone from Hedgeye express any concerns or disapproval to Solstein over their hiring of Ben Ryan. (NT Dec at ¶ 10).

3-18. Ryan did not provide any confidential information of Hedgeye's to Solstein and Solstein did not seek such information. (NT Dec at ¶ 9). Ryan was hired to perform marketing functions at Solstein. (NT Dec at ¶ 9; Ex. 21, NT 2022 Depo Tr. 147:20-149:6).

**D. <u>Dale Resigns From Hedgeye and Considers His Professional Options</u>**

3-19. Over time Terman and Dale became personal friends and Terman mentored Dale as his professional career developed. (Ex. 5, Dale 2021 Depo Tr. 54:23-55:3; 61:10-11).

3-20. Terman regarded Dale as a promising young professional and was eager to support a talented young Black man in an industry where women and minorities are generally underrepresented. (Ex. 21, NT 2022 Depo Tr. 92-93, 244). Solstein, Terman and its principals are heavily involved in diversity initiatives in the financial industry. They launched the conference that has become 100WF's Global FundWomen Week, and have participated in Bloomberg's Diversity Drives Returns, Bloomberg's New Voices program, and CNBC's NEXT program. (NT Dec at ¶ 5).

3-21. In early 2021, Solstein reviewed the status of its Hedgeye subscription. Solstein had two immediate concerns. One was that despite the high cost of the Solstein subscription, they did not have access to a Hedgeye-run message board called the Arena. Another was that it appeared that Hedgeye offered other subscription plans that could provide an equivalent level of service for less cost. (NT Dec at ¶ 11).

3-22. On the morning of March 22, 2021, Terman wrote Jamie Bruno of Hedgeye: "I hear there is something called the Arena available, but I don't see it. Do you know why?" (Ex. 308, SOLS00023850). Bruno did not respond until the following day, when he explained that the Arena was only available for Mass Market and Middle Market subscribers, not institutional subscribers like Solstein. *Id*.

3-23. On March 22, 2021, after sending the email to Bruno, Nadine Terman called Darius Dale to discuss her interest in access to the Arena and a potential modification in

Solstein's subscription. (Ex. 21, NT 2022 Depo Tr. 121:20-24). On that call, Dale told her that he had resigned from Hedgeye and was leaving the firm. ((Ex. 5, Dale 2021 Depo Tr. 56:7-13. 68:6-10) (Q. "[Y]ou told her you had quit, right? A. "Yes"); (Ex. 21, NT 2022 Depo Tr. 123:17-20) ("He told he resigned a few weeks back.")). Terman and Solstein were previously unaware of Dale's resignation. (Ex. 5, Dale 2021 Depo Tr. 55:11-22).

3-24. Terman then introduced Dale to Lamar. (Ex. 5 Dale 2021 Depo Tr. 55:7-10).

3-25. During her discussions with Dale on March 22, 2021, Dale discussed and considered a number of potential post-Hedgeye employment options. The nature of the discussions was exploratory and conceptual. (Ex. 21, NT 2022 Depo Tr. 128:22-132:5).

3-26. Terman did not encourage Dale to start his own business. (Ex. 5, Dale 2021 Depo Tr. 63:12-13; Ex. 21, NT 2022 Depo Tr. 131:9-14).

3-27. Terman mentioned that she and Lamar had started a new venture called Longbow. She did not pitch Dale to join Longbow. (NT Dec at ¶ 14). But Dale himself expressed interest in joining Longbow. (Ex. 309, SOLS00030356).

3-28. Lamar emailed Terman with some "thoughts" that included the idea of providing Dale with 10% of the equity in Longbow. (Ex. 310, SOLS00023801).

3-29. Longbow was still in its early stages and did not launch until August 2022. Fifth Amended Complaint at ¶ 92; NT Dec at ¶ 15. Dale never received equity in Longbow and discussions about any Dale role in Longbow did not reach fruition (Ex. 13, Lamar Depo Tr. 222-23; Ex. 21, Terman 2022 Depo Tr. 159-60, 168; NT Dec at ¶ 15).

3-30. After the first call on March 22, Dale sent Terman and Lamar a thank you note, which attached a sample of his Hedgeye morning note, a research publication routinely shared with Hedgeye subscribers (including, at that time, Solstein). (Ex. 138, DALE0154623). As

Hedgeye subscribers, Terman and Solstein regularly received a copy of Dale's morning note, entitled the Rise & Grind, each day that Dale published it, including that very day. (Ex. 311, SOLS00010426)

3-31. Dale also sent an email to Terman On March 22, 2021, with the subject line "[EXTERNAL] Columns N:Z.' (Ex. 139, DALE0157181). The email contained an illegible screenshot which Hedgeye claims is part of a "Price, Volume, Volatility" file. (*Id.*, FAC ¶ 112). Terman forwarded the email without comment to Lamar the same day. Id. She did nothing else with it. (NT Dec at ¶ 16).

