# Defendants' Response to Hedgeye's Statement of Undisputed Material Facts
## Part 1 of 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HEDGEYE RISK MANAGEMENT, LLC,

Plaintiff-Counterdefendant,

v.

DARIUS DALE, STEVEN LAMAR, 42
MACRO, LLC, NADINE TERMAN, AND
SOLSTEIN CAPITAL, LLC,

Defendants-Counterclaimants.

No. 1:21-cv-03687 (ALC) (RWL)

**DEFENDANTS' RESPONSE TO HEDGEYE'S
STATEMENT OF UNDISPUTED MATERIAL FACTS**

PRESS KORAL LLP
Jason Koral
641 Lexington Avenue, 13th Floor
New York, NY 10022
Tel: (212) 520-8270
Fax: (347) 342-3882
jkoral@presskoral.com

*Attorneys for Nadine Terman and Solstein
Capital LLC*

SHAPIRO ARATO BACH LLP
Jonathan P. Bach
Fabien M. Thayamballi
Alice Buttrick
1140 Avenue of the Americas, 17th Floor
New York, NY 10036
Tel: (212) 257-4897
Fax: (212) 202-6417
jbach@shapiroarato.com
fthayamballi@shapiroarato.com
abuttrick@shapiroarato.com

*Attorneys for Defendants Darius Dale, Steven
Lamar, and 42 Macro LLC*

**TABLE OF CONTENTS**

Page

I.    "Darius Dale's Employment With Hedgeye" ........................................................ 1

    A.    "Dale's Separation from Hedgeye" ............................................................ 8

II.   "Dale's Violation of the Restrictive Covenant in his Employment
      Agreement (Non-Competition) and Terman and Lamar's Actions
      Inducing Dale to Breach" ........................................................................... 9

III.  "Dale's Violation of the Restrictive Covenant in his Employment
      Agreement (Non-Solicitation)" ................................................................. 31

IV.   "Dale's Violation of the Assignment of Rights Provision in his
      Employment Agreement" ........................................................................... 33

V.    "Hedgeye's Financial Models are Trade Secrets" .................................... 36

    A.    "Expert Testimony" .................................................................................. 36

    B.    "Dale's Admissions" ................................................................................ 68

VI.   "Hedgeye Took Adequate Measures to Keep the Source Files for its
      Financial Models Secret" ........................................................................... 71

VII.  "Dale Acquired Hedgeye's Source Files By Improper Means" ............... 84

    A.    "Expert Testimony" .................................................................................. 84

    B.    "Dale's Admissions" .............................................................................. 101

VIII. "Defendants Disclosed Hedgeye Trade Secrets and Confidential
      Information" .............................................................................................. 110

IX.   "Dale Used Hedgeye's Source Files to Create 42 Macro's Financial
      Models" ..................................................................................................... 114

    A.    "Expert Testimony" ................................................................................ 114

        1.    "Daniel Lacalle's Analysis: 42 Macro Uses the Same
            Methodology as Hedgeye, and Could Not Have Gotten to
            that Same Methodology Without Copying and Analyzing
            Hedgeye's Model in Detail" ......................................................... 114

        2.    "Liam Bastick's Analysis: Many Key Calculations of 42
            Macro's Models Could Not Have Been Constructed without
            Sight and Copying of their Hedgeye Counterparts" .................... 137

    B.    "Dale's Admissions" .............................................................................. 160

X.    "Hedgeye's Confidential Notebooks" ..................................................... 168

XI.   "Hedgeye's Customer Lists" .................................................................... 177

XII.    "Hedgeye's Registration as an Investment Adviser" ....................................................... 184

XIII.   "Hedgeye's Disclosures Regarding Sierpinski Capital
        Management ('Sierpinski')" ................................................................................... 187

XIV.    "Hedgeye's Real Time Alerts" ................................................................................ 195

XV.     "Terman's Relationship with CNBC" ....................................................................... 197

XVI.    "Solstein's Agreement with Hedgeye" ..................................................................... 198

XVII.   "Solstein's Lack of Reliance on Hedgeye's Disclosures" .......................................... 202

XVIII.  Defendants' Statement Of Additional Material Facts ................................................ 217

        A.      Hedgeye's Claims .................................................................................. 217

                1.      Dale's Notebooks .......................................................................... 217

                2.      Hedgeye's Customer Lists ............................................................. 218

                3.      Hedgeye's Code of Ethics .............................................................. 220

                4.      Hedgeye's Damages ...................................................................... 220

        B.      42 Macro's Counterclaims ...................................................................... 220

                1.      Hedgeye's Use Of Twitter ............................................................. 220

                2.      Hedgeye Encourages Third Parties To Attack Dale
                        And 42 Macro ............................................................................... 222

                3.      Hedgeye's Harassment Campaign Accelerates in
                        February 2022 ............................................................................... 224

                4.      Hedgeye's Campaign Is Commercially Motivated ............................ 232

                5.      42 Macro Has Suffered Harm As A Result Of Hedgeye's
                        Campaign ..................................................................................... 233

        C.      Terman And Solstein .............................................................................. 236

                1.      Ben Ryan ..................................................................................... 236

                2.      Hedgeye Representations of Independence and Lack of
                        Conflicts ...................................................................................... 236

                3.      Hedgeye's Conflicted Trading in ETFs ........................................... 238

                4.      Defamatory Statements ................................................................. 239

                5.      CNBC .......................................................................................... 241

                6.      Loss of Business ........................................................................... 242

Pursuant to Local Civil Rule 56.1(b) and Rule 2.E of this Court's Individual Practices, Defendants Darius Dale, Steven Lamar, 42 Macro LLC, Nadine Terman, and Solstein Capital LLC (collectively "Defendants") respectfully submit this response to Plaintiff Hedgeye Risk Management LLC's statement of facts:[1]

## I.   "Darius Dale's Employment With Hedgeye"

1-1.   Hedgeye was founded in 2008 by CEO Keith McCullough and President/COO Michael Blum. Declaration of Michael Blum, dated April 26, 2021, Dkt. No. 7 (the "Blum Decl."), ¶ 2; Declaration of Sarika Andavolu, dated October 25, 2024 (the "Andavolu Decl."), Ex. 76 (Transcript of Deposition of Keith McCullough, held on May 24, 2022, (the "First McCullough Dep. Tr."), at 69:9-18).

**Defendants' Response:** Undisputed.

1-2.   Hedgeye offers market predictions and macroeconomic research to paying subscribers. Blum Decl. ¶¶ 2, 3.

**Defendants' Response:** Undisputed that Hedgeye offers market predictions and macroeconomic research to its subscribers, among other offerings.  Defendants dispute that these are Hedgeye's sole offerings:  Hedgeye also offers research coverage of "nearly 20 sectors" of the economy, including retail, housing, healthcare and the like.  (Fifth Amended Complaint ("FAC"), Dkt. 653, ¶ 15).  Hedgeye also sells access to different media offerings, such as "The Macro Show," a weekly online video hosted by Hedgeye CEO Keith McCullough, and "The Call," a live webcast hosted by McCullough that offers commentary and stock ideas.  (*See* Hedgeye "The Macro Show," *available at* https://info.hedgeye.com/3-for-3-macro-email; "The Call @ Hedgeye," *available at* https://accounts.hedgeye.com/products/the_call/785!786).

---

[1]  Exhibits to the Declaration of Jonathan P. Bach dated October 25, 2024, the Declaration of Jason Koral dated October 25, 2024, the Declaration of Jonathan P. Bach dated December 6, 2024, amd the Declaration of Jason Koral dated December 6, 2024, are numbered sequentially, and are cited as "Defs Ex. __".  The Dale Defendants' Statement of Undisputed Material Facts is cited herein as "Dale 56.1 ¶__".  The Terman Defendants' Statement of Undisputed Material Facts is cited herein as "Terman 56.1 ¶__".

1-3.    Defendant Darius Dale was hired by Hedgeye pursuant to an employment agreement dated July 17, 2009. First Declaration of Darryl Jones, dated April 26, 2021, Dkt. No. 8 (the "First Jones Decl."), ¶ 18.

**Defendants' Response:** Undisputed.

1-4.    That agreement was replaced by an employment agreement dated March 8, 2010 (the "Employment Agreement"). First Jones Decl. ¶ 18 & Ex. 1.

**Defendants' Response:** Undisputed.

1-5.    Dale was employed by Hedgeye from July 17, 2009 through March 28, 2021. First Jones Decl. ¶ 18; Blum Decl. ¶ 17.

**Defendants' Response:** Undisputed that Dale was employed by Hedgeye from July 17, 2009 through mid-March 2021. Defendants dispute that Dale was "employed by Hedgeye" through Sunday, March 28, 2021. Dale announced his intention to resign from Hedgeye on March 11, 2021. (FAC ¶¶ 105-06; Dale Defendants' Answer, Dkt. 674, ¶¶ 105-06). On March 29, 2021, Tanya Waite, Hedgeye's Director of Human Resources, informed Hedgeye's General Counsel, Anthony Parsio, that "3/26 is official termination for Darius." (Defs. Ex. 328, HE0212658). Dale also understood his resignation was effective as of Friday, March 26, 2021. (Defs. Ex. 341, DALE0144045).

1-6.    On March 28, 2021, Dale tendered his immediate resignation to Hedgeye in an email with the subject line, "I am resigning." Blum Decl. ¶ 21.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). No paragraph in the Blum declaration, cited as evidentiary support, states that Dale sent an email with the subject line "I am resigning." The paragraph cited does not discuss Dale's resignation at all. Thus no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that on Sunday, March 28, 2021, Dale submitted a formal letter of resignation to Hedgeye along with an email to

2

Hedgeye CEO McCullough, President Blum, and others with the subject line "I am resigning."

(Defs. Ex. 134, HE0213527; Defs. Ex. 329, HE0213522 at HE0213525).

1-7.    Dale's Employment Agreement contains a "Confidential Information" provision (the "Confidential Information Provision") that states as follows:

> **Confidential Information.** In your employment at the Company you will be exposed to confidential and proprietary information of the Company and its affiliates (such information, "Confidential Information"), including without limitation, financial information about the Company and its affiliates (collectively, the "Company Group") and the Company's clients, and proprietary investment and trading strategies of the Company Group and the Company's clients. You agree not to disclose such Confidential Information to any person or entity outside the Company Group at any time either during or after your employment, and upon termination of your employment, whether voluntary or involuntary, or upon the Company's request at any time during the term of your employment, you will deliver to the Company all written and other materials which contain or relate to such Confidential Information, whether formal or informal, whether prepared by you or by others and whether or not required for your work with the Company, including, without limitation, all documents, notes, computer programs and data prepared for or stored in or obtained from any automated information system, all of which such materials shall be and remain the property of the Company. Similarly, the Company is hiring you for your professional skills, and not to learn any confidential information related to any prior employer. We expect that you will not disclose or utilize any confidential information of any prior employer. You will not bring any documents or computer files that belong to any prior employer, and the Company has instructed you not to use any such materials while working for us. Your commitments under this paragraph shall survive the termination of your employment and of this agreement. You agree that the restrictions set for above are necessary to protect the Company Group's Confidential Information, and that they are reasonable in duration and scope and that they do not prevent you from earning your living. These restrictions shall survive the termination of

3

your employment and of this agreement.

First Jones Decl. Ex. 1 at 2-3.

**Defendants' Response:** Undisputed that Dale's employment agreement with Hedgeye included

this language. The agreement speaks for itself.

1-8. Dale's Employment Agreement contains an "Assignment of Rights" provision
(the "Assignment of Rights Provision") that states as follows:

> **Assignment of Rights.** All inventions, discoveries, ideas,
> computer programs, programs based upon or developed
> from computer programs, including any improvements,
> codes, system documentation, technical data, drawings, flow
> charts, prototypes, design specifications, and any other
> documentation, notes and materials related to the foregoing
> (whether or not patentable or copyrightable) that are
> conceived or made by you, either alone or with others, during
> the course of or derived from your employment by the
> Company and in any way related to any business in which
> the Company is engaged at any time during the term of your
> employment or (if it should reasonably be known by you) is
> considering in engaging ("Discoveries") shall be deemed to
> be "works made for hire" pursuant to applicable law and
> shall belong to the Company. You will promptly disclose all
> Discoveries to the Company. To the extent that it is
> subsequently determined by any authority having
> jurisdiction that any Discovery does not constitute a work
> made for hire pursuant to applicable law, you hereby
> transfer, grant, convey, assign and relinquish exclusively to
> the Company all of your rights, title, interest in, and to all
> Discoveries, in perpetuity (or for the longest period of time
> otherwise pemlitted by law). You agree to execute and
> deliver, from time to time after the date hereof, upon the
> Company's request, such further conveyance instruments,
> and take such further actions, as the Company may deem
> necessary or desirable to evidence more fully the transfer of
> ownership of all the Discoveries to the Company, or the
> original ownership of all the Discoveries on the part of the
> Company, to the fullest extent possible. In furtherance of
> this agreement, you acknowledge that, from this date
> forward, or a previous date if rights were earlier transferred,
> the Company has succeeded to all of your rights, title, and
> standing to receive all rights and benefits pertaining to the
> Discoveries, to institute and prosecute all suits and

4

proceedings to collect, assert or enforce any claim, right or title of any kind in and to any and all of the Discoveries, and to defend and compromise any and all such actions, suits or proceedings. To effectuate the terms of this paragraph, you hereby name and irrevocably constitute and appoint the Company, with the full power of substitute therein, as your true and lawful attorney-in-fact to exercise the rights assigned hereby.

First Jones Decl. Ex. 1 at 3-4.

**Defendants' Response:** Undisputed that Dale's employment agreement with Hedgeye included

this language. The agreement speaks for itself.

1-9.    Dale's Employment Agreement contains a "Restrictive Covenants" provision (the "Restrictive Covenant Provision") that states as follows:

> **Restrictive Covenants.** During the period that you render services to the Company, you agree to not engage in any employment, business or activity that is in any way competitive with the business or proposed business of the Company or its affiliates.
>
> You will not assist any other person or organization in competing (directly or indirectly) with the Company or any of its affiliates, or in preparing to engage in competition with the business or proposed business of the Company or any of its affiliates.
>
> You agree that you shall not, while employed by the Company and for a period of six months thereafter, directly or indirectly (including assist any person to or otherwise participate in the process to), (i) hire, engage, offer to hire, divert, entice away, solicit or in any other manner persuade or attempt to persuade ("Solicitation") any person who is, or was, at any time within the twelve (12) months prior to such Solicitation, an officer, director, employee, agent, consultant, licensor, licensee, customer, or supplier of the Company or any of its affiliates to discontinue, terminate or adversely alter his, her or its relationship therewith or (ii) provide names or other information about such persons to any third party or business under circumstances which could lead to the use of that information by such third party in connection with a Solicitation; provided, however, that you will not be deemed to have violated the restrictions in this paragraph if an employee of the Company or its affiliates

5

> responds directly to a general advertisement of a third party as long as you had no involvement or participation, either directly or indirectly, in the employment of such person.
>
> You agree that the restrictions set forth above are necessary to protect the Company's business and that they are reasonable in duration and scope and that they do not prevent you from earning your living.

First Jones Decl. Ex. 1 at 1-2.

**Defendants' Response:** Undisputed that Dale's employment agreement with Hedgeye included this language. The agreement speaks for itself.

1-10.    Beginning in 2010, Dale's primary responsibility was to work on creating, revising and backtesting Hedgeye's financial models, including Hedgeye's "Growth, Inflation & Policy" ("GIP") model. Blum Decl. ¶ 6.

**Defendants' Response:** Defendants object that object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). Michael Blum, the cited declarant, lacks personal knowledge of the matters discussed. Fed. R. Civ. P. 56(c)(4). Under oath in his capacity as Hedgeye's corporate designee, Blum testified that if he were asked to "determine the amount of time Hedgeye spent developing [its] models," he would simply "make certain assumptions" based on "the job descriptions that various employees had at various periods of time" at the firm. (Defs. Ex. 4, Blum 30(b)(6) Dep. Tr. 7, 53-54). Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that Dale began building Excel spreadsheets for Hedgeye in or around 2010 or 2011. (Defs. Ex. 16, McCullough 2022 Dep. Tr. 71-72).

Defendants dispute that building such models was Dale's "primary" responsibility from 2010 onward. Dale only began to "build[] out the larger macro framework" in Excel in a more "active or formal way" in or around "2015 [or] 2016." (Defs. Ex. 8, Drake Dep. Tr. 36, 38). In

6

addition, in his last year at Hedgeye, Dale ran the institutional client business for the Macro team and spent an extensive portion of his time on client meetings and calls, among other responsibilities. (Defs. Ex. 2, Blum 2022 Dep. Tr. 138, 184-85; Defs. Ex. 16, McCullough 2022 Dep. Tr. 331-32; Third Dale Decl., Dkt. 36-1 ¶ 7).

Defendants also dispute that the Excel spreadsheets Dale created constituted all of Hedgeye's "financial models." Other members of Hedgeye's Macro team built and used their own models. As Hedgeye CEO Keith McCullough explained, "everyone has their own model they work on all the time." (Defs. Ex. 16, McCullough 2022 Dep. Tr. 174; *see also* Defs. Ex. 8, Drake Dep. Tr. 21-24, 44-45 (another Macro team member, discussing models and spreadsheets he would create); Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 78-79 (Christian Drake "developed his own models on the macro side"); Defs. Ex. 16, McCullough 2022 Dep. Tr. 73 (referring to Christian Drake creating models for Macro team)).

1-11.   Dale also had daily responsibility for ensuring data was updated and outputs were produced and published to Hedgeye's subscribers. Blum Decl. ¶ 6.

**Defendants' Response:** Defendants object that object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). Michael Blum, the cited declarant, lacks personal knowledge of the matters discussed. Fed. R. Civ. P. 56(c)(4). (*See* Defendants' Response to ¶ 1-10 *supra*). Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that Dale's responsibilities included producing output models and research for Hedgeye subscribers. Defendants dispute that Hedgeye sold the output from any of Dale's Excel spreadsheets as a standalone product. Only some of Hedgeye's research offerings incorporate some of the output from the GMRM model, and that output is always accompanied by additional content, including

7

but not limited to interpretive gloss and commentary provided by Hedgeye's analysts. (Defs. Ex. 16, McCullough 2022 Dep. Tr. 174; Defs. Ex. 10, Jones 2023 Dep. Tr. 326; Defs. Ex. 15, Malesevic Dep. Tr. 10; Defs. Ex. 8, Drake Dep. Tr. 84-90).

### A. "Dale's Separation from Hedgeye"

1-12.    Dale rose through the ranks and in 2015 was promoted to Director and in 2017 to Managing Director. Blum Decl. ¶ 8.

**Defendants' Response:** Undisputed.

1-13.    Dale's 2020 annual review took place on February 9, 2021. Blum Decl. ¶ 11.

**Defendants' Response:** Undisputed.

1-14.    At that meeting, Dale demanded increased compensation. Blum Decl. ¶ 11.

