# Defendants' Response to Hedgeye's Statement of Undisputed Material Facts
## Part 2 of 3

**Defendants' Response:** Undisputed that Dale submitted a yearly attestation certifying his compliance with Hedgeye's Code of Ethics on January 5, 2021, as shown in the cited exhibit.

1-137. Dale controlled the active source models on his desktop and no other employee had access to Hedgeye's most current versions of those models. Jones Decl. ¶ 23.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration. Fed. R. Civ. P. 56(c)(4). Specifically, the following exchange occurred at Jones' deposition: "Q. Okay, so you don't know where the macroeconomic models were stored while Mr. Dale was at Hedgeye? … A. No." (Defs. Ex. 9, Jones 2022 Dep. Tr. 55:24-56:5). Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that Dale stored the Excel spreadsheets he built for Hedgeye on his Hedgeye laptop and no other employee had access to those models.

1-138. Source models were not shared internally or externally, meaning Dale had sole access to them. Jones Decl. ¶ 23.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, Jones lacks personal knowledge of the matters discussed in his declaration. Fed. R. Civ. P. 56(c)(4). Thus, no response is necessary.

Defendants further object that it is unclear whether the term "source models" in this paragraph refers to the eleven specific files Hedgeye identified as its trade secret files in interrogatory responses (*see* Defs. Ex. 34, Hedgeye's 10/11/21 Interrogatory Reponses at 4; Defs. Ex. 41, Hedgeye's 4/7/22 Interrogatory Responses at 4); the two specific models it defined as "Hedgeye Source Models" in Paragraph 1-107 *supra,* which are housed in the GMRM file, or

something else.

Subject to and without waiving these objections, Defendants dispute this paragraph to the following extent: Hedgeye admits that five of the eleven files it previously identified as its trade secret files are, in fact, output models that were sent to subscribers. (Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, Nos. 55-67). A member of Hedgeye's Macro team also shared one additional file from that list, the "GIP Model Factor Exposure Backtests" file, with a Hedgeye salesperson so that it could be sent to a client. (Def. Exs. 192, HE0215773; Defs. Ex. 193, HE0215778; Defs. Ex. 194, HE0225376).

1-139. Client-facing output models were provided only under a limited license and could not be republished pursuant to Hedgeye's Service Agreement (for institutional clients), disclaimers and website Terms of Service (for retail or mass market subscribers). Jones Decl. ¶ 23.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, the statements in the declaration cited as evidentiary support are not competent evidence because they are entirely conclusory and do not include or discuss a single instance of any Service Agreement, disclaimer, or "Terms of Service."

Defendants further object that Hedgeye's reliance on Jones' declaration in lieu of the actual "Service Agreement," "disclaimers" or "Terms of Service" violates the best evidence rule in Rule 1002 of the Federal Rules of Evidence, which generally provides that "an original writing …. is required in order to prove its content." Thus, no response is necessary.

Subject to and without waiving those objections, Defendants dispute that output models were not distributed outside of Hedgeye's client base. Hedgeye itself published portions of its output files online for anyone to see. (*See, e.g.,* https://app.hedgeye.com/e/0'H/amoDvb/

quarterly-investment-outlook-q2-2018 at p. 4 (showing an image of the GIP Model Factor

Exposure Backtests.xlsx output file); Defs. Ex. 58 at 7 (Q3 2021 Macro Themes – Prepping For

The Pivot – Mid-Quarter Update, Sept. 14, 2021), previously available at

https://app.hedgeye.com/mu/he3q21macrothemesupdateversion?encodeddata=f4vO!KIXoRRr5x

gOYx8zsU/ofzcI+Etc= (visited May 12, 2023) (showing an image of the Hedgeye GIP Model

Market History Backtests file)).

**VII.    "Dale Acquired Hedgeye's Source Files By Improper Means"**

      **A.  "Expert Testimony"**

1-140.  In April of 2021, Hedgeye engaged KLDiscovery to conduct a forensic examination of Dale's company-issued Lenovo Laptop T490s with serial number PC-1CZE3B (the "Hedgeye Laptop"). Declaration of Alisha Zhang, dated April 26, 2021 (the "Zhang Decl.") ¶ 4.

**Defendants' Response:** Defendants do not dispute this paragraph for purposes of this motion.

However, Defendants object to Hedgeye's use of the Declaration of Alisha Zhang dated April

26, 2021.[5]  Hedgeye submitted this declaration in support of its motion for a temporary

restraining order and preliminary injunction.  It was perhaps appropriate in that limited context,

but not on summary judgment, for three reasons.

*First*, Hedgeye is precluded from using the declaration under Rules 26 and 37.  A witness

"retained or specially employed to provide expert testimony in the case" must submit a detailed

report containing, *inter alia*, (1) "a complete statement of all opinions the witness will express

and the basis and reasons for them," (2) "the facts or data considered by the witness in forming

---

[5] Rather than filing a separate motion to strike or *Daubert* motion, Defendants set forth their objections to Zhang's declaration (and, below, to Bastick's declaration) in this submission.  In opposing summary judgment, a "party may object that the material cited to support … a fact cannot be presented in a form that would be admissible as evidence."  Fed. R. Civ. P. 56(c)(2). "The objection functions much as an objection at trial, adjusted for the pretrial setting," and "[t]here is no need to make a separate motion to strike."  Adv. Comm. Notes, 2010 Amend.

them," (3) "the witness's qualifications, including a list of all publications authored in the previous 10 years," and (4) "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition." Fed. R. Civ. P. 26(a)(2)(B). Hedgeye never provided Defendants with these disclosures. Accordingly, Hedgeye "is not allowed to use that information or witness to supply evidence on [this] motion … or at a trial, unless the failure was substantially justified or is harmless," which it was not. Fed. R. Civ. P. 37(c)(1). As a result of Hedgeye's failure to serve an expert report—or, really, any further information about or from Zhang after this case was filed—Zhang was never deposed or otherwise made the subject of expert discovery. Furthermore, Zhang's declaration is largely conclusory and unsupported, and it therefore does not satisfy the disclosure purposes of an expert report. *See* Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). Defendants identify the conclusory statements in Zhang's declaration below, in connection with the paragraphs that cite them.

*Second*, the conclusory nature of Zhang's declaration is not merely a procedural defect— it also precludes the declaration's use as substantive evidence. "[C]onclusory" testimony is "insufficient to create a genuine issue for trial," let alone to justify summary judgment. *Patterson*, 375 F.3d at 219; *accord McKenny*, 973 F.3d at 1303 ("[C]onclusory affidavits lack probative value."). Moreover, a "court may … strike portions of an affidavit that … make generalized and conclusory statements." *Hollander*, 172 F.3d at 198; *accord, e.g.*, *Merrill Lynch*, 2007 WL 2815741, at *4; *Vantage Point*, 266 F. Supp. 3d at 654.

*Third*, Zhang's purported expert testimony is inadmissible under Federal Rule of Evidence 702. Hedgeye bears "the burden of establishing [the] admissibility" of its expert's testimony "by a preponderance of the evidence." *Choi v. Tower Rsch. Cap. LLC*, 2 F.4th 10, 20 (2d Cir. 2021). Hedgeye must "demonstrate[] to the court that it is more likely than not that,"

85

*inter alia*, "[1] the testimony is based on sufficient facts or data; [2] the testimony is the product of reliable principles and methods; and [3] the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court must "take a hard look" at the challenged testimony and "undertake a *rigorous examination* of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *In re Mirena IUS Levonorgestrel-Related Products Liability Litigation (No. II)*, 982 F.3d 113, 123 (2d Cir. 2020). Here, however, Hedgeye has provided no information about Zhang's background, experience, or other qualifications beyond the fact that she is employed as a forensic analyst. And Zhang's conclusory statements concerning the findings of her investigation—discussed further below— are precisely "the sort of *ipse dixit* connection between methodology and conclusion that [a] district court has the duty to exclude." *Nimely v. City of N.Y.*, 414 F.3d 381, 399 (2d Cir. 2005); *accord Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002); *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005).

1-141. KLDiscovery received the Hedgeye Laptop on April 5, 2021, via FedEx, tracking number 7733 7701 8451.

**Defendants' Response:** Defendants object that Hedgeye does not cite any evidence in support of this paragraph.

1-142. KLDiscovery personnel created a Bit-Stream forensic image of the Hedgeye Laptop's hard drive, which is a Western Digital SDBQNTY-512G-1001 with the serial number 8SSSS0L24775D1MY98F0MEZ, utilizing Guidance Software's EnCase. Zhang Decl. ¶ 5.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants'

86

Response to ¶ 1-140 *supra*).

In this paragraph, for instance, there is no explanation of what it means to "create[] a Bit-Stream forensic image" or to "utiliz[e] Guidance Software's EnCase."

1-143.  After the completion of the imaging process, a duplicate copy of the forensic image was created. Zhang Decl. ¶ 5.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded.  (*See* Defendants' Response to ¶ 1-140 *supra*).

1-144.  All analysis performed was done on the copies of the original forensic images. Zhang Decl. ¶ 5.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded.  (*See* Defendants' Response to ¶ 1-140 *supra*).

1-145.  The MD5 hash value for the Hedgeye Laptop's hard drive is DBE2E0FF73A6C1FE1B40A2792EFFB990. Zhang Decl. ¶ 5.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded.  (*See* Defendants' Response to ¶ 1-140 *supra*).

1-146.  A Bit-Stream Forensic Image is an exact copy of all of the data, including deleted as well as active files, all materials residing in slack space, and transactional data, that exists on the imaged media (HDD, floppy drive, USB thumb drive). Zhang Decl. ¶ 6.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

1-147. It is verified by a "hash value," that is, a number generated using a complex algorithm, so that a copy of a specific hard drive generates a unique hash value, and an examiner can tell whether the copy has been altered by reconfirming the hash value of the original against that of the Forensic Image. Zhang Decl. ¶ 6.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

1-148. A hash value is a digital fingerprint in that any digital media, even at a file level, will have a unique hash value. Zhang Decl. ¶ 6.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

1-149. All analysis performed was done so by using forensically sound practices and industry-standard tools and methodologies. Zhang Decl. ¶ 7.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

In this paragraph, for example, there is no explanation of what it means to use "forensically sound practices" or "industry-standard tools and methodologies," let alone any identification of the tools or methodologies used. We are simply expected to take Zhang's word for it, which Federal Rule of Evidence 702 does not permit.

1-150. The primary tools utilized for analysis were Guidance Software's EnCase v8.11, Magnet Forensics' Axiom 4.11.0.24063, and USB Detective v1.6.2 Professional. Zhang Decl. ¶ 7.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants'

Response to ¶ 1-140 *supra*).

1-151. KLDiscovery's analysis revealed that on Sunday, March 28, 2021, starting at 5:57 a.m., the Windows user profile "ddale" accessed 68 files and four folders on the Hedgeye Laptop. Zhang Decl. ¶ 8.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants'

Response to ¶ 1-140 *supra*).

In this paragraph, for instance, there is no explanation for the conclusion that a particular

user profile "accessed" specific files and folders. (*See also* Defendants' Response to ¶ 1-152

*infra*).

1-152. Exhibit 1 to the Zhang Declaration contains a listing of files and folders. This listing depicts the location of the files and folders as well as the time of creation date when they were last accessed. Zhang Decl. ¶ 8 & Ex. 1.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants'

Response to ¶ 1-140 *supra*).

In this paragraph, for instance, the phrase "the time of creation date when they were last

accessed" is completely unintelligible. To the extent Zhang means to suggest that she created a

listing of files and folders that shows "when they were last accessed," Zhang provides no basis

for that conclusion.  The exhibit she cites (Exhibit 1 to her declaration) contains a column that

purports to show the "Last Access Date/Time – UTC-05:00" for each file.  But Zhang does not

explain what information is recorded in that data field or why it has any probative value here.  A

quick internet search suggests that computers' "last access" dates and times are not necessarily

accurate and do not necessarily indicate activity by a human user.[6]  Zhang's failure to explain her

conclusions in any level of detail requires exclusion of her declaration.  (*See* Defendants'

Response to ¶ 1-140 *supra*).

1-153.  On Sunday, March 28, 2021, user profile "ddale" also created 18 PNG files and one Microsoft Excel (.xlsx) spreadsheet.  Zhang Decl. ¶ 9.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded.  (*See* Defendants'

Response to ¶ 1-140 *supra*).

1-154.  A PNG (Portable Network Graphics) is a file extension typically used for pictures. Zhang Decl. ¶ 9.

**Defendants' Response:** Undisputed.

1-155.  KLDiscovery visually verified the 18 PNG files, which were screenshots of data from Excel spreadsheets.  Zhang Decl. ¶ 9.

---

[6] *See, e.g.*, Troy Larsen, "An Attorney's Brief Guide to Dating (Computer File Dating That Is)," *Digital Mountain*, available at https://digitalmountain.com/newsletter/an-attorneys-brief-guide-to-dating-computer-file-dating-that-is-by-troy-larson/ ("The last access date stamp refers to just about any activity that a user or even the computer system itself might do to a file. … Antivirus, backup and other system maintenance applications will typically update file last access dates when they run."); "The (in)consistency of last access timestamps," *My DFIR Blog*, available at https://dfir.ru/2018/12/16/the-inconsistency-of-last-access-timestamps/ ("In one of my tests with Windows XP SP2 (64-bit), an updated last access timestamp of a file in a desktop folder wasn't written to a drive for 1.5 hours. … [Also,] a last access timestamp obtained from one source may be inconsistent with a last access timestamp for the same file obtained from another source.").

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

Subject to and without waiving that objection, Defendants note that the PNG files are images of charts and other output that Hedgeye publishes to subscribers and on the internet. (*See* Defs. Ex. 337 (18 PNG files listed in Zhang declaration)[7]; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 8-10 ("PNG files are images. So you might refer to them as screenshots, screen captures, image captures, of output from different models. … [O]utput files … don't contain any source material.")).

