# Defendants' Response to Hedgeye's Statement of Undisputed Material Facts
## Part 3 of 3

not communicated to us.")).

1-273. Dale recorded that information in notebooks, including bound, ruled, composition notebooks with black and white covers.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

Thus, no response is required.

Subject to and without waiving that objection, Defendants do not dispute that Dale kept

handwritten notebooks while he worked at Hedgeye.

1-274. The notebooks marked at Dale's deposition held on June 15, 2021 (the "First Dale Dep."), as Exhibits 2, 3, 4, 5, 6, 7 and 8, contain Dale's handwritten notes made by him while he was a Hedgeye employee. Andavolu Decl. Ex. 4 (First Dale Dep. Tr. at 165:16-18; 166:12-15; 167:1-8; 168:20-169:5; 174:2-10; 176:25-177:23).

**Defendants' Response:** Undisputed.

1-275. The information that Dale recorded in his notebooks included:
   a. Notes of conversations with Hedgeye institutional subscribers, for example:





**Defendants' Response:** Defendants object to this statement under Federal Rules of Civil

Procedure 26(e) and 37(c). Hedgeye has never previously identified any of these specific

notations as relevant to its claims despite multiple requests for identification in discovery

requests and at court conferences. Throughout years of fact discovery, Defendants pressed

Hedgeye to identify which particular items, if any, among Dale's voluminous volumes of

handwritten notes were relevant to this case. (*See, e.g.*, Dkts. 162, 221). In December 2021, this

Court ordered Hedgeye to state its claims with respect to any purported trade secrets in the

notebooks with particularity, and specifically directed Hedgeye to identify any "notes concerning

the identity of Hedgeye customers" that it claimed as a trade secret. (Dkt. 162 at 4). Instead of

identifying any specific notes, Hedgeye took the position that "[e]ach notebook in its entirety, as

well as the totality of the notebooks collectively are trade secrets, but this category does not refer to any particular specific portion of a notebook." (Defs. Ex. 41, Hedgeye's 4/7/22 Interrogatory Responses, No. 1 at 5). At a subsequent Court conference in April 2022, Judge Lehrburger confirmed that Hedgeye did "not claim any aspect, single aspect, any individual aspect, anything in the notebooks is a trade secret but does claim that the entirety of the notebooks are a trade secret." (Defs. Ex. 51, 4/28/22 Court Conf. Tr. 47-48). He ruled that Hedgeye would "be precluded from taking a position that's contrary to that." (*Id.* at 51).

Hedgeye expressly linked its breach of confidentiality claims to its trade secret claims. In a June 11, 2022 interrogatory response seeking information about each item Hedgeye claims as "proprietary" in this case, Hedgeye referred to its interrogatory response identifying its purported trade secrets—which deliberately omitted any reference to any particular notations in the notebooks. (Defs. Ex. 42, Hedgeye's 6/11/2022 Interrogatory Responses, Dale Interrogatory No. 7). Hedgeye also asserted that the same "facts are the basis for" its trade secret misappropriation and contract claims. (*Id.*, Lamar Interrogatory No. 13). Hedgeye's witnesses also failed to identify these specific notations as confidential during their depositions. For instance, when asked for "an example of any content from any Dale notebook that records or applies Hedgeye's proprietary analysis," Hedgeye's Director of Research Daryl Jones responded: "I haven't seen all of his notebooks, so I can't say." (Defs. Ex. 9, Jones 2022 Dep. Tr. 189-90). He continued: "I saw a subsection of the notebooks [in the context of this litigation]" and ventured only that "the repeated writing down of our process was *probably* proprietary." (*Id.* Tr. 190 (emphasis added); *see also id.* Tr. 187). The Federal Rules do not permit Hedgeye to ambush Defendants with newly invented claims at summary judgment, and Defendants reserve the right to seek sanctions for this conduct. Thus, no response is required.

171

Subject to and without waiving those objections, Defendants do not dispute that the pages of the notebooks identified appear to refer to the listed entities, with the following exceptions:

Paragraph 1-275 (a)(v) appears to include references to pages that do not discuss Monashee. (*See* Pl. Ex. 56 at 15-16, Pl. Ex. 54 at 4-5).

Paragraph 1-275(b)(i) does not accurately describe the notebooks' contents, which do not discuss any effort to discuss "a meeting with Nadine Terman to create a new business 'Powered by Hedgeye.'" The pages cited appear to refer to two separate meetings:  one on December 12, 2019, with "Nadine and Ben," and one on February 4, 2020 with "Teri" (likely Hedgeye's Chief Operating Officer, Teri Van Noy).  (*See* Pl. Ex. 57 at 123).

Defendants further dispute that the identified notations are material, as Hedgeye has not calculated any damages related to any notation and many of the notations appear to have been recorded years ago and thus contain information that is outdated and stale.

1-276.  Hedgeye has a total of seven of Dale's notebooks. Andavolu Decl. Ex. 58 (First Dale Dep. Ex. 2); Andavolu Decl. Ex. 57 (First Dale Dep. Ex. 3); Andavolu Decl. Ex. 55 (First Dale Dep. Ex. 4); Andavolu Decl. Ex. 56 (First Dale Dep. Ex. 5); Andavolu Decl. Ex. 53 (First Dale Dep. Ex. 6); Andavolu Decl. Ex. 59 (First Dale Dep. Ex. 7); Andavolu Decl. Ex. 54 (First Dale Dep. Ex. 8).

**Defendants' Response:**  Undisputed that Hedgeye has at least the seven identified notebooks in its possession.  Defendants dispute that Hedgeye has "a total of seven" notebooks—it has at least nine.  Defendants produced copies of two additional notebooks following Dale's 2021 deposition that are not included in the above list.  (*See* Defs. Ex. 342, Dale 2020 Notebook; Defs. Ex. 343, Dale 2021 Notebook; *see also* Dkt. 81-1 at 2 (Hedgeye's counsel, stating that on "July 23 [2021], Hedgeye's counsel received a package from Defendant's counsel containing … two notebooks"); Dkt. 81-2 ¶ 2 (Hedgeye's counsel, declaring, under penalty of perjury, that the documents were labelled "2020 Notebook …" and "2021 Notebook …")).

1-277.  After Dale resigned from Hedgeye on March 28, 2021, Hedgeye found three of

the notebooks in Dale's desk area. Third Declaration of Daryl Jones, dated July 16, 2021 ("Third Jones Decl.") ¶ 3; Andavolu Decl. Ex 58 (First Dale Dep. Ex. 2); Andavolu Decl. Ex. 57 (First Dale Dep. Ex. 3); Andavolu Decl. Ex. 55 (First Dale Dep. Ex. 4); Andavolu Decl. Ex. 56 (First Dale Dep. Ex. 5); Andavolu Decl. Ex. 53 (First Dale Dep. Ex. 6); Andavolu Decl. Ex. 59 (First Dale Dep. Ex. 7); Andavolu Decl. Ex. 54 (First Dale Dep. Ex. 8).

**Defendants' Response:** Undisputed.

1-278. On April 28, 2021, a box from Dale arrived at Hedgeye's office. Third Jones Decl. ¶ 2.

**Defendants' Response:** Undisputed that a box from Dale arrived at Hedgeye's office on that date.

Defendants dispute that Dale improperly withheld any notebooks. Hedgeye never told Dale it viewed his notebooks as confidential materials while Dale worked there. (Defs. Ex. 19, Parsio 30(b)(6) Dep. Tr. 88). On the contrary, Dale routinely ███████████████

██████████████████████████████████████

███████ (Defs. Ex. 45, Hedgeye's 1/9/23 RFA Responses, Nos. 37, 38). Hedgeye did not ask Dale to return his notebooks when he announced his intention to resign from Hedgeye or at any point thereafter, until this litigation commenced. Accordingly, Dale did not know that Hedgeye expected him to return his notebooks after his departure. Dale first learned that Hedgeye was "demanding repossession of my handwritten notebooks" and other items when this lawsuit was filed on April 26, 2021. (Defs. Ex. 443, DALE0144046). On that date, Dale wrote to Tanya Waite, Hedgeye's Head of Human Resources, "I had no idea these things could be considered valuable to anyone, let alone me, but I'm shipping them back now to comply with their request regardless." (*Id.*).

1-279. That box contained, among other things, four composition notebooks. Third Jones Decl. ¶ 2.

**Defendants' Response:** Undisputed that Dale sent Hedgeye a box containing four composition notebooks.

173

Defendants dispute that Dale improperly withheld any notebooks. Hedgeye never told Dale it viewed his notebooks as confidential materials while Dale worked there. (Defs. Ex. 19, Parsio 30(b)(6) Dep. Tr. 88). On the contrary, Dale routinely ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████ Hedgeye did not ask Dale to return his notebooks when he announced his intention to resign from Hedgeye or at any point thereafter, until this litigation commenced. Accordingly, Dale did not know that Hedgeye expected him to return his notebooks after his departure. Dale first learned that Hedgeye was "demanding repossession of my handwritten notebooks" and other items when this lawsuit was filed on April 26, 2021. (Defs. Ex. 443, DALE0144046). On that date, Dale wrote to Tanya Waite, Hedgeye's Head of Human Resources, "I had no idea these things could be considered valuable to anyone, let alone me, but I'm shipping them back now to comply with their request regardless." (*Id.*).

1-280. Those four composition notebooks were returned to Hedgeye by Dale. Third Jones Decl. ¶ 2.

**Defendants' Response:** Undisputed that Dale sent Hedgeye a box containing four composition notebooks.

Defendants dispute that Dale improperly withheld any notebooks. Hedgeye never told Dale it viewed his notebooks as confidential materials while Dale worked there. (Defs. Ex. 19, Parsio 30(b)(6) Dep. Tr. 88). On the contrary, ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████ Hedgeye did not ask Dale to return his notebooks when he announced his intention to resign from Hedgeye or at any point thereafter, until this litigation commenced. Accordingly, Dale did not know that Hedgeye

174

expected him to return his notebooks after his departure.  Dale first learned that Hedgeye was

"demanding repossession of my handwritten notebooks" and other items when this lawsuit was

filed on April 26, 2021.  (Defs. Ex. 443, DALE0144046).  On that date, Dale wrote to Tanya

Waite, Hedgeye's Head of Human Resources, "I had no idea these things could be considered

valuable to anyone, let alone me, but I'm shipping them back now to comply with their request

regardless."  (*Id.*).

      1-281.  During the course of Dale's employment at Hedgeye (from July 17, 2009 to March 28, 2021), Dale filled more than seven notebooks with his handwritten notes. Third Jones Decl. ¶ 4.

**Defendants' Response:** Undisputed.

      1-282.  Dale used many notebooks over the years that were not left with or returned to Hedgeye after Dale's departure. For example:

    a. An email from Dale to Josh Balch of Hedgeye dated January 21, 2021 contains a photograph of a page from a notebook with Dale's handwriting. That notebook was not left with or returned to Hedgeye. Andavolu Decl. Ex. 60 (First Dale Dep. Ex. 9); Andavolu Decl. Ex. 4 (First Dale Dep. Tr. at 181:24-182:11).

    b. An email from Dale to ███████████████ dated March 23, 2021 contains a photograph of a page from a notebook with Dale's handwriting. That notebook was not left with or returned to Hedgeye. Andavolu Decl. Ex. 61 (First Dale Dep. Ex. 10); Andavolu Decl. Ex. 4 (First Dale Dep. Tr. at 185:1-17).

    c. Dale stated that the notebook containing the page shown in Dale's March 23, 2021 email to ██████ was missing. Andavolu Decl. Ex. 4 (First Dale Dep. Tr. at 189:9-16).

    d. A photograph marked at Dale's first deposition shows a page from a notebook with notes in Dale's handwriting. That notebook was not left with or returned to Hedgeye. Andavolu Decl. Ex. 62 (First Dale Dep. Ex. 12); Andavolu Decl. Ex. 4 (First Dale Dep. Tr. at 195:18-196:17).

    e. A photograph marked at Dale's first deposition shows a page of notes from a client meeting in Dale's handwriting. Those notes were not left with or returned to Hedgeye. Andavolu Decl. Ex. 63 (First Dale Dep. Ex. 14); Andavolu Decl. Ex. 4 (First Dale Dep. Tr. at 191:6-10).

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

175

It is grossly misleading for Hedgeye to rely on statements from Dale's June 2021 deposition concerning whether various notebooks were returned when it is undisputed that Dale produced additional notebooks to Hedgeye's counsel shortly *after* that deposition took place. (*See* Dkt. 81-1 at 2 (Hedgeye's counsel, stating that on "July 23 [2021], Hedgeye's counsel received a package from Defendant's counsel containing … two notebooks"); Dkt. 81-2 ¶ 2 (Hedgeye's counsel, declaring, under penalty of perjury, that the documents were labelled "2020 Notebook …" and "2021 Notebook …")). Hedgeye offers no evidence whatsoever to support the contention that Dale used "many" more notebooks while at Hedgeye than the nine notebooks he returned after his departure.

Defendants further object that the deposition testimony cited in Paragraph 1-282(e) does not concern the relevant exhibit showing handwritten notes (Deposition Exhibit 14). It specifically concerns a *different* exhibit, No. 11, an iPhone photo, and the question posed concerns an image of Dale's computer screen in the background of that photo. (Defs. Ex. 5, Dale 2021 Dep. Tr. 191:6-10 ("Q. …[Y]ou recognize the screen that's shown in Exhibit 11?"); *see also id.* at 189-90 (describing Exhibit 11)). Thus, no response is required.

Subject to and without waiving those objections, Defendants dispute that Dale failed to return notebooks containing these notations:

The page cited in Paragraph 1-282(a) is included in the 2021 notebook Dale returned to Hedgeye in July 2021. (Defs. Ex. 343, Dale 2021 Notebook at p. 13).

The page cited in Paragraphs 1-282(b) and (c) is included in the 2021 notebook Dale returned to Hedgeye in July 2021. (Defs. Ex. 343, Dale 2021 Notebook at p. 63).

The page cited in Paragraph 1-282(d) is undated; thus, Defendants are unable to determine which notebook it originated from, if any. (Pl. Ex. 62).

176

At his deposition, Dale was uncertain whether the page cited in Paragraph 1-297(e) was contained in any of his notebooks, because that image includes "hole punches." (Defs. Ex. 5, Dale 2021 Dep. Tr. 200).

More broadly, Defendants dispute the inference that Hedgeye's inability to locate a page of a notebook indicates that Dale failed to return it after his departure. (*See* Defs. Ex. 5, Dale 2021 Dep. Tr. 175 (testifying that he took notebooks on the road and lost them on occasion)).

## XI.    "Hedgeye's Customer Lists"

1-283. Hedgeye has hundreds of institutional investor clients who pay significant amounts of money to subscribe to Hedgeye's research. First Jones Decl. ¶ 10.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, the paragraph of Daryl Jones's declaration cited as evidentiary support is not competent evidence because it is entirely conclusory and therefore must be disregarded. Fed. R. Civ. P. 56(c)(4). Thus, no response is required.

Subject to and without waiving that objection, Defendants dispute that "Hedgeye has hundreds of institutional investor clients." The "Institutional Macro Tiers" lists identify around 120 institutional customers. (*E.g.*, Defs. Ex. 344, HE0256333, with attachment Defs. Ex. 346, HE0256334 (Institutional Macro Tiers – MAR '21.xlsx, showing 128 customer names)). Other lists of Hedgeye institutional customers that circulated around the firm in 2021 similarly show around 100 institutional customers. (Ex. 435 HE0217351 with attachment Ex. 434, HE0217352).

1-284. Hedgeye's standard institutional service agreement promises institutional subscribers that Hedgeye will not disclose their identity. First Jones Decl. ¶ 10.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

177

As set forth in the accompanying motion to strike, the paragraph of Daryl Jones's declaration cited as evidentiary support is not competent evidence because it is entirely conclusory and therefore must be disregarded. Fed. R. Civ. P. 56(c)(4).

Defendants further object that Hedgeye's reliance on Jones's declaration in lieu of the "standard institutional service agreement" itself violates the best evidence rule in Rule 1002 of the Federal Rules of Evidence, which generally provides that "an original writing …. is required in order to prove its content." Thus, no response is required.

Subject to and without waiving those objections, Defendants dispute that "Hedgeye's standard institutional service agreement promises institutional subscribers that Hedgeye will not disclose their identity." Hedgeye produced in discovery a document entitled "TEMPLATE STANDARD SERVICE AGREEMENT." (Defs. Ex. 345, HE0216628). This document does not promise that institutional subscribers' identities will be kept confidential. Hedgeye agrees only that it will not disclose customer identities "in any marketing, promotional, or sales material" or in "media program[s]" without the customer's written consent. (*Id.* at 5 ¶ 17). It further states that subscriber identities may be disclosed at Hedgeye events to other participants, including "non-subscribers" and "potentially members of the media." (*Id.*).

1-285. Hedgeye has assembled customer lists over a period of years, through the expenditure of substantial time and money, including personal solicitation. First Jones Decl. ¶ 12.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, the paragraph of Daryl Jones's declaration cited as evidentiary support is not competent evidence because it is entirely conclusory and therefore must be disregarded. Fed. R. Civ. P. 56(c)(4). Thus, no response is required.

Subject to and without waiving that objection, Defendants dispute that the customer lists

178

Hedgeye claims are at issue required "expenditure of substantial time and money" to assemble.

Hedgeye asserts that Dale misappropriated four customer lists. (*See* ¶¶ 1-289, 1-291 *infra*).

