**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

HEDGEYE RISK MANAGEMENT, LLC,

Plaintiff-Counterdefendant,

v.

DARIUS DALE, STEVEN LAMAR, 42 MACRO, LLC, NADINE TERMAN, AND SOLSTEIN CAPITAL, LLC,

Defendants-Counterclaimants.

No. 1:21-cv-03687 (ALC) (RWL)

# PLAINTIFF HEDGEYE RISK MANAGEMENT, LLC'S OPPOSITION TO DEFENDANTS DARIUS DALE'S AND SOLSTEIN CAPITAL LLC'S POST-SUMMARY JUDGMENT MOTIONS TO DISMISS HEDGEYE'S BREACH OF CONTRACT CLAIMS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .......... 1

STATEMENT OF FACTS .......... 2

ARGUMENT .......... 10

I. THE COURT'S SUMMARY JUDGMENT RULING ALREADY ADDRESSED HEDGEYE'S DAMAGES .......... 10

A. The Court Held That Hedgeye May Present Its Damages Case to a Jury .......... 11

B. Defendants Improperly Seek Another Bite at the Apple .......... 12

II. PRECLUSION UNDER RULE 37 IS UNWARRANTED .......... 15

A. Defendants Do Not Meet the Legal Standard for Preclusion Under Rule 37(c)(1) .......... 15

B. Hedgeye Properly Disclosed Its Damages During Discovery .......... 16

C. Any Failure Is Harmless and Substantially Justified .......... 18

III. HEDGEYE IS ENTITLED TO PRESENT EVIDENCE OF ITS DAMAGES AT TRIAL .......... 19

A. Avoided Development Costs Represent Hedgeye's Damages .......... 19

B. Hedgeye Has Ample Factual Evidence of Its Losses .......... 21

C. At a Minimum, Hedgeye Is Entitled to Nominal Damages .......... 23

D. Hedgeye Is Entitled to Attorneys' Fees for Dale and Solstein's Breaches of Contract .......... 24

CONCLUSION .......... 25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Agence France Presse v. Morel*, 293 F.R.D. 682 (S.D.N.Y. 2013)....18

*Ascot Valley Foods, Ltd. v. ADF Foods (USA), Ltd.*, No. 22-cv-2655 (DEH) (OTW), 2025 WL 3467914 (S.D.N.Y. Dec. 3, 2025)....16

*Austrian Airlines Oesterreichische Lufverkehrs AG v. UT Finance Corporation*, No. 04-cv-3854 (RCC)(AJP), 2005 WL 977850 (S.D.N.Y. Apr. 28, 2005)....17

*Crawley v. United States*, 417 Fed. Appx. 94 (2d Cir. 2011)....14

*Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006)....15, 17

*EJ Brooks Company v. Cambridge Sec. Seals*, 31 N.Y.3d 441 (2018)....19

*Feltenstein v. City of New Rochelle*, No. 14-cv-5434 (NSR), 2018 WL 3752874 (S.D.N.Y. Aug. 8, 2018)....16

*Hart, Nininger & Campbell Assocs., Inc. v. Rogers*, 16 Conn. App. 619 (Conn. App. Ct. 1988) 21

*Hayden v. Int'l Bus. Machs. Corporation*, No. 21-cv-5090 (KMK), 2026 WL 1266014 (S.D.N.Y. May 8, 2026)....17

*Lydall, Inc. v. Ruschmeyer*, 282 Conn. 209 (Conn. 2007)....23

*Maldonado v. Town of Greenburgh*, No. 18-cv-11077 (KMK) (AEK), 2022 WL 21295040 (S.D.N.Y. Mar. 31, 2022)....15-16

*McCarter & Eng., LLP v. Jarrow Formulas, Inc.*, 351 Conn. 186 (Conn. 2025)....24

*McGraw-Hill Global Educ. Holdings, LLC v. Mathrani*, 293 F. Supp. 3d 394 (S.D.N.Y. 2018).13

*NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.*, 262 F. Supp. 2d 134 (S.D.N.Y. 2003)....13

*News America Marketing In-Store, Inc. v. Marquis*, 86 Conn. App. 527 (Conn. App. Ct. 2004), aff'd 276 Conn. 310 (Conn. 2005)....23

*Pinda Tech. Co. v. Greenwich Metals, Inc.*, No. 3:25-cv-258 (AWT), 2026 WL 658351 (D. Conn. Mar. 9, 2026)....20

*Syntel Sterling Best Shores Mauritius Limited v. The TriZetto Group Inc.*, 68 F.4th 792 (2d Cir. 2023)....19

*Trade Links, LLC v. BI-QEM SA de CV*, No. 24-cv-418, 2025 WL 1416759 (2d Cir. May 15, 2025)....25

*United States Nat'l Bank v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439 (1993)....14

*Wells Fargo Bank, N.A. v. Konover Dev. Corp.*, 630 F. App'x 46 (2d Cir. 2015)....24

**Statutes**

Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq. ....7

Connecticut Unfair Trade Practices Act ("CUTPA") ........................................................ 8

**Rules**

Fed. R. Civ. P. 26 ........................................................ 15, 16, 17
Fed. R. Civ. P. 37 ........................................................ passim
Fed. R. Civ. P. 37(c)(1) ........................................................ 3, 15, 16, 25
Local Civil Rule 6.3 ........................................................ 13

Plaintiff Hedgeye Risk Management, LLC ("Hedgeye") respectfully submits this memorandum of law in opposition to the motions filed by Defendant Darius Dale ("Dale") (Dkt. 1090, the "Dale Motion") and Defendant Solstein Capital LLC ("Solstein") (Dkt. 1094, the "Solstein Motion") seeking to dismiss Hedgeye's breach of contract claims against them.

## PRELIMINARY STATEMENT

Defendants' motions seek an extraordinary result: dismissal, purportedly pursuant to Federal Rule of Civil Procedure 37, of claims this Court has already held should be tried to a jury. And they seek that result based not on anything Hedgeye has done, but on speculation about what Hedgeye *might* do at trial. Hedgeye has not asserted a new damages theory, sought to amend its damages case, or indicated that it intends to rely on previously undisclosed damages. Defendants nevertheless ask the Court to preclude hypothetical evidence and, through that preclusion, to eliminate Hedgeye's remaining claims without a trial. But Rule 37 is not a vehicle for dispositive relief based on hypothetical arguments.