3-32. Terman had "no idea" what the screenshot was and had no idea why Dale sent it. (Ex. 21, NT 2022 Depo Tr. 120:10-25). She was able to identify the screenshot as being part of an Excel file but could not discern anything else about it because "I can't read anything." (Id. at 121:14-15).

3-33. Also on March 22, Dale sent an email to Terman and Lamar attaching a Microsoft Excel file called "Hedgeye_US_&_Global_GIP_Models_&_Nowcast_Summaries." (Ex. 312, SOLS00023813).

3-34. The "Hedgeye_US_&_Global_GIP_Models_&_Nowcast_Summaries" attachment is a Hedgeye output file. (Ex. 5, Dale 2021 Depo Tr. 67:5-7); (Ex. 8, Drake Depo Tr. 105:8-18) (confirming that the file is a Hedgeye output file). Terman had already received a copy of this file because Solstein received it regularly as part of its Hedgeye subscription. She had received a copy of that file that morning as an attachment to Dale's "Rise & Grind" emails, sent daily to Solstein as part of their Hedgeye subscription. (Ex. 311 SOLS00010426).

3-35. Output files are derived from the GIP source files but contain outputs and are shared with Hedgeye subscribers. (Ex. 17, McCullough 2023 Depo Tr. 123:23-25); (Drake

105:19-106:9) (confirming that Hedgeye_US_&_Global_GIP_Models_&_Nowcast_Summaries is an output file "sent to subscribers" and that at least for some period time, it was sent to subscribers "on a daily basis); (Ex. 20, Steiner Depo Tr. 10:7-9) (confirming that output files "do not contain any source material"). Hedgeye has conceded that output files are not trade secrets. (Ex. 3, Blum 2023 Depo Tr. 145:25-146:6; Ex. 45, Hedgeye Response 55 to 42 Macro's Request for Admissions, dated January 9, 2023).

3-36. On March 27, 2021, Terman shared a file via Dropbox with Darius Dale. The shared Dropbox had been created by Terman on March 25. (Ex. 313, SOLS00032641). The file she shared was entitled "Hedgeye_US_&_Global_GIP_Models_&_Nowcast_Summaries." *Id.*

3-37. The file Terman shared is another version of the same output file Dale sent in his March 22, 2021 email. Ms. Terman had received a copy of this file directly from Hedgeye's daily "Rise & Grind" email, as received through the Solstein subscription. (Ex. 314, SOLS00024563; NT Dec at ¶¶ 17-18) She did not share it with anyone other than Mr. Dale. *Id.* The file had been sent out by Hedgeye on the morning of March 26, a day when, according to Hedgeye's Fifth Amended Complaint, Dale was still working at Hedgeye. (Ex. 314, SOLS00024563, FAC ¶¶ 132-33).

3-38. On March 22, Dale also sent Terman a picture of two pages of his notebook, which Terman forwarded to Lamar. (Ex. 140, DALE0157182). Terman had no idea what the notebook was or why Dale sent it, and she never did anything with the screenshot other than forward it to Lamar. (Ex. 21, NT 2022 Depo Tr. 138:22-139:5 (testifying that she had no idea why Dale sent the screenshot and that "I have no idea what that is.")).

3-39. Terman and Solstein have never seen the GIP source model, "Global Macro Risk Monitor.xlsx" and know nothing of its contents other than what Hedgeye has chosen to reveal to

subscribers. (NT Dec at ¶ 29).

3-40. Neither Terman nor Solstein have ever seen a Hedgeye customer list. (NT Dec at ¶ 30).

**E. Dale Begins Work With 42 Macro**

3-41. Terman and Solstein did not have any involvement in the formation of any 42 Macro business entity. (NT Dec at ¶ 24).

3-42. Terman provided some advice to Dale about how he should describe his departure from Hedgeye in his communications and social media. On March 25, 2021, Terman told Dale that his communications should display "positive strength" and "keep it about entrepreneurialism." (Ex. 315, SOLS00024321).

3-43. Terman advised that his new communication should go out at the same time on all platforms and recommended language to use for tweets and email communications. *Id*. None of the recommended language said anything negative about Hedgeye. *Id*.

3-44. Also on March 25, Terman encouraged Dale to have content ready to publish when he announced his new business. (Ex. 151, DALE0121864).