**Defendants' Response:** Undisputed that, at the February 9, 2021 meeting, Dale asked for increased compensation commensurate with his contributions to Hedgeye. (Defs. Ex. 113, HE0240240 at HE0240242; Defs. Ex. 9, Jones 2022 Dep. Tr. 285; Defs. Ex. 6, Dale 2022 Dep. Tr. 48-49).

1-15.    A follow-on meeting took place on March 11, 2021. Blum Decl. ¶ 11.

**Defendants' Response:** Undisputed.

1-16.    At the follow-on meeting, Dale communicated that he would be leaving Hedgeye. Blum Decl. ¶ 13.

**Defendants' Response:** Undisputed.

1-17.    Dale decided to leave Hedgeye on or about March 11, 2021. Andavolu Decl. Ex. 1 (Dale's Revised and Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories, dated August 27, 2021 (the "Dale Aug. 2021 Rev. Interr. Resp."), Resp. to Interr. No. 8).

**Defendants' Response:** Undisputed.

1-18.    Dale informed Hedgeye on March 12, 2021 by email that he intended to leave Hedgeye in the immediate future in an "orderly, mutually beneficial manner." Andavolu Decl. Ex. 2 (Deposition of Darius Dale, held on June 15, 2021 (the "First Dale Dep."), Ex. 15).

8

**Defendants' Response:** Undisputed that on March 12, 2021, Dale sent an email to Hedgeye President Michael Blum, CEO Keith McCullough, and Head of Research Daryl Jones stating, among other things, that he was "committed to departing in an orderly, mutually beneficial manner." The document speaks for itself.

1-19.    On March 15, 2021, Dale had a conversation about his departure from Hedgeye with Anthony Parsio, Hedgeye's General Counsel. Andavolu Decl. Ex. 3 (DALE0151654).

**Defendants' Response:** Undisputed.

1-20.    Unbeknownst to Parsio, Dale recorded that conversation. Andavolu Decl. Ex. 3 (DALE0151654).

**Defendants' Response:** Undisputed that Dale recorded a conversation between himself and Parsio on March 15, 2021.

Defendants object that the statement that Dale made the recording "unbeknownst" to Parsio is not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). Thus, no response is required.

1-21.    On March 28, 2021, at approximately 12:30 p.m., Dale sent an e-mail to Keith McCullough (CEO of Hedgeye), Tanya Waite (director of Human Resources), Anthony Parsio (General Counsel of Hedgeye), and Michael Blum (President of Hedgeye) attaching his resignation letter. Blum Decl. ¶ 17.

**Defendants' Response:** Undisputed.

**II.    "Dale's Violation of the Restrictive Covenant in his Employment Agreement (Non-Competition) and Terman and Lamar's Actions Inducing Dale to Breach"[2]**

---

[2] The statements in Hedgeye's headings and subheadings should be disregarded because they are merely for organizational purposes and are not supported by competent or admissible evidence. *See* Local Rule 56.1(a) and (b), and this Court's Individual Rules; *see also Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 394, 396 (S.D.N.Y. 2015), *aff'd*, 945 F.3d 83 (2d Cir. 2019) ("[T]he Court can … disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement;" disregarding argumentative "headings" in plaintiffs' Rule 56.1 statement on that basis). To the extent any response is required, Defendants object that these headers merely assert legal conclusions and dispute the underlying facts as discussed in response to each numbered paragraph.

1-22.    During his employment with Hedgeye, Dale became acquainted with Defendant Nadine Terman ("Terman"). Andavolu Decl. Ex. 4 (Transcript of Deposition of Darius Dale, held on June 15, 2021 (the "First Dale Dep. Tr.") at 54:22-55:3).

**Defendants' Response:** Undisputed.

1-23.    Terman and Dale became friends, and Dale considered Terman to be a mentor of his. Andavolu Decl. Ex. 4 (First Dale Dep. Tr. 54:22-55:3).

**Defendants' Response:** Undisputed.

1-24.    Nadine Terman is a founder, CEO and CIO of Defendant Solstein Capital, LLC ("Solstein"), a San Francisco-based investment firm.  Andavolu Decl. Ex. 5 (Transcript of 30(b)(6) Deposition of Solstein Capital, LLC by Nadine Terman, held on February 15, 2023 (the "Solstein Dep. Tr.") at 23:4-25:2).

**Defendants' Response:** Undisputed.

1-25.    Terman founded Solstein in 2010 with J.C. Torres. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 23:4-23:12, 24:23-24:24).

**Defendants' Response:** Undisputed.

1-26.    Prior to founding Solstein, Terman worked at Blum Capital. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 23:4-23:2).

**Defendants' Response:** Undisputed.

1-27.    Steven Lamar subscribed to a number of premium Hedgeye mass market products as a retail investor. Andavolu Decl. Ex. 6 (Deposition of Steven Lamar, held on November 30, 2022 (the "Lamar Dep. Tr.") at 243:14-243:15; 271:7-271:19).

**Defendants' Response:** Undisputed that Lamar subscribed to various Hedgeye mass market

products.

1-28.    Since late 2020, Terman had been working with Lamar to develop a product similar to Hedgeye's Risk Range Signals. Andavolu Decl. Ex. 7  (Deposition of Sandra Southworth, held on February 27, 2023 (the "Southworth Dep."), Ex. 224, also produced as SOLS00005829).

**Defendants' Response:** Defendants dispute that Terman had been working with Lamar to

develop a product similar to Hedgeye's Risk Range Signals.  The document cited as evidentiary

support does not support that proposition; indeed, it does not discuss Hedgeye's "Risk Range

10

Signals" at all. Instead, it explains that Longbow plans to offer market data, "like a current stock price" as well as "some data that are the result of formulas." (Pl. Ex. 7). Hedgeye certainly is not the only market participant offering that type of information. Moreover, Longbow was "not up and running" and had no product offerings as of the date of the email. (Defs. Ex. 14, Longbow Dep. Tr. 78:14-79:25).

Defendants also dispute the implication that the references to Hedgeye in this document suggest any intention by Longbow to copy or compete with Hedgeye's business model. The email in question concerns how Longbow should register with the SEC, and Hedgeye is referenced because it "publish[es] equity and macro research—and [is] **not** registered with the SEC as an investment adviser." (Pl. Ex. 7).

1-29. Around January 2021, Lamar formed a company called Longbow Trade Signals LLC ("Longbow") to offer that product. Andavolu Decl. Ex. 8 (Transcript of 30(b)(6) Deposition of Longbow by Nadine Terman, held on October 4, 2023 (the "Longbow Dep. Tr.") at 45:25-46:12).

**Defendants' Response:** Undisputed that Lamar registered Longbow Trading Signals as an LLC in January 2021.

Defendants object that the statement that Lamar formed Longbow "to offer that product" is not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). Thus, no response is required.

Subject to and without waiving that objection, Defendants dispute that Lamar formed Longbow to offer a product similar to any Hedgeye offering. Longbow is a "data dashboard" that can be used as a platform for multiple content providers. (Defs. Ex. 1, Lamar Dep. Tr. 216-18). When Lamar formed Longbow, he "wanted to see … if [Hedgeye CEO] Keith [McCullough] would be interested in Longbow" because he was "hoping that that [McCullough] would be favorably inclined to work with Longbow," potentially as one of its content providers.

11

(*Id.* Tr. 86:9-12; *see also id.* at 69:13-15 ("I really wanted Longbow to work with Hedgeye, so not be competitive but be additive. We thought their customers would benefit."); *id.* at 214:13-16 (As of April 9, 2021 "I wanted to work with Keith [McCullough]. 100 percent."); *see also* Defs. Ex. 21, Terman Dep. Tr. 166).

1-30.   Solstein contributed $50,000 in capital to Longbow, and initially held almost 35% of the equity of the company. Andavolu Decl. Ex. 8 (Longbow Dep. Tr. 24:13-24:19; 37:5-37:19).

**Defendants' Response:** Undisputed.

1-31.   On March 4, 2021, Terman admitted in an email to SEC Compliance Solutions and that Longbow does "exactly what Hedgeye does." Andavolu Decl. Ex. 9 (DALE0154578).

**Defendants' Response:** Undisputed that Terman sent an email to Elizabeth Cope, the Managing Member of SEC Compliance Solutions, LLC, a private company not affiliated with the Securities Exchange Commission ("SEC"), on that date, including the quoted text.

Defendants dispute that Longbow does exactly what Hedgeye does in all respects and dispute that Terman intended to convey such a claim to SEC Compliance Solutions. The subject discussed in the email chain was whether Longbow would need to register with the SEC as an investment advisor. The context of the email, as is clear when the entire text is read, is a discussion about whether Longbow engages in "data/research" as opposed to "providing advice on what stocks to buy." (Pl. Ex. 9). Ms. Terman accordingly was not representing to Ms. Cope that Longbow does "exactly what Hedgeye does" in all respects, but that Longbow did not intend to provide advice on what stocks to buy, similar to Hedgeye, because "they say they do not provide advice." Moreover, Longbow was "not up and running" and had no product offerings as of that date. (Defs. Ex. 14, Longbow Dep. Tr. 78:14-79:25).

In addition, although Ms. Terman in the email told Ms. Cope about Hedgeye that "they say they do not provide advice," Hedgeye does in fact provide advice on what stocks to buy,

unlike Longbow.  For example, Hedgeye provides specific trading recommendations in the form of Real-Time Alerts ("RTAs").  (*See* Defendants' Response to ¶ 1-312 *infra*).  Another example is that Hedgeye analysts make themselves available for one-on-one live discussions by phone or electronic communication with high-paying subscribers.  (Pl. Ex. 7, Second Parsio Dep. Tr. 34:11-36:16).

1-32.    Lamar likewise stated to Terman in March of 2021 that they "should stop dancing around the elephant in the room and just start messaging directly to 'hedgeye' customers." Andavolu Decl. Ex. 10 (DALE0154805).

**Defendants' Response:** Undisputed that, on March 16, 2021, Lamar sent Terman an email including the quoted text.  That email speaks for itself.

Defendants dispute that Lamar or Terman was primarily intending to target Hedgeye customers for a competitive business.  The quotations around the word "Hedgeye" themselves indicate that Lamar was not intending to target specific Hedgeye customers, but rather customers who might be interested in related services.  As Lamar explained at his deposition, "I really wanted Longbow to work with Hedgeye, so not be competitive but be additive. We thought their customers could benefit."  (Defs. Ex. 1, Lamar Dep. Tr. 69:13-15; *see also* Defs. Ex. 21, Terman Dep. Tr. 117:23-118:3 (explaining that Lamar viewed Longbow, an "open platform," as "complementary" to Hedgeye); *id.* Tr. 118:24-119:8 (testifying that Terman and Lamar contemplated that "there could be people who would subscribe to Hedgeye and Longbow … people could have … multiple subscriptions"); Defs. Ex. 14, Longbow Dep. Tr. 78 (confirming that Hedgeye was never a competitor of Longbow)).

1-33.    Dale and Terman had conversations regarding 42 Macro while Dale was still employed at Hedgeye. Andavolu Decl. Ex 11 (Defendant Steven Lamar's Responses and Objections to Plaintiff's Requests for Admissions, dated January 9, 2023 ("Lamar Jan. 9, 2023 RFA Resp."), Resp. No. 41).

**Defendants' Response:** Defendants Dale, Lamar, and 42 Macro do not dispute this statement.

Defendants Terman and Solstein do not dispute that from March 22, 2021 on, Terman had discussions with Lamar about Dale's potential future prospects, and that at least one of the potential future prospects discussed was one where Dale would found his own research firm. Defendants Terman and Solstein dispute that Terman had conversations regarding 42 Macro prior to when they understood Dale had resigned from Hedgeye. Defendant Terman was not aware of the existence of 42 Macro until Mr. Lamar informed her of the company registration on March 24, 2021. (Defs. Ex. 330, SOLS00024053). On March 22, 2021, Dale informed Terman by telephone that he had already resigned from Hedgeye. (Terman 56.1 ¶ 3-23). Terman subsequently learned that his last day at Hedgeye would be March 26, 2021. (*Id.* ¶ 3-56).

1-34. On or about March 22, 2021, before Dale resigned from Hedgeye, Terman specifically told others at Solstein that Dale's "last day will be on Friday [March 26, 2021]," that Dale was going to "join Longbow," and that he would "start publishing his macro quad research on Monday." Andavolu Decl. Ex. 12 (SOLS00030358).

**Defendants' Response:** Defendants do not dispute that, on March 22, 2021, Terman sent an email stating that Dale's last day will be Friday, denoting March 26, 2021.

The statement is otherwise disputed. Terman sent the email attached as Pl. Ex. 12 after her phone call with Dale, when Dale informed her he had already tendered his resignation to Hedgeye. (Terman 56.1 ¶ 3-23). The quoted portion of this email in Hedgeye's statement omits the critical qualification that Dale "wants" to join Longbow and start publishing his macro quad research on Monday. Thus, Terman was not stating what Dale was doing but rather what she believed Dale wanted to do. In fact, Dale never joined Longbow. (See Terman 56.1 ¶ 3-29; Dale 56.1 ¶ 2-110).

1-35. Terman also reported that with Dale "creating a site that offers risk ranges and the macro data," Solstein could "go to Hedgeye and remove that cost from our subscription." Andavolu Decl. Ex. 12 (SOLS00030358).

**Defendants' Response:** Undisputed that, on March 22, 2021, Lamar sent Terman an

email including the quoted text.

The statement is otherwise disputed, because the statement omits key words and improperly combines two separate passages to create an improper and false inference. The first quotation comes from a paragraph that states that Dale "***has been dreaming*** about creating a site that offers risk ranges and the macro data." (Emphasis added to the words omitted by Hedgeye). It is a statement of Dale's aspirations and not a statement of what he had accomplished. The second quoted section comes from the middle of the next paragraph and is not connected to the prior paragraph. The second quoted section was based on Terman's assumption, which turned out to be incorrect, that Hedgeye would not be able to continue to offer "daily data and updated quad forecasts" without Dale.

In fact, Terman and Solstein did not seek to eliminate their Hedgeye subscription and instead sought to keep subscribing to Hedgeye. (*See* Terman 56.1 ¶ 3-58). Terman and Solstein sought to change their Hedgeye subscription because they were told that their current subscription did not provide them access to the Hedgeye Arena. (*Id.*) Hedgeye proposed alternative subscription packages, which Terman accepted. (*Id.* ¶¶ 3-62, 3-63). Hedgeye then refused to provide services to Terman and Solstein. (*Id.* ¶ 3-64).

Defendants further dispute that Dale had any ability or intention to misappropriate Hedgeye's "Risk Range" formulas or that any other defendant encouraged him to do so. Hedgeye admits that its CEO McCullough was the "only person permitted to access the formulas, algorithms, or models used to generate Hedgeye's Risk Ranges," and thus, Dale had never seen them. (Defs. Ex. 43, Hedgeye's 7/5/22 Interrogatory Responses, No. 16). Moreover, Longbow already had functioning "trading ranges" on its site prior to any discussion between Terman, Lamar, and Dale concerning Longbow. (Defs. Ex. 14, Longbow Dep. Tr. 70, 77).

15

1-36.    In March 2021, Terman introduced Dale and Lamar. Andavolu Decl. Ex. 6 (Lamar Dep. Tr. 37:20-38:10).

**Defendants' Response:** Undisputed

1-37.    On March 22, 2021, Terman and Lamar discussed how they might approach working with Dale. Andavolu Decl. Ex. 13 (Deposition of Steven Lamar, held on November 30, 2022, (the "Lamar Dep."), Ex. 91, also produced as DALE0154809).

**Defendants' Response:** Undisputed

1-38.    One idea was to provide Dale with 10% equity in Longbow.  Andavolu Decl. Ex. 13 (Lamar Dep. Ex. 91, also produced as DALE0154809); Andavolu Decl. Ex. 6  (Lamar Dep. Tr. 79:23-80:1; 80:11-16).

**Defendants' Response:** Undisputed that Lamar proposed this as one possible idea.

Defendants dispute the implication that Dale actually did obtain an equity stake in

Longbow.  Lamar's idea was never acted upon. (*See* Dale 56.1 ¶ 2-110; Terman 56.1 ¶ 3-29).

1-39.    Another idea was to have Dale monetize his Hedgeye following by forming a new company, then combining that company with Longbow in order to provide all of the services Hedgeye provides to its subscribers: price, volume and volatility on a rate of change basis, trade signals and "risk ranges" for individual securities, and using Dale, a macro-economic overlay of a GIP four quadrant model. Andavolu Decl. Ex. 13 (Lamar Dep. Ex. 91, also produced as DALE0154809).

**Defendants' Response:** Undisputed that Lamar discussed his "thoughts," including the

possibility of Dale "monetiz[ing] his following starting 4/12ish"—*i.e.*, after Dale's departure

from Hedgeye was announced.  (Pl. Ex. 13; *see also* Defs. Ex. 1, Lamar Dep. Tr. 83:4-22).

Defendants dispute that either Terman or Lamar proposed the idea of forming a company

that would "provide all of the services Hedgeye provides to its subscribers."  The cited email

does not support that contention, nor does it refer to "price, volume and volatility on a rate of

change basis, trade signals and 'risk ranges' for individual securities, [or] a macro-economic

overlay of a GIP four quadrant model."  As Lamar explained at his deposition, the email

Hedgeye cites was sent one day after he first met Dale, at which time he was contemplating that

Dale could "provide macro investment research to people that knew of and/or followed [him],"

16

and potentially "be a content provider for the Longbow platform." (Defs. Ex. 1, Lamar Dep. Tr. 85-86, 91-92). At that time, Terman and Lamar were also exploring "a variety of things" with Dale. (Defs. Ex. 21, Terman Dep. Tr. 156-57).

In fact, Dale's company was never combined with Longbow, and he does not provide "all of the services Hedgeye provides to its subscribers." (Dale 56.1 ¶ 2-110; Defs. Ex. 1, Lamar Dep. Tr. 40-41; Pl. Ex. 43 (Dale 2nd Dep. Tr. 88:9-12)).

1-40. Specifically, on March 22, 2021, Lamar sent an email to Terman outlining the plan to give Dale 10% equity in "newco" and to get Dale to put together a plan to reach and monetize his following starting "4/12ish (after Easter Holiday)." Lamar stated that they would launch "newco," which he suggested calling "MacroQuiver" after seeing if McCullough had any reaction to the launch of their other business, Longbow. Lamar stated "[t]his keeps target off of [Longbow] and gives us visibility of how [McCullough] reacts to [Longbow] before we announce [the Dale] affiliation." Andavolu Decl. Ex. 6 (Lamar Dep. Tr. 82:9-84:20); Andavolu Decl. Ex. 13 (Lamar Dep. Ex. 91, also produced as DALE0154809).

**Defendants' Response:** Undisputed that, on March 22, 2021, Lamar sent an email including the quoted text. That email speaks for itself.