1-156. Thus, on the morning of March 28, 2021, 18 screenshots of different Excel files were created. Zhang Decl. ¶ 9. The following excerpt from Exhibit 1 shows the 18 PNG files and Microsoft Excel spreadsheet:

| File Name | Target File Created Date/Time | Path |
|---|---|---|
| CFTC Z-Score Table.png | 3/28/21 7:45 AM | C:\Users\ddale\Pictures\CFTC Z-Score Table.png |
| Style Factor Performance Table.png | 3/28/21 7:46 AM | C:\Users\ddale\Pictures\Style Factor Performance Table.png |
| NORWAY GROWTH & INFLATION.png | 3/28/21 7:32 AM | C:\Users\ddale\Pictures\GIP\NORWAY GROWTH & INFLATION.png |
| UK GROWTH & INFLATION.png | 3/28/21 7:35 AM | C:\Users\ddale\Pictures\GIP\UK GROWTH & INFLATION.png |

---

[7] HE0180145 (CFTC Z-Score Table.png), HE0180301 (Style Factor Performance Table.png), HE0180191 (NORWAY GROWTH & INFLATION.png), HE0180197 (UK GROWTH & INFLATION.png), HE0180188 (GERMANY GROWTH & INFLATION.png), HE0180184 (AUSTRALIA GROWTH & INFLATION.png), HE0180186 (CANADA GROWTH & INFLATION.png), HE0180196 (SOUTH AFRICA GROWTH & INFLATION.png), HE0180194 (SAUDI ARABIA & GROWTH & INFLATION.png), HE0180192 (INDIA GROWTH & INFLATION.png), HE0180195 (TAIWAN GROWTH & INFLATION.png), HE0180198 (SOUTH KOREA GROWTH & INFLATION.png), HE0180185 (CHINA GROWTH & INFLATION.png), HE0180190 (GLOBAL MACRO RISK MONITOR.png), HE0180187 (EM GIP MODEL SUMMARY.png), HE0180189 (G20 GIP MODEL SUMMARY.png), HE0180201 (US NOWCAST MODEL SUMMARY.png), and HE0180199 (US GIP MODEL.png).

| | | |
|---|---|---|
| GERMANY GROWTH & INFLATION.png | 3/28/21 7:31 AM | C:\Users\ddale\Pictures\GIP\GERMANY GROWTH & INFLATION.png |
| AUSTRALIA GROWTH & INFLATION.png | 3/28/21 7:30 AM | C:\Users\ddale\Pictures\GIP\AUSTRALIA GROWTH & INFLATION.png |
| CANADA GROWTH & INFLATION.png | 3/28/21 7:31 AM | C:\Users\ddale\Pictures\GIP\CANADA GROWTH & INFLATION.png |
| SOUTH AFRICA GROWTH & INFLATION.png | 3/28/21 7:33 AM | C:\Users\ddale\Pictures\GIP\SOUTH AFRICA GROWTH & INFLATION.png |
| SAUDI ARABIA & GROWTH & INFLATION.png | 3/28/21 7:33 AM | C:\Users\ddale\Pictures\GIP\SAUDI ARABIA & GROWTH & INFLATION.png |
| INDIA GROWTH & INFLATION.png | 3/28/21 7:32 AM | C:\Users\ddale\Pictures\GIP\INDIA GROWTH & INFLATION.png |
| TAIWAN GROWTH & INFLATION.png | 3/28/21 7:34 AM | C:\Users\ddale\Pictures\GIP\TAIWAN GROWTH & INFLATION.png |
| SOUTH KOREA GROWTH & INFLATION.png | 3/28/21 7:34 AM | C:\Users\ddale\Pictures\GIP\SOUTH KOREA GROWTH & INFLATION.png |
| CHINA GROWTH & INFLATION.png | 3/28/21 7:31 AM | C:\Users\ddale\Pictures\GIP\CHINA GROWTH & INFLATION.png |
| GLOBAL MACRO RISK MONITOR.png | 3/28/21 7:38 AM | C:\Users\ddale\Pictures\GIP\GLOBAL MACRO RISK MONITOR.png |
| EM GIP MODEL SUMMARY.png | 3/28/21 7:37 AM | C:\Users\ddale\Pictures\GIP\EM GIP MODEL SUMMARY.png |
| G20 GIP MODEL SUMMARY.png | 3/28/21 7:37 AM | C:\Users\ddale\Pictures\GIP\G20 GIP MODEL SUMMARY.png |
| US NOWCAST MODEL SUMMARY.png | 3/28/21 7:37 AM | C:\Users\ddale\Pictures\GIP\US NOWCAST MODEL SUMMARY.png |
| US GIP MODEL.png | 3/28/21 7:36 AM | C:\Users\ddale\Pictures\GIP\US GIP MODEL.png |
| 4Q20.xlsx | 3/28/21 6:35 AM | C:\Users\ddale\Music\iTunes (Old Laptop)\Previous iTunes Libraries\4Q20.xlsx |

Zhang Decl. ¶ 9.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

Subject to and without waiving that objection, Defendants note that Hedgeye has not alleged the file "4Q20.xlsx" is a trade secret, and that the PNG files are images of charts and other output that Hedgeye publishes to subscribers and on the internet. (*See* Defs. Ex. 337 (18

PNG files listed in Zhang declaration)[8]; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 8-10 ("PNG files are images. So you might refer to them as screenshots, screen captures, image captures, of output from different models. … [O]utput files … don't contain any source material.")).

1-157. User profile "ddale" cleared the Chrome web browser history on the Hedgeye Laptop on Sunday, March 28, 2021, at 8:33 a.m. Zhang Decl. ¶ 10.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

In this paragraph, for instance, Zhang does not provide any basis for her conclusion that this user profile "cleared" the browser history, or that it happened at a particular date and time.

1-158. Recovered web browser history from the Hedgeye Laptop shows that Dropbox was used. Zhang Decl. ¶ 11.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

---

[8] HE0180145 (CFTC Z-Score Table.png), HE0180301 (Style Factor Performance Table.png), HE0180191 (NORWAY GROWTH & INFLATION.png), HE0180197 (UK GROWTH & INFLATION.png), HE0180188 (GERMANY GROWTH & INFLATION.png), HE0180184 (AUSTRALIA GROWTH & INFLATION.png), HE0180186 (CANADA GROWTH & INFLATION.png), HE0180196 (SOUTH AFRICA GROWTH & INFLATION.png), HE0180194 (SAUDI ARABIA & GROWTH & INFLATION.png), HE0180192 (INDIA GROWTH & INFLATION.png), HE0180195 (TAIWAN GROWTH & INFLATION.png), HE0180198 (SOUTH KOREA GROWTH & INFLATION.png), HE0180185 (CHINA GROWTH & INFLATION.png), HE0180190 (GLOBAL MACRO RISK MONITOR.png), HE0180187 (EM GIP MODEL SUMMARY.png), HE0180189 (G20 GIP MODEL SUMMARY.png), HE0180201 (US NOWCAST MODEL SUMMARY.png), and HE0180199 (US GIP MODEL.png).

In this paragraph, for instance, there is no explanation of how Zhang "recovered" any of the web browser history that was supposedly "cleared." (*See* ¶ 1-157 *supra*).

1-159. Dropbox is a Cloud Repository that is used to save data to a device on the Internet and can be accessed from a different device at a later time. Zhang Decl. ¶ 11.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

Subject to and without waiving that objection, Defendants do not dispute that Dropbox is a service that allows a person to save data from a device to an online repository, and that the data can be accessed from a different device at a later time.

1-160. When a folder or file is interacted with on the Dropbox website the folder or file can be seen in the URL. Zhang Decl. ¶ 11.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

1-161. The following table contains the Dropbox URLs accessed. Zhang Decl. ¶ 11. Some of the folders and files include:

| URL | Date/Time (EST/EDT) |
|---|---|
| https://www.dropbox.com/home/Vault?preview=Budget.xlsx | 3/24/21 6:19 PM |
| https://www.dropbox.com/home/Vault?preview=PRICE+VOLUME+VOLATILITY.xlsx | 3/24/21 6:19 PM |
| https://www.dropbox.com/home/GIP | 3/23/21 8:43 AM |
| https://www.dropbox.com/home/Backtests | 3/23/21 8:43 AM |
| https://www.dropbox.com/home/3Q20 | 10/27/20 6:50 PM |
| https://www.dropbox.com/home/Excel/Customers | 10/21/20 9:47 AM |
| https://www.dropbox.com/home/Excel/Macro%20Tools | 8/2/19 10:47 AM |

**Defendants' Response:** Defendants object that the statements in this paragraph are not

94

supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants'

Response to ¶ 1-140 *supra*).

1-162. Windows user profile "ddale" also accessed files and folders with the same name as the above entries on the Hedgeye Laptop between March 23 and March 28, 2021. Zhang Decl. ¶ 12.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants'

Response to ¶ 1-140 *supra*).

In this paragraph, for instance, there is no explanation for the conclusion that a particular

user profile "accessed" specific files and folders. (*See also* Defendants' Response to ¶ 1-163

*infra*).

1-163. The following table shows the files and folders that were accessed from the Hedgeye Laptop:

| File Name | Last Access (EST/EDT) | Path |
| --- | --- | --- |
| Backtests | 3/28/21 8:00 AM | C:\Users\ddale\Pictures\Backtests |
| Macro Tools | 3/28/21 6:46 AM | C:\Users\ddale\Documents\Excel\Macro Tools |
| GIP | 3/25/21 7:27 AM | C:\Users\ddale\Pictures\GIP |
| Budget.xlsx | 3/24/21 6:20 PM | C:\Users\ddale\Downloads\Budget.xlsx |
| PRICE VOLUME VOLATILITY.xlsx | 3/24/21 4:10 PM | C:\Users\ddale\Documents\Excel\Macro Tools\PRICE VOLUME VOLATILITY.xlsx |
| Budget.xlsx | 3/24/21 10:07 AM | C:\Users\ddale\Documents\Excel\Macro Tools\Budget.xlsx |
| Customers | 3/23/21 11:22 AM | C:\Users\ddale\Documents\Excel\Customers |
| 3Q20.xlsx | 9/28/20 10:15 AM | C:\Users\ddale\Documents\Excel\Macro Tools\3Q20.xlsx |
| PRICE VOLUME VOLATILITY.xlsx | 6/15/20 9:28 PM | C:\Users\ddale\Desktop\PRICE VOLUME VOLATILITY.xlsx |

Zhang Decl. ¶ 12.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

In this paragraph, for instance, Zhang provides no basis for her conclusion that particular files and folders "were accessed" at particular times. Her table contains a column that purports to show the "Last Access (EST/EDT)" for each file and folder. But Zhang does not explain what information is recorded in that data field or why it has any probative value here. A quick internet search suggests that computers' "last access" dates and times are not necessarily accurate and do not necessarily indicate activity by a human user.[9] Zhang's failure to explain her conclusions in any level of detail requires exclusion of her declaration. (*See* Defendants' Response to ¶ 1-140 *supra*).

1-164. "Backtests," "Macro Tools," "GIP," and "Customers" are folders, each containing multiple files. Zhang Decl. ¶ 13.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

1-165. The "Macro Tools" folder contains 30 Excel files. Zhang Decl. Ex. 2.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

---

[9] *See, e.g.*, Troy Larsen, "An Attorney's Brief Guide to Dating (Computer File Dating That Is)," *Digital Mountain*, available at https://digitalmountain.com/newsletter/an-attorneys-brief-guide-to-dating-computer-file-dating-that-is-by-troy-larson/ ("The last access date stamp refers to just about any activity that a user or even the computer system itself might do to a file. … Antivirus, backup and other system maintenance applications will typically update file last access dates when they run."); "The (in)consistency of last access timestamps," *My DFIR Blog*, available at https://dfir.ru/2018/12/16/the-inconsistency-of-last-access-timestamps/ ("In one of my tests with Windows XP SP2 (64-bit), an updated last access timestamp of a file in a desktop folder wasn't written to a drive for 1.5 hours. … [Also,] a last access timestamp obtained from one source may be inconsistent with a last access timestamp for the same file obtained from another source.").

supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded.  (*See* Defendants'

Response to ¶ 1-140 *supra*).

1-166.  The "GIP" folder contains 3 Excel files and 18 PNG files.  Zhang Decl. Ex. 3.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded.  (*See* Defendants'

Response to ¶ 1-140 *supra*).

1-167.  The "Backtests" folder contains 3 PNG files and 12 Excel files.  Zhang Decl. Ex. 4.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded.  (*See* Defendants'

Response to ¶ 1-140 *supra*).

1-168.  The "Customers" folder contains 3 Excel files, 2 PDF files, and 1 PNG file. Zhang Decl. Ex. 5.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded.  (*See* Defendants'

Response to ¶ 1-140 *supra*).

1-169.  In addition to several separate Excel files and folders that were interacted with in Dropbox, files and folders with the same name were also interacted with from the Hedgeye Laptop. Zhang Decl. ¶ 13.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded.  (*See* Defendants'

Response to ¶ 1-140 *supra*).

1-170. KLDiscovery located a file with the name "PRICE VOLUME VOLATILITY.xlsx" in two locations in a Volume Shadow Copy. Zhang Decl. ¶ 14.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

1-171. A Volume Shadow Copy is a backup of the file system and is used to recover files that may be lost or corrupt due to a system crash. Zhang Decl. ¶ 14.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

1-172. This Volume Shadow Copy was created on March 22, 2021 at 5:26 PM. Zhang Decl. ¶ 14.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

1-173. "PRICE VOLUME VOLATILITY.xlsx" was located at "C:\Users\ddale\Documents\Excel\Macro Tools\" when it was accessed on March 24, 2021. Zhang Decl. ¶ 14.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

98

1-174. This is consistent with this file being deleted or renamed and modified sometime between March 24, 2021 and March 28, 2021. Zhang Decl. ¶ 14.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants'

Response to ¶ 1-140 *supra*).

Defendants further note that Zhang's carefully worded opinion that certain evidence is

"consistent with" deletion or renaming is not an opinion that those acts did, in fact, occur.

1-175. "PRICE VOLUME VOLATILITY.xlsx" was also located at "C:\Users\ddale\Documents\Excel\" within the Volume Shadow Copy. Zhang Decl. ¶ 14.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants'

Response to ¶ 1-140 *supra*).

1-176. This is consistent with this file being deleted or renamed and modified sometime after March 24, 2021. Zhang Decl. ¶ 14.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants'

Response to ¶ 1-140 *supra*).

Defendants further note that Zhang's carefully worded opinion that certain evidence is

"consistent with" deletion or renaming is not an opinion that those acts did, in fact, occur.

1-177. A file named "PRICE VOLUME VOLATILITY.xlsx" can also be seen in the Dropbox URL on March 24, 2021. Zhang Decl. ¶ 14.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

1-178. Windows user profile "ddale" also accessed three PNG files depicted in the table below on March 23, 2021. Zhang Decl. ¶ 15.

| File Name | Last Access Date/Time | Path |
|---|---|---|
| Trend Open Rates.png | 3/23/21 10:05 AM | C:\Users\ddale\Pictures\Trend Open Rates.png |
| March 8th Open Summary.png | 3/23/21 10:03 AM | C:\Users\ddale\Pictures\March 8th Open Summary.png |
| 30-day Open Rates.png | 3/23/21 10:02 AM | C:\Users\ddale\Pictures\30-day Open Rates.png |

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

In this paragraph, for instance, Zhang provides no basis for her conclusion that particular files were "accessed" at particular times. Her table contains a column that purports to show the "Last Access Date/Time" for each file. But Zhang does not explain what information is recorded in that data field or why it has any probative value here. A quick internet search suggests that computers' "last access" dates and times are not necessarily accurate and do not necessarily indicate activity by a human user.[10] Zhang's failure to explain her conclusions in any level of

---

[10] *See, e.g.*, Troy Larsen, "An Attorney's Brief Guide to Dating (Computer File Dating That Is)," *Digital Mountain*, available at https://digitalmountain.com/newsletter/an-attorneys-brief-guide-to-dating-computer-file-dating-that-is-by-troy-larson/ ("The last access date stamp refers to just about any activity that a user or even the computer system itself might do to a file. … Antivirus, backup and other system maintenance applications will typically update file last access dates when they run."); "The (in)consistency of last access timestamps," *My DFIR Blog*, available at https://dfir.ru/2018/12/16/the-inconsistency-of-last-access-timestamps/ ("In one of my tests with Windows XP SP2 (64-bit), an updated last access timestamp of a file in a desktop folder wasn't written to a drive for 1.5 hours. … [Also,] a last access timestamp obtained from one source may be inconsistent with a last access timestamp for the same file obtained from another source.").

detail requires exclusion of her declaration. (*See* Defendants' Response to ¶ 1-140 *supra*).

1-179. A search for these file names on the laptop resulted in no hits. Zhang Decl. ¶ 15. This is consistent with these files being renamed or deleted and overwritten.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants'

Response to ¶ 1-140 *supra*).

Defendants further note that Zhang's carefully worded opinion that certain evidence is

"consistent with" deletion or renaming is not an opinion that those acts did, in fact, occur.