Three of those lists are entitled "Institutional Macro Tiers." (*See* ¶ 1-289 *infra*). Those

documents are short lists reflecting the clients Dale and McCullough worked with while Dale

was employed at Hedgeye, and Dale himself put those lists together for his own convenience.

(*See* Defs. Ex. 347, HE0359206, attaching Defs. Ex. 348 HE0359211 ("Institutional Macro Tiers

– August 2020.xlsx")); Defs. Ex. 344, HE0256333, with attachment Defs. Ex. 346, HE0256334

("Institutional Macro Tiers – MAR '21.xlsx"); Defs. Ex. 349, HE0216616 (April 8, 2021 email,

cc'ing Jones, with the subject line: "Casey, I believe you helped Darius with this chart.")).

Indeed, the declaration Hedgeye proffered from Alisha Zhang indicates that Dale created these

files before he announced his resignation from Hedgeye. (*See* Zhang Decl. Ex. 5 (showing the

Institutional Macro Tiers - JAN '21.xlsx file was created on December 31, 2020 and "last

written" on January 26, 2021; the FEB '21 file was created on February 1, 2021 and "last

written" on February 27, 2021; and the MAR '21 file was created on March 1, 2021 and "last

written" on March 15, 2021)).

The remaining list—the "Domus" list—was simply an automatically generated email

distribution list.   (Defs. Ex. 5, Dale 2021 Dep. Tr. 307-11).

1-286.  Hedgeye's customer lists reflect Hedgeye's selection of customers constituting a specialized market; that is, buy-side investors who are interested in particular investment services such as dynamic investment models and daily podcasts, their interest level, and the amount they wish to pay for such research. First Jones Decl. ¶ 12.

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

As set forth in the accompanying motion to strike, the paragraph of Daryl Jones's declaration

cited as evidentiary support is not competent evidence because it is entirely conclusory and

therefore must be disregarded. Fed. R. Civ. P. 56(c)(4).

Defendants further object that Hedgeye's reliance on Jones' declaration in lieu of "Hedgeye's customer lists" violates the best evidence rule in Rule 1002 of the Federal Rules of Evidence, which generally provides that "an original writing …. is required in order to prove its content." Thus, no response is required.

Subject to and without waiving those objections, Defendants dispute that the customer lists Hedgeye claims are at issue "reflect Hedgeye's selection of customers constituting a specialized market" or their interest in various products or price points. Hedgeye asserts that Dale misappropriated four customer lists. (*See* ¶¶ 1-289, 1-291 *infra*). Three of those lists are entitled "Institutional Macro Tiers." (*See* ¶ 1-289 *infra*). Hedgeye admits that its institutional customer are "known Wall Street institutions." (Defs. Ex. 2, Blum 2022 Dep. Tr. 220). Hedgeye "identif[ies] prospects for potential institutional client subscriptions" by "systematically reach[ing] out to [the] firms" listed in "Hedge Fund Alert," a third-party publication to which Hedgeye subscribes. (Defs. Ex. 9, Jones 2022 Dep. Tr. 237-39). Moreover, the "Institutional Macro Tiers" lists simply identify the name of the institution and the products and services they received from Hedgeye (primarily, access to Dale or McCullough). They do not provide any information about the institutions' preferences or even direct contact information. (*E.g.*, Defs. Ex. 344, HE0256333, with attachment Defs. Ex. 346, HE0256334 (Institutional Macro Tiers – MAR '21.xlsx)).

The remaining list—the Domus list—was simply an email distribution list. (Defs. Ex. 5, Dale 2021 Dep. Tr. 307-11). Hedgeye cites no evidence that it included any information about what services the listed individuals are interested in or the amount they wish to pay.

1-287. One of the files that Dale accessed on the Hedgeye Laptop, and copied to his personal Dropbox was called "Customers." Zhang Decl. ¶ 12.

180

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*).

Defendants further object that the cited paragraph in Zhang's declaration does not support the proposition that Dale "copied" anything "to his personal Dropbox" on or around his departure. It does not discuss Dropbox at all. (*See* Zhang Decl. ¶ 12). Thus, no response is required.

Subject to and without waiving these objections, Defendants dispute that Dale accessed the "Customers" folder improperly. Zhang's declaration shows that Dale last accessed the "Customers" folder on March 23, 2021—several days before March 28, which Hedgeye claims was Dale's last day at the firm. (Zhang Decl. ¶ 12). Dale accessed the folder on that date in the course of performing work for Hedgeye. On March 23, 2021, Dale sent an email to another Hedgeye employee attaching a document entitled "Institutional Macro Tiers – MAR '21.xlsx"— one of the documents Zhang declares was saved in the "Customers" folder. (Defs. Ex. 344, HE0256333, with attachment Defs. Ex. 346, HE0256334; Zhang Dec. Exhibit 5). There is no evidence that Dale accessed these files after this point.

1-288. The "Customers" folder contained 3 Excel files, 2 PDF files and 1 PNG file. Zhang Decl. ¶ 13, Ex. 5.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*). Thus, no response is required.

Subject to and without waiving that objection, Defendants do not dispute that the

181

"Customers" folder on Dale's Hedgeye laptop contained the listed materials.

1-289. The 3 Excel files were called "Institutional Macro Tiers – MAR '21.xlsx," "Institutional Macro Tiers – FEB '21.xlsx," and "Institutional Macro Tiers – JAN '21.xlsx." Zhang Decl. Ex. 5.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). The Zhang declaration is conclusory, inadmissible, and should be excluded. (*See* Defendants' Response to ¶ 1-140 *supra*). Thus, no response is required.

Subject to and without waiving that objection, Defendants do not dispute that the "Customers" folder on Dale's Hedgeye laptop contained the listed materials.

1-290. Those 3 Excel files contained curated lists of the names of Hedgeye's highest paying clients at every level of the Macro business. Jones Decl. ¶ 33.

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). As set forth in the accompanying motion to strike, the paragraph of Daryl Jones's declaration cited as evidentiary support is not competent evidence because it is entirely conclusory and therefore must be disregarded. Fed. R. Civ. P. 56(c)(4).

Defendants further object that Hedgeye's reliance on Jones' declaration in lieu of the relevant Excel files violates the best evidence rule in Rule 1002 of the Federal Rules of Evidence, which generally provides that "an original writing …. is required in order to prove its content." Thus, no response is required.

Subject to and without waiving those objections, Defendants dispute Hedgeye's characterization of these lists. The "Institutional Macro Tiers" lists were created by Dale during the course of his work at Hedgeye to identify the institutional clients that he and McCullough serviced directly. (*See* Defs. Ex. 347, HE0359206, attaching Defs. Ex. 348 HE0359211

182

("Institutional Macro Tiers – August 2020.xlsx"); Defs. Ex. 344, HE0256333, with attachment

Defs. Ex. 346, HE0256334 ("Institutional Macro Tiers – MAR '21.xlsx"); Defs. Ex. 349,

HE0216616 (April 8, 2021 email, cc'ing Jones, with the subject line: "Casey, I believe you

helped Darius with this chart.")).

1-291.  Before leaving Hedgeye, Dale uploaded over 5,000 - 10,000 contacts from Hedgeye's master list of contacts into Dale's personal "My Contacts" list in Hedgeye's StreetContxt system. Andavolu Decl. Ex. 4. (First Dale Dep. Tr. 308:21-309:9).

**Defendants' Response:** Undisputed.  (Defs. Ex. 5, Dale 2021 Tr. 305-306).

1-292.  To disguise his actions, Dale then copied all of the contacts to another personal folder, named for a local charity that Dale was known to be associated with, named DOMUS, and which previously had only 65 contacts.  Andavolu Decl. Ex. 4. (First Dale Dep. Tr. 308:21-309:9).

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The cited deposition testimony does not concern the "DOMUS" folder, let alone suggest that

Dale was attempting to "disguise his actions."  Thus, no response is required.

Subject to and without waiving that objection, Defendants do not dispute that Dale copied

contacts to a "DOMUS" folder.  (Defs. Ex. 5, Dale 2021 Dep. Tr. 313).  Dale testified that folder

previously contained "several hundred" contacts.  (Defs. Ex. 5, Dale 2021 Dep. Tr. 304-05).

1-293.  Dale then exported the list to himself. Andavolu Decl. Ex. 4. (First Dale Dep. Tr. 308:21-309:9).

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence.  Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d).

The deposition testimony cited as evidentiary support does not concern whether Dale "exported

the list to himself."  Thus, no response is required.

Subject to and without waiving that objection, Defendants do not dispute that Dale

created a distribution list protocol in the Street Contxt platform—essentially, a link that enables

183

one to send a mass email.  (Defs. Ex. 5, Dale 2021 Dep. Tr. 307:13-308:12, 309:19-310:1).  Dale

did not use the link to send a mass email and he deleted the link.  (Defs. Ex. 5, Dale 2021 Dep.

Tr. 313:20-317:12).

**XII.   "Hedgeye's Registration as an Investment Adviser"**

1-294.  In June 2008, Hedgeye registered as an Investment Adviser with the State of Connecticut Department of Banking and Securities Division under the name Research Edge, LLC. Andavolu Decl. Ex. 64 (HE0373808).

**Defendants' Response:** Undisputed.

1-295.  In 2010, Research Edge, LLC changed its name to Hedgeye Risk Management, LLC, and been registered with the State of Connecticut Department of Banking and Securities Division since that time. Andavolu Decl. Ex. 64 (HE0373808).

**Defendants' Response:** Undisputed.

1-296.  Hedgeye maintains a Code of Ethics that is distributed to all employees at the firm. Andavolu Decl. Ex. 65 (HE0375148); Andavolu Decl. Ex. 66 (HE0379661); Andavolu Decl. Ex. 67 (HE0380866); Andavolu Decl. Ex. 68 (HE0373932).

**Defendants' Response:** Defendants object that the statements in this paragraph are not

supported by competent or admissible evidence insofar as none of the cited documents support

the statement that Hedgeye distributed its Code of Ethics to all employees at the firm.  Fed. R.

Civ. P. 56(c)(2) and Local Rule 56.1(d).  Thus, no response is required.

Subject to and without waiving that objection, Defendants do not dispute that Hedgeye

maintains a Code of Ethics and that some versions of the Code of Ethics were distributed to

Hedgeye employees.  (See, e.g., Pl. Ex. 70 (Second Parsio Dep. Tr. 167:15-25)).

1-297.  Hedgeye's Code of Ethics includes a Personal Trading Policy, which is periodically updated. Andavolu Decl. Ex. 69 (HE0375174).

**Defendants' Response:** Disputed. The Hedgeye Code of Ethics contains a section on Personal

Securities Transactions.  (See, e.g., Pl. Ex. 65 at HE0375151).  The Personal Trading Policy

referenced in this paragraph is dated April 2016 and purports to be a Supplement to the Code of

184

Ethics. There is no evidence in this document or elsewhere of a process to periodically update the Personal Trading Policy. The contact person on the document (Moshe Silver) is no longer with Hedgeye. (Pl. Ex. 76, First McCullough Dep. Tr. 359:8-12).

1-298. Since March 2017, Anthony Parsio, Hedgeye's Chief Compliance Officer, has been involved in the completion of Hedgeye's Form ADV Part 2A. Andavolu Decl. Ex. 70. Transcript of Deposition of Anthony Parsio held on February 3, 2023 (the "Second Parsio Dep. Tr.") 12:3-13:20.

**Defendants' Response:** Undisputed.

1-299. The following statement is in each of Hedgeye's Form ADVs from March 2017 – March 2022: "Hedgeye is not registered with the Securities Exchange Commission ('SEC') as an investment adviser under the Investment Advisers Act of 1940, as amended. Hedgeye has no assets under management and has no investment advisory clients." Andavolu Decl. Ex. 71 (HE0373828); Andavolu Decl. Ex. 72 (HE0373855); Andavolu Decl. Ex. 73 (HE0373875); Andavolu Decl. Ex. 64 (HE0373808); Andavolu Decl. Ex. 74 (HE0373895); Andavolu Decl. Ex. 75 (HE0373915).

**Defendants' Response:** Undisputed that the quoted language is contained in the selected ADVs.

Defendants dispute the implication that the statements were accurate. Sierpinski Capital Management, a Hedgeye affiliate run by McCullough and Blum, provided asset management services. (*See, e.g.*, Pl. Ex. 44, Second McCullough Dep. Tr. 212:24-213-6; Pl. Ex. 74 at HE0373911 (describing Sierpinski as "an active asset manager" and acknowledging McCullough's ownership and Blum's position as President); Pl. Ex. 88, McNamara Dep. Tr. 14:18-15:6 (testifying that Sierpinski's decision-making was "completely driven by Hedgeye)). For additional evidence of Hedgeye's control over Sierpinski, *see* Defendants' Responses to ¶¶ 1-304 – 1-307 *infra*. Hedgeye shared the contact information of its mass market subscribers with Sierpinski. (*See, e.g.*, Pl. Ex. 74 at HE0373912). In addition to the Sierpinski relationship, Hedgeye also advised clients through RTAs, which involved making real-time recommendations to purchase or sell securities, circulated as opportunities arose. (*See, e.g.*, Pl. Ex. 70, Second Parsio Dep. Tr. 51:10-54:9; Pl. Ex. 88, McNamara Dep. Tr. 103:18-104:24 (explaining that

185

RTAs provide "explicit direction" in the form of "recommending buy and sell transactions")).

Hedgeye further provided bespoke advice to selected institutional clients, including direct access

to Hedgeye professionals through unmonitored phone conversations, and special projects

conducted at request of particular client. (*See, e.g.*, Pl. Ex. 70, Second Parsio Dep. Tr. 34:15-

36:21, 107:23-113:4; Pl. Ex. 64 (2020 ADV) at HE0373812-13 (describing special services and

access provided certain institutional subscribers)).

1-300. The following statement is in each of Hedgeye's Form ADVs from March 2017 –
March 2022: Hedgeye believes that it qualifies for the "newsletter exemption" and therefore is
not an investment adviser under SEC regulations, requiring registration with the SEC under the
Advisors Act of 1940. Andavolu Decl. Ex. 71 (HE0373828); Andavolu Decl. Ex. 72
(HE0373855); Andavolu Decl. Ex. 73 (HE0373875); Andavolu Decl. Ex. 64 (HE0373808);
Andavolu Decl. Ex. 74 (HE0373895); Andavolu Decl. Ex. 75 (HE0373915).

**Defendants' Response:** Undisputed that the quoted language is contained in the selected ADVs.

Defendants dispute the implication the statements were accurate. Hedgeye was not

entitled to claim the newsletter exemption. Hedgeye's own expert confirms that the exemption is

only available if applied to a "bona fide" publication that "provides disinterested or impersonal

advice and has general and regular circulation. (Declaration of Jeffrey Hiller ("Hiller Decl.") Ex.

1 at 10-11). Hedgeye' business fails all of these elements.

First, it is not merely a bona fide publisher; it also provides bespoke advice to selected

institutional clients, including direct access to Hedgeye professionals through unmonitored

phone conversations, and special projects conducted at request of particular client. (*See, e.g.*, Pl.

Ex. 70, Second Parsio Dep. Tr. 34:15-36:21, 107:23-113:4; Pl. Ex. 64 (2020 ADV) at

HE0373812-13 (describing special services and access provided certain institutional

subscribers)).

Second, it is not of general and regular circulation. It is not of general circulation

because critical insights and recommendations are limited to a small set for favored institutional

subscribers. (Pl. Ex. 64 (2020 ADV) at HE0373812-13). It is not of a regular circulation because one of its key products – RTAs – are not released on any regularized schedule, but are specifically timed and released to exploit temporary market opportunities. (Pl. Ex. 70, Second Parsio Dep. Tr. 51:10-54:9; Pl. Ex. 88, McNamara Dep. Tr. 103:18-104:24; Pl. Ex. 76, First McCullough Dep. Tr. 89:8-22 (real-time alerts generated out of live market feeds)).

Third, Hedgeye's advice is not disinterested. Hedgeye personnel trade in ETFs recommended by the firm. (Pl. Ex. 70, Second Parsio Dep. Tr. 138:34-139:12, 141:7-11).

In addition, Hedgeye personnel touted opportunities to invest in Sierpinski, a firm owned and controlled by Keith McCullough and which invested in products also recommended by Hedgeye. (Defs. Ex. 2, Blum 2022 Dep. Tr. 78:15-23; Defs. Ex. 411, HE0231130 (introduction of Hedgeye client to Sierpinski); Pl. Ex. 70, Second Parsio Dep. Tr. 146:18-25 (admitting that McCullough referred to Sierpinski on Hedgeye's "The Macro Show"); Defs. Ex. 10, Jones 2023 Dep. Tr. 432:16-25 (same); Pl. Ex. 88 (McNamara Dep. Tr. 14:12-15:22, 103:18-104:24); Defs. Ex. 412, SCM-00000439 (describing Sierpinski as based on rules-based trading from Hedgeye research and attaching outputs from the Hedgeye GIP model); Pl. Ex. 67, First McCullough Dep. Tr. 51:10-54:9 (McCullough admitting he owns Sierpinski "outright.")).

For additional information and evidence refuting Hedgeye's positions on the publisher's exemption, *see* Chen Declaration Ex. 1 (Expert Report of Richard Chen).

## XIII. "Hedgeye's Disclosures Regarding Sierpinski Capital Management ('Sierpinski')"

1-301. Beginning in March 2020, Hedgeye's Form ADVs began to include references to its relationship with Sierpinski Capital Management. Andavolu Decl. Ex. 70 (Second Parsio Dep. Tr. 85:4-85:19).