The Court has already rejected the premise underlying Defendants' motions. In its September 30, 2025 Sealed Summary Judgment Order (Dkt. 998), the Court permitted Hedgeye's breach of contract claims against Dale and Solstein to proceed to trial, expressly finding that Hedgeye established a reasonable basis for a jury to estimate its damages for their breach. Specifically, the Court agreed that Hedgeye's damages expert, Thomas Britven, could "opine on breach of contract damages" at trial. *See id.* at 45-46, 98 n.19. As it relates to Hedgeye's breach of contract claims against Solstein specifically, the Court likewise held that it "cannot conclude that Britven's analysis provides no reasonable basis for a jury to estimate damages." *Id.* at 98.

At best, Defendants' motions are impermissible, late-stage motions for reconsideration or summary judgment, dressed up as evidentiary motions. But the Court's decision to defer ruling on the applicability of Britven's avoided development cost analysis, *see id.* at 92 n.14, was not an

invitation to relitigate Hedgeye's breach of contract claims on the eve of trial. Defendants had the opportunity to challenge Hedgeye's claims. They should not get another bite at the apple now.

On the merits, Defendants fare no better. Preclusion under Rule 37(c)(1) is unwarranted because Hedgeye disclosed its damages categories—lost profits, unjust enrichment, and avoided development costs—during fact discovery and quantified them through expert Thomas Britven. And even setting Britven aside, Hedgeye has independent fact evidence of actual losses it is entitled to present. Defendants' attempt to manufacture a discovery violation should be rejected. As this Court already decided, Hedgeye's claims should proceed to trial.

## STATEMENT OF FACTS

Hedgeye is a financial research firm that develops Excel-based macroeconomic models to generate investment recommendations and research it sells to retail subscribers and institutional clients. Beginning in 2010, Dale's primary responsibility was to create, revise, and backtest Hedgeye's financial models. By 2019, Dale was one of the highest compensated employees at Hedgeye. He was, however, perennially dissatisfied with his compensation, and on March 11, 2021, he decided to leave Hedgeye—though he did not resign until March 28, 2021.

In the interim period, before Dale resigned, he acknowledged to Hedgeye's General Counsel, Anthony Parsio, that the financial models he had been working on during his tenure at Hedgeye were the property of Hedgeye. Nevertheless, Dale, Lamar and Terman (a Hedgeye customer through her company Solstein) took affirmative steps to form a new business to compete with Hedgeye. For example, before he resigned, Dale updated his LinkedIn to state that he was the "Founder and Chief Executive Officer at 42 Macro LLC." *See* Dkt. No. 653 (the "Fifth Amended Compl.") ¶ 128. Before he resigned, Dale also sent an email to Terman containing a partial screenshot of a Hedgeye model called "PRICE VOLUME VOLATILITY.xlsx" and instructed her

to keep their conversation private for the time being. Terman then forwarded this screenshot to Lamar. *See* Dkt. 818-48. She even offered to provide Dale with tech support to scrub his laptop before returning it to Hedgeye to ensure they would not be able to access anything. Dkt. 818-23.

Dale admits that in the early morning hours of Sunday, March 28, 2021, before he tendered his resignation, he copied dozens of Hedgeye's computer files from his Hedgeye computer to his private Dropbox account—including the core proprietary financial models that underlie Hedgeye's flagship products and a file called "Customers" containing curated lists of Hedgeye's highest paying clients. *See* Dkt. No. 9. Dale then copied contacts from Hedgeye's master customer list, cleared his Chrome browser history, and downloaded files—including Hedgeye's primary source model, the Global Macro Risk Monitor—from his Dropbox to a new laptop he had purchased, all in violation of the Confidential Information Provision of his Employment Agreement. *See id.*; Fifth Amended Compl., ¶¶ 145, 152, 234; Ex. A (the "Employment Agreement") at 2-3.

Dale also admits that when he started creating financial models for 42 Macro, he opened Hedgeye's files side-by-side with 42 Macro's models as he was creating them. *See* Declaration of Sarika Andavolu, dated August 21, 2026 ("Andavolu Decl."), Ex. 1. He copied Bloomberg functions and formulas from Hedgeye's files into his 42 Macro files and then deleted Hedgeye's files from his personal laptop. *See id.*

One business day after Dale's resignation from Hedgeye, Dale, Lamar, and Terman launched Defendant 42 Macro, which the three of them had already established during Dale's tenure at Hedgeye, in violation of the Non-Competition Provision of the Employment Agreement. 42 Macro is a direct competitor of Hedgeye's: it also offers market predictions and macroeconomic research to paying subscribers by using financial models. Dale also solicited Hedgeye's former

employee Collin de Rham to work for 42 Macro, in violation of the Non-Solicitation Provision of the Employment Agreement.

Shortly after Dale left Hedgeye, he took to social media, claiming that he alone was responsible for Hedgeye's successful models and that he owned them. Dale tweeted that Hedgeye's proprietary GIP model was "merely a conceptual framework," and that "[w]hat powers it are the forecasting and backtesting tools I built many years ago." *See* Fifth Amended Compl. ¶ 205. He falsely told Hedgeye's customers that he was the "brains" behind Hedgeye, and that "[f]irms don't produce research, research analysts produce research for firms." *Id.* ¶ 207. Indeed, Dale ridiculed the research that Hedgeye was sending to its subscribers and gloated to Terman that "[Hedgeye doesn't] actually have access to the nowcasts; they're on my hard drive." *Id.* ¶ 138.

Dale also disparaged Hedgeye and posted tweets that attacked CEO Keith McCullough personally, including characterizing McCullough as a "salty plantation owner." *See, e.g.,* Andavolu Decl., Exs. 2-4.

**A. The Parties' Claims and Counterclaims**

On April 26, 2021, Hedgeye filed this lawsuit against Dale, along with a motion for a temporary restraining order and preliminary injunction. *See* Dkt. Nos. 1, 5, 10. Hedgeye subsequently amended its complaint to add Lamar, 42 Macro, and the Terman Defendants as it learned of their participation in the scheme. *See* Dkt. Nos. 92, 323.