3-45. Terman did not provide any professional assistance to Dale or 42 Macro other than advice on messaging, logos, website and communications presentation, and social media profiles. (NT Dec at ¶ 25).

**F. Dale's Communications with Terman About 42 Macro**

3-46. On March 26 and 27, 2024, Terman was included on emails between Darius Dale and Steven Lamar concerning potential pricing for 42 Macro. (Ex. 316, SOLS00024606). However, Terman did not have a sense about what the right pricing would be and thus did not participate beyond offering the "thought" that Dale should "make sure the intro price is low

enough, but I have no idea what that is." *Id.*

3-47. Neither Terman nor Solstein provided any assistance, advice, or contributions to Dale or 42 Macro on their financial models; nor do they have any financial interest in the company. Neither Terman nor Solstein have or ever had any knowledge concerning the content of 42 Macro's models other than the information and disclosures and 42 Macro makes available to all subscribers. (NT Dec at ¶ 26).

### G. Terman Refers to Dale to an IT Vendor to Assist With Personal Confidential Information on His Laptop

3-48. Dale frequently used his Hedgeye laptop for personal purposes, which he believed was common at Hedgeye. (Dale 2021 Depo Tr. 20-23).

3-49. On March 25 and March 26, on the understanding that Dale's Hedgeye issued laptop contained personal non-work related files, Terman recommended that Dale "get[] someone to help you ensure [Hedgeye] cannot access anything from the laptop you are returning." She also offered access to the IT vendors employed by Solstein to assist him in protecting his personal files. (Ex. 153, DALE0143950; NT Dec at ¶ 20).

3-50. Terman was concerned that Dale's laptop contained sensitive personal information, including personal financial information, that Hedgeye might misuse to smear or harm Dale. (Ex. 156, DALE0143951) (informing Dale that she did not trust Hedgeye IT people to handle his personal information properly); (Ex. 21, NT 2022 Depo Tr. at 196-97) ("[Dale] "had shared that he had personal information, like bank account information, on his laptop. And I just told him, listen, you have to get all your personal stuff off because anything on their property belongs to them. And I would be worried that they could go as far as, like, abusing his bank accounts or…stealing his identity. Again, I thought that maybe Hedgeye would have no bounds.").

3-51. Terman's concerns were valid, as Hedgeye did use personal information obtained from Dale's laptop to smear him publicly. *See* Ex. 2, Blum 2023 Depo Tr. 262:10-265:5.

3-52. Terman did not participate in Dale's interactions with the IT vendor she recommended and her only knowledge of such interactions was from Dale's March 26, 2021 email, when he reported that "Thanks for your help with the IT guys, Nadine. Super helpful. Our bases are adequately covered." (Ex. 155, DALE0157973; NT Dec at ¶ 20).

3-53. Terman believed and understood that the IT vendor she recommended would and did perform their tasks in an ethical and professional manner, as they had in prior engagements for Solstein. She believed and understood that the IT vendor was directing their efforts only to Dale's personal information, not work files. (NT Dec at ¶ 20). Thus, when Dale mentioned on March 27, 2021, that the GIP model nowcasts were on his hard drive, Terman responded by telling him that Hedgeye might own rights in those files and that "I would just make sure your lawyer gives you advice." (Ex. 166, DALE0122365). Dale responded "Yes, they will get the models back," confirming Terman's understanding that Dale was preserving and returning work files on the laptop. (*Id.*)

### H. Terman Advises Dale to Seek Counsel and Respect Hedgeye Property

3-54. Hedgeye contends that Dale improperly shared confidential information about Hedgeye's institutional subscriber pricing with Lamar and Terman to enable 42 Macro to develop its pricing plans. (FAC ¶ 162 and Ex. X). Terman already knew what Hedgeye charged institutional subscribers, because her own firm had been an institutional subscriber at Hedgeye since 2017. (Ex. 301, HE0306642; FAC ¶¶ 71, 73. Terman also did not participate in developing pricing for 42 Macro. *See supra* at ¶ 3-46.

3-55. On March 27, Dale told Terman that Hedgeye did not "actually have access to the

nowcasts; they're on my hard drive." (Ex. 166, DALE0122365). Terman advised Dale that the models likely belonged to Hedgeye and urged him to seek legal advice, writing: "I would just make sure your lawyer gives you advice. If you built something while at their company, technically they own it. So, you would have to give them a copy, I believe. But I don't even play a lawyer on tv, so that is just based on historical random knowledge." (*Id.*). Dale confirmed that he would return the models, writing: "Yes, they will get the models back[.]" (*Id.*).