Defendants dispute that this email memorialized a formal plan. The email itself indicating that Lamar is only sharing his "thoughts." (Pl. Ex. 13). Discussions about any Dale role in Longbow did not reach fruition, and he has never contributed any "IP" to Longbow. (See Defs. Ex. 1, Lamar Dep. Tr. 222-23; Defs. Ex. 21, Terman Dep. Tr. 158-60, 168; Defs. Ex. 6, Dale 2022 Dep. Tr. 16; Ex. 14, Longbow Dep. Tr. 126-27).

Lamar also clarified at his deposition when referencing Dale's "following," Lamar intended that Dale take steps to make sure that his personal social media following on Twitter and LinkedIn would not forget him. (Defs. Ex. 1, Lamar Dep. Tr. 83:4-22).

Defendants also dispute that Terman and Lamar were seeking to conceal Longbow for any improper reason. As Lamar explained at his deposition, at that time, he and Terman "didn't want to bring any visibility to Longbow" because it was an un-launched and unannounced

17

company, "[i]t wasn't ready …. it was still in the works." (Defs. Ex. 1, Lamar Dep. Tr. 86-87).

1-41. The "newco," or "MacroQuiver" referred to in that email was 42 Macro. Andavolu Decl. Ex. 6 (Lamar Dep. Tr. 85:11-14).

**Defendants' Response:** Defendants object that that the statements in this paragraph are not

supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule

56.1(d). Specifically, the cited deposition testimony does not discuss the relevant email. Thus,

no response is required.

Subject to and without waiving that objection, Defendants do not dispute that what Lamar

initially conceived as MacroQuiver eventually became 42 Macro.

1-42. On March 22, 2021, Dale created the Twitter account @42__Mgmt, while still employed at Hedgeye. His profile prematurely stated "former managing director of Hedgeye." Dale later renamed the Twitter account to @42macroDDale. First Jones Decl. ¶ 34, Ex. 4.

**Defendants' Response**: Defendants object that that the statements in this paragraph are not

supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule

56.1(d). There is no basis to assume that Jones, the declarant on which this paragraph relies, has

any personal knowledge of when Dale created any Twitter account, and the exhibit cited does not

show a "@42__Mgmt" Twitter account or any date associated with any such account. Fed. R.

Civ. P. 56(c)(4). Moreover, Jones's declaration discusses the creation of a

"@42_Capital_Mgmt" account, rather than a "@42__Mgmt" account. (*See* First Jones Decl.,

Dkt. 8 ¶ 34). Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that Dale

created a Twitter account named @42_Capital_Mgmt on or around March 22, 2021. Defendants

dispute that the creation of that account was related to 42 Macro. Dale created the

@42_Capital_Mgmt account in anticipation of creating a separate, minority-owned investment

management business. (Defs. Ex. 332, DALE0134656).

18

Defendants also dispute that Dale's profile "prematurely stated 'former managing director of Hedgeye.'" At the time Dale created the account, he had already announced his intention to resign from Hedgeye, separation negotiations had begun, and Dale's anticipated departure date was less than a week away. (*See* ¶¶ 1-17 – 1-18 *supra*; *see also* Defs. Ex. 135, DALE0121863; Defs. Ex. 136, DALE0144361; Defs. Ex. 137, DALE0143962 (Dale, stating on Wednesday, March 24, 2021, that he would have "a life outside of Hedgeye … by week's end")).

1-43.   On March 23, 2021, Lamar sent Dale a video describing the intended Longbow trading platform. Andavolu Decl. Ex. 14 (DALE0144315).

**Defendants' Response:** Undisputed that on March 23, 2021, Lamar sent Dale a link to a brief promotional video for Longbow.

1-44.   On March 24, 2021, Dale told Lamar and Terman that he wanted to communicate via text and to avoid mentioning Longbow and its connection to 42 Macro in their personal emails. Andavolu Decl. Ex. 15 (DALE0143962).

**Defendants' Response:** Defendants object that that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). Specifically, the cited document does not discuss 42 Macro at all or any connection 42 Macro might have to Longbow, nor does it discuss any need "to avoid mentioning Longbow" in either Terman or Lamar's "personal emails." Thus, no response is required.

Subject to and without waiving that objection, Defendants do not dispute that that on March 24, 2021, Dale sent a text message to Terman and Lamar stating that he was "texting to avoid mentioning Longbow even in my gmail." That document speaks for itself. Defendants dispute that either Lamar or Terman agreed "to avoid mentioning Longbow" in their personal emails or saw any reason to do so. Lamar testified at his deposition that he did not know why Dale used that language, and posited that Dale was "concerned about those Hedgeye characters" and might have been "concerned that Hedgeye might be reading his emails or texts." (Defs. Ex.

1, Lamar Dep. Tr. 93-94). Both Terman and Lamar testified that they wanted to keep Longbow in "stealth mode" simply because it "was going to take us a while to create Longbow" and they didn't want to announce Longbow prematurely. (Defs. Ex. 21, Terman Dep. Tr. 164; Defs. Ex. 1, Lamar Dep. Tr. 92).

1-45. On March 24, 2021, Dale stated that he intended to retire a billionaire as a function of his contributions to Longbow. Andavolu Decl. Ex. 15 (DALE0143962).

**Defendants' Response**: Undisputed that on March 24, 2021, two days after Dale, Terman, and Lamar first spoke, Dale sent a text message stating that "it is my full intention to retire as a billionaire as a function of my contributions to what we're building @Longbow."

Defendants dispute that Dale ever joined Longbow or contributed any IP to Longbow. (*See* Defs. Ex. 1, Lamar Dep. Tr. 222-23; Defs. Ex. 21, Terman Dep. Tr. 159-60, 168; Defs. Ex. 6, Dale 2022 Dep. Tr. 16; Defs. Ex. 14, Longbow Dep. Tr. 126-27).

1-46. On March 24, 2021, before Dale resigned from Hedgeye, Lamar formed 42 Macro by filing the "LLC Registration – Article of Organization" for 42 Macro with the California Secretary of State. Andavolu Decl. Ex. 16 (https://bizfileonline.sos.ca.gov/search/business).

**Defendants' Response:** Undisputed that on March 24, 2021, Lamar registered 42 Macro as a limited liability corporation in California. (Defs. Ex. 143, DALE0157207).

Defendants dispute that March 24, 2021 was "before" Dale resigned from Hedgeye. Dale announced his resignation on March 11, 2021. (FAC ¶¶ 105-06; Dale Defendants' Answer, Dkt. 674 ¶¶ 105-06). Lamar met Dale in the context of his resignation. (Defs. Ex. 1, Lamar Dep. Tr. 74-76).

Defendants also dispute that the 42 Macro LLC was "formed" as of March 24, 2021. Lamar advised Dale that it "usually takes a week" for California to issue the LLC Articles of Organization. (Defs. Ex. 144, DALE0144319).

1-47. Dale says that he first publicly announced 42 Macro on March 25, 2021.

20

Andavolu Decl. Ex. 1 (Dale Aug. 2021 Rev. Interr. Resp., Resp. to Interr. No. 8).

**Defendants' Response**: Undisputed that Dale first publicly announced 42 Macro on or about March 25, 2021. Defendants dispute that this "announcement" was intentional. Dale intended to keep the new, 42 Macro social media accounts "private" until after Hedgeye announced his departure, but inadvertently failed to do so. (Defs. Ex. 333, DALE0134664 at DALE0134665).

1-48. On March 25, 2021, Terman emailed Dale regarding communication plan for his departure from Hedgeye. Andavolu Decl. Ex. 17 (DALE0134664).

**Defendants' Response:** Undisputed that Terman sent the cited email to Dale on March 25, 2021. The statement is otherwise disputed. The cited email is not a formal communication plan. Rather, as is clear from the subject line "THOUGHTS," it consists of Terman providing her thoughts to Dale about potential edits to his planned email and tweet announcing his departure from Hedgeye, and her suggestions about his LinkedIn profile.

1-49. This plan included having "one well-crafted communication ready" regarding his departure, as well as a "new communication at your new Twitter handle, LinkedIn, etc. Everything goes out at the same time. You should also have a detailed email ready that you can send to those who reach out to you via email." Andavolu Decl. Ex. 17 (DALE0134664).

**Defendants' Response:** Undisputed that Terman sent the cited email to Dale on March 25, 2021. The statement is otherwise disputed. The cited email is not a formal communication plan. Rather, as is clear from the subject line "THOUGHTS," it consists of Terman providing her thoughts to Dale about potential edits to his planned email and tweet announcing his departure from Hedgeye, and her suggestions about his LinkedIn profile.

1-50. Terman also told Dale "if possible, I would have a few pieces of content you can push out so that it demonstrates that Darius is not skipping a beat—and that people who worked with you before will want to work with you now." Andavolu Decl. Ex. 18 (DALE0121848); Andavolu Decl. Ex. 11(Lamar Jan. 9, 2023 RFA Resp., Resp. No. 40); Andavolu Decl. Ex. 17 (DALE0134664).

**Defendants' Response:** Undisputed.

1-51. On March 25, 2021, Dale replied to Terman's email stating "[t]hese are all great

edits! I hadn't even considered the 360-degree approach across all social media. I'll get started on all this at once." Dale included a "[t]o do list" that included "[u]pdate LinkedIn and Twitter once Steve [Lamar] sends through the link to 42 Macro." Andavolu Decl. Ex. 17 (DALE0134664).

**Defendants' Response:** Undisputed.

1-52.   In that March 25, 2021 email, Dale also stated that "the problem with having content ready off the bat is that it implies the models I used to produce the analysis were created while working at Hedgeye and would thus be subject to their IP claims." Andavolu Decl. Ex. 19 (DALE0121851).

**Defendants' Response:** Undisputed that Dale sent an email on March 25, 2021 including the

quoted text.  That document speaks for itself.

Defendants dispute the implication that this message suggests Dale intended to use

Hedgeye models at 42 Macro.  In the sentence following the quoted text, Dale explains that he

plans to "crank all weekend"—*i.e.*, after his anticipated departure from Hedgeye—"so that I have

at least some content ready to roll Monday morning."   Thus, the message implies that Dale was

planning to develop *new* models and tools for 42 Macro.

1-53.   On March 25, 2021, Terman responded, again stating "[a]nd you want everything done at the same time. So, when the Hedgeye communication goes out….the new communication goes out. People will go from one to the other to find you. Definitely don't make changes on LinkedIn, for example, until that time." Andavolu Decl. Ex. 17 (DALE0134664).

**Defendants' Response:** Undisputed that Terman sent the cited email to Dale on March 25, 2021

containing the quoted language.  That document speaks for itself.

The statement is otherwise disputed.  The Terman email in which the quoted portions

appear was not a response to the Dale email quoted in Paragraph 1-52.  (*Compare* Pl. Ex. 17,

*with* Pl. Ex. 19).

1-54.   On March 25, 2021, Dale replied to Terman that he had "hidden myself on LinkedIn so I'm good there. I'll reappear with the new titles once we're ready to go live." Andavolu Decl. Ex. 17 (DALE0134664); Andavolu Decl. Ex. 20 (DALE0134656).

**Defendants' Response:** Undisputed.

22

1-55.   Dale also stated that he thought "DJ," meaning Darryl Jones at Hedgeye, "might have let something slip publicly already . . . ." Andavolu Decl. Ex. 17 (DALE0134664).

**Defendants' Response:** Undisputed that Dale sent a message with the quoted language. The statement is otherwise disputed.  Dale was not making a statement based on his own knowledge, but states that he had "gotten a couple of texts from clients mentioning DJ might've let something slip publicly already." (Pl. Ex. 17).  Because the statements Hedgeye relies on are from unidentified out-of-court declarants, they are inadmissible as hearsay if they are being offered for the purpose of showing that Jones, in fact, "let something slip publicly already."

1-56.   In response, on March 25, 2021, Terman suggested that Dale call Jones, and she drafted an email for Dale to send to him. Andavolu Decl. Ex. 17 (DALE0134664).

**Defendants' Response:** Undisputed.

1-57.   On March 25, 2021, Dale responded that he "just sent DJ and Anthony (our CCO) an email after neither answered the phone. I'll follow up when I hear back." Andavolu Decl. Ex. 17 (DALE0134664).

**Defendants' Response:** Undisputed.

1-58.   On March 25, 2021, in that same email, Dale sent Terman and Lamar an updated LinkedIn profile and stated "LMK if you have any edits on this." Andavolu Decl. Ex. 17 (DALE0134664).

**Defendants' Response:** Undisputed.

1-59.   Dale's updated LinkedIn profile stated that he was the founder and CEO of 42 Macro LLC, an "online financial media company specializing in macro risk management." Blum Decl. ¶ 16; Andavolu Decl. Ex. 21 (Defendant Darius Dale's Responses and Objections to Plaintiff's Requests for Admissions, dated January 9, 2023 ("Dale Jan. 9, 2023 Resp. to RFAs"), Response No. 70).

**Defendants' Response:** Undisputed.

1-60.   On March 25, 2021, Terman responded regarding the updated profile, stating "Love the Linked In. Now, you must create a new company LinkedIn Profile for 42 Macro. You can use the logo design that Steve shared. You just copy the verbiage you already wrote about the company for your personal profile . . . . That is where you will link the website to for LinkedIn. Also you can link a twitter account to it." Andavolu Decl. Ex. 17 (DALE0134664).

**Defendants' Response:** Undisputed.

23

1-61.   On March 25, 2021, Lamar provided Dale and Terman "my 2 cents for what it's worth is keep everything positive and about the future. You had a good run at your former company and were instrumental in building that business." Andavolu Decl. Ex. 22 (DALE0121845).

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). Specifically, the cited document does not include the quoted language or any email from Lamar. Thus, no response is required.

Subject to and without waiving that objection, Defendants do not dispute that Lamar sent an email containing the quoted words.  (Defs. Ex. 334, DALE0121848).

1-62.   Lamar also said he would "set up @42macro on twitter asap!" Andavolu Decl. Ex. 20 (DALE0134656).

**Defendants' Response:** Defendants dispute that Lamar said he would "set up @42Macro."  The cited document shows that Lamar suggested that Dale set up that Twitter account; however, in a text on March 25, 2021, sent shortly after the cited email, Lamar advised Dale to wait to set up the handle associated with his own name, so that it would not occur until after the "announcement [of his departure from Hedgeye] is public."  (Defs. Ex. 145, DALE0144349).

1-63.   In another email to Dale and Terman on March 25, 2021, Lamar advised Dale on 42 Macro Twitter accounts, stating that @42macro should be for "global twitter comms related to the risk management business" and "general news;" @42macroDDale should be for "comms related to that business" and Dale's "primary twitter handle going forward;" and @42_Capital_Mgmt for "global Twitter comm related to the investment management business." Andavolu Decl. Ex. 20 (DALE0134656).

**Defendants' Response:** Undisputed that Lamar sent an email with the quoted text.  That document speaks for itself.  Defendants dispute that Lamar intended for those accounts to become public before Hedgeye announced Dale's departure.  In a text on March 25, 2021, sent shortly after the cited email, Lamar advised Dale to wait to set up the handle associated with his own name, so that it would not occur until after the "announcement [of his departure from

24

Hedgeye] is public." (Defs. Ex. 145, DALE0144349).

1-64.   In that same email, Lamar stated that he was "also setting up" Dale's 42 Macro email address, "dariusdale@42macro.com." Andavolu Decl. Ex. 20 (DALE0134656).

**Defendants' Response:** Undisputed that Lamar sent an email with the quoted text.  That document speaks for itself.

1-65.   Lamar also told Dale that "we want the branding / messaging consistent and not confuse people." Andavolu Decl. Ex. 20 (DALE0134656).

**Defendants' Response:** Undisputed that Lamar sent an email with the quoted text.  That document speaks for itself.  Defendants dispute that Lamar intended for those accounts to become public before Hedgeye announced Dale's departure.  In a text on March 25, 2021, sent shortly after the cited email, Lamar advised Dale to wait to set up the handle associated with his own name, so that it would not occur until after the "announcement [of his departure from Hedgeye] is public." (Defs. Ex. 145, DALE0144349).

1-66.   Terman then emailed Dale on March 25, 2022 saying "Once you are out from Hedgeye I will share their macro look. Figure it is best done when you have your own computer. I highly recommend getting someone to help you ensure they cannot access anything from the laptop you are returning. If you want 5 min with our tech team to advise you, I could ask them for a favor. I will tell them you will be working with us so we need their help. Just let me know." Andavolu Decl. Ex. 23 (DALE0143950).

**Defendants' Response:** Undisputed that Terman sent a message with the quoted language.

Defendants dispute, however, that Terman sent that message in response to the message from Lamar cited in Paragraph 1-65.  (*Compare* Pl. Ex. 23, *with* Pl. Ex. 20).

1-67.   The next day, on March 26, 2021, Dale emailed Terman and Lamar asking Terman to connect him with her technology support people to help in "cleaning" his Hedgeye laptop. Andavolu Decl. Ex. 24 (DALE0142637).

**Defendants' Response:** Undisputed.

1-68.   Dale then texted Terman and Lamar thanking them for the technology help, stating "our bases are adequately covered." Andavolu Decl. Ex. 25 (DALE0157973).

**Defendants' Response:** Undisputed that Dale sent a message containing the quoted language to

25

Terman.

The statement is otherwise disputed. Lamar was not a recipient of the text message.

Dale did not thank Terman for her "technology help," but for her help identifying IT

professionals that could carry out a job in a professional manner. (Pl. Ex. 25; *see also* Terman

56.1 ¶¶ 3-49 – 3-53).

1-69.    Dale then texted Terman that he "just did not want to trust a Hedgeye IT person."
Andavolu Decl. Ex. 26 (DALE0143951).

**Defendants' Response:** Defendants dispute that Dale sent any such message. The cited exhibit

shows that he was not the sender. (Pl. Ex. 26).

1-70.    In an email chain beginning on March 26, 2021, and stretching over to March 27,
2021, Lamar, Terman and Dale exchanged emails regarding the subscription plan, prices and
product names for 42 Macro. Andavolu Decl. Ex. 90 (Lamar Dep. Tr. Ex. 99, also produced as
DALE0116785).

**Defendants' Response:** Undisputed that on March 26 and 27, 2021, Terman, Dale, and Lamar

discussed potential pricing for 42 Macro at a high level.

1-71.    Lamar contemplated launching 42 Macro in "a week or two" from that email.
Andavolu Decl. Ex. 6 (Lamar Dep. Tr. 127:18-21).

**Defendants' Response:** Undisputed that Lamar thought Dale would publicly announce a new

company in a week or two after his departure from Hedgeye. Defendants dispute that Lamar's

thoughts concerning that timeline had any relationship to any specific email exchange. The

testimony cited does not support that proposition or discuss any specific email. Fed. R. Civ. P.

56(c)(2) and Local Rule 56.1(d).