### B. "Dale's Admissions"

1-180. In March and April of 2021, Dale had a personal Dropbox account with the user name darius.dale@gmail.com. Andavolu Decl. Ex. 4 (First Dale Dep. Tr. at 65:15-18).

**Defendants' Response:** Defendants do not dispute that Dale had been using this Dropbox

account "for years," including in March and April of 2021. (Defs. Ex. 5, Dale 2021 Dep. Tr.

65:15-18, 110:6-15).

1-181. Dale admits that he took files from his Hedgeye Laptop and made copies of them into his personal Dropbox. Andavolu Decl. Ex. 4 (First Dale Dep. Tr. at 85:16-22).

**Defendants' Response:** Defendants do not dispute that Dale made such copies "for years" and

continued up to the last day of his employment at Hedgeye. (Defs. Ex. 5, Dale 2021 Dep. Tr.

85:16-22, 110:6-15, 267:17-269:11).

1-182. Dale admits that he then downloaded "two or three" files from his personal Dropbox to his personal computer (the "Personal Laptop"). Andavolu Decl. Ex. 4 (First Dale Dep. Tr. at 86:4-16).

**Defendants' Response:** Defendants do not dispute that Dale downloaded a few files from his

personal Dropbox to his personal laptop in April 2021. (Defs. Ex. 5, Dale 2021 Dep. Tr. 86:4-

87:6)).

101

1-183.  Dale admits that he then opened the files he had downloaded from Dropbox on his Personal Laptop. Andavolu Decl. Ex. 4 (First Dale Dep. Tr. at 86:12-16).

**Defendants' Response:** Defendants do not dispute that Dale opened Hedgeye files that he had downloaded from Dropbox to his personal laptop.  Defendants dispute the implication that this constituted misappropriation under the trade secret laws.  Dale testified that when building his own models for 42 Macro in April 2021, he opened certain of these Excel files a few times to "double-check" that he had not "inadvertently" included "anything associated with Hedgeye," and to minimize any "overlap" between the models.  (Defs. Ex. 5, Dale 2021 Dep. Tr. 84, 131-35, 143-45, 150-54, 341-46, 354).  "[T]here was no extensive activity in and around Hedgeye's source files," because the purpose "was to verify."  (*Id.* Tr. 146).  For instance, "[a]fter [he] had chosen [his] inputs" for 42 Macro's model, he checked the "30 data points" in Hedgeye's model "to make sure there wasn't a substantial degree of overlap."  (*Id.* Tr. 341-43).  Dale worked long hours over many weeks to build 42 Macro's models.  (*Id.* Tr. 322-40; Defs. Ex. 27, Britven Initial Report ¶ 78 (estimating Dale "spent a total of 756 hours" on these models)).  He built them using "publicly available information" and "proven quantitative techniques"—not by taking material from Hedgeye's files.  (Defs. Ex. 5, Dale 2021 Dep. Tr. 347-49, 353-54; *see also, e.g.*, Second Dale Decl., Dkt. 28-1 ¶¶ 4, 6-9, 17, 20; Third Dale Decl., Dkt. 36-1 ¶¶ 3-4, 11; Defs. Ex. 6, Dale 2022 Dep. Tr. 90).  The sole exception is that Dale "copied partial lists of Bloomberg ticker symbols," and, in some instances, rudimentary formulas, from Hedgeye files into his 42 Macro files.  (Defs. Ex. 32, Dale 7/27/21 Responses to Interrogatories, No. 7).  These "standard industry formulas" included the "Bloomberg formula to pull" certain metrics from Bloomberg, as well as "simple calculation[s]" for things like percentage changes and moving averages. (Defs. Ex. 6, Dale 2022 Dep. Tr. 119-25, 129-31, 133-35).  These were "limited materials" and "miniscule in the context of the models."  (*Id.* Tr. 163-64).  Dale did this to "save [him]self a few

hours of work" on tedious tasks, such as gathering ticker symbols from Bloomberg. (*Id.* Tr. 124, 131-32). And in all other respects, Dale built his models "based on his knowledge of proven techniques employed throughout the industry and using designs, features, and formulas that he independently developed." (Defs. Ex. 32, Dale 7/27/21 Responses to Interrogatories, No. 7).

1-184. Dale admits that he created a file named "Global Macro Risk Monitor.xlsx" in the course of his work at Hedgeye. Andavolu Decl. Ex. 21 (Dale Jan. 9, 2023 Resp. to RFAs, Resp. No. 85).

**Defendants' Response:** Defendants do not dispute that Dale created a file named "Global Macro Risk Monitor.xlsx" in the course of his work at Hedgeye.

Defendants dispute that this file is a trade secret. (*See, e.g.*, Defendants' Responses to §§ V-VI *supra*).

1-185. Dale admits that a file named "Global Macro Risk Monitor.xlsx" is one of Hedgeye's source models. Andavolu Decl. Ex. 21 (Dale Jan. 9, 2023 Resp. to RFAs, Resp. No. 85).

**Defendants' Response:** Defendants do not dispute that the file named "Global Macro Risk Monitor.xlsx" is a source model, as opposed to an output file.

Defendants dispute that this file is a trade secret. (*See, e.g.*, Defendants' Responses to §§ V-VI *supra*).

1-186. In fact, Dale admits that "the 'Global Macro Risk Monitor' source file is the primary econometric forecasting tool I built and maintained while employed at Hedgeye." Declaration of Darius Dale, dated May 3, 2021, (the "Dale Decl."), ¶ 17.

**Defendants' Response:** Defendants do not dispute that Dale has stated that "the 'Global Macro Risk Monitor' source file is the primary econometric forecasting tool I built and maintained while employed at Hedgeye." (Second Dale Decl., Dkt. 28-1 ¶ 8 (May 3, 2021)).

Defendants dispute that this file is a trade secret. (*See, e.g.*, Defendants' Responses to §§ V-VI *supra*). Defendants further note that at or around the time he made the statement quoted above, Dale also stated that the GMRM file "w[as] built by me, with no supervision, based on …

103

information from publicly available sources," and that "even the two publicly available models (Atlanta Fed GDP Nowcast Model and the New York Fed Nowcast Model) that directly influenced my design and development of [this file] are still more advanced" than it is. (Third Dale Decl., Dkt. 36-1 ¶ 3 (May 18, 2021)).

1-187. Dale admits that he copied a file named "Global Macro Risk Monitor.xlsx" from his Hedgeye Laptop to his personal Dropbox account and, at some point thereafter, from his personal Dropbox account to his Personal Laptop. Andavolu Decl. Ex. 21 (Dale Jan. 9, 2023 Resp. to RFAs, Resp. No. 88).

**Defendants' Response:** Undisputed.

1-188. Dale admits that he created a file named "US INFLATION Model.xlsx" in the course of his work at Hedgeye. Andavolu Decl. Ex. 21 (Dale Jan. 9, 2023 Resp. to RFAs, Resp. No. 89).

**Defendants' Response:** Defendants do not dispute that Dale created a file named "US INFLATION Model.xlsx" in the course of his work at Hedgeye.

Defendants dispute that this file is a trade secret. (*See, e.g.*, Defendants' Responses to § VI *supra*). Defense expert Professor Bianchi reviewed Hedgeye's Excel files and concluded that they "consist of standard elements generally known in the industry" and do "not have any independent economic value." (Bianchi Decl. Ex. 1, Bianchi Initial Report ¶¶ 9, 11; *see also id.* ¶¶ 4-6, 35 & App'x A). Moreover, Hedgeye's primary forecast of inflation is contained in its GMRM model, and the "U.S. INFLATION Model.xlsx" file merely "provides a second separate estimate for just U.S. inflation." (Defs. Ex. 15, Malesevic Dep. Tr. 30-31). ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████ Defs. Ex. 15, Malesevic Dep. Tr. 33; Jones Decl., Dkt. 8 ¶ 6; Defs. Ex. 16, McCullough 2022 Dep. Tr. 83, 132; Defs. Ex. 20, Steiner

30(b)(6) Dep. Tr. 128).

1-189.  Dale admits that a file named "US INFLATION Model.xlsx" is one of Hedgeye's source models. Andavolu Decl. Ex. 21 (Dale Jan. 9, 2023 Resp. to RFAs, Resp. No. 90).

**Defendants' Response:** Defendants do not dispute that the file named "US INFLATION

Model.xlsx" is a source model, as opposed to an output file.

Defendants dispute that this file is a trade secret.  (*See* Defendants' Response to ¶ 1-188

*supra*).

1-190.  Dale admits that he copied a file named "US INFLATION Model.xlsx" from his Hedgeye Laptop to his personal Dropbox account. Andavolu Decl. Ex. 21 (Dale Jan. 9, 2023 Resp. to RFAs, Resp. No. 92).

**Defendants' Response:** Undisputed.

1-191.  Dale admits that he may well have copied a file named "US INFLATION Model.xlsx" from his personal Dropbox account to his Personal Laptop. Andavolu Decl. Ex. 21 (Dale Jan. 9, 2023 Resp. to RFAs, Resp. No. 92).

**Defendants' Response:** Defendants do not dispute that Dale admitted he "may well have copied

that file from his personal Dropbox account to his personal laptop," but he was "unable to admit

or deny" with any certainty that he had done so "despite having made reasonable inquiry."

(Andavolu Decl. Ex. 21 (Dale Jan. 9, 2023 Resp. to RFAs, Resp. No. 92)).

1-192.  Dale cannot verify whether he copied a file named "US INFLATION Model.xlsx" from his personal Dropbox account to his Personal Laptop, because he deleted all Hedgeye files from his Personal Laptop before it could be forensically examined. Andavolu Decl. Ex. 2 (First Dale Dep. Tr. 146:2 – 147:3).

**Defendants' Response:** Defendants do not dispute that Dale deleted Hedgeye files from his

personal laptop based on his mistaken belief that this was the appropriate way to eliminate his

own access to such materials after having provided copies to his then counsel.  (Defs. Ex. 5, Dale

2021 Dep. Tr. 85-88, 103, 106, 146-47).

Defendants dispute that the deletions have made it impossible to verify whether Dale

copied a file named "US INFLATION Model.xlsx" from his Dropbox account to his personal

105

laptop.  Hedgeye retained an expert who performed a forensic examination of Dale's personal laptop.  (Defs. Ex. 338, Intrepid Forensic Report).  The expert purports to have found evidence of certain files on the laptop (including in its "Recycle Bin"), and at his earlier deposition, Dale identified the very same files when asked which files he had downloaded to the laptop.  (Defs. Ex. 339, Selected tabs from Exhibit B to Intrepid forensic report; Defs. Ex. 5, Dale 2021 Dep. Tr. 148).  The expert did not find any evidence of the "US INFLATION Model.xlsx" file on the laptop.  (*See id.*).

1-193.  Dale admits that he created a file named "US GROWTH Model.xlsx" in the course of his work at Hedgeye. Andavolu Decl. Ex. 21 (Dale Jan. 9, 2023 Resp. to RFAs, Resp. No. 93).

**Defendants' Response:** Defendants do not dispute that Dale created a file named "US GROWTH Model.xlsx" in the course of his work at Hedgeye.

Defendants dispute that this file is a trade secret.  (*See, e.g.*, Defendants' Responses to § VI *supra*).  Defense expert Professor Bianchi reviewed Hedgeye's Excel files and concluded that they "consist of standard elements generally known in the industry" and do "not have any independent economic value."  (Bianchi Decl. Ex. 1, Bianchi Initial Report ¶¶ 9, 11; *see also id.* ¶¶ 4-6, 35 & App'x A).  Moreover, there is no evidence that Hedgeye uses the "US GROWTH.xlsx" file or that it contributes to Hedgeye's research.  (Defs. Ex. 15, Malesevic Dep. Tr. 34-35 ("Q. Does this file do anything other than pulling data from Bloomberg and transforming the data in any way?  A. I don't interact much with this file, so I don't know. Q. Who interacts more with the file than you? … A. I don't know."); *id.* Tr. 112-13 ("Q. The next [file is] 'U.S. growth model.[xlsx,]' and we also discussed this earlier, right?  A. Yes. Q. You work with this file ever?  A. Not really. … Q. When was the last time you've opened it? A. I cannot recall.  Q. Last year?  A. I'm not sure.")).

1-194.  Dale admits that a file named "US GROWTH Model.xlsx" is one of Hedgeye's

106

source models. Andavolu Decl. Ex. 21 (Dale Jan. 9, 2023 Resp. to RFAs, Resp. No. 94).

**Defendants' Response:** Defendants do not dispute that the file named "US GROWTH

Model.xlsx" is a source model, as opposed to an output file.

Defendants dispute that this file is a trade secret. (*See* Defendants' Response to ¶ 1-193

*supra*).

1-195.  Dale admits that he copied a file named "US GROWTH Model.xlsx" from his Hedgeye Laptop to his personal Dropbox account. Andavolu Decl. Ex. 21 (Dale Jan. 9, 2023 Resp. to RFAs, Resp. No. 96).

**Defendants' Response:** Undisputed.

1-196.  Dale admits that he may well have copied a file named "US GROWTH Model.xlsx" from his personal Dropbox account to his Personal Laptop. Andavolu Decl. Ex. 21 (Dale Jan. 9, 2023 Resp. to RFAs, Resp. No. 96).

**Defendants' Response:** Defendants do not dispute that Dale admitted he "may well have copied

that file from his personal Dropbox account to his personal laptop," but he was "unable to admit

or deny" with any certainty that he had done so "despite having made reasonable inquiry."

(Andavolu Decl. Ex. 21 (Dale Jan. 9, 2023 Resp. to RFAs, Resp. No. 96)).

1-197.  Dale cannot verify whether he copied a file named "US GROWTH Model.xlsx" from his personal Dropbox account to his Personal Laptop, because he deleted all Hedgeye files from his Personal Laptop before it could be forensically examined. Andavolu Decl. Ex. 2 (First Dale Dep. Tr. 146:2 – 147:3).

**Defendants' Response:** Defendants do not dispute that Dale deleted Hedgeye files from his

personal laptop based on his mistaken belief that this was the appropriate way to eliminate his

own access to such materials after having provided copies to his then counsel. (Defs. Ex. 5, Dale

2021 Dep. Tr. 85-88, 103, 106, 146-47).

Defendants dispute that the deletions have made it impossible to verify whether Dale

copied a file named "US GROWTH Model.xlsx" from his Dropbox account to his personal

laptop. Hedgeye retained an expert who performed a forensic examination of Dale's personal

107

laptop. (Defs. Ex. 338, Intrepid Forensic Report). The expert purports to have found evidence

of certain files on the laptop (including in its "Recycle Bin"), and at his earlier deposition, Darius

identified the very same files when asked which files he had downloaded to the laptop. (Defs.

Ex. 339, Selected tabs from Exhibit B to Intrepid forensic report; Defs. Ex. 5, Dale 2021 Dep. Tr.

148). The expert did not find any evidence of the "US GROWTH Model.xlsx" file on the laptop.

(*See id.*).

1-198. Macroeconomic research analyzes the causes and effects of inflation, price levels, national income, and unemployment. Declaration of Daniel Lacalle, dated October 11, 2024 (the "Lacalle Decl."), Ex. 1 at 7.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule

56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for

summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702.

Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that

macroeconomic research can analyze, among other things, the causes and effects of inflation,

price levels, national income, and unemployment.

1-199. Dale admits that a file named "PRICE VOLUME VOLATILITY.xlsx" was a model he built while employed at Hedgeye. Andavolu Decl. Ex. 43 (Second Dale Dep. Tr. 25:12-26:12).