**Defendants' Response:** Undisputed.

1-302. Hedgeye's March 2020 Form ADV disclosed that:

Hedgeye's founder, CEO and indirect majority owner, Keith

187

McCullough holds an indirect majority ownership interest in an active asset manager, Sierpinski Capital Management, LLC, ("Sierpinski Capital"). With President Michael Blum serves as president of Sierpinski Capital. Neither Hedgeye, nor Mr. McCullough, have day-to-day control over the operations of Sierpinski Capital. Neither Hedgeye nor any individual employed by Hedgeye (including Mr. McCullough and Mr. Blum) have discretion over the portfolio investments of Sierpinski Capital. Sierpinski Capital subscribes to Hedgeye's products and services.

Andavolu Decl. Ex. 64 (HE0373808).

**Defendants' Response:** Undisputed that the ADV contains the quoted language but otherwise disputed to the extent it seeks to imply that the quoted language accurately describes the relationship between Hedgeye and Sierpinski. (*See* Defendants' Responses to ¶¶ 1-305 & 1-307 *infra*).

1-303. Hedgeye's March 2021 Form ADV disclosed that:

As stated earlier, Hedgeye's founder, CEO, and indirect majority owner, Keith McCullough holds an indirect majority ownership interest in an active asset manager, Sierpinski Capital Management. President Michael Blum serves as President of Sierpinski Capital Management. Neither Hedgeye, nor Mr. McCullough, have day-to-day control over the operations of Sierpinski Capital Management.

Hedgeye has adopted a number of policies and practices designed to address conflicts resulting from its relationship with Sierpinski Capital Management. Neither Hedgeye nor any individual employed by Hedgeye (including Mr. McCullough and Mr. Blum) have discretion or control over the portfolio investments of Sierpinski Capital Management. Sierpinski Capital Management does not pay commission-based or performance fees to Hedgeye. Hedgeye provides research to Sierpinski Capital Management at the same time it provides research to all other Institutional Subscribers. Hedgeye does not engage in selective disclosure, therefore, Sierpinski Capital Management does not receive prereleased nor advanced research ahead of other subscribers. Sierpinski Capital Management does not compensate Hedgeye for investments or client referrals. Hedgeye does not participate in entering orders or making investment determinations for Sierpinski Capital Management.
Hedgeye does provide contact information for Sierpinski Capital

188

Management to Hedgeye Mass-Market subscribers for subscribers seeking an active asset manager employing Hedgeye research. NorthCoast Asset Management is the exclusive manager of the Sierpinski Tactical Growth Strategy, based on Sierpinski's asset allocation and investment process. NorthCoast pays management fees to Sierpinski Capital Management; NorthCoast does not pay Hedgeye for referrals. Hedgeye also provides contact information for NorthCoast Asset Management, and the Sierpinski Tactical Growth Strategy, for subscribers seeking a managed fund that employs Hedgeye research. Neither Hedgeye, nor Mr. McCullough, nor Mr. Blum, receive any commissions or direct payment from NorthCoast Asset Management for referrals. Hedgeye, as a research provider to Sierpinski Capital Management, Mr. McCullough as a majority indirect owner of Sierpinski Capital Management and Mr. Blum as an officer of Sierpinski Capital Management, will benefit from the success of Sierpinski Capital Management.

Andavolu Decl. Ex. 74 (HE0373895).

**Defendants' Response:** Undisputed that the ADV contains the quoted language but otherwise

disputed to the extent it seeks to imply that the quoted language accurately describes the

relationship between Hedgeye and Sierpinski. (*See* Defendants' Responses to ¶¶ 1-305 & 1-307

*infra*).

1-304. Keith McCullough testified in his deposition that Sierpinski is a separate entity; Hedgeye only provides research to Sierpinski; and there is a firewall between Hedgeye and Sierpinski that prevents Sierpinski from acting on anything until Hedgeye publishes it. Andavolu Decl. Ex. 76 (First McCullough Dep. Tr. 44:18-45:11).

**Defendants' Response:** Disputed.  In the cited passage, McCullough testified that Sierpinski

was a "separate fund" not a separate entity.  He testified that Hedgeye "advises" Sierpinski but

did not represent that it only provided research.  He testified that a firewall existed but did not

specify how it prevented Sierpinski from acting.  (Pl. Ex. 76, First McCullough Dep. Tr. 44:18-

45:11).  In addition, McCullough's testimony was false in material respects and contradicted by

other, more reliable testimony and evidence that conclusively demonstrates that McCullough

effectively ran Sierpinski and dictated its trading activities.  (*See* Defendants' Responses to ¶¶ 1-

189

305 & 1-307 *infra*).

1-305. McCullough further testified that Hedgeye's publications reach Sierpinski at the same time as Hedgeye's other top-tier subscribers. Andavolu Decl. Ex. 76 (First McCullough Dep. Tr. at 45:6-11).

**Defendants' Response:** Disputed. McCullough did not testify that that Hedgeye's publications reach Sierpinski at the same time as Hedgeye's other top-tier subscribers. Rather, he testified that Hedgeye could not *act* on information received from Hedgeye until Hedgeye published that information to subscribers, implying that Sierpinski *received* the information before subscribers. In addition, other more reliable testimony and evidence demonstrates that Sierpinski did receive information in advance of other subscribers, including key insights from McCullough himself never published by Hedgeye. For example, Sierpinski boasted of its special access to McCullough's investment ideas, explaining that "we are best placed to [implement the Hedgeye process] due to our unique access." (Defs. Ex. 350, SCM-01813132; *see also* Pl. Ex. 88, McNamara Dep. Tr. 85:14-86:9 (Sierpinski portfolio manager testifying that Sierpinski received "unique access … to Mr. McCullough's insights."). Another example is that although McCullough would publish "risk ranges" available to all subscribers, Sierpinski would on a daily basis obtain custom risk ranges on securities not published to other subscribers. (*Id*. Tr. 88:21-25). McCullough would regularly email Sierpinski his thoughts and insights about the market, emails that were not shared outside Sierpinski. (*See, e.g.*, Defs. Ex. 351, SCM-01041599; Defs. Ex. 352, SCM-01095711; Defs. Ex. 353, SCM-01859596; *see also* Pl. Ex. 88, McNamara Dep. Tr. 108:15-109:23). He also had a running personal text message commentary with Sierpinski. (Defs. Ex. 354, SCM-02015150 (partial log of text messages from McCullough to Sierpinski giving explicit and timely recommendations on specific securities, *e.g.*, "Have AMLP in long only")). He would also have "regular" private phone calls with Sierpinski and make trading recommendations for specific securities. (Pl. Ex. 88, McNamara Dep. Tr. 85:14-86:9)

190

1-306. Hedgeye does not allow employees to trade in stocks that they cover in the research provided to Sierpinski. Andavolu Decl. Ex. 70 (Second Parsio Dep. Tr. 86:9-86:11).

**Defendants' Response:** Disputed. Hedgeye permits employees to trade in Exchange Traded Funds even if covered in Hedgeye research or recommended in Real-Time Alerts. (Pl. Ex. 70, Second Parsio Dep. Tr. 137:4-138:21).

1-307. Hedgeye would provide research including "hundreds of ideas" from Sierpinski to choose from. The "timing and the sizing" of their trades is Sierpinski's choice. Andavolu Decl. Ex. 70 (Second Parsio Dep. Tr. 88:13-88:16).

**Defendants' Response:** Disputed. Defendants object to the admissibility of the evidence cited in Paragraph 1-307. Parsio has no personal knowledge of how Sierpinski conducted its trading and is not competent to testify on that subject. Moreover, Parsio's testimony is contradicted by the documentary evidence and by the testimony of Sierpinski's corporate witness and portfolio manager. Sierpinski spoke to Mr. McCullough "daily" and received recommendations about what Mr. McCullough was "doing and looking at" that day. (Pl. Ex. 88, McNamara Tr. 86:10-20; Defs. Ex. 354, SCM-2015150 (partial log of text messages from McCullough to Sierpinski giving explicit and timely recommendations on specific securities, *e.g.*, "Have AMLP in long only")). Those communications include daily phone conversations where McCullough explicitly discussed position sizing. (Pl. Ex. 88, McNamara Dep. Tr. 112:12-18 ("Q: Have you ever discussed position sizing with Mr. McCullough on the telephone. A. Yes. Q. How often does that happen? A. Often. Q. Daily? A. Yes.")).

McCullough would "regularly" direct that specific positions be dropped from the portfolio or that specific trades should be made at specific prices if those prices become available. (*Id*. Tr. 88:8-20). Trades were not limited to published Hedgeye recommendations, as Sierpinski often asked to get specific trading recommendations on securities not listed in Hedgeye publications, typically receiving responses "right away." (*Id*. Tr. 88:21-89:11; *see also*

191

*id.* Tr. 95:16-22).

Sierpinski had little discretion over timing and selection of trades because McCullough directed the Sierpinski portfolio manager to "Read the RTAs closely" and the Sierpinski portfolio manager understood this instruction as "[p]rovid[ing] explicit direction … by instructing what transactions to be made … saying at explicit times what to do." (*Id.* Tr. 104:11-105:10). McCullough would often check in multiple times per day and give specific directions to trade particular stocks. (*See, e.g.* Defs. Ex. 355, SCM-01875132 (recommending that the Sierpinski PM sell off exposure in two specific ETFs and informing the PM that he would be "back online in 3 hours")). McCullough's supervision also included directions about position sizing. (*See, e.g.*, Defs. Ex. 356, SCM-01859104 (McCullough criticizing the Sierpinski PM for taking insufficiently large position in four named securities)).

McCullough insisted that the Sierpinski portfolio manager's follow his instructions exactly to the letter and responded to any deviation with fury. (*See, e.g.*, Defs. Ex. 356, SCM-01859104 ("[I]nstead of Jedi mind-tricking yourself into trying to do something super interesting, just following what I fn do works.")). In the summer of 2021, Makis Kaketsis, then Sierpinski's portfolio manager, failed to sell off certain stocks as recommended by McCullough in a real-time alert because he believed the sale would violate fund turnover restrictions. (Defs. Ex. 357, SCM-01999336). McCullough read the riot act to Kaketsis: "You have to do what I say … Enough is enough." (*Id.*). Kaketsis responded by saying that "me following every move you do is impossible with the turnover restrictions we have. (*Id.*). McCullough then answered: "Your turnover problems of the past aren't mine and don't matter going forward," concluding "You either get doing it my way by now or you do not." (*Id.*). Approximately a month later, Kaketsis meekly informed McCullough with he had exited holdings of a particular security

(PLAN) recommended by McCullough because of risk concerns shared by another Hedgeye employee.  McCullough responded furiously, "Man really?  STAY WITH WHAT I DO," and followed up by explaining, "This is not the Makis stock picker fund … Be 100% consistent with what I do or say or this will not work."  (Defs. Ex. 358, SCM-02008476; Defs. Ex. 359, SCM-2008486).

Several weeks later, Kaketsis described the disconnect between Sierpinski's false marketing as an independent fund exercising its own trading discretion, and the reality that McCullough was directing trading:

> In my mind this comes back to something simple - what kind of product do we want - and who do we want to sell it to. We had discussed initially about a product with a Hedgeye flavour and limited turnover. By definition this product can not follow 100% what Keith says 100% of the time.  Or we can have a product with much higher turnover that follows 100% what Keith does. This is the product we have post Sept 1st.

(Defs. Ex. 360, SCM-2016986).  The impasse between Kaketsis' efforts to maintain some level of meaningful trading discretion and McCullough's insistence on strict adherence to his precise directions led to Kaketsis' removal and exit from Sierpisnki.  (*See* ¶ 1-362 *infra*).

1-308.  Hedgeye also maintains a Code of Ethics, which includes Hedgeye's policy that mandates the reporting of outside business. Andavolu Decl. Ex. 70 (Second Parsio Dep. Tr. 143:22-144:22).

**Defendants' Response:** Undisputed that Hedgeye maintains a Code of Ethics that includes a policy mandating internal reporting of outside business activities.

Defendants dispute this statement to the extent it characterizes the policy in a manner different from Mr. Parsio's testimony or the Code itself.  (Pl. Ex. 70, Second Parsio Dep. Tr. 143:22-144:22; Defs. Ex. 446, HE0373932 (Code of Ethics) at 23).

1-309.  Hedgeye's March 2022 Form ADV included an "update that [Sierpinski] is an investment advisor with the SEC." Andavolu Decl. Ex. 75 (HE0373915).

193

**Defendants' Response:** Disputed because the ADV is not accurately quoted. The ADV contains a heading for Sierpinski Capital Management and includes a representation that Sierpinski is an "SEC registered investment advisor."

1-310. As of 2023, Sierpinski Capital Management was de-registered with the SEC. Andavolu Decl. Ex. 70 (Second Parsio Dep. Tr. 100:22-101:3).

**Defendants' Response:** Undisputed

1-311. Sierpinski received Real Time Alerts ("RTAs") in the same manner as all other Hedgeye subscribers. Andavolu Decl. Ex. 70 (Second Parsio Dep. Tr. 182:4-182:15).

**Defendants' Response:** Defendants object that the statements in this paragraph are not supported by competent or admissible evidence. Fed. R. Civ. P. 56(c)(2) and Local Rule 56.1(d). Anthony Parsio has no first-hand knowledge of how Sierpinski operated or traded and is not competent to testify as to Sierpinski's operations and activities. Thus, no response is necessary.

Subject to and without waiving that objection, Defendants dispute Paragraph 1-311. At times, Keith McCullough provided Sierpinski advance notice of an RTA. (*See, e.g.*, Defs. Ex. 447, HE0405024-25 (McCullough telling Kaketsis that he should "bolt in" when an RTA goes "live" at 10:30 AM where message is sent at 2:23 PM GMT, corresponding to 10:23 AM eastern time); Defs. Ex. 354, SCM-2015150 (alerting Sierpinski that "TXG is tomorrow")). McCullough also regularly sent direct text messages to Sierpinski portfolio manager Makis Keketsis highlighting particular new RTAs that he wanted to emphasize. (*See, e.g.*, Defs. Ex. 361, HE0405080).

In addition, Sierpinski had preset templates for each Hedgeye "signal" that permitted it to trade RTAs ahead of other customers. (Pl. Ex. 88, McNamara Tr. 181:7-183:9). Sierpinski also retained third parties to develop processes for automated trading of RTAs. (Defs. Ex. 362, SCM-00490141; Defs. Ex. 363, SCM-00976233).

194

## XIV.    "Hedgeye's Real Time Alerts"

1-312.  RTAs are a Hedgeye product that provide subscribers with buy, sell, short or cover signals. Andavolu Decl. Ex. 77 (https://app.hedgeye.com/user-guides/real-time-alerts).

**Defendants' Response:** Undisputed that RTAs are a Hedgeye product provided to subscribers, but disputed that RTAs merely provide signals.  RTAs are recommendations to purchase or sell specific named securities at particular times, such that Hedgeye often reports the alleged successful performance of the recommendations.  (Defs. Ex. 364, SCM-01075903 (Hedgeye tweeting out record of purported RTA performance); Pl. Ex. 88, McNamara Dep. Tr. 104:20-24 (confirming that prior document refers to RTA results from March 2020); *id*. Tr. 104:20-24 (explaining that RTAs provide "explicit direction" in the form of "recommending buy and sell transactions"); Defs. Ex. 365, Reilly Dep. Tr. 44:2-23 (describing RTA as a recommendation to trade); *id.* Tr. 18:3-8 (describing a "signal" as recommendation to buy or sell based on the results of a quantitative model)).

1-313.  Subscribers can receive RTAs: (1) via Hedgeye's website; (2) via email; and (3) via an App. Andavolu Decl. Ex. 77  (https://app.hedgeye.com/user-guides/real-time-alerts).

**Defendants' Response:** Undisputed that the statement was true as of the time the cited Exhibit was generated on October 25, 2024.

The statement is otherwise disputed.  The App functionality was not originally part of the RTA offering but was added later.  (Pl. Ex. 70, Second Parsio Dep. Tr. 179:15-17; Pl. Ex. 88 McNamara Dep. Tr. 175:8-25 (confirming that the App was not available prior to 2020)). Defendants were not informed of the existence of the App and only learned of its existence in connection with these lawsuits.  (Pl. Ex. 5, Solstein 30(b)(6) Dep. Tr. 59:16-17, 175:10-12, 182:3-9).  The failure to inform Defendants and other subscribers of the App was prejudicial because Hedgeye implemented RTAs in such a way that iPhone users of the App would receive the alerts before others.  (Defs. Ex. 366, SCM-00310413).

195

1-314. Hedgeye has a Product Disclaimer for RTAs (the "RTA Disclaimer") on its website. Andavolu Decl. Ex. 78 (https://app.hedgeye.com/legal/product_disclaimers).

**Defendants' Response:** Undisputed that the RTA Disclaimer attached as Exhibit 78 was posted to the Hedgeye website on the date indicated October 30, 2023.

The statement is otherwise disputed. The document has no relevance to the case, as it was posted after the lawsuit and counterclaims were filed and more than two years after Sierpinski ceased receiving services from Hedgeye. Furthermore, Hedgeye admitted that disclaimer language concerning RTA timing was not added until 2020, after customers began to complain of unfair and disparate treatment and three years after Solstein subscribed to Hedgeye's service. (Pl. Ex. 70, Second Parsio Dep. Tr. 177:20-178:23). Hedgeye did not notify Terman or Solstein when the RTA Disclaimer language was added to the website, and Defendants were not aware of its existence during the time Solstein was a Hedgeye subscriber. (Pl. Ex. 5, Solstein 30(b)(6) Dep. Tr. 173:15-174:6, 179:7-15 184:15-17).