In its Fifth (and final) Amended Complaint, Hedgeye brought claims against the Defendants for: (1) Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* (against Dale, Lamar, 42 Macro, and Terman); (2) Common Law Misappropriation (against Dale, Lamar, 42 Macro, and Terman); (3) Breach of Contract (against Dale); (4) Intentional Interference with

Contractual Relations (against Lamar, 42 Macro, and Terman); and (5) Breach of Services Agreement (against Solstein). *See* Fifth Amended Compl. ¶¶ 238-302.

42 Macro counterclaimed for Violation of the Connecticut Unfair Trade Practices Act ("CUTPA") and Unfair Competition, alleging that Hedgeye disparaged Dale and 42 Macro on social media. *See* Dkt. 348 ("42 Macro's Countercls."). The Terman Defendants counterclaimed for fraud in the inducement, tortious interference with contract, tortious interference with prospective economic relationships, and defamation. *See* Dkt. 485 (the "Terman Defendants' Countercls.").

**B. Hedgeye's Damages Disclosures**

Throughout discovery, Hedgeye consistently and timely disclosed the categories and factual bases of its damages.

**i. *Hedgeye's Damages Claims Against Dale and 42 Macro***

On July 12, 2021, in response to Dale Interrogatory No. 14, Hedgeye identified its categories of damages: "lost Hedgeye profits, Defendant's unjust enrichment, a reasonable royalty, the diminution in value of Hedgeye's trade secrets, exemplary damages, statutory damages and attorney's fees and costs." *See* Andavolu Decl., Ex. 5.

On November 22, 2021, in response to Defendant Steven Lamar's Interrogatory No. 13, Hedgeye responded that while the request was premature because expert reports had not yet been completed, Hedgeye would provide further damages information through expert reports on the Court-ordered schedule. *See* Andavolu Decl., Ex. 6.

On June 11, 2022, Hedgeye supplemented its response to Dale Interrogatory No. 14, reaffirming its previously disclosed damages categories and adding that it would "offer further information by way of an expert report on the schedule ordered by the Court." *See* Andavolu Decl., Ex. 7.

On January 9, 2023, in response to 42 Macro Interrogatory No. 6, Hedgeye identified additional damages categories: "research and development costs for Hedgeye's trade secrets, lost profits, goodwill, competitive advantage, business opportunities, and 42 Macro's avoided costs." *See* Andavolu Decl., Ex. 8.

Moreover, at his deposition, Hedgeye's CEO, Keith McCullough, identified Solstein as a subscriber Hedgeye lost, testifying that Solstein had been "[p]aying us hundreds of thousands of dollars" before the subscription went "to zero before [Dale] walked out the door." *See* Andavolu Decl., Ex. 9 at 415:21-24. During discovery, Hedgeye produced the Service Agreement between Hedgeye and Solstein and financial records evidencing those amounts paid by Solstein to Hedgeye. *See* Dkt. 785-1.

On June 28, 2024, Hedgeye timely served the Expert Report of Thomas W. Britven, which quantified: (1) disgorgement of Defendants' profits at $13,266,000 through December 31, 2023, and (2) 42 Macro's avoided development costs at $8,940,000. *See* Dkt. 829. The Britven Report quantified the damages categories that Hedgeye had consistently disclosed throughout fact discovery.

In short, Hedgeye's damages disclosures were consistent, timely, and transparent. Hedgeye identified its damages categories—including lost profits, unjust enrichment, avoided development costs, reasonable royalty, exemplary damages, statutory damages, and attorney's fees—from the outset of discovery in July 2021 and never introduced a new or previously undisclosed theory.

**ii. *Hedgeye's Damages Claims Against Terman and Solstein***

Hedgeye has also consistently alleged and disclosed the damages arising from Solstein's breaches of the Services Agreement. Hedgeye's Fifth Amended Complaint alleges that, "[a]s a direct and proximate cause" of those breaches, Hedgeye suffered "the loss of customers and profit,

goodwill, competitive advantage, and business opportunities," and that Defendants were "unjustly enriched." Fifth Am. Compl. ¶¶ 301-02. Those damages flow from Solstein's alleged misconduct, including soliciting Dale to join Longbow (another entity Defendant Terman and Steven Lamar set up to compete with Hedgeye) while he remained a Hedgeye employee, misusing Hedgeye's intellectual property, and engaging in conduct that adversely affected Hedgeye's business.

Hedgeye reiterated those same damages throughout discovery and summary judgment. Its corporate representative, Michael Blum, testified that Hedgeye sought "lost profit," "unjust enrichment," "damages related to reputation, loss of goodwill," and "additional costs." *See* Andavolu Decl., Ex. 10. And at summary judgment, Hedgeye identified "direct and indirect damages including special and consequential damages," including "loss of goodwill to Hedgeye or reputational damage" resulting from Solstein's role in inducing Dale to leave Hedgeye. *See* Dkt. No. 813 at 38, 40.

These are not new damages theories; they have been part of Hedgeye's case from the outset. Moreover, contrary to the assertions in Solstein's Rule 37 motion, Hedgeye's claimed lost profits included the loss of Solstein as a customer. Solstein materially mischaracterizes the record by contending that it is undisputed that Hedgeye "made the decision to fire" Solstein as a client. Solstein Mot. at 6. Hedgeye maintains however, and the evidence supports, that Solstein, acting through Terman, sought to replace its high-cost institutional subscription with a retail-level subscription—an arrangement that Hedgeye, as a matter of policy, does not offer to hedge-fund clients like Solstein. Terman no longer needed the institutional subscription because she had communicated with Dale, while he was still employed by Hedgeye, and solicited him to provide research identical to the Hedgeye research upon which Solstein had relied. But for Terman's

solicitation of Dale on Solstein's behalf, in breach of the Services Agreement, Solstein would not have ended its relationship with Hedgeye.

**C. The Summary Judgment Opinion**

Fact discovery closed in July 2024, and expert discovery closed in September 2024. The parties cross-moved for summary judgment on Hedgeye's claims and Defendants' counterclaims. On September 30, 2025, this Court issued a comprehensive opinion resolving all motions. *See* Dkt. 998 (the "Sealed Summary Judgment Order").[1]

On summary judgment, the Court dismissed Hedgeye's trade secret claims, but granted summary judgment to Hedgeye on its contract claims against Dale, finding he breached the Confidential Information, Non-Solicitation, and Non-Competition provisions in his Employment Agreement—with only damages for those claims remaining for trial.