3-56. Terman was told and understood that Dale's last day at Hedgeye was to be March 26. (Ex. 135, DALE0121863; *see also* Ex. 137 DALE0143962 (Dale, stating on March 24, 2021 that he would have "a life outside of Hedgeye…by week's end")).

**I. Terman and Solstein Attempt to Renew Their Hedgeye Subscription, But Are Fired by Hedgeye**

3-57. On March 23, 2021, Hedgeye sent an invoice to Solstein for their services in the second quarter of 2021. (Ex. 317, SOLS00023864). Even though Solstein was a macro subscriber, Hedgeye did not disclose that Dale would no longer be at Hedgeye. (*Id.*)

3-58. Terman was still interested in renewing Solstein's subscription, as she wanted to "be a subscriber of both" Hedgeye and 42 Macro and wanted to make clear that "we weren't going to [] pick sides." (Ex. 21, NT 2022 Depo Tr. 232:1-17). Because Bruno had told her that the Arena was only available for mass market and middle market subscribers (*see* Para 3-32 *supra*), Terman wrote Bruno on March 23, 2021, requesting a 30 minute call the following week "to walk through your subscription options." (Ex. 318, SOLS00023732).

3-59. On March 24, 2021, Danny New of Hedgeye responded, inviting Terman for a call the following Monday or Tuesday. Terman proposed a call for late afternoon on Monday, March 29, 2021. (Ex. 318, SOLS00023732). Early morning on March 29, 2021, New responded that Jamie Bruno would be on the call with Terman and would explain non-institutional service

offerings such as "'Pro' and middle market options." (Ex. 318, SOLS00024732)

3-60. On the March 29 call, New and Bruno did not reveal who at Hedgeye would be taking over the Quad models. (Ex. 319, HE223203). Terman expressed concern that daily Rise & Grind did not have as many updated charts and country data as usual. *Id.*

3-61. Following the March 29 call, Terman wrote to express concern about Hedgeye's failure to disclose Dale's departure and sought clarification about who at Hedgeye would be handling macro forecasting going forward. (Ex. 320, SOLS00024814). Bruno responded: "Thanks, Nadine – we will be in touch soon." *Id.*

3-62. Terman and Bruno had another call on March 31, 2021. During that call they discussed the possibility of replacing the existing institutional subscription plan with a non-institutional "Sector Pro" plan that would secure Terman the desired access to the Arena. (NT Dec at ¶ 22; Ex. 321, SOLS00025250).

3-63. The following day, April 1, 2021, Bruno emailed Terman overviews of the Hedgeye Sector Pro products. (Ex. 321, SOLS00025250). Terman responded by proposing that for the second quarter of 2021, she would subscribe individually to Macro Pro (priced at $7,500 per user) and four sector pros (priced at $1,999 each per user). *Id.* Terman added that: "We continue to appreciate partnering with Hedgeye and are simply trying out a new mix." *Id.*

3-64. Bruno did not respond to Terman. Instead, Daryl Jones emailed back less than two hours later: "Jamie passed on your proposal, which Keith and I discussed, and we are going to kindly decline. We will remove you and your team from our distributions effective today." (Ex. 322, SOLS025279). Hedgeye proceeded to cancel the Solstein subscription and did not offer either Terman or Solstein the option of continuing to subscribe on any terms.

3-65. Hedgeye declined to renew the subscription on any terms because Keith

McCullough made the decision to fire Solstein and Terman and not provide them any further opportunity to remain subscribers. (Ex. 323, HE360219).

**J. Terman Discussed Dale's Separation Terms Only After Dale Departed**

3-66. On April 1, 2021, Lamar and Dale sought input from Terman on how Dale should respond to Hedgeye's proposal that Dale sign a separation agreement. Dale sent Terman copies of the proposed separation agreement and markups. (Ex. 324, SOLS00025353). Lamar sent Terman a copy of Dale's 2010 employment agreement with Hedgeye. (Ex. 325, SOLS00025301). Lamar provided some comments to the proposed separation agreement, and Terman responded that she would incorporate those comments into a document she was making (Ex. 326, SOLS00025388). Later that night, Terman distributed the document containing her comments and incorporating Lamar's. (Ex. 327, SOLS00025403). She did not propose refusing to sign any separation agreement with Hedgeye. *Id*.

Dated: New York, New York
October 25, 2024

Respectfully submitted,

**PRESS KORAL LLP**

By: /s/ Jason Koral
Jason M. Koral

641 Lexington Avenue, 13th Floor
New York, NY 10022
tel: 917-881-1347
fax: (347) 342-3882

*Attorneys for Defendants Terman and Solstein*