1-72.    On March 27, 2021, referring to the fact that Lamar had formed 42 Macro on
March 24, 2021, Dale told Lamar that he was reading his employment agreement and was
nervous about the timing of the LLC application for 42 Macro. Andavolu Decl. Ex. 27 (Lamar
Dep. Ex. 100).

**Defendants' Response:** Defendants object that the cited document is not in admissible form.

Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). It is a compilation of several different

26

documents put together by counsel. Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that on March 27, 2021, Dale had raised a concern with Lamar about the LLC application for 42 Macro as follows: "Was reading my employment contract and nervous about the timing of the LLC application." (Defs. Ex. 168, DALE0144384).

1-73. Lamar responded "[d]on't worry, you [sic] name isn't on the LLC yet." Lamar also said "I'll look at your agreement, but your name isn't on any document." Andavolu Decl. Ex. 27 (Lamar Dep. Ex. 100).

**Defendants' Response:** Defendants object that the cited document is not in admissible form. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). It is a compilation of several different documents put together by counsel. Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that on March 27, 2021, Lamar advised Dale that Dale's "name isn't on the LLC yet" and that Lamar had handled the application process entirely on his own without Dale's assistance. (Defs. Ex. 169, DALE0144385). In a separate message, Lamar offered "to look at [Dale's] agreement, but your name isn't on any document." (Defs. Ex. 170, DALE0144388).

1-74. Dale replied stating "I was suggesting that if I suddenly become an employee of 42 Macro LLC and the application was file [sic] prior to my leaving Hedgeye, they could connect the dots and deem me in violation of the clause to not help "prepare competition." Andavolu Decl. Ex. 27 (Lamar Dep. Ex. 100).

**Defendants' Response:** Defendants object that the cited document is not in admissible form. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). It is a compilation of several different documents put together by counsel. Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that on March 27, 2021, Dale sent a message with that language. The document speaks for itself. (Defs. Ex. 171, DALE0143967).

Defendants dispute that this exchange indicates that Lamar believed there was any breach of Dale's non-competition obligations. Lamar responded to Dale: "I'm not remotely concerned about that. [You] haven't set anything up …. you haven't given us anything or assisted us in any way and when 42 launches it will appear you're flying solo." (Defs. Ex. 173, DALE0144392). Lamar further responded: "I hear you, but I'm not concerned. We could have filed for 42 macro a year ago. We haven't done anything within that business yet. You have not rendered services to it, nor have you assisted with it or in it." (Defs. Ex. 174, DALE0144395). When asked about this exchange at his deposition, Lamar confirmed that he did not believe that the limited steps taken by Lamar to set up an LLC ran afoul of Dale's contractual obligations. (Defs. Ex. 1, Lamar Dep. Tr. 139-141).

1-75.   On March 27, 2021, Dale texted Terman and Lamar, saying "I'm only sticking around [at Hedgeye] for 2-3 more days MAX…. I'm either going to spend that time helping them transition, or I'm going to spend that time working on 42." Andavolu Decl. Ex. 28 (DALE0143943).

**Defendants' Response:** Undisputed that on March 27, 2021, Dale sent a message that included the quoted text. That document speaks for itself.

Defendants dispute that the message implies any interference on behalf of Lamar or Terman. In the message, Dale goes on to say that Hedgeye's "offer or non-offer of a reasonable severance award is the key driver of [his] decision [whether to help Hedgeye transition or work on 42 Macro]."

1-76.   In the same text, Dale also stated "[y]ou're going to be blown away by the granularity and soup-to-nuts asset allocation and portfolio construction solutions I'm going to provide. . . . No one at Hedgeye has any knowledge of these solutions because it's all in my head/notebook." Andavolu Decl. Ex. 28 (DALE0143943).

**Defendants' Response:** Undisputed that on March 27, 2021, Dale sent a message that included the quoted text. That document speaks for itself.

Defendants dispute that the message implies that Dale was planning to take anything

28

proprietary from Hedgeye.  The message indicates that Dale would be developing *new* approaches to his research at 42 Macro, that were not used at, or known by Hedgeye.  In the same message, Dale stated that he planned to leave all of Hedgeye's materials with Hedgeye: "At best, I'm leaving them with what will soon become an admittedly-popular-but-antiquated set of forecasting and backtesting tools. …. At worse, I'm leaving them with tools they have no idea how to employ."  (Pl. Ex. 28, DALE0143943).

1-77.    That same day, Dale offered his opinion to Lamar and Terman on pricing options for 42 Macro subscriptions.  Andavolu Decl. Ex. 29 (DALE0117123).

**Defendants' Response:** Undisputed that on March 26 and 27, 2021, Dale discussed potential pricing for 42 Macro at a high level.

Defendants dispute the implication that Terman had any substantive involvement in those discussions.  The cited email chain begins on March 26, 2021.  The first email is from Lamar, proposing his "thoughts on subscriptions" for 42 Macro.  Terman responded by saying: "I am not sure if I know what the right pricing is."  (Pl. Ex. 29).

1-78.    On March 29, 2021, the first business day after his resignation from Hedgeye, Dale posted a Tweet that said "we're live! 42macro.com." First Jones Decl. ¶ 35, Ex. 6.

**Defendants' Response:** Undisputed that on March 29, 2021 Dale posted a Tweet that said "we're live! 42macro.com."

Defendants dispute that March 29, 2021 was "the first business day after [Dale's] resignation from Hedgeye."  Dale announced his intention to resign from Hedgeye on March 11, 2021.  (FAC ¶¶ 105-06; Dale Defendants' Answer, Dkt. 674 ¶¶ 105-06); *see also* Dale 56.1 ¶ 2-86; Terman 56.1 ¶ 3-23).

1-79.    On March 29, 2021, Terman texted Dale her plan to announce at a Solstein team meeting that Solstein had signed up for Dale's "new research service and it sounds like we we'll continue to get his quad data once he sets up his frameworks in a few weeks." She additionally added that she will tell the team "[i]ronically I have my annual subscription call with Hedgeye today, so I am going to ask them what their plan is." Andavolu Decl. Ex. 30 (DALE0143957).

**Defendants' Response:** Undisputed that on March 29, 2021 Terman sent a message containing the quoted language.

Defendants dispute the implication that Terman intended to replace Solstein's Hedgeye subscription with 42 Macro. Terman intended to use both services and her interest in changing the parameters of the Hedgeye subscription related to factors that arose before she even knew Dale was leaving Hedgeye. (Terman 56.1 ¶¶ 3-21 – 3-23).

Defendants further dispute the implication that Terman believed Dale would use any Hedgeye materials at 42 Macro. As demonstrated by the quoted text, Terman understood that Dale would be setting up *new* "frameworks" for 42 Macro over the course of a "few weeks," following his departure from Hedgeye.

1-80. Lamar is an owner of RAMAL Inc. Andavolu Decl. Ex. 11 (Lamar Jan. 9, 2023 RFA Resp., Resp. No. 23).

**Defendants' Response:** Undisputed.

1-81. Lamar has a ███████████████████████████. Andavolu Decl. Ex. 11 (Lamar Jan. 9, 2023 RFA Resp., Resp. No. 28).

**Defendants' Response:** Undisputed.

1-82. RAMAL Inc. is a ██% owner of 42 Macro. Andavolu Decl. Ex. 11 (Lamar Jan. 9, 2023 RFA Resp., Resp. No. 22).

**Defendants' Response:** Undisputed.

1-83. RAMAL is "Lamar" spelled backwards. RAMAL, Inc. ████████████ ████████████ Andavolu Decl. Ex. 6 (Lamar Dep. Tr. 28:21-33:11).

**Defendants' Response:** Undisputed that RAMAL is "Lamar" spelled backwards.

Defendants dispute that RAMAL, Inc. "████████████████████████." As the cited testimony indicates, RAMAL is ██████████████████████████, and it has annual meetings to conduct its business. (Defs. Ex. 1, Lamar Dep. Tr. 28:21-33:11).

1-84. The managers of 42 Macro, LLC are RAMAL Inc. and Darius Dale. Andavolu

Decl. Ex. 31 (Deposition of Collin de Rham, held on October 28, 2022 (the "deRham Dep."), Ex. 83, also produced as DALE0149621).

**Defendants' Response:** Undisputed that as of December 20, 2021, the date of the cited exhibit, the managers of 42 Macro were RAMAL Inc. and Darius Dale.

1-85.    The members of 42 Macro, LLC are RAMAL Inc. ██ ownership), Darius Dale (██ ), and Collin de Rham (██%). Andavolu Decl. Ex. 31 (deRham Dep. Ex. 83, also produced as DALE0149621).

**Defendants' Response:** Undisputed that as of December 20, 2021, the date of the cited exhibit, the members of 42 Macro were RAMAL Inc. (██%), Darius Dale ██%), and Collin De Rham (██%).

### III.    "Dale's Violation of the Restrictive Covenant in his Employment Agreement (Non-Solicitation)"

1-86.    Collin de Rham began working for Hedgeye as "Head of Production / Creative Director" on August 1, 2020, pursuant to an employment agreement dated July 8, 2020. Andavolu Decl. Ex. 32 (deRham Dep. Ex. 76).

**Defendants' Response:** Undisputed.

1-87.    De Rham's last day of employment with Hedgeye was March 26, 2021. Andavolu Decl. Ex. 33 (de Rham Dep. Ex. 82).

**Defendants' Response:** Undisputed that De Rham's last day of employment with Hedgeye was March 26, 2021. Defendants dispute that Dale or 42 Macro were responsible for the end of De Rham's employment. Hedgeye itself independently decided to terminate De Rham. (Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, No. 53; *see also* Defs. Ex. 7, De Rham Dep. Tr. 146).

1-88.    By April 7, 2021, de Rham was providing services for Lamar, Dale and 42 Macro. Specifically, on April 7, 2021, de Rham sent Dale links to two videos and stated "Think about doing something for your website." Andavolu Decl. Ex. 34 (de Rham Dep. Ex. 85).

**Defendants' Response:** Undisputed that De Rham sent an email to Dale on April 7, 2021 with two links and the quoted text.  That email speaks for itself.

Defendants dispute that De Rham was "providing services" for Lamar, Dale, and 42

31

Macro as of that date. The document cited does not support that proposition, and instead demonstrates that the parties only began discussions about potentially working together on that date. (Pls. Ex. 34).

1-89.    On April 7, 2021, Dale responded "Wow, these are excellent! Thanks for sharing. I don't know that we'll be able to legally use these/I don't want to run the risk of [Hedgeye] seeing this and coming after us. What are your thoughts on reshooting something like this when the time is right?" Andavolu Decl. Ex. 34 (de Rham Dep. Ex. 85).

**Defendants' Response:** Undisputed that Dale sent an email to De Rham on April 7, 2021 with the quoted text. That email speaks for itself.

1-90.    On April 7, 2021, Lamar responded, saying "Assume Collin is no longer at Hedgeye? 100% we want to re-write and re-shoot something like this under the 42 Macro moniker . . . . Let's do one better for DD @ 42 Macro." Andavolu Decl. Ex. 34 (de Rham Dep. Ex. 85).

**Defendants' Response:** Undisputed that Lamar sent an email on April 7, 2021 including the quoted text. That email speaks for itself.

1-91.    On April 7, 2021, de Rham responded, stating "Hey Steven. No longer @ Hedgeye either . . . . Regarding the videos, we can't use there as is because they are definitely the property of Hedgeye even though we never completed. I certainly believe we can make a better [one] now given the freedom." Andavolu Decl. Ex. 34 (deRham Dep. Ex. 85).

**Defendants' Response:** Undisputed that De Rham sent an email on April 7, 2021 including the quoted text, although the paragraph above includes a typographic error ("we can't use *these* as is…."). That email speaks for itself.

1-92.    De Rham and Lamar then arranged to speak on April 8, 2021. Andavolu Decl. Ex. 34 (deRham Dep. Ex. 85).

**Defendants' Response:** Undisputed that Lamar and De Rham exchanged emails arranging to speak. Those emails speak for themselves.

1-93.    De Rham provided services for 42 Macro thereafter. *See, e.g.*, Andavolu Decl. Ex. 35 (Deposition of Nadine Terman, held on December 1, 2022 ("Terman Dep."), Ex. 114); Andavolu Decl. Ex. 36 (SOLS00030349); Andavolu Decl. Ex. 37 (SOLS00030347); Andavolu Decl. Ex. 38 (SOLS00030155); Andavolu Decl. Ex. 39 (SOLS00029892); Andavolu Decl. Ex. 40 (SOLS00029802); Andavolu Decl. Ex. 41 (DALE0153084).

**Defendants' Response:** Undisputed that De Rham provided services to 42 Macro in April 2021 and thereafter.

### IV.   "Dale's Violation of the Assignment of Rights Provision in his Employment Agreement"

1-94.   During Dale's employment at Hedgeye, Hedgeye typically provided its subscribers with its quad calculations on a quarterly basis. Andavolu Decl. Ex. 42 (Transcript of Deposition of Keith McCullough held on July 30, 2024 (the "Third McCullough Dep.") Tr. 11:8-11:14).

**Defendants' Response:** Undisputed that at times during Dale's employment at Hedgeye,

Hedgeye provided its subscribers with research and commentary that included "quad"

predictions on a quarterly basis.  *See, e.g.*, https://app.hedgeye.com/insights/81549-risk-report-a-

quad-4-investing-playbook (Feb. 2020); https://app.hedgeye.com/e/SH4/anNmfG/market-edges-

stay-with-quad4-in-q3 (Sept. 2019); https://app.hedgeye.com/insights/71780-icymi-the-quad-4-

investing-cheat-sheet (Nov. 2018).

Defendants dispute that Hedgeye was incapable of calculating "quads" on a monthly

basis while Dale worked there.  As Hedgeye CEO Keith McCullough states in the cited

testimony, in April 2020—before Dale's departure—Hedgeye had the ability to calculate

"quads" on a monthly basis: "We had our quarterly quad model, our monthly quad model.  So

we already had it."  (Defs Ex. 18, McCullough 2024 Dep. Tr. 11:8-14; *see also id.* Tr. 26

(agreeing that Hedgeye had a "monthly quad model" before April 2020)).  As McCullough has

explained in two separate depositions, the "monthly [quad process] is embedded in our files and

embedded in our process."  (Defs. Ex. 16, McCullough 2022 Dep. Tr. 279-80; *see also* Defs. Ex.

18, McCullough 2024 Dep. Tr. 34 ("the monthlies are already in the quarterly quad model")).

1-95.   In April of 2020, Dale sent an email to McCullough in which he presented the idea of calculating quads on a monthly, rather than quarterly, basis. Andavolu Decl. Ex. 43 (Transcript of Deposition of Darius Dale, held on December 9, 2022 (the "Second Dale Dep. Tr.") at 138:7-21).

33

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The cited deposition testimony does not concern any events taking place in April 2020, or even any timeframe in which Dale worked at Hedgeye, and it does not discuss any "monthly quads" model or any outline for such a model that Dale supposedly presented to McCullough while he worked at Hedgeye. Thus, no response is necessary.

Subject to and without waiving that objection, Defendants dispute that Dale created a standalone "monthly quads" model while he worked at Hedgeye or presented an outline for any such model to McCullough in April 2020. Even after forensic examinations of Dale's Hedgeye and personal laptops (*see* Dkt. 9 ¶ 4; Dkts. 252, 258), no standalone monthly quads "model," or "calculator," or any "outline" for any such model has been identified in discovery. Hedgeye's post-discovery allegation that a "monthly quads" model existed and had been taken but never returned by Dale was based only on "information and belief." (FAC ¶ 150).

Defendants also dispute that any conversation about a purported monthly quads outline took place in April 2020. Hedgeye CEO Keith McCullough, the only witness deposed on this topic, admitted in his deposition testimony that he has no recollection of any specific discussion with Dale in April 2020 concerning a monthly quads model. (Def. Ex. 18, McCullough 2024 Dep. Tr. 6-12; *see also id.* Tr. 19 ("Q. Do you recall any specific conversation with [Dale], in April 2020? A. Do I recall having conversations with people I work with? Yes. I don't recall the specific conversation you're trying to get to.")).

1-96.    42 Macro now offers its subscribers monthly quad calculations. Andavolu Decl. Ex. 4 (First Dale Dep. Tr. 138:7-140:3).

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The

34

cited testimony does not discuss 42 Macro or monthly quad calculations. Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that 42 Macro's models calculate macroeconomic forecasts on a monthly basis. Defendants dispute that 42 Macro offers "monthly quad calculations," to the extent that terminology is intended to reference models Dale built at Hedgeye, which were colloquially referred to as "quad" models. 42 Macro's models produce monthly outputs because it uses the OECD composite leading time series (the "OECD CLI") as its dependent variable for growth and that data is available on a monthly basis. (Defs. Ex. 6, Dale 2022 Dep. Tr. 138-39). As Hedgeye's proffered expert, Daniel Lacalle, observes, Hedgeye does not use the OECD CLI. (Defs. Ex. 28, Lacalle Initial Report at 10 n.2). Instead, Hedgeye uses Gross Domestic Product ("GDP"), which data is typically available on a quarterly basis. (Defs. Ex. 6, Dale 2022 Dep. Tr. 138-39).

1-97. Dale never returned to Hedgeye any model capable of calculating quads on a monthly basis.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). Indeed, this paragraph does not point to anything in the record at all. Thus, no response is necessary.

Subject to and without waiving that objection, Defendants dispute that Dale "never returned to Hedgeye any model capable of calculating quads on a monthly basis." It is undisputed that Dale returned models to Hedgeye, and as Hedgeye CEO Keith McCullough himself attested, Hedgeye's models were always capable of calculating quads on a monthly basis. (Defs. Ex. 16, McCullough 2022 Dep. Tr. 279-80 (The "monthly [quad process] is embedded in our files and embedded in our process."); *see also* Defs. Ex. 18, McCullough 2024 Dep. Tr. 34 ("the monthlies are already in the quarterly quad model")).

35

Several years before Hedgeye first asserted this "monthly quads" claim in this action, Hedgeye CEO McCullough told subscribers that Hedgeye had had always had the ability to calculate monthly quads using its standard quads model and that it retained that ability after Dale's departure. For instance, on July 13, 2021, McCullough told Hedgeye subscribers on his Macro Show: "We do month[ly]. Well, you can do weekly quads. You get daily quads, you can do monthly quads. We do it all, we invented it." (Defs. Ex. 195, HE0286783 video at 26:50-26:55). On December 2, 2021, McCullough told Hedgeye subscribers on his Macro Show that monthly quads could be derived from the monthly indicators in Hedgeye's normal quad model. He said it was "unequivocally not true" that Hedgeye doesn't "do monthly quads. I mean, the numbers in the column [showing the inputs to Hedgeye's normal quad model] are monthly, for God sakes." (Defs. Ex. 242, HE0286722 video at 30:50-31:00).