**Defendants' Response:** Defendants do not dispute that Dale testified that he built the "PRICE

VOLUME VOLATILITY.xlsx" file "while employed by Hedgeye."

Defendants dispute that the "PRICE VOLUME VOLATILITY.xlsx" file had any

meaningful connection to Hedgeye's work. Dale testified that he created this file "to trade [his]

personal account," and that "[b]uilding this particular model" was not "part of [his] job duties for

Hedgeye." (Defs. Ex. 6, Dale 2022 Dep. Tr. 25-26). Before this litigation began, no one at

Hedgeye was even aware this file existed. (Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, Nos. 30-31; Defs. Ex. 6, Dale 2022 Dep. Tr. 27:2-4; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 19:9-12). The members of Hedgeye's current Macro Team do not know what the file is or does. (Defs. Ex. 15, Malesevic Dep. Tr. 113:24-14:11; Defs. Ex. 8, Drake Dep. Tr. 62:20-22; Defs. Ex. 9, Jones 2022 Dep. Tr. 115:11-16). And Hedgeye has not used the file since Dale returned it to the company. (Defs. Ex. 15, Malesevic Dep. Tr. 113-14; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 16, 19; Defs. Ex. 9, Jones 2022 Dep. Tr. 114-15). Hedgeye's assertions at the outset of the case that the "PRICE VOLUME VOLATILITY.xlsx" was a "critical file" and source model were entirely fabricated. (*Compare* Jones Decl., Dkt. 8 ¶ 26, *with* Defs. Ex. 9, Jones 2022 Dep. Tr. 123-24).

Defendants also dispute that this file is a trade secret. (*See, e.g.*, Defendants' Responses to § VI *supra*). In addition to the reasons given in the preceding paragraph, defense expert Professor Bianchi has opined that the "PRICE VOLUME VOLATILITY.xslx" file does not contain anything beyond "basic statistics," has no "substantial calculation[s]," and is unrelated to any "macroeconomic nowcast or forecast." (Bianchi Decl. Ex. 1, Bianchi Initial Report ¶ 35). Professor Bianchi has opined that the Excel files that Hedgeye claims as alleged trade secrets, including this file, "consist of standard elements generally known in the industry" and do "not have any independent economic value." (*Id.* ¶¶ 9, 11; *see also id.* ¶¶ 4-6, 35 & App'x A). Hedgeye has submitted no expert testimony whatsoever concerning this file, let alone any testimony that rebuts Professor Bianchi's conclusion.

1-200. Dale admits that he accessed a file named "PRICE VOLUME VOLATILITY.xlsx" in his personal Dropbox account before his departure from Hedgeye. Andavolu Decl. Ex. 21 (Dale Jan. 9, 2023 Resp. to RFAs, Resp. No. 77).

**Defendants' Response:** Undisputed.

1-201. Dale admits that he saved a file named "PRICE VOLUME VOLATILITY.xlsx"

109

on his Personal Laptop at some point in time after March 25, 2021, when he acquired the Personal Laptop. Andavolu Decl. Ex. 21 (Dale Jan. 9, 2023 Resp. to RFAs, Resp. No. 75).

**Defendants' Response:** Undisputed.

## VIII.   "Defendants Disclosed Hedgeye Trade Secrets and Confidential Information"

1-202.   Lamar knew that Terman was communicating with Dale around the time of March 22, 2021. Andavolu Decl. Ex. 6 (Lamar Dep. Tr. 73:10-15).

**Defendants' Response:** Undisputed that Lamar was aware that Terman had a conversation with Dale around March 22, 2021.  Defendants dispute that Lamar had any basis to believe that these conversations concerned Hedgeye "trade secrets or confidential information."  The cited deposition testimony does not remotely support that suggestion.  Lamar testified that he understood Terman "reached out to [Dale] to check in" and that during that conversation, Dale told Terman he "just quit" Hedgeye.  (Defs. Ex. 1, Lamar Dep. Tr. 73).

1-203.   Dale admits that he sent an email containing a screenshot of a portion of the file named "PRICE VOLUME VOLATILITY.xlsx" on or about March 22, 2021. Andavolu Decl. Ex. 21 (Dale Jan. 9, 2023 Resp. to RFAs, Resp. No. 76).

**Defendants' Response:**  Undisputed that Dale sent an email containing a screenshot of a portion of a file named "PRICE VOLUME VOLATILITY.xlsx" on or about March 22, 2021. Defendants dispute that the screenshot disclosed the inner workings of the file.  The screenshot is almost illegible and does not show the formulas embedded in the file.  (Defs. Ex. 139, DALE0157181).  Dale's purpose was merely to show that his talents and interests were not limited to macroeconomic forecasting.  (Defs. Ex. 6, Dale 2022 Dep. Tr. 26-27).  Defendants further dispute that the file is a trade secret.  (*See* Defendants' Response to ¶ 1-199 *supra*).

1-204.   That email was sent to Nadine Terman. Andavolu Decl. Ex. 48 (Terman Dep. Ex. 89, also produced as DALE157181).

**Defendants' Response:** Undisputed.

1-205.   That email stated "Please keep this and our conversation under wraps for now."

110

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that Dale sent an email including the quoted text. That document speaks for itself.

1-206. Nadine Terman forwarded that email to Steven Lamar. Andavolu Decl. Ex. 6 (Lamar Dep. Tr. 71:19-72:3).

**Defendants' Response:** Undisputed that Terman forwarded an email with a blurry screenshot of the "PRICE VOLUME VOLATILITY.xlsx" file to Lamar. Defendants dispute that Lamar solicited the file or engaged with it in any way. Lamar is not versed in the details of Excel economic modeling and thus the screenshot, as such, "i[s] not anything I could do anything with. … I wouldn't know what to do with it. Wouldn't even waste time trying to figure out what it is." (Defs. Ex. 1, Lamar Dep. Tr. 71-72).

1-207. On March 22, 2021, Dale emailed Terman a photo of pages in a notebook Dale kept while working at Hedgeye containing the "Sequence/Impulse Macro" and writing "I see tremendous value in leveraging each other's resources to do this the RIGHT way. This could and should be the future of finance." Andavolu Decl. Ex. 49 (Terman Dep. Ex. 90, also produced as DALE0157182).

**Defendants' Response:** Undisputed that Dale sent Terman an email on March 22, 2021, containing a largely illegible screenshot of two pages from a notebook Dale kept while working at Hedgeye and an email containing the quoted language.

Defendants dispute that Terman was aware of the notebook's content or that it was a Hedgeye notebook. (Terman 56.1 ¶ 3-38).

Defendants do not dispute that one of the notebook pages appears to contain the phrase "Sequence / Impulse Macro." By referring to "*the* 'Sequence/Impulse Macro,'" Hedgeye's statement, however, suggests this refers to some specific process. It cites no evidence

111

identifying this alleged "macro," nor has it produced any. Accordingly, to the extent Hedgeye

implies that the phrase "Sequence / Impulse Macro" refers to anything of significance,

Defendants object that implication is not supported by competent or admissible evidence. Fed.

R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

1-208. On March 22, 2021, Terman introduced Dale to Lamar. Dale sent an email to Lamar, copying Terman, that included an Excel file called US_&_Global_GIP_Models_&_Nowcast_Summaries.XLSX. Andavolu Decl. Ex. 6 (Lamar Dep. Tr. 87:24-89:5); Andavolu Decl. Ex. 50 (Lamar Dep. Ex. 92, also produced as DALE0154623).

**Defendants' Response:** Undisputed that Terman introduced Dale to Lamar on March 22, 2021

and that Dale sent an email to Lamar, copying Terman, including the referenced Excel file.

Defendants dispute the implication that the Excel file contained anything sensitive or

confidential. On the contrary, the record shows that this Excel file was part of Dale's Hedgeye

morning note, a research publication routinely shared with Hedgeye subscribers including, at that

time, Solstein. (*See* Defs. Ex. 311, SOLS00010426). Hedgeye admits that this file was

published to subscribers and that it is not a trade secret. (Defs. Ex. 45, Hedgeye's 1/9/23 RFA

Responses, Nos. 55-56, 68-69). Defendants note that the actual name of the Excel file is

"Hedgeye_US_&_Global_GIP_Models_&_Nowcast_Summaries.xlsx."

1-209. Terman then forwarded Dale's email to Lamar, with the message "He is motivated." Andavolu Decl. Ex. 49 (Terman Dep. Ex. 90, also produced as DALE0157182).

**Defendants' Response:** Undisputed that Terman sent an email to Lamar containing the quoted

language. Defendants dispute that the email cited as Plaintiff's Exhibit 49 forwarded the email

contained in Plaintiff's Exhibit 50 and referenced in Paragraph 1-208 *supra*.

1-210. Lamar understood the words "He is motivated" to mean that Dale might want to work with them. Andavolu Decl. Ex. 6 (Lamar Dep. Tr. 79:5-15).

**Defendants' Response:** Undisputed that Lamar understood those words to mean Dale might

want to work with him and Terman.

112

1-211. Lamar thought about making Dale a partner. Andavolu Decl. Ex. 6 (Lamar Dep. Tr. 79:16-17).

**Defendants' Response:** Undisputed that Lamar thought about making Dale a partner in Longbow in March 2021, among other possibilities. Defendants dispute that Dale ever became a partner in Longbow—he did not. (*See* Defs. Ex. 1, Lamar Dep. Tr. 222-23; Defs. Ex. 21, Terman Dep. Tr. 159-60, 168; Defs. Ex. 14, Longbow Dep. Tr. 94, 101-02).

1-212. Dale and Terman shared access to a folder in Dropbox named "42 Macro." Andavolu Decl. Ex. 51 (DALE0122365).

**Defendants' Response:** Undisputed.

1-213. On March 29, Dropbox notified Dale that "Nadine [Terman] made changes in your shared folders." Andavolu Decl. Ex. 52 (DALE0134710).

**Defendants' Response:** Undisputed.

1-214. The document shows a partial file name of an Excel file that includes the words "Hedgeye" and "US_&_Global_GIP_Models." Andavolu Decl. Ex. 52 (DALE0134710).

**Defendants' Response:** Undisputed. As noted above (*see* ¶ 1-208 *supra*), Hedgeye admits that this file was published to subscribers and that it is not a trade secret. (Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, Nos. 55-56, 68-69).

1-215. The Dropbox notification also indicates that "Nadine added" that file to the 42 Macro shared folder on March 27, the day before Dale resigned from Hedgeye. Andavolu Decl. Ex. 52 (DALE0134710).

**Defendants' Response:** Undisputed that the Dropbox notification contains the quoted language. Defendants dispute that March 27 was "the day before Dale resigned from Hedgeye." Dale announced his resignation to Hedgeye on March 11, 2021. (*See* Dale 56.1 ¶ 2-86; Terman 56.1 ¶ 3-23).

113

## IX. "Dale Used Hedgeye's Source Files to Create 42 Macro's Financial Models"

### A. "Expert Testimony"

1. "Daniel Lacalle's Analysis: 42 Macro Uses the Same Methodology as Hedgeye, and Could Not Have Gotten to that Same Methodology Without Copying and Analyzing Hedgeye's Model in Detail"

1-216.



**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702. Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that 42 Macro uses multiple sub-models to arrive at estimates of GDP growth and inflation. However, Defendants dispute Lacalle's explanation. As explained by Defendants' expert Professor Francesco Bianchi:

████████████████████████████████████████████████████████████

████████████████████████████████████████████

1-217. ████████████████████████████████████████████

████████████████████████████████████████

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702. Thus, no response is necessary.

Defendants further object that the assertions in this paragraph are conclusory and unsupported. "[C]onclusory" testimony is "insufficient to create a genuine issue for trial," let alone to justify summary judgment. *Patterson*, 375 F.3d at 219; *accord McKenny*, 973 F.3d at 1303 ("[C]onclusory affidavits lack probative value."). Moreover, a "court may … strike portions of an affidavit that … make generalized and conclusory statements." *Hollander*, 172 F.3d at 198; *accord, e.g.*, *Merrill Lynch*, 2007 WL 2815741, at *4; *Vantage Point*, 266 F. Supp. 3d at 654.

Subject to and without waiving these objections, Defendants dispute the assertions in this paragraph. It is mystifying that Hedgeye would present these assertions from its "expert" as "undisputed facts," given that Defendants submitted a rebuttal expert report that directly addresses and controverts them. (*See generally* Bianchi Decl. Ex. 2, Bianchi Rebuttal Report). Without itemizing every point of disagreement, Defendants note that Professor Bianchi opines that

- ███████████████████████████████████████████████████████████
████████████████████████████████████████████████



(*See also* Bianchi Decl. Ex. 1, Bianchi Initial Report ¶ 9 ██████████████

████████████████████████████ ")). Unlike Hedgeye's experts, defense expert

Professor Bianchi provides a detailed explanation in support of each of these points in his

reports.  (*See generally* Bianchi Decl. Ex. 1, Bianchi Initial Report; Bianchi Decl. Ex. 2, Bianchi

Rebuttal Report).

1-218. ███████████████████████████████████

████████████████████

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule

56.1(d).  As set forth in the *Daubert* motion submitted in support of Defendants' motion for

summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702.

Thus, no response is necessary.

Subject to and without waiving that objection, Defendants dispute the assertions in this

paragraph.  In his rebuttal report, Defendants' expert Professor Bianchi opines that "████

████████████████████████████████████

██████████████  Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶¶ 23-24).

1-219.  Hedgeye's analysis methodology as described in paragraphs 1-216 – 1-218 above
is not common in the financial industry (including among investment banks, sell-side analysts,
and international official bodies). Lacalle Decl. Ex. 1 at 10.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule

56.1(d).  As set forth in the *Daubert* motion submitted in support of Defendants' motion for

summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702. Thus, no response is necessary.

Defendants further object that the assertions in this paragraph are conclusory and unsupported. "[C]onclusory" testimony is "insufficient to create a genuine issue for trial," let alone to justify summary judgment. *Patterson*, 375 F.3d at 219; *accord McKenny*, 973 F.3d at 1303 ("[C]onclusory affidavits lack probative value."). Moreover, a "court may … strike portions of an affidavit that … make generalized and conclusory statements." *Hollander*, 172 F.3d at 198; *accord, e.g., Merrill Lynch*, 2007 WL 2815741, at *4; *Vantage Point*, 266 F. Supp. 3d at 654.

Subject to and without waiving these objections, Defendants dispute the assertions in this paragraph. As Hedgeye incorporates by reference "paragraphs 1-216 – 1-218 above," Defendants incorporate by reference their responses to those paragraphs as well. Notably, paragraph 1-216 by its terms refers only to 42 Macro's methodology, and not to "Hedgeye's analysis methodology" as Hedgeye claims here. In fact, the cited paragraphs do not describe Hedgeye's methodology at all, other than stating that Hedgeye uses 30 variables.

Defendants further dispute Hedgeye's suggestion that the two companies' methodologies are identical or even similar in any relevant respect. (*See generally* Bianchi Decl. Ex. 2, Bianchi Rebuttal Report).

In addition, Defendants dispute Hedgeye's assertion that Hedgeye's methodology "is not common in the financial industry." Defense expert Professor Bianchi has opined, with extensive supporting detail, that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Indeed, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████ (Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 18; *accord, e.g., id.* ¶¶ 22, 39-40, 59).
In their own summary judgment papers, Defendants address each of the supposedly unusual features of Hedgeye's methodology and demonstrate that these features are commonly known in the industry and/or publicly disclosed. (Dale 56.1 ¶¶ 2-222 – 2-256).