1-315. The RTA Disclaimer incorporates by reference Hedgeye's Terms of Service. Andavolu Decl. Ex. 78 (https://app.hedgeye.com/legal/product_disclaimers); Andavolu Decl. Ex. 89 (https://www.hedgeye.com/terms_of_service).

**Defendants' Response:** Undisputed that the October 30, 2023 version of the RTA Disclaimer contains a hyperlink to the Hedgeye terms of service, and otherwise denied. Whether the mere reference to a hyperlink constitutes "incorporation by reference" is a legal question. In any event, this document has no relevance to the case, as it was posted after the lawsuit and counterclaims were filed and more than two years after Sierpinski ceased receiving services from Hedgeye. Hedgeye did not notify Terman or Solstein when the RTA Disclaimer language was added to the website, and Defendants were not aware of its existence during the time Solstein was a Hedgeye subscriber. (Pl. Ex. 5, Solstein 30(b)(6) Dep. Tr. 173:15-174:6, 179:7-15 184:15-17).

196

1-316. In 2020, the RTA Disclaimer stated that "an Alert 'time stamp' represents the time the Alert was submitted to the Product Website." Andavolu Decl. Ex. 79 (HE0373962).

**Defendants' Response:** Undisputed that the May 1, 2020 version of the RTA Disclaimer contains the quoted language, and otherwise disputed.  Hedgeye did not notify Terman or Solstein when the RTA Disclaimer language was added to the website, and Defendants were not aware of its existence during the time Solstein was a Hedgeye subscriber.  (Pl. Ex. 5, Solstein 30(b)(6) Dep. Tr. 173:15-174:6, 179:7-15 184:15-17).

1-317. In 2020, the RTA Disclaimer also stated that "Subscribers may experience delays between the time an Alert is issued on the Product Website and when the subscriber receives the Email Notification or App Notification." Andavolu Decl. Ex. 79 (HE0373962).

**Defendants' Response:** Undisputed that the May 1, 2020 version of the RTA Disclaimer contains the quoted language.

The statement is otherwise disputed.  Hedgeye did not notify Terman or Solstein when the RTA Disclaimer language was added to the website, and Defendants were not aware of its existence during the time Solstein was a Hedgeye subscriber.  (Pl. Ex. 5, Solstein 30(b)(6) Dep. Tr. 173:15-174:6, 179:7-15 184:15-17).

## XV.   "Terman's Relationship with CNBC"

1-318. On December 6, 2021, Terman received an email from Mary Duffy (NBCUniversal) (SOLS00016103) that attached a letter agreement (SOLS00016104, the "CNBC Agreement") for Terman's signature. Andavolu Decl. Ex. 80 (30(b)(6) Deposition of Solstein Capital, LLC by Nadine Terman held on February 15, 2023 (the "Solstein Dep."), Ex. 189, also produced as SOLS00016103), Andavolu Decl. Ex. 80 (SOLS00016104).

**Defendants' Response:** Undisputed.

1-319. The CNBC Agreement was effective as of January 24, 2022. Andavolu Decl. Ex. 80 (SOLS00016104).

**Defendants' Response:** Undisputed.

1-320. The CNBC Agreement stated that "there is no guaranteed number of actual appearances." Andavolu Decl. Ex. 80 (Solstein Dep. Ex. 189, also produced as SOLS00016103).

**Defendants' Response:** Undisputed.

1-321.  Terman testified that CNBC never officially terminated her agreement. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 232:9-232:15).

**Defendants' Response:** Disputed.  Terman did not use the word "officially."  To the contrary,

Terman testified the CNBC terminated the agreement "in effect," explaining that "[CNBC] said

that I can't go on because of the Hedgeye allegations until it's cleared up."  (Pl. Ex. 5, Solstein

Dep. Tr. 232:9-232:15).

1-322.  Terman testified that she was instead informed by CNBC that she would not be on the network until the lawsuit with Hedgeye concluded. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 232:16-233:13).

**Defendants' Response:** Undisputed that CNBC told Terman that she would not be on the

network until the lawsuit with Hedgeye concluded, but disputed to the extent that the word

"instead" implies that an effective termination had not occurred.  (*See* Defendants' Response to

¶ 1-321 *supra*).

1-323.  CNBC never told Terman that she would not be allowed on CNBC anymore. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 233:14-24).

**Defendants' Response:** Undisputed that CNBC left open the possibility that Terman could

return to CNBC after the lawsuit concluded, and otherwise disputed.  CNBC made it clear that as

long as the case was pending, Terman could not appear.  (Pl. Ex. 5, Solstein Dep. Tr. 232:9-

232:15).

**XVI.  "Solstein's Agreement with Hedgeye"**

1-324.  Solstein and Hedgeye entered into an institutional subscriber services agreement effective as of July 1, 2017 (the "Solstein Subscriber Agreement"). Andavolu Decl. Ex. 81 (HE0306642).

**Defendants' Response:** Undisputed.

1-325. Section 3 of the Solstein Subscriber Agreement contains the following "Subscriber Acknowledgements:"
      a.  Subscriber acknowledges that it has received Provider's Form ADV Part II at

198

least forty-eight (48) hours prior to execution of this Agreement.

b. Subscriber acknowledges that either: (i) Provider's compensation hereunder shall not be based upon capital gains in Subscriber's accounts or capital appreciation of the funds, or any portion of the funds, of Subscriber's accounts; or (ii) Subscriber is a "qualified client" as defined in Rule 205-3 under the Investment Advisers Act of 1940, as amended, and the payment of the compensation is otherwise in compliance with Rule 205-3.

c. Subscriber acknowledges that the Services contemplated under this Agreement are purely independent research and not offered as an invitation, or inducement, to engage in investment activity, or as a promotion, offer, or solicitation of a transaction.

d. Subscriber acknowledges its obligation to make available its own technology staff and resources to ensure delivery of the Services, including working directly with Provider's technology staff to assure delivery of the Services in compliance with Subscriber's firewalls and other security, legal and compliance requirements.

Andavolu Decl. Ex. 81 (HE0306642).

**Defendants' Response:** Undisputed.

1-326. Section 5 of the Solstein Subscriber Agreement contains the following "Terms of Service" provision:

> Subscriber's access to the Website will be subject to the Terms of Service for Web Service ("Terms of Service") available on the Website. Provider reserves the right to modify the Terms of Service at any time. Where reasonably practical, Provider shall give Subscriber advance notice of any changes that may materially impact Subscriber's ability to use the Services.

Andavolu Decl. Ex. 81 (HE0306642).

**Defendants' Response:** Undisputed.

1-327. Section 6 of the Solstein Subscriber Agreement contains the following "Mutual Non-Solicitation" provision:

> The Parties affirm that they will not solicit each other's employees for employment for the term of this Agreement. Further, if an employee of either Party shall leave that Party's employ, the other Party agrees not to employ such individual for a period of twelve months from the date of termination, without prior written approval from the other Party, except that this Paragraph 6 shall not apply to responses to a general solicitation for applicants for employment.

Andavolu Decl. Ex. 81 (HE0306642).

**Defendants' Response:** Undisputed.

1-328.  In mid-December 2018, Ben Ryan, a Hedgeye employee, left his position at Hedgeye. Andavolu Decl. Ex. 82 (Transcript of Deposition of Ben Ryan held on February 27, 2023 (the "Ryan Dep. Tr.") at 27:13-27:18.

**Defendants' Response:** Undisputed.

1-329.  In March 2019, Ryan began working at Solstein. Andavolu Decl. Ex. 82 (Ryan Dep. Tr. 33:4-33:11).

**Defendants' Response:** Undisputed.

1-330.  Ryan testified that when he left Hedgeye, his "ultimate plan was to go and work at Solstein. So it wasn't like we had zero conversations about it and then after I left Hedgeye I just came across Solstein or anything like that." Andavolu Decl. Ex. 82 (Ryan Dep. Tr. 30:7-30:12).

**Defendants' Response:** Undisputed that the quoted language is contained in the Ryan deposition.

The statement is otherwise disputed.  Ryan testified that the reason he departed from Hedgeye was personal, based on his desire to settle his family either in the west coast, where his wife's family lived, or in the Midwest, where his family lived.  (Pl. Ex. 82, Ryan Dep. Tr. 27:19-28:15).

1-331.  Ryan did not tell McCullough that he had been speaking with Terman about working at Solstein prior to his resignation to Hedgeye. He "got the sense from talking with Solstein" that he shouldn't tell Keith.  Andavolu Decl. Ex. 82 (Ryan Dep. Tr. 30:15-31:18).

**Defendants' Response:** Undisputed that the quoted language is contained in the deposition transcript.

The statement is otherwise disputed.  The statement implies that Ryan had been speaking with Terman about working at Solstein prior to his resignation to Hedgeye, but Ryan denied that Terman asked him to work at Solstein before he left Hedgeye. (Pl. Ex. 82, Ryan Dep. Tr. 29:12-13).  Defendants further object that the second sentence does not contain potentially admissible evidence because Ryan could not identify any specific statement made by Solstein that would explain his "feeling."

200

1-332.  While working at Solstein, Ryan had access to Hedgeye's research. Andavolu Decl. Ex. 82 (Ryan Dep. Tr. 69:21-69:25).

**Defendants' Response:** Undisputed that Ryan had access to Hedgeye research that Hedgeye

provided to Solstein, but only as long as the Solstein was receiving services from Hedgeye.  (Pl.

Ex. 82, Ryan Dep. Tr. 69:21-69:25).

1-333.  On March 24, 2021, Terman emailed Sandra Southworth, stating that she was speaking with Hedgeye on Monday (March 29, 2021) to downgrade Solstein's Hedgeye subscription. Andavolu Decl. Ex. 83 (SOLS00010511).

**Defendants' Response:** Undisputed that on March 24, 2021, Terman emailed Sandra

Southworth, stating that she was speaking with Hedgeye on Monday (March 29, 2021).

Undisputed that Terman intended to inform Hedgeye that she wanted to switch to a "retail level"

subscription but disputed that this was a "downgrade."  Terman and Solstein viewed the switch

as an upgrade as it was necessary to secure access to the Hedgeye Arena.  (Terman 56.1 ¶¶ 3-22

& 3-62).

1-334.  On or about March 31, 2021, Terman proposed to downgrade Solstein's Hedgeye subscription from an institutional subscription to a mass market subscription. Andavolu Decl. Ex. 84 (HE0359031).

**Defendants' Response:** Disputed.  The cited document does not support Paragraph 1-334.  It

merely refers to a "proposal" that Hedgeye is declining, without further clarification.  In fact,

Solstein sought access to Hedgeye's "Arena" service, but was informed that it could not do so

through an institutional subscription; Hedgeye's Jamie Bruno then proposed several premium

retail subscription plans as an alternative.  Terman accepted one of those proposals, but Keith

McCullough directed Hedgeye to refuse all services to Terman and Solstein.  (Terman 56.1 ¶¶ 3-

22, 3-62 – 3-65).

1-335.  On April 1, 2021, Hedgeye declined that proposal and removed Solstein from Hedgeye's distributions, effective that day. Andavolu Decl. Ex. 84 (HE0359031).

**Defendants' Response:** Undisputed, except that the characterization of the "proposal" referred

201

to in Paragraph 1-334 is disputed for the reasons stated in response to that paragraph.

## XVII.  "Solstein's Lack of Reliance on Hedgeye's Disclosures"

1-336.  Terman does not recall whether she reviewed Hedgeye's Form ADV before signing the Solstein Subscriber Agreement with Hedgeye in 2017. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 36:7-37:5).

**Defendants' Response:** Disputed.  Terman testified that she reviewed the ADV before submitting the signed agreement to Hedgeye.  At her deposition taken many years later, she could not recall whether she added her signature to the form, then reviewed the ADV, then submitted the signed agreement to Hedgeye, or whether she reviewed the ADV prior to performing the mechanical act of signing on the signature line.  (Pl. Ex. 5, Solstein Dep. Tr. 37:9-38:11).  In either case, Terman confirmed that she reviewed the ADV before Solstein sent an executed copy of the agreement to Hedgeye for countersignature.  (*Id.*).

1-337.  Terman testified that it was possible that someone else, like Sandra Southworth, Solstein LLC's Chief Compliance Officer, may have reviewed Hedgeye's Form ADV prior to signing the Services Agreement with Hedgeye. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 39:3-8).

**Defendants' Response:** Undisputed that Terman testified that Southworth may have reviewed the ADV.

The statement is otherwise disputed, because Terman's testimony was that Southworth may have reviewed the ADV "as well," in addition to Terman herself.  (Pl. Ex. 5, Solstein Dep. Tr. 39:3-8).

1-338.  Southworth testified that she could not recall having conversations with Ms. Terman about Hedgeye in 2017, 2018, 2019, or 2020. Andavolu Decl. Ex. 85 (Transcript of Deposition of Sandra Southworth held on February 27, 2023 ("Southworth Dep. Tr.") at 26:2-8).

**Defendants' Response:** Undisputed.

1-339.  Southworth was not aware that Solstein entered into the Solstein Subscriber Agreement with Hedgeye in 2017. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 25:8-13).

**Defendants' Response:** Disputed.  Southworth testified that she was not aware of the specifics

of the agreement, but that she knew that Solstein was paying Hedgeye for services provided.  (Pl. Ex. 85, Southworth Dep. Tr. 25:8-13).

1-340.  Southworth did not conduct any due diligence on Hedgeye prior to Solstein executing the Solstein Subscriber Agreement with Hedgeye. Andavolu Decl. Ex. 85 (Southworth Dep. Tr.24:23-25:2).

**Defendants' Response:** Undisputed.

1-341.  Southworth did not know if anyone at Solstein reviewed Hedgeye's ADV prior to Solstein's execution of the Solstein Subscriber Agreement with Hedgeye. Andavolu Decl. Ex. 85 (Southworth Dep. Tr.55:24-56:03).

**Defendants' Response:** Undisputed.

1-342.  Southworth was not aware of the applicable regulatory requirements that Hedgeye needed to adhere to prior to the execution of the Solstein Subscriber Agreement with Solstein. Andavolu Decl. Ex. 85 (Southworth Dep. Tr.55:12-55:18).

**Defendants' Response:** Undisputed that Southworth provided this testimony, subject to

counsel's objection.  Defendants object that this paragraph does not contain admissible evidence

because Hedgeye failed to establish a proper foundation concerning Southworth's personal

knowledge of Hedgeye's activities and her understanding of potentially applicable regulatory

requirements.

1-343.  Southworth only reviewed one of Hedgeye's eight Form ADVs in 2021. Andavolu Decl. Ex. 85 (Southworth Dep. Tr.55:20-55:23).

**Defendants' Response:** Undisputed.

1-344.  Southworth testified that, "Hedgeye was claiming newsletter exemption, and I recall looking at their ADV and talking with Nadine [Terman] about it briefly" when she was looking into registering "Longbow," Terman's other business. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 26:22-27:14).

**Defendants' Response:** Undisputed that the quoted language is contained in the deposition

transcript, and otherwise disputed.  The cited deposition passage does not ascribe ownership of

Longbow.

1-345. Southworth testified that she never had any conversation with Terman regarding

Terman's review of Hedgeye's Form ADV. Southworth testified that she no one at Solstein ever expressed a concern to her that Hedgeye had a conflict of interest with Sierpinski. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 56:05-07; 59:22-25).

**Defendants' Response:** The first sentence is disputed: Southworth testified that she discussed Hegdeye's Form ADV with Terman in 2021.  (Pl. Ex. 85, Southworth Dep. Tr. 275-11).  The second sentence is not disputed.

1-346.  Terman could not remember any specific instance when she reviewed one of Hedgeye's Form ADVs. Andavolu Decl. Ex. 5 (Solstein Dep. Tr.  47:14-48:19).

**Defendants' Response:** Disputed.  Terman specifically recalled reviewing the 2017 ADV before sending an executed copy of the Hedgeye Services Agreement to Hedgeye.  (Pl. Ex. 5, Solstein Dep. Tr. 37:9-38:11).

In addition, when specifically asked the question, "Can you recall another instance in which Solstein reviewed a Hedgeye ADV," Terman responded "yes."  (*Id.* Tr. 47:3-7).  She then went on to identify specific years she reviewed Hedgeye ADVs, and then for each of those years other than 2022 and 2023 (for which privilege objections were raised), went on to give detailed testimony concerning some of the reasons why she reviewed the ADVs at those times and which ADVs she reviewed.  (*Id.* Tr. 47:25-48:4, 48:20-58:12).

The portion of the deposition transcript cited by Hedgeye does not contradict her testimony recalling her review of specific past Hedgeye ADVs.  It simply states that as of the time the deposition was taken in 2023, she did not recall the specific dates and times she conducted those reviews.

1-347.  Terman does not recall anyone at Solstein having a conversation with anyone at Hedgeye about any of the Form ADVs. Andavolu Decl. Ex. 5 (Solstein Dep. Tr.  64:12-15).

**Defendants' Response:** Undisputed.

1-348.  Terman stated that of those at Solstein, she was the best positioned to know whether Hedgeye was asked to complete a due diligence questionnaire or make any compliance representations to Solstein. Andavolu Decl. Ex. 5 (Solstein Dep. Tr.  66:14-22).