Specifically, the Court held that Dale breached the Confidential Information provision by retaining copies of Hedgeye source models and customer lists after his termination. *See* Sealed Summary Judgment Order at 84-85. ("It is undisputed that Dale kept copies of Hedgeye source models and customer lists after his termination. . . . Such information clearly falls within the provision's definition of confidential.") (internal citations omitted). The Court also held that Dale breached the Non-Solicitation Provision in his Employment Agreement (*see* Employment Agreement at 2) by hiring a Hedgeye employee, Collin de Rham, for 42 Macro. *See* Sealed Summary Judgment Order at 89 ("The fact that de Rham began providing services to 42 Macro in April of 2021 one month after his termination on March 26, 2021, and Dale's termination on March 28, 2021, is not disputed. It is additionally not in dispute that de Rham owned ten percent of 42

[1] Given Hedgeye's claims in this action for misappropriation of trade secrets and confidential information, much of the record in this case remains under seal, including the entire Summary Judgment Order.

Macro as of December 20, 2021. Accordingly, there is no issue of material fact precluding summary judgment on Dale's breach of the non-solicitation covenant.") (internal citations omitted). The Court likewise found that Dale breached the Non-Competition Provision in his Employment Agreement, which not only restrained him from "engag[ing] in any . . . activity that is in any way competitive with the business . . . of the Company," but also from "assist[ing] any other person or organization in competing . . . or in preparing to engage in competition . . . ." *Id.* at 90-91 ("The Court finds summary judgment in favor of Hedgeye is appropriate on Dale's breach of the non-competition covenant."). The Court dismissed Hedgeye's breach of Assignment of Rights claim, as well as its intentional interference claim. *Id.* at 87, 95.

Thus, even though the Court found that Hedgeye's source models and customer list were not protectable trade secrets, it nonetheless found that Dale's theft of them was a breach of the Confidential Information Provision in his Employment Agreement, and that his actions also breached the Non-Solicitation and Non-Competition Provisions. All that remains for trial on these claims is Hedgeye's proof of damages.

On Hedgeye's contract claims against Terman and Solstein, the Court sustained Hedgeye's claims and narrowed the issues for trial. First, on Hedgeye's claim that Terman and Solstein breached the Hedgeye Subscriber Agreement by soliciting Dale, the Court found that whether Terman's actions were in the course of Solstein's business is a question of fact on which reasonable jurors could disagree. Accordingly, that claim is proceeding to trial on that narrow issue. *See id.* at 97-98. The Court dismissed Hedgeye's claim that Terman and Solstein breached the Hedgeye Subscriber Agreement by soliciting Ben Ryan for lack of damages. *See id.* at 96-97. The Court also allowed Hedgeye's claim that Solstein breached Hedgeye's Terms of Service by infringing Hedgeye's intellectual property through use of material accessed through Hedgeye's products to

go to trial. The Court reasoned that the Terms of Service only apply to Terman Defendants' use of the materials procured through Solstein's license, and that there is a disputed issue of material fact regarding whether certain files Terman possessed (the Excel files "Hedgeye" and "US_&_Global_GIP_Models") were accessed through a Hedgeye "product," because Dale seemingly emailed to them to Terman. *See* Sealed Summary Judgment Order at 99-100.

On the counterclaims, the Court granted summary judgment in Hedgeye's favor on 42 Macro's CUTPA claim, leaving only causation on 42 Macro's unfair competition claim for trial. *Id.* at 100-06. The Court likewise dismissed the Terman Defendants' fraudulent inducement claim, tortious interference with contract claim, and tortious interference with prospective economic relationships claim, permitting only a narrowed subset of defamation statements to proceed to trial. *Id.* at 106-115, 118-123.

The case is now ready to proceed to trial on the following issues: (1) Hedgeye's proof of damages for Dale's breaches of the Confidential Information, Non-Solicitation, and Non-Competition Provisions in his Employment Agreement; (2) Hedgeye's breach of contract claims against Solstein; (3) 42 Macro's unfair competition counterclaim; and (4) the Terman Defendants' defamation counterclaim.

## ARGUMENT

### I. The Court's Summary Judgment Ruling Already Addressed Hedgeye's Damages

Defendants' motions should be denied. The Court's Summary Judgment Opinion already permitted Hedgeye's breach of contract claims to proceed to trial, expressly finding that Hedgeye established a reasonable basis for damages and that its expert, Thomas Britven, could "opine on breach of contract damages." Sealed Summary Judgment Order at 45-46, 98 n.19. Defendants should not now be permitted to obtain dispositive relief they failed to obtain at summary judgment.

**A. The Court Held That Hedgeye May Present Its Damages Case to a Jury**

This Court's Summary Judgment Opinion permitted Hedgeye's breach of contract claims against Dale and Solstein to proceed to trial.

As to Hedgeye's claims against Dale, this Court unequivocally held that Dale breached the Confidential Information, Non-Solicitation, and Non-Competition Provisions of his Employment Agreement, allowing Hedgeye's breach of contract claims to proceed to trial on the issue of damages. *See id.* at 84-85 ("It is undisputed that Dale kept copies of Hedgeye source models and customer lists after his termination. . . . Such information clearly falls within the provision's definition of confidential.") (internal citations omitted), 90 ("The fact that de Rham began providing services to 42 Macro in April of 2021 one month after his termination on March 26, 2021, and Dale's termination on March 28, 2021, is not disputed. It is additionally not in dispute that de Rham owned ten percent of 42 Macro as of December 20, 2021. Accordingly, there is no issue of material fact precluding summary judgment on Dale's breach of the non-solicitation covenant.") (internal citations omitted), 91 ("The Court finds summary judgment in favor of Hedgeye is appropriate on Dale's breach of the non-competition covenant."). Similarly, the Court found that sufficient issues of material fact existed to submit Hedgeye's contract claims against the Terman Defendants for trial. *See id.* at 97 (finding, as to solicitation of Dale, that "[t]here is a factual issue as to whether Terman's actions fall within this definition. . . . Whether Terman's actions were in the course of Solstein's business is a question of fact on which reasonable jurors could disagree. Thus, it is inappropriate for the Court to decide the question on the parties' motions"), 99-100 (finding, as to Solstein's breach of the Terms of Service, that "a genuine, disputed issue of material fact regarding whether this file was accessed through a Hedgeye product," and stated that "[t]his dispute bars summary judgment in either parties' favor").