## V.     "Hedgeye's Financial Models are Trade Secrets"

### A. "Expert Testimony"

1-98.   For example, to predict inflation, macroeconomic researchers may analyze pricing trends among various goods and services and compare those trends to increases or decreases in national income, resources, and spending. Lacalle Decl. Ex. 1 at 7.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702. Thus, no response is necessary.

In addition, this paragraph purports to be an "example" of some principle that is nowhere identified in Hedgeye's Rule 56.1 statement.

1-99.   Macroeconomic research is used for a number of purposes, including by individual and institutional investors to predict stock market trends and other fluctuations in the economy. Lacalle Decl. Ex. 1 at 7.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702. Thus, no response is necessary.

1-100. A financial model is a numerical representation of the main figures that define an economy or a company's business. Lacalle Decl. Ex. 1 at 7.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702. Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that a financial model typically contains numerical representations of certain figures related to an economy or a company's business. However, Lacalle provides no support for the proposition that a financial model will, by definition, contain "the main figures that define" the subject of interest.

1-101. Financial models are used to predict trends, to estimate the performance of an economy or a business, or to compare the economies and businesses of different countries or companies. Lacalle Decl. Ex. 1 at 7.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702. Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that financial

37

models can be used for such purposes.

1-102. Economists and financial analysts use financial models to help analyze and sometimes predict the trends in the economy. Lacalle Decl. Ex. 1 at 7.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702. Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that financial models can be used for such purposes.

1-103. Hedgeye uses financial models to provide its subscribers with macroeconomic research. First Jones Decl. ¶ 3.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration. Fed. R. Civ. P. 56(c)(4). Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that Hedgeye sometimes uses financial models to inform its macroeconomic research. Defendants dispute the suggestion that Hedgeye's macroeconomic research is wholly or even primarily determined by financial models (let alone the specific models at issue in this case).

Hedgeye uses a variety of methodologies to inform its macroeconomic research, including but not limited to financial models. (Defs. Ex. 62, HE0373895 at HE0373904-06 (discussing Hedgeye's research offerings); Defs. Ex. 8, Drake Dep. Tr. 84-91 (discussing the limited extent to which Dale's models informed Hedgeye's products); Defs. Ex. 16, McCullough

38

2022 Dep. Tr. 84-88 (explaining that Hedgeye CEO McCullough's "risk ranges" and "trade, trend tail signals" are not based on "Excel models")).  Certain of these methodologies, such as the determination of Hedgeye's "risk ranges," involve a considerable amount of ████ ████ (Defs. Ex. 17, McCullough 2023 Dep. Tr. 248-50; Defs. Ex. 56, KraneShares Hedgeye Summary Prospectus).

Before Dale's arrival on the Macro team, Hedgeye provided macroeconomic research to subscribers without any Excel nowcasting or forecasting model.  (Defs. Ex. 16, McCullough 2022 Dep. Tr. 69-73, 75; Def. Ex. 5, Dale 2021 Dep. Tr. 353).  Dale built an Excel nowcasting and forecasting model for Hedgeye called "Global Macro Risk Monitor.xlsx" (the "GMRM file"), which forms the basis for Hedgeye's so-called "Growth, Inflation & Policy" (GIP) model. (*E.g.*, Second Dale Decl., Dkt. 28-1 ¶ 8; Defs. Ex. 15, Malesevic Dep. Tr. 29:4-10, 110:12-19). Hedgeye generally does not use the other Excel files it alleges are trade secrets for macroeconomic research.  (*E.g.*, Defs. Ex. 15, Malesevic Dep. Tr. 34-35, 110-14; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 15-19; Defs. Ex. 9, Jones 2022 Dep. Tr. 114-15; Defs. Ex. 8, Drake Dep. Tr. 58).

Critically, Hedgeye's research is not truly based on the GMRM file's automated calculations, since Hedgeye makes ████████████████████████ ████████ to allow Hedgeye to report numbers to subscribers that are ████████ ████████ (Dale 56.1 §§ VIII.A-B (citing, *e.g.*, ████████████████ 5-7; Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, Nos. 10-12, 14-16; Defs. Ex. 11, Lacalle Dep. Tr. 244; Defs. Ex. 15, Malesevic Dep. Tr. 77-78, 80-82, 102-03, 143-45, 148-49; Defs. Ex. 16, McCullough 2022 Dep. Tr. 237-38; Defs. Ex. 83, HE0305131 at HE0305133; Defs. Ex. 86, HE0215697 at HE0215697-98; Defs. Ex. 189, HE0221554 at HE0221555; Defs. Ex. 190,

39

HE0221567 at HE0221567-68); *see also* Bianchi Decl. Ex. 1, Bianchi Initial Report ¶¶ 10, 48-58, 62; Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶¶ 20 n.6, 38).

In addition, Hedgeye claims that the GMRM file has no value unless combined with the non-model-based analyses allegedly devised by Hedgeye CEO McCullough. McCullough has testified that Hedgeye simply could *not* "do the work it does without [McCullough's] [T]rade, [T]rend, [T]ail signals or process." (Defs. Ex. 16, McCullough 2022 Dep. Tr. 107). He has told subscribers that it would be "really fucking stupid" to use only "the quads and no signals" (*i.e.*, to use the GMRM file's quadrant output but not McCullough's Risk Range and Trade/Trend/Tail signals). (Defs. Ex. 69, HE0286729 video at 10:11-10:21). "[I]f we're only using the quad and not the signal, which is absolutely not the way to do it, that's like getting into a Formula One car, not having the brakes…. It's like asinine." (Defs. Ex. 70, HE0286727 video at 27:08-27:26). Hedgeye managing director Joshua Steiner explains: "Mr. McCullough's signal process is a discrete, separate entity. It doesn't connect in any way to the GIP model [*i.e.*, the GMRM file]. The output of the two processes is conjoined into what we use to advise our clients." (Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 81-84; *see also* Defs. Ex. 15, Malesevic Dep. Tr. 18-24 ("I don't think you can separate one from the other.")).

1-104. Hedgeye sells to its subscribers investment recommendations and comprehensive financial market and economic research and analysis based on its models, and it shares its output models with certain institutional subscribers. First Jones Decl. ¶ 3.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration. Fed. R. Civ. P. 56(c)(4). Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that Hedgeye

40

sells *subscriptions* that include investment recommendations and research (Defs. Ex. 10, Jones 2023 Dep. Tr. 326), that Hedgeye sometimes uses financial models to help inform its investment recommendations and research, or that Hedgeye shares "output models" with subscribers. Defendants dispute that Hedgeye's investment recommendations and research are wholly or even primarily "based on its models" (let alone the specific models at issue in this case).

Hedgeye uses a variety of methodologies to inform its macroeconomic research, including but not limited to financial models. (Defs. Ex. 62, HE0373895 at HE0373904-06 (discussing Hedgeye's research offerings); Defs. Ex. 8, Drake Dep. Tr. 84-91 (discussing the limited extent to which Dale's models informed Hedgeye's products); Defs. Ex. 16, McCullough 2022 Dep. Tr. 84-88 (explaining that Hedgeye CEO McCullough's "risk ranges" and "trade, trend tail signals" are not based on "Excel models")). Certain of these methodologies, such as the determination of Hedgeye's "risk ranges," involve a considerable amount of ███████ ███████ (Defs. Ex. 17, McCullough 2023 Dep. Tr. 248-50; Defs. Ex. 56, KraneShares Hedgeye Summary Prospectus).

Before Dale's arrival on the Macro team, Hedgeye provided macroeconomic research to subscribers without any Excel nowcasting or forecasting model. (Defs. Ex. 16, McCullough 2022 Dep. Tr. 69-73, 75; Def. Ex. 5, Dale 2021 Dep. Tr. 353). Dale built an Excel nowcasting and forecasting model for Hedgeye called "Global Macro Risk Monitor.xlsx" (the "GMRM file"), which forms the basis for Hedgeye's so-called "Growth, Inflation & Policy" (GIP) model. (*E.g.*, Second Dale Decl., Dkt. 28-1 ¶ 8; Defs. Ex. 15, Malesevic Dep. Tr. 29:4-10, 110:12-19). Hedgeye generally does not use the other Excel files it alleges are trade secrets for macroeconomic research. (*E.g.*, Defs. Ex. 15, Malesevic Dep. Tr. 34-35, 110-14; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 15-19; Defs. Ex. 9, Jones 2022 Dep. Tr. 114-15; Defs. Ex. 8, Drake

41

Dep. Tr. 58).

Critically, Hedgeye's research is not truly based on the GMRM file's automated calculations, since Hedgeye makes ████████████████████████████ ████████ to allow Hedgeye to report numbers to subscribers ███████████████ ████████████████ (Dale 56.1 §§ VIII.A-B (citing, *e.g.,* █████████████ ██Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, Nos. 10-12, 14-16; Defs. Ex. 11, Lacalle Dep. Tr. 244; Defs. Ex. 15, Malesevic Dep. Tr. 77-78, 80-82, 102-03, 143-45, 148-49; Defs. Ex. 16, McCullough 2022 Dep. Tr. 237-38; Defs. Ex. 83, HE0305131 at HE0305133; Defs. Ex. 86, HE0215697 at HE0215697-98; Defs. Ex. 189, HE0221554 at HE0221555; Defs. Ex. 190, HE0221567 at HE0221567-68); *see also* Bianchi Decl. Ex. 1, Bianchi Initial Report ¶¶ 10, 48-58, 62; Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶¶ 20 n.6, 38).

In addition, Hedgeye claims that the GMRM file has no value unless combined with the non-model-based analyses allegedly devised by Hedgeye CEO McCullough.  McCullough has testified that Hedgeye simply could *not* "do the work it does without [McCullough's] [T]rade, [T]rend, [T]ail signals or process." (Defs. Ex. 16, McCullough 2022 Dep. Tr. 107).  He has told subscribers that it would be "really fucking stupid" to use only "the quads and no signals" (*i.e.,* to use the GMRM file's quadrant output but not McCullough's Risk Range and Trade/Trend/Tail signals). (Defs. Ex. 69, HE0286729 video at 10:11-10:21). "[I]f we're only using the quad and not the signal, which is absolutely not the way to do it, that's like getting into a Formula One car, not having the brakes…. It's like asinine." (Defs. Ex. 70, HE0286727 video at 27:08-27:26). Hedgeye managing director Joshua Steiner explains: "Mr. McCullough's signal process is a discrete, separate entity.  It doesn't connect in any way to the GIP model [*i.e.,* the GMRM file]. The output of the two processes is conjoined into what we use to advise our clients." (Defs. Ex.

42

20, Steiner 30(b)(6) Dep. Tr. 81-84; *see also* Defs. Ex. 15, Malesevic Dep. Tr. 18-24 ("I don't

think you can separate one from the other.")).

1-105. At Hedgeye, macroeconomic research is based on a full cycle investing process
that includes:
  a. A macroeconomic overlay of global economies in the context of a four quadrant
     model mapping the rate of change of growth, inflation and policy ("GIP") for each;
     and
  b. Hedgeye's quantitative trading signals, derived by measuring price, volume and
     volatility on a rate of change basis, including daily "risk ranges" for individual
     securities.

Andavolu Decl. Ex. 44 (Transcript of Deposition of Keith McCullough held on February 2, 2023
(the "Second McCullough Dep. Tr.") at 32:14-21; 67:3-17).

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by the cited testimony. The cited testimony merely confirms that Hedgeye has certain

unexplained items called (i) a "Growth, Inflation & Policy model," (ii) "risk ranges," and (iii) a

"trade trend and tail method." The other explanations and embellishments in this paragraph

appear nowhere in the testimony (*e.g.*, the "bas[is]" of Hedgeye's macroeconomic research, the

purported "full cycle investing process," the "measur[ement of] price, volume and volatility on a

rate of change basis," etc.).

Subject to and without waiving that objection, Defendants do not dispute that Hedgeye

offers macroeconomic research that includes "a four quadrant model mapping the rate of change

of growth [and] inflation" and "trading signals" including "risk ranges." Defendants dispute that

Hedgeye's macroeconomic research is "based on" any particular model (let alone the specific

models at issue in this case).

Hedgeye uses a variety of methodologies to inform its macroeconomic research,

including but not limited to financial models. (Defs. Ex. 62, HE0373895 at HE0373904-06

(discussing Hedgeye's research offerings); Defs. Ex. 8, Drake Dep. Tr. 84-91 (discussing the

limited extent to which Dale's models informed Hedgeye's products); Defs. Ex. 16, McCullough

43

2022 Dep. Tr. 84-88 (explaining that Hedgeye CEO McCullough's "risk ranges" and "trade, trend tail signals" are not based on "Excel models")).

Within the realm of financial models, Hedgeye uses a variety of models to inform its macroeconomic research other than the "GIP" model (*i.e.*, GMRM file) cited in this paragraph. (Defs. Ex. 16 McCullough 2022 Dep. Tr. 174 (explaining that "everyone has their own model they work on all the time"); Defs. Ex. 8, Drake Dep. Tr. 21-24, 44-45 (another Macro team member, discussing models and spreadsheets he would create); Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 78-79 (Christian Drake "developed his own models on the macro side"); Defs. Ex. 16, McCullough 2022 Dep. Tr. 73 (referring to Christian Drake creating models for Macro team)).

Moreover, Hedgeye's research is not truly based on the GMRM file's automated calculations, since Hedgeye makes ████████████████████████████████ ████████████ to allow Hedgeye to report numbers to subscribers ████████████████ ████████████████ (Dale 56.1 §§ VIII.A-B (████████████████████████████ ██ Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, Nos. 10-12, 14-16; Defs. Ex. 11, Lacalle Dep. Tr. 244; Defs. Ex. 15, Malesevic Dep. Tr. 77-78, 80-82, 102-03, 143-45, 148-49; Defs. Ex. 16, McCullough 2022 Dep. Tr. 237-38; Defs. Ex. 83, HE0305131 at HE0305133; Defs. Ex. 86, HE0215697 at HE0215697-98; Defs. Ex. 189, HE0221554 at HE0221555; Defs. Ex. 190, HE0221567 at HE0221567-68); *see also* Bianchi Decl. Ex. 1, Bianchi Initial Report ¶¶ 10, 48-58, 62; Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶¶ 20 n.6, 38).

1-106. Hedgeye uses two distinct models to forecast the year-over-year (YoY) growth rates of Real GDP and Headline CPI, and the combination of the two allows Hedgeye to develop both a highly accurate real-time assessment of near-term economic and inflation momentum, as well as a high-probability scenario for where growth and inflation are likely to trend over the next twelve months (NTM). The models are:
    a. Hedgeye Nowcast Model: Intra-quarter, Hedgeye employs a stochastic nowcasting framework that anchors on nonlinear interpolation to relay rate-of-change signals from the individual features of the dynamic factor

44

model to the base rate.

    b.  Hedgeye Comparative Base Effect Model: In out-quarters where high-frequency data has yet to be reported, Hedgeye employs a Bayesian inference process that adjusts each of the preceding forecasted base rates inversely and proportionally to changes in the base effects.

Andavolu Decl. Ex 45 (Hedgeye's Third Supplemental Amended Responses to Defendant Dale's Second Set of Interrogatories, dated April 7, 2022 ("Hedgeye's Third Interr. Resp."), at 3-4).

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The only purported evidence that Hedgeye cites is its own unverified interrogatory response, which is not admissible. A party cannot use its own interrogatory responses on summary judgment unless they are "verified" and "based upon personal knowledge," just like an affidavit. *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 & n.1 (2d Cir. 1968); *accord Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir. 1990); *Houston v. Sectek, Inc.*, 2008 WL 2599832, at *1 (D.D.C. June 30, 2008). Granted, an earlier version of this interrogatory response was verified by Hedgeye employee Daryl Jones and could arguably be treated as an affidavit from Jones. (*See* Defs. Ex. 34, Hedgeye's 10/11/21 Interrogatory Responses; Defs. Ex. 335, Jones Verification of Hedgeye 10/11/21 Interrogatory Responses). But as set forth in the accompanying motion to strike, Jones lacks any personal knowledge concerning the inner workings or accuracy of Hedgeye's models, so his testimony on these subjects cannot be considered competent evidence. Fed. R. Civ. P. 56(c)(4).

Defendants further object that the assertions in this paragraph—including that the models are "highly accurate" and generate "high-probability scenario[s]"—are entirely conclusory and unsupported. "[C]onclusory" testimony is "insufficient to create a genuine issue for trial," let alone to justify summary judgment. *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004); *accord McKenny v. United States*, 973 F.3d 1291, 1303 (11th Cir. 2020)

45

("[C]onclusory affidavits lack probative value."). Moreover, a "court may … strike portions of an affidavit that … make generalized and conclusory statements." *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999), *abrogated on other grounds by Schnabel v. Abramson*, 232 F.3d 83 (2d Cir. 2000); *accord, e.g.*, *Merrill Lynch Bus. Fin. Servs. Inc. v. Heritage Packaging Corp.*, 2007 WL 2815741, at *4 (E.D.N.Y. Sept. 25, 2007); *Fed. Trade Comm'n v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 654 (W.D.N.Y. 2017). Jones's inability to muster any support for his averments is unsurprising, as he is "only the Director of Research at Hedgeye in title alone," "largely as a function of his close personal relationship with Hedgeye CEO Keith McCullough," and his "role at Hedgeye is primarily limited to managing the Sales team." (Second Dale Decl., Dkt. 28-1 ¶ 5).

Subject to and without waiving these objections, Defendants do not dispute that Hedgeye's GMRM file contains calculations designed to "nowcast" and "forecast" GDP growth and inflation. Defendants dispute Hedgeye's other assertions.

For instance, Defendants dispute that this model is "highly accurate" and generates "high-probability scenario[s]." Hedgeye has presented no evidence of the accuracy of its models. Moreover, Hedgeye admits in its own internal communications, the model produces "unreasonabl[e]," "distorted," and "unsensible" predictions. (Defs. Ex. 189, HE0221554 at HE0221555; Defs. Ex. 190, HE0221567 at HE0221567-68; *see also* Defs. Ex. 86, HE0215697 at HE0215697-98; Ex. 83, HE0305131 at HE0305133). That is why Hedgeye ████████████ ████████████████████████████████████████████████████████████ ████████████████████ by ███████████. (Dale 56.1 §§ VIII.A-B (████████████ ███████████████████; Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, Nos. 10-12, 14-16; Defs. Ex. 11, Lacalle Dep. Tr. 244; Defs. Ex. 15, Malesevic Dep. Tr. 77-78, 80-82, 102-03,

143-45, 148-49; Defs. Ex. 16, McCullough 2022 Dep. Tr. 237-38; Defs. Ex. 83, HE0305131 at HE0305133; Defs. Ex. 86, HE0215697 at HE0215697-98; Defs. Ex. 189, HE0221554 at HE0221555; Defs. Ex. 190, HE0221567 at HE0221567-68)).  Without these ███████████ ████████████████████████ Hedgeye's results would "oftentimes" be "incorrect," "unreasonable," and "completely off."  (Bianchi Decl. Ex. 1, Initial Report ¶ 54; Bianchi Decl. Ex. 3, Bianchi Dep. Tr. 41; *see also id.* Tr. 79-80 (the model "produce[s] bad forecast[s]")). ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

Hedgeye admits it has never evaluated the accuracy of the GMRM file.  (Defs. Ex. 17, McCullough 2023 Dep. Tr. 182, 192; Defs. Ex. 15, Malesevic Dep. Tr. 63-66; Defs. Ex. 11, Lacalle Dep. Tr. 217, 221-24, 226-29).  When Hedgeye director Drago Malesevic took over the GMRM file from Dale, Malesevic determined that the file was even less accurate than a simple alternative model that he devised as an experiment.  (Defs. Ex. 190, HE0221567; Defs. Ex. 336, HE0221572 (attachment to Defs. Ex. 190)).  Accordingly, since Dale's departure, Hedgeye has considered and made significant changes to the GMRM file.  (Defs. Ex. 191, HE0304465 at HE0304465; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 115, 141, 168, 170; Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, Nos. 8-9).  Indeed, Hedgeye told its Excel expert Liam Bastick there were ███████████████████████████████████████ (Defs. Ex. 13, Bastick Dep. Tr. 167-68).