1-220.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702. Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that models of the sort described here are commonly used in the industry. However, Defendants dispute the suggestion that Hedgeye's model is meaningfully different. In fact, ████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████

1-221. ███████████████████████████

████████████████████████████████

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702. Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that it is common in the industry to use a ███████████ Defendants note that this paragraph serves no purpose, however, since the presence or absence of a ███████████ has no connection to the arguments Hedgeye makes in support of summary judgment.

1-222. ████████████████████████████████████████████
████████████████████████████████████████████

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702. Thus, no response is necessary.

Subject to and without waiving that objection, Defendants do not dispute that it is common in the industry to use a ███████████. Defendants note that this paragraph serves no purpose, however, since the presence or absence of a ███████████ has no connection to the arguments Hedgeye makes in support of summary judgment.

1-223. ████████████████████████████████████████████
████████████████████████████████████████████

119

████████████████████████████████████████████

███████████████████████

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702. Thus, no response is necessary.

Defendants further object that the assertions in this paragraph are conclusory and unsupported—in particular, the sweeping assertion that ████████████████████████ ██████████████████████████████████████████ "[C]onclusory" testimony is "insufficient to create a genuine issue for trial," let alone to justify summary judgment. *Patterson*, 375 F.3d at 219; *accord McKenny*, 973 F.3d at 1303 ("[C]onclusory affidavits lack probative value."). Moreover, a "court may … strike portions of an affidavit that … make generalized and conclusory statements." *Hollander*, 172 F.3d at 198; *accord, e.g.*, *Merrill Lynch*, 2007 WL 2815741, at *4; *Vantage Point*, 266 F. Supp. 3d at 654.

Defendants further object that this paragraph mischaracterizes the cited evidence. While the paragraph asserts that ███████████████████████████ ██████████████████████████ the cited portion of Lacalle's expert report says ████████████████████████████████████████████ ███████████████████████████

Subject to and without waiving these objections, Defendants dispute the assertions in this paragraph. It is mystifying that Hedgeye would present these assertions from the report of their purported expert Lacalle as "undisputed facts," given that Defendants submitted a rebuttal report from their expert Professor Bianchi, which directly addresses and controverts them. As

120

Professor Bianchi explains:



Furthermore, Defendants' expert Professor Bianchi has opined, with extensive supporting

detail, that ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

In their own summary judgment papers, Defendants address each of the supposedly unusual

features of Hedgeye's methodology and demonstrate that these features are commonly known in

the industry and/or publicly disclosed.  (Dale 56.1 ¶¶ 2-222 – 2-256).

Professor Bianchi has also opined, with extensive supporting detail, that any ███████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

In addition, Hedgeye's assertion in this paragraph that 42 Macro uses a "distinct non-linear transformation" is contradicted by Hedgeye's assertion in paragraph 1-216 that 42 Macro uses "lineal" (*i.e.*, linear) models. (*See* ¶ 1-216 *supra* (citing Lacalle Decl. Ex. 1 at 9)).

1-224. Hedgeye's model applies a unique methodology to predict macroeconomic variables. ████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████████.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702. Thus, no response is necessary.

Defendants further object that the assertions in this paragraph are conclusory and unsupported—in particular, the assertions that ████████████████████████████
████████████████████████████████ "[C]onclusory" testimony is "insufficient to create a genuine issue for trial," let alone to justify summary judgment. *Patterson*, 375 F.3d at 219; *accord McKenny*, 973 F.3d at 1303 ("[C]onclusory affidavits lack probative value."). Moreover, a "court may … strike portions of an affidavit that … make generalized and conclusory statements." *Hollander*, 172 F.3d at 198; *accord, e.g., Merrill Lynch*, 2007 WL 2815741, at *4; *Vantage Point*, 266 F. Supp. 3d at 654.

Subject to and without waiving these objections, Defendants dispute the assertions in this

paragraph. It is mystifying that Hedgeye would present these assertions from the report of their purported expert Lacalle as "undisputed facts," given that Defendants submitted a rebuttal report from their expert Professor Bianchi, which directly addresses and controverts them.

Defendants dispute, for instance, the supposed "uniqueness" of Hedgeye's methodology. Professor Bianchi has opined, with extensive supporting detail, that ████████████████████ ████████████████████████████████████████ (Bianchi Decl. Ex. 1, Bianchi Initial Report ¶ 9). Indeed, ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ In their own summary judgment papers, Defendants address each of the supposedly unusual features of Hedgeye's methodology and demonstrate that these features are commonly known in the industry and/or publicly disclosed. (Dale 56.1 ¶¶ 2-222 – 2-256).

Defendants also dispute that the model is ██████████████ In fact, as Hedgeye admits in its own internal communications, the model produces "unreasonabl[e]," "distorted," and "unsensible" predictions. (Defs. Ex. 189, HE0221554 at HE0221555; Defs. Ex. 190, HE0221567 at HE0221567-68; *see also* Defs. Ex. 86, HE0215697 at HE0215697-98; Ex. 83, HE0305131 at HE0305133). That is why Hedgeye ████████████████ ████████████████████████████████████████████████ ██████████ (Dale 56.1 §§ VIII.A-B (████████████████████████ 5-7; Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, Nos. 10-12, 14-16; Defs. Ex. 11, Lacalle Dep. Tr. 244; Defs. Ex. 15, Malesevic Dep. Tr. 77-78, 80-82, 102-03, 143-45, 148-49; Defs. Ex. 16, McCullough 2022 Dep. Tr. 237-38; Defs. Ex. 83, HE0305131 at HE0305133; Defs. Ex. 86, HE0215697 at HE0215697-98; Defs. Ex. 189, HE0221554 at HE0221555; Defs. Ex. 190,

123

HE0221567 at HE0221567-68). ██████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

While referring to ████████████ variables, Hedgeye admits it has never evaluated the accuracy of its model relative to other models. (Defs. Ex. 17, McCullough 2023 Dep. Tr. 182, 192; Defs. Ex. 15, Malesevic Dep. Tr. 63-66; Defs. Ex. 11, Lacalle Dep. Tr. 217, 221-24, 226-29). When Hedgeye director Drago Malesevic took over the model from Dale, Malesevic determined that it was even less accurate than a simple alternative model that he devised as an experiment. (Defs. Ex. 190, HE0221567; Defs. Ex. 336, HE0221572 (attachment to Defs. Ex. 190)). Accordingly, since Dale's departure, ██████████████████████████████

██████████████████ (Defs. Ex. 191, HE0304465 at HE0304465; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 115, 141, 168, 170; Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, Nos. 8-9). Indeed, Hedgeye told its Excel expert Liam Bastick there were ████████████████████████

██████████████ (Defs. Ex. 13, Bastick Dep. Tr. 167-68).

Defendants also dispute that Hedgeye's model uses "Bayesian analysis" or that it would be unique even if it did. As Professor Bianchi opines: ████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

Defendants also dispute that Hedgeye's model estimates ███████████████

██████████████████████████████████████████ is in any way unique to Hedgeye.

Hedgeye's expert Lacalle has testified that ████████████████████████████████████

████████████████████████████████ (Defs. Ex. 11, Lacalle Dep. Tr. 80).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████

1-225.  42 Macro's methodology is also ████████████████████████████

██.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702. Thus, no response is necessary.

Defendants further object that the assertions in this paragraph are conclusory and unsupported. "[C]onclusory" testimony is "insufficient to create a genuine issue for trial," let alone to justify summary judgment. *Patterson*, 375 F.3d at 219; *accord McKenny*, 973 F.3d at 1303 ("[C]onclusory affidavits lack probative value."). Moreover, a "court may … strike portions of an affidavit that … make generalized and conclusory statements." *Hollander*, 172 F.3d at 198; *accord, e.g., Merrill Lynch*, 2007 WL 2815741, at *4; *Vantage Point*, 266 F. Supp. 3d at 654.

Subject to and without waiving these objections, Defendants dispute the assertions in this paragraph. It is mystifying that Hedgeye would present these assertions from the report of their purported expert Lacalle as "undisputed facts," given that Defendants submitted a rebuttal report from their expert Professor Bianchi, which directly addresses and controverts them. As Professor Bianchi explains:

- ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████
  ███████████████████████████████

126



1-226. ███████████████████████████████████

███████████

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702. Thus, no response is necessary.

Defendants further object that this paragraph is vague and ambiguous as to the phrase "This is because." Given the content of the preceding paragraphs 1-223 – 1-225, Defendants assume that Hedgeye means to suggest that Hedgeye and 42 Macro are similar in their use ████

████████ methods because ██████████████████████

Defendants incorporate by reference their objections and responses to paragraphs 1-223 – 1-225 here, including their response that 42 Macro's model is neither ████████████████ that Hedgeye's model is not ████████ and that the models are not similar in any relevant respect.

Subject to and without waiving these objections, Defendants do not dispute that ████

██████████████████████████████████████████

████████████████████

However, Defendants ██████████████████████████████

██████████████████████████████████

███████████████ *id.* ¶¶ 48-57 (████████████████████

127



Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, Nos. 25-26 (

Defs. Ex. 22, McCullough 2023 Deposition Exhibit 150; Defs. Ex. 119, HE0261935; Defs. Ex. 16, McCullough 2022 Dep. Tr. 189:6-9, 194:12-13; Defs. Ex. 118, HE0210908; Defs. Ex. 66, HE0218983).

Defendants also dispute that the interest in

It is basic math, widely known and used in the field of economics. (Defs. Ex. 11, Lacalle Dep. Tr. 80, 82-84, 91; Defs. Ex. 17, McCullough 2023 Dep. Tr. 70; Defs. Ex. 8, Drake Dep. Tr. 25; Defs. Ex. 13, Bastick Dep. Tr. 61).

1-227. ██████████████████████████████████
██████████████████████████████████████████

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702. Thus, no response is necessary.

Defendants further object that the assertions in this paragraph are conclusory and unsupported—in particular, the assertion that industry models are less "complex" than Hedgeye's. "[C]onclusory" testimony is "insufficient to create a genuine issue for trial," let alone to justify summary judgment. *Patterson*, 375 F.3d at 219; *accord McKenny*, 973 F.3d at 1303 ("[C]onclusory affidavits lack probative value."). Moreover, a "court may … strike portions of an affidavit that … make generalized and conclusory statements." *Hollander*, 172 F.3d at 198; *accord, e.g., Merrill Lynch*, 2007 WL 2815741, at *4; *Vantage Point*, 266 F. Supp. 3d at 654.

Subject to and without waiving these objections, Defendants dispute the assertions in this paragraph. Defendants dispute, for instance, that it is uncommon for industry models to focus on the rate of change. (Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 49 ("The interest in 'rates of change' is not unique to Hedgeye."); *id.* ¶¶ 48-57 (explaining the widespread use of, and ease of calculating, "rate of change")). Hedgeye and 42 Macro depict the "rates of change" of GDP growth and inflation on four-quadrant charts, an approach that is widespread and generally known in the financial industry. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████  The four-quadrant framework was popularized by Ray Dalio, a well-known investor who founded the hedge fund Bridgewater, and his framework was the inspiration for Hedgeye's. (Second Dale Decl., Dkt. 28-1 ¶ 19; Bianchi Decl. Ex. 1, Bianchi Initial Report ¶ 25; Defs. Ex. 11, Lacalle Dep. Tr. 218:6-219:6; Defs. Ex. 22, McCullough 2023 Deposition Exhibit 150; Defs. Ex. 119, HE0261935; Defs. Ex. 16, McCullough 2022 Dep. Tr. 189:6-9, 194:12-13; Defs. Ex. 118, HE0210908; Defs. Ex. 66, HE0218983).

Defendants also dispute that the interest in "rates of change" has any relationship to the design of the companies' models. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████  It is basic math, widely known and used in the field of economics. (Defs. Ex. 11, Lacalle Dep. Tr. 80, 82-84, 91; Defs. Ex. 17, McCullough 2023 Dep. Tr. 70; Defs. Ex. 8, Drake Dep. Tr. 25; Defs. Ex. 13, Bastick Dep. Tr. 61).

Defendants also dispute Hedgeye's assertion that other models "do not use a complex methodology as Hedgeye and 42 Macro do." Professor Bianchi has opined, with extensive supporting detail, that "Hedgeye's source models consist of standard elements generally known in the industry." (Bianchi Decl. Ex. 1, Bianchi Initial Report ¶ 9). Indeed, "Hedgeye's model is, in a fundamental sense, a more simplistic, watered-down version of commonly used forecasting

130

models." (Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 18; *accord, e.g., id.* ¶¶ 22, 39-40, 59).

In their own summary judgment papers, Defendants address each of the supposedly unusual

features of Hedgeye's methodology and demonstrate that these features are commonly known in

the industry and/or publicly disclosed. (Dale 56.1 ¶¶ 2-222 – 2-256). Moreover, ███████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████ (Bianchi

Decl. Ex. 2, Bianchi Rebuttal Report ¶ 57 n. 42).

1-228. ████████████████████████████████████████████

████████████████████████████████████████████████

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule

56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for

summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702.

Thus, no response is necessary.

Defendants further object that this paragraph is vague and ambiguous as to the phrases

"the industry avoids this route" and "Hedgeye's and 42 Macro's models must be curated and

adjusted."

Subject to and without waiving these objections, Defendants respond as follows:

To the extent Hedgeye means that Hedgeye routinely makes ████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████, Defendants do not dispute this. (*See* Dale Br. 9-17).

To the extent Hedgeye means that estimating "rates of change" requires curating and

131

adjusting the models in some more scientific manner, and that others in the industry avoid this route, Defendants dispute those assertions.  For starters, the industry does not avoid estimating rates of change, as explained above.  (*See* Defendants' Responses to ¶¶ 1-226 – 1-227 *supra*).  Moreover, defense expert Professor Bianchi specifically rebuts Lacalle's claim: " ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████  (Bianchi Decl. Ex. 2, Bianchi Rebuttal

Report ¶ 57).  He further explains that ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

(*Id.* ¶ 24).

　　　1-229. ████████████████████████████████████

████████████████████████████

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).  As set forth in the *Daubert* motion submitted in support of Defendants' motion for summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702.  Thus, no response is necessary.

　　　Subject to and without waiving that objection, Defendants dispute the assertions in this paragraph.  As Defendants' expert Professor Bianchi explains, ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████ (Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 57). He

further explains that "there are no computational issues in training models such as the ones used

by Hedgeye and 42 Macro," since "[p]ractitioners have automated ways to 'retrain' their

models," and indeed, "J.P. Morgan's nowcasting model is significantly more elaborate and

computationally intensive than the models employed by Hedgeye and 42 Macro." (*Id.* ¶ 24).

1-230. ████████████████████████████████████████████████████████████

**Defendants' Response:** Although Defendants do not dispute Hedgeye's assertion that Lacalle

has worked in the financial industry for more than two decades, Defendants dispute that Lacalle

has adequate relevant experience to make the claims that Hedgeye proffers as evidence. As set

forth in the *Daubert* motion submitted in support of Defendants' motion for summary judgment,

Lacalle's testimony is inadmissible under Federal Rule of Evidence 702 and should be excluded.

1-231. ████████████████████████████████████████████████████████████

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule

56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for

summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702.

Among other things, Lacalle admitted in deposition that he never reviewed "Attachment A," the

document that describes the "methodology" supposedly employed by Hedgeye. Thus, no

response is necessary.