204

**Defendants' Response:** Undisputed that Terman gave that testimony, but subject to counsel's objection. Defendants object that Paragraph 1-348 does not contain admissible evidence. The question was compound, improperly asked a hypothetical question to a fact witness, did not give sufficient facts to permit a response to the hypothetical question, and was unfairly vague and ambiguous because it did specify what kind of specific compliance representation or due diligence inquiries were being asked about.

1-349. Terman had no recollection of whether anyone at Solstein asked Hedgeye to complete a due diligence questionnaire or make any compliance representations to Solstein. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 66:24-67:1).

**Defendants' Response:** Defendants object that Paragraph 1-349 does not contain admissible evidence. The question was compound, improperly asked a hypothetical question to a fact witness, did not give sufficient facts to permit a response to the hypothetical question, and was unfairly vague and ambiguous because it did specify what kind of specific compliance representation or due diligence inquiries were being asked about.

1-350. Terman had no recollection of whether anyone at Solstein inquired about Hedgeye's Code of Ethics. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 67:02-04).

**Defendants' Response:** Undisputed.

1-351. Terman had no recollection of whether anyone at Solstein requested a copy of Hedgeye's Code of Ethics. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 67:05-07).

**Defendants' Response:** Undisputed.

1-352. Terman had no recollection of whether anyone at Solstein inquired with Hedgeye regarding its compliance trading practices. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 67:08-10).

**Defendants' Response:** Undisputed.

1-353. Terman had no recollection of what year or time frame she discussed the purported omissions in Hedgeye's ADVs with Sandra Southworth during the time period that Solstein was a Hedgeye subscriber. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 69:12-70:3).

**Defendants' Response:** Undisputed.

1-354. Terman testified that despite "concerns" about purported omissions in Hedgeye's ADVs, she could not recall when she spoke to Southworth about ceasing business with Hedgeye. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 75:15-76:19).

**Defendants' Response:** Undisputed that Terman testified that there came a point when she had concerns about omissions in the Hedgeye ADV and that she could not recall when she spoke to Southworth about ceasing business with Hedgeye. Paragraph 1-354 is otherwise disputed as it attempts to characterize the testimony in an argumentative fashion using words the witness did not use.

1-355. Terman could not recall whether there was ever a time that Solstein was concerned about putting its clients at risk because of its concerns regarding Hedgeye's registration status. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 81:15-20).

**Defendants' Response:** Disputed. When asked to elaborate, Terman testified that her concerns were alleviated by the fact that she trusted that she was getting "straight information" from Dale as opposed to "other people at the firm" that Solstein relied on less for information, but that "many of the concerns started occurring towards the end of our relationship." (Pl. Ex. 5, Solstein Dep. Tr. 83:21-84:5). Also disputed because the cited testimony is not admissible; counsel properly objected to the line of questioning as outside the permissible scope of the Rule 30(b)(6) deposition because Defendants had already designated prior testimony on that topic as the company's Rule 30(b)(6) testimony.

1-356. Terman testified that it is "hard for me to remember when I was a client and after I was a client the things that I learned about [Hedgeye's] conflicts of interest." Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 88:13-19).

**Defendants' Response:** Undisputed that the quoted language is contained in the transcript; the complete answer in proper context without misleading omissions reads: "It's the technicality of your question is when we were clients is like I knew they had some type of relationship with Sierpinski and that was noted in the ADV. It's hard for me to remember when I was a client and after I was a client the things that I learned about their conflicts of interest, so it's hard for me to

206

answer your question to me. Like how do I know what I knew when? I don't remember when I learned certain things. And you're asking something very specific in time, like being a client versus not being a client, like I don't mentally think of -- you know, whatever, I don't even know if it was March 31st or April 1st, like what did I learn when; it's very hard to answer these questions because you are giving me kind of a point in time that, mentally, I didn't make the same delineation that you are making now."

1-357. Terman testified that from July 2017 to April 2021, she knew about Hedgeye's affiliation with Sierpinski and that Hedgeye disclosed that in its Form ADV. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 90:2-16).

**Defendants' Response:** Disputed. Sierpinski did not exist in July 2017, and Hedgeye admits that it did not make any disclosures about Sierpinski until 2020. (*See* ¶¶ 1-301 – 1-302 *supra*). Terman did not testify about the specific time she first learned about Sierpinski. She testified that at some point prior to 2021, she knew about Sierpinski and reviewed the disclosures about Sierpinski contained in the Hedgeye ADVs, but that she "learned a lot more about Sierpinski later." (Pl. Ex. 5, Solstein Dep. Tr. 90:2-16, 91:10-15).

1-358. Terman recalled seeing Sierpinski disclosed in Hedgeye's Form ADVs for the years 2020, 2021 and 2022. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 103:25-104:4).

**Defendants' Response:** Undisputed.

1-359. Terman testified that she believed that Hedgeye's Form ADV should have been updated to disclose that Makis Kaketsis was no longer CIO at Sierpinski, and that Keith McCullough was the only investment professional on the Sierpinski ADV. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 60:17-61:8).

**Defendants' Response:** Undisputed that Terman testified that she believed that Hedgeye's Form ADV should have disclosed that Makis Kaketsis was no longer CIO at Sierpinski, and otherwise disputed. With respect to Mr. McCullough, she testified that the ADV identified him as the "only senior advisement professional at Sierpinski" and that McCullough was the only investment person "named" on the Sierpinski ADV. (Pl. Ex. 5, Solstein Dep. Tr. 60:17-61:8).

207

1-360. Terman could not remember when Kaketsis left his position as CIO of Sierpinski. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 104:8-106:13).

**Defendants' Response:** Undisputed.

1-361. Terman could not recall if Kaketsis's departure occurred before or after Solstein stopped being a Hedgeye subscriber. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 105:2-105:7).

**Defendants' Response:** Undisputed.

1-362. Kaketsis left Sierpinski in January of 2022. Andavolu Decl. Ex. 88 (Transcript of Deposition of John McNamara, held on April 19, 2023 (the "McNamara Dep. Tr.") at 45:14-45:20).

**Defendants' Response:** Undisputed.

1-363. Terman testified that it was hard for her to "delineate on two things, the time period of when we were a client or not what I knew and what was disclosed, and then things I learned later." Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 91:10-92:15).

**Defendants' Response:** Undisputed that the quoted words are contained in the deposition transcript which contains the complete testimony on this matter in its proper context.

1-364. Terman could not identify a single instance where Solstein relied on performance data from Hedgeye that it believed should have come with a disclosure. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 125:14-128:5).

**Defendants' Response:** Disputed. Terman recalled receiving performance data from Hedgeye "that looked great" and testified that receiving the performance data "gave us confidence that the RTAs working, that they were successful." (Pl. Ex. 5, Solstein Dep. Tr. 124:2-125:25).

The cited portions of the transcript confirm that testimony. Hedgeye was asking questions about events that occurred between two and eight years prior to the deposition date. Accordingly, in introducing the series of questions, Hedgeye's counsel states, "I understand that memories are hazy and you learn things over time … So it's not a memory test. I'm just trying to understand sitting here today what you do recall from your time period as a subscriber to Hedgeye services." (Id. Tr. 124:2-12). In response, Terman testified that she specifically recalled receiving performance data and that Solstein relied on it. (Id. Tr. 124:19-21 ("When we

208

received the cherry-picked performance data, it gave us confidence ...."); *id.* Tr. 125:19-25 ("I remember seeing performance data that looked great ... I do remember seeing it."). Several years later, sitting in a deposition room and not being shown any documents that could refresh her recollection, Terman merely stated that she could not recall the specific dates and times of the emails transmitting that performance data, but she did not deny recalling seeing the data. (*Id.*).

1-365. Terman could not recall calling Hedgeye to inquire about disclosures for certain performance data that it received from Hedgeye. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 128:25-130:4).

**Defendants' Response:** Undisputed.

1-366. Terman could not recall the point in time when it became "difficult to execute trades." Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 182:11-21).

**Defendants' Response:** Disputed. Terman was not asked when Solstein started to notice when it became difficult to execute RTA trades, the quoted fragment exists in the transcript but the paragraph's characterization is false. (Pl. Ex. 5, Solstein Dep. Tr. 182:11-21).

1-367. Terman could not recall making notes about it becoming more difficult to trade on RTAs. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 187:21-188:5).

**Defendants' Response:** Disputed. Terman testified that she did an analysis of the firm's difficulty trading RTAs. (Pl. Ex. 5, Solstein Dep. Tr. 187:10-11 ("I just said that I did an analysis that shows that.")).

1-368. Hedgeye's RTAs include a link at the bottom to click for more information about that RTA. Andavolu Decl. Ex. 86 (SOLS00025039).

**Defendant's Response:** Undisputed that emails transmitting RTAs contained a hyperlink at the bottom "for more information," but otherwise disputed, as no evidence was produced in discovery concerning the alleged content available at those hyperlinks, and the cited document does not provide any proof of the content of the alleged "more information" concerning the

209

RTAs. Accordingly, Defendants object that the statements in this paragraph are not supported by competent or admissible evidence.

1-369. Terman does not recall ever clicking on such a link for more information. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 172:5-13).

**Defendants' Response:** Undisputed.

1-370. Solstein did not terminate the Solstein Subscriber Agreement because of any difficulty with trading on RTAs. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 192:14-19).

**Defendants' Response:** Disputed to the extent this statement implies that Solstein terminated the Solstein Subscriber Agreement, and otherwise not disputed. Hedgeye, not Solstein, terminated the relationship. (*See* Terman 56.1 ¶¶ 3-64 – 3-65).

1-371. Terman could not specifically recall any instances of others complaining about advance trading. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 199:12-23).

**Defendants' Response:** Disputed. The cited portion of the transcript states the opposite. (Pl. Ex. 5, Solstein Dep. Tr. 199:22-23 ("Other people complained about it as well"); *see also id*. Tr. 199:2-4 (referring to her experience of "other people being subscribers and complaining about it")).

1-372. Terman was unable to testify as to whether Solstein would have subscribed to Hedgeye's bundle had it not included RTAs. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 207:25-208:21).

**Defendants' Response:** Disputed. Terman testified that Hedgeye did not offer RTAs as a standalone product and that it was included in a bundle with other Hedgeye products. (Pl. Ex. 5, Solstein Dep. Tr. 206:22-207:24). Hedgeye's counsel then asked a counterfactual hypothetical question about whether Solstein would have signed up for the bundle without the RTAs. (*Id*. Tr. 208:9-10). Solstein's counsel objected to the improper hypothetical. (*Id*. Tr. 208:11). Terman's response, made subject to the objection, was not that she was unable to testify. Rather, she said that she would need additional information to answer the incomplete (and improper)

hypothetical, such as the content and terms of the hypothetical offer. (*Id*. Tr. 208:16-21).

Hedgeye's counsel did not provide the requested clarifying information and moved on other

questions. (*Id*. Tr. 208:22-23).

1-373. Terman could not name a single trade Solstein made based on an RTA. Andavolu Decl. Ex. 87 (Transcript of Deposition of Nadine Terman held on December 1, 2022 (the "Terman Dep. Tr.") at 20:18-21:9).

**Defendants' Response:** Disputed. Terman identified several specific trades that Solstein made

based on RTAs. (Pl. Ex. 5, Solstein Dep. Tr. 203:18-204:17). Terman further testified that she

had identified many other trades Solstein based on RTAs. (*Id.* Tr. 209:25-210:7).

Hedgeye cites to a deposition taken in December 2022, more than 20 months after

Solstein received its last RTA from Hedgeye. At that deposition, without being shown any

documents to help refresh her recollection, Terman could not recall from memory which of the

tens of thousands of trades Solstein made years earlier were the specific trades made on the basis

of RTAs. But she did unambiguously testify that "I know I did it." (Pl. Ex. 87, Terman Dep. Tr.

20:18-21:9). Furthermore, Terman requested that Hedgeye's counsel show her the real-time alert

data so should give an accurate answer. (*Id*. Tr. 23:3-6 ("As I said before, I would like to have

the data in front of me to be able to accurately answer. And I don't have that here today.")).

Hedgeye's counsel did not provide the requested data, nor did he provide any documents that

could have refreshed Terman's recollection, had he genuinely sought an accurate response to the

question.

1-374. Terman could not name a single stock that she personally traded based on an RTA. Andavolu Decl. Ex. 87 (Terman Dep. Tr. 23:1-23:18).

**Defendants' Response:** Disputed. Terman identified several specific trades that Solstein made

based on RTAs. (Pl. Ex. 5, Solstein Dep. Tr. 203:18-204:17). Terman further testified that she

had identified many other trades Solstein based on RTAs. (*Id.* Tr. 209:25-210:7).

211

Hedgeye cites to a deposition taken in December 2022, more than 20 months after Solstein received its last RTA from Hedgeye. At that deposition, without being shown any documents to help refresh her recollection, Terman could not recall from memory which of the tens of thousands of trades Solstein made years earlier were the specific trades made on the basis of RTAs. But she did unambiguously testify that "I know I did it." (Pl. Ex. 87, Terman Dep. Tr. 20:18-21:9). Furthermore, Terman requested that Hedgeye's counsel show her the real-time alert data so should give an accurate answer. (*Id.* Tr. 23:3-6 ("As I said before, I would like to have the data in front of me to be able to accurately answer. And I don't have that here today.")). Hedgeye's counsel did not provide the requested data, nor did he provide any documents that could have refreshed Terman's recollection, had he genuinely sought an accurate response to the question.

1-375. Southworth does not have any training or certifications relating to securities law compliance. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 64:18-64:23).

**Defendants' Response:** Undisputed.

1-376. Southworth was not aware of any false representations made in Hedgeye's Form ADVs. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 61:2-61:14).

**Defendants' Response:** Disputed. Southworth testified that she was aware of false representations made in the Hedgeye ADVs. (Pl. Ex. 85, Southworth Dep. Tr. 61:5-6 ("I was made aware of these items I read this Complaint, this Counterclaim.")). In addition, Southworth testified that she only read one Hedgeye ADV, from 2021. (*See* ¶ 1-343 *supra*).

1-377. Southworth could not name any key omissions in Hedgeye's Form ADV. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 63:04-06).

**Defendants' Response:** Defendants object that this paragraph does not contain admissible evidence because Hedgeye has established through Paragraph 1-375 that Southworth does not have any training or certifications relating to securities law compliance, and thus cannot be asked

212

to identify "key omissions."  Thus, no response is required.

Subject to and without waiving that objection, Defendants dispute this statement.

Southworth stated that she "didn't have enough information" to frame an answer to the question.

(Pl. Ex. 85, Southworth Dep. Tr. 62:25-63:06).

1-378.  Southworth never made a determination that Hedgeye's ADVs contained material misstatements or omissions concerning its compliance with state and federal securities regulations. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 68:03-68:09).

**Defendants' Response:** Defendants object that this paragraph does not contain admissible

evidence because Hedgeye has established through Paragraph 1-375 that Southworth does not

have any training or certifications relating to securities law compliance, and thus cannot be asked

to identify "key omissions."  Defendants further object that the statements in this paragraph are

not supported by competent or admissible evidence.  Hedgeye did not establish an evidentiary

foundation that Southworth had ever sought to make such a determination or was asked to make

one.  Thus, no response is required.

Subject to and without waiving those objections, Defendants do not dispute the statement.

1-379.  Southworth testified that as part of her job, she would be expected to know who Solstein would use as an investment advisor. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 37:03-07).

**Defendants' Response:** Undisputed.

1-380.  Southworth testified that she was not aware of any investment advisors that Solstein has used during her time as Chief Compliance Officer for Solstein. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 38:14-18).

**Defendants' Response:** Undisputed.

1-381.  Southworth testified that from her "limited understanding" of Hedgeye's business, it seemed that Hedgeye was "giving advice that would actually have an effect on securities markets," but that it was "not for [her] to determine." Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 50:14-25).

**Defendants' Response:** Undisputed that the quoted words are contained in the transcript.

1-382.  Southworth could not give a definitive view one way or another on whether Hedgeye was properly using the newsletter exception, stating that "it wasn't [her] focus" when reviewing Hedgeye's Form AD. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 51:01-51:04).

**Defendants' Response:** Defendants object that this paragraph does not contain admissible evidence because Hedgeye has established through Paragraph 1-375 that Southworth does not have any training or certifications relating to securities law compliance, and thus cannot be asked to identify "key omissions."  Thus, no response is required.

Subject to and without waiving that objection, Defendants dispute the statement. Southworth did not say she "could not" give a view on the subject, but that she "would not."  She testified that she did not consider the matter because she was not reviewing Hedgeye's ADV for that purpose.  (Pl. Ex. 85, Southworth Dep. Tr. 50:10-13).  To the extent she gave consideration to the matter, she thought that Hedgeye's attempt to claim the exception seemed "odd."  (*Id.* Tr. 50:14-18).

1-383.  Southworth was not able to identify who would have decided that Hedgeye was not complying with the Newsletter Exemption, other than Nadine Terman. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 68:24-69:20).

**Defendants' Response:** Defendants object that this paragraph does not contain admissible evidence because Hedgeye has established through Paragraph 1-375 that Southworth does not have any training or certifications relating to securities law compliance, and thus cannot be asked to identify "key omissions."  Thus, no response is required.