As for Hedgeye's damages for its breach for contract claims, the Court noted that "because Dale does not challenge Hedgeye's ability to establish damages for its breach of contract claims in his motion for summary judgment, the Court need not formally reach any conclusion as to the viability of these claims at this time." *Id.* at 92 n.14. Having found that Hedgeye "provides a reasonable basis for a jury to estimate damages," the Court also found that it "cannot conclude that Britven's analysis provides no reasonable basis for a jury to estimate damages" on its claim that Solstein breached the Services Agreement. *Id.* at 98. The Court's decision to allow the claims to proceed was a considered judgment that Hedgeye had presented a sufficient basis for a jury to estimate damages.

Moreover, the Court did not exclude Britven's avoided development cost analysis. To the contrary, the Court expressly left open the question of its applicability to the surviving claims, stating that Britven could "opine on breach of contract damages" and that avoided development costs could support Hedgeye's causes of action "if applicable." *Id.* at 45-46, 49. This applies to Hedgeye's remaining claims against both Dale and Solstein. Hedgeye is entitled to present its damages case to the finder of fact, and the Court should allow the trial record to develop before entering the drastic remedy of dismissal or preclusion.

**B. Defendants Improperly Seek Another Bite at the Apple**

Defendants' motions to preclude for imaginary Rule 37 violations are either an attempt at a second summary judgment briefing, or an untimely and improper motion for reconsideration dressed up in different clothing. Neither is permissible. The logical flaw in both Dale's and Solstein's arguments is readily apparent. Dale's argument is composed of three steps. First, Dale argues that Hedgeye lacks evidence of its damages for its breach of contract claims. Next, he argues that if (and only if) Hedgeye seeks to rely on new evidence or new damages theories at trial, that

would be a violation of Rule 37. Finally, he argues that dismissal of Hedgeye's breach of contract claims is a justified sanction for that non-existent Rule 37 violation.

The reason for this convoluted logic is clear. If the Defendants made only the first and the third arguments—that Hedgeye lacked evidence of damages and therefore its breach of contract claims should be dismissed—that would require either a renewed motion for summary judgment or a motion for reconsideration—neither of which is available to them. Accordingly, Dale has sandwiched in a non-existent Rule 37 violation as an intermediate step, with the hopes of getting a second chance at summary judgment. That cannot be allowed.

First, the deadline to file a dispositive motion was October 25, 2024—nearly two years ago—and no party can make another such motion now. *See, e.g.*, *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.*, 262 F. Supp. 2d 134, 150 (S.D.N.Y. 2003) (denying summary judgment motion made less than a month after the deadline, finding the "failure to abide by the Court's scheduling order without any showing of good cause is sufficient grounds to deny the plaintiffs' motion for summary judgment").

In fact, all parties moved for summary judgment on Hedgeye's breach of contract claims, and this Court held that those claims should proceed to trial. If Dale (or Solstein) disagreed with that ruling, and had a basis to do so, they could have sought reconsideration. But the deadline to seek such relief expired long ago. Local Civil Rule 6.3 requires that a motion for reconsideration be served within fourteen days of the order at issue unless otherwise provided by rule or court order, and the Court need not consider an untimely motion. *See, e.g.*, *McGraw-Hill Global Educ. Holdings, LLC v. Mathrani*, 293 F. Supp. 3d 394, 397 (S.D.N.Y. 2018) (denying motion for reconsideration made after the fourteen-day deadline of Local Civil Rule 6.3). Neither Dale nor Solstein sought reconsideration within that period. Having failed to do so, neither Defendant can

now use a discovery motion as a vehicle to relitigate the Court's summary judgment determinations.

Solstein's argument is even weaker than Dale's. Solstein's motion essentially argues that Hedgeye lacks evidence of its damages and that, *if* Hedgeye attempts to present new damages evidence at trial, such evidence should be precluded. *See* Solstein Mot. at 8 ("Because Hedgeye still has not indicated what (if any) new evidence it intends to offer against Solstein, it cannot yet be determined whether such evidence would be subject to exclusion."). That is, Solstein concedes outright that Hedgeye has not attempted to present any new damages evidence at trial, and it seeks nothing more than an advisory opinion that any such evidence should be precluded. That argument cannot succeed. *See Crawley v. United States*, 417 Fed. Appx. 94, 95 (2d Cir. 2011) (holding that the judicial power of a federal court under the Constitution '"depends on the existence of a case or controversy, and a federal court lacks the power to render advisory opinions.'") (quoting *United States Nat'l Bank v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993) (internal quotation marks and brackets omitted).

And on that sole issue, Solstein is right. Hedgeye has not asserted any new damages theory since the Summary Judgment Opinion was rendered. Hedgeye has not filed any motion to present previously undisclosed damages. Hedgeye has not indicated any intention to move forward with damages theories beyond those already before this Court. Indeed, Hedgeye's position today is identical to its position at summary judgment: it seeks to prove its damages through factual evidence of actual losses as well as through the allowed testimony of its expert, Thomas Britven.

Defendants' motions amount to nothing more than a preemptive strike at a purely speculative future event—an attempt to secure preclusion against evidence that may never be

offered. These attempts to invoke Rule 37 as a vehicle to challenge claims this Court has already permitted to proceed to trial should be summarily rejected.

## II. Preclusion Under Rule 37 Is Unwarranted

Even if this Court were to entertain the Defendants' preemptive Rule 37 arguments, which it should not, their motions still would not succeed. They cannot meet their burden under Rule 37(c)(1), because Hedgeye timely disclosed the categories of damages it sought during fact discovery, including lost profits, unjust enrichment, avoided development costs, and attorneys' fees, and quantified those damages through its expert, Thomas Britven, precisely as it disclosed it would do. Preclusion is a drastic remedy that the Court should not impose lightly—and certainly not where, as here, Defendants have had ample opportunity to challenge Hedgeye's damages and cannot credibly claim surprise.

### A. Defendants Do Not Meet the Legal Standard for Preclusion Under Rule 37(c)(1)

Rule 37(c)(1) provides that if a party fails to provide information required by Rule 26(a) or (e), "the party is not allowed to use that information . . . to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Courts consider four factors: "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006) (internal quotations omitted).