Defendants also dispute Hedgeye's description of the GMRM file in this paragraph, which uses sophisticated-sounding terms like "stochastic nowcasting framework," "nonlinear interpolation," and "Bayesian inference."  As Hedgeye managing director Joshua Steiner has

47

admitted, this phrasing is just "$5 word salad." (Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 102).

Moreover, Hedgeye provides no specific evidentiary support these jargony propositions.  In fact,

as Professor Bianchi explains, "Hedgeye's descriptions of its models in this action actually

suggest a lack of familiarity with macroeconomic forecasting approaches that are common in the

industry."  (Bianchi Decl. Ex. 1, Bianchi Initial Report ¶ 27).  Hedgeye misuses these terms or

uses them in an exaggerated way, and they do not demonstrate that Hedgeye's model differs

from standard, generally known approaches.  (*Id.* ¶¶ 28-30, 33-34; *see also* Bianchi Decl. Ex. 2,

Bianchi Rebuttal Report ¶¶ 58-59).

For example, Professor Bianchi, who is an expert in Bayesian techniques (*see* Bianchi

Initial Report ¶ 3, App'x B at 1, 6), explains that, contrary to the jargon Hedgeye employs,

"Hedgeye's models … do not use Bayesian methods."  (Bianchi Rebuttal Report ¶ 59; *accord*

Bianchi Initial Report ¶ 33).

1-107.  The underlying methodologies employed by Hedgeye's two models ███

███████████████████████ are set forth in Attachment A to Hedgeye's Third Supplemental

Amended Responses to Defendant Dale's Second Set of Interrogatories. Andavolu Decl. Ex. 46
(AEO).

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule

56.1(d).  The only purported evidence that Hedgeye cites is "Attachment A" to its own

unverified interrogatory response, which is not admissible.  A party cannot use its own

interrogatory responses on summary judgment unless they are "verified" and "based upon

personal knowledge," just like an affidavit.  *Schwartz v. Compagnie Gen. Transatlantique*, 405

F.2d 270, 273 & n.1 (2d Cir. 1968); *accord Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir.

1990); *Houston v. Sectek, Inc.*, 2008 WL 2599832, at *1 (D.D.C. June 30, 2008).  Granted, an

earlier version of this interrogatory response was verified by Hedgeye employee Daryl Jones and

48

could arguably be treated as an affidavit from Jones. (*See* Defs. Ex. 34, Hedgeye's 10/11/21 Interrogatory Responses; Defs. Ex. 35, Attachment A; Defs. Ex. 335, Jones Verification of Hedgeye 10/11/21 Interrogatory Responses). But as set forth in the accompanying motion to strike, Jones lacks any personal knowledge concerning "Attachment A," so his testimony on these subjects cannot be considered competent evidence. Fed. R. Civ. P. 56(c)(4).

Subject to and without waiving that objection, Defendants do not dispute that Hedgeye's "Attachment A" purports to summarize ███████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

Defendants dispute this paragraph to the extent it suggests "Attachment A" ████████████

████████████████████████████████████████████ (Defs. Ex. 15, Malesevic Dep. Tr. 32:14-16, 48:12-50:4, 60:5-61:19, 69:12-70:4, 92:19-94:1; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 129:11-130:24, 147:11-19, 153:2-154:9).

Defendants also dispute Hedgeye's definition of "Hedgeye Source Models," which is not used consistently throughout its summary judgment papers, and whose meaning changes to suit whatever point Hedgeye happens to be making at the time. In this paragraph, Hedgeye defines the term "Hedgeye Source Models" narrowly, as including only the two components of the GMRM file. In its brief, however, Hedgeye engages in sleight of hand, using the term "Hedgeye Source Models" to refer to other Excel files that are not reflected in Attachment A and that

Hedgeye does not discuss in any detail in its Rule 56.1 statement.[3] In other words, Hedgeye

makes factual assertions about the supposed inner workings of two aspects of one particular

Excel file in this Rule 56.1 statement, but pretends in its brief that they apply to several other

Excel files, thereby covering up a lack of evidence concerning those other Excel files.

    1-108. ██████████████████████████████████████

██████████████████████████████████████████

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule

56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for

summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702.

Thus, no response is necessary.

    Subject to and without waiving that objection, Defendants do not dispute that one

component of the GMRM file is designed to "nowcast" GDP growth and inflation in the current

quarter. Defendants also do not dispute that this component of the GMRM file takes certain

variables (*e.g.*, retail sales or oil prices) and arrives at an estimate of the current quarter's GDP

---

[3] Pl. Br. 8 ("These files included the Hedgeye GIP Model, the Global Macro Risk Monitor, and other Hedgeye Source Models. … These files also included a file named 'PRICE VOLUME VOLATILITY.xlsx' (the 'Price Volume Volatility File'), which was Dale's best effort to replicate a source model that Hedgeye used for its quantitative trading signals, or 'risk ranges.'"); *id.* at 9 ("Dale admits that he created files called 'Global Macro Risk Monitor.xlsx,' 'US INFLATION Model.xlsx,' and 'US GROWTH Model.xlsx' while working at Hedgeye. … He also admits that all three of those files are Hedgeye Source Models."); *id.* at 9 ("Dale admits that he had Hedgeye Source Models open while he created the 42 Macro source models. … Dale admits that he opened 'the [G]lobal [M]acro [R]isk [M]onitor . . . the Hedgeye GIP [M]odel backtest . . . the [P]rice [V]olume [V]olatility file and the file called "[B]udget."'"); *id.* at 25 (same); *id.* at 21 ("These files included Hedgeye's crown jewel, the Global Macro Risk Monitor, and other Hedgeye Source Models."); *id.* at 23 ("Dale also sent Terman a screenshot of one of Hedgeye's Source Models, his version of Hedgeye's Price Volume Volatility model, which Terman subsequently shared with Lamar.").

growth or inflation using █████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████

Defendants dispute that Hedgeye's nowcasting method takes ███████████████

████████████ For starters, Hedgeye's calculations depend ███████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████ Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, Nos. 10-12, 14-16;

Defs. Ex. 11, Lacalle Dep. Tr. 244; Defs. Ex. 15, Malesevic Dep. Tr. 77-78, 80-82, 102-03, 143-

45, 148-49; Defs. Ex. 16, McCullough 2022 Dep. Tr. 237-38; Defs. Ex. 83, HE0305131 at

HE0305133; Defs. Ex. 86, HE0215697 at HE0215697-98; Defs. Ex. 189, HE0221554 at

HE0221555; Defs. Ex. 190, HE0221567 at HE0221567-68). ██████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████

In addition, no file Hedgeye has identified as the relevant trade secrets can be described

as a ██████████████████████████████████████████████████████████████

████████, the ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

51

███████████████████████████████████████████████████████

███████████████████████████████ Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, No.

7 (admitting that "██████████████████████████████████████████████████████

Since Dale's departure, ██████████████████████████████████████

(Defs. Ex. 191, HE0304465 at HE0304465; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 115, 141,

168, 170; Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, Nos. 8-9; Defs. Ex. 13, Bastick Dep.

Tr. 167-68).

1-109. ███████████████████████████████████████████
████████████████████████████████████████

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule

56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for

summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702.

Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that one

component of the GMRM file is designed to forecast GDP growth and inflation in future

quarters, and that Hedgeye calls this component its "Comparative Base Effect Model."

Defendants also do not dispute that this forecasting component generates "a view in the absence

of data" in the sense that it is forecasting GDP growth and inflation that have not happened yet.

That is the nature of forecasting: it attempts to predict the future.

Defendants dispute that trying to forecast the future makes Hedgeye's model "Bayesian,"

or that Hedgeye's model is "Bayesian" in any meaningful sense. Although Hedgeye cites

Lacalle's report, it inexplicably ignores the rebuttal testimony of Defendants' expert Professor

Bianchi: █████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████ (Bianchi Decl. Ex. 2, Bianchi Rebuttal Report

¶ 58 (citing, e.g., page 13 of Lacalle's report); *accord* Bianchi Decl. Ex. 1, Bianchi Initial Report

¶ 34 ██████████████████████████████████████████

████████████████████████████████████ Professor Bianchi is an expert in

Bayesian techniques (*see* Bianchi Initial Report ¶ 3, App'x B at 1, 6), and he opines that,

contrary to the jargon Hedgeye employs, ████████████████████████████████

(Bianchi Rebuttal Report ¶ 59; *accord* Bianchi Initial Report ¶ 33).

Defendants also dispute that Hedgeye's model estimates "the rates of change in real GDP

growth and inflation," or that estimating "rates of change" is in any way unique to Hedgeye.

Hedgeye's expert ██████████████████████████████████████████

████████████████████████████████ (Defs. Ex. 11, Lacalle Dep. Tr. 80).

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████ To be sure,

with those estimates, an analyst can then calculate the " ██████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████ Bianchi Rebuttal Report ¶¶ 55-57; Defs. Ex. 17, McCullough 2023 Dep. Tr. 195-99,

discussing Defs. Ex. 24, McCullough 2023 Deposition Exhibit 159 at 13).  It is basic math, widely known and used in the field of economics.[4]

1-110.  The Hedgeye Source Models are dynamic market and economic analysis engines built into Excel spreadsheets. First Jones Decl. ¶ 3.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).  As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration.  Fed. R. Civ. P. 56(c)(4).  Thus, no response is necessary.

Defendants further object that the statements in this paragraph are vague, ambiguous, and conclusory.  As explained above, Hedgeye uses a variety of inconsistent definitions for the defined term "Hedgeye Source Models."  (*See* Defendants' Response to ¶ 1-107 *supra*).  Furthermore, Hedgeye does not explain what makes these models "dynamic" or what qualifies as an "engine."

Subject to and without waiving these objections, Defendants do not dispute that the "Hedgeye Source Models" as defined in ¶ 1-107 (the so-called "Hedgeye Nowcast Model" and

---

[4] *See* Defs. Ex. 11, Lacalle Dep. Tr. 80

"Hedgeye Comparative Base Effect Model") are designed for "economic analysis" and are "built into Excel spreadsheets"—specifically, the spreadsheets that comprise the GMRM file. (Defs. Ex. 15, Malesevic Dep. Tr. 32:14-16, 48:12-50:4, 60:5-61:19, 69:12-70:4, 92:19-94:1; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 129:11-130:24, 147:11-19, 153:2-154:9).

To the extent this paragraph is intended to suggest that the model is of high quality (as the words "dynamic" and "engine" appear to suggest), Defendants dispute that suggestion, as explained in greater detail above. (*See* Defendants' Response to ¶ 1-106 *supra*).

1-111. The spreadsheets use APIs (Application Programming Interface) to dynamically gather virtually real-time financial marketplace and economic data from a number of sources. First Jones Decl. ¶ 3.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration. Fed. R. Civ. P. 56(c)(4). Thus, no response is necessary.

Defendants further object that the statements in this paragraph are vague and ambiguous, as it is unclear what it means to "dynamically gather virtually real time" data.

Subject to and without waiving these objections, Defendants do not dispute that the GMRM file's spreadsheets use "APIs" (a sort of connection between two pieces of software, here Excel and Bloomberg) to gather data from publicly available sources such as Bloomberg. (Second Dale Decl., Dkt. 28-1 ¶¶ 11, 13; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 103; Defs. Ex. 16, McCullough 2022 Dep. Tr. 200:20-24; Defs. Ex. 17, McCullough 2023 Dep. Tr. 46:21-24; Defs. Ex. 8, Drake Dep. Tr. 116:5-7; Defs. Ex. 9, Jones 2022 Dep. Tr. 46).

1-112. Hedgeye employees select dozens of discrete data points from a near-infinite number of potential inputs from virtually every country in the world. Hedgeye's source models then apply mathematical formulas that Hedgeye developed to weigh, combine, and analyze the

data, and feed the results to "output models." First Jones Decl. ¶ 3. By 2019, Dale was one of the highest compensated employees at Hedgeye. Blum Decl. ¶ 8.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration. Fed. R. Civ. P. 56(c)(4). Thus, no response is necessary.

Defendants further object that this paragraph appears to combine two unrelated points: one concerning Hedgeye's model, and one concerning Dale's compensation.

Subject to and without waiving these objections, Defendants do not dispute that the nowcasting component of Hedgeye's GMRM file applies formulas to a few dozen data points to obtain purported estimates of GDP growth and inflation for a number of countries, which are fed into "output models" published to subscribers. Defendants dispute Hedgeye's other assertions.

For instance, Defendants dispute that the data points were selected "from a near-infinite number of potential inputs." Hedgeye managing director Christian Drake testified that Hedgeye looks at "a set of kind of name brand indicators that a lot of people look at." (Defs. Ex. 8, Drake Dep. Tr. 116:5-7). Moreover, as Defendants' expert Professor Bianchi has explained, "there is no over[-]abundance of macro variables." (Bianchi Decl. Ex. 3, Bianchi Dep. Tr. 125). "[V]ariables are not chosen randomly in a nowcasting model" but "are instead chosen based on their co-movement with the target variables." (Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 26). "[I]f you approach the[] [selection] in a scientific way, there is not so much that can happen in the end." (Bianchi Decl. Ex. 3, Bianchi Dep. Tr. 129). In Hedgeye's model, "[a]ll [of the variables] are readily accessible on common data sources such as Bloomberg and are used by other forecasters. Indeed, the variables used in [Hedgeye's model] can be retrieved from

Bloomberg by simply using the mnemonics 'ECO' and 'ECST.' These two mnemonics return a list of key data releases that are considered highly relevant to assessing the state of the economy and that market participants monitor regularly. … Thus, the indicators used by Hedgeye … are the same indicators that Bloomberg's more than 300,000 clients around the world consider particularly relevant." (Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 27).

Defendants dispute that Hedgeye uses "dozens" of data points from "virtually every country in the world" for its estimates. For instance, "[i]n Hedgeye's nowcasting model for inflation, … Hedgeye uses only a single variable: the year-over-year change in the price of the Generic 1st Crude Oil Brent." (Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 31; *accord* Defs. Ex. 15, Malesevic Dep. Tr. 134-35). To forecast growth in China, Hedgeye uses "the nominal secondary industries gdp figure." (Defs. Ex. 86, HE021697 at HE021697). The claim that Hedgeye analyzes "virtually every country in the world" is an exaggeration as well. Hedgeye analyzes 47 "geographies" (Second Jones Decl., Dkt. 24 ¶ 14), including broad categories like "Emerging Markets," "Eurozone," and "World," and selects only a few dozen countries to analyze individually. (Defs. Ex. 336, HE0221572; *see also* Defs. Ex. 23, McCullough 2023 Deposition Exhibit 154 / HE0101444 at HE0101468).

Defendants dispute the suggestion that the data points were selected by a team of "Hedgeye employees." Hedgeye does not know how the data points were originally selected. At the deposition of its Rule 30(b)(6) representative, Hedgeye was unable to identify "who chose the data points included in Hedgeye's GIP model." (Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 57). Similarly, the declarant Hedgeye cites, Daryl Jones, testified at his deposition that he was "not sure" "[w]ho chose the data points." (Defs. Ex. 9, Jones 2022 Dep. Tr. 47).

Defendants dispute that "Hedgeye's source models … apply mathematical formulas that

57

Hedgeye developed," as follows:

- The declarant, Jones, has no personal knowledge on this subject and no idea whether this statement is true. (Defs. Ex. 9, Jones 2022 Dep. Tr. 180 ("Q. Do you know if someone at Hedgeye developed this formula? … A. I assume because it was in our model, somebody at Hedgeye did, but I can't say that I saw somebody develop this formula. Q. Well, do you know if they got these formulas from a source outside of Hedgeye? A. I don't know.")).

- As Darius Dale has testified, "Hedgeye is not the originator of any of the quantitative methodologies that its models employ. Such methodologies … are well known to any investor with a decent knowledge of statistics, financial engineering, macroeconomic, microeconomics, and/or accounting …." (Second Dale Decl., Dkt. 28-1 ¶ 14).

- The formulas are generally known in the field of macroeconomics. (Bianchi Decl. Ex. 1, Bianchi Initial Report ¶¶ 9, 26, 38-47; Defs. Ex. 16, McCullough 2022 Dep. Tr. 257; Defs. Ex. 15, Malesevic Dep. Tr. 61-63, 96; Defs. Ex. 9, Jones 2022 Dep. Tr. 221).

- Hedgeye admits that no formula, by itself, is a trade secret. (Defs. Ex. 9, Jones 2022 Dep. Tr. 34-36, 59-60, 94, 107; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 63, 71-72, 150, 152, 175-78; Defs. Ex. 19, Parsio 30(b)(6) Dep. Tr. 203, 210-11; Defs. Ex. 187, HE0304934 at HE0304939; Defs. Ex. 49, 10/13/21 Court Conf. Tr. 69; Defs. Ex. 46, Hedgeye's 1/9/23 Interrogatory Responses, No. 7).

- Moreover, no one at Hedgeye other than Dale wrote the formulas into these models. (Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, Nos. 21-23; Second Dale Decl., Dkt. 28-1 ¶¶ 8, 18; Third Dale Decl., Dkt. 36-1 ¶¶ 2-3; Defs. Ex. 5, Dale 2021 Dep. Tr. 121, 125-26, 135, 353; Jones Decl., Dkt. 8 ¶ 22; Defs. Ex. 16, McCullough 2022 Dep. Tr. 29, 31-32, 69-73, 75; Defs. Ex. 18, McCullough 2024 Dep. Tr. 28-29, 62; Defs. Ex. 17, McCullough 2023 Dep. Tr. 40, 53-54, 59, 78, 184; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 46-47, 80-85, 149; Defs. Ex. 8, Drake Dep. Tr. 57-58, 75-76; Defs. Ex. 9, Jones 2022 Dep. Tr. 217; Defs. Ex. 65, HE0221078; Defs. Ex. 66, HE0218983 at HE0218986, HE0218993).