Subject to and without waiving that objection, Defendants dispute the assertions in this

paragraph. Defendants' expert Professor Bianchi has opined, with extensive supporting detail,

that "Hedgeye's source models consist of standard elements generally known in the industry,

133

such as the use of leading and contemporaneous indicators to build nowcasts." (Bianchi Decl. Ex. 1, Bianchi Initial Report ¶ 9; *accord, e.g., id.* ¶¶ 13-16, 20-21, 23, 26-32, 36-39, 42).  Any

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ (Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 21;

*accord, e.g., id.* ¶¶ 22-38).

Furthermore, ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

1-232. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the *Daubert* motion submitted in support of Defendants' motion for summary judgment, Lacalle's testimony is inadmissible under Federal Rule of Evidence 702. Thus, no response is necessary.

Defendants further object that the assertions in this paragraph are entirely conclusory and unsupported. "[C]onclusory" testimony is "insufficient to create a genuine issue for trial," let alone to justify summary judgment. *Patterson*, 375 F.3d at 219; *accord McKenny*, 973 F.3d at 1303 ("[C]onclusory affidavits lack probative value."). Moreover, a "court may … strike portions of an affidavit that … make generalized and conclusory statements." *Hollander*, 172 F.3d at 198; *accord, e.g.*, *Merrill Lynch*, 2007 WL 2815741, at *4; *Vantage Point*, 266 F. Supp. 3d at 654.

Defendants further object that Lacalle's opinion consists of large inferences, and the law is clear that a summary judgment movant is not entitled to draw inferences in its favor in seeking summary judgment. *See, e.g.*, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

Subject to and without waiving these objections, Defendants dispute the assertions in this paragraph. Defendants' expert Professor Bianchi has opined, with extensive supporting detail, that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*

135

¶ 11). The "similarities between the models simply reflect common practices in the field and publicly available information," as well as "the common presence of the same modeler." (*Id.* ¶¶ 21, 87; *accord* Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶ 10 ("The presence of similarities, whether broad or narrow, is unsurprising given that the same modeler created both sets of models, for the same general purpose, within the same general context…."); Defs. Ex. 13, Bastick Dep. Tr. 16 ("

Furthermore, Dale denies creating 42 Macro's models by "copying and analyzing Hedgeye's model." Dale testified that when building his own models for 42 Macro in April 2021, he opened certain of these Excel files a few times to "double-check" that he had not "inadvertently" included "anything associated with Hedgeye," and to minimize any "overlap" between the models. (Defs. Ex. 5, Dale 2021 Dep. Tr. 84, 131-35, 143-45, 150-54, 341-46, 354). "[T]here was no extensive activity in and around Hedgeye's source files," because the purpose "was to verify." (*Id.* Tr. 146). For instance, "[a]fter [he] had chosen [his] inputs" for 42 Macro's model, he checked the "30 data points" in Hedgeye's model "to make sure there wasn't a substantial degree of overlap." (*Id.* Tr. 341-43). Dale worked long hours over many weeks to build 42 Macro's models. (*Id.* Tr. 322-40; Defs. Ex. 27, Britven Initial Report ¶ 78 (estimating Dale "spent a total of 756 hours" on these models)). He built them using "publicly available information" and "proven quantitative techniques"—not by taking material from Hedgeye's files. (Defs. Ex. 5, Dale 2021 Dep. Tr. 347-49, 353-54; *see also, e.g.*, Second Dale Decl., Dkt.

136

28-1 ¶¶ 4, 6-9, 17, 20; Third Dale Decl., Dkt. 36-1 ¶¶ 3-4, 11; Defs. Ex. 6, Dale 2022 Dep. Tr. 90). The sole exception is that Dale "copied partial lists of Bloomberg ticker symbols," and, in some instances, rudimentary formulas, from Hedgeye files into his 42 Macro files. (Defs. Ex. 32, Dale 7/27/21 Responses to Interrogatories, No. 7). These "standard industry formulas" included the "Bloomberg formula to pull" certain metrics from Bloomberg, as well as "simple calculation[s]" for things like percentage changes and moving averages. (Defs. Ex. 6, Dale 2022 Dep. Tr. 119-25, 129-31, 133-35). These were "limited materials" and "miniscule in the context of the models." (*Id.* Tr. 163-64). Dale did this to "save [him]self a few hours of work" on tedious tasks, such as gathering ticker symbols from Bloomberg. (*Id.* Tr. 124, 131-32). And in all other respects, Dale built his models "based on his knowledge of proven techniques employed throughout the industry and using designs, features, and formulas that he independently developed." (Defs. Ex. 32, Dale 7/27/21 Responses to Interrogatories, No. 7).

2. **"Liam Bastick's Analysis: Many Key Calculations of 42 Macro's Models Could Not Have Been Constructed without Sight and Copying of their Hedgeye Counterparts"**

1-233.

**Defendants' Response:** Defendants do not dispute that Bastick conducted a comparison of certain Hedgeye and 42 Macro files. Defendants dispute that the collection of Hedgeye files constitutes a single "Hedgeye Model" or that the collection of 42 Macro files constitutes a single "42 Macro Model."

Moreover, the only three files that Bastick discusses in any detail in his report are Hedgeye's GMRM file, the "42 Macro Regime Forecasting Tool," and (to a much lesser extent)

137

42 Macro's "Market Regime Observation Tool." (Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶¶ 11, 33 n.5; Bastick Decl. Ex. 1 at 6 (discussing these files using Bastick's numbering system: "Hedgeye File 1333 and … 42 Macro Files 1403 and 1404")).

1-234. There are similarities between the Hedgeye Model and the 42 Macro Model. Bastick Decl. Ex. 1 at 22. For



**Defendants' Response:** Although Defendants do not dispute that there are certain similarities between the Excel files used by Hedgeye and by 42 Macro, both sets of files having been designed by the same designer, Defendants dispute Hedgeye's assertions as follows:

Subparagraphs "a" and "b": Defendants do not dispute that ███████████████

████████████████████████████████████████████████████████

███████████████████████ Defendants dispute, however, that 42 Macro produces the same chart, as alleged here. As shown in the legend above 42 Macro's chart (*see id.*), 42 Macro uses the OECD CLI (Composite Leading Indicator) as its measure of economic activity, rather than real GDP growth. GDP growth figures are published on a quarterly basis, and OECD CLI

138

figures are published on a monthly basis.  As a result, "Hedgeye's chart shows, on a quarterly basis, the changes in real GDP growth and inflation from one calendar quarter to the next," while "42 Macro's chart shows, on a monthly basis, the changes in the OECD [CLI] and inflation compared to three months ago (a period that does not necessarily coincide with any standard calendar quarter)."  (Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶ 32; *accord id.* ¶ 59; Bastick Decl. Ex. 1 at 21 ███████████████████████████████████████████████████████████ ██████; Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 89; Second Dale Decl., Dkt. 28-1 ¶¶ 16, 18).

Moreover, this similarity does not suggest that 42 Macro copied from Hedgeye's Excel model, since the quadrant framework is not unique to Hedgeye (*see* Defendants' Response to ¶ 1-226 *supra*), and Hedgeye publishes its quadrant charts to subscribers and on the internet. (Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶ 31; Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 89).  ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████ To the contrary, he █████████████ ███████████████████████████████████████████████ █████████████████████

Subparagraphs "c" and "d":  Defendants do not dispute that there are some similarities in formatting, layout, and headings between the two worksheets identified, but dispute the inference that these similarities are indicative of copying.  As defense expert Michael Barbera explains, it is "unsurprising that part of the worksheets would look similar, as they are not particularly complex, perform the same general function, and were built by the same modeler."  (Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶ 34; *see also id.* ¶¶ 35-38; Bianchi Decl. Ex. 2, Bianchi

Rebuttal Report ¶ 88).  Bastick himself admits that ███████████████████████████

█████████████████████████████████████████████████████████████████████████

██████  There are certain differences between the worksheets as well.  (Barbera Decl. Ex. 1,

Barbera Rebuttal Report ¶ 33; *see also* Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 88).

Subparagraph "e":  Defendants do not dispute that both files use Excel's "OFFSET"

function in a particular way.  Defendants dispute that this similarity has any relevance, and

dispute the inference that it is indicative of copying, since in both files the "OFFSET" function is

used to perform a basic, well-known economic calculation.  (Barbera Decl. Ex. 1, Barbera

Rebuttal Report ¶¶ 40-47; Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 90).

Defendants further note that Hedgeye has not identified the items discussed in

subparagraphs "a" through "e" as alleged trade secrets in this case.

1-235. ███████████████████████████████████████

███████████████████████████████████

**Defendants' Response:** Undisputed.

1-236. ████████████████████████████████████████████

██████

**Defendants' Response:** Defendants do not dispute ██████████████████████████████

██████████████████████████████████  But Defendants dispute the inference that 42

Macro's use of this function suggests any copying from Hedgeye's Excel model.  As defense

expert Michael Barbera explains in detail in his report, this inference is entirely "speculative and

unjustified."  (Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶ 45).  He explains:

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████



(*Id.* ¶ 46).

1-237.

**Defendants' Response:** Defendants do not dispute that Excel Help has made this statement. But Defendants dispute the inference that this statement is indicative of any copying, because as explained above, Dale's continued use of the STDEV function was unsurprising and perfectly reasonable. (*See* Defendants' Response to ¶ 1-236 *supra*, discussing Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶¶ 45-47).

---

[11] Citing HE0018783, Global Macro Risk Monitor.xlsx.

[12] Citing "Excel 2013 Tutorial – Using the Percentile Function," at 5:40-6:08, https://www.youtube.com/watch?v=14jwxD_7RLI (May 24, 2013); "What's the difference between stdev p, stdev s, and stdev," https://www.youtube.com/watch?v=wM4yjuTxQL4 (Aug. 14, 2016) ("2016 YouTube Video"); "=StDev.S And =StDev.P (What Is the Difference?)," https://www.youtube.com/watch?v=NdIVwuwfMIg (Jan. 24, 2019).

1-238.



**Defendants' Response:** Defendants do not dispute that these two worksheets perform the same general steps in the same order. But Defendants dispute the inference that this is indicative of any copying. Both worksheets "perform basic functions like importing data and calculating moving averages. Mr. Dale would have no need to copy formulas for such basic tasks, and it is understandable that he would have used the same standard steps and calculations to perform the same basic functions in each of these worksheets," as well as the same order of steps. (Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶ 49; *accord id.* ¶¶ 33-34, 64-67; Second Dale Decl., Dkt. 28-1 ¶ 9). "In addition, for certain processes, the order of steps is dictated by the nature of the calculations. For example, one cannot perform 'fastest/slowest since' calculations (step [7] in the Hedgeye 'R&G Process') without performing the 'movement' calculations first (step [6])." (Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶ 68; *accord* Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 97).

Defendants also dispute that the two worksheets perform steps in the same way. As

142

defense expert Michael Barbera explains: ████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

Defendants also dispute that the two worksheets are indicative of any misappropriation of any alleged trade secrets. The Hedgeye worksheet simply collects "typical summary statistics reported throughout the financial services industry. They can be found on trade platforms and finance websites, such as Bloomberg and Fidelity, as they provide easy-to-interpret information about the recent performance of a particular security or asset class. Furthermore, these calculations are very basic and can only be performed in certain ways because they have very limited purposes, such as identifying the last time a series was higher or lower than today, or computing a rate of change." (Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 88; *accord* Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶ 49; Second Dale Decl., Dkt. 28-1 ¶ 9). "It is fair to estimate that the [42 Macro] worksheet would take four hours or so to create. Given this level of effort, there would be no need to copy from the [Hedgeye] worksheet." (Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶ 33; *accord* Second Dale Decl., Dkt. 28-1 ¶ 8).

Defendants further note that Hedgeye has not identified these steps or their order as an alleged trade secret in this case.

1-239.

**Defendants' Response:** Defendants do not dispute that these two worksheets perform the same general functions. But Defendants dispute the inference that this is indicative of copying. The three simple steps outlined above are standard steps "dictated by the companies' common goal of identifying the correct economic 'quadrant' based on changes in growth and changes in inflation." (Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶ 56; *accord* Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 89). And, as explained above, it is entirely unsurprising and innocuous that both companies would share that "quadrant" framework. (*See* Defendants' Response to ¶ 1-234(a)-(b) *supra*).

Defendants also dispute that the two worksheets perform the same steps in the same way. As defense expert Michael Barbera explains: "█████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████

Defendants further note that Hedgeye has not identified these steps or their order as an alleged trade secret in this case.

1-240. ████████████████████████████████████
██████████████████████████████

**Defendants' Response:** Defendants do not dispute this observation, which shows that "42 Macro performs an additional step not performed by Hedgeye" and is one of the ████████

███████████████████████████████████████

(Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶ 57).

1-241. There is an ████████████████████████████ calculation present in both models. ██████████████████████████████████

Both models were found to perform the following steps within these sections:

1. ████████████████████████

144



Bastick Decl. Ex. 1 at 56.

**Defendants' Response:** Defendants do not dispute that these two worksheets contain an

"AVERAGE(OFFSET)/STDEV(OFFSET)" function and perform the same general functions.

But Defendants dispute the inference that this is indicative of any copying. In both worksheets

the "AVERAGE(OFFSET)/STDEV(OFFSET)" function is used to perform a basic, well-known

economic calculation. (Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶¶ 40-47; Bianchi Decl.

Ex. 2, Bianchi Rebuttal Report ¶ 90). As to the steps ███████████████████████████

██████████████████████████████████████████:



(Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶ 61).

> These are the differences that Mr. Bastick acknowledges, but there are many
> others as well. ████████████████████████████████████████

145



(*Id.* ¶ 62).  Defendants' expert Professor Bianchi also identifies many ways in which these portions of Hedgeye's and 42 Macro's models differ despite performing the general functions that Bastick enumerates.  (Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 91 (noting that ███

███████████████████████████████████

███████ ; *id.* ¶¶ 92-93 (identifying differences in the nowcasting portions of these steps); *id.* ¶¶ 94-96 (identifying differences in the forecasting portions of these steps)).

Even putting the differences aside, the similarities are not indicative of copying.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████  A

macroeconomic nowcasting and forecasting model would be expected to perform the steps Bastick identifies, including but not limited to such obvious steps as "[o]btaining the relevant GDP data," "[i]dentifying the key indicator indices," "[d]etermining the correlation between the indicator indices and GDP," "[p]erforming an adjustment for the coefficient of variation" (*i.e.*, standardizing the variables), applying the "weightings," and "[c]alculating an initial GDP forecast." (Bastick Decl. Ex. 1 at 55; *see, e.g.*, Bianchi Decl. Ex. 2, Bianchi Rebuttal Report ¶ 22

146

("us[ing] indicators available at high frequencies to build a nowcast of a variable of interest" is "well known to the point of being mundane"); *id.* ¶ 93 ("[T]he use of regressions or co-movement to weight variables in a nowcasting model is commonplace and by no means unique to either company."); *id.* ¶ 90 ("Standardization is a basic, well-known, and routinely used mathematical transformation that makes it possible to compare variables of different scales and volatilities.")).

Defendants further note that Hedgeye has not identified these steps or their order as an alleged trade secret in this case.

1-242. ███████████████████████████████████████████

████████████████████████████████

**Defendants' Response:** Defendants do not dispute this observation, which shows that "42 Macro performs an additional step of cleaning the data and does not perform its steps in the same order as Hedgeye." (Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶ 61).