Subject to and without waiving that objection, Defendants dispute this statement. Southworth testified that she did not know whether anyone at Solstein other than Terman made the determination that Hedgeye was not complying with the Newsletter Exemption.  She was not asked who at Solstein "would have decided" that question.

1-384.  Southworth believed that the determination of whether one of Solstein's investment advisors was circumventing marketing rules would require consultation with a legal expert in the field. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 70:01-70:03).

214

**Defendants' Response:** Disputed.  Southworth was asked who at Solstein would make the

determination, and she answered that she would have done so while consulting a legal expert.

She did not testify that such consultation was required.  (Pl. Ex. 85, Southworth Dep. Tr. 70:01-

70:03).

1-385.  Southworth did not have any knowledge of Solstein retaining an expert, prior to the initiation of this Action, to determine whether Hedgeye was circumventing marketing rules. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 70:14-70:18).

**Defendants' Response:** Undisputed.

1-386.  When Solstein entered into the Solstein Subscriber Agreement with Hedgeye, it was aware that Hedgeye was claiming the newsletter exemption. Andavolu Decl. Ex. 5 (Solstein Dep. Tr.  137:14-137:18).

**Defendants' Response:** Undisputed.

1-387.  Terman testified that she was not sure she understood the extent of the newsletter exemption when she was a Hedgeye subscriber. Andavolu Decl. Ex. 5 (Solstein Dep. Tr. 137:24-138:16).

**Defendants' Response:** Undisputed.

1-388.  Solstein did not consider Hedgeye to be an investment adviser under the SEC's regulations, nor did Solstein's Form ADV disclose Hedgeye as an investment adviser. Andavolu Decl. Ex. 87 (Terman Dep. Tr. 297:1-6).

**Defendants' Response:** Disputed.  Terman testified that she did not know if Hedgeye was an

investment advisor within the meaning of the SEC regulations.  (Pl. Ex. 87, Terman Dep. Tr.

297:1-3).

1-389.  Southworth did not have enough knowledge of Hedgeye's business to determine whether there were any conflicts of interest that Hedgeye did not disclose prior to Solstein's execution of the 2017 services agreement with Hedgeye. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 56:12-56:17).

**Defendants' Response:** Defendants object that this paragraph does not contain admissible

evidence because Hedgeye has established through Paragraph 1-375 that Southworth does not

have any training or certifications relating to securities law compliance, and thus cannot be asked

to identify "key omissions."  Thus, no response is required.

1-390.  Southworth could not name any conflicts of interest that Hedgeye failed to disclose in its Form ADVs. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 63:9-63:13).

**Defendants' Response:** Defendants object that this paragraph does not contain admissible evidence because Hedgeye has established through Paragraph 1-375 that Southworth does not have any training or certifications relating to securities law compliance, and thus cannot be asked to identify "key omissions."  Thus, no response is required.

Subject to and without waiving that objection, Defendants dispute this statement. Southworth did not testify that she was unable to name any such conflicts; she did not identify any at the time of her deposition, because, as she testified multiple times, she was not familiar with Hedgeye's business.  (*See, e.g.,* ¶¶ 1-338 – 1-345, 1-389 *supra*, 1-392 *infra*).

1-391.  Southworth only learned about Hedgeye's RTAs when reading Terman's Counterclaims against Hedgeye. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 32:18 – 23).

**Defendants' Response:** Disputed.  The cited transcript says nothing about RTAs and asked only about whether Terman expressed concerns to her about Hedgeye's registration status.

1-392.  Southworth testified that she never reviewed Hedgeye's terms of service and disclaimers. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 36:19-37:07).

**Defendants' Response:** Undisputed.

1-393.  Southworth could not identify whether there was anything that Hedgeye had done that was not in compliance with state or federal securities regulations. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 63:24-64:4).

**Defendants' Response:** Disputed.  Southworth did not testify that she was unable to identify any non-compliance by Hedgeye; she did not identify any at the time of her deposition, because, as she testified multiple times, she was not familiar with Hedgeye's business.  (*See, e.g.,* ¶¶ 1-338 – 1-345, 1-389, 1-392 *supra*).

1-394.  Southworth did not have any information about Hedgeye's RTAs or how they were used, nor did she have any information to suggest that Hedgeye would make select clients

216

or partners available for trading opportunities before Solstein. Andavolu Decl. Ex. 85 (Southworth Dep. Tr. 65:14-65:20).

**Defendants' Response:** Disputed. Southworth did not testify that she was unable to identify any non-compliance by Hedgeye; she did not identify any at the time of her deposition, because, as she testified multiple times, she was not familiar with Hedgeye's business. (*See, e.g.*, ¶¶ 1-338 – 1-345, 1-389, 1-392 *supra*).

## XVIII. Defendants' Statement Of Additional Material Facts

### A. Hedgeye's Claims

#### 1. Dale's Notebooks

1-395. Hedgeye never told Dale it viewed his notebooks as confidential materials while Dale worked there. (Defs. Ex. 19, Parsio 30(b)(6) Dep. Tr. 88; *see also* Defs. Ex. 9, Jones 2022 Dep. Tr. 185-86 (Hedgeye's Director of Research, admitting that he did not know whether Hedgeye kept "an inventory of notebooks," whether Dale was "given any guidance with respect to how he should store or preserve his notebooks," or whether Dale "was ever given any instruction specifically with regard to the notebooks" concerning confidentiality)).

1-396. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

1-397. Hedgeye did not ask Dale to return his notebooks when he announced his intention to resign from Hedgeye or at any point thereafter, until this litigation commenced.

1-398. Dale first learned that Hedgeye was "demanding repossession of my handwritten notebooks" and other items when this lawsuit was filed on April 26, 2021. (Defs. Ex. 443, DALE0144046).

1-399. On April 26, 2021, Dale wrote to Tanya Waite, Hedgeye's Head of Human

217

Resources, "I had no idea these things could be considered valuable to anyone, let alone me, but I'm shipping them back now to comply with their request regardless." (Defs. Ex. 443, DALE0144046).

### 2. Hedgeye's Customer Lists

1-400. The majority of Hedgeye's customers are in its mass-market business, rather than its institutional business. (*Compare* Defs. Ex. 433, HE0307431, "Product Charts" Tab (showing that Hedgeye had approximately 13,000 mass-market subscribers in 2021), *with* Defs. Ex. 435 HE0217351 with attachment Defs. Ex. 434, HE0217352) (showing approximately 100 institutional clients)).

1-401. Hedgeye admits that its institutional customers are "known Wall Street institutions." (Defs. Ex. 2, Blum 2022 Dep. Tr. 220).

1-402. Hedgeye "identif[ies] prospects for potential institutional client subscriptions" by "systematically reach[ing] out to [the] firms" listed in "Hedge Fund Alert," a third-party publication to which Hedgeye subscribes. (Defs. Ex. 9, Jones 2022 Dep. Tr. 237-39).

1-403. Hedgeye's motion for summary judgment focuses on four customer lists—three "Institutional Macro Tiers" lists and one list of names copied into a folder for the "Domus" charity (the "Domus" list). (Pl. Br. 28-29; Pl. 56.1 ¶¶ 1-288 – 1-293 *supra*).

1-404. The "Institutional Macro Tiers" lists reflect the clients Dale and McCullough worked with while Dale was employed at Hedgeye. (*See* Defs. Ex. 344, HE0256333, attaching Defs. Ex. 346, HE0256334 ("Institutional Macro Tiers – MAR '21.xlxs"); Defs. Ex. 349, HE0216616; *see also* Defs. Ex. 347, HE0359206, attaching Defs. Ex. 348 HE0359211 ("Institutional Macro Tiers – August 2020.xlsx")).

1-405. The "Institutional Macro Tiers" lists do not provide any information about the

218

institutions' preferences or even direct contact information. (*E.g.*, Defs. Ex. 344, HE0256333, with attachment Defs. Ex. 346, HE0256334 (Institutional Macro Tiers – MAR '21.xlsx)).

1-406. Dale compiled the "Institutional Macro Tiers" lists for his own convenience. (*See* Defs. Ex. 347, HE0359206, attaching Defs. Ex. 348 HE0359211 ("Institutional Macro Tiers – August 2020.xlsx")); Defs. Ex. 344, HE0256333, with attachment Defs. Ex. 346, HE0256334 ("Institutional Macro Tiers – MAR '21.xlsx"); Defs. Ex. 349, HE0216616 (April 8, 2021 email, cc'ing Jones, with the subject line: "Casey, I believe you helped Darius with this chart.")).

1-407. Dale created the "Institutional Macro Tiers" lists. He created all of the "Institutional Macro Tiers" lists at issue before he announced his resignation from Hedgeye on March 11, 2021. (*See* Zhang Dec. Exhibit 5 (showing the Institutional Macro Tiers - JAN '21.xlsx file was created on December 31, 2020 and "last written" on January 26, 2021; the FEB '21 file was created on February 1, 2021 and "last written" on February 27, 2021; and the MAR '21 file was created on March 1, 2021 and "last written" on March 15, 2021)).

1-408. The "Institutional Macro Tiers" lists were not stored on Hedgeye's password-protected network. They were stored in a folder on Dale's Hedgeye laptop. (*See* Zhang Decl. ¶ 12 & Ex. 5).

1-409. The "Institutional Macro Tiers" customer lists were permitted to circulate via email. (Defs. Ex. 344, HE0256333, attaching Defs. Ex. 346, HE0256334 ("Institutional Macro Tiers – MAR '21.xlxs"); Defs. Ex. 349, HE0216616; *see also* Defs. Ex. 347, HE0359206, attaching Defs. Ex. 348 HE0359211 ("Institutional Macro Tiers – August 2020.xlsx")).

1-410. Zhang's declaration shows that Dale last accessed the "Customers" folder on March 23, 2021. (Zhang Decl. ¶ 12).

1-411. On March 23, 2021, Dale sent an email to another Hedgeye employee attaching a

219

document entitled "Institutional Macro Tiers – MAR '21.xlsx"—one of the documents Zhang declares was saved in the "Customers" folder. (Defs. Ex. 344, HE0256333, attaching Defs. Ex. 346, HE0256334; *see also* Zhang Decl. Ex. 5).

1-412. The "Domus" list was simply an automatically generated email distribution list. (Defs. Ex. 5, Dale 2021 Dep. Tr. 307-11).

1-413. Dale created the "Domus" list "to send a tell-all email about the process I experienced at Hedgeye to their customers." (Defs. Ex. 5, Dale 2021 Dep. Tr. 307-08).

### 3. Hedgeye's Code of Ethics

1-414. Hedgeye's Code of Ethics only binds current employees, not former employees. (Defs. Ex. 102, HE0018744 at HE0018748-49 (providing that the Code of Ethics applies only to "Access Persons," defined "a person who, because of his or her function within the firm, may be reasonably assumed to have access to confidential information of [Hedgeye] or [its] clients")).

### 4. Hedgeye's Damages

1-415. On Thursday, March 25, 2021, Kevin Peel, a Hedgeye Director of Sales, informed Director of Research Daryl Jones that Dale had been "very professional," "great," and "still doing a good job" on client calls that week, and that Dale had appropriately declined to participate in a call with a prospective client to avoid having to explain his imminent departure. (Defs. Ex. 436, HE0304940). Jones agreed that he "ha[d]n't heard or thought otherwise at all." (*Id.* at HE030491).

### B. 42 Macro's Counterclaims

### 1. Hedgeye's Use Of Twitter

1-416. 42 Macro competes with Hedgeye insofar as both companies sell financial and

220

market analyses based on models forecasting macroeconomic conditions. (42 Macro Counterclaim, Dkt. 674 ¶ 2; Hedgeye Answer, Dkt. 677 ¶ 2).

1-417. 42 Macro uses Twitter and social media to market its business. (Defs. Ex. 448, 2/15/2022 Court Tr. 25).

1-418. Hedgeye's business model includes communications on Twitter. (Defs. Ex. 45, Hedgeye 1/9/2023 RFA Response, No. 76).

1-419. As Hedgeye CEO McCullough explained, Hedgeye views Twitter as "one of [its] main communication tools." (Defs. Ex. 16, McCullough 2022 Dep. Tr. 403:4-5).

1-420. Hedgeye uses Twitter for standard commercial and marketing purposes. (Defs. Ex. 45, Hedgeye 1/9/2023 RFA Response, No. 74); *see also* FAC ¶ 199 ("Both 42 Macro and Hedgeye relied on and continue to rely on X (formerly Twitter) for cost-efficient marketing.")). As Hedgeye President Blum explained, Hedgeye's Twitter and social media use is a "very important component" of its subscriber growth. (Defs. Ex. 4, Blum 2022 Dep. Tr. 21:12-18).

1-421. Hedgeye uses Twitter to communicate with current and potential customers and business partners. (Defs. Ex. 45, Hedgeye 1/9/2023 RFA Response, No. 75; 42 Macro Counterclaim, Dkt. 674 ¶ 5; Hedgeye Answer, Dkt. 677 ¶ 5).

1-422. Hedgeye has a "Twitter for Business Use" policy and provides training to its employees on how to use Twitter for business purposes. (Defs. Ex. 19, Parsio 30(b)(6) Dep. Tr. 132-33).

1-423. Hedgeye employees' professional Twitter handles—*i.e.*, handles that refer to their status as Hedgeye employees—are "for the promotion of Hedgeye's business use" and should be used for the "advancement of business purposes for Hedgeye." (Defs. Ex. 19, Parsio 30(b)(6) Dep. Tr. 134-35).

221

1-424.  Hedgeye executives, including CEO McCullough, President Blum, and Director of Research Jones, use their Twitter handles to communicate on behalf of Hedgeye.  (Defs. Ex. 45, Hedgeye 1/9/2023 RFA Response, No. 78-80).

1-425.  Hedgeye views the statements its executives post on Twitter as a critical form of business competition.  (Defs. Ex. 45, Hedgeye 1/9/2023 RFA Response, No. 77).

1-426.  Hedgeye's General Counsel and Chief Compliance officer has vetted Hedgeye CEO McCullough and President Blum's Tweets before they are posted.  (Defs. Ex. 19, Parsio 30(b)(6) Dep. Tr. 131-32).

1-427.  At a court conference before Judge Lehrburger at which Dale, Lamar, and 42 Macro sought to limit Hedgeye's tweets about Dale, Lamar, and 42 Macro, Hedgeye's counsel asserted that Hedgeye's "entire business model … is to communicate on Twitter and on social media."  (Defs. Ex. 448, 2/15/2022 Court Tr. 25; *see also id.* Tr. 25-26 ("[M]y client [Hedgeye] … conduct[s its] business on Twitter …. these are social media businesses by nature …. That's how these businesses communicate.").

1-428.  In a written objection to Judge Lehrburger's order restricting Hedgeye's ability to tweet about this litigation, Hedgeye's counsel asserted that "[i]n [Hedgeye and 42 Macro's] financial research and publishing industry, challenges and critiques on Twitter are a critical form of business competition."  (Dkt. 193: Hedgeye Objection to Order of Magistrate Judge Pursuant to Fed. R. Civ. P. 72(a) at 2).

### 2.  Hedgeye Encourages Third Parties To Attack Dale And 42 Macro

1-429.  In or around the fall of 2021, Hedgeye President Blum "specifically made a decision to have members of Hedgeye nation disseminate details and quotes from the lawsuits themselves … rather than that coming from [Hedgeye] internally" because he believed that third

222

parties would "be more effective … in disseminating the message." (Defs. Ex. 2, Blum 2022 Dep. Tr. 243-245, 249).

1-430. Blum "went to a friendly audience" of third parties who "had a strong reason to believe would be receptive" to his request. (Defs. Ex. 2, Blum 2022 Dep. Tr. 245; *see also id.* Tr. 285-86 (Blum, testifying that he made a "direct call to action from me to" three individuals, including anonymous Twitter user "Caffeine Addict," and Hedgeye subscribers Leslie De Villiers and Andrew Palmer)).

1-431. In September 2021, Hedgeye CEO Keith McCullough and Director of Research Daryl Jones agreed that employees should "start[] burner accounts to reveal Darius." McCullough then directed Jones to provide one enthusiastic Hedgeye supporter with material to post about Dale online. (Defs. Ex. 367, HE0286597 at [0:40]; *see also* Defs. Ex. 368, HE0305343 (Sep. 29, 2021 private message from Jones to "Leslie," stating "Considering a burner account to say what I actually want to…").

1-432. Both McCullough and Blum have admitted that they provided what they viewed as damaging information about Dale to "Caffeine Addict," an anonymous Twitter user, and encouraged him to post that information without disclosing how he obtained it. For instance:

a. In December 2021, after cautioning that "You didn't hear this from me," McCullough disclosed alleged financial information about Dale to "Caffeine Addict." In particular, McCullough wrote "You didn't hear this from me but last time his lawyer updated it, nefarious [Darius Dale] had ███████████." When "Caffeine Addict" asked, "How do I let that tidbit out without implicating you?," McCullough responded, "Just allude to it if you want." (Defs. Ex. 16, McCullough 2022 Dep. Exhibit 17 (composite exhibit consisting of

223

McCullough's communications with Caffeine Addict from December 12, 2021 to December 23, 2021 - HE306256, HE306128, HE306122, HE306169, HE306138 and HE306226); *see also* 42 Macro Counterclaim, Dkt. 674 ¶ 32(a); Hedgeye Answer, Dkt. 677 ¶ 32(a)). At his deposition, McCullough admitted that he provided the information to Caffeine Addict and was "hoping [Caffeine Addict] would post something on Twitter that would allude to it." (Defs. Ex. 16, McCullough 2022 Dep. Tr. at 384-86, 388:18-25). McCullough further admitted that the information he provided to Caffeine Addict was something he had learned from Lamar in the course of confidential discussions. (*Id.* 377:6-379:17).

b. On December 28, 2021, McCullough told "Caffeine Addict": "if you're lucky, Blum will get you some pics from the Real Life of Nefarious [a derogatory nickname Hedgeye employees use for Dale]—they're beyond incriminating." (Defs. Ex. 369, HE0306130; *see also* 42 Macro Counterclaim, Dkt. 674 ¶ 32(b); Hedgeye Answer, Dkt. 677 ¶ 32(b)).

c. President Blum printed out personal and private text messages obtained from Dale's Hedgeye laptop and showed them to "Caffeine Addict" during a private lunch. (Defs. Ex. 2, Blum 2022 Dep. Tr. 262-265; *see also* 42 Macro Counterclaim, Dkt. 674 ¶ 32(c); Hedgeye Answer, Dkt. 677 ¶ 32(c) (admitting that "Blum showed "Caffeine Addict" certain documents during a lunch")).