The party seeking preclusion bears the burden of establishing that the nondisclosure was neither substantially justified nor harmless. *See Maldonado v. Town of Greenburgh*, No. 18-cv-11077 (KMK) (AEK), 2022 WL 21295040, at *4 (S.D.N.Y. Mar. 31, 2022) ("'Where a party seeks sanctions for discovery-related abuses pursuant to Rule 37, the moving party bears the burden of

showing that its adversary failed to timely disclose information required by Rule 26.'") (quoting *Feltenstein v. City of New Rochelle*, No. 14-cv-5434 (NSR), 2018 WL 3752874, at *6 (S.D.N.Y. Aug. 8, 2018)). Preclusion is a "drastic remedy that [a] Court will not impose lightly." *Ascot Valley Foods, Ltd. v. ADF Foods (USA), Ltd.*, No. 22-cv-2655 (DEH) (OTW), 2025 WL 3467914, at *2 (S.D.N.Y. Dec. 3, 2025).

As discussed further below, Hedgeye timely disclosed its damages categories under Rule 26, the cases Defendants cite are inapposite because they involve undisclosed or dramatically changed theories, and any alleged deficiency was harmless given that Defendants have litigated these damages issues for years.

**B. Hedgeye Properly Disclosed Its Damages During Discovery**

As an initial matter, Defendants' argument that Hedgeye failed to disclose damages applicable to breach of contract claims is a red herring. Rule 26(a)(1)(A)(iii) requires disclosure of "a computation of each category of damages claimed by the disclosing party" and "the documents or other evidentiary material . . . on which each computation is based[.]" The Rule does not require a party to separately categorize damages by claim or to provide detailed methodologies during fact discovery. Hedgeye disclosed the categories of damages it sought and then quantified them through its expert, witness testimony and documentary evidence. This is how damages are typically disclosed in complex commercial litigation.

Indeed, Hedgeye satisfied its disclosure obligations under Rule 26. In response to Defendants' interrogatories seeking information about damages, Hedgeye identified the categories of damages it would seek, including lost profits, unjust enrichment, avoided development costs, goodwill, competitive advantage, costs, and research and development costs. For example, in response to Dale Interrogatory No. 14, which demanded that Hedgeye "[d]escribe in numerical detail each element of damages [Hedgeye] is claiming in this case and how that numerical amount

was calculated," Hedgeye responded that "Hedgeye's damages include lost Hedgeye profits, Defendant's unjust enrichment, a reasonable royalty, the diminution in value of Hedgeye's trade secrets, exemplary damages, statutory damages and attorney's fees and costs." *See* Andavolu Decl., Ex. 5. Hedgeye also disclosed that it would provide the basis for its damages claims and calculations through its expert reports. This is precisely what Hedgeye did when it served the expert report of its damages expert, Thomas Britven.

Moreover, while Solstein cited no case law in support of its motion to preclude Hedgeye's damages, the cases on which Dale relies are inapposite. In *Design Strategy, Inc. v. Davis*, the plaintiff *never disclosed "lost profits" as a category of damages*—neither in its initial disclosures nor at any point during discovery—*and sought to introduce that new theory only in a proposed pretrial order "shortly before trial."* 469 F.3d at 293, 295 (emphasis added). By contrast, Hedgeye disclosed its damages categories, including unjust enrichment, avoided development costs, and lost profits, during fact discovery and then quantified them through its expert.

Similarly, in *Hayden v. Int'l Bus. Machs. Corporation*, the court precluded damages evidence because the plaintiff's disclosures "never provided a computation of unjust enrichment damages supported by documents" despite multiple orders to do so, and the plaintiff disclosed new unjust enrichment figures *years after the end of fact discovery without leave of court*. No. 21-cv-5090 (KMK), 2026 WL 1266014, at *5-7 (S.D.N.Y. May 8, 2026). Unlike those plaintiffs, Hedgeye's damages theories were disclosed during fact discovery and timely quantified by expert report.

Moreover, in *Austrian Airlines Oesterreichische Lufverkehrs AG v. UT Finance Corporation*, the plaintiff introduced a previously undisclosed currency conversion damages theory that *did not appear in the complaint or initial Rule 26 disclosures and was introduced near*

*the close of discovery*. No. 04-cv-3854 (RCC)(AJP), 2005 WL 977850, at *2 (S.D.N.Y. Apr. 28, 2005). Hedgeye, by contrast, disclosed its damages categories from the outset. And in *Agence France Presse v. Morel*, the plaintiff *changed his theory* from the 16 DMCA violations he had disclosed, to 527 violations shortly before trial—a dramatic and prejudicial shift in the scope of claimed damages. 293 F.R.D. 682, 684-88 (S.D.N.Y. 2013). Hedgeye has made no comparable change to its damages theories.

The cases Dale cites involve genuine surprise from a previously undisclosed damages theory. There is no such surprise here. In fact, Hedgeye has not done anything since the Court issued its Sealed Summary Judgment Order to suggest it would pursue damages that it did not previously disclose. The Defendants created such arguments themselves merely to justify their invocation of Rule 37.

Hedgeye seeks only damages categories disclosed during discovery, supported by evidence produced during discovery. Defendants had years to pursue discovery on those damages and fully litigated them through summary judgment. They cannot now credibly claim that they are ambushed by theories they have challenged since 2021.

### C. Any Failure Is Harmless and Substantially Justified

Even if Hedgeye's disclosures were somehow deficient—which they were not—preclusion would still be unwarranted because any alleged failure was both substantially justified and harmless. Defendants have known since Hedgeye served its discovery responses in this action that Hedgeye would seek avoided development costs as one measure of its damages, and were likewise on notice of Hedgeye's other claimed damages. Defendants had ample opportunity to litigate the "viability" of such claims. Dale failed to take the opportunity to depose Britven, but nevertheless moved to exclude his testimony under *Daubert*. Despite those efforts, the Court still allowed Britven's opinion to provide a framework for the jury to assess Hedgeye's damages on its breach

of contract claims. Having fully litigated these issues through summary judgment, Defendants cannot now feign prejudice.