Defendants dispute that █████████████████████████████████

Hedgeye's ███████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████

Defendants dispute that "Dale was one of the highest compensated employees at

Hedgeye." (Second Dale Decl., Dkt. 28-1 ¶ 2; Third Dale Decl., Dkt. 36-1 ¶ 6).

1-113. Hedgeye's "Growth, Inflation & Policy" model, or GIP, employs roughly 30 uniquely-curated and back-tested economic data points to which Hedgeye assigns varying weights. First Jones Decl. ¶ 7.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).  As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration.  Fed. R. Civ. P. 56(c)(4).  Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that the GMRM file (which Hedgeye calls the "GIP model") employs 30 data points to estimate U.S. real GDP growth and a single data point to estimate U.S. inflation.  (*See, e.g.*, Defs. Ex. 23, McCullough 2023 Deposition Exhibit 154 / HE0101444 at HE0101459; Defs. Ex. 9, Jones 2022 Dep. Tr. 44; Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 31; Defs. Ex. 15, Malesevic Dep. Tr. 134-35).

Defendants dispute that the data points are "uniquely-curated."  Hedgeye managing director Christian Drake testified that Hedgeye looks at "a set of kind of name brand indicators that a lot of people look at."  (Defs. Ex. 8, Drake Dep. Tr. 116:5-7).  Defendants' expert Professor Bianchi agrees: "All [of the variables] are readily accessible on common data sources such as Bloomberg and are used by other forecasters.  Indeed, the variables used in [Hedgeye's model] can be retrieved from Bloomberg by simply using the mnemonics 'ECO' and 'ECST.'  These two mnemonics return a list of key data releases that are considered highly relevant to assessing the state of the economy and that market participants monitor regularly. … Thus, the indicators used by Hedgeye … are the same indicators that Bloomberg's more than 300,000 clients around the world consider particularly relevant."  (Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 27).

59

Although Defendants do not dispute that Hedgeye has performed some form of "back-test[ing]" on the data points, Defendants dispute the suggestion that back-testing is a meaningful way to assess the accuracy of a model (*see* Bianchi Decl. Ex. 1, Bianchi Initial Report ¶ 60) and dispute the suggestion that Hedgeye's model generates accurate predictions (*see* Defendants' Response to ¶ 1-106 *supra*).

Defendants dispute that Hedgeye necessarily



1-114. Back-testing is a methodology by which models are applied retroactively, and their predictive results are measured with the benefit of hindsight. First Jones Decl. ¶ 7.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration. Fed. R. Civ. P. 56(c)(4). (*See* Defs. Ex. Ex. 9, Jones 2022 Dep. Tr. 73-75 ("Q. Okay, and does Hedgeye use standard backtesting algorithms or backtesting algorithms that it has developed on its own? A. I don't know the details of backtests. … Q. What about Hedgeye's backtesting do you consider unique or proprietary? A. I don't – yes, I don't know enough about the backtest to say. Q. Why wouldn't Hedgeye simply use the best backtesting techniques the industry had to offer? A. I don't know. I don't know that we did or that we didn't.")). Thus, no response is necessary.

Subject to and without waiving that objection, Defendants dispute that back-testing is a meaningful way to assess the accuracy of a model (*see* Bianchi Decl. Ex. 1, Bianchi Initial

Report ¶ 60) and dispute the suggestion that Hedgeye's model generates accurate predictions (*see* Defendants' Response to ¶ 1-106 *supra*).

1-115. Putting this lawsuit aside, no other competitor uses the same back-tested data points, or uses data points in the same way with the same weighting. First Jones Decl. ¶ 7.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration. Fed. R. Civ. P. 56(c)(4). (*See* Defs. Ex. 9, Jones 2022 Dep. Tr. 76 ("I don't know anything about competitors' data points, so it's hard for me to say. … I don't know anything about what they are using or what their data points are."); *id.* Tr. 96 ("Q. Okay. Can you identify any Hedgeye data point that a competitor does not use? A. Can I identify -- no. I mean I don't really know what competitors use, so it would be hard for me to do that."); *see also id.* Tr. 37 ("I don't really know what's known in the general[] industry, so it's kind of hard for me to speculate."); *id.* Tr. 85 ("Q. Okay, so what is one method that Hedgeye applies that no other competitor applies. A. Yes. I don't know."); *id.* Tr. 92 ("I don't know what other analysts use."); *id.* Tr. 95 ("I don't know the methods competitors use."); *id.* Tr. 103 (same); *id.* Tr. 108 ("I don't know for sure what other participants [in the industry] do.")). Thus, no response is necessary.

Subject to and without waiving that objection, Defendants dispute the assertions in this paragraph. Hedgeye admits that it does not know what its competitors do. (Defs. Ex. Ex. 9, Jones 2022 Dep. Tr. 76, 85, 92, 95-96, 103, 108 (quoted above); Defs. Ex. 16, McCullough 2022 Dep. Tr. 38 ("I don't know what was in the field."), 41 ("Now plenty of people have nowcast, and they may say whatever they say with their model, but I don't know what they actually do."), 42 (same), 150 ("I don't know. I haven't seen other people's models."), 157 ("I don't see other

61

people's models.  I don't know what they do."), 223-24 (same), 239-40 ("I don't know what their models are."); Defs. Ex. 17, McCullough 2023 Dep. Tr. 133 ("[Y]ou're not allowed to take other people's models.  I don't know what's embedded in their model."), 134 ("Q. Do you know whether [the Atlanta Fed] use[s] any other components or aspects of the Hedgeye model?  A. I don't know."), 144 ("I don't know what other people do."); Defs. Ex. 15, Malesevic Dep. Tr. 62-63 ("Q. Do you know how these other industry participants create their forecast or nowcast?  A. No, no.  Q. Do you know how, if at all, this Hedgeye nowcast model differs from the way that other industry participants nowcast GDP or inflation?  A. I don't know.")).

However, Hedgeye managing director Christian Drake testified that Hedgeye looks at "a set of kind of name brand indicators that a lot of people look at."  (Defs. Ex. 8, Drake Dep. Tr. 116:5-7).  Defendants' expert Professor Bianchi agrees: "All [of the variables] are readily accessible on common data sources such as Bloomberg and are used by other forecasters. Indeed, the variables used in [Hedgeye's model] can be retrieved from Bloomberg by simply using the mnemonics 'ECO' and 'ECST.'  These two mnemonics return a list of key data releases that are considered highly relevant to assessing the state of the economy and that market participants monitor regularly.  …  Thus, the indicators used by Hedgeye … are the same indicators that Bloomberg's more than 300,000 clients around the world consider particularly relevant."  (Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 27).

It is unsurprising that others in the industry would use the same data points as Hedgeye, since they are featured in academic papers on macroeconomics.  (Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶¶ 28-29).  In addition, Hedgeye has broadly disclosed its selection of data inputs, and their relative weighting, to subscribers and to the general public over the internet. (*Id.* ¶ 30 & n.21; Defs. Ex. 17, McCullough 2023 Dep. Tr. 126-27, 152-53; Defs. Ex. 23,

McCullough 2023 Deposition Exhibit 154 / HE0101444; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 54-56, 103; Defs. Ex. 25, Steiner 30(b)(6) Deposition Exhibit 55; Defs. Ex. 15, Malesevic Dep. Tr. 38-39; Defs. Ex. 242, HE0286722 video at 30:42; *see also* internet links at Dale 56.1 ¶¶ 2-225 – 2-226).

1-116.  It took Hedgeye many years and significant investment of resources to derive the mix of indicators to where they are today. First Jones Decl. ¶ 7.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).  As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration.  Fed. R. Civ. P. 56(c)(4).  (*See* Defs. Ex. 9, Jones 2022 Dep. Tr. 84 ("Q. Okay.  Does Hedgeye track the expenditures and the amount of money it has spent on developing its Excel models?  A. I don't know.  Q. Is there any way to estimate how much Hedgeye has spent on developing its models?  A. I'm not sure."); *see also id.* Tr. 54 ("I actually don't know firsthand … which of those data points are used in any model at any given time …."); *id.* Tr. 61-62 ("Q. So did you ever have occasion to see any actual data points that Mr. Dale was using in his Excel models?  A. Not that I remember.  Q. So how would you know if Mr. Dale was using data points that were consistent with what you consider to be Hedgeye's method of economic analysis?  A. Do you mean currently or while at Hedgeye?  Q. While at Hedgeye.  A. I don't really see the outputs, so I guess I wouldn't know.  Q. Okay. Would anyone know whether Mr. Dale was using data points consistent with what you consider to be Hedgeye's unique method of economic analysis?  A. I don't know.  Q. What data points would not be consistent with Hedgeye's method of economic analysis?  A. I'm not sure."); *id.* Tr. 75 ("Q. Okay.  Why doesn't Hedgeye use more data points?  A. I don't know."); *id.* Tr. 96-97 ("Q. Okay. Is there a guiding principle that Hedgeye employs in choosing data points?  A. I don't know.")).

63

Thus, no response is necessary.

Defendants further object that the assertions in this paragraph are entirely conclusory and unsupported. "[C]onclusory" testimony is "insufficient to create a genuine issue for trial," let alone to justify summary judgment. *Patterson*, 375 F.3d at 219; *accord McKenny*, 973 F.3d at 1303 ("[C]onclusory affidavits lack probative value."). Moreover, a "court may … strike portions of an affidavit that … make generalized and conclusory statements." *Hollander*, 172 F.3d at 198; *accord, e.g., Merrill Lynch*, 2007 WL 2815741, at *4; *Vantage Point*, 266 F. Supp. 3d at 654. Jones's inability to muster any support for his averments is unsurprising, as he is "only the Director of Research at Hedgeye in title alone," "largely as a function of his close personal relationship with Hedgeye CEO Keith McCullough," and his "role at Hedgeye is primarily limited to managing the Sales team." (Second Dale Decl., Dkt. 28-1 ¶ 5). Jones "lacks any insight into the development process of [Excel forecasting] models, having neither developed, nor published any such tool" while Dale was at Hedgeye. (*Id.* ¶ 4).

Subject to and without waiving these objections, Defendants dispute the assertions in this paragraph. Hedgeye managing director Christian Drake testified that Hedgeye looks at "a set of kind of name brand indicators that a lot of people look at." (Defs. Ex. 8, Drake Dep. Tr. 116:5-7). Defendants' expert Professor Bianchi agrees: "All [of the variables] are readily accessible on common data sources such as Bloomberg and are used by other forecasters. Indeed, the variables used in [Hedgeye's model] can be retrieved from Bloomberg by simply using the mnemonics 'ECO' and 'ECST.' These two mnemonics return a list of key data releases that are considered highly relevant to assessing the state of the economy and that market participants monitor regularly. … Thus, the indicators used by Hedgeye … are the same indicators that Bloomberg's more than 300,000 clients around the world consider particularly relevant."

64

(Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 27).  These data points are also featured in academic papers on macroeconomics.  (*Id.* ¶¶ 28-29).

Moreover, if it had taken "Hedgeye many years and significant investment of resources to derive the mix of indicators to where they are today," presumably Hedgeye would not have broadly disclosed this "mix of indicators" to subscribers and to the general public over the internet.  But it has.  (Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 30 & n.21; Defs. Ex. 17, McCullough 2023 Dep. Tr. 126-27, 152-53; Defs. Ex. 23, McCullough 2023 Deposition Exhibit 154 / HE0101444; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 54-56, 103; Defs. Ex. 25, Steiner 30(b)(6) Deposition Exhibit 55; Defs. Ex. 15, Malesevic Dep. Tr. 38-39; Defs. Ex. 242, HE0286722 video at 30:42; *see also* internet links at Dale 56.1 ¶¶ 2-225 – 2-226).

1-117.  The Hedgeye Source Models also dynamically re-weigh the 30 data points for "marginal rate of change" impact; in essence, the model continually retrains itself based on the curated source data. First Jones Decl. ¶ 7.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).  As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration.  Fed. R. Civ. P. 56(c)(4).  (*See* Defs. Ex. 9, Jones 2022 Dep. Tr. 50 ("Q. So what is the underlying concept or idea behind Hedgeye's various weightings?  A. I'm not sure."); *id.* Tr. 51 ("Q. Well, what data sources does Hedgeye see as deserving more weight in terms of macroeconomic analysis than others?  A. What data sources does -- I'm not sure how to answer that.  Q. Can you tell us anything more about the concepts behind how Hedgeye weights different points of data in modeling the macroeconomy?  A. No.  I mean I know there's a sort of subcomponent of the model that does that.  I'm not involved in the model day to day and, you know, didn't build it."); *id.* Tr. 71 ("Q. Now, do Hedgeye's weightings in its macroeconomic forecasting models change from time to time?  A. I believe so.  Q. How do they

change?  A. I believe that there is a module on the model that can re-weight them or, you know, possibly, you know, factors will be dropped in or out.  This kind of based on what I heard Keith say."); *id.* Tr. 72 ("Q. Okay.  What discussion or conversation have you participated in in which Mr. McCullough said anything about an algorithm for changing the weightings or the data points?  A. I don't recall specifics … on that."); *id.* Tr. 73 ("Q. Are the weightings that Hedgeye uses today different from the weightings that Hedgeye used when Dale was at the company?  A. I don't know.  Q. Okay, but if an algorithm suggested that the weightings should change, Hedgeye would have made that change?  A. Yes.  I don't know.  I don't operate the models or come up with the macro viewpoints.")).  Thus, no response is necessary.

Defendants further object that the statements in this paragraph are vague and ambiguous. As explained above, Hedgeye uses a variety of inconsistent definitions for the defined term "Hedgeye Source Models."  (*See* Defendants' Response to ¶ 1-107 *supra*).

Subject to and without waiving these objections, Defendants do not dispute that the GMRM file calculates weights for the 30 data points and that those weights change over time.

Defendants dispute that Hedgeye "dynamically re-weigh[s] … data points for 'marginal rate of change' impact," whatever that means.  The GMRM file has a worksheet that "computes the absolute value of the correlation between a series of indicators and GDP growth," but "[t]his is a very basic way to assess co-movement between the target variable (GDP growth) and the indicators, and there is nothing particularly novel or advantageous about this approach." (Bianchi Decl. Ex. 1, Bianchi Initial Report ¶ 20; *see also id.* ¶ 42; Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 93; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 60-61).  Hedgeye appears to acknowledge this when it says that, "in essence, the model continually retrains itself based on the curated source data."  It is the "general practice in the profession" for forecasters to employ

"automated ways to 'retrain' their models—that is, to re-estimate the weights of the variables, which may need to change for various reasons, including because the variables might be redefined at different points in time." (Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 24).

Defendants dispute that the GMRM file necessarily applies the calculated weights to the data points. Hedgeye's ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████

1-118. Only the most senior analysts at Hedgeye, such as Dale prior to his departure, understand how to do this. First Jones Decl. ¶ 7.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration. Fed. R. Civ. P. 56(c)(4). (*See* Defs. Ex. 9, Jones 2022 Dep. Tr. 97-98 ("Q. Okay. You write at the end of paragraph 7, 'Only the most senior analysts at Hedgeye, such as Mr. Dale prior to his departure, would understand how to do this.' What do you mean by that? A. I mean that only Darius or somebody of his level would be able to -- would know how to do this. Q. So at the time Mr. Dale left the company, who at Hedgeye would understand how to do this? A. At the time on the macro team, he was probably the most senior analyst, so at the time him. Q. And who else at that time? A. I don't know for sure. … Q. Who would understand how to do the things you describe here? A. I don't know for sure who else had the capability."). Thus, no response is necessary.

Defendants further object that this paragraph is vague and ambiguous as to the phrase "do this." Given the content of the preceding paragraph 1-117, Defendants assume that "do this"

67

means "re-weigh the data points."

Subject to and without waiving these objections, Defendants dispute the assertions in this paragraph. Re-weighing the data points is a simple process that can be done by anyone with basic quantitative skills. The GMRM file has a worksheet that "computes the absolute value of the correlation between a series of indicators and GDP growth," which "is a very basic way to assess co-movement between the target variable (GDP growth) and the indicators, and there is nothing particularly novel or advantageous about this approach." (Bianchi Decl. Ex. 1, Bianchi Initial Report ¶ 20; *see also id.* ¶ 42; Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 93; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 60-61). As Darius Dale put it, Jones's "claim that 'only a very senior analyst' would know how to construct first difference regressions in Microsoft Excel clearly demonstrates that he lacks expertise…. Regression analysis is statistics 101 type stuff. Every single person who has a front-office job on Wall Street knows how to perform such calculations." (Third Dale Decl., Dkt. 36-1 ¶ 3). Jones's claim is also inconsistent with Jones's earlier statements, around the time of Dale's departure, that Hedgeye would "just need a junior chart data monkey" to replace Dale. (Defs. Ex. 128, HE0221150; *see also* Defs. Ex. 131, HE0215000 at HE0215000-02 (Jones and McCullough agreeing that a "junior analyst" could replace Dale)).

### B. "Dale's Admissions"

1-119. Dale testified that Hedgeye's financial models contain "secret source formulas." Andavolu Decl. Ex. 4 (First Dale Dep. Tr. 135:10-12).

**Defendants' Response:** Defendants dispute this paragraph, which takes Dale's quote out of context. Dale testified that when building 42 Macro's models, he wanted to avoid using "what *I would consider* to be *sort of* Hedgeye secret source formulas." (Pl. Ex. 4, First Dale Dep. Tr. 135:4-12 (emphasis added)). He went on to say, "And mind you, the background here is I built –

68

I built all of Hedgeye's tools, you know, just by sourcing open source, Internet, you know, reading white papers and things of that nature." (*Id.* Tr. 135:12-17).  In other words, Dale relied on public, not secret, formulas.

Defendants further dispute that Hedgeye's models contain "secret source formulas." Hedgeye admits that no formula, by itself, is a trade secret.  (Defs. Ex. 9, Jones 2022 Dep. Tr. 34-36, 59-60, 94, 107; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 63, 71-72, 150, 152, 175-78; Defs. Ex. 19, Parsio 30(b)(6) Dep. Tr. 203, 210-11; Defs. Ex. 187, HE0304934 at HE0304939; Defs. Ex. 49, 10/13/21 Court Conf. Tr. 69; Defs. Ex. 46, Hedgeye's 1/9/23 Interrogatory Responses, No. 7).  And the formulas in ███████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████

1-120. ████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

**Defendants' Response:** Defendants do not dispute that this exchange occurred, but note that Dale went on to say, "I just want to make sure that it doesn't get used to disparage me in the interim," and Parsio responded, "Understood."

b.

**Defendants' Response:** Defendants do not dispute that this exchange occurred, and note that

Parsio went on to say,

"

c.

**Defendants' Response:** Defendants dispute this subparagraph, as Parsio actually said,

"

d.

**Defendants' Response:** Defendants do not dispute that this exchange occurred.

e.