1-243. ███████████████████████████████████████████

████████████████████████████████

**Defendants' Response:** Defendants object that the term "duplication" is vague and ambiguous.

Subject to and without waiving that objection, Defendants dispute Hedgeye's definitions of the "Hedgeye Model" and "42 Macro Model," as explained above. (*See* Defendants' Response to ¶ 1-233 *supra*). Defendants do not dispute that some of the Custom Styles (*e.g.*, colors and fonts) in the 42 Macro Regime Forecasting Tool appear to be the same as some of the Custom Styles in certain Hedgeye files, including the GMRM file and one of the output files that Hedgeye sends to its subscribers. (Defs. Ex. 340, Screenshot from HE0018790, "International GIP Model Factor Exposure Backtests.xlsx"; Defs. Ex. 45, Hedgeye's 1/9/23 Responses to RFAs, Nos. 64-65). But Defendants dispute the inference that this is indicative of copying, as

147

explained further below.  (*See* Defendants' Response to ¶ 1-253 *infra*).

1-244.

**Defendants' Response:** Undisputed for purposes of this motion.

1-245.

**Defendants' Response:** Undisputed for purposes of this motion, but Defendants note that

formats can be copied across groups of cells in Microsoft Excel.

1-246.

**Defendants' Response:** Undisputed for purposes of this motion.

1-247.

**Defendants' Response:** Defendants do not dispute that Styles may be inadvertently created in

multiple ways, and that Bastick identifies ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ (Bastick Decl. Ex. 1 at 83-84).

1-248.

**Defendants' Response:** Defendants object that the phrase "[i]n the case of some of the duplicate

Styles" is vague and ambiguous, because in the cited portion of Bastick's report, he is discussing

a ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮. (Bastick Decl. Ex. 1 at 76).

Subject to and without waiving that objection, Defendants do not dispute, for purposes of

this motion, that "when Excel doesn't recognize a Style being copied as one that exists in the target workbook (*e.g.* the Normal Style uses Calibri font in one workbook, but employs Arial in the other), … it creates a new one (with appended numbering) to distinguish it from the existing ones." (*Id.*).

1-249. █████████████████████████████████████████████████
█████████████████████████████████

**Defendants' Response:** Defendants dispute Hedgeye's definitions of the "Hedgeye Model" and "42 Macro Model," as explained above. (*See* Defendants' Response to ¶ 1-233 *supra*). Defendants do not dispute, for purposes of this motion, that ███████████████████
██████████████████████████████
███████████████████████████████████████
█████████████████████████



Bastick Decl. Ex. 1 at 77.

**Defendants' Response:** Defendants do not dispute that there are some Hedgeye files with Custom Styles in place, or that the Custom Styles shown above appear in the GMRM file (which Bastick calls "File 1333") and in one of the output files that Hedgeye sends to its subscribers. (Defs. Ex. 340, Screenshot from HE0018790, "International GIP Model Factor Exposure Backtests.xlsx"; Defs. Ex. 45, Hedgeye's 1/9/23 Responses to RFAs, Nos. 64-65).

150

1-251. 42 Macro File



Bastick Decl. Ex. 1 at 78.

**Defendants' Response:** Undisputed for purposes of this motion, but Defendants note that the

Styles under the headings "Good, Bad and Neutral," "Data and Model," "Titles and Headings,"

and "Themed Cell Styles" differ between the two files, as shown in the screenshots that Hedgeye

151

has pasted above. (*Compare* ¶ 1-250 *with* ¶ 1-251 *supra*). Defendants dispute the inference that the similarities are indicative of copying, as explained further below. (*See* Defendants' Response to ¶ 1-253 *infra*).

1-252. ███████████████████████████████████████
████████████████████████████

**Defendants' Response:** Undisputed for purposes of this motion.

1-253. ███████████████████████████████████████
███████████

**Defendants' Response:** Defendants dispute this paragraph and dispute the inference that the similarities in Custom Styles are indicative of copying. As defense expert Michael Barbera explains, Bastick is calculating ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████ Moreover, ██████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████. (*Id.* ¶ 70).

Bastick also admits his analysis is not inconsistent with the possibility that Dale transferred the Custom Styles alone from a Hedgeye file to the 42 Macro file, without copying any substantive content whatsoever. (Defs. Ex. 13, Bastick Dep. Tr. 220-21 ██████████████

███████████████████████████████████████████████████

██████████████ ; *id.* Tr. 229-33 ███████████████████████████

███████████████████████████████████████████ *id.* Tr. 270-71

(agreeing with Barbera that "Dale may have merged the styles" due to "aesthetic preference"); *see also* Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶ 72 ("This would transfer the styles but not any of the contents between the files.")).

This "merging" scenario is far more likely than ███████████████████████████

████████████████████████████████████████████████████████████████████

████████████. Barbera opines that Bastick's theory is "implausible": █████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ (*Id.*).[13]

Moreover, as Hedgeye acknowledges, the Custom Styles are not identical between the two companies' files, since the hyperlink styles are different. (*See* ¶ 1-251 *supra*). The Styles under the headings "Good, Bad and Neutral," "Data and Model," "Titles and Headings," and "Themed Cell Styles" are different as well. (*See id.*). "Th[is] difference in styles suggests that one set of files was not copied from the other, because a copy would have identical styles." (Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶ 71). Defense expert Joseph Chaput, a senior digital forensic examiner at TransPerfect, has also ██████████████████████████████

---

[13] Bastick performed ████████████████████████████████
████████████████ (Bastick Decl. Ex. 1 at 12-19). At his deposition, Bastick testified:
██████████████████████████████████████████████████████████
████████████ (Bastick Decl. Ex. 1 at 6). █████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████

████████████████████████ (Chaput Decl. Ex. 1, Chaput Rebuttal Report ¶¶ 8, 22-23).

1-254. ████████████████████████████████████████████████████
████████████████

**Defendants' Response:** Defendants object that Bastick's conclusion is inadmissible under Federal Rule of Evidence 702. Hedgeye bears "the burden of establishing [the] admissibility" of its expert's testimony "by a preponderance of the evidence." *Choi*, 2 F.4th at 20. Hedgeye must "demonstrate[] to the court that it is more likely than not that," *inter alia*, "[1] the testimony is based on sufficient facts or data; [2] the testimony is the product of reliable principles and methods; and [3] the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 597. The Court must "take a hard look" at the challenged testimony and "undertake a *rigorous examination* of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *In re Mirena*, 982 F.3d at 123. Bastick's conclusion fails this test.

Bastick has no hard proof that Dale ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



Lacking hard proof, Bastick relies on his own subjective comparison of the Excel files and draws inferences therefrom to conclude that key calculations were copied in some form. But Bastick did not apply any reliable methodology in making such a comparison, and he does not have sufficient experience to draw reliable conclusions. At his deposition, Bastick was repeatedly asked ████████████████████████████████

████████████████████████████████████████████████

However, an expert "relying solely or primarily on experience … must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the

---

[14] Similarly, although Bastick discusses ██████████████████████████
████████████████████████████████████████████
██████████████████ (*See* Defendants' Response to ¶ 1-253 *supra*).

[15] *See, e.g.*, Defs. Ex. 13, ████████████████████████████

opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702, Adv. Comm. Notes, 2000 Amend.; *accord, e.g.*, *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 636, 647 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017); *LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002). Hedgeye has not met this standard.

Although Bastick has experience building and reviewing Excel models, he does not have adequate experience with the task at hand: comparing two models to determine whether the modeler used one to build the other. At his deposition, Bastick admitted ███████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████

Moreover, Bastick admits ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████

Similarly, Bastick admits █████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████

The Advisory Committee Notes to the 2023 amendment to Rule 702 caution against the use of unreliable "feature comparison evidence (i.e., evidence that a set of features corresponds between two examined items)"—precisely what Hedgeye attempts here in offering Bastick's comparison of the two models.  Fed. R. Evid. 702, Adv. Comm. Notes, 2023 Amend.  The Advisory Committee specifically instructs that any expert opinions based on such a comparison "must be limited to those inferences that can reasonably be drawn from a reliable application of the principles and methods," and it encourages courts to demand "an estimate of the known or potential rate of error of the methodology employed." *Id.*  Bastick applies no known, testable principles or methods here.  Instead, he puts forth "the sort of *ipse dixit* connection between methodology and conclusion that [a] district court has the duty to exclude." *Nimely v. City of N.Y.*, 414 F.3d 381, 399 (2d Cir. 2005).  Bastick's opinion is therefore inadmissible.[16]

---

[16] *See also, e.g., United States v. Frazier*, 387 F.3d 1244, 1264-65 (11th Cir. 2004) (excluding expert's testimony that absence of hair or seminal fluid at crime scene was contrary to what

At the very least, Bastick's opinion consists of large inferences, and the law is clear that a summary judgment movant is not entitled to draw inferences in its favor in seeking summary judgment. *See, e.g.*, *Adickes*, 398 U.S. at 158-59; *Pinto*, 221 F.3d at 398.

Subject to and without waiving these objections, Defendants dispute Bastick's opinion. Defendants have offered testimony from three rebuttal experts who directly address and refute Bastick's analysis. Michael Barbera opines that █████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████ (Barbera Decl. Ex. 1, Barbera Rebuttal Report ¶¶ 8-9; *see also id.* ¶¶ 10-76 (rebutting Bastick's analysis in detail)). Professor Francesco ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████ And Joseph Chaput rebuts the inferences that Bastick draws from his analysis of Custom Styles. (Chaput Decl. Ex. 1, Chaput Rebuttal Report ¶¶ 1-24).

Furthermore, in his own testimony, Dale has disputed the inferences and conclusions that

---

"would be expected" in a rape case in his "experience," since without "hard information" showing "how frequently hair or seminal fluid is transferred … in similar cases," he could not "make even an informed assessment"); *United States v. Briscoe*, 703 F. Supp. 3d 1288, 1301-09 (D.N.M. 2023) (excluding expert's "subjective determination that three marks on [bullet] casings were similar enough to conclude that the casings were fired from the same firearm, without a known sample to eliminate the possibility that the marks" came from similar firearms); *Greco v. Broan-NuTone LLC*, 2020 WL 1044002, at *7 (D. Conn. Mar. 4, 2020) (excluding expert's testimony in part because he "did not compare the striations on the rotor shaft of the fan [at issue] to any other fan's rotor shaft to identify whether those striations were typical").

Bastick seeks to draw concerning Dale's purported use of the Hedgeye files. Dale testified that when building his own models for 42 Macro in April 2021, he opened certain of these Excel files a few times to "double-check" that he had not "inadvertently" included "anything associated with Hedgeye," and to minimize any "overlap" between the models. (Defs. Ex. 5, Dale 2021 Dep. Tr. 84, 131-35, 143-45, 150-54, 341-46, 354). "[T]here was no extensive activity in and around Hedgeye's source files," because the purpose "was to verify." (*Id.* Tr. 146). For instance, "[a]fter [he] had chosen [his] inputs" for 42 Macro's model, he checked the "30 data points" in Hedgeye's model "to make sure there wasn't a substantial degree of overlap." (*Id.* Tr. 341-43). Dale worked long hours over many weeks to build 42 Macro's models. (*Id.* Tr. 322-40; Defs. Ex. 27, Britven Initial Report ¶ 78 (estimating Dale "spent a total of 756 hours" on these models)). He built them using "publicly available information" and "proven quantitative techniques"—not by taking material from Hedgeye's files. (Defs. Ex. 5, Dale 2021 Dep. Tr. 347-49, 353-54; *see also, e.g.*, Second Dale Decl., Dkt. 28-1 ¶¶ 4, 6-9, 17, 20; Third Dale Decl., Dkt. 36-1 ¶¶ 3-4, 11; Defs. Ex. 6, Dale 2022 Dep. Tr. 90). The sole exception is that Dale "copied partial lists of Bloomberg ticker symbols," and, in some instances, rudimentary formulas, from Hedgeye files into his 42 Macro files. (Defs. Ex. 32, Dale 7/27/21 Responses to Interrogatories, No. 7). These "standard industry formulas" included the "Bloomberg formula to pull" certain metrics from Bloomberg, as well as "simple calculation[s]" for things like percentage changes and moving averages. (Defs. Ex. 6, Dale 2022 Dep. Tr. 119-25, 129-31, 133-35). These were "limited materials" and "miniscule in the context of the models." (*Id.* Tr. 163-64). Dale did this to "save [him]self a few hours of work" on tedious tasks, such as gathering ticker symbols from Bloomberg. (*Id.* Tr. 124, 131-32). And in all other respects, Dale built his models "based on his knowledge of proven techniques employed throughout the

159

industry and using designs, features, and formulas that he independently developed." (Defs. Ex. 32, Dale 7/27/21 Responses to Interrogatories, No. 7). A jury would be entitled to credit Dale over Bastick, particularly given that Bastick admits to having made a major error in the initial version of his report, which calls into question even the more technical aspects of his expert work.[17]

### B. "Dale's Admissions"

1-255. According to Dale, 42 Macro has three primary source files, the 42 Macro regime forecasting tool, the 42 Macro market observation tool, and the 42 Macro market history observation tool. Andavolu Decl. Ex 4 (First Dale Dep. Tr. at 323:12-324:6).

**Defendants' Response:** Undisputed that these were 42 Macro's three primary source files through the time of the cited deposition.

1-256. According to Dale, he completed the 42 Macro regime forecasting tool on around April 15, 2021, the 42 Macro market observation tool on April 20, 2021 or so, and the 42 Macro market history observation tool on May 5 or May 6, 2021. Andavolu Decl. Ex. 4 (First Dale Dep. Tr. at 323:12-324:6).

**Defendants' Response:** Undisputed, but Defendants note that Dale stated: "Don't hold me to that specific date. I'm guessing." (Andavolu Decl. Ex. 4 (First Dale Dep. Tr. at 323:14-15)).

1-257. 42 Macro launched on April 26, 2021. First Jones Decl. ¶ 45 & Ex. 15.

**Defendants' Response:** Undisputed.

1-258. One of the Hedgeye files that Dale copied from his Laptop to Dropbox is PRICE VOLUME VOLATILITY.xlsx. Zhang Decl. ¶ 12.

---

[17] Defs. Ex. 13, Bastick Dep. Tr. 114-16 ████████████████████████████████

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

Subject to and without waiving that objection, Defendants do not dispute that Dale copied the file "PRICE VOLUME VOLATILITY.xlsx" from his laptop to his Dropbox. However, Defendants dispute Hedgeye's characterization of the file as a "Hedgeye file[]." Dale testified that he created this file "to trade [his] personal account," and that "[b]uilding this particular model" was not "part of [his] job duties for Hedgeye." (Defs. Ex. 6, Dale 2022 Dep. Tr. 25-26). Before this litigation began, no one at Hedgeye was even aware this file existed. (Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, Nos. 30-31; Defs. Ex. 6, Dale 2022 Dep. Tr. 27:2-4; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 19:9-12). The members of Hedgeye's current Macro Team do not know what the file is or does. (Defs. Ex. 15, Malesevic Dep. Tr. 113:24-14:11; Defs. Ex. 8, Drake Dep. Tr. 62:20-22; Defs. Ex. 9, Jones 2022 Dep. Tr. 115:11-16). And Hedgeye has not used the file since Dale returned it to the company. (Defs. Ex. 15, Malesevic Dep. Tr. 113-14; Defs. Ex. 20, Steiner 30(b)(6) Dep. Tr. 16, 19; Defs. Ex. 9, Jones 2022 Dep. Tr. 114-15). Hedgeye's assertions at the outset of the case that the "PRICE VOLUME VOLATILITY.xlsx" was a "critical file" and source model were entirely fabricated. (*Compare* Jones Decl., Dkt. 8 ¶ 26, *with* Defs. Ex. 9, Jones 2022 Dep. Tr. 123-24).