1-433. In January 2022, Hedgeye provided "Caffeine Addict" with complimentary tickets to a Hedgeye event called "Hedgeye Live." (Defs. Ex. 370, HE0305146).

### 3. Hedgeye's Harassment Campaign Accelerates in February 2022

1-434. Since February 2022, Hedgeye and its executives have tweeted hundreds of times

224

about 42 Macro, Dale, and his colleagues.  For instance, Hedgeye President Blum testified at his May 26, 2022 deposition that he had personally tweeted "at least" hundreds of times about this litigation in the prior several months. (*See* Defs. Ex. 2, Blum 2022 Dep. Tr. 261:8-12).

1-435.  In February 2022, Hedgeye CEO McCullough had more than 200,000 followers on Twitter.  (Defs. Ex. 371, HE0306886, "Social" tab, cell CU16).

1-436.  In February 2022, Hedgeye's official Twitter account had more than 120,000 followers on Twitter.  (Defs. Ex. 371, HE0306886, "Social" tab, cell CU17).

(a)    **Hedgeye Tweets About Dale's Personnel Records**

1-437.  On March 26, 2021, during the time Hedgeye and Dale were negotiating a separation agreement, Hedgeye CEO McCullough wrote to Hedgeye President Blum, "It's time to tell Darius lawyer about the file – ie the true Darius Dale revealed."  (Defs. Ex. 133, HE0305067 at HE0305067).

1-438.  On February 14, 2022, Hedgeye President Blum publicized a memo from Dale's personnel file concerning a disciplinary incident that was fully resolved in 2018 (the "Central Park incident").  (Defs. Ex. 107, DALE0158054).  Blum accompanied the record with additional commentary about Dale's employment at Hedgeye, asserting that "1 of my biggest mistakes was not to insist on Dale's termination @Hedgeye after the [2018] incident." (*Id.*).

1-439.  On February 14, 2022, Hedgeye President Blum tweeted about "the 1st time [he] wanted to fire Dale," which concerned a 2016 incident involving airplane seats.  (Defs. Ex. 107, DALE0158054).

1-440.  On February 14, 2022, Hedgeye President Blum tweeted: "No Hedgeye employee has ever been fined, let alone $10,000.  Dale enjoys that distinction twice over!"  (Defs. Ex. 107, DALE0158054).

1-441.  On March 18, 2022, Hedgeye CEO McCullough sent a direct message to

225

"Caffeine Addict" stating: "Nefarious [Darius Dale] tweeting about being part of a community that has "dignity" right after the Central Park incident leaked #TheBest." (Defs. Ex. 372, HE0306227). At the time McCullough sent that message, Hedgeye was subject to a protective order that required "[a]ny information from Dale's Hedgeye personnel file" to be "treated as Confidential under the Protective Order," including the "Central Park" memo. (Dkt. 188 ¶ 3; *see also* Dkt. 193 at 16-17 (Hedgeye's counsel, objecting to that limitation in the Court's order)).

1-442. On April 1, 2022, Hedgeye President Blum posted on Twitter certain text messages that Dale sent to him in May 2018 concerning the Central Park incident. (Defs. Ex. 373, DALE0158066).

1-443. On November 16, 2022, Hedgeye President Blum posted a Tweet referring to the Central Park incident, including an anonymous email he received in 2018 making allegations against Dale. (Defs. Ex. 374, DALE0157992). In that Tweet, Blum wrote that he had "take[n] responsibility for not firing Dale on the spot when the [2018] incident took place. We should not ignore these behaviors." (*Id.*).

### (b)   Hedgeye Tweets About Materials Supposedly Found On Dale's Hedgeye Laptop

1-444. Hedgeye and its executives have repeatedly asserted online that they had recovered sensitive personal information about Dale, including "explicit" photographs, from Dale's Hedgeye laptop, and threatened to post these materials online. For instance:

> a. On November 11, 2021, Hedgeye President Blum suggested that Hedgeye had recovered personal materials from Dale's Hedgeye laptop, writing on Twitter that "We have the entire personal browsing record & a photo record… just saying. #Discovery[.] Not what I would like my folks to know. Though clearly I have other standards." (Defs. Ex. 375, DALE0158050; *see also* 42 Macro

Counterclaim, Dkt. 674 ¶ 27(a); Hedgeye Answer, Dkt. 677 ¶ 27(a)).

b. On February 12, 2022, Blum asserted that Dale "LEFT all of the personal documents (we have 10s of 1,000), many very explicit" on his Hedgeye laptop. Blum promised, "We will get into that next week." (Defs. Ex. 376, DALE0158059; *see also* 42 Macro Counterclaim, Dkt. 674 ¶ 27(b); Hedgeye Answer, Dkt. 677 ¶ 27(b)).

c. On February 23, 2022, Blum posted a disingenuous five-part "lecture" about leaving sexual materials on a work laptop to insinuate that Hedgeye had recovered "porn," "explicit pictures," and "naked pictures of people" from Dale's Hedgeye laptop. (Defs. Ex. 377, DALE0158085; *see also* 42 Macro Counterclaim, Dkt. 674 ¶ 27(c); Hedgeye Answer, Dkt. 677 ¶ 27(c)). This thread was reposted by the official Hedgeye account, as well as by CEO McCullough. (Defs. Ex. 377, DALE0158085; Defs. Ex. 378, DALE0158196 at DALE0158199 (showing McCullough and Hedgeye reposts)). Commenters understood that in this thread, Hedgeye was threatening to release Dale's sensitive, personal information. (*See* Defs. Ex. 377, DALE0158085 ("Nefarious [a nickname for Darius] took nudes of other people (of anyone, really) on his COMPANY electronics?" …. "Dirty darious dale" …. "Man I hope this is going where I think its going. Hope justice is done for all at @Hedgeye")).

1-445. On April 29, 2022, Hedgeye Director of Research Daryl Jones tweeted "Wait until you see the shit we found on Darius' computer lol God bless indeed !" (Defs. Ex. 379, DALE0158070).

(c)    **Hedgeye Makes Misrepresentations About 42 Macro And Its Product**

1-446. Hedgeye has had access to 42 Macro's models since June 2021. (Dkt. 77).

1-447. On February 28, 2022, Hedgeye President Blum stated on Twitter that that Dale's statement that "[42 Macro's] models are better" was a "lie," and further claimed, "They are our models, not his." (Defs. Ex. 380, DALE0158052; *see also* 42 Macro Counterclaim, Dkt. 674 ¶ 29; Hedgeye Answer, Dkt. 677 ¶ 29). Keith McCullough reposted these tweets. (Defs. Ex. 381, DALE0158195).

(d)    **Hedgeye Publicly and Privately Threatens A Third-Party Platform Due To Its Support For 42 Macro**

1-448. Raoul Pal is the CEO of Real Vision, a popular, on-demand platform for content from financial analysts. (*See* Real Vision, "About Raoul," *available at* https://www.realvision.com/contributor/raoul-pal).

1-449. In a 2019 survey, dozens of Hedgeye subscribers reported that they first learned about Hedgeye from Real Vision. (Defs. Ex. 71, HE0201016).

1-450. After 42 Macro's launch, Real Vision occasionally hosted Dale on its platform. (Defs. Ex. 3, Blum 2023 Dep. Tr. 291).

1-451. On January 27, 2022, McCullough sent Pal an email complaining that Dale had been featured on Real Vision. McCullough's email concluded: "You were warned. The next leg of this legal process is in motion." (Defs. Ex. 382, HE0306277; *see also* 42 Macro Counterclaim, Dkt. 674 ¶ 35; Hedgeye Answer, Dkt. 677 ¶ 35).

1-452. On February 9, 2022, Blum sent Pal an article about this litigation and expressed Hedgeye's "extreme frustration / disapproval with Darius Dale and his co-conspirators." (Defs. Ex. 383, HE0305791 at HE0305792; *see also* 42 Macro Counterclaim, Dkt. 674 ¶ 36; Hedgeye Answer, Dkt. 677 ¶ 36).

228

1-453. Blum insinuated that Pal should stop permitting Dale to appear on Real Vision. (Defs. Ex. 3, Blum 2023 Dep. Tr. 293 ("Q. Did you ask Mr. Pal to stop having Mr. Dale on the air with him? A. That was certainly the insinuation of my conversation with him. I don't know if I used those specific words.")).

1-454. Around the same time, McCullough emailed Pal about removing Dale from his platform. (*See* Defs. Ex. 384, HE0304716 (February 10, 2022 email from McCullough to Hedgeye executives complaining that Real Vision "had a spotlight on Nefarious today as their content. Sad and pathetic. And just wrong. He completely and shamelessly ignored my email.")).

1-455. On February 10, 2022, Blum discussed Pal in a series of private Twitter messages with "Caffeine Addict." (Defs. Ex. 385, HE0305770 at HE0305778-79). "Caffeine Addict" wrote: "I would love to see [Pal] taste a little blood." Blum responded: "Keith is getting upset at Raoul. I am getting there too." "Caffeine Addict" responded: "good then I don't feel bad about lighting him up." He then shared a screenshot of a post criticizing Dale for pointing out that Hedgeye's analysts were mostly white, and tagging Raoul Pal. Blum responded: "Nice one!" (*Id.*).

1-456. Also on February 10, 2022, "Caffeine Addict" noted that "Raoul Pal is a new follower." Blum responded: "Progress." "Caffeine Addict" wrote: "You don't think he's following me for other reasons…some of what I say could be a little slanderous…" (Defs. Ex. _385, HE0305770 at HE0305780).

1-457. On February 12, 2022, at 11:28 AM, Blum posted a public message on Twitter addressed to Pal, stating that both he and McCullough "have tried to reach out to you directly in the past few weeks. Unsuccessfully." (Defs. Ex. 386, DALE0158055). Blum stated that Judge

Carter had found "[t]hat Dale obtained @Hedgeye trade secrets upon his departure" and "[t]hat Dale retained @Hedgeye trade secrets & reviewed them with extreme care while creating 42 Macro." Blum demanded that Pal "remove from @RealVision all of Dale's content provided from March 29, 2021 to the present." (*Id.*).

1-458. On February 12, 2022, at 4:03 PM, Pal wrote to Blum "I do not appreciate our private affairs being aired in public as it is not professional. Additionally, you do not have the right to demand that we either don't work with a person or remove their content …. Once the court has officially ruled, we will then abide by that ruling with regards to 42 Macro. Until there is a legal ruling, it is conjecture. … Again, we do not expect to be public criticized, nor do I expect to get threatening emails by [McCullough]." (Defs. Ex. 383, HE0305791 at HE0305791-92).

1-459. On February 12, 2022, at 11:20 PM, Blum responded to Pal: "We are now in corporate espionage territory. If you cannot accept that the judge has already resolved the IP theft / misappropriation matter [against Dale and 42 Macro], then we are headed in the wrong direction. … Our complaint … is backed by hard evidence uncovered during discovery. We have a conspiracy of highly unethical people who represent the worst of our industry…. Its not going to be possible for us to partner with businesses that fail to recognize this." (Defs. Ex. 383, HE0305791 at HE0305791; *see also* 42 Macro Counterclaim, Dkt. 674 ¶ 37; Hedgeye Answer, Dkt. 677 ¶ 37).

1-460. On February 14, 2022, McCullough posted: "[T]his is the 3rd day I am giving @RaoulGMI and @RealVision an opportunity to do the right thing[.] There will not be a 4th[.]" (Defs. Ex. 387, DALE0158082). McCullough also posted that he had attempted to contact Pal "Multiple times." (Defs. Ex. 388, DALE0158084).

230

1-461. On February 14, 2022, "Caffeine Addict" sent Blum a direct message on Twitter including a screenshot of a message "Caffeine Addict" had posted tagging Pal and asserting that Real Vision was "sacrific[ing] integrity to constantly bring in Darius Dale." (Defs. Ex. 385, HE0305770 at HE0305782). Blum responded with the "prayer hands" and "thumbs-up" emojis. (*Id*. at HE0305783).

1-462. On March 2, 2022, Hedgeye executives including CEO McCullough, Director of Research Jones, and President Blum internally discussed the fact that Pal had featured Dale on Real Vision. (Defs. Ex. 389, HE0305559). Blum wrote: "I'm going to hit RV and Raoul [Pal] about this tomorrow." (*Id*.; *see also* 42 Macro Counterclaim, Dkt. 674 ¶ 38(c); Hedgeye Answer, Dkt. 677 ¶ 38(c)).

1-463. McCullough repeatedly criticized Real Vision on Twitter the same day, writing, among other things, "Raoul and @RealVision Going with any content that gets them clicks instead of integrity #Sad" (Defs. Ex. 390, DALE0158075); and "Hiding from the #truth Is consistent with who [Pal] chooses to have as business partners." (Defs. Ex. 391, DALE0158091; *see also* Defs. Ex. 392, DALE0158080).

1-464. Between February and March 2022, individuals claiming to be Real Vision subscribers posted online that they were cancelling their subscriptions due to the platform's association with Dale. (*E.g.*, Defs. Ex. 393, DALE0158192 (Mar. 3, 2022 Twitter message reading: "it does appear @42macroDDale is using @KeithMcCullough's models. Paid for a year of RV already, but I'm signing off until sorted," and attaching Real Vision cancellation); *see also* Defs. Ex. 394, DALE0158018 (Mar. 16, 2022 Twitter exchange in which McCullough refers to "#nefarious recaps" on Real Vision, and another user responds "#dump42Macro"); Defs. Ex. 395, DALE0158037 (Mar. 16, 2022 Twitter exchange, in response to Real Vision post

featuring Dale, another user writes "Still have the crook Darius Dale in your briefings?  You guys suck."); Defs. Ex. 396, DALE0158038 (Mar. 16, 2022 Twitter exchange, in response to Real Vision post featuring Dale, another user writes "Despicable to promote DD after everything he has done …. You guys literally live in fantasy island."); Defs. Ex. 397, DALE0158039 (Mar. 16, 2022 Twitter exchange, in response to Real Vision post featuring Dale, another user writes "Trash Bennington and Nefarious Dale.  Sad @RealVision is turning into another morally bankrupt media payperclick gobble gobble machine.  Used to love the quality content.")).

1-465. On February 15, 2022, one person privately messaged McCullough:  "I put on my cancellation that it was the association with Darius Dale.  It's fucking bullshit.  Hang in there!" (Defs. Ex. 398, HE0304691).

1-466. On March 1, 2022, "Caffeine Addict" messaged Blum: "Is there any course of action that can be taken when this is over to pull Darius off RV?"  (Defs. Ex. 385, HE0305770 at HE0305783).  Blum responded:  "Nothing obvious.  But calling people out in public who decide to appear with him is very good.  At least one person has already made it be known to us that they are now refusing appearances on RV with him. … The person became very concerned when called out.  Studied and adjusted."  (*Id.* at HE0305784).

### 4. Hedgeye's Campaign Is Commercially Motivated

1-467. Hedgeye CEO McCullough and President Blum included Hedgeye marketing personnel, such as Dan Holland, Hedgeye's Vice President of Media and Communications, and Robert Milburn, Hedgeye's Vice President of Marketing Strategy, in their internal communications about their plans to attack Dale and Pal on social media. (*See, e.g.*, Defs. Ex. 399, HE0305664 (McCullough writing to Milburn on February 10, 2022 that he was "putting nails in nefarious' [Darius Dale's] coffin"); Defs. Ex. 384, HE0304716 (McCullough writing to

232

Holland on February 10, 2022 that Pal "completely and shamelessly ignored my email" about Dale); Defs. Ex. 389, HE0305559 (McCullough and Blum writing to Holland on March 2, 2022 about Pal and Blum's plan to "hit RV" about Dale).

1-468. On February 10, 2022, one Twitter user described Blum's "evidence drops" as "Hedgeye marketing nights." (Defs. Ex. 400, DALE0158049). Blum and McCullough endorsed this understanding by reposting the Tweet. (*Id*.).

1-469. On March 3, 2022, Blum posted on Twitter that "@Hedgeye clients are thrilled" about Hedgeye's public attacks on Dale and 42 Macro because "having the opportunity to finally counter [Dale's] year long disrespectful and disgusting campaign against us &our 75+ employees has invigorated our staff. We are not a 1-man show like [42 Macro is]. Our breadth & depth is top." (Defs. Ex. 401, DALE0158053).