## III. Hedgeye Is Entitled to Present Evidence of Its Damages at Trial

Hedgeye's damages case rests on two independent grounds. First, Hedgeye's development costs, and the benefit Defendants obtained by avoiding those costs, provide a reasonable basis to estimate damages. Connecticut law does not require mathematical certainty, and Defendants bear the risk of uncertainty their wrongdoing created. Second, Hedgeye has substantial evidence of actual losses, including lost customers and other economic harm, reinforced by Dale's admissions that he copied Hedgeye's proprietary files, used them alongside 42 Macro's models, and incorporated Hedgeye's formulas into competing products. Moreover, the Court has already concluded, on summary judgment, that Dale breached his Employment Agreement when he took and used Hedgeye Confidential Information, and prepared to compete with Hedgeye while he was still employed there. The record is also clear that but for Hedgeye bringing suit to enforce the obligations Dale owed to Hedgeye, Dale would not have quarantined himself from the Hedgeye information he retained, nor modified the 42 Macro models to remove the parts he copied. Defendants are well aware of the substantial attorney's fees Hedgeye incurred to enforce the Employment Agreement and to curb Dale's unlawful behavior.

### A. Avoided Development Costs Represent Hedgeye's Damages

Defendants argue that avoided development costs cannot be recovered as contract damages because they measure a defendant's gain rather than a plaintiff's loss. However, Defendants identify no Connecticut authority holding that evidence of avoided development costs is categorically unavailable in a contract action. Indeed, both *Syntel Sterling Best Shores Mauritius Limited v. The TriZetto Group Inc.* and *EJ Brooks Company v. Cambridge Sec. Seals* address avoided development costs as unjust enrichment remedies in trade secret and related tort claims,

but not its permissibility as proof of loss for a breach of contract claim. *See* 68 F.4th 792 (2d Cir. 2023); 31 N.Y.3d 441 (2018).

Dale's Employment Agreement required him not to disclose confidential information, "including without limitation, financial information . . . and proprietary investment and trading strategies." Employment Agreement at 2-3. He also agreed not to compete or prepare to compete with Hedgeye during his employment and annually certified compliance with Hedgeye's Code of Ethics, which provides that employees "must only use Firm confidential information for authorized purposes." Fifth Amended Compl., ¶ 35.

Nevertheless, Dale took Hedgeye's proprietary models, used them to launch a competing business within mere days, and also solicited Collin de Rham to work for 42 Macro within two weeks of the termination of his employment with Hedgeye. With these swift actions, Dale breached the Confidentiality Provision of his Employment Agreement, as well as the Non-Compete and Non-Solicitation provisions of his Employment Agreement with Hedgeye.

Hedgeye is entitled to recover damages for Dale's material and undisputed breaches of his contractual obligations. Indeed, under Connecticut law, "the general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed. . . . It has traditionally been held that a party may recover general contract damages for any loss that may fairly and reasonably be considered [as] arising naturally, i.e., according to the usual course of things, from such breach of contract itself." *Pinda Tech. Co. v. Greenwich Metals, Inc.*, No. 3:25-cv-258 (AWT), 2026 WL 658351, at *4 (D. Conn. Mar. 9, 2026) (internal citations omitted). To hold that Hedgeye suffered no damages as a result of Dale's breach is, in and of itself, to deprive Hedgeye of the value of the promises for which it bargained when it agreed to pay Dale

as an employee.

Here, the appropriate measure of Hedgeye's losses is the costs it incurred to develop its proprietary models, the very models Dale copied and used to build 42 Macro. This is powerful evidence of the value of what was taken and the harm Hedgeye suffered when it lost the exclusive use of that information. The Court has already found that Hedgeye "provides a reasonable basis for a jury to estimate damages." Sealed Summary Judgment Order at 98. It is certain that Dale's breaches caused damage to Hedgeye; the only uncertainty is as to the precise amount—and that is for the jury to decide.

**B. Hedgeye Has Ample Factual Evidence of Its Losses**

Defendants' argument that the Court should dismiss Hedgeye's claims wholesale because avoided development costs are not contract damages is also a logical non sequitur. This chain of reasoning fails because Hedgeye has admissible fact evidence of actual loss that can be quantified at trial—with or without Britven's avoided development costs analysis. Defendants' attempt to eliminate Hedgeye's claims through tortured logic rather than trial should be rejected for what it is: an effort to avoid accountability.

Evidence of Hedgeye's financial losses, lost customers, and other economic harm is relevant to the damages caused by Defendants' breaches. *See Hart, Nininger & Campbell Assocs., Inc. v. Rogers*, 16 Conn. App. 619 (Conn. App. Ct. 1988) (affirming damages award based on, among other things, evidence of lost commissions and customers diverted by defendants' breach). Hedgeye's discovery disclosures specifically identified this harm, explaining in supplemental response to Lamar Interrogatory No. 13 that "Defendants acquired, disclosed and used Hedgeye's trade secrets by copying electronic files to Dale's personal Dropbox, by then copying them to Dale's laptop and by then opening, reviewing and copying them while designing 42 Macro's source files," as well as Hedgeye's trade secret customer lists. *See* Andavolu Decl., Ex. 7. Though

the Court held these files are not trade secrets, it held that Dale's possession and use of them breached his Employment Agreement. Moreover, at his deposition, Hedgeye's CEO Keith McCullough identified Solstein as a lost subscriber, testifying that Solstein had been "[p]aying us hundreds of thousands of dollars" before the subscription went "to zero before [Dale] walked out the door." *See* Andavolu Decl., Ex. 9.

These disclosures put Defendants on notice of the factual basis for Hedgeye's claimed losses. For example, Dale's breaches resulted in a competitor business built entirely upon Hedgeye's proprietary confidential information. Indeed, Dale admitted in his June 2021 deposition that he had Hedgeye's source models open side-by-side while building 42 Macro's competing products. Dale later conceded in sworn interrogatory responses that he "copied partial lists of Bloomberg ticker symbols" and "adjacent formulas" from Hedgeye's source models into 42 Macro's files, and that he "created the 'Time Series Analysis' component" of 42 Macro's models "by copying formulas" from Hedgeye's files "into a blank worksheet within the workbook." *See* Andavolu Decl., Ex. 1. 42 Macro to this day still sells products and services built on Hedgeye's models. A jury is entitled to hear this evidence and determine what damages, if any, Hedgeye suffered as a result of Dale's breaches.