**Defendants' Response:** Defendants dispute that Dale said he would not build a research firm.

70

The quoted exchange simply says that

. Throughout the recording, Dale and Parsio discussed the

(Defs. Ex. 19, Parsio 30(b)(6) Dep. Tr. 98). A week after this call, Hedgeye Director of Research Daryl Jones told Hedgeye managing director Joshua Steiner, "I think [Dale] is going ultimately [to] compete with us." (Defs. Ex. 187, HE0304934 at HE0304934).

### VI.   "Hedgeye Took Adequate Measures to Keep the Source Files for its Financial Models Secret"

1-121. The Hedgeye Source Models are the product of Hedgeye's investment of many millions of dollars, as well as years of intensive work, troubleshooting, continuously improving and innovating, as well as working closely with its customers. First Jones Decl. ¶ 5.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration. Fed. R. Civ. P. 56(c)(4). (*See* Defs. Ex. 9, Jones 2022 Dep. Tr. 84 ("Q. Okay. Does Hedgeye track the expenditures and the amount of money it has spent on developing its Excel models? A. I don't know. Q. Is there any way to estimate how much Hedgeye has spent on developing its models? A. I'm not sure.").

Defendants further object that Jones's statement is entirely conclusory and unsupported by specific evidence. "[C]onclusory" testimony is "insufficient to create a genuine issue for trial," let alone to justify summary judgment. *Patterson*, 375 F.3d at 219; *accord McKenny*, 973 F.3d at 1303 ("[C]onclusory affidavits lack probative value."). Moreover, a "court may … strike

71

portions of an affidavit that … make generalized and conclusory statements." *Hollander*, 172 F.3d at 198; *accord, e.g., Merrill Lynch*, 2007 WL 2815741, at *4; *Vantage Point*, 266 F. Supp. 3d at 654. Jones's inability to muster any support for his averments is unsurprising, as he is "only the Director of Research at Hedgeye in title alone," "largely as a function of his close personal relationship with Hedgeye CEO Keith McCullough," and his "role at Hedgeye is primarily limited to managing the Sales team." (Second Dale Decl., Dkt. 28-1 ¶ 5). Jones "lacks any insight into the development process of [Excel forecasting] models, having neither developed, nor published any such tool" while Dale was at Hedgeye. (*Id.* ¶ 4).

Defendants further object that in its statement, Hedgeye defines the term "Hedgeye Source Models" to refer to the "Hedgeye Nowcast Model" and the "Hedgeye Comparative Base Effect Model." (*See* Defendants' Response to ¶ 1-107 *supra*). Jones's declaration does not refer specifically to either of these models in the cited paragraph, nor does it refer to the GMRM file (also known as the "GIP" model) that reflects and contains these models. Instead, Jones refers to Hedgeye's "models" generally. Hedgeye used numerous models besides Dale's, such as Hedgeye's Trade, Trend, Tail model and McCullough's "Risk Ranges," to generate their research. As Hedgeye CEO Keith McCullough explained, "everyone has their own model they work on all the time." (Defs. Ex. 16, McCullough 2022 Dep. Tr. 174; *see also* Defs. Ex. 8, Drake Dep. Tr. 21-24, 44-45 (another Macro team member, discussing models and spreadsheets he would create); Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 78-79 (Christian Drake "developed his own models on the macro side"); Defs. Ex. 16, McCullough 2022 Dep. Tr. 73 (referring to Christian Drake creating models for Macro team)). Thus, no response is necessary.

Subject to and without waiving these objections, Defendants dispute that "the Hedgeye Source Models are the product of Hedgeye's investment of many millions of dollars, as well as

72

years of intensive work, troubleshooting, continuously improving and innovating, as well as working closely with its customers."

Dale built Excel spreadsheets at Hedgeye. He drew upon publicly available tools and materials from outside of Hedgeye, including Investopedia articles and Federal Reserve white papers, to build these files. (Third Dale Decl., Dkt. 36-1 ¶¶ 2-3; Defs. Ex. 5, Dale 2021 Dep. Tr. 135; Defs. Ex. 37, Hedgeye's 11/22/21 RFA Responses, No. 4). Dale worked alone, without supervision, in building the GMRM file and other Hedgeye files. (Second Dale Decl., Dkt. 28-1 ¶ 18 ("[I] built [the] model[] with no supervision at all…."); Third Dale Decl., Dkt. 36-1 ¶ 3 ("[E]ach of the 'Source Files' referenced [by Hedgeye] w[as] built by me, with no supervision, based on the information from publicly available sources.").

Prior to Dale's departure, Hedgeye did not identify Dale's Excel spreadsheets as valuable intellectual property. In a "firm brochure" issued on March 31, 2021 to comply with SEC regulatory requirements—one month before commencing this lawsuit—Hedgeye identified and described what it regarded as its key intellectual property. (Defs. Ex. 62, HE0373895 at HE0373904-06). That brochure did not refer to any of the outputs, files, or models developed by Dale as significant intellectual property. It nowhere refers to the GMRM file (or GIP model) by name.

1-122. The Hedgeye Source Models, including the weighting of data points and the computations used to produce analysis from them, are not disclosed outside of Hedgeye. First Jones Decl. ¶ 4.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration. Fed. R. Civ. P. 56(c)(4).

Defendants further object on the ground that, in its statement, Hedgeye defines the term

"Hedgeye Source Models" to refer to the "Hedgeye Nowcast Model" and the "Hedgeye Comparative Base Effect Model." (*See* ¶ 1-107 *supra*). Jones's declaration does not refer specifically to either of these models in the cited paragraph, nor does it refer to the GMRM file (also known as the "GIP" model) that reflects and contains these models. Thus, no response is necessary.

Subject to and without waiving these objections, Defendants dispute that Hedgeye does not disclose "the weighting of data points and the computations used to produce analysis from them" outside of Hedgeye. Hedgeye's GIP model does not have a single set of weightings; rather, it changes its weightings on a regular basis. (Defs. Ex. 16, McCullough 2022 Dep. Tr. 211:11-25, 212:12-19 (weightings are "constantly changing"); *see also* Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 58-59, 104 (weightings change "on a quarterly basis"); ███████████

████████████████████████████████████████████

███████████████████████████████. However, Hedgeye discloses its relative weightings—that is, the general ranking scheme of the importance it assigns to each data input— to thousands of subscribers as well as to the public at large over the internet. (Defs. Ex. 17, McCullough 2023 Dep. Tr. 126-27, 152-55; Defs. Ex. 23, McCullough 2023 Deposition Exhibit 154 (providing ordinal list of relative weighting of each data input); Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 103-04; Defs. Ex. 25, Steiner 30(b)(6) Deposition Exhibit 55; *see also, e.g.*, https://app.hedgeye.com/mu/current-market-outlook-12-2021?encoded_data=f4Oy, IowGIThhp6kb7EiXtOn/ufVDjkU=.

Hedgeye also broadly discloses the nature of the computations in its GIP model, including its use of a two-year base effect. (Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, No. 6 ("Hedgeye has disclosed to subscribers its use of a two-year base effect"); Defs. Ex. 17,

74

McCullough 2023 Dep. Tr. 131 ("Q. And so your subscribers would be aware that in calculating these estimates, you're using two year comparative base effects, right? A. Yes.")).

1-123. Subscribers who receive Hedgeye's output models cannot access the source models on which they are based. First Jones Decl. ¶ 4.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration. Fed. R. Civ. P. 56(c)(4). Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that a subscriber who receives only an output model cannot access the source model on which that output model is based.

1-124. Subscribers cannot view the underlying methodology that goes into the source models or update the output models. First Jones Decl. ¶ 4.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration. Fed. R. Civ. P. 56(c)(4). Thus, no response is necessary.

Subject to and without waiving that objection, Defendants admit that a subscriber who receives only an output model cannot access the source model on which that output model is based.

1-125. Subscribers do not have access to or visibility into how Hedgeye's algorithms work or derive information. First Jones Decl. ¶ 4.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters

discussed in his declaration. Fed. R. Civ. P. 56(c)(4). Thus, no response is necessary.

Subject to and without waiving that objection, Defendants admit that recipients of output files generally cannot see their inner workings. Defendants dispute that "subscribers do not have access or visibility into how Hedgeye's algorithms work or derive information." It is unclear whether the term "algorithms" in this paragraph refers to the algorithms in *all* Hedgeye source models; the eleven specific files Hedgeye identified as its trade secret files in interrogatory responses (*see* Defs. Ex. 34, Hedgeye's 10/11/21 Interrogatory Responses at 4; Defs. Ex. 41, Hedgeye's 4/7/22 Interrogatory Responses at 4); the two specific models it defined as "Hedgeye Source Models" in Paragraph 1-107 *supra*, which are housed in the GMRM file, or something else.

Regardless, Hedgeye broadly discloses the methodologies it uses in its models to its subscribers and online. For instance, Hedgeye discloses to its subscribers (and online) that "Intra-quarter, we employ a stochastic nowcasting framework that anchors on nonlinear interpolation to relay rate of change signals from the individual features of the dynamic factor model to the base rate. In out-quarters where high-frequency data has yet to be reported, we employ a Bayesian Inference process that adjusts each of the preceding forecasted base rates inversely and proportionally to changes in the base effects." Hedgeye, "Hedgeye's Current Market Outlook" (Dec. 6, 2021) at p. 5, *available at* https://app.hedgeye.com/mu/current-market-outlook-12-2021?encoded_data=f4Oy,IowGIThhp6kb7EiXtOn/ufVDjkU=; *see also* "Chart of the Day" (Dec. 8, 2021), *available at* https://app.hedgeye.com/insights/108992-chart-of-the-day-perfectly-timed-cycle-pivots?type=macro (same); "Hedgeye's Current Market Outlook" (June 30, 2020), *available at* https://app.hedgeye.com/mu/current-market-outlook-6-30-2020?encoded_data=fSaz,SE9skbBpHEWUYWm9aLhxcDeLxG4=. Hedgeye also discloses the

fact that it uses a two-year base effect in its GIP model. (Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, No. 6 ("Hedgeye has disclosed to subscribers its use of a two-year base effect"); Defs. Ex. 17, McCullough 2023 Dep. Tr. 131 ("Q. And so your subscribers would be aware that in calculating these estimates, you're using two year comparative base effects, right? A. Yes.").

1-126. Hedgeye's network is password protected, and each employee is required to use a password to access the network. First Jones Decl. ¶ 17.

**Defendants' Response:** Undisputed that Hedgeye has a password-protected network. Defendants dispute that any of the relevant materials were stored on that network during Dale's employment.

Indeed, when Jones submitted the April 26, 2021 declaration cited as evidentiary support, he knew that Dale's models had not been stored on Hedgeye's network during Dale's Hedgeye employment. Just three days later, on April 29, Jones stated in an episode of *The Macro Show* that Hedgeye had only recently "moved all our models from our laptop to a central server." (Defs. Ex. 186, HE0286647 video at 17:19-17:23). Dale kept the Excel files on his Hedgeye-issued laptop computer, to which he alone had regular access. (FAC ¶ 38 ("Dale controlled the active source models on his desktop and no other employee had access to Hedgeye's most current versions of those models. Source models were not shared internally or externally, meaning Dale had sole access."); Jones Decl., Dkt. 8 ¶ 23 (same); Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 162-63 ("Q. And how long have these files been on the network drive? … [A.] Since we received the files back from Mr. Dale."); Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, No. 39 (claiming that "Hedgeye … lacks information sufficient" to determine whether "Hedgeye's source models were [ever] stored on Hedgeye's network while Darius Dale worked at Hedgeye")). Dale also backed up his Hedgeye Excel files to a Dropbox account "for years." (Defs. Ex. 5, Dale 2021 Dep. Tr. 110; *see also id.* Tr. 32, 126; Third Dale Decl., Dkt. 36-

1 ¶ 7 (explaining that, for "years" while he worked at Hedgeye, all of the source files "were stored on my company laptop and I used Dropbox to back them up"); Defs. Ex. 19, Parsio 30(b)(6) Dep. Tr. 81 (admitting that the files "were stored in Dropbox" while Dale was "still an employee")).

Dale's handwritten notebooks were not, and could not have been stored, on Hedgeye's password-protected electronic network. (Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, No. 41).

Hedgeye also regularly permitted its customer lists to circulate outside of its password-protected network server. Lists were saved to third-party platforms and emailed around the firm. (Defs. Ex. 19, Parsio 30(b)(6) Dep. Tr. 82-84; Defs. Ex. 43, Hedgeye's 7/5/22 Interrogatory Responses, No. 14; FAC ¶ 54; *see also, e.g.*, Defs. Ex. 9, Jones 2022 Dep. Tr. 231-234 (customer list through third party vendor accessible by most of the sales team and managing directors which could be curated to generate different lists); Defs. Ex. 90, HE0215949; Defs. Exs. 91-92, HE0388517 with attachment HE0388518 (Hedgeye Director of Sales circulating client list to Hedgeye research analyst); Defs. Exs. 93-94, HE0321691 with attachment HE0321696 (Hedgeye circulating curated customer list to outside marketing firm)).

1-127. Further, access to specific directories, folders and files is permission-based. First Jones Decl. ¶ 17.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration. Fed. R. Civ. P. 56(c)(4). Specifically, in his deposition, Jones testified that he was unaware of any "permission-based" controls in place with respect to the Excel files Hedgeye has identified as its trade secrets or its customer database. (Defs. Ex. 9,

Jones 2022 Dep. Tr. 112:15-113:10, 234-35). Thus, no response is necessary.

Subject to and without waiving that objection, Defendants dispute that any of the materials Hedgeye claims as its trade secrets were kept in "permission-based" folders. As noted, Jones, Hedgeye's Director of Research, was unable to identify any "permission-based" controls protecting the Excel files. (*See* Defs. Ex. 9, Jones 2022 Dep. Tr. 112:15-113:10). As discussed in response to Paragraph 1-126 *supra*, Dale kept the Excel files on his personal laptop and backed them up to a Dropbox folder.

Hedgeye also cannot identify any way in which Hedgeye informs its employees about who has permission to access its customer lists. (Defs. Ex. 19, Parsio 30(b)(6) Dep. Tr. 84-85; *see also* Defs. Ex. 9, Jones 2022 Dep. Tr. 234-35 (Hedgeye's Director of Research, admitting that he did not know what level of access Dale had to Hedgeye's customer database; did not know who else had a "high level of access" to that database; and did not know what limitations were placed on those with access to that database)).

1-128. Hedgeye's network drive is password protected and requires a secured VPN login to access remotely. First Jones Decl. ¶ 17.

**Defendants' Response:** Undisputed that Hedgeye has a password-protected network. Defendants dispute that any of the relevant materials were stored on that network during Dale's employment, as discussed in response to Paragraph 1-126 *supra*.

1-129. Hedgeye is not aware of any prior breach of confidentiality concerning its proprietary and confidential information. First Jones Decl. ¶ 17.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration. Fed. R. Civ. P. 56(c)(4). Specifically, Jones testified at his deposition: "I don't know that we ever, you know, we had policies in place, I don't know that

we necessarily audited where people were storing things." (Defs. Ex. 9, Jones 2022 Dep. Tr. 56:12-15). Thus, no response is necessary.

Subject to and without waiving that objection, Defendants dispute that Hedgeye did anything to ensure that its employees were actually complying with its confidentiality policies. Hedgeye's General Counsel and Chief Compliance Officer Anthony Parsio, testifying as Hedgeye's corporate designee, admitted that Hedgeye took no steps to monitor whether employees complied with the company's general confidentiality policies, such as the policy that confidential materials be stored on the company's protected network server. Hedgeye conducted no audits to determine compliance, nor did it have any monitoring procedures in place to ensure policies were being followed. (Defs. Ex. 19, Parsio 30(b)(6) Dep. Tr. 145:16-20 ("Q. Does Hedgeye or does your office conduct any audits to determine whether Hedgeye's employees are complying with Hedgeye's confidentiality policies? A. No."); 167-68 (Parsio, admitting that he is unable to identify "additional monitoring procedures" beyond the general trainings on Hedgeye's confidentiality policies); *see also* Defs. Ex. 8, Drake Dep. Tr. 70-71). Parsio was also unable to identify any instance in which Hedgeye conducted an investigation to determine whether its confidential materials had been sent outside of the firm, prior to this litigation. (Defs. Ex. 19, Parsio 30(b)(6) Dep. Tr. 150-51).

Hedgeye employees who frequently interacted with Hedgeye's purportedly valuable files were unaware of Hedgeye's policies. Christian Drake, a managing director on the Macro team, did not know if Hedgeye had explicit rules governing the sharing of confidential information. (Defs. Ex. 8, Drake Tr. 67-68). Dale himself was similarly unaware of such policies. (Defs. Ex. 5, Dale 2021 Dep. Tr. 22, 25-26, 121-122).

1-130. Pursuant to Dale's Employment Agreement, Dale agreed not to disclose confidential information, "including without limitation, financial information . . . and proprietary

80

investment and trading strategies of" Hedgeye. Jones Decl. Ex. 1.

**Defendants' Response:** Undisputed that Dale's 2010 employment agreement with Hedgeye

includes the quoted text.  That agreement speaks for itself.

1-131.  Pursuant to the Employment Agreement, Dale agreed not to compete or prepare to compete with Hedgeye during his employment. Jones Decl. Ex. 1.

**Defendants' Response:** Undisputed.

1-132.  Pursuant to the Employment Agreement, Dale agreed that all inventions, discoveries, ideas, programs, notes, charts, and other materials that he created during the course of his employment in any way related to the business were to be deemed "works made for hire" and belonged to Hedgeye. Jones Decl. Ex. 1.

**Defendants' Response:** Undisputed that Dale's 2010 employment agreement included an

"assignment of rights" provision to that effect.  That agreement speaks for itself.

1-133.  As a condition of employment, all Hedgeye employees, including Dale, are bound by Hedgeye's Code of Ethics. Jones Decl. ¶ 16.

**Defendants' Response:** Defendants object that this paragraph asserts a legal conclusion to

which no response is needed.

1-134.  Hedgeye's Code of Ethics is distributed to Dale and all employees. Jones Decl. ¶ 16.

**Defendants' Response:** Undisputed.

1-135.  Hedgeye's Code of Ethics provides that employees, including Dale, owe "a duty of loyalty to the Firm," and states that employees, including Dale, "must only use Firm confidential information for authorized purposes." Andavolu Decl. Ex. 47 (de Rham Dep. Ex. 78, also produced as HE0018744).

**Defendants' Response:** Undisputed that Hedgeye's 2020 Code of Ethics states that "Access

Persons … owe a duty of loyalty to the Firm" and that "Access Persons must only use Firm

confidential information for authorized purposes."  (Pl. Ex. 47 at 8).  That document speaks for

itself.

1-136.  Dale submitted yearly attestations certifying his compliance with Hedgeye's Code of Ethics, including on January 5, 2021 prior to his departure. First Jones Decl. Ex. 3.