Defendants also dispute that this file is a trade secret. (*See, e.g.*, Defendants' Responses to § VI *supra*). In addition to the reasons given above, defense expert Professor Bianchi has opined that the "PRICE VOLUME VOLATILITY.xslx" file does not contain anything beyond "basic statistics," has no "substantial calculation[s]," and is unrelated to any "macroeconomic

161

nowcast or forecast." (Bianchi Decl. Ex. 1, Bianchi Initial Report ¶ 35). Professor Bianchi has opined that the Excel files that Hedgeye claims as alleged trade secrets, including this file, "consist of standard elements generally known in the industry" and do "not have any independent economic value." (*Id.* ¶¶ 9, 11; *see also id.* ¶¶ 4-6, 35 & App'x A). Hedgeye has submitted no expert testimony whatsoever concerning this file, let alone any testimony that rebuts Professor Bianchi's conclusion.

1-259. Dale admits that in April 2021, after he left Hedgeye, Dale accessed the PRICE VOLUME VOLATILITY.xlsx file that he had copied. Andavolu Decl. Ex. 1 (Dale Aug. 2021 Rev. Interr. Resp., Resp. to Interr. No. 5).

**Defendants' Response:** Undisputed, but as noted above, Defendants dispute that the "PRICE VOLUME VOLATILITY.xlsx" file is a Hedgeye trade secret. (*See* Defendants' Response to ¶ 1-258 *supra*).

1-260. Dale admits that he had Hedgeye files open while he created the 42 Macro files. Andavolu Decl. Ex. 4 (First Dale Dep. Tr. at 145:22-146:1).

**Defendants' Response:** Defendants do not dispute that Dale provided this testimony, but Defendants dispute Hedgeye's suggestion that Dale had the Hedgeye files open for assistance in creating the 42 Macro files. Dale testified that when building his own models for 42 Macro in April 2021, he opened certain of these Excel files a few times to "double-check" that he had not "inadvertently" included "anything associated with Hedgeye," and to minimize any "overlap" between the models. (Defs. Ex. 5, Dale 2021 Dep. Tr. 84, 131-35, 143-45, 150-54, 341-46, 354). "[T]here was no extensive activity in and around Hedgeye's source files," because the purpose "was to verify." (*Id.* Tr. 146). For instance, "[a]fter [he] had chosen [his] inputs" for 42 Macro's model, he checked the "30 data points" in Hedgeye's model "to make sure there wasn't a substantial degree of overlap." (*Id.* Tr. 341-43). Dale worked long hours over many weeks to build 42 Macro's models. (*Id.* Tr. 322-40; Defs. Ex. 27, Britven Initial Report ¶ 78 (estimating

162

Dale "spent a total of 756 hours" on these models)). He built them using "publicly available information" and "proven quantitative techniques"—not by taking material from Hedgeye's files. (Defs. Ex. 5, Dale 2021 Dep. Tr. 347-49, 353-54; *see also, e.g.*, Second Dale Decl., Dkt. 28-1 ¶¶ 4, 6-9, 17, 20; Third Dale Decl., Dkt. 36-1 ¶¶ 3-4, 11; Defs. Ex. 6, Dale 2022 Dep. Tr. 90). The sole exception is that Dale "copied partial lists of Bloomberg ticker symbols," and, in some instances, rudimentary formulas, from Hedgeye files into his 42 Macro files. (Defs. Ex. 32, Dale 7/27/21 Responses to Interrogatories, No. 7). These "standard industry formulas" included the "Bloomberg formula to pull" certain metrics from Bloomberg, as well as "simple calculation[s]" for things like percentage changes and moving averages. (Defs. Ex. 6, Dale 2022 Dep. Tr. 119-25, 129-31, 133-35). These were "limited materials" and "miniscule in the context of the models." (*Id.* Tr. 163-64). Dale did this to "save [him]self a few hours of work" on tedious tasks, such as gathering ticker symbols from Bloomberg. (*Id.* Tr. 124, 131-32). And in all other respects, Dale built his models "based on his knowledge of proven techniques employed throughout the industry and using designs, features, and formulas that he independently developed." (Defs. Ex. 32, Dale 7/27/21 Responses to Interrogatories, No. 7).

1-261. Dale admits that he opened the Hedgeye files "five or six times" over a period of 'four weeks, three weeks" while creating 42 Macro's files. Andavolu Decl. Ex. 4 (First Dale Dep. Tr. at 146:2-15).

**Defendants' Response:** Defendants do not dispute that Dale provided this testimony, but Defendants dispute Hedgeye's suggestion that Dale had the Hedgeye files open for assistance in creating the 42 Macro files, as explained above. (*See* Defendants' Response to ¶ 1-260 *supra*).

1-262. Dale admits that he opened those files on his personal computer "[p]robably [the] first week of April [2021] and then maybe the third week of April [2021]." Andavolu Decl. Ex 4. (First Dale Dep. Tr. at 86:17-20).

**Defendants' Response:** Defendants do not dispute that Dale provided this testimony, but Defendants dispute Hedgeye's suggestion that Dale had the Hedgeye files open for assistance in

creating the 42 Macro files, as explained above. (*See* Defendants' Response to ¶ 1-260 *supra*).

1-263. Dale admits that those files were "the global macro risk monitor, the Hedgeye GIP model backtest . . . the price volume volatility file and the file called 'budget.'" Andavolu Decl. Ex. 4 (First Dale Dep. Tr. at 86:23-87:3; 87:4-6).

**Defendants' Response:** Defendants do not dispute that Dale provided this testimony, but Defendants dispute Hedgeye's suggestion that Dale had the Hedgeye files open for assistance in creating the 42 Macro files, as explained above. (*See* Defendants' Response to ¶ 1-260 *supra*). Defendants further note that Dale did not characterize all of these files as Hedgeye files, but rather as files he had taken "from [his Hedgeye] work computer and made copies of [in his] personal Dropbox." (Defs. Ex. 5, Dale 2021 Dep. Tr. 85-87). The "Budget" and "Price Volume Volatility" files, for instance, were stored on Dale's Hedgeye computer but contained personal information. (*Id.* Tr. 276-80, 284-85; Third Dale Decl., Dkt. 36-1 ¶ 8). Hedgeye apparently is unable to present any evidence concerning the contents or inner workings of any file other than the GMRM file.

1-264. Hedgeye cannot verify whether Dale copied other files from his Hedgeye laptop to his personal computer, because Dale deleted all of the copied files from his personal laptop. Andavolu Decl. Ex. 4 (First Dale Dep. Tr. at 88:8-14).

**Defendants' Response:** Defendants do not dispute that Dale deleted Hedgeye files from his personal laptop based on his mistaken belief that this was the appropriate way to eliminate his own access to such materials after having provided copies to his then counsel. (Defs. Ex. 5, Dale 2021 Dep. Tr. 85-88, 103, 106, 146-47).

Defendants dispute that the deletions have made it impossible to verify whether Dale copied other files from his Hedgeye laptop to his personal laptop. Hedgeye retained an expert who performed a forensic examination of Dale's personal laptop. (Defs. Ex. 338, Intrepid Forensic Report). The expert purports to have found evidence of certain files on the laptop (including in its "Recycle Bin"), and at his earlier deposition, Darius identified the very same

164

files when asked which files he had downloaded to the laptop.  (Defs. Ex. 339, Selected tabs

from Exhibit B to Intrepid forensic report; Defs. Ex. 5, Dale 2021 Dep. Tr. 148).

1-265.  Dale testified on June 15, 2021 that the Hedgeye source files that were on his personal computer were "never copied in any way, shape or form . . . ." Andavolu Decl. Ex. 4 (First Dale Dep. Tr. at 147:17-21).

**Defendants' Response:** Defendants dispute Hedgeye's misleading quotation of Dale's

testimony.  In context, it is clear that Hedgeye's counsel was asking Dale whether he had made

copies of the Hedgeye source files in any other electronic device or account:

> Q. Okay.  And [the files] were only opened though, right, never printed, of course?
> A. No.
> Q. Never forwarded via an e-mail?
> A. No, sir.
> Q. Never otherwise copied onto any kind of electronic storage device?
> A. Oh, no, not from the computer.
> Q. So the Hedgeye source files that were on your personal computer were never copied in any way, shape or form; fair enough?
> A. Yes, sir, that is correct.

(Defs. Ex. 5, Dale 2021 Dep. Tr. 147).

1-266.  But Dale later admitted that he "copied partial lists of Bloomberg ticker symbols" and "adjacent formulas" from the Hedgeye Source Models into 42 Macro's source models. Andavolu Decl. Ex. 1 (Dale Aug. 2021 Rev. Interr. Resp., Resp. to Interr. No. 7).

**Defendants' Response:** Defendants object that the statements in this paragraph are vague and

ambiguous.  As explained above, Hedgeye uses a variety of inconsistent definitions for the

defined term "Hedgeye Source Models."  (*See* Defendants' Response to ¶ 1-107 *supra*).

Subject to and without waiving that objection, Defendants do not dispute that Dale

admitted he "copied partial lists of Bloomberg ticker symbols" and "adjacent formulas" from

Hedgeye files into 42 Macro files. (Defs. Ex. 32, Dale 7/27/21 Responses to Interrogatories, No.

7).  Defendants dispute the inference that this constituted misappropriation under the trade secret

laws.  As this Court has already held, "[t]he discovery proceedings before Judge Lehrburger have

165

established that the Bloomberg ticker symbols and formulas [in Hedgeye's Excel files] are not trade secrets." (Defs. Ex. 50, 11/10/21 Court Conf. Tr. 4). These "standard industry formulas" included the "Bloomberg formula to pull" certain metrics from Bloomberg, as well as "simple calculation[s]" for things like percentage changes and moving averages. (Defs. Ex. 6, Dale 2022 Dep. Tr. 119-25, 129-31, 133-35). These were "limited materials" and "miniscule in the context of the models." (*Id.* Tr. 163-64). Dale did this to "save [him]self a few hours of work" on tedious tasks, such as gathering ticker symbols from Bloomberg. (*Id.* Tr. 124, 131-32). And in all other respects, Dale built his models "based on his knowledge of proven techniques employed throughout the industry and using designs, features, and formulas that he independently developed." (Defs. Ex. 32, Dale 7/27/21 Responses to Interrogatories, No. 7).

1-267. Dale also admitted that he "created the 'Time Series Analysis' component" of 42 Macro's source models "by copying formulas" from the Hedgeye Source Models "into a blank worksheet within the workbook." Andavolu Decl. Ex. 1 (Dale Aug. 2021 Rev. Interr. Resp., Resp. to Interr. No. 7).

**Defendants' Response:** Defendants object that the statements in this paragraph are vague and ambiguous. As explained above, Hedgeye uses a variety of inconsistent definitions for the defined term "Hedgeye Source Models." (*See* Defendants' Response to ¶ 1-107 *supra*).

Subject to and without waiving that objection, Defendants do not dispute that Dale admitted he "created the 'Time Series Analysis' component" of one of 42 Macro's files "by copying formulas" from Hedgeye files "into a blank worksheet within the workbook." (Defs. Ex. 32, Dale 7/27/21 Responses to Interrogatories, No. 7). Defendants dispute the inference that this constituted misappropriation under the trade secret laws. Hedgeye has not previously identified the Time Series Analysis component as a trade secret, and it cannot do so at this late stage. Moreover, as this Court has already held, "[t]he discovery proceedings before Judge Lehrburger have established that the … formulas [in Hedgeye's Excel files] are not trade

166

secrets." (Defs. Ex. 50, 11/10/21 Court Conf. Tr. 4). These "standard industry formulas" included the "Bloomberg formula to pull" certain metrics from Bloomberg, as well as "simple calculation[s]" for things like percentage changes and moving averages. (Defs. Ex. 6, Dale 2022 Dep. Tr. 119-25, 129-31, 133-35). These were "limited materials" and "miniscule in the context of the models." (*Id.* Tr. 163-64). Dale did this to "save [him]self a few hours of work" on tedious tasks. (*Id.* Tr. 124, 131-32). And in all other respects, Dale built his models "based on his knowledge of proven techniques employed throughout the industry and using designs, features, and formulas that he independently developed." (Defs. Ex. 32, Dale 7/27/21 Responses to Interrogatories, No. 7).

1-268. Dale admits that he accessed the Hedgeye Source Models while building the 42 Macro source files "to verify that they did not include certain features that he was developing for 42 Macro." Andavolu Decl. Ex. 1 (Dale Aug. 2021 Rev. Interr. Resp., Resp. to Interr. No. 7).

**Defendants' Response:** Defendants object that the statements in this paragraph are vague and ambiguous. As explained above, Hedgeye uses a variety of inconsistent definitions for the defined term "Hedgeye Source Models." (*See* Defendants' Response to ¶ 1-107 *supra*).

Subject to and without waiving that objection, Defendants do not dispute that Dale admitted he accessed Hedgeye files while building the 42 Macro source files "to verify that they did not include certain features that he was developing for 42 Macro." (Defs. Ex. 32, Dale 7/27/21 Responses to Interrogatories, No. 7).

1-269. On April 16, 2021, when asked, "What tools are you using to create your models," Dale responded, "The same one I've been using for the last 12 years." Jones Decl. ¶ 40.

**Defendants' Response:** Defendants dispute Hedgeye's misleadingly truncated quotation from Dale's Twitter feed. On April 16, 2021, when asked on Twitter, "What tools are you using to create your models," Dale responded, "The same one I've been using for the last 12yrs: *Microsoft Excel*." (Jones Decl. Ex. 11, Dkt. 8-11 (emphasis added)).

167

1-270. When asked via on Twitter, "Where can we see how your process will differentiate from Hedgeye?", Mr. Dale responded: "The easiest way to spot the differentiation is that Darius '#Quadzilla' Dale no longer works at Hedgeye. Firms don't produce research, research analysts produce research for firms." Jones Decl. ¶ 41.

**Defendants' Response:** Undisputed, except Defendants note that Dale wrote "for *their* firms," not "for firms." (Jones Decl. Ex. 13, Dkt. 8-13 (emphasis added)).

1-271. On April 16, 2021, in response to a Tweet which stated, "No one does a better job modeling the cycle than Hedgeye," Mr. Dale responded: "…. And the guy who built and maintained all those forecasting tools sweeps and mops the floors at @42macro now. #team42 #onwardandupward." Jones Decl. ¶ 43.

**Defendants' Response:** Undisputed, except Defendants note that the Tweet to which Dale responded said: "No one does a better job modeling the cycle than Hedgeye.  Their GIP model is actually based on the one we used at [Ray Dalio's hedge fund] Bridgewater…."  (Jones Decl. Ex. 14, Dkt. 8-14).  To the extent Hedgeye intends to offer this Tweet for the truth of the matters asserted, however, Defendants object that it is inadmissible hearsay not subject to any exception. *See* Fed. R. Evid. 802.

## X.    "Hedgeye's Confidential Notebooks"

1-272.  As part of his job duties at Hedgeye, Dale was instructed by Mr. McCullough to write down and keep information regarding Hedgeye's business operations on a daily basis.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).  Thus, no response is required.

Subject to and without waiving that objection, Defendants dispute that Dale was aware of or subject to any Hedgeye policy concerning keeping or storing notebooks, or that he was required to record any particular information about "Hedgeye's business operations on a daily basis."  (*See* Defs. Ex. 5, Dale 2021 Tr. 161 ("There is no Hedgeye policy about keeping notebooks …. There is no Hedgeye policy about storing notebooks …. [Any such policies] were