1-470. On March 9, 2022, Hedgeye CEO McCullough messaged President Blum: "Jump in on twitter [o]n this Darus didn't do math meme. I got the ball rolling." (Defs. Ex. 402, HE0396552). Blum responded: "At dinner with McNamara [the prior Chief Investment Officer at Sierpinski], [Hedgeye Director of Research] Jones, and [Hedgeye General Counsel and Chief Compliance Officer] Parsio. Everyone on their phone now!" (*Id*.).

1-471. On June 4, 2022, McCullough messaged Blum: "Jump into my tweets tonight about rug Pal [Raoul Pal] and nefarious [Darius Dale]." (Defs. Ex. 403, HE0396529). Blum responded with a "thumbs-up" emoji. (*Id*.).

### 5. 42 Macro Has Suffered Harm As A Result Of Hedgeye's Campaign

1-472. 42 Macro's mass-market subscriber numbers grew steadily from the business's inception until February 2022. (Defs. Ex. 404, DALE0158160, Rows 12 and 16; *see also* Boushie Decl. Ex. 1, Boushie Counterclaim Report ¶¶ 29, 33).

1-473. 42 Macro's mass-market subscriber numbers declined beginning in February

233

2022 and thereafter. (Defs. Ex. 404, DALE0158160, Cells L16 & M12 (showing peak of ███ subscribers in January 2022), Cells M15 & 16 (showing ██ "churned" subscribers and a net of ██ subscribers lost in February 2022); Cells N15 & 16 (showing ██ "churned" subscribers and a net of ██ subscribers lost in March 2022); *see also* Boushie Decl. Ex. 1, Boushie Counterclaim Report ¶ 33).

1-474. On February 10, 2022, a Twitter user named "@RyanMcFace" privately messaged Hedgeye CEO Keith McCullough and stated: "I gave him the benefit of the doubt…I was wrong and have cancelled my subscription …. [I] still have my subscription w/ Hedgeye however. I appreciate you and your team. Darius fooled [me]." (Defs. Ex. 405, HE0306193). Attached to the message was an image of a 42 Macro cancellation. (Defs. Ex. 437, HE0306196; *see also* Defs. Ex. 405 at HE0306194).

1-475. On March 2, 2022, ███████, Partner and Portfolio Manager ███████ ███████████, wrote to McCullough: "[I] wanted to let you know we will NEVER ever give Darius Dale our business …. I know how it feels dealing with untruthful backstabbers and snakes." (Defs. Ex. 406, HE0305590). In response, McCullough wrote: "What Nefarious Dale did is now on full public display as it should be. It's professionally embarrassing and shameful." (*Id.*).

1-476. On March 29, 2022, Lamar stated in an email to Dale and other 42 Macro employees: "active customers still falling. ██ since HE smear campaign." (Defs. Ex. 407, DALE0157219).

1-477. Dale and 42 Macro received messages indicating that current or potential subscribers were declining to subscribe because of Hedgeye's messages. (*See, e.g.*, Defs. Ex. 408, DALE0158167 (Feb. 15, 2022 message to 42 Macro reading, "Hello Darius, after reading

234

the complaint against you abusing women this is really disgusting behavior. I thought you were a decent human and we were wrong. Women against Darius."); Defs. Ex. 409, DALE0158163 (Feb. 28, 2022 Twitter message reading, "Darius, I used to like you but stealing trade secrets, slandering your co-workers, abusing your expense account, watching porn on your work computer and recording sex videos of women (probably w/o their consent) are too much to take. Goodbye and good luck, you'll need it.")).

1-478. On October 27, 2022, Mark White, a media consultant, informed Dale: "You can't go on CNBC until" the "Keith lawsuit" is "resolved …. I think they might be worried that Keith will start tweeting up a storm and causing mayhem." (Defs. Ex. 438, DALE0158122).

1-479. Kristopher Boushie, a certified public accountant and experienced expert as the Managing Director of the Washington, D.C. office of NERA Economic Consulting, calculated that 42 Macro has suffered between $5,254,772 and $8,289,314 in damages as a result of Hedgeye's conduct. (Boushie Decl., Ex. 1, Boushie Counterclaim Report ¶ 11).

1-480. Hedgeye's proffered damages expert, Thomas Britven, calculated that 42 Macro's mass-market customer "churn" rate increased by approximately 1 percent beginning in February 2022. (Britven Decl. Ex. 2, Britven Rebuttal Report ¶ 47). Assuming that increase was attributable to Hedgeye's conduct, Britven calculated that 42 Macro suffered between $96,754 and $134,820 in lost profits to its mass market business and between $12,188 and $12,540 in lost profits to its institutional business. (*Id.* ¶¶ 51, 54, 55).

1-481. At all relevant times, Hedgeye was headquartered in Connecticut. (*See* Defs. Ex. 410, HE0306739 (2020 confidentiality agreement between Hedgeye and a third party, stating that Hedgeye's "principal place of business" is in Stamford, Connecticut); Hedgeye Live, "About Us," *available at* https://www.hedgeyelive.com/about (stating that Hedgeye is "[h]eadquartered

in Stamford, Connecticut").

1-482.  Hedgeye CEO Keith McCullough lives in Connecticut.  (*See* Hedgeye, "Buy More Gold, Silver Etc." (April 23, 2024), available at https://app.hedgeye.com/insights/149452-buy-more-gold-silver-etc?single_item=true (McCullough, describing his home in "Fairfield County, Connecticut"); Hedgeye, "Diary of a Hedgeye User" (Sept. 16, 2024), *available at* https://app.hedgeye.com/insights/155962-diary-of-a-hedgeye-user-anything-you-do-is-everything-you-do?single_item=true (stating that McCullough's "home" is "in Connecticut")).

### C.  Terman And Solstein

#### 1.  Ben Ryan

1-483.  When Ben Ryan was employed at Hedgeye Ryan, he lacked access to the GIP model.  (Pl. Ex. 82, Ryan Dep. Tr. 14:21-23 16:5-11, 21:21-23 (testifying that he lacked access to the model "the entire time I worked there.")).

#### 2.  Hedgeye Representations of Independence and Lack of Conflicts

1-484.  Hedgeye markets itself as "an independent and unconflicted provider" of investment research.  (Defs. Ex. 420 (Hedgeye, Institutional Research, available at https://accounts.hedgeye.com/institutional).

1-485.  As of May 2017, just before Hedgeye and Solstein executed their services agreement, Hedgeye's website described the company as "an independent research firm," representing that "We have no conflicts of interest like a trading desk and don't run any money." (Defs. Ex. 428 (Hedgeye, Real-Time Alerts (May 2017), captured by the Wayback Machine).

1-486.  In 2014, in response to press inquiries about a lawsuit against the firm, Hedgeye stated that "No one at Hedgeye [trades]," adding that: "Hedgeye doesn't run any money.  The employees there spend their time analyzing and researching markets, not buying, and selling."

(Defs. Ex. 419 (Business Insider, Hedgeye: One Of The Most Polarizing Companies In Finance Is Suing A Stay At Home Dad For Defamation (May 9, 2014)).

1-487.  In 2014, McCullough stated in a video about real-time alerts, that "I don't run a portfolio.  That would be a conflict of interest."  (Defs. Ex. 450 (Hedgeye TV, What Is Real-Time Alerts, available at https://www.youtube.com/watch?v=DirMwo9EqsQ).

1-488.  Hedgeye's claim of independence was a key inducement for Terman and Solstein to subscribe to Hedgeye's services in 2017 because Solstein sought unvarnished and unconflicted analysis.  (Terman 12/6/24 Decl. ¶¶ 4-5).

1-489.  Prior to Solstein's agreement with Hedgeye, Terman reviewed and heard oral statements she heard from Keith McCullough, in which he stated that he and other Hedgeye employees did not trade securities that Hedgeye covered and recommended.  (Terman 12/6/2024 Decl. ¶ 4).

1-490.  Terman and Solstein relied on Hedgeye's claims of independence and McCullough's representations that Hedgeye employees did not trade securities that Hedgeye covered and recommended when deciding to enter into the services agreement with Hedgeye in 2017.  (Terman 12/6/2024 Decl. ¶¶ 4-5, 8, 10).

1-491.  Nadine Terman reviewed Hedgeye's 2017 Form ADV before returning a signed copy of the agreement to Hedgeye. If she had not found the disclosures to be satisfactory, she would have torn up the contract and informed Hedgeye that she wasn't interested. (Terman 12/6/2024 Decl. ¶ 6).

1-492.  Nadine Terman was actively involved in the decision to subscribe to Hedgeye's services but Sandra Southworth was not. (Terman 12/6/2024 Decl. ¶ 8).

1-493.  Terman and Solstein also relied on Hedgeye's claims of independence and its

237

representations that Hedgeye employees did not trade securities that Hedgeye covered and recommended, in deciding to renew their Hedgeye subscription in 2018, 2019, and 2020. (Terman 12/6/2024 Decl. ¶ 9).

1-494. Terman reviewed the Hedgeye Form ADVs each year from 2017 through 2021. She relied on the accuracy of those representations each time that she agreed to extend our Hedgeye subscription on a quarterly basis. (Terman 12/6/2024 Decl. ¶¶ 9, 10).

1-495. Hedgeye's ADVs represented that it was not registered with the SEC because "its business fully qualifies for the newsletter exemption from registration requirements under the Advisors Act of 1940, as its model is one-to-many distribution of its content." (Pl. Exs. 64, 71-75 (2017-2021 ADV)).

1-496. Solstein would never have signed a contract with a firm it knew was in violation of the securities law. (Terman 12/6/2024 Decl. ¶ 7).

1-497. Had Solstein known that Hedgeye's claim to qualify for the newsletter exemption was false, it would not have executed the services agreement with Hedgeye in 2017, nor would it have renewed the subscription with Hedgeye in 2018, 2018, and 2020. (Terman 12/6/2024 Decl. ¶¶ 7, 9).

1-498. From the third quarter of 2017 through the first quarter of 2020, Solstein paid $35,000 per quarter to Hedgeye. From the second quarter of 2020 to the first quarter of 2021, Solstein paid $16,000 per quarter. (Terman 12/6/2024 Decl. ¶ 11; Defs. Ex. 444 (HE0352270).

### 3. Hedgeye's Conflicted Trading in ETFs

1-499. Hedgeye employees "frequently" traded in Exchange Traded Funds ("ETFs") when those same ETFs were also mentioned in RTAs. (Pl. Ex. 70, Second Parsio Dep. Tr. 141:7-13).

1-500.  The experts retained by both sides agree that from July 5, 2018 to March 31, 2021, Hedgeye personnel executed over ▇ trades within one day of any RTA, where the Hedgeye employee traded the same security and got a better price than the one mentioned in the RTA.  (Milev Decl. Ex. 1, Expert Report of Jordan Milev, dated June 28, 2024 ("Milev Report"), at ¶ 20 (reporting ▇ such trades); Defs. Ex. 427, Rebuttal Report of James Reilly, dated August 2, 2024 ("Reilly Report"), at Exhibit 1, p. 3 (reporting ▇ such trades); Defs. Ex. 365, Reilly Dep. Tr. 12:1-9).  Over ▇ of those trades were made by McCullough personally. (Milev Decl. Ex. 1, Milev Report ¶ 20).

1-501.  Of the over ▇ trades made by Hedgeye personnel from July 5, 2018 to March 31, 2021 within one day of an RTA, where the Hedgeye employee traded the same security and got a better price than the one mentioned in the RTA, approximately ▇ of the trades were made the day prior to the RTA and ▇ on the same day.  (Defs. Ex. 427, Rebuttal Report of James Reilly at Exhibit 1 pp. 2-3).

1-502.  Keith McCullough personally determined what securities would be the subject of RTAs and when the RTAs would be released.  (Pl. Ex. 44, Second Parsio Dep. Tr. 264:22-265:17).

### 4.  Defamatory Statements

1-503.  On March 31, 2021, Keith McCullough accused Terman of stealing the idea of investing in Dufry.  (Defs. Ex. 451, HE0360219 ("[S]he literally copied my process (and ideas like DUFRY).")).

1-504.  McCullough made the same statement on a Hedgeye program, The Call, on March 30, 2021.  (Ex. 426 (March 31, 2021 Recording of the Call).

1-505.  Hedgeye pitched DUFRY on its "Fast Money Show" on March 25, 2021.  (Defs.

Ex. 421, HE0359624; Defs. Ex. 10, Jones 2023 Dep. Tr. 407:4-19, 416:2-19).

1-506.  Solstein had been investing in DUFRY since at least October 2020 and made additional purchases of shares on March 2 and March, 2021.  (Terman 12/6/2024 Decl.¶ 11).

1-507.  Hedgeye specifically looked into whether Terman had listened in on the Dufry call.  Hedgeye's records confirmed that Terman had not listened to that call.  (Defs. Ex. 422, HE0362290 ("Nadine Terman did not watch nor anyone from Solstein."); Terman 12/6/2024 Decl. ¶ 12).

1-508.  On February 11, 2022, Michael Blum published a tweet accusing Terman of "IP theft."  (Defs. Ex. 413 (Blum 2/11/2022 Tweet No. 1)).

1-509.  On February 11, 2022, Blum also published a tweet stating that "[o]n April 26, 2021, Terman and Solstein Capital, through 42 Macro, began publishing content based on models derived from Hedgeye's trade secret source models."  (Defs. Ex. 414 (Blum 2/11/2022 Tweet No. 2)).

1-510.  On February 24, 2022, Blum published a tweet claiming that "Terman actively assisted Dale with building 42 Macro's models."  (Defs. Ex. 415 (Blum 2/24/2022 Tweet No. 1)).

1-511.  Blum also claimed that "After his extensive copying of @Hedgeye confidential info & trade secrets to his personal Dropbox, Dale & Terman both shared access to a folder in Dropbox named '42 Macro.'  Terman & Solstein thereby themselves directly acquired Hedgeye's confidential information & trade secrets."  (Defs. Ex. 416 (Blum 2/24/2022 Tweet No. 2)).

1-512.  On March 1, 2022, Blum published a tweet stating that "Judge Carter already ruled @Hedgeye is likely to prevail on the merits."  (Defs. Ex. 417 (Blum 3/1/2022 Tweet)).

1-513.   On March 11, 2022, Blum published a tweet stating that "the evidence of Dale's misappropriation is literally undisputed" and that "Dale has produced evidence irrefutably establishing the active participation of Defendants Nadine Terman and her company Solstein Capital."  (Defs. Ex. 418 (Blum 3/11/2022 Tweet)).

1-514.   Plaintiff sent a copy of its draft complaint to the media before filing it. (Defs. Ex. 445) (HE0375316)

### 5.   CNBC

1-515.   Terman began making appearances on CNBC in 2021.  (Terman 12/6/2024 Decl. ¶ 13; Pl. Ex. 5, Solstein 30(b)(6) Dep. Tr. 222:15-223:16).  Terman made weekly appearances on CNBC, with the frequency of her appearances increasing over time.

1-516.   Terman's agreement with CNBC was renewed in December 2022.  (Pl. Ex. 80).

1-517.   McCullough had been on CNBC many times in the past but later turned against the network because he saw them as a competitor and held them in contempt. (Pl. Ex. 44 (Second McCullough Dep. Tr. 314:12-315:7, 318:6-321:18)).

1-518.   McCullough was opposed Terman appearing at CNBC. (Pl. Ex. 44 (Second McCullough Dep. Tr. 323:14-24)).

1-519.   McCullough hoped the Hedgeye's accusations against Terman would cause CNBC to drop her as a client.  At his deposition, he testified that he retweeted a comment stating that "I would hope CNBC will ban Nadine" because "I thought it was good content." (Pl. Ex. 44 (Second McCullough Dep. Tr. 339:16-14-341:25))

1-520.   On May 2, 2022, McCullough stated: "I do not believe she's appeared on CNBC since @mablum proceeded with the evidence." (Defs. Ex. 425 (McCullough 5/2/2022 Tweet)).

1-521.   In February 2022, CNBC informed Terman that her appearances would be

241

suspended until the lawsuit was resolved. (Terman 12/6/2024 Decl. ¶ 14). After appearing more than weekly for approximately a year, Terman's appearances dropped to zero. (Terman 12/6/2024 Decl. ¶ 14).

### 6. Loss of Business

1-522. On February 11, 2021, Blum confirmed that he had communicated directly with Solstein clients about his accusations against with Solstein." (Defs. Ex. 413 (Blum 2/11/2022 Tweet No. 1)).

242

1-528. Defendants produced in discovery copies of the Investment Advisory Agreement, an Investor Policy Statement that references the Advisory Agreements and sets forth the responsibilities of the parties, and invoices for management fees charged for the two poached clients. Terman is prepared to provide testimony authenticating these documents and, on the formation, and performance of the agreements. (Terman 12/6/2024 Decl. ¶ 15 & Exhibit A).

Dated: December 6, 2024

/s/ Jason Koral
Jason Koral
PRESS KORAL LLP
641 Lexington Avenue, 13th Floor
New York, NY 10022
Tel: (212) 520-8270
Fax: (347) 342-3882
jkoral@presskoral.com

*Attorneys for Nadine Terman and Solstein Capital LLC*

/s/ Jonathan P. Bach
Jonathan P. Bach
Fabien M. Thayamballi
Alice Buttrick
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, NY 10036
Tel: (212) 257-4897
Fax: (212) 202-6417
jbach@shapiroarato.com
fthayamballi@shapiroarato.com
abuttrick@shapiroarato.com

*Attorneys for Defendants Darius Dale, Steven Lamar, and 42 Macro LLC*

243