Solstein's motion fares no better. It argues that because Britven allegedly says little about Solstein, the contract claim cannot succeed. *See* Solstein Mot. at 5-7. But Solstein's own motion concedes prematurity: "Because Hedgeye still has not indicated what (if any) new evidence it intends to offer against Solstein, it cannot yet be determined whether such evidence would be

subject to exclusion." *Id.* at 8. If the Terman Defendants cannot determine whether exclusion is warranted, they should not seek it.[2]

Moreover, evidence concerning Dale and the formation and launch of 42 Macro is relevant to causation and the harm flowing from the Terman Defendants' breaches of the Services Agreement. Terman forwarded Hedgeye's confidential Excel file to Dale and actively solicited him to join a venture she was involved in. The Britven Report provides a basis for calculating damages from those breaches, and Hedgeye is entitled to present that evidence to the jury. At a minimum, Hedgeye has clearly identified the revenue it lost when Solstein ceased to be a Hedgeye subscriber. As stated above, but for Terman's successful solicitation of Dale on Solstein's behalf, in breach of the Services Agreement, Solstein would not have ended its relationship with Hedgeye.

**C. At a Minimum, Hedgeye Is Entitled to Nominal Damages**

In any event, Hedgeye is entitled to at least nominal damages for Dale's and Solstein's breaches of contract. Under Connecticut law, a plaintiff that proves a breach of contract is entitled to recover nominal damages even if it cannot prove actual compensatory damages. *See Lydall, Inc. v. Ruschmeyer*, 282 Conn. 209, 254 (Conn. 2007) (holding that, although the plaintiff failed to prove compensatory damages, it nevertheless was entitled to nominal damages under its breach of contract claim); *see also News America Marketing In-Store, Inc. v. Marquis*, 86 Conn. App. 527, 535 (Conn. App. Ct. 2004) ("If a party has suffered no demonstrable harm . . . that party may be entitled . . . to nominal damages for breach of contract."), *aff'd* 276 Conn. 310 (Conn. 2005).

This principle forecloses Defendants' motions. The Court has already held that Dale breached the Confidential Information, Non-Solicitation, and Non-Competition provisions of his Employment Agreement, and those liability findings stand. As to Solstein, the Court found genuine

[2] Hedgeye expressly reserves its rights to challenge the sufficiency of the Defendants' damages evidence (including Terman's alleged damages for defamation) at the appropriate time.

issues of material fact requiring trial. Either way, Hedgeye's contract claims survive because a proven breach entitles Hedgeye to at least nominal damages.

Therefore, even if Hedgeye's evidence of its actual damages were excluded, and it should not be, the result would not be dismissal. The case would proceed to trial, where the jury would determine the amount of damages. And if the jury concluded that Hedgeye failed to prove actual damages with reasonable certainty, Hedgeye would still recover nominal damages.

### D. Hedgeye Is Entitled to Attorneys' Fees for Dale and Solstein's Breaches of Contract

Hedgeye also seeks its attorneys' fees and costs, which it is entitled to recover under both Dale's Employment Agreement and Solstein's Subscriber Agreement.

With respect to Dale, Connecticut law permits recovery of punitive damages—defined to include litigation expenses less taxable costs—where the breach of contract is "founded on tortious conduct" involving "wanton and malicious injury, evil motive and violence." *McCarter & Eng., LLP v. Jarrow Formulas, Inc.*, 351 Conn. 186, 190-96, 206-10 (Conn. 2025). Dale's conduct satisfies this standard. He did not merely commit technical breaches; he acted in a calculated effort to use Hedgeye's confidential information to compete with Hedgeye. The fact that Hedgeye's trade secret claims were dismissed is of no moment where he copied and retained Hedgeye source models, attempted to cover up his theft, used them while building 42 Macro's competing products, lied about his use to the Court, and publicly disparaged Hedgeye and its CEO on Twitter, with the specific intent to distract and deflect from his own wrongful acts. This is precisely the sort of malicious, wanton conduct that satisfies Connecticut's punitive damages standard. *See Wells Fargo Bank, N.A. v. Konover Dev. Corp.*, 630 F. App'x 46, 51-52 (2d Cir. 2015) ("Connecticut courts look to the character of a defendant's actions to determine whether an award of punitive damages is appropriate even if the underlying claims do not usually warrant such a remedy.").

Hedgeye is also entitled to attorneys' fees for Solstein's breach of the Subscriber Agreement. Section 5 of the Agreement incorporates the Hedgeye Terms of Service, which require Solstein to "defend, indemnify and hold harmless" Hedgeye from "all actions, suits, claims . . . and liabilities, losses and expenses, including attorneys' fees and costs, arising in connection with any breach of these Terms of Service." *See* Dkt. 818-89. The Second Circuit, applying Connecticut law, has recognized that such indemnification provisions may cover first-party claims between contracting parties. *See Trade Links, LLC v. BI-QEM SA de CV*, No. 24-cv-418, 2025 WL 1416759, at *3-4 (2d Cir. May 15, 2025) (affirming the District Court's holding that the expansive language of the parties' agreement incorporates indemnity for first-party actions and thus covered claims between the contracting parties themselves for breach of the agreement, not just third-party claims).

In sum, Hedgeye has independent contractual and legal entitlement to recover its attorneys' fees and costs.

## CONCLUSION

For these reasons, the Court should deny Defendants' motions in their entirety. Defendants seek to relitigate issues already resolved at summary judgment and fail to satisfy Rule 37(c)(1). Hedgeye timely disclosed its damages theories, properly supported them through expert testimony, and is entitled to present its damages case, including lost profits, unjust enrichment, avoided development costs, and the factual evidence supporting its actual losses, to the jury. At a minimum, Hedgeye is entitled to nominal damages and its contractual attorneys' fees.

Dated: August 21, 2026

VENABLE LLP

By: */s/ Jessie F. Beeber*

Jessie F. Beeber

Eric A. Prager
Jake W. Goodman
Sarika Andavolu
Venable LLP
151 West 42nd Street
New York, New York 10036
212-307-5500
JBeeber@Venable.com
EAPrager@Venable.com
JWGoodman@Venable.com
SAndavolu@Venable.com

*Attorneys for Plaintiff*
*Hedgeye Risk Management, LLC*