**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **HEDGEYE RISK MANAGEMENT, LLC,**<br>**Plaintiff,**<br>**-against-**<br>**DARIUS DALE, et al.,**<br>**Defendants.** | **1:21-cv-3687 (ALC) (RWL)**<br>**OPINION & ORDER**<br>**(UNSEALED VERSION)** |

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Hedgeye Risk Management, LLC ("Hedgeye") brings this action against Defendants Darius Dale ("Dale"), Stephen Lamar ("Lamar"), 42 Macro, LLC ("42 Macro") (collectively, the "Dale Defendants") and Defendants Nadine Terman ("Terman") and Solstein Capital, LLC ("Solstein") (together the "Terman Defendants," and with the Dale Defendants, "Defendants") for (1) violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836; (2) common law misappropriation; (3) breach of employment contract; (4) intentional interference with contractual relations; and (5) breach of services agreement. 42 Macro asserts two counterclaims against Hedgeye for (1) violation of the Connecticut Unfair Trade Practices Act and (2) unfair competition. The Terman Defendants also bring counterclaims against Hedgeye for (1) fraud in the inducement; (2) tortious interference with a contract; (3) tortious interference with prospective economic relationships; and (4) defamation.

Hedgeye, Dale, the Terman Defendants, and 42 Macro and Lamar have filed four separate motions for summary judgment on all five of Hedgeye's claims. Hedgeye has filed two more motions for summary judgment on the two sets of counterclaims as well. The parties have additionally moved to exclude testimony presented by the parties' proffered experts under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

After resolving the *Daubert* motions, the Court grants 42 Macro's motion for summary judgment, and grants in part and denies in part the five other summary judgment motions. The only claims which provide a genuine issue of material fact—and are therefore suitable for a jury to decide at trial—are Hedgeye's breach of contract claims against Dale and Solstein, 42 Macro's unfair competition counterclaim, and the Terman Defendants' defamation counterclaim. Even so, the Court may narrow their scope. The following opinion details the Court's reasoning and analysis for this conclusion.

## BACKGROUND

### I. Factual History[1]

a. <u>The Parties</u>

Hedgeye is a financial research fund founded in 2008 by its C.E.O. Keith McCullough ("McCullough") and its President and C.O.O. Michael Blum ("Blum"). *See* Ds. Resp. Stmt. ¶ 1-1. Hedgeye uses financial models (also referred to as "source models") to develop investment recommendations, market predictions, and macroeconomic research, which it sells to paying subscribers. *See id.* ¶¶ 1-2, 1-104.

The Dale Defendants consist of Darius Dale, Steven Lamar, and their company, 42 Macro. *See* FAC ¶ 8. Dale worked at Hedgeye from 2009 until 2021. *See* Ds. Resp. Stmt. ¶¶ 1-3, 1-15. Lamar is a former Hedgeye subscriber. *See id.* ¶ 1-27. Lamar is a majority owner of RAMAL Inc. *See id.* ¶¶ 1-80–81. 42 Macro is a limited liability company registered in California. *See id.* ¶ 1-

[1] This factual history is drawn from Hedgeye's Statement of Undisputed Material Facts submitted pursuant to Local Civil Rule 56.1, *see* ECF No. 817 ("Pl. Stmt."), the Dale Defendants' Statement of Undisputed Material Facts, *see* ECF No. 775 ("Dale Stmt."), Hedgeye's response to the Dale Defendants' statement, *see* ECF No. 846, the Terman Defendants' Rule 56.1 Statement, *see* ECF No. 784 ("Terman Stmt."), Hedgeye's response to the Terman Defendants' statement, *see* ECF No. 852, the Defendants' response and counterstatement, *see* ECF No. 805 ("Ds. Resp. Stmt."), Hedgeye's objections to Defendants' response, *see* ECF No. 865, Hedgeye's response to the Counterstatement, *see* ECF No. 881, the summary judgment briefing, and the exhibits attached thereto. The Court largely cites to Defendants' response where a fact is not in dispute.

46. The managers of 42 Macro are RAMAL Inc. and Dale. *See id.* ¶ 1-84. Dale has a [redacted] ownership interest in 42 Macro. *See id.* ¶ 1-85. RAMAL Inc. has a [redacted] ownership stake in 42 Macro. *See id.* ¶ 1-82. Collin de Rham owns the [redacted] of 42 Macro. *See id.* ¶ 1-85.

The Terman Defendants consist of Nadine Terman and Solstein Capital, LLC. Terman is the founder, C.E.O. and C.I.O. of Solstein, a California-based investment firm. *See id.* ¶ 1-24. Solstein is a former subscriber to Hedgeye's services. *See id.* ¶¶ 1-324, 1-335. In March of 2021, Terman introduced Dale to Lamar. *See id.* ¶ 1-36. Terman collaborated with Dale and Lamar to develop 42 Macro. *See id.* ¶ 1-70.

b. Hedgeye's Confidential and Proprietary Information

Hedgeye identifies three categories of proprietary and confidential information at issue in this matter: (1) the financial source models built in Microsoft Excel ("Excel") spreadsheets, (2) handwritten notebooks kept by Dale during his employment, and (3) several lists containing Hedgeye's customer information. *See* ECF No. 846 ¶ 2-2.

*i. Financial Source Models*

A financial model is a numerical representation of the main figures that define an economy or a company's business. *See* Ds. Resp. Stmt. ¶ 1-101. Financial models are used to predict trends, to estimate the performance of an economy or a business, or to compare the economies and businesses of different countries or companies. *See id.* ¶ 1-102. Hedgeye uses financial models to help analyze and predict trends in the economy. *See id.* ¶ 1-103.

One version of this, developed by Hedgeye, is a four-quadrant model which maps the rate of change of growth, inflation, and policy ("GIP") for global economies. *See id.* ¶ 1-105. The file containing this model is an Excel spreadsheet named "Global Macro Risk Monitor.xlsx" ("GMRM file" or "GMRM model"). *See* ECF No. 846 ¶ 2-7. Hedgeye identifies the GMRM file and five

other source models[2] as trade secrets. *See id.* ¶¶ 2-187–189. The spreadsheets use Application Programming Interfaces ("APIs") to gather real-time financial marketplace and economic data points selected by Hedgeye. *See* Ds. Resp. Stmt. ¶¶ 1-111–12. The GMRM file specifically employs roughly 30 data points for its estimates. *See id.* ¶ 1-113. These data points are weighed, combined, and analyzed through mathematical formulae built into the source models. *See id.* ¶ 1-112. Hedgeye contends that the GMRM file also "dynamically re-weigh[s] the 30 data points," which Defendants dispute is done by the file alone. *Id.* ¶ 1-117. Hedgeye itself states that "[o]nly the most senior analysts . . . , such as Dale prior to his departure, understand how to do this" reweighing. Pl. Stmt. ¶ 1-118.

After applying the mathematical formulae, the source models subsequently feed the results to "output models," which are shared with some subscribers. *See* Ds. Resp. Stmt. ¶ 1-112. A subscriber who receives only an output model cannot access the source model on which that output model is based. *See id.* ¶ 1-123. While it is undisputed that Hedgeye maintains a password protected network with permission-based access to select folders containing the source models, the Dale Defendants dispute that "any of the relevant materials were stored on that network during Dale's employment," *id.* ¶ 1-126, or "kept in 'permission-based' folders," *id.* ¶ 1-127.

The Dale Defendants contend that, despite any protective efforts, Hedgeye discloses the 30 data points used in the GMRM file "in a 'Macro Themes' publication that it sends to thousands of subscribers on a quarterly basis." *See* Dale Stmt. ¶ 2-222. Further, they maintain that Hedgeye has disclosed these data points publicly. *See id.* ¶¶ 2-224–26. The Dale Defendants argue that these disclosures also convey the relative weighting scheme of the data points. *See id.* ¶ 2-230. Hedgeye does not contest that it made these disclosures, but rather argues they were limited to the data

---

[2] These are named "TACRM 7.0.xlsx," "US INFLATION Model.xlsx," "US GROWTH Model.xlsx," "GIP Model Factor Exposure Backtests.xlsx," and "PRICE VOLUME VOLATILITY.xlsx." *See* ECF No. 846 ¶¶ 2-187–89.

points for one country (the United States) and one variable (growth), and do not disclose their precise weightings. *See* ECF No. 846 ¶ 2-224.

*ii. Dale's Notebooks*

During his employment at Hedgeye, Dale recorded handwritten notes in black and white composition notebooks. *See* Ds. Resp. Stmt. ¶ 1-273. Dale returned seven notebooks to Hedgeye upon his resignation and in a shipment one month afterwards. *See id.* ¶¶ 1-277–80. It is undisputed that Dale filled more than seven notebooks during his employment. *See id.* ¶ 1-281.

*iii. Customer Lists*

Hedgeye has assembled customer lists with its hundreds of institutional subscribers. *See* Ds. Resp. Stmt. ¶¶ 1-283, 1-285. Hedgeye alleges to have expended substantial time and money to assemble these customer lists. *See* Pl. Stmt. ¶ 1-285. Hedgeye further contends that these lists are valuable because Hedgeye's selection of customers constitute a specialized market. *See id.* ¶ 1-286. Defendants dispute both how much effort it took Hedgeye to develop these lists and how curated they are. *See* Ds. Resp. Stmt. ¶¶ 1-285–86.

c. <u>Dale's Employment at Hedgeye</u>

Hedgeye hired Dale as a junior analysist in 2009. *See* Ds. Resp. Stmt. ¶ 1-3. Beginning in 2010, Dale worked on building, revising, and backtesting Hedgeye's financial models, including its GMRM file. *See id.* ¶ 1-10. Over the years, Dale ascended through the company's ranks and was eventually promoted to Managing Director in 2017. *See id.* ¶ 1-15.

When he was hired, Dale agreed to the terms of an employment agreement dated July 17, 2009. *See id.* ¶ 1-3. On March 8, 2010, Dale's original contract was replaced with a new agreement (the "Employment Agreement"). *See id.* ¶ 1-4. The Employment Agreement included a provision to prohibit Dale from disclosing confidential Hedgeye information. *See id.* ¶ 1-7. It also contained

restrictive covenants which prohibited Dale from (1) engaging in any business activity that was competitive with Hedgeye while he was employed ("non-competition covenant") and (2) soliciting anyone employed by Hedgeye within the past twelve months, during Dale's employment and for six months following his termination ("non-solicitation covenant"). *See id.* ¶ 1-9. The Employment Agreement also assigned Hedgeye the right of Dale's work product while employed at Hedgeye ("Assignment of Rights Provision"). *See id.* ¶ 1-8.

As a condition of employment, Dale was also bound by Hedgeye's Code of Ethics, *see id.* ¶ 1-133, which provides that all employees owe "a duty of loyalty to [Hedgeye]," and "must only use [Hedgeye] confidential information for authorized purposes," *id.* ¶ 1-135. Dale submitted yearly certifications of his compliance with the Code of Ethics. *See id.* ¶ 1-136.

On March 11, 2021, Dale informed Hedgeye he planned to leave. *See id.* ¶ 1-16. On March 28, around 12:30 p.m., Dale emailed McCullough, Blum, Anthony Parsio (Hedgeye General Counsel), and Hedgeye's Director of Human Resources his letter of resignation. *See id.* ¶ 1-21.

d. <u>Formation of 42 Macro</u>

In late 2020, Terman began working with Lamar to develop a financial market data product. *See* Ds. Resp. Stmt. ¶ 1-28. In January of 2021, Lamar formed a company called Longbow Trade Signals LLC ("Longbow"). *See id.* ¶ 1-29. Solstein contributed [redacted] in capital to Longbow and initially held almost [redacted] of the company's equity. *See id.* ¶ 1-30. On March 16, Lamar emailed Terman stating that they "should stop dancing around the elephant in the room and just start messaging directly to '[H]edgeye' customers." *Id.* ¶ 1-32 (internal quotation omitted).

On March 22, 2021, Terman introduced Dale to Lamar. *See id.* ¶ 1-208. That same day, Terman told others at Solstein that Dale wanted to join Longbow and start publishing macroeconomic research there following his resignation from Hedgeye. *See id.* ¶ 1-34. Terman

and Lamar discussed various ways they could work with Dale, including his joining Longbow or forming his own company. *See id.* ¶ 1-37. Lamar specifically suggested giving Dale [redacted] equity in a new company. *See id.* ¶ 1-40. Lamar stated "[t]his keeps target off of [Longbow] and gives us visibility of how [McCullough] reacts to [Longbow] before we announce [the Dale] affiliation." *Id.* This idea for a new company became 42 Macro. *See id.* ¶ 1-41.

Dale created a Twitter account named @42_Capital_Mgmt on or around March 22, 2021. *See id.* ¶ 1-42. On March 24, 2021, Dale told Lamar and Terman that he wanted to communicate via text to avoid mentioning Longbow on his email account. *See id.* ¶ 1-44. That same day, Dale sent Lamar a text reading: "[I]t is my full intention to retire as a billionaire as a function of my contributions to what we're building @Longbow." *Id.* ¶ 1-45. Also on March 24, 2021, Lamar registered 42 Macro as a limited liability corporation in California. *See id.* ¶ 1-46.

Dale first publicly announced 42 Macro on March 25, 2021. *See id.* ¶ 1-47. That day, Terman shared some thoughts with him about a communications strategy for his departure from Hedgeye. *See id.* ¶ 1-48. Terman also told Dale: "if possible, I would have a few pieces of content you can push out so that it demonstrates that Darius is not skipping a beat." *Id.* ¶ 1-50. Dale responded: "the problem with having content ready off the bat is that it implies the models I used to produce the analysis were created while working at Hedgeye and would thus be subject to their IP claims. I'm going to crank all weekend so that I have at least some content ready to roll Monday morning." Dale Stmt. ¶ 2-114.

On March 25, 2021, Dale shared his new LinkedIn profile with Terman and asked if she had any edits. *See* Ds. Resp. Stmt. ¶ 1-58. Dale's updated LinkedIn profile stated that he was the founder and C.E.O. of 42 Macro, LLC, an "online financial media company specializing in macro risk management." *Id.* ¶ 1-59. Terman responded: "Love the Linked In. Now, you must create a

new company LinkedIn Profile for 42 Macro. You can use the logo design that Steve shared." *Id.* ¶ 1-60. That same day, Terman emailed Dale

> Once you are out from Hedgeye I will share their macro look. Figure it is best done when you have your own computer. I highly recommend getting someone to help you ensure they cannot access anything from the laptop you are returning. If you want 5 min with our tech team to advise you, I could ask them for a favor. I will tell them you will be working with us so we need their help. Just let me know.

*Id.* ¶ 1-66. The next day, Dale asked Terman to connect him with her technology team to help him "clean" his Hedgeye laptop. *See id.* ¶ 1-67.

On March 26 and 27 of 2021, Dale, Lamar, and Terman emailed about the subscription plan, prices, and product names for 42 Macro. *See id.* ¶ 1-70. On March 27, 2021, Dale emailed Lamar that he "[w]as reading [his] employment contract and nervous about the timing of the LLC application." *Id.* ¶ 1-72. Lamar responded that Dale's name was not associated with the registration and separately offered to look at Dale's employment contract. *See id.* ¶ 1-73. Dale replied stating "I was suggesting that if I suddenly become an employee of 42 Macro LLC and the application was file[d] . . . prior to my leaving Hedgeye, they could connect the dots and deem me in violation of the clause to not help 'prepare competition.'" *Id.* ¶ 1-74. That day, Dale also texted Lamar and Terman: "I'm only sticking around [at Hedgeye] for 2-3 more days MAX. . . . I'm either going to spend that time helping them transition, or I'm going to spend that time working on 42." *Id.* ¶ 1-75. Dale also stated: "You're going to be blown away by the granularity and soup-to-nuts asset allocation and portfolio construction solutions I'm going to provide. . . . No one at Hedgeye has any knowledge of these solutions because it's all in my head/notebook." *Id.* ¶ 1-76.

On March 29, 2021, the first business day after his resignation from Hedgeye, Dale posted a Tweet that said "we're live! 42macro.com." *Id.* ¶ 1-78. That same day, Terman told Dale she planned to announce that Solstein had signed up for a 42 Macro subscription and that they would receive its products a few weeks later, "once [Dale] sets up his frameworks." *Id.* ¶ 1-79.

42 Macro officially launched on April 26, 2021. *See id.* ¶ 1-257. "42 Macro has three primary source models, the 42 Macro regime forecasting tool, the 42 Macro market observation tool, and the 42 Macro market history observation tool." *Id.* ¶ 1-255. Dale completed the forecasting model by April 15, the market observation model by April 20, and the market history observation model by May 6 of 2021. *See id.* ¶ 1-256.

On March 26, 2021, Collin de Rham ("de Rham"), Hedgeye's Head of Production and Creative Director left the company. *See id.* ¶¶ 1-86–87. On April 7, 2021, de Rham communicated with Dale and Lamar about ideas for 42 Macro's website. *See id.* ¶ 1-88. From April of 2021 onwards, de Rham provided services to 42 Macro. *See id.* ¶ 1-93. He later became a part owner of the company. *See id.* ¶ 1-85.

e. <u>Defendants' Alleged Misappropriation</u>

Hedgeye offers contested evidence[3] that at 5:57 a.m. on March 28, 2021—the day Dale later resigned—he began copying source models from his Hedgeye laptop to his private Dropbox account. *See* Pl. Stmt. ¶ 1-152. That morning Dale accessed 68 files and four folders. *See id.* These files included the GMRM file and several other source models. *See id.* ¶¶ 1-153, 1-164. Dale admits that he copied the GMRM file from his Hedgeye laptop to his personal Dropbox account, and later to his personal computer. *See* Ds. Resp. Stmt. ¶ 1-188.

Terman and Dale shared a Dropbox folder named "42 Macro." *See id.* ¶ 1-212. On March 27, 2021, Dale received a Dropbox notification that Terman had added an Excel spreadsheet with a file name including the words "Hedgeye" and "US_&_Global_GIP_Models." *See id.* ¶¶ 1-213–

[3] Defendants contest the admissibility of the expert report on which the subsequent statements rely. They did not submit a motion *in limine* but rather objected in their response to Hedgeye's 56.1 statement. *See* Ds. Resp. Stmt. ¶ 1-140. Hedgeye argues that such a response is inappropriate given the parties' leave to file *Daubert* motions. *See* ECF No. 865 ¶ 1-140 (Hedgeye's objection to Ds. Resp. Stmt.). As the Court does not reach the issue of whether Defendants misappropriated the alleged trade secrets, there is no need to resolve this dispute or rule on the admissibility of the underlying expert report. *See infra* at III.b.

15. Dale admits that he had Hedgeye source models open on his computer while creating 42 Macro's financial modeling, although the parties dispute both Dale's reason for doing so and his use of the files. *See id.* ¶ 1-260.

Hedgeye expert Daniel Lacalle opines that a comparison of the two companies' models demonstrates that Dale copied the inputs and formulae in Hedgeye's source models to create 42 Macro's modeling. *See* ECF No. 813 at 10–11. Another expert for Hedgeye, Liam Bastick, concluded that the 42 Macro model is a copy of Hedgeye's based on his analysis of the Excel spreadsheets themselves, rather than the content they contain. *See id.* at 11. The Dale Defendants proffer experts Francesco Bianchi, Joseph Chaput, and Michael Barbera to dispute these conclusions. *See generally* ECF Nos. 782, 809, 807.

Before leaving, Dale also uploaded thousands of contacts from Hedgeye's master list into his personal contact list. *See id.* ¶ 1-291. He then exported the list to allow him to access it later. *See id.* ¶ 1-293.

f. <u>Solstein's Subscription Agreement with Hedgeye</u>

On July 1, 2017, Solstein entered into a services agreement (also referred to as the "subscriber agreement") with Hedgeye and became a Hedgeye institutional subscriber. *See* Ds. Resp. Stmt. ¶ 1-324. The services agreement incorporated Hedgeye's Terms of Service for the use of its website and financial products. *See id.* ¶ 1-326. The Terms of Service impose restrictions on how subscribers may use Hedgeye products, including prohibitions on copying and sharing the information with non-subscribers. *See* ECF No. 818-89 (2024 Terms of Service); *see also* ECF No. 813 at 39.

The subscriber agreement also included a non-solicitation provision which prohibited Solstein from recruiting or hiring a Hedgeye employee within one year of their employment. *See*

Ds. Resp. Stmt. ¶ 1-327. A Hedgeye employee named Ben Ryan ("Ryan") left Hedgeye in December of 2018 and began working at Solstein in March of 2019. *See id.* ¶¶ 1-328–29.

Terman testified that she reviewed Hedgeye's Form ADV—a registration form for investment advisors with the Securities and Exchange Commission ("SEC"), *see* ECF No. 814 at 3 n.1—prior to transmitting the executed subscriber agreement to Hedgeye, *see* Ds. Resp. Stmt.¶ 1-335. These Form ADVs contained representations that Hedgeye (1) believed it was entitled to the SEC "newsletter exemption" from registration requirements, *see id.* ¶ 1-495, (2) operated independently from an active asset manager named Sierpinski Capital Management ("Sierpinski"), *see id.* ¶¶ 1-299–303, (3) did not trade in any of the securities the firm covers, *see id.* ¶ 1-484; ECF No. 839 at 6. This independence—specifically that Hedgeye did not engage in conflicted trading—was a large draw for Terman. *See* Ds. Resp. Stmt. ¶ 1-490. It is undisputed that Hedgeye analysts did in fact trade in Exchange Traded Funds ("ETFs") which contained securities mentioned in Hedgeye Real Time Alerts ("RTAs"), a service provided to Hedgeye subscribers. *See id.* ¶¶ 1-499–500 (citing the expert reports of Jordan Milev and James Reilly).

g. <u>Hedgeye's Campaign Against the Dale Defendants</u>

The Dale Defendants allege Hedgeye engaged in a harassment campaign intended to harm 42 Macro's success by disseminating misleading and disparaging statements about the defendants, Dale in particular. *See* ECF No. 810 at 4–9. The Court need not recount each and every statement made on social media, as 42 Macro's counterclaims enumerate them. *See* ECF No. 658. Not all these statements came from Hedgeye, McCullough, or Blum directly. Blum decided "to have members of Hedgeye nation disseminate details and quotes from the lawsuits themselves . . . rather than that coming from Hedgeye internally." Ds. Resp. Stmt. ¶ 1-429 (quoting Blum's deposition) (internal quotation marks omitted). "Both McCullough and Blum have admitted that they provided

what they viewed as damaging information about Dale to 'Caffeine Addict,' an anonymous Twitter user," to post. *Id.* ¶ 1-432.

The posts—authored or retweeted by "Caffeine Addict," Blum, or McCullough—included claims about Dale's finances, *see id.* ¶ 1-432(a), disciplinary incidents in Dale's Hedgeye personnel file, *see id.* ¶¶ 1-438–43, and the browsing history and images found on Dale's laptop, *see id.* ¶¶ 1-444–45. They also included claims relating to this litigation, such as Blum's tweet that 42 Macro's models "are our models, not [Dale's]." *Id.* ¶ 1-447.

Hedgeye also directly confronted other businesses which promoted Dale and 42 Macro, demanding they cut ties with the Dale Defendants. *See id.* ¶¶ 1-451–54. When one C.E.O. failed to do so, McCullough, Blum, and "Caffeine Addict" publicly criticized him and his decision over social media. *See id.* ¶¶ 1-455, 1-457, 1-460–61, 1-463, 1-466. Hedgeye followers seemed to relish in these public accusations, with Blum tweeting, "'[]Hedgeye clients are thrilled' about Hedgeye's public attacks on Dale and 42 Macro because 'having the opportunity to finally counter Dale's year long disrespectful and disgusting campaign against us & our 75+ employees has invigorated our staff.'" *Id.* ¶ 1-469 (internal citation omitted).

42 Macro alleges that these attacks caused it to lose subscribers. *See id.* ¶¶ 1-472–73, 1-476. Several social media users reached out to Hedgeye and Dale to say they had cancelled their 42 Macro subscriptions because of the information Hedgeye shared. *See id.* ¶¶ 1-474–75, 1-477.

h. Hedgeye's Campaign Against the Terman Defendants

Beginning in 2021, Terman was a regular commentator on CNBC. *See* Ds. Resp. Stmt. ¶ 1-515. In February of 2022, CNBC informed her that she would not appear again until this litigation was resolved. *See id.* ¶ 1-521. Terman alleges this decision was motivated by a separate

but connected harassment campaign Hedgeye waged against her and Solstein over social media. *See* ECF No. 839 at 21.

The statements forming this campaign are detailed at length in the Terman Defendants' counterclaims. *See* ECF No. 670. They generally fall into two categories. The first are tweets reacting to Terman's CNBC appearance and accusing her of plagiarizing commentary from Hedgeye. *See* Ds. Resp. Stmt. ¶ 1-503. The second are tweets about this litigation and Hedgeye's accusations against both Terman and Solstein for "IP theft." *See id.* ¶¶ 1-508–09, 512. The Terman Defendants argue these statements are false, defamatory, and caused (1) CNBC to terminate Terman's appearances, (2) two Solstein subscribers to close their accounts, and (3) a business relationship with [redacted] to dissolve. *See* ECF No. 839 at 8–9.

## II. Procedural History

On April 26, 2021, Hedgeye filed case against Defendant Dale alone. *See* ECF No. 1. Hedgeye also filed a motion for a temporary restraining order ("TRO") and preliminary injunction against Dale that day. *See* ECF Nos. 5, 10. The Court granted the TRO and scheduled a hearing on the preliminary injunction. *See* ECF No. 13. The Court denied Hedgeye's first motion for a preliminary injunction, *see* ECF No. 51 at 4:22–5:6, but later granted a renewed motion, *see* ECF No. 90 at 7:10–14.

On August 20, 2021, Hedgeye amended its complaint, adding Lamar and 42 Macro as defendants. *See* ECF No. 92. On February 9, 2022, Hedgeye brought a separate action against the Terman Defendants in this court. *See Hedgeye Risk Management, LLC v. Terman*, No. 22-cv-1113 (S.D.N.Y. Feb. 9, 2022), ECF No. 1. On July 28, 2022, Hedgeye amended its complaint to consolidate the cases, adding Terman and Solstein as defendants in this action. *See* ECF No. 323. The complaint, and subsequent counterclaims, have been challenged through motions to dismiss

and amended, sometimes on several occasions. *See Hedgeye Risk Mgmt., LLC v. Dale*, No. 21-cv-3687 (ALC) (RWL), 2023 WL 6386845 (S.D.N.Y. Sept. 29, 2023) (order on Defendants' motion to dismiss the Third Amended Complaint); ECF No. 661 (order on Hedgeye's motion to dismiss the Terman Defendants' counterclaims).

Currently before the Court is Hedgeye's Fifth Amended Complaint. ECF No. 653 ("FAC"). In that pleading Hedgeye brings claims for (1) violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, against the Dale Defendants and Terman; (2) common law misappropriation against the same defendants; (3) breach of contract against Dale; (4) intentional interference with contractual relations against Lamar, 42 Macro, and Terman; and (5) breach of contract against Solstein. *See id.* at 49–58.

In their answer to the Fifth Amended Complaint, the Terman Defendants bring their Second Amended Counterclaims against Hedgeye for (1) fraud in the inducement; (2) tortious interference with a contract; (3) tortious interference with prospective economic relationships; and (4) defamation. *See* ECF No. 670 at 44–48. 42 Macro also asserts counterclaims against Hedgeye in the Dale Defendants' answer, for (1) violation of the Connecticut Unfair Trade Practices Act ("CUTPA") and (2) unfair competition. *See* ECF No. 674 at 62–64.

In order to confer regarding appropriate redactions, the parties filed all of their summary judgment briefing on February 10, 2025, along with the opening briefs for their *Daubert* motions. *See* ECF Nos. 725–867. On March 31, 2025, the parties filed their oppositions to the *Daubert* motions. *See* ECF Nos. 887–914. They submitted their replies on April 28, 2025. *See* ECF Nos. 919–40. The parties also filed motions to seal, which were referred to Magistrate Judge Robert W. Lehrburger. *See* ECF No. 946. On July 29, 2025, Judge Lehrburger granted in part and denied in part the parties' motions to seal. *See* ECF Nos. 955–58. Upon Hedgeye's motion, Judge Lehrburger

reconsidered his decision and issued an amended sealing order on September 2, 2025. *See* ECF Nos. 980–81. On September 9, 2025, Hedgeye requested a stay in the deadline to file objections to the amended order until after the publication of this decision on the pending summary judgment motions. *See* ECF No. 984. Given Judge Lehrburger's recognition that his sealing decisions may be impacted by the resolution of the summary judgment motions, *see* ECF No. 955 at 4–5, the Court granted Hedgeye's request, *see* ECF No. 992.

**DISCUSSION**

As previously noted, in conjunction with the summary judgment motions, the parties filed ten motions to exclude proffered expert testimony pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993). They additionally filed two motions to strike non-expert declarations.

As "[t]he summary judgment standard requires a court to consider all relevant, admissible evidence," the Court must first determine whether it would be proper to rely on the proffered evidence before ruling on the motions for summary judgment. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016); *see also Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 351 (S.D.N.Y. 2023) ("[T]he Court must address whether the opinions proffered by the parties' experts are admissible before ruling on [the] motion for summary judgment."); *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001) ("Evidence contained in an expert's report therefore must be evaluated under Fed. R. Evid. 702 before it is considered in a ruling on the merits of a summary judgment motion."). "If a proffer of expert testimony is excluded as inadmissible pursuant to Rule 702, the court must make the summary judgment determination on a record that does not include that evidence." *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)).

## I. *Daubert* Motions

### a. Standard of Admissibility

Under Federal Rule of Evidence 702, expert testimony is usually admissible where it is relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). To admit an expert's testimony, a court must conclude that (1) the witness is "qualified as an expert;" (2) the witness's testimony is based on reliable data and methodology; and (3) the testimony will "assist the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). Testimony may also be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* (citing Fed. R. Evid. 403).

"It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions," and district courts enjoy broad discretion to admit expert testimony. *Nimely*, 414 F.3d at 395. Because of this liberal admissibility standard, exclusion of expert testimony is warranted only when the district court finds "serious flaws in reasoning or methodology." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009).

If the testimony falls within a "range where experts might reasonably differ," the duty to evaluate the weight and sufficiency of the evidence on which the expert relied lies properly with the jury, rather than the trial court. *Kumho Tire, Co. v. Carmichael*, 526 U.S. 137, 153 (1999). Similarly, credibility challenges to expert testimony ordinarily do not require its preclusion, but rather go to its weight. *See Daubert*, 509 U.S. at 596. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements under Rule 702 are satisfied." *United States v.*

*Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert*, 509 U.S. at 593 n.10). "[T]he district court is the ultimate gatekeeper . . . [and must] 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* (quoting *Daubert*, 509 U.S. at 597).

b. Daniel Lacalle

Hedgeye offers the testimony of Dr. Daniel Lacalle to compare and analyze financial models from Hedgeye and 42 Macro for evidence of copying. *See* ECF No. 833-1 at 4–5 ("Lacalle Rep."). The Dale Defendants challenge Dr. Lacalle's testimony for multiple reasons, including his alleged bias, perjury, and inadequate methods. While the Court agrees with the Dale Defendants that several portions of Dr. Lacalle's testimony assert conclusions he is unable to adequately support with his methods, Dr. Lacalle is qualified and has experience which will assist the jury.

Accordingly, the Court finds Dr. Lacalle is qualified to and may provide testimony on how these financial models are used, valued, and protect in the industry. The Court will preclude Dr. Lacalle from testifying about (1) the GMRM model and whether Dale or any other Defendant used it, (2) how Hedgeye's and 42 Macro's financial models compare, (3) similarities between and distinct features of Hedgeye's and 42 Macro's investment advice compared to other investment firms, and (4) whether Dale's post-employment conduct violated industry standards. Regarding his rebuttal, the Court agrees with Hedgeye that the issue is premature as the rebuttal is not relied upon in the summary judgment briefing.

*i. Lacalle's Bias*

The Dale Defendants argue that Dr. Lacalle's longstanding friendship with McCullough and working relationship with Hedgeye disqualify his testimony in its entirety. *See* ECF No. 732 at 11. "The threshold for disqualifying an expert on this basis is high because many expert witnesses have some level of discernible bias or appearance of bias, and a complete lack of bias is

not required." *El Ansari v. Graham*, No. 17-CV-3963, 2019 WL 3526714, at *8 (S.D.N.Y. Aug. 2, 2019). Nevertheless courts have disqualified experts "where [the expert] is also a party in the case, lives with a party, or is a party's attorney." *PRCM Advisers LLC v. Two Harbors Inv. Corp.*, No. 20-CV-5649, 2025 WL 1276513, at *16 (S.D.N.Y. May 2, 2025) (citing *Hasemann v. Gerber Prods. Co.*, 2024 WL 1282368, at *7 (E.D.N.Y. Mar. 25, 2024) (collecting cases)).

Where there is only a professional relationship—even one where the expert and a party have done each other favors over the years—"a court may exercise its discretion, within the bounds of Rule 702, and permit the expert to testify." *Id.* (declining to exclude expert with professional relationship to a party); *see also Knowledge Based Techs., Inc. v. Int'l Bus. Machines Corp.*, No. 96 CIV. 9461, 1998 WL 164791, at *1 (S.D.N.Y. Apr. 8, 1998) ("[C]ourts routinely permit expert testimony by parties, employees, and others with financial and other plain interests in the outcome of the litigation."). In such cases any allegations of bias go to the weight, rather than admissibility, of the expert's testimony, and may be properly raised on cross-examination. *See Hasemann*, 2024 WL 1282368, at *7 ("[T]he opposing party's 'arguments that the proffered expert is an interested witness may be raised on cross-examination at trial on the issues of his bias and credibility, and the appropriate weight, if any, to be afforded his expert testimony.'" (quoting *Keystone Mfg. Co. v. Jaccard Corp.*, 394 F. Supp. 2d 543, 568 (W.D.N.Y. 2005) (alterations omitted))).

While Dr. Lacalle may have a long-standing relationship with Hedgeye and McCullough, it "does not amount to the 'clear conflict of interest' or 'bias of an extraordinary degree' generally required to merit disqualification of an expert." *PRCM Advisers LLC*, 2025 WL 1276513, at *16 (citing *El Ansari*, 2019 WL 3526714, at *8). Accordingly, the Court declines to exclude his testimony based on this relationship. The Dale Defendants may still raise this relationship on cross-examination.

*ii. Lacalle's Perjury*

The Dale Defendants additionally move to exclude Dr. Lacalle's testimony in full based alleged perjury. *See* ECF No. 732 at 11. There are two distinct versions of these allegations that the Court gleans from the briefing: (1) that Lacalle disavowed counsel's role in reviewing his report during his deposition testimony, only to change his response via an "errata" sheet weeks later, *see id.* at 7–9; and (2) that Lacalle failed to review documents supposedly relied upon in his report, *see id.* at 9–10 (on Attachment A); ECF No. 938 at 1–3 (on the GMRM model).

As for the first category, the Dale Defendants do not argue—or provide the Court with a basis to conclude—that Dr. Lacalle's "errata" sheet failed to meet the requirements of Rule 30(e)(1), which provide "a deponent the opportunity to review his deposition transcript and submit a statement listing any 'changes in form or substance,' along with 'the reasons for making them.'" *Adams v. Co-op City Dep't of Pub. Safety*, No. 21CV2675, 2024 WL 1478897, at *6 (S.D.N.Y. Apr. 5, 2024) (quoting Fed. R. Civ. P. 30(e)(1)(A)-(B)). While the Dale Defendants may argue that the specific corrections Dr. Lacalle made are dubious, *see* ECF No. 732 at 9, they lack sufficient support to substantiate their allegations of perjury.

The Court similarly finds the second set of allegations do not rise to the level of perjury. Dr. Lacalle claims to have "relied upon" Attachment A, a document which sets forth "[t]he underlying trade secret methodologies employed by" Hedgeye's financial models in his expert report. Lacalle Rep. at 8; *see also id.* at 22 (material relied upon). But, during his deposition, he stated that he had not reviewed Attachment A. *See* ECF No. 781-9 at 148:14–149:18. The Dale Defendants argue that Dr. Lacalle's failure to review Attachment A is evidence of perjury both because the report purports to rely on it and because Dr. Lacalle would have needed to review the document in order to come to his conclusions. *See* ECF No. 732 at 9–10.

Hedgeye responds that Dr. Lacalle did not need to review Attachment A "because the models [he reviewed] already incorporated that logic within them." ECF No. 905 at 10. While there may be some statements in the report which Dr. Lacalle should have reviewed Attachment A to verify, these are not statements in dispute, and the Court agrees with Hedgeye that Dr. Lacalle did not necessarily need to review Attachment A in order to opine on the models.

The Court will last address whether Dr. Lacalle has perjured himself by claiming to have reviewed the GMRM file despite indications otherwise; an argument which the Dale Defendants raise on reply. *See* ECF No. 938 at 1–3. As will be discussed further in the following section, the Court finds Dr. Lacalle's analysis of the financial models unreliable. *See infra* at II.b.iv. One reason is because Dr. Lacalle's deposition testimony shows that he cannot verify whether he reviewed the GMRM file.

But the Court disagrees that this establishes perjury, as Dr. Lacalle never purported to have reviewed or analyzed the GMRM file. The deposition testimony, in fact, indicates that Dr. Lacalle had no awareness of which specific Hedgeye model he had compared to 42 Macro's, as he was only provided the two financial models for his report. Counsel for the Dale Defendants asked:

> Q: Do you remember which Hedgeye model was provided to you?
> A: I do not understand the question. You' re assuming that there are various?
> Q: Well, our -- let me ask you, are there various different models that Hedgeye uses to perform its analysis?
> A: I would not know because what I was provided to make my report were two models, not three, not four, not different models from Hedgeye or different models from 42 Macro. Two models.

ECF No. 781-9 at 44:9–44:20. Accordingly, the Court will not disqualify Dr. Lacalle for perjured testimony.

*iii. The Role and Protection of Financial Models*

Dr. Lacalle is qualified to and may provide testimony about the utility of financial models, their value to investment firms, and the industry's standard practice for protecting this type of

information. Dr. Lacalle is financial executive who holds a Ph.D. in Economy and a master's degree in economic investigation. *See* Lacalle Rep. at 2. Dr. Lacalle previously served as a portfolio manager at two large scale hedge funds. *See id.*; ECF No. 905 at 2. He is currently the Chief Economist at Tressis SV, CEO at Alpha Strategy Consulting, and a fund manager at Adriza International Opportunities. *See* Lacalle Rep. at 2. Additionally, Dr. Lacalle has experience building financial models in Excel. *See* ECF No. 901-2 at 55:6–57:12.

While the Dale Defendants argue that Dr. Lacalle lacks relevant experience and fails to apply a reliable methodology in their motion, these concerns seem to be limited to his more analytical conclusions, which the Court will address in the following section. *See* ECF No. 732 at 12; *see also infra* at II.b..iv. "An expert is permitted to support his opinions by reference to his experience." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 716 F. Supp. 2d 220, 227 (S.D.N.Y. 2010). As far as his testimony concerns the use and value of financial models at financial companies, Dr. Lacalle is clearly qualified to opine and can assist the jury in understanding these concepts.

The Dale Defendants additionally move to exclude Dr. Lacalle's opinion that Dale's post-employment actions violated industry standards as irrelevant. *See* ECF No. 732 at 15–16. Hedgeye offers no case law or other support for the conclusion that Dr. Lacalle may opine on whether Dale violated industry practices, let alone the other more specific conclusions Dr. Lacalle reached in his report. *See* ECF No. 905 at 20 (highlighting Dr. Lacalle's ability to provide the jury with important context); Lacalle Rep. at 20 ("[I]t would be highly improper for an employee to take financial models from a previous employer, and review those models while creating new models for a competitor."); *id.* ("Every professional in my industry that I know would assume that someone who downloaded and consulted financial models from a prior firm intended to use them.").

Hedgeye generally states that Dr. Lacalle's testimony will help the jury conclude that Dale knew his conduct was wrong and violated the DTSA. *See* Lacalle Rep. at 20. But Hedgeye offers no specific support for why industry standards are relevant for the misappropriation inquiry or why the jury may reach this conclusion based on industry standards as opposed to his employment contract. *See* ECF No. 732 at 16. Accordingly, Hedgeye fails to meet its burden and Dr. Lacalle is precluded from testifying about whether Dale's post-employment actions violated industry standards.

In addition, Hedgeye argues that Dr. Lacalle can provide helpful context to the jury about the privacy expectations investment firms have regarding their use of financial models which is directly relevant to whether Hedgeye's source models are trade secrets. *See* ECF No. 905 at 19–20. The Court agrees, and the Dale Defendants do not seem to contest, the admissibility of Dr. Lacalle's opinion regarding the protection and privacy expectations of financial models.

*iv. The Content of and Comparisons Between the Financial Models*

The bulk of the Dale Defendants' motion pertains to Dr. Lacalle's testimony analyzing the content of Hedgeye's and 42 Macro's financial models, describing the similarities between them, and comparing two companies' investment advice to each other and several major investment banks. All of these opinions involved some level of empirical analysis requiring "a reliable application of the principles and methods." Fed. R. Evid. 702 Advisory Committee Note. The Dale Defendants argue that Dr. Lacalle lacks the requisite qualifications and failed to apply a principled methodology to reach these opinions. The Court agrees .

"[E]ven if a proposed expert lacks formal training in a given area, he may still have 'practical experience' or 'specialized knowledge' that qualifies him to give opinion testimony." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 636 (S.D.N.Y. 2016)

(citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995)), *aff'd sub nom. LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*, 720 F. App'x 24 (2d Cir. 2017). "[W]here an expert possesses qualifications in a 'general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.'" *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 236 (E.D.N.Y. 2014) (quoting *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 425 (E.D.N.Y. 2011)). The crucial inquiry is whether the expert has the "relevant experience and qualifications such that whatever opinion he will ultimately express would not be speculative." *In re Fosamax Prods. Liab. Litig.*, No. 6-cv-7631, 2009 WL 4042769, at *5 (S.D.N.Y. Nov. 23, 2009), *aff'd sub nom. Flemings v. Merck & Co.*, 399 F. App'x 672 (2d Cir. 2010). "If the 'witness's expertise is too general or too deficient,' the Court 'may properly conclude [he is] insufficiently qualified.'" *Id.* (quoting *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997)).

While Dr. Lacalle possesses the requisite qualifications to opine on the use and value of financial models, the Dale Defendants argue his failure to "not identify any other instance in his long career in which he had compared two economic models to determine if one was based on the other" render him unqualified to testify on the conclusions of his empirical analysis. ECF No. 732 at 12. Hedgeye responds that his "experience building, reviewing, and analyzing models, including having previously identified a model that improperly included proprietary analysis" adequately qualify him. ECF No. 905 at 7 (citing ECF No. 901-2 214:6–23 (Dr. Lacalle's deposition testimony regarding the copied model)). The Court is convinced that Dr. Lacalle's experience building and reviewing financial models, in addition to providing consultation services to various financial institutions, equips him with sufficient "experience and qualifications such that whatever opinion he will ultimately express would not be speculative." *In re Fosamax*, 2009 WL 4042769, at *5.

On the other hand, the Court finds Dr. Lacalle's methodology to be unreliable. The Court's gate-keeping function to ensure expert testimony "is not only relevant, but reliable," *Daubert*, 509 U.S. at 589, applies not just to "scientific expert testimony . . . but also to testimony based on 'technical' and 'other specialized' knowledge," *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 91 (2d Cir. 2000). To ascertain a methodology's reliability, a court may consider:

> (1) whether the expert's technique or theory can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether there is a high error rate for the expert's technique, and whether there are "standards controlling the technique's operation"; and (4) whether the expert's technique or theory is generally accepted by the relevant scientific community.

*LVL XIII Brands*, 209 F. Supp. 3d at 644 (quoting *Daubert*, 509 U.S. at 592–94). "Properly understood, the *Daubert* analysis applies to cases involving unique, untested, or controversial methodologies or techniques. It is not appropriate to invoke the *Daubert* test in cases where expert testimony is based solely on experience or training, as opposed to a methodology or technique." *Liriano v. Hobart Corp.*, 949 F. Supp. 171, 177 (S.D.N.Y.1996) (internal quotation omitted).

"[T]he Supreme Court has also stated that reliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions." *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Hedgeye's insistence that Dr. Lacalle only testifies based on his experience oversimplifies the analysis provided in his report. While Dr. Lacalle's conclusion that Hedgeye's and 42 Macro's

financial models both utilize Bayesian estimates may rely on his experience analyzing models of this sort, *see* Lacalle Rep. at 12, his experience alone cannot form the basis of his opinions that there is a one hundred percent overlap in growth indicators between the two models, *see id.* at 15, or that "aside from Hedgeye and 42 Macro, we have found no major investment bank that predicted the persistent inflation and slowdown in growth," *id.* at 19. It is clear that these conclusions are based in an empirical analysis of financial information provided by both Hedgeye and 42 Macro, and numerous other investment firms. "Where expert opinion has been presented as the product of scientific method or analytic thought, courts [apply] *Daubert*." *Liriano*, 949 F. Supp. at 178.

The Dale Defendants argue that Dr. Lacalle's testimony fails the *Daubert* test at its first criteria. Dr. Lacalle's methodology cannot be tested or challenged because (1) it is unknown which models Dr. Lacalle analyzed, (2) he fails to adequately articulate the methodology he used, and (3) he fails to include the factual basis for several of his conclusions.

Regarding first point, the Dale Defendants raise that Dr. Lacalle stated during his deposition that he only reviewed one financial model from Hedgeye and that he could not recall its specific name. *See* ECF No. 732 at 3–4, 4 n.7 (citing ECF No. 781-9 at 44–46). At his deposition, counsel for Dale Defendants asked Dr. Lacalle

> Q: Do you remember which Hedgeye model was provided to you?
> A: I do not understand the question. You're assuming that there are various?
> Q: Well, our -- let me ask you, are there various different models that Hedgeye uses to perform its analysis?
> A: I would not know because what I was provided to make my report were two models, not three, not four, not different models from Hedgeye or different models from 42 Macro. Two models.
> Q: So you were provided two Excel spreadsheets, one from 42 Macro, one from Hedgeye, correct?
> A: Uh-huh.

ECF No. 781-9 at 44:9–24. A little later on counsel asked him

> Q: Which Excel spreadsheet were you provided for purposes of analyzing the Hedgeye model?

> A: The macro -- the macro -- the macro spreadsheet, the Hedgeye macro model.
> Q: Well, is that what it was called, the Hedgeye macro model?
> A: I don't know the name. I don't know the name. I was provided with two Excel spreadsheets that were the basis of my analysis. That is all I received. I did not know of any other. I do not know of any other names or anything. The Hedgeye and the 42 Macro spreadsheets, that's all I had to do, look at those.

*Id.* at 45:10–24. While this invites the inference that Dr. Lacalle reviewed the GMRM file, in their reply, the Dale Defendants raise compelling evidence that the financial model Dr. Lacalle reviewed was not the GMRM file, because Lacalle's model only pertained to the US. *See* ECF No. 938 at 1.

As Exhibit A to his report, Dr. Lacalle listed the materials he relied on and included twenty Excel spreadsheets from Hedgeye, begging the question: which one did he actually review? *See* Lacalle Rep. at 22. Where an expert's disclosure of the facts and data considered pursuant to Federal Rule of Civil Procedure 26(a)(2)(B) leaves the Court and opposing parties "without a clear understanding of the data upon which [the expert] relied, as well as the specific bases for his opinions" it "renders th[e] disclosure meaningless." *Koppell v. New York State Bd. of Elections*, 97 F. Supp. 2d 477, 482 (S.D.N.Y. 2000); *see also LVL XIII Brands*, 209 F. Supp. 3d at 645 n.33 (S.D.N.Y. 2016) (citing *Koppell*). This also makes it more difficult for Dr. Lacalle's methodology to be "tested or challenged in any objective sense." *LVL XIII Brands*, 209 F. Supp. 3d at 645.

As for the second issue, Dr. Lacalle failed to meaningfully detail and preserve a record of the analysis used to reach several empirical conclusions in his report. Take Dr. Lacalle's analysis that the "actionable calls" of Hedgeye and 42 Macro coincide at a rate of ninety-five percent. *See* Lacalle Rep. at 18. The report and its exhibits include no documentation containing the data and analysis which led to this figure. *See generally* ECF No. 833. When asked at his deposition where the supporting information could be found, Dr. Lacalle responded that they "gathered the actionable calls from the reports that were outlined below from both [Hedgeye and 42 Macro] for that same time period." ECF No. 781-9 184:7–9. He added that while they did perform

mathematical calculations at the time, "we don't have it now." *Id.* at 184:18. This has significant consequences when one understands that Dr. Lacalle also distinguished certain numbers as "actionable calls" as opposed to "estimates" and "recommendations;" the analysis for which there is no record. *See id.* at 268:2–12. This leaves the other parties with no means to "retrace his steps[,] preclude[ing] . . . an objective assessment." *LVL XIII Brands*, 209 F. Supp. 3d at 645 n.35.

Last, on several occasions Dr. Lacalle fails to articulate a factual basis for the comparisons he provides. Returning to his "actionable calls" analysis, Dr. Lacalle states that he reviewed data from JP Morgan, Morgan Stanley, and Goldman Sachs as well and that all three "share[d] a very different short-term view on growth, inflation, and asset allocation" from Hedgeye and 42 Macro. *See* Lacalle Rep. at 18–19. Critically, Dr. Lacalle at no point provides citations for the basis of this information and any reference to these financial institutions is notably absent from the list of materials on which his report relied. *See id.*; *id.* at 22–23.

Also concerning is Dr. Lacalle's contention that one would expect the data inputs between two companies' macroeconomic models to only overlap at a rate of fifty percent. *See* Lacalle Rep. at 15, 17. While Dr. Lacalle maintained in his deposition that this figure was based in his experience, *see* ECF No. 781-9 at 139:4, "[i]f experts are permitted to testify on an issue of fact, they must provide some explanation for their conclusions, rather than referring generally to their experience," *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 CIV. 7242, 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002); *see also Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 530 (S.D.N.Y. 2001) ("While it is permissible for [an expert] to base his opinion on his own experience, he must do more than aver conclusorily that his experience led to his opinion."), *amended on other grounds*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001). Dr. Lacalle's experience is not a sufficiently reliable basis to conclude the typical coincidence rate or the investment advice of other banks.

All of these issues "make[] it impossible for a court or adversary to test—or a jury to assess—[Dr. Lacalle]'s methodology, as applied here, for veracity and reliability." *LVL XIII Brands*, 209 F. Supp. 3d at 645 (citing *Amorgianos*, 303 F.3d at 267 ("[T]he district court should undertake a rigorous examination of the facts on which the expert relies" to test the reliability of the methodology.)). Crucially, this precludes Dr. Lacalle from testifying that Dale copied Hedgeye's source model. The Court notes that even if Hedgeye met its burden and established the reliability of Dr. Lacalle's testimony about the content of the source models, it may have been an impermissible conclusion. *See Hayden v. Int'l Bus. Machines Corp.*, No. 21 CV 2485, 2025 WL 1697021, at *7 (S.D.N.Y. June 17, 2025) (An expert "opinion that these purported similarities necessarily indicate that Cloud Pak was based on A2E is classic *ipse dixit* and is not appropriate expert testimony because it is not based on reliable methodology." (internal quotation omitted)); *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp.*, No. 15 CIV. 211, 2020 WL 5822064, at *2 (S.D.N.Y. Sept. 30, 2020) ("[W]hile [an expert] may not opine as to the legal issue of whether Syntel copied the Data Dictionary, he may opine as to the similarities between Syntel's source code and the Data Dictionary.").

*v. Lacalle's Rebuttal Report*

As Hedgeye highlights, it has not cited or otherwise introduced Dr. Lacalle's rebuttal report to support its briefing on the pending motions for summary judgment. *See* ECF No. 905 at 22. As the relevant inquiry is what evidence is admissible for the Court's resolution of the pending summary judgment motions, analyzing the rebuttal report would be premature. *See Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 351 (S.D.N.Y. 2023) ("[T]he Court must address whether the opinions proffered by the parties' experts are admissible before ruling on [the] motion for summary judgment."); *cf. Hudson Techs., Inc. v. RGAS, LLC*, 716 F. Supp. 3d 327, 333 n.1

(S.D.N.Y. 2024) ("[T]he Court need not resolve RGAS's motion to exclude Kevin Dennis's expert report . . . as the Court ultimately concludes that it is premature to decide issues related to damages before liability has been established.").

Accordingly, the Dale Defendants' motion to exclude the testimony proffered in Dr. Daniel Lacalle's initial report is granted in part and denied in part. The Court denies the motion to exclude the rebuttal as premature and without prejudice to renewal.

c. Francesco Bianchi

The Dale Defendants offer the testimony of Professor Francesco Bianchi for his analysis of Hedgeye's economic modeling and conclusion that (1) the components are well known economic indicators and (2) the models bear no independent economic value. *See* ECF No. 782-1 ¶¶ 9–11 ("Biachi Rep."). Professor Bianchi also rebuts the testimony of Hedgeye's experts Daniel Lacalle and Liam Bastick. *See* ECF No. 782-2 ¶¶ 9–11 ("Bianchi Rebuttal"). Hedgeye argues that Professor Bianchi's testimony should be excluded because he lacks the requisite qualifications, his conclusions are irrelevant and misleading, and his methodology was not reliable. The Court disagrees with Hedgeye and declines to exclude the proffered testimony and rebuttal of Professor Bianchi in full. The Court grants Hedgeye's motion as to Professor Bianchi's comparison of Hedgeye's models to those of other private financial institutions but otherwise denies it.

*i. Bianchi's Qualifications*

The Dale Defendants argue that Professor Bianchi is unqualified for two reasons: (1) because his "experience is solely academic and entirely divorced from the realities of how macroeconomic research models are developed, used, and valued in a business setting," and (2) because of his limited experience with Excel. ECF No. 740 at 9.

Professor Bianchi is a professor and Chair of the Economics Department at Johns Hopkins University. *See* Bianchi Rep. ¶ 1. His "academic areas of interest include macroeconomics, Bayesian econometrics, and asset pricing, and [his] research has concerned topics such as the use of machine learning techniques to improve forecasts." *Id.* ¶ 3. He has "taught econometrics and forecasting at the undergraduate and graduate level at several academic institutions." *Id.* Professor Bianchi is co-editor of the *American Economic Journal: Macroeconomics* and has published articles in several academic journals. *See id.* ¶¶ 1–2. As part of his research, Professor Bianchi writes macroeconomic models, *see* ECF No. 782-3 at 14:8–15, primarily in programs other than Excel. *See id.* at 11:8 ("My coding expertise is in other languages than Excel.), 11:24–25 ("Most of the time these days I use MATLAB. I also coded R that is similar to MATLAB.").

Formal education may sufficiently qualify a witness even if that expert lacks "extensive practical experience directly on point." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 466 (S.D.N.Y. 2018) (quoting *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, No. 99 Civ. 1725 (VM), 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003)) (internal quotation marks omitted). Hedgeye contests that Professor Bianchi's academic experience is directly applicable to his testimony regarding the value economic institutions would place on Hedgeye's source models. *See* ECF No. 927 at 2 ("Bianchi's experience is solely academic and entirely divorced from the realities of how macroeconomic research models are developed, used, and valued in a business setting."). While Professor Bianchi has not worked for a financial institution, his extensive academic career qualifies him to opine about the source models, the variables used therein, their accuracy, and how they compare to publicly available alternatives. Hedgeye imposes a false requirement on Professor Bianchi's testimony to come from one with the perspective of a financial

institution, when his opinions do not rely on such experience. To the extent this bears on his testimony, it goes to weight as opposed to admissibility.

As for Professor Bianchi's experience with Excel, Hedgeye makes much of the one line in his deposition testimony where he states that he used Excel back in college. *See* ECF No. 782-3 at 11:25–12:1 ("When I was an undergrad I was coding in Excel."). In doing so, Hedgeye overlooks the fact that Professor Bianchi voiced comfort working with Excel, *see id.* at 11:14–15 ("I didn't particularly feel like I needed the help."), and that he has extensive experience working with more complex codes, *see id.* at 11–12, 14:8–15. More importantly, Professor Bianchi is not offering testimony about Excel or how a financial model is coded using the program. Rather, Professor Bianchi is testifying about the contents of the Excel spreadsheets along with the other Hedgeye materials provided to him. *See* Bianchi Rep. ¶ 6. His knowledge of Excel need only be great enough to properly identify the formulae and variables within the source models, a skillset Hedgeye does not seem to contest. *See generally* ECF No. 740. Hedgeye is welcome to cross-examine Professor Bianchi regarding the reliability of his conclusions based on his review of the Excel model, but the Court will not exclude his testimony because of his lack of experience with the program.

*ii. Generally Known & Bear No Independent Economic Value*

Hedgeye argues Professor Bianchi's opinions that "Hedgeye's source models consist of standard elements generally known in the industry" and they bear no independent economic value are irrelevant to the misappropriation claims and therefore misleading to the jury. ECF No. 740 at 10, 12. Hedgeye specifically highlights portions of Professor Bianchi's testimony which opine on (1) the unique nature of the models' components, (2) the accuracy of its models compared to public forecasts, and (3) the use of the alpha variable.

Taking each in turn, Hedgeye properly highlights that "[a] trade secret . . . does not have to be novel or an invention . . . [and] 'can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design, and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.'" *Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 48 (2d Cir. 2018) (quoting *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990)); *see* ECF No. 740 at 11 (citing *Integrated Cash*, 920 F.2d at 174). Nevertheless, this does not mean that evidence of the components' general availability is inherently irrelevant. In fact, such evidence may discredit whether the alleged trade secret was not publicly known or that it provided a competitive advantage. *See Waterville Inv., Inc. v. Homeland Sec. Network (NV Corp.)*, No. 08-CV-3433, 2010 WL 2695287, at *4 (E.D.N.Y. July 2, 2010) (finding plaintiff failed to establish the publicly available information was compiled in a unique way); *Capricorn Mgmt. Sys., Inc. v. Gov't Emps. Ins. Co.*, No. 15-CV-2926, 2020 WL 1242616, at *8 (E.D.N.Y. Mar. 16, 2020) ("Capricorn merely lists the various functions without evidence of how they work together in a unique and valuable way.").

Regarding the models' value, Hedgeye argues that this testimony only analyzes whether the models provide independent economic value, not whether they provide such a value as a result of their secrecy: the proper inquiry for the misappropriation claims. *See* ECF No. 740 at 16–18. But this testimony also weighs on whether the models provided Hedgeye with a competitive advantage. *See Next Commc'ns.*, 758 F. App'x at 48; *Integrated Cash*, 920 F.2d at 174.

If, as Professor Bianchi opines, the models are completely composed of publicly available or widely accepted variables, that fact may weigh on whether the models can be "replicated by a competitor using proper means." *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328,

388 (S.D.N.Y. 2023). If the models provide financial forecasts that are no more accurate than other public alternatives, *see* Bianchi Rep. ¶ 24, it puts into question whether the models—as unique combinations of generally known variables—provide Hedgeye an advantage over its competitors. It is not that Hedgeye's models need to be the best in order to be trade secrets, but at the same time Defendants are not precluded from trying to discredit whether the models provide any advantage at all. *See* ECF No. 740 at 11–12. For the same reason, if the alpha variable is used to override the models' outputs and [redacted], *see* Bianchi Rep. ¶¶ 48–58, it calls into question whether the unique compilation—or in other words the models' results before the alpha variable is applied—offers Hedgeye an advantage over its competitors.

Accordingly, Hedgeye's motion to exclude these opinions is denied.

*iii. Comparison Between Hedgeye and Other Private Models*

The Court can quickly address whether Professor Bianchi's comparison of Hedgeye's models to other non-public models should be excluded for a flawed methodology. *See* ECF No. 740 at 15–16. The Dale Defendants failed to address this critique in their opposition, *see generally* ECF No. 894, and as the burden rests with them, the Court deems this issue conceded, *see G.T. by Reyes v. United States*, No. 22-CV-10901, 2025 WL 2030160, at *2 (S.D.N.Y. July 21, 2025) (partially excluding expert opinion as conceded based on plaintiff's failure to respond in opposition); *see also Cole v. Blackwell Fuller Music Publ'g, LLC*, 2018 WL 4680989, at *7 (S.D.N.Y. Sept. 28, 2018) ("Numerous courts have held that a plaintiff's failure to address an issue in its opposition . . . amounts to a concession or waiver of the argument."). Accordingly, Hedgeye's motion on Professor Bianchi's initial report is granted as to his opinion that Hedgeye's models are not superior to others used by private financial firms and otherwise denied.

*iv. Bianchi's Rebuttal*

In rebuttal, Professor Bianchi responds to the reports of Hedgeye experts Daniel Lacalle and Liam Bastick, and opines that their conclusions are unsound. *See* Bianchi Rebuttal ¶¶ 4, 9–10. Hedgeye largely contests the admissibility of Professor Bianchi's rebuttal report on the same grounds as his initial report: that he lacks the relevant practical or applied experience in the financial industry and with Excel, and that he misapplies the relevant standard for misappropriation claims. The arguments regarding his lack of experience in the industry and failure to apply the relevant standard are no more convincing than before. *See supra* at II.c.i–ii.

The Court is similarly unpersuaded by Hedgeye's concern that Professor Bianchi lacks the relevant training in Excel to rebut Bastick's testimony, given that Professor Bianchi largely opines about substantive differences between Hedgeye's and 42 Macro's economic models and does not contest Bastick's objective findings regarding the coding or values in the Excel spreadsheets. *See* Bianchi Rebuttal at 25–29. For example, Professor Bianchi contests the dispositive nature of the "'conceptual' similarities in the steps and calculations performed by Hedgeye and 42 Macro" because the models were created by the same person and with "concepts generally known in the field." *See id.* ¶ 87. This opinion does not disagree with Bastick's conclusion regarding the contents of the Excel files, only what import he considers them to have given his experience in econometrics and macroeconomics. As the Court has already found, Professor Bianchi is qualified to testify on such a topic. *See supra* at II.c.i. Accordingly, Hedgeye's motion to preclude the rebuttal report of Professor Bianchi is denied.

d. <u>Joseph Chaput</u>

The Dale Defendants offer the testimony of Joseph Chaput to rebut Hedgeye expert Liam Bastick's "conclusion that the 42 Macro Regime Forecasting Tool Excel file was most likely 'initially a copy' of" the GMRM file. ECF No. 809-1 ¶ 7 ("Chaput Rep."). Chaput analyzed the

metadata of the two Excel spreadsheets and opined that they do not support Bastick's conclusion because they have different creation dates and times. *See id.* ¶¶ 8, 23.

Hedgeye moves to exclude this proffered testimony, arguing that Chaput is unqualified, inadequately considers alternative explanations for his findings, and relies on subjective terminology. *See* ECF No. 746 at 1–3. The Court declines to exclude Joseph Chaput's rebuttal.

*i. Chaput's Qualifications*

Joseph Chaput a senior digital forensic examiner at TransPerfect Legal Solutions ("TransPerfect"), a provider of "digital forensic analysis of electronic media and digital artifacts from computer-based systems." Chaput Rep. ¶ 1. Chaput has over a decade of experience in forensic investigation and litigation support, having worked at the Concord Police Department as a Detective in the Computer Crimes Unit prior to his work at TransPerfect. *See id.* ¶¶ 2–3.

Hedgeye argues that Chaput is unqualified to opine "on the similarities between Hedgeye's GMRM and 42 Macro's source models" or Bastick's finding on that issue. ECF No. 746 at 12. Hedgeye primarily relies on the fact that Chaput is not specifically an expert in Excel, and "had never looked at two Excel files to determine if there was any copying from one of them to the other," *id.* Hedgeye concedes that Chaput is qualified "to render an opinion on the 'created' date found in the file level metadata of the two models." *Id.* at 13.

As the Dale Defendants point out, Chaput does not opine about any similarities between the two Excel files, only that his analysis of the metadata indicates that 42 Macro's file is not a copy of the GMRM file, rebutting Bastick's conclusion. *See* ECF No. 896 at 6 ("Hedgeye argues that Chaput is not an expert in other subjects, like 'Excel', but that is neither relevant to or necessary for the opinion he gave." (internal citation omitted)); Chaput Rep. ¶¶ 22–24 (summarizing his findings on the files' metadata). Chaput's qualifications to give this opinion are

further supported by his deposition testimony that, although he did has not specifically analyze two Excel spreadsheets in order to determine if one was copied from the other prior to this case, he has compared the metadata of two Excel files and made such a determination on several occasions. *See* ECF No. 738-7 at 20:18–21:25.

For clarity, Chaput's opinion is not limited to the "created" date as Hedgeye insists. *See* ECF No. 746 at 13; ECF No. 920 at 4. Chaput's testimony includes a discussion of other metadata, *see* Chaput Rep. ¶¶ 11–15, 24, as well as analysis regarding the ability to alter metadata, *see id.* ¶¶ 16–21, 23, on which he is likewise qualified to opine. Therefore, the Court will not exclude Chaput's testimony based on his qualifications.

*ii. Alternative Explanations*

Hedgeye questions the reliability of Chaput's testimony for failing to establish that the metadata were not manipulated. Specifically, Hedgeye argues that Chaput inadequately grapples with the alternative explanation for the different "created" dates that someone altered the metadata. *See* ECF No. 746 at 14–15. In developing his opinions, Chaput may "rely[] on an accepted forensic tool and his own expertise and experience." *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 84 (S.D.N.Y. 2017). "While an expert should address evidence that contradicts his conclusions, it is not required that an expert categorically exclude each and every possible alternative cause in order to render the proffered testimony admissible." *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 287 (S.D.N.Y. 2011) (internal quotations omitted).

Chaput does not ignore the potential for manipulation, and in fact, specifically considers two alternative scenarios through which one could alter the metadata. *See* Chaput Rep. ¶¶ 16–21. That Chaput rejects these alternatives in favor of his conclusions does not render his testimony unreliable, and can be addressed through cross-examination. *See U.S. Info. Sys., Inc. v. Int'l Bhd.*

*of Elec. Workers Loc. Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 236 (S.D.N.Y. 2004) ("[P]urported inconsistencies in Dr. Dunbar's methodology go to the weight, not the admissibility of his testimony."); *Bernstein v. Cengage Learning, Inc.*, No. 19-cv-7541 (ALC) (SLC), 2023 WL 6303424, at *11 (S.D.N.Y. June 9, 2023) (denying motion to exclude where "failure to consider additional or different variables" could be addressed on cross-examination); *cf. United States v. Schohn*, 602 F. Supp. 3d 447, 464 (W.D.N.Y. 2022) ("Investigator Lombardi later conceded on cross-examination by Defendant that while unlikely, it was 'not impossible' to manipulate the devices' software."). Likewise, Chaput's failure to definitively rule out the possibility of manipulation does not render his testimony unhelpful to the jury. *See* ECF No. 746 at 17–18. Chaput's opinion that the differences in the metadata make it unlikely that one was copied from the other is still relevant to rebut "Bastick's conclusion that the 42 Macro source model was 'initially a copy' of Hedgeye's GMRM" file. ECF No. 920 at 8.

*iii. Subjective Terminology*

Hedgeye additionally challenges Chaput's testimony for relying on subjective terminology, specifically the concept of a "typical computer user." As the Court previously stated, Chaput is permitted to rely upon the results of his forensic analysis along with his professional experience in giving his testimony. *See supra* at II.d.ii (quoting *Digital Music*, 321 F.R.D. at 84). Chaput employs this experience to conclude that "it is uncommon for most typical computer users to possess awareness, knowledge, and skills to" alter the metadata. Chaput Rep. ¶ 21. This leads Chaput to conclude it is more likely that the metadata have not been manipulated.

Hedgeye is correct that there are boundaries regarding the types of opinions an expert may give based solely on their experience. *See* ECF No. 756 at 15–16. Again, "an expert basing his opinion solely on experience 'must do more than aver conclusorily that his experience led to his

opinion.'" *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003) (quoting *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 530 (S.D.N.Y. 2001)), *aff'd*, 99 F. App'x 274 (2d Cir. 2004). An expert may fail to satisfy this standard where they provide no basis for their opinion, *see ValveTech, Inc. v. Aerojet Rocketdyne, Inc.*, No. 17-CV-6788, 2023 WL 3558214, at *3 (W.D.N.Y. May 19, 2023), or opine on subjects outside of their profession, *see Israel v. Spring Indus., Inc.*, No. 98CV5106, 2006 WL 3196956, at *9 (E.D.N.Y. Nov. 3, 2006).

Neither is the case here. First, this statement regarding the "typical computer user" is not so much an opinion Chaput offered but more an attempt to preemptively address contradictions in his testimony, which Hedgeye may properly cross-examine him on at trial. *See supra* at II.d.ii. Chaput opines within his expertise, insisting that "most people do not . . . have the knowledge on how to change metadata." *See* ECF No. 738-7 at 121:6–8. Whether such knowledge is easily acquired, or Dale should be considered within the category of "most people," does not discount the admissibility of Chaput's analysis, but rather goes to the weight given to his opinion.

Thus, Hedgeye's motion to exclude Joseph Chaput's proffered testimony is denied.

e. <u>Michael Barbera</u>

The Dale Defendants offer the testimony of Michael Barbera to rebut Hedgeye expert Liam Bastick, specifically "Bastick's speculation that Mr. Dale likely reviewed and copied Hedgeye's models to create 42 Macro's models." ECF No. 807-1 ¶ 8 ("Barbera Rep."). Barbera analyzed the content of the source models and concluded that "the 42 Macro models could have been constructed without sight or copying of the Hedgeye models." *Id.* ¶ 9.

Hedgeye argues the Court must exclude Barbera's proffered rebuttal testimony because he is not an expert in macroeconomic modeling, relied on software he had never used before this case,

and failed to record the details of his analysis. *See* ECF No. 759 at 2. For the following reasons, the Court disagrees and denies Hedgeye's motion.

*i. Barbera's Qualifications*

When he prepared his report, Michael Barbera was the Chief Financial Officer of an "advisory firm focused on helping corporations achieve their climate goals" called The Climate Board. Barbera Rep. ¶ 1; *see also* ECF No. 897 (noting his job change since drafting report). In that role and over the course of his career, Barbera has built and operated numerous financial models in Excel, including The Climate Board's financial forecast model. *See id.* ("I built the company's financial forecast model and have presented it to investors."); *id.* ¶ 2 ("Throughout my time at Albright, I built and oversaw the buildout of financial models in Excel to model business transactions."); ECF No. 897-2 at 15:12–14 ("Q: How many Excel models have you constructed by yourself from scratch? A: Over 100.").; *id.* at 16:20–24 ("Q: How many Excel models have you been involved in constructing, although you did not construct them totally by yourself? A: So that would be more in the range of 300, over 300.").

Hedgeye argues that, despite this experience, Barbera's lack of specific expertise in macroeconomic modeling and comparing Excel spreadsheets for evidence of duplication renders him unqualified. *See* ECF No. 759 at 13. The Court disagrees. "Assertions that the witness lacks particular educational or other experiential background, 'go to the weight, not the admissibility, of the testimony.'" *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)). "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks

expertise in the specialized areas that are directly pertinent." *Id.* Barbera's extensive experience building and operating financial models in Excel adequately establish his qualifications to testify.

*ii. Reliability of Barbera's Testimony*

Hedgeye questions the reliability of Barbera's conclusions on three primary bases. First, Hedgeye argues that Barbera's use of the automated software, ExcelAnalyzer, to conduct his examination of the formulae in the source models was unreliable because he had not used it prior to this case. *See* ECF No. 759 at 14; *see also* ECF No. 919 at 6 ("Hedgeye's argument against Barbera is not about whether he operated ExcelAnalyzer properly—it is that Barbera's lack of experience using ExcelAnalyzer goes to his methodology, not his qualifications."). Second, Hedgeye claims Barbera failed to keep of record of his analysis comparing the formulae in the two spreadsheets. *See* ECF No. 759 at 15–16. Last, Hedgeye states that Barbera selectively ignored relevant evidence, demonstrating the biased nature of his conclusions. *See id.* at 16–17.

As the Dale Defendants note, the Court may decide the pending summary judgment motions without evaluating Hedgeye's first and second arguments. *See* ECF No. 897 at 14. Barbera employed ExcelAnalyzer to rebut Bastick's conclusions regarding the number of unique formulae in both companies' source models and the overlap between the two. *See* Barbera Rep. ¶¶ 22–24. But Hedgeye does not rely upon Bastick's empirical evaluation of the source model formulae in its summary judgment briefing. Instead Hedgeye only specifically cites his opinion on the significant coincidence between the "Custom Styles" coded into one Hedgeye and one 42 Macro spreadsheet. *See* ECF No. 813 at 11–12 (citing ECF No. 827-1 at 75–77 ("Bastick Rep.")) (Hedgeye's opening brief); ECF No. 879 at 12–13 (citing Bastick Rep. at 75–77) (Hedgeye's opposing brief to Dale's motion); *see also* ECF No. 835 at 3, 11 (referencing Bastick's conclusions

only generally in the statement of facts in opposition to Lamar and 42 Macro's motion); ECF No. 850 (not citing Bastick's testimony in opposition to the Terman Defendants' motion).

Barbera's rebuttal of the "Custom Styles" testimony did not involve the use of ExcelAnalyzer or other empirical analysis. *See* Barbera Rep. ¶¶ 69–72. Instead, his testimony relies on his own review of the same two spreadsheets. *See id.* ¶ 71 (highlighting that two of the "Custom Styles" are different contrary to Bastick's report). He then opines based on his experience as to how such similarities could have arisen. *See id.* ¶ 72. Therefore, the Court need not reach issues regarding Barbera's review of the formulae, use of ExcelAnalyzer, and record of his analysis at this stage. *See Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) ("[T]he court must evaluate evidence for admissibility before it considers that evidence in ruling on a summary judgment motion." (citing Fed. R. Evid. 104(a))).[4, 5]

As for Barbera's allegedly biased conclusion, the Court considers this within the context of the specific evidence introduced for the summary judgment motions as well. Hedgeye asserts that Barbera selectively "chose to ignore Dale's admissions of copying." ECF No. 759 at 16. These ignored admissions include that Dale duplicated the GMRM file to his personal Dropbox account, copied certain symbols, and had Hedgeye and 42 Macro files open simultaneously on several occasions. *See id.* at 17 (internal citations to Pl. Stmt. omitted).

"Opinions that assume a conclusion and reverse-engineer a theory to fit that conclusion are . . . inadmissible." *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig.* (No. II), 341 F. Supp. 3d 213, 241 (S.D.N.Y. 2018) (internal quotation omitted), *aff'd sub nom. In re Mirena IUS*

---

[4] The Court notes that Hedgeye offered no response to the Dale Defendants' argument in its reply. *See generally* ECF No. 919.

[5] Hedgeye raises one additional objection to Barbera's testimony—that Barbera's opinion would not assist the jury—largely based the fact that his empirical analysis is unreliable and therefore unhelpful. *See* ECF No. 759 at 16–17. As the Court does reach whether his analysis is reliable, it will likewise decline to rule on the value of these opinions for the finder of fact.

*Levonorgestrel-Related Prods. Liab. Litig.* (No. II), 982 F.3d 113 (2d Cir. 2020). "Where an expert ignores evidence that is highly relevant to his conclusion, contrary to his own stated methodology, exclusion of the expert's testimony is warranted." *Id.* at 242. "However, 'a contention that an expert did not weigh a certain piece of evidence adequately does not take an expert opinion into the realm of speculative or conjectural.'" *In re Omnicom Grp. Inc. Erisa Litig.*, No. 120CV4141, 2022 WL 18674830, at *10 (S.D.N.Y. Dec. 23, 2022) (quoting *Cooper Crouse-Hinds, LLC v. City of Syracuse, New York*, 568 F. Supp. 3d 205, 221 (N.D.N.Y. 2021)). "Rather, the method to contest the factual underpinning of expert opinion is vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Id.* (internal quotation omitted).

Upon its review of the record, the Court finds Barbera adequately addressed the unfavorable evidence contained in Dale's admissions; he in fact incorporates it into his opinion on the "Custom Styles." Commenting on a scenario presented to Bastick at his deposition, Barbera noted that when Dale had both Hedgeye and 42 Macro files open simultaneously, "he could have 'merged' the styles simply as a matter of aesthetic preference. This would transfer the styles but not any of the contents between the files." Barbera Rep. ¶ 72. Any remaining challenge goes more to what weight Barbera gave these admissions compared to the other factors he considered and may be properly raised on cross-examination. Accordingly, the Court finds Barbera's testimony sufficiently reliable and admissible.

Hedgeye's motion to exclude the rebuttal testimony of Michael Barbera is denied.

f. <u>Thomas Britven</u>

The Dale Defendants move to exclude the proffered testimony of Hedgeye's sole damages expert, Thomas Britven. *See* ECF No. 733. Britven evaluated damages based on Defendants' alleged appropriation of eleven Hedgeye Excel files, Dale's composition notebooks, and

Hedgeye's customer lists, commonly referring to them in the aggregate as "Trade Secrets and Confidential Information at Issue." ECF No. 829-1 ¶¶ 32, 36–37 ("Britven Rep."). For clarity, the Court will refer to these as the "aggregated information."

Britven analyzed Hedgeye's damages under the theory of unjust enrichment. *See id.* § 6. Specifically Britven calculated 42 Macro's avoidance costs to be $4,043,781, by estimating Hedgeye's cost to develop the aggregated information and subtracting 42 Macro's necessary costs to adapt the aggregated information into its own files. *See id.* ¶ 79; *see generally id.* § 6.2. Additionally, Britven calculated 42 Macro's "profits to be disgorged" by estimating 42 Macro's ill-gotten revenues and subtracting 42 Macro's relevant costs. *See id.* § 6.1. Britven apprises those profits to be $4,114,557. *See id.* ¶ 66.

The Dale Defendants argue the aggregated information includes files which the parties agree do not constitute trade secrets and that Britven's failure to disaggregate his damages calculations based on the remaining trade secrets in dispute renders his opinion unreliable. *See* ECF No. 733 at 3–7. They separately argue that Britven wrongfully assumes all of 42 Macro's profits flow from the aggregated information and can therefore be considered ill-gotten revenues. *See id.* at 11–13.[6] The Court takes each argument in turn.

*i. Failure to Disaggregate*

Britven calculated damages based on eleven Excel files, Dale's notebooks, and the customer lists included within the aggregated information. *See generally* Britven Rep. Five of the Excel files are no longer alleged to be trade secrets. *See* ECF No. 846 ¶¶ 2-188–90. The Dale Defendants argue that this over-inclusion "cannot be easily corrected or walked back" because Britven failed to provide a disaggregated damages calculation. ECF No. 733 at 5. This is less an

[6] The Dale Defendants move to exclude Britven's testimony on three additional bases. *See generally* ECF No. 733. The Court need not consider these as it excludes Britven's testimony based on the first two arguments alone.

argument regarding the reliability of Britven's analysis, and more one concerned with how helpful Britven's opinion can be for the finder of fact given his failure to indicate the damages flowing from specific trade secrets. To support their argument, the Dale Defendants cite *Ford Motor Company v. Versata Software, Inc.*, where a proffered expert calculated one value for misappropriation damages based on all the alleged trade secrets, rather than a value for each. No. 15-11624, 2018 WL 10733561, (E.D. Mich. July 9, 2018). In excluding the damages expert's opinion, the court reasoned that

> [T]he jury will have to make an independent determination – on a trade-secret-by-trade-secret basis – as to whether Ford misappropriated each of the relevant trade secrets. Elson's all-or-nothing approach thus does not fit well with the jury's task and poses a substantial risk of confusing and/or misleading the jury. Indeed, if the jury were to conclude that Ford misappropriated less than all of Versata's trade secrets (a distinct possibility, if not a likelihood in a hotly-disputed action like this), then Elson's damages calculation would not assist the jury in calculating damages and could only serve to confuse them.

*Id.* at *11.

The court in *02 Micro International Limited v. Monolithic Power Systems, Inc.* encountered a similar situation. 399 F. Supp. 2d 1064 (N.D. Cal. 2005), *amended sub nom. O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070 (N.D. Cal. 2006), *aff'd*, 221 F. App'x 996 (Fed. Cir. 2007. In a pretrial conference, "[t]he [c]ourt warned O2 Micro of the dangers of bundling all of its alleged trade secrets damages together," stating that it could move forward with its expert but "if you do and you don't win on all 12 of your trade secrets, you'll have no damages." *Id.* at 1076. When the jury later found only five of the trade secrets were misappropriated, the court concluded that the expert's testimony "regarding damages for misappropriation of all trade secret was useless to the jury." *Id.* at 1077.

This Court is in the unique position of already knowing that a jury would conclude some of the information included in Britven's calculation are not trade secrets because Hedgeye does not even dispute this. *See* ECF No. 846 ¶¶ 2-188–90. The Court is thus inclined to find Britven's

opinion would be unhelpful to the finder of fact. Hedgeye defends Britven's testimony by arguing that (1) the non-trade secret files are still provided to clients and should therefore be considered for the purposes of damages; (2) the non-trade secret files still qualify as confidential information and should be included for the purposes of Hedgeye's breach of contract claims; (3) the Dale Defendants rely on out-of-Circuit case law; and (4) a ruling on Britven's testimony should be deferred until after trial. The Court finds none of these convincing.

Hedgeye provides no support for why the five "output" Excel files, which are provided to clients and therefore not trade secrets, should be included in Britven's damages calculation, beyond its conclusory statement that such is the case. *See* ECF No. 906 at 5 ("They are outputs of the GMRM model and are the very product Hedgeye's customers pay for. As such, Mr. Britven's calculation of damages calculation necessarily includes the output files."). This argument also ignores the fact that at no point did Britven account for Hedgeye's profits in his damages calculations. His estimates for unjust enrichment were limited to an evaluation of 42 Macro's profits, 42 Macro's expenses, and the development costs for both firms. *See generally* Britven Rep. Hedgeye provides no justification for why the costs to develop a shared file should be included in its expert's calculation.

The Court now turns to the inclusion of "confidential information" in the aggregated information and Hedgeye's reliance of this category as a viable alternative for the five output files. Hedgeye argues that "to the extent that [the output files] fail to qualify as a trade secret, they nonetheless constitute confidential information at the very minimum." ECF No. 906 at 7. This confidential information, Hedgeye contends, can then properly be considered for the purposes of calculating damages on its breach of contract claims. *See id.* The Court agrees that Britven may

opine on breach of contract damages,[7] but as the Dale Defendants note upon reply, this is not responsive to their argument that Britven's aggregation of the trade secrets—with each other and with other potentially protected information—limits the usefulness of his testimony for the jury. *See* ECF No. 939 at 4–5.

Hedgeye responds by highlighting the fact that the authority on which the Dale Defendants rely primarily comes from outside this Circuit. Hedgeye cites courts in this district which have "declined to exclude an expert's damages calculation for failure to apportion damages between trade secrets, finding these arguments inappropriate to address pretrial." ECF No. 906 at 5 (citing *Town & Country Linen Corp. v. Ingenious Designs LLC*, 18-cv-5075, 2022 WL 2757643 (S.D.N.Y. July 14, 2022)). First, the Court notes that the Dale Defendants cite to *TransPerfect Global, Inc. v. Lionbridge Technologies, Inc.*, which, although it did not consider a *Daubert* motion, did find an expert's report on misappropriation damages inadmissible for failing to provide a "way to determine . . . what trade secrets are at issue in th[e] calculation of damages." No. 19CV3283, 2022 WL 195836, at *8 (S.D.N.Y. Jan. 21, 2022), *aff'd*, No. 22-1348, 2024 WL 177726 (2d Cir. Jan. 17, 2024).

Separately, Hedgeye's reliance on *Town & Country* is misplaced. In that case, Judge Liman deferred consideration of a *Daubert* motion because "the Court w[ould] benefit from hearing the direct and cross examination of [the expert] at trial." *Town & Country*, 2022 WL 2757643, at *13. Critically, this decision was made in the context of a "case [which] will be tried to the bench," *id.* at *1. The case law Judge Liman relied upon emphasizes the import of that distinction. *Id.* at *13 (citing *3DT Holdings LLC v. Bard Access Sys. Inc.*, No. 17-CV-5463, 2022 WL 2037853

[7] The Court addresses whether these damages are appropriate for a breach of context claim in the context of the summary judgment motions below. *See infra* at III.d.

(S.D.N.Y. May 10, 2022); *Joseph S. v. Hogan*, No. 06 CIV. 1042, 2011 WL 2848330 (E.D.N.Y. July 15, 2011)).

At a bench trial, "[t]here is no risk of the Court hearing something on direct examination . . . to which it has not already been exposed pretrial." *3DT Holdings LLC*, 2022 WL 2037853, at *1. "In any event, and as a legal matter, 'the trial judge is presumed to be able to exclude improper inferences from his or her own decisional analysis.'" *Id.* (quoting *Bic Corp. v. Far Eastern Source Corp.*, 23 F. App'x 36, 39 (2d Cir. 2001)). "[W]ithout the risk of poisoning the jury with misleading expert testimony of limited probative value, . . . the Court can take in the evidence freely and separate helpful conclusions from ones that are not grounded in reliable methodology." *Joseph S.*, 2011 WL 2848330, at *3. In this matter, Hedgeye and the counterclaimants have all demanded a jury trial. *See generally* ECF Nos. 653, 658, 670. Hedgeye provides no support for why deferring this issue would be appropriate in the context of a jury trial.

The Court notes that Britven's aggregation is most consequential to his analysis of avoided development costs, as it involved calculations based on the specific protected material. *See* Britven Rep §§ 6.1, 6.2. It also impacts his damages calculation regarding ill-gotten profits because Britven assumes that all of 42 Macro's profits are attributable to the aggregated information, only some of which are alleged to be trade secrets. As the Court finds this assumption regarding 42 Macro's profits was unreasonable in the first instance, though, Britven's calculation of ill-gotten profits is excluded in any event. *See infra* at II.f.ii.

*ii. Unreasonable Assumption*

"[U]nder Federal Rule of Evidence 703, the court must 'determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony.'" *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, No. 95 CIV. 8136, 2001 WL 1602976, at *4 (S.D.N.Y. Dec.

14, 2001) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). An expert's opinions should be excluded where they "are so 'speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison.'" *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 355 (S.D.N.Y. 2023) (quoting *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009)). "Other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Zerega Ave.*, 571 F.3d at 214 (internal quotation omitted). "An expert opinion, however, 'is not *per se* unreliable because it relies on some unverified or inaccurate information provided by the expert's client.'" *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 52 (S.D.N.Y. 2016) (quoting *Lee Valley Tools, Ltd. v. Indus. Blade Co.*, 288 F.R.D. 254, 267 (W.D.N.Y. 2013)).

As stated above, Britven calculated 42 Macro's ill-gotten profits by totaling all of 42 Macro's profits since its creation. *See* Britven Rep. § 6.1. Britven states that these profits are "applicable to the accused products," *id.* ¶ 63, based on his "understand[ing] that all of 42 Macro's products directly or indirectly rely on the [aggregate information]," *id.* ¶ 63 n.176. To support this understanding, Britven cites to the expert reports of Daniel Lacalle and Liam Bastick. *See id.* The Dale Defendants argue this is not a reasonable assumption to draw from either report, as both "focus on a single 42 Macro Excel spreadsheet and on a single Hedgeye spreadsheet, and do not purport to analyze either business as a whole, nor do they analyze either company's profit streams." ECF No. 733 at 11.

Hedgeye fails to adequately respond to these points. It mistakenly states that Britven relied on Hedgeye for the allegation that all of 42 Macro's profits are traceable to the aggregated information. *See* ECF No. 906 at 14 (citing Britven Rep. ¶ 63 (in turn, citing Lacalle Rep.; Bastick

Rep.)). Next, Hedgeye argues that Britven was permitted to rely on its other experts as a general legal principle, but fails to properly support why Britven can rely on the reports of Lacalle and Bastick for this proposition specifically. *See id.*

Experts are "certainly 'entitled to rely on facts, opinions and data developed or prepared by another' expert." *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 362 (S.D.N.Y. 2023) (quoting *In re M/V MSC Flamini*a, No. 12 Civ. 8892, 2017 WL 3208598, at *5 n.6 (S.D.N.Y. July 28, 2017)). But "[i]f one expert's opinions are built upon a foundation laid by another, reliability of the latter requires reliability of the former." *In re M/V MSC Flamini*a, 2017 WL 3208598, at *5 (collecting cases). But neither Bastick nor Lacalle opine on 42 Macro's profits anywhere in their reports, including the specific pages cited by Britven to support his assumption. *See generally* Lacalle Rep.; Bastick Rep.; *see also* Britven Rep. ¶ 63 n.176 (citing Lacalle Rep. at 9; Bastick Rep. at 23–24, 26, 88). Because of this, the Court finds there was no reasonable basis to conclude that all of 42 Macro's profits are traceable to the aggregated information, rendering Britven's calculation unreliable. *See Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, No. 95 CIV. 8136, 2001 WL 1602976, at *5 (S.D.N.Y. Dec. 14, 2001) (excluding expert's calculation of profit for "incorrectly assum[ing] that everything Supply & Building ordered would be sold"); *see also Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 284 (S.D.N.Y. 2000) (finding expert wrongly "assumed that Johnson would not have made sales" prior to its use of the infringing product).

Accordingly, the Court will exclude Thomas Britven's opinion on 42 Macro's ill-gotten profits. Regarding avoided development costs, his proffered testimony on misappropriation damages is excluded, but may be used to support Hedgeye's claim for damages on its other causes of action if applicable.

g. Kristopher Boushie

Hedgeye moves to exclude the proffered testimony of 42 Macro's damages expert, Kristopher Boushie, who opines specifically on its counterclaims. *See* ECF No. 743. To conduct his analysis, Boushie reviewed the tweets comprising the alleged harassment campaign against the Dale Defendants. *See* ECF No. 808-1 ¶ 27 ("Boushie Rep."); *see also* ECF No. 801-2 (histogram representing timeline of harassing tweets). Based on that review, Boushie "set February 2022 as the beginning of [his] damages period." Boushie Rep. ¶ 27. Boushie "estimate[d] the actual lost profit damages that 42 Macro suffered in both its mass-market and institutional market segments . . . provid[ing] a range of lost profit damages in the mass-market business under two scenarios:" one with conservative and the other with likely profit expectations. *Id.* ¶ 10. Boushie calculated that 42 Macro lost $4,937,171 in profits under the conservative conditions and $7,806,633 in profits under the likely conditions. *See id.* ¶ 11.

Hedgeye argues that Boushie's opinion should be excluded because (1) he is not qualified to analyze the social media posts at issue; (2) his calculations rely on several unreasonable assumptions; and (3) his opinion regarding the damages period is unreliable. *See generally* ECF No. 743. The Court finds Hedgeye's first two arguments unpersuasive but agrees with its third. Thus, Hedgeye's motion to exclude the proffered testimony of Kristopher Boushie is granted in part and denied in part.

*i. Boushie's Qualifications*

There is no dispute about Boushie's qualifications to analyze the financial information from Hedgeye and 42 Macro in order to render his damages calculation. Rather, the question is limited to whether he is "qualified to render an opinion on the impact of Hedgeye's allegedly disparaging tweets on 42 Macro's profits." *See* ECF No. 743 at 8. The Court concludes that he is.

Boushie "ha[s] over 30 years of experience in financial and litigation consulting, with a focus on forensic valuation." Boushie Rep. ¶ 1. His "expertise includes the analysis of historical and projected financial-related business records and the preparation of economic damage estimates." *Id.* ¶ 2. He is currently "a Managing Director in the Washington, DC office of NERA Economic Consulting ("NERA"), where [he is] a member of the firm's Intellectual Property Practice and lead[s] NERA's trade secret task force." *Id.* ¶ 1.

While Boushie is not a social media expert, his testimony does not require such expertise. His limited evaluation of the economic impact of the alleged harassment campaign, he has previously analyzed the impact of social media posts on a client's revenue. *See* ECF No. 738-4 at 22:17–23:20 (Boushie deposition transcript). Within the liberal construction of Rule 702, the Court finds Boushie is sufficiently qualified to serve as an expert on the impact of Hedgeye's allegedly disparaging tweets. *See United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) (qualification requirements of Rule 702 "must be read in light of the liberalizing purpose of the rule").

*ii. Unreasonable Assumptions*

Hedgeye argues that Boushie's testimony must be excluded because it relies on a number of impermissible assumptions: that Hedgeye's tweets caused all the alleged lost profits; that a number of alternative causes were not a factor in 42 Macro's profit losses; that 42 Macro's costs were not subtracted from the calculation; and the estimates for 42 Marco's profits were accurate. *See* ECF No. 743 at 10–26.

"[U]nder Federal Rule of Evidence 703, the court must 'determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony.'" *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, No. 95 CIV. 8136, 2001 WL 1602976, at *4 (S.D.N.Y. Dec. 14, 2001) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). An expert's

opinions should be excluded where they "are so 'speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison.'" *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 355 (S.D.N.Y. 2023) (quoting *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009)). "Other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Zerega Ave.*, 571 F.3d at 214 (internal quotation omitted). "An expert opinion, however, 'is not *per se* unreliable because it relies on some unverified or inaccurate information provided by the expert's client.'" *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 52 (S.D.N.Y. 2016) (quoting *Lee Valley Tools, Ltd. v. Indus. Blade Co.*, 288 F.R.D. 254, 267 (W.D.N.Y.2013)). "Data or information that has been compiled by a client in the ordinary course of business may 'provide some indicia of reliability for the data.'" *Scott*, 315 F.R.D. at 52 (quoting *Lee Valley*, 288 F.R.D. at 267).

The Court finds that all of Hedgeye's concerns go to the weight, not the admissibility, of Boushie's testimony and can be addressed during cross-examination. *See Actava TV, Inc. v. Joint Stock Co. "Channel One Russia Worldwide"*, No. 18-CV-06626 (ALC), 2023 WL 2529115, at *6 (S.D.N.Y. Mar. 15, 2023) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)). Regarding the cause of 42 Macro's lost profits, "[w]hile an expert should address evidence that contradicts his conclusions, it is not required that an expert categorically exclude each and every possible alternative cause in order to render the proffered testimony admissible." *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 287 (S.D.N.Y. 2011) (internal quotations omitted). Here, Boushie did not ignore the potential impact of this litigation or Dale's other conduct, but rather concluded that such factors "would be already included in the

financial – historical financial performance of 42 Macro." ECF No. 738-4 at 56:18–20; *see also id.* at 55:6–58:9.

Boushie was not required to analyze every potential alternative cause, and that he rejected several in favor of his conclusions does not render his testimony unreliable and can be addressed through cross-examination. *See U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 236 (S.D.N.Y. 2004) ("[P]urported inconsistencies in Dr. Dunbar's methodology go to the weight, not the admissibility of his testimony."); *Bernstein v. Cengage Learning, Inc.*, No. 19-cv-7541 (ALC) (SLC), 2023 WL 6303424, at *11 (S.D.N.Y. June 9, 2023) (denying motion to preclude where "failure to consider additional or different variables" could be addressed on cross-examination).

As for Boushie's reliance on Dale and Lamar's representations, "[w]here, as here, lost profits are at issue, 'an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding' a party's future prospects." *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, No. 95 CIV. 8136 (RCC), 2001 WL 1602976, at *4 (S.D.N.Y. Dec. 14, 2001) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). An expert cannot rely solely on the party's projections and representations, but "must be able to point to some sales data or independent market report indicating that the business venture could make sales and be profitable." *Ho Myung Moolsan, Co. v. Manitou Min. Water, Inc.*, No. 07 CIV.07483, 2010 WL 4892646, at *10 (S.D.N.Y. Dec. 2, 2010), *aff'd*, 501 F. App'x 85 (2d Cir. 2012). While Boushie did speak with Lamar and Dale—and used their estimates as a basis for 42 Macro's reasonable growth conditions—he considers financial statements and comparator data in addition to these

representations to develop his testimony. *See* Boushie Rep. ¶¶ 34 (reviewing 42 Macro profit and loss statements), 37 (reviewing 42 Macro meeting notes), 38–41 (analyzing comparators).[8]

Finally, regarding Boushie's deduction of costs, the Court finds that Hedgeye's motion overstates the issue. Boushie relies on the assumption that "the only expected incremental costs *associated with increasing revenue or resulting from increasing revenue* are advertising and marketing expenses." Boushie Rep. ¶ 50 (emphasis added). Hedgeye's contentions that Boushie improperly estimates this number or fails to consider other factors which would have contributed to 42 Macro's costs, *see* ECF No. 743 at 22–23, are not large enough flaws for this Court to conclude that Boushie "lacks good grounds for his . . . conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002); *see id.* ("This limitation . . . accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.").

*iii. Damages Period and Selection of Tweets*

Last, Hedgeye argues that Boushie uses an unreliable methodology to determine the temporal scope of his damages calculation. *See* ECF No. 743 at 23–25. One element of this argument is that Boushie utilized a selective methodology to review the tweets and determine when the harassment campaign began, or began to harm 42 Macro's financial health. *See id.* at 8–10. Boushie admitted as much during his deposition. *See* ECF No. 738-4 at 84:24-85:5 ("Q: What methodology did you employ to determine whether one of [the t]weets would have a substantial impact on the business? A: More of a subjective determination than a methodology."). 42 Macro

[8] Hedgeye's objections regarding the assumptions Boushie made in analyzing these comparators, *see* ECF No. 743 at 20–21, also go to the weight, rather than the admissibility of his testimony. *See ValveTech, Inc. v. Aerojet Rocketdyne, Inc.*, No. 17-CV-6788, 2023 WL 3558214, at *2 (W.D.N.Y. May 19, 2023) ("[T]he adequacy of Timko's comparators goes to 'the weight of the testimony and its credibility, not its admissibility.'" (quoting *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013))).

largely responds to this by arguing that "Boushie's expert report discusses Hedgeye's social media campaign only as 'background,'" and does not "opine on or characterize the content of Hedgeye's tweets." ECF No. 895 at 15. 42 Macro characterizes Boushie's analysis as all falling within a damages expert's permissible assumption on liability. *See Actava*, 2023 WL 2529115, at *6 n.9 ("As an expert on damages, Dr. Kerr can assume a finding of liability.").

"An expert is not a black box into which data is fed at one end and from which an answer emerges at the other; the Court must be able to see the mechanisms in order to determine if they are reliable and helpful." *ValveTech, Inc. v. Aerojet Rocketdyne, Inc.*, No. 17-CV-6788, 2023 WL 3558214, at *3 (W.D.N.Y. May 19, 2023) (internal quotation omitted). "Where . . . an expert's opinion provides no 'explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion'—and relies only on the '*ipse dixit*' of the expert—it must be excluded under *Daubert* and Rule 702." *Potter v. United States*, No. 17-CV-4141, 2020 WL 2836440, at *7 (S.D.N.Y. May 30, 2020) (quoting *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006)).

But this is not a challenge of Boushie's methodology for calculating damages based on the tweets, only an objection to the timeframe and selection he used. Accordingly, the Court finds it goes to the weight more than the admissibility of his testimony. Hedgeye will have the opportunity to raise these issues with Boushie's testimony through cross-examination.

Thus, Hedgeye's motion to exclude Kristopher Boushie's opinion is denied.

h. Jeffrey Hiller

The Terman Defendants move to exclude two proffered opinions of Jeffrey Hiller, a Hedgeye expert retained to opine on the Terman Defendants' fraudulent inducement counterclaim. *See* ECF No. 756. Specifically, they argue that two of Hiller's opinions are unreliable and will

confuse the jury. *See generally id.* These opinions are that (1) "Hedgeye's disclosures concerning its affiliation with Sierpinski 'were adequate and proper'" and (2) "Hedgeye's policies and procedures were adequate and reasonable to prevent any advantaged trading by Hedgeye insiders and . . . 'consistent with industry standards.'" *Id.* at 1–2 (quoting ECF No. 831-1 at 13, 16 ("Hiller Rep.")). The Terman Defendants refer to the former as the "Sierpinski Disclosure Opinion" and the latter as the "Advantaged Trading Opinion."

The Terman Defendants argue both these opinions rest on an unreliable methodology. *See* ECF No. 756 at 4. The Court agrees. "[I]f [a] witness is relying solely or primarily on experience, then he must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 754 F. Supp. 3d 456, 464 (S.D.N.Y. 2024); *see also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 716 F. Supp. 2d 220, 227 (S.D.N.Y. 2010) ("[A]lthough an expert is permitted to support his opinions by reference to his experience, he must demonstrate that this 'experience is a sufficient basis for' these opinions." (quoting Fed. R. Evid. 702 Advisory Committee Note)). "Without good explanations, courts cannot assess the reliability of any conclusion drawn by an expert, even if he possesses relevant experience." *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 CIV. 7242, 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Hedgeye argues that Hiller's extensive experience in the securities industry is a reliable basis to make the Sierpinski Disclosure Opinion. *See* ECF No. 912 at 4–6. But it fails to

demonstrate how Hiller's experience informed his conclusions. After reciting the disclosures, Hiller simply states:

> Given the level of detail in these disclosures, I believe that they adequately and reasonably disclosed to the institutional subscribers reviewing them the nature of the relationship between Hedgeye employees and Sierpinski. In my opinion, these disclosures were also consistent with industry standards.

Hiller Rep. at 16. Beyond his reference to the level of detail, Hiller provides no explanation why his experience instructs that these were adequate disclosures. He provides no criteria which indicate, based on his experience, that these disclosures were adequate or reasonable. Hedgeye fails to provide citations for what examples in his experience lead to his conclusion that the disclosures align with industry standards. Hedgeye's citation to *SR International Business Insurance Company v. World Trade Center Properties, LLC* is unavailing as the expert there identified a practice over his years of experience and applied his understanding of that practice to the facts of the case. *See* 467 F.3d 107, 132 (2d Cir. 2006) ("He explained that through these experiences, he was able to identify a practice whereby insurers tie the definition of occurrence to a physical cause of loss in order to maximize the number of deductibles that an insured would be required to pay."). For these reasons, Hedgeye fails to meet its burden to establish Hiller's reliability.

The same is true for the Advantaged Trading Opinion. While Hiller discusses Hedgeye's internal policies, he provides no explanation why his experience indicates that these specific mechanisms are sufficient to ensure Hedgeye's compliance with its representations to subscribers. Thus, the Terman Defendants' motion to partially exclude Jeffrey Hiller's opinion is granted.

i. <u>Richard Chen</u>

Hedgeye moves to exclude the proffered testimony of Richard Chen, an expert for the Terman Defendants on their fraudulent inducement counterclaim. *See* ECF No. 762. Before

discussing the content of Chen's testimony or Hedgeye's specific argument, the Court finds that it can resolve the pending summary judgment motion without referring to or relying on Chen's expert report. In its motion on the Terman Defendants' counterclaims, Hedgeye cites Chen's admission that its statement regarding the newsletter exemption was one of belief. *See* ECF No. 814 at 8. In opposition, the Terman Defendants only reference Chen's testimony to highlight the disputed nature of Hiller's opinions: an inference the Court can assess based on the law alone. *See* ECF No. 839 at 16 n.2. Hedgeye cites Chen's admission again on reply. *See* ECF No. 858 at 6.

Neither party introduces Chen's testimony for the substance of his opinions, rendering Hedgeye's motion to exclude premature. *See Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 351 (S.D.N.Y. 2023) ("[T]he Court must address whether the opinions proffered by the parties' experts are admissible before ruling on [the] motion for summary judgment."); *cf. Hudson Techs., Inc. v. RGAS, LLC*, 716 F. Supp. 3d 327, 333 n.1 (S.D.N.Y. 2024) ("The Court need not resolve [the motions] to partially exclude . . . as the Court resolves the present summary judgment motions without reaching the issues on which [the experts'] reports opine."). Therefore, the Court denies the motion to exclude Richard Chen's testimony without prejudice to renewal.

j. <u>Jordan Milev</u>

Hedgeye moves to exclude the proffered testimony of Jordan Milev, an expert for the Terman Defendants on their fraudulent inducement counterclaim. *See* ECF No. 749. Milev is an economist and "a Managing Director in the Global Securities and Finance Practice of NERA." ECF No. 840-1 ¶ 4 ("Milev Rep."). The Terman Defendants retained Milev to evaluate its allegation that by trading on securities the day of or day before Hedgeye published a Real Time Alert ("RTA"), Hedgeye "obtained a superior price than that recommended in the RTA, which ran

contrary to Hedgeye's policy to reasonably prevent any employees from trading in a security which the Firm is actively covering." *Id.* ¶ 2 (internal quotations omitted).

To conduct his analysis, Milev reviewed the trades completed by Hedgeye employees the same day as, or the day before, Hedgeye issued an RTA. Milev then used the term "Advantaged Trades" to define "trades executed one trading day prior to, or on the same day as, an RTA, . . . where a security was purchased at a lower price than the buy RTA Price, or a security was sold at a higher price than the sell RTA Price." Milev Rep. ¶ 19.

The heart of Hedgeye's motion challenges whether Milev's testimony is relevant and misleading given that he offers a limited descriptive opinion of these advantaged trades, with no conclusion as to whether they were obtained unfairly, were made before the RTAs were issued (for the same day trades), or had any influence the price of the security. At various points, Hedgeye's motion argues that Milev's testimony must weigh on a finding of "front-running" or other securities fraud, which would in turn mean that he would have to rely on more precise data and potentially show the resulting impact on the market. *See generally* ECF No. 749. But the only party asserting that that is what Milev's testimony does or must do is Hedgeye. The Terman Defendants simply present his testimony on the limited opinion and assert that this is relevant to their counterclaim that Hedgeye "repeatedly and falsely represented that it prohibits all employees from trading in the securities covered by the firm." ECF No. 913 at 3 (citing ECF No. 670 ¶¶ 28–37). Hedgeye offers no argument why Milev is unqualified to do so or why his opinions on such are unreliable. *See generally* ECF No. 749.

The only question is then whether this limited opinion is irrelevant or misleading, which the Court briefly addresses. "Whether expert testimony is 'relevant' is governed by the same test as any other evidence—Rule 401. . . . Under that rule, 'evidence is relevant if: (a) it has any

tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.'" *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 368 (S.D.N.Y. 2023) (quoting Fed. R. Evid. 401) (internal citation omitted). Milev's opinion is certainly relevant as it directly bears on the Terman Defendants' allegation that Hedgeye "repeatedly and falsely represented that it prohibits all employees from trading on the securities covered by the firm." ECF No. 913 at 3. While Hedgeye may maintain that this evidence is not sufficient to establish some elements of the Terman Defendants' counterclaims, "these arguments concern the merits of the case and do not provide a basis for excluding the testimony of the witnesses." *Catalyst Advisors, LP v. Catalyst Advisors Invs. Glob. Inc.*, No. 21 CIV. 4855, 2024 WL 522751, at *16 (S.D.N.Y. Feb. 9, 2024)

As far as prejudice is concerned, expert testimony is subject to Federal Rule of Evidence 403, which provides that testimony "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. The Court finds potential merit to Hedgeye's motion on the limited ground that the term "advantage trades" seems incongruous with Milev's opinions. While this issue was underdeveloped on Hedgeye's *Daubert* motion, there seems to be little support for any probative value conveyed by Milev's self-conceived term "advantaged trades," let alone in comparison to its potential to mislead or prejudice the jury. *See* ECF No. 913 at 11–14.

The Court will not be prejudiced by this discordance on its resolution of the pending summary judgment motions and so there is no need to decide on this issue before it has been more fully briefed by both parties. Hedgeye's motion to exclude Jordan Milev's proffered testimony based on Rule 403 is hereby denied without prejudice to renewal at a later stage.

k. <u>James Reilly</u>

The Terman Defendants move to exclude the proffered testimony of James Reilly, Hedgeye's expert to rebut Jordan Milev's opinions on the Terman Defendants' fraudulent inducement counterclaim. *See* ECF No. 753. Specifically, they argue that two of Reilly's opinions fall outside the scope of Milev's expert report, are unreliable, and will confuse the jury. *See generally id.* These opinions are (1) "there is no way that Hedgeye employees' small volume of trades of ETPs could have moved the market in a favorable direction for those employees" and (2) "[t]he exemption for ETPs contained in Hedgeye's Code of Ethics is consistent with personal trading policies across the broker/dealer and Registered Investment Adviser industry." *Id.* at 2 (quoting ECF No. 863-1 at 3 ("Reilly Rep.")) (internal quotation marks omitted). The former is referred to as the "Market Movement Opinion" and the latter as the "ETP Opinion."

It is first necessary to address whether these opinions were proper rebuttals to Milev's testimony. "Under Federal Rule of Civil Procedure 26, a rebuttal report is limited to 'the same subject matter identified by another party.'" *Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, No. 20 CIV. 10832, 2023 WL 5670711, at *19 (S.D.N.Y. Mar. 6, 2023) (quoting Fed. R. Civ. P. 26(a)(2)(D)(ii)). "'[R]ebuttal' is hardly limited to evidence that directly contradicts what it opposes; rather, rebuttal encompasses any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary." *United States v. Barrow*, 400 F.3d 109, 121 (2d Cir. 2005); *see also id.* at 120 (collecting cases confirming "that proper rebuttal is not limited to direct contradiction").

The Court finds the connection between Milev's proffered testimony and the Market Movement Opinion to be too attenuated. As elucidated in analyzing whether to exclude Milev's testimony, Milev does not opine about market movement so Reilly's opinion on the subject does

not counter or cast doubt on Milev's opinions. *See supra* at II.h. The Market Movement Opinion thus exceeds the scope of a proper rebuttal.

Even if this were not the case, the Court notes that the Market Movement Opinion is inadmissible for the separate reason that Reilly fails to provide a reliable basis for this conclusion beyond his general experience. "[I]f [a] witness is relying solely or primarily on experience, then he must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 754 F. Supp. 3d 456, 464 (S.D.N.Y. 2024); *see also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 716 F. Supp. 2d 220, 227 (S.D.N.Y. 2010) ("[A]lthough an expert is permitted to support his opinions by reference to his experience, he must demonstrate that this 'experience is a sufficient basis for' these opinions." (quoting Fed. R. Evid. 702 Advisory Committee Note)).

Hedgeye does not contest that Reilly relies on his experience but argues that he supports the Market Movement Opinion with reference to specific trades and through his documentation of the ETPs in a spreadsheet. *See* ECF No. 911 at 12. Reilly referenced this spreadsheet at his deposition, but the Terman Defendants maintain when it was produced "[t]he spreadsheet included a tab listing 113 ETP products recommended by Hedgeye and contain[ed] a column for the average size of those products, but all entries in the tab [were] blank." *See* ECF No. 931 at 2 n.1. As for the specific trades Reilly addressed, these five instances are not a sufficient basis to conclude that all the RTAs were unable to affect any of 110 unique ETPs Hedgeye traded on. *See Ripple Labs*, 2023 WL 5670711, at *8 (permitting expert testimony based on smaller sample because the expert did "not purport to offer a broader conclusion about Defendants' general trading strategy and d[id]

not extrapolate from his limited sample”). Accordingly, the Court cannot conclude that the Market Movement Opinion is based on sufficient facts, or that Reilly used reliable principles and methods.

Reilly’s ETP Opinion meets a different fate. This opinion properly falls within the scope of rebuttal to Milev’s testimony, by offering an alternative consideration. “Rebuttal experts routinely testify about factors that opposing experts failed to consider in their analyses.” *Ripple Labs*, 2023 WL 5670711, at *26. Additionally, the ETP Opinion is one regarding industry standards, practices, and norms, which Reilly may properly rely on his experience to make. *See SR Int’l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 133 (2d Cir. 2006) (recognizing different treatment for “customs and practices” testimony as opposed scientific opinions). Reilly is also able to support his opinion with specific references to the policies of financial institutions. *See* ECF No. 753-1 at 49:19–50:9. The Terman Defendants’ contrary evidence, *see id.* at 51:3–53:14, goes to the weight of Reilly’s opinion, not its admissibility. The Terman Defendants will have the opportunity to raise these issues with Reilly’s testimony through cross-examination.

For these reasons, the Terman Defendants’ motion to exclude James Reilly’s rebuttal testimony is granted as to his Market Movement Opinion and otherwise denied.

## II. Motions to Strike

There are additionally two pending motions to strike. In one, the Dale Defendants move to strike the declaration of, and interrogatory responses verified by, Hedgeye Director of Research Daryl Jones. *See* ECF No. 734. In the other, Hedgeye moves to strike a declaration filed in support of Dale’s reply brief in support of his motion for summary judgment, authored by Fabien M. Thayamballi, Dale’s attorney. *See generally* ECF No. 765. The Court takes each in turn.

"Because a decision on the motion to strike may affect [a movant's] ability to prevail on summary judgment, it is appropriate to consider the Motion to Strike prior to the Motion for summary judgment." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 213 (S.D.N.Y. 2007) (internal quotation marks omitted). Federal Rule 56(c) of Civil Procedure states that affidavits and declarations in support of motions for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." A court may "strike portions of an affidavit that are not based on the affiant's personal knowledge, contain inadmissible hearsay or make generalized or conclusory statements." *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999), *cert. denied*, 528 U.S. 965 (1999), *rehr'g denied*, 528 U.S. 1107 (2000).

While "[m]otions to strike are generally disfavored," *Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 829 (S.D.N.Y. 2008) (internal quotation marks omitted), "[a] motion to strike is particularly disfavored in the Rule 56.1 context," *Pearlstein v. BlackBerry Ltd.*, No. 13CIV7060, 2022 WL 19792, at *7 (S.D.N.Y. Jan. 3, 2022). "Although Rule 56(c)(2) provides that a party moving for summary judgment may object to evidence that 'cannot be presented in a form that would be admissible in evidence,' the 2010 Committee Notes to that subsection make clear that '[t]here is no need to make a separate motion to strike' . . . [b]ecause evidence inadmissible at trial is insufficient to create a genuine dispute of material fact." *Codename Enters., Inc. v. Fremantlemedia N. Am., Inc.*, No. 16CIV1267, 2018 WL 3407709, at *4 (S.D.N.Y. Jan. 12, 2018). "Where a court does not rely on contested submissions in deciding a motion for summary judgment, it may deny a party's motion to strike as 'academic.'" *Kleeberg v. Eber*, No. 16CV9517, 2020 WL 4586904, at *13 (S.D.N.Y. Aug. 10, 2020) (internal quotation omitted). "Alternatively, it may, without granting a motion to strike, simply 'decline to consider evidence' from the

inadmissible declarations." *Sec. & Exch. Comm'n v. Mattessich*, 523 F. Supp. 3d 624, 633 (S.D.N.Y. 2021) (quoting *Fabrication Enters., Inc. v. Hygenic Corp.*, 64 F.3d 53, 59 n.5 (2d Cir. 1995)).

a. Declaration of & Interrogatory Responses Verified by Daryl Jones

The Dale Defendants move to strike a declaration from Daryl Jones, Hedgeye's Director of Research, the interrogatory responses that he verified, and the portions of Hedgeye's briefing which rely on those materials. *See* ECF No. 734. The Dale Defendants argue that Jones lacks the personal knowledge to provide competent and admissible evidence on the subjects he opines and verifies, specifically the content of the source models and Hedgeye's protective measures.

"The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." *Searles v. First Fortis Life Ins. Co.*, 98 F. Supp. 2d 456, 461 (S.D.N.Y. 2000); *see also Giallanzo v. City of New York*, 630 F. Supp. 3d 439, 458 (S.D.N.Y. 2022) (citing *id.*). Both parties introduced statements from Jones's deposition that speak to his personal knowledge of Hedgeye's source models, or lack thereof. *See* ECF No. 734 at 9–11; ECF No. 907 at 13–14, Ex. A. The Court concludes that a reasonable trier of fact could believe that Jones had sufficient knowledge to opine on Hedgeye's source models based on this record. Cross-examination is the more appropriate means to challenge the limited recall and familiarity Jones showed with the various source models during his deposition, as these issues go more towards the weight than the admissibility of his testimony. *Cf. Mattessich*, 523 F. Supp. 3d at 633 (denying motion to strike for lack of personal knowledge based on "vague or poorly substantiated" descriptions).

Regarding his statements on Hedgeye's confidentiality practices and customer lists, "courts in this Circuit have found the 'personal knowledge' requirement satisfied in similar situations,

such as where a high-ranking official's position and tenure gives him broad familiarity with an organization's practices." *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, No. 17 CIV. 4576, 2025 WL 1951864, at *11 (S.D.N.Y. July 16, 2025) (collecting cases). The Dale Defendants' insistence that the Court find differently is unavailing.

For these reasons, the Court denies the Dale Defendants' motion to strike the declaration of, and interrogatory responses verified by Daryl Jones.

b. <u>Attorney Declaration of Fabien Thayamballi</u>

Hedgeye moves to strike a declaration filed in support of Dale's reply brief by Fabien M. Thayamballi, Dale's attorney. *See generally* ECF No. 765; *see also* ECF No. 792 ("Thayamballi Decl."). Hedgeye argues that Thayamballi impermissibly interprets the evidence beyond the scope of an attorney declaration and raises new evidence on reply. While the Court agrees that the document exceeds what is admissible within an attorney declaration at several points, the Court finds many statements are merely descriptive of documentary evidence and that these statements are responsive to Hedgeye's opposition. In light of this, the Court denies the motion to strike but will disregard any inadmissible portions of the declaration in deciding the motions for summary judgment.

*i. Proper Attorney Declaration*

"An attorney declaration or affidavit is generally used to provide the courts with documents and other evidence, for purposes of establishing a record, and should not be used as a 'vehicle to lobby the court.'" *Degelman Indus., Ltd. v. Pro-Tech Welding & Fabrication, Inc.*, No. 06-CV-6346, 2011 WL 6754053, at *2 (W.D.N.Y. May 31, 2011) (quoting *Internet L. Libr., Inc. v. Southridge Cap. Mgmt., LLC*, No. 01 CIV. 6600, 2005 WL 3370542, at *3 (S.D.N.Y. Dec. 12, 2005)), *report and recommendation adopted*, No. 06-CV-6346T, 2011 WL 6752565 (W.D.N.Y.

Dec. 23, 2011). "Such declarations 'often do not rest entirely on personal knowledge,' but will be stricken only when they 'are rife with argument, seek to introduce inadmissible evidence, or contain unsubstantiated factual averments.'" *Cancel v. New York City Hum. Res. Admin./Dep't of Soc. Servs.*, No. 11-CV-9725, 2014 WL 5508487, at *4 (S.D.N.Y. Oct. 31, 2014) (quoting *Degelman*, 2011 WL 6754053, at *3), *aff'd*, 634 F. App'x 843 (2d Cir. 2015).

Where the declaration better "resemble[s] an adversarial memorandum than a *bona fide* affidavit," it is within the court's discretion to strike the document. *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999) (internal quotation omitted). Alternatively, "a court may 'simply decline to consider those aspects of a supporting affidavit that do not appear to be based on personal knowledge or are otherwise inadmissible.'" *Perez v. Manna 2nd Ave. LLC*, No. 15 CIV. 4655, 2016 WL 7489040, at *4 (S.D.N.Y. Dec. 28, 2016) (quoting *Pineda v. Masonry Construction, Inc.*, 831 F. Supp. 2d 666, 681 (S.D.N.Y. 2011)). "In resolving motions to strike, courts use 'a scalpel, not a butcher knife.'" *Pharmacy, Inc. v. Am. Pharm. Partners, Inc.*, No. CIV.A.05-776, 2007 WL 2728898, at *1 (E.D.N.Y. Sept. 14, 2007) (quoting *Perez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001)).

To argue that the Thayamballi Declaration is a proper attorney declaration, Dale cites to several cases which highlight the latitude provided attorneys in referring to exhibits and portions of sworn testimony outside their personal knowledge in order to aid the court's understanding. *See* ECF No. 899 at 10 (quoting *Sanmina Corp. v. Dialight plc*, No. 19-cv-11710, 2023 WL 9022882, at *6 (S.D.N.Y. Dec. 29, 2023) ("[D]eclarations of attorneys … are frequently allowed to function as vehicles to introduce evidence produced in discovery into the record in a cohesive manner."); *Trustees of Loc. 8A-28A Welfare Fund v. Am. Grp. Adm'rs*, No. 14-cv-1088, 2017 WL 3700899, at *1 (E.D.N.Y. Aug. 25, 2017) ("Attorney affidavits are … allowed a degree of latitude to

characterize the evidence by informing the court of the basis for the summary judgment motion and identifying the portion of the record counsel believes demonstrates the absence of genuine issues of fact.”)). These cases, though, involved attorney declarations where counsel simply attested “that each of the exhibits is a ‘true and correct copy’ of a document produced in discovery,” *Sanmina*, 2023 WL 9022882, at *6, or merely referred to portions of deposition testimony. *See Am. Grp. Adm’rs*, 2017 WL 3700899, at *2.

The Thayamballi Declaration does more than this by analyzing a key document in this case, the GMRM file, for the variables and weightings of its economic models. Throughout the declaration Thayamballi initially cites to Hedgeye’s experts but he quickly shifts from summarizing the findings of another expert or witness in this case, to providing an independent account of the content in a Hedgeye economic file. Thayamballi first does by citing to Liam Bastick for the tab to locate the variables “nowcasting” economic growth but relies on his own analysis of the spreadsheet entries from there on out. *See* Thayamballi Decl. ¶ 7 (citing to Hedgeye expert Liam Bastick); *see id.* ¶¶ 8–13 (providing no citations to expert testimony). He does so again regarding “nowcasting” inflation, by citing to Drago Malesevic for proper inflation model and then relying on his own analysis of the variables used therein. *See id.* ¶¶ 22–23 (citing to testimony of Hedgeye employee Drago Malesevic); *see id.* ¶ 24 (providing no citations to expert testimony). This is likewise the case for Thayamballi’s analysis of the alpha variable’s use in the GMRM file. *See id.* ¶ 45.

Dale argues that “[t]here is nothing improper in highlighting portions of the record that show a basic correspondence between a company’s internal documents and its external publications,” but when those internal documents require expertise to analyze, it is improper for an attorney to summarize the documents based on their personal knowledge of the record alone.

*See New York v. Solvent Chem. Co.*, 225 F. Supp. 2d 270, 278 (W.D.N.Y. 2002) ("Rule 56 prohibits an attorney's affidavit from containing legal arguments or factual assertions not made upon personal knowledge."). These portions of the declaration—paragraphs eight to thirteen, twenty-four, and forty-five—do more than describe documents in evidence and present the Court with characterizations beyond the scope of Thayamballi's personal knowledge. Accordingly, the Court will disregard these portions.

Following each of those portions of the declaration, Thayamballi provides the court with documents in the record to compare which variables or data points Hedgeye has disclosed. *See* Thayamballi Decl. ¶¶ 13–18, 25–28. These portions are merely descriptive and do not require the Court to disregard their content. *See Pharmacy, Inc.*, 2007 WL 2728898, at *1 ("[P]ublic documents filed with regulatory agencies or released to press by defendants are admissions of party opponent and thus not excludable from summary judgment affidavit." (citing *Spitzer v. Saint Francis Hospital*, 94 F. Supp. 2d 423, 426 (S.D.N.Y. 2000))). Likewise Thayamballi's discussion and comparison of Attachment A to publicly available slides on growth and inflation, *see id.* ¶¶ 29–34, "do[] nothing more than describe" those sources, even at times using Hedgeye's own language, and need not be stricken, *Cancel*, 2014 WL 5508487, at *4 ("The declaration does nothing more than describe the exhibits attached to it."). The same is true for his discussion of Hedgeye's disclosure of its weighting methodology. *See* Thayamballi Decl. ¶¶ 35–41. Last, the final sections of the declaration describing the differences in Hedgeye's factual summaries and 42 Macro's LLC registration, seem outside to be the scope of the motion to strike.

*ii. Responsiveness*

For the sake of clarity, the Court does not find that the declaration or Dale's reply brief improperly raised new arguments, as Hedgeye argued. It seems instead that the points made in

both were responsive to opposition. When Dale moved for summary judgment, he argued that the thirty data points used in the GMRM file had been publicly disclosed. *See* ECF No. 774 at 7–8. In opposition, Hedgeye contended, for the first time, that it relies on far more than thirty data points in its financial source models, and that these were not public. *See* ECF No. 879 at 19–23. In support of this, Hedgeye cited to a new declaration from Daryl Jones, filed on the public docket, which explained that the GMRM file relied on 184 sets of data points. *See* ECF No. 848 ("Jones Opp. Decl."). Given that this was Hedgeye's first mention of its larger data set, Dale's reply—disputing whether these data sets should be considered as standalone inputs rather than subsets of the prior thirty data points Dale previously asserted Hedgeye had disclosed, *see* ECF No. 790 at 4, and arguing that Hedgeye has in fact publicly disclosed all of these data sets—seems clearly responsive to Hedgeye's opposition, *see id.* at 3–4.

Accordingly, Dale properly raised the legal arguments on reply. The Court will not disregard the statements which cite to sources other than the Thayamballi Declaration. *Cf. Black v. Buffalo Meat Serv., Inc.*, No. 15-CV-49S, 2021 WL 763723, at *4 (W.D.N.Y. Feb. 26, 2021) ("This Court is exercising its discretion and will disregard the repeated legal arguments contained in the Declaration and consider the arguments as raised in Plaintiff's Memorandum of Law.")

Nevertheless, as discussed above, the Thayamballi Declaration did impermissibly characterize the record and make factual assertions on several occasions. Rather than striking the document, the Court will disregard these portions and "draw its own conclusions based on th[e] evidence, not based upon an attorney's characterizations of it." *Solvent Chem.*, 218 F. Supp. 2d at 331 (W.D.N.Y. 2002). Hedgeye's motion is therefore denied.

## III. Summary Judgment Motions

Before the Court are six motions for summary judgment: three filed by Hedgeye, one by Defendant Dale, one by Defendants Lamar and 42 Macro, and one by the Terman Defendants. Across these six motions the parties move for the Court's review on eleven different claims: the five claims asserted in Hedgeye's Fifth Amended Complaint, the 42 Macro's two counterclaims, and the Terman Defendants' four counterclaims. Specifically, the parties cross move on Hedgeye's six claims for violation of the Defend Trade Secrets Act, common law misappropriation, breach of employment contract and code of ethics, intentional interference with contractual relations, and breach of services agreement. Hedgeye separately moves for summary judgment on 42 Macro's counterclaims for violation of the Connecticut Unfair Trade Practices Act and unfair competition, and on the Terman Defendants' counterclaims for fraud in the inducement, tortious interference with a contract, tortious interference with prospective economic relationships, and defamation. The Court takes each claim in turn, first addressing those on which the parties cross move.

a. Standard of Review

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." *Cortes v. MTA New York City Transit*, 802 F.3d 226, 230 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson*, 477 U.S. at 248. Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact. *See National Union Fire Ins. Co. of Pittsburgh, Pa. v. Walton Ins. Ltd.*, 696 F. Supp. 897, 900 (S.D.N.Y. 1988). An issue of fact is "genuine" when a reasonable fact finder could render a verdict in the nonmoving party's favor. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." (internal quotation omitted)).

At summary judgment, the moving party has the burden "to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). A movant "may discharge its burden by showing that the nonmoving party has 'failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 383 (S.D.N.Y. 2023) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"To avoid summary judgment, a party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Gallo*, 22 F.3d at 586. When the moving party has met its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial." *Id.* When a motion for summary judgment is unopposed, a court "may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006).

"If there are cross-motions for summary judgment, the Court must assess each of the motions and determine whether either party is entitled to judgment as a matter of law." *Gen. Ins.*

*Co. of Am. v. Starr Indem. & Liab. Co.*, No. 14-CV-07354 (JGK), 2016 WL 4120635, at *4 (S.D.N.Y. July 22, 2016) (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)). "[W]hen both sides move for summary judgment, neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc.*, 996 F.2d at 1461. Instead, the court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.*

In deciding a summary judgment motion, courts must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Niagara Mohawk Power Corp. v. Jones Chemical Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). Courts may not assess credibility, nor may they decide between conflicting versions of events because those matters are reserved for the jury. *See Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005). However, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Id.* (citing *Anderson*, 477 U.S. at 252).

b. <u>Defend Trade Secrets Act</u>

"The DTSA provides a private right of action for 'an owner of a trade secret that is misappropriated if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.'"[9] *Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 419 (S.D.N.Y. 2021) (quoting 18 U.S.C. § 1836(b)(1)). "To prevail on its claim for trade secret misappropriation under the DTSA, a plaintiff must prove that '(1) it possessed a trade secret, and (2) the defendant

[9] It seems the parties do not dispute that the "interstate or foreign commerce" element is satisfied.

misappropriated the trade secret.'" *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 384 (S.D.N.Y. 2023) (quoting *Democratic Nat'l Comm. v. Russian Fed.*, 392 F. Supp. 3d 410, 447 (S.D.N.Y. 2019)).

In its DTSA claim, Hedgeye asserts that its source models, customer lists, and Dale's notebooks are trade secrets which Defendants misappropriated. *See* FAC ¶ 239. Hedgeye moves for summary judgment on the source models and customer lists only. *See* ECF No. 813 at 18, 27. Dale moves for judgment as a matter of the law that Hedgeye fails to establish (1) the source models, customer lists, and notebooks are trade secrets and (2) its entitlement to monetary damages. *See* ECF No. 774 at 5, 28. Terman incorporates Dale's arguments as to the existence of a trade secret and individually moves that Hedgeye fails to prove her misappropriation. *See* ECF No. 778 at 9–11. Lamar and 42 Macro join in their co-defendants' arguments and move separately for judgment that Hedgeye fails to demonstrate that they misappropriated any of the alleged trade secrets. *See* ECF No. 767 at 5–9.

The Court finds there are no genuine issues of material fact regarding the existence of a trade secret. For the reasons that follow, the Court grants Defendants' motions for summary judgment on Hedgeye's DTSA claim and denies Hedgeye's motion.

*i. Existence of a Trade Secret*

Under the DTSA, a trade secret may take a wide variety of forms,

> [S]o long as: (1) "the owner thereof has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

*Better Holdco*, 666 F. Supp. 3d at 384 (quoting 18 U.S.C. § 1839(3)). Even if the components of the trade secret are individually publicly available, the information may still constitute a trade secret if "the unified process, design[,] and operation of [the components], in unique combination,

affords a competitive advantage." *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990) (quoting *Imperial Chem. Indus. Ltd. v. National Distillers and Chem. Corp.*, 342 F.2d 737, 742 (2d Cir.1965)) (internal quotation marks omitted). "To show that such a process, design, or operation constitutes a trade secret, a party must describe the trade secret with 'specific and concrete information.'" *Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 48 (2d Cir. 2018) (internal quotation omitted).

The existence of a trade secret is generally a question of fact and therefore more appropriate for a jury to decide. *See id.*; *Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 274 (S.D.N.Y. 2021). "As such, where both parties have proffered evidence as to whether an alleged trade secret is well-known in the industry, a genuine issue of fact exists and summary judgment for either party is not warranted." *Town & Country*, 556 F. Supp. 3d at 274. Nevertheless, "summary judgment may be appropriate 'where it is clear that the information at issue is not actually secret or there is no discernible economic value from that information not being generally known.'" *Better Holdco*, 666 F. Supp. 3d at 384 (quoting *Catalyst Advisors, L.P., v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 672 (S.D.N.Y. 2022)).

1. Hedgeye's Source Models

Turning first to whether Hedgeye's source models constitute trade secrets, the Court must note the changing nature of Hedgeye's description of these trade secrets throughout this litigation. In the Fifth Amended Complaint, Hedgeye broadly alleged that the models were trade secrets which included

> Hedgeye's proprietary combination of specific sources from which economic data is gathered, the weights given to the data, the combination of the weighted data, the mathematical formulae applied to the data, as designed by Hedgeye, and the internal functioning of its dynamic market and economic analysis engines.

FAC ¶ 43. During discovery, the Defendants sought clarity from Hedgeye regarding what specifically in the models it alleged were trade secrets. In his second set of interrogatories, Dale asked Hedgeye to "[i]dentify with particularity each and every alleged trade secret that [it] claim[s] Defendant misappropriated." ECF No. 818-45 at 2. Hedgeye responded that the combination of input data, "the weights given to the data, the combination of the weighted data, and the internal functioning of its dynamic market and economic analysis engines" were all trade secrets. *Id.* Hedgeye includes with its response an "Attachment A," detailing the models' methodology. *See id.* at 4; *see also* ECF No. 821-10 ("Attachment A" or "Att. A").

Unsatisfied by this description, Dale filed a letter motion with Magistrate Judge Robert W. Lehrburger to compel an identification of specific components in the source models as trade secrets. *See* ECF No. 114. After holding a conference, Judge Lehrburger noted his concern with Hedgeye's response and ruled that "the alleged trade secrets identified by Plaintiff are (1) the entirety of each source file . . . and (2) [Attachment] A." ECF No. 127 at 2. Judge Lehrburger stated that "Plaintiff shall be precluded from claiming as an independent trade secret any sub-portion of the entirety of each source file or [Attachment] A." *Id.*

In describing the source models on its motion for summary judgment, Hedgeye states that these models take the data inputs from countries across the globe and "apply mathematical formulas that Hedgeye developed to weigh, combine, and analyze the data, and feed the results to 'output models.'" ECF No. 813 at 4. Hedgeye then focuses on the GMRM file, stating that it

> [E]mploys roughly 30 uniquely curated and backtested economic data points to which Hedgeye assigns varying weights. [It] also dynamically re-weighs these 30 data points for "marginal rate of change" impact; in essence, the model continually retrains itself based on the curated source data.

*Id.* at 5 (internal citations omitted). In its opposition to Dale's motion, though, Hedgeye focuses instead on the outputs, stating that the GMRM "generates 184 different sets of critical output"

from the 30 input data points, "their respective weightings, and the extensive mathematical transformations applied to them." ECF No. 879 at 19. These weightings are assigned by Hedgeye, *see* Pl. Stmt. ¶ 1-113, and "dynamically" revised, *see id.* ¶ 1-117, through a process only understood by "the most senior analysts at Hedgeye," *id.* ¶ 1-118. And the transformations, Hedgeye asserts, "are all performed using Hedgeye's closely guarded trade secrets—the methodologies set out [i]n Attachment A." ECF No. 879 at 21.

Dale argues that this changing description represents an impermissible moving target, one which establishes Hedgeye's failure to properly identify the trade secrets at issue. *See* ECF No. 790 at 9. The Court believes this goes too far, because even though Hedgeye might focus on the outputs, the core alleged trade secret is still the combination of the input data points, Hedgeye's weighting scheme, and the mathematical transformations applied in each source model. This is distinct from the case Dale cites, where the plaintiff first alleged the combination of three of its products constituted a trade secret and then argued only one product, along with its monetizing method, was a trade secret. *See Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 49 (2d Cir. 2018). In that case, the plaintiff was unable to "explain[] the way in which all of the features are interrelated, the know-how by which the [technology] was created, or the method of making it work." *Id.* at 49–50. The same cannot be said for Hedgeye.

But even considering the source models in their entirety, the Court is not convinced that the inputs, their weightings, or the mathematical transformations can be considered trade secrets. At the very least, it is clear that Hedgeye has not met the burden on its motion. Dale contends that (1) the input data points have been publicly disclosed, (2) the weightings are not fixed, and (3) the mathematical transformations are dependent on an analyst's subjective input.

Dale introduces evidence that Hedgeye has repeatedly published the 30 input data points used in the source models. *See* ECF No. 774 at 7–8. Hedgeye responds that the disclosures are limited to its calculation of growth for the United States. *See* ECF No. 879 at 20. While this may be true, Hedgeye fails to rebut the conclusion that it uses the same inputs for the other 47 countries the GMRM file analyzes. The alternative seems to fly in the face of Hedgeye's prior statement that the GMRM model "employs roughly 30 uniquely curated and backtested economic data points." Pl. Stmt. ¶ 1-113. That these data points would contain different values depending on the country does not redeem Hedgeye's position either, as it has repeatedly insisted the data inputs—not their values—are a part of its trade secret. *See id.*; ECF No. 813 at 4–5.

This public disclosure does not necessarily doom Hedgeye's claim, as the weightings and mathematical transformations also contribute to "the unified process, design[,] and operation of" the models. *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990). Hedgeye argues that even if the inputs are known, the public disclosures do not provide an individual or a competitor with the requisite information to replicate the GMRM model or its outputs. *See* ECF No. 879 at 22 ("[T]here is no way, by solely looking at the data table for the 'US Real GDP Nowcast Model,' that anyone could replicate Hedgeye's trade secret GMRM Model Quad Framework output for any of the 46 countries Hedgeye's GMRM Model analyzes."). But Hedgeye fails to meet its burden to establish that the methodologies used to calculate the outputs based on the publicly disclosed data points are trade secrets.

Having precluded Hedgeye expert Daniel Lacalle's opinions regarding the content of the source models at issue, *see supra* at II.b, there is a dearth of evidence to find that Hedgeye's methodology is unique, *see Waterville Inv., Inc. v. Homeland Sec. Network (NV Corp.)*, No. 08-CV-3433, 2010 WL 2695287, at *4 (E.D.N.Y. July 2, 2010) ("[P]laintiff has failed to present any

evidence that its alleged technique for making material more 'condensed, concise and clear' is unique."). Hedgeye cites a statement from Daryl Jones, its Director of Research, that "no other competitor uses those same Hedgeye data points, or uses data points in the same way with the same weighting." *See* Pl. Stmt. ¶ 1-115 (citing ECF No. 8 ¶ 7). When asked during his deposition for the basis of such a statement, Jones responded

> A: It would have been based on conversations with my colleagues or things I've observed over time.
> . . .
> Q: Okay. Can you identify any Hedgeye data point that a competitor does not use?
> A: Can I identify -- no. I mean I don't really know what competitors use, so it would be hard for me to do that.

ECF No. 781-7 at 96:7–9, 18–22; *see also id.* at 95:18–19 ("I don't know the methods competitors use."). Disregarding Jones's statement regarding competitors' data points, the Court is left with little evidence of the methodology's unique nature. This is particularly harmful to Hedgeye's DTSA claim in contrast to the opinion of Dale expert Professor Francesco Bianchi, who concluded that the source models and Attachment A contain "methodologies [that] are common and generally known in the industry." Dale Stmt. ¶ 2-238 (quoting Bianchi Rep. ¶ 9).

To meet the burden on his own motion, Dale additionally raises the subjective determinations included in both Hedgeye's weighting practices and its mathematical transformations. Dale highlights that "Hedgeye has no single or constant set of weightings." ECF No. 774 at 8. This is evident from Hedgeye's descriptions of the source models as "dynamically re-weigh[ing]" the input data, ECF No. 813 at 5, and its admissions that the weightings regularly change. *See* ECF No. 846 ¶ 2-229. Hedgeye provides no methodology used for its weightings, only ever referring to Attachment A, which speaks only to the mathematical transformations. *See* ECF No. 879 at 21–22 (referring to the methodology outlined in Att. A). Hedgeye further represents that the process used to reevaluate the weightings is only understood by "the most senior analysts

at Hedgeye." Pl. Stmt. ¶ 1-118. Dale asserts that given the fluid nature of the weightings, Hedgeye has materially disclosed this element of the alleged trade secret because it published the relative rankings of the input values, providing competitors with the sense of which ones play a larger factor within the confines of their variability. *See* Dale Stmt. ¶ 2-230.

As for the methodology outlined in Attachment A, Dale argues Hedgeye's use of the discretionary "alpha" variable dooms its claim. Hedgeye refers to this as a "smoothing" variable and admits that its "value is set by the analyst." Att. A at 2. Based on the screenshots included in Attachment A, Dale highlights the wide range of values assigned to the alpha variable which "has a profound and material effect on the calculations performed." ECF No. 774 at 10. Dale additionally cited to McCullough's statement that

> The reason why the alpha is here is because Darius would -- once he would get to a place where our model would look like it's way off, he would want to [redacted].

Dale Stmt. ¶ 2-269 (quoting McCullough's deposition); *see also* ECF No. 846 ¶ 2-269.

Dale argues that the subjective determinations inherent in both the weightings and mathematical transformations preclude the source models from being trade secrets. To make this argument, Dale relies on *Matec SLR v. Gramercy Holdings I, LLC*, which evaluated whether knowledge or expertise that an ex-employee takes with him can be considered a trade secret. *See* No. 20-CV-4136, 2021 WL 1226956, at *4 (S.D.N.Y. Mar. 31, 2021). Judge Nathan found that "trade secret protection does not extend to the 'general knowledge and experience' of a departing employee." *Id.* While in *Matec* the plaintiff was attempting to stop a former employee from using this knowledge in the future, the point is well taken that if these subjective determinations were made on a case-by-case basis and largely informed by Dale's experience and instincts, then how could Hedgeye argue those subjective determinations are protectable? Put another way, how could Hedgeye argue that the weightings and mathematical transformations contribute to its competitive

advantage such that it would be harmed in the hands of rival, if they inherently depend on an employee's discretionary choices?

Hedgeye responds that the alpha variable is "used sparingly," but provides no citation or evidence to support such a conclusion. ECF No. 856 at 3. Even if the alpha variable is rarely used, the Court notes the choice to use it would still be a subjective one, not included or protectable as part of the source model methodology.

This leaves the Court with no genuine issues of material fact. Hedgeye fails to describe its source models "with specific and concrete information" to establish they are trade secrets. *Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 48 (2d Cir. 2018).

2. Customer Lists

"Customer lists may constitute trade secrets under certain limited circumstances. Specifically, the identity of customers is protected if the list was developed through substantial effort and kept in confidence." *Cardiocall, Inc. v. Serling*, 492 F. Supp. 2d 139, 148 (E.D.N.Y. 2007) (citing *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999)). Dale argues that Hedgeye fails to establish any "substantial effort" taken to create its customer lists. The Court agrees.

Hedgeye solely relies on Daryl Jones's declaration to support its claim that it expended substantial effort to assemble its customer lists. *See* ECF No. 813 at 27 (citing Pl. Stmt. ¶ 1-285 (citing ECF No. 8 ¶ 12)); ECF No. 879 at 33 (same). Jones's statement reads

> Hedgeye's customer lists are particularly valuable because they reflect Hedgeye's selection of customers constituting a specialized market; that is, buy-side investors who are interested in particular investment services such as dynamic investment models and daily podcasts, their interest level, and the amount they wish to pay for such research.

ECF No. 8 ¶ 12. While this speaks to the process for creating the list, this does not weigh on what efforts Hedgeye took to assemble its lists. Jones additionally asserts that "Hedgeye has assembled

various customer lists over a period of years, through the expenditure of substantial time and money including personal solicitation. It would take years to develop the lists from scratch." *Id.* ¶ 11. The Court finds this statement to be conclusory and will therefore not consider it. *See Ridinger v. Dow Jones & Co. Inc.*, 651 F.3d 309, 317 (2d Cir. 2011) ("[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment.").

If Hedgeye believes it expended such effort to create its customer lists "it was incumbent on [it] to so inform the district court and to do so by proffer of admissible evidence." *Id.* Left with no other facts supporting Hedgeye's efforts, the Court finds that Hedgeye has failed to demonstrate that its customer lists constitute trade secrets.

3. Dale's Notebooks

Hedgeye abandons its claim that Dale's notebooks constitute trade secrets in response to Dale's motion, focusing instead on their status as confidential information. *See* ECF No. 879 at 31 ("Dale's notebooks at the very least constitute confidential information that he was prohibited from disclosing to anyone outside of Hedgeye."); *id.* at 32 ("By stealing the notebooks and disclosing images in the notebooks, Dale violated the Confidential Information section of his Employment Agreement and the Hedgeye Code of Ethics.").

As the Court finds that Hedgeye has failed to establish the existence of any trade secret as a matter of the law, there is no need to reach the elements of misappropriation and damages. Hedgeye's motion for summary judgment on its DTSA violation claim is denied and the Defendants' motions on the DTSA claim are granted. Hedgeye's DTSA claim is dismissed.

c. <u>Common Law Misappropriation</u>

"The elements for a misappropriation claim under New York law are fundamentally the same" as a DTSA violation. *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (citing *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999)).[10] In particular New York's analysis as to what constitutes a trade secret mirror that under the DTSA. *See KCG Holdings, Inc. v. Khandekar*, No. 17-CV-3533, 2020 WL 1189302, at *14 (S.D.N.Y. Mar. 12, 2020) (proceeding to the misappropriation analysis under New York common law based on the existence of a trade secret under the DTSA). Accordingly, the Court grants Defendants' motions for summary judgment on common law misappropriation and denies Hedgeye's motion. Hedgeye's claim for common law misappropriation is dismissed.

d. Breach of Employment Contract and Code of Ethics

"Under Connecticut law, to state a breach of contract claim, a plaintiff must plead 'the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages.'"[11] *Peterson v. Wells Fargo Bank, N.A.*, No. 22-1343-CV, 2023 WL 4363239, at *3 (2d Cir. July 6, 2023) (quoting *CCT Commc'ns, Inc. v. Zone Telecom, Inc.*, 172 A.3d 1228, 1240 (Conn. 2017)). Hedgeye brings a breach of contract claim against Dale individually for violating provisions in his employment contract and Hedgeye's Code of Ethics. *See* FAC at 54–55. It is undisputed that Dale's role at Hedgeye was governed by his employment agreement and that Dale's employment was contingent on compliance with Hedgeye's Code of Ethics. *See* Ds. Resp. Stmt. ¶ 1-133. It is also undisputed that Hedgeye performed by compensating Dale. *See* ECF No. 813 at 31. The dispute solely pertains to Dale's breach.

[10] The parties both brief this claim under New York law. The Court will therefore apply New York law, finding such consent sufficient to establish choice of law for the purposes of this motion. *See Tehran-Berkeley Civ. & Env't Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989) ("[I]mplied consent to use a forum's law is sufficient to establish choice of law."); *see also Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 383 n.23 (S.D.N.Y. 2023) (applied to summary judgment motion).
[11] The parties both brief this claim under Connecticut law. Such consent sufficient to establish choice of law for the purposes of this motion. *See supra* at n.10.

Hedgeye asserts that "Dale breached the Confidential Information Provision, the Assignment of Rights Provision," and two restrictive covenants on competition and solicitation in his employment agreement. ECF No. 813 at 31. Hedgeye contends that Dale also violated the "duty of loyalty" and confidentiality provisions of the Code of Ethics. *See id.* Hedgeye moves for summary judgment on these arguments. *See id.* at 31–36. Dale moves for judgment as a matter of the law that he did not violate the Assignment of Rights or the non-solicitation covenant in the employment agreement. *See* ECF No. 778 at 32–36.

For the following reasons, the Court grants in part and denies in part both motions for summary judgment on Hedgeye's breach of contract claim against Dale.

1. Confidential Information Provision

Dale does not dispute the validity of the confidential information provision in his employment contract. Rather, Dale argues that Hedgeye has failed to satisfy its burden to establish his breach. The relevant portion of Dale's contract reads

> You agree not to disclose such Confidential Information to any person or entity outside the Company Group at any time either during or after your employment, and upon termination of your employment, whether voluntary or involuntary, or upon the Company's request at any time during the term of your employment, you will deliver to the Company all written and other materials which contain or relate to such Confidential Information.

Ds. Resp. Stmt. ¶ 1-7. Hedgeye argues that Dale breached this provision by (1) sharing screenshots and Hedgeye's customer lists with Lamar and Terman, and (2) keeping the source models and his notebooks post-termination. *See* ECF No. 813 at 32–33. Dale maintains Hedgeye fails to establish the notebooks and screenshots contain confidential information, and that any disclosure occurred.

Disclosure is not necessary to establish a breach as the provision also required Dale to return any materials containing or relating to confidential information upon his termination. *See* Ds. Resp. Stmt. ¶ 1-7. It is undisputed that Dale kept copies of Hedgeye source models and customer lists after his termination. *See id.* ¶¶ 1-259–63 (source models); *id.* ¶¶ 1-289–90

(customer lists). Such information clearly falls within the provision's definition of confidential. *See id.* ¶ 1-7 (Confidential Information "include[s] . . . financial information about the Company and its affiliates (collectively, the 'Company Group') and the Company's clients, and proprietary investment and trading strategies of the Company Group and the Company's clients.").

As for Dale's notebooks, Hedgeye fails to establish that the information contained in them was or related to confidential matters. Hedgeye cites twenty selections from Dale's notebooks, but provides nothing to support that these are confidential beyond the general description of them as "contain[ing] notes of conversations with Hedgeye's customers, as well as notes regarding Hedgeye's potential business plans and opportunities." *See* ECF No. 813 at 32 (citing Pl. Stmt. ¶ 1-275). Other than this, Hedgeye relies on a statement Dale made to Terman that "[n]o one at Hedgeye has any knowledge of these solutions because it's all in my head/notebook." Pl. Stmt. ¶ 1-76. Considering the limited nature of this support and Dale's specific objections regarding the confidential nature of these excerpts, *see* ECF No. 8-4 at 27–28, the Court finds that Hedgeye has failed to meet its burden to demonstrate no issue of material fact exists related to whether the notebooks contain or reference confidential information.

2. Code of Ethics

Hedgeye's Code of Ethics provides that "Access Persons" owe "a duty of loyalty to the Firm," and states that they "must only use Firm confidential information for authorized purposes." Pl. Stmt. ¶ 1-136 (quoting ECF 818-47 at 8). Hedgeye argues that the same conduct which violated the confidential information provision of Dale's employment contract violated the Code of Ethics. *See* ECF No. 813 at 33. Dale responds that the Code of Ethics only applies to actions Dale took

while he was still employed at Hedgeye and that "Dale was free to use confidential materials while at Hedgeye."[12] ECF No. 804 at 27.

It is clear from the language of the Code that Dale was not free to use confidential information however he pleased, as the Code limits such use to "authorized purposes." ECF 818-47 at 8. It is hard to argue that sharing screenshots of Hedgeye source models was an authorized use, and indeed Dale does not make this argument. *See* ECF No. 804 at 27.

The Court agrees with Dale that Hedgeye fails to support any breach based on Dale's post-employment use of the information. The Code applies the confidentiality provision to "Access Persons" which only includes current Hedgeye employees unless the Chief Compliance Officer specifically deems a non-employee to be an Access Person. *See* ECF 818-47 at 5–6. Hedgeye cites no evidence that the Chief Compliance Officer so designated Dale after his termination. Accordingly, the breaching conduct is limited to Dale's actions prior to his resignation, including the shared screenshots of Hedgeye's source models. *See* Ds. Resp. Stmt. ¶¶ 1-203–04.

3. Assignment of Rights Provision

Dale does not dispute the validity of the assignment of rights provision in his employment agreement. In response to Hedgeye's motion and in support of his own, Dale argues that Hedgeye has failed to satisfy its burden to establish his breach. The assignment of rights reads in part

> All inventions, discoveries, ideas, computer programs, programs based upon or developed from computer programs . . . related to the foregoing (whether or not patentable or

[12] Dale also argues in a footnote that Hedgeye is precluded from arguing he violated a "duty of loyalty," as this claim was not included in the operative complaint. *See* ECF No. 804 at 27 n.12 (citing FAC ¶ 277 ("Dale breached the confidentiality provision of Hedgeye's internal Code of Ethics.")). Hedgeye does not respond to this point in its reply. *See* ECF No. 856 at 20. The Court agrees that Hedgeye cannot expand its claim to assert a violation of the duty of loyalty that is independent from the restrictions on confidential information contained within that section of the Code of Ethics. Nevertheless, Hedgeye may still pursue its claim that Dale mishandled confidential information in violation of the duty of loyalty in the Code of Ethics as Dale had fair notice of this claim in the operative complaint. *See Beckman v. U.S. Postal Serv.*, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) ("[A] complaint need not correctly plead every legal theory supporting the claim. . . . [A]t the very least, [a] plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense." (citing *Newman v. Silver*, 713 F.2d 14, 16 n. 1 (2d Cir.1983); *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 711 n. 4 (2d Cir.1980))).

> copyrightable) that are conceived or made by you, either alone or with others, during the course of or derived from your employment by the Company . . . ("Discoveries") shall be deemed to be "works made for hire" pursuant to applicable law and shall belong to the Company. You will promptly disclose all Discoveries to the Company.

Ds. Resp. Stmt. ¶ 1-8. Dale asserts that Hedgeye has failed to identify any "discovery" which he withheld during his employment. The Court agrees.

Hedgeye alleges that Dale developed and withheld a four quadrant source model capable of monthly, rather than quarterly, calculations upon his resignation. *See* ECF No. 813 at 33–34. To support this contention, Hedgeye cites an email from Dale to McCullough where he presented the idea of developing such a model. *See id.* at 33 (citing Pl. Stmt. ¶ 1-95). Hedgeye highlights the fact that "42 Macro now offers its subscribers monthly quad calculations, and Dale never returned to Hedgeye any model capable of calculating quads on a monthly basis." *Id.* (citing Pl. Stmt. ¶ 1-96). Critically absent from Hedgeye's motion—and its response to Dale's motion—is any evidence that Dale indeed developed this model or another one capable of monthly calculations during his employment at Hedgeye. Hedgeye solely cites the conclusory statement that 42 Macro's model is "a model Dale created while he was employed by Hedgeye" with no additional support. *See id.* at 34; *see also* ECF No. 879 at 39 ("One of the models Dale created at Hedgeye calculated quads on a monthly basis rather than a quarterly basis." (citing no evidence)). In response to Dale's motion, Hedgeye misrepresents the factual situation, stating that Dale "showed the model he had developed" to McCullough without any support for such. ECF No. 879 at 39.

The evidence before the Court raises no genuine factual dispute regarding Dale's creation of a monthly four quadrant model while at Hedgeye and thus no basis for the Court to find Dale breached the assignment of rights provision in his employment agreement. Accordingly, Dale is entitled to summary judgment regarding his breach of this provision.

4. Non-Solicitation Covenant

Hedgeye argues that Dale breached the non-solicitation provision by engaging de Rham in 42 Macro's work. The Court previously analyzed the validity of the non-solicitation provision on Defendants' motion to dismiss the third amended complaint. *See Hedgeye Risk Mgmt., LLC v. Dale*, No. 21CV3687 (ALC) (RWL), 2023 WL 6386845, at *12 (S.D.N.Y. Sept. 29, 2023). The Court noted that "Connecticut, like many other jurisdictions, carefully limits a former employer's ability to restrict an employee's ability to compete, including by soliciting the employer's other employees." *Id.* As articulated in *Deming v. Nationwide Mutual Insurance Company*,

> [T]hese covenants may be against public policy, and, thus, are enforceable only if their imposed restraint is reasonable, an assessment that depends upon the competing needs of the parties as well as the needs of the public. These needs include: (1) the employer's need to protect legitimate business interests, such as trade secrets and customer lists (2) the employees need to earn a living and (3) the public's need to secure the employee's presence in a labor pool.

905 A.2d 623, 634 (Conn. 2006). The Court assessed these factors and found the non-solicitation provision was not "overly broad nor unenforceable." *Hedgeye*, 2023 WL 6386845, at *12.

The parties provide no support for a different conclusion here. Dale questions the enforceability of the covenant, arguing that the provision protects no "legally recognized interest" given Hedgeye's release of Collin de Rham from his non-compete. *See* ECF No. 804 at 32–33 (citing *Integrated Corp. Rels., Inc. v. Bidz, Inc.*, No. CV094028269S, 2009 WL 2962374, at *4 (Conn. Super. Ct. Aug. 14, 2009) ("[E]ven if the language of this contract is clear, it still must seek to regulate a legally protected interest in order to be enforceable.")). Hedgeye argues "[t]hat *de Rham* was released from his *non-competition* obligation, does not release *Dale* from his enforceable obligation to *not solicit* de Rham." *See* ECF No. 856 at 19 (emphasis in original). The Court agrees that Dale fails to elucidate why de Rham's release would mean Hedgeye has no legitimate business interest in restricting Dale's recruitment efforts after his termination.

Dale alternatively argues that the non-solicitation provision does not apply to his actions because the employment agreement "defines 'Solicitation' as taking actions specifically to 'persuade' a Hedgeye employee 'to discontinue, terminate, or adversely alter his . . . relationship [with Hedgeye].'" ECF No. 804 at 32. But this is a selective recitation of the agreement. It is undisputed that the non-solicitation provision states:

> You agree that you shall not, while employed by the Company and for a period of six months thereafter, directly or indirectly (including assist any person to or otherwise participate in the process to), (i) hire, engage, offer to hire, divert, entice away, solicit or in any other manner persuade or attempt to persuade ("Solicitation") any person who is, or was, at any time within the twelve (12) months prior to such Solicitation, an officer, director, employee, agent, consultant, licensor, licensee, customer, or supplier of the Company or any of its affiliates to discontinue, terminate or adversely alter his, her or its relationship therewith.

Ds. Resp. Stmt. ¶ 1-9. Reading Dale's argument generously, the definition of solicitation specifically could be limited to the persuasion related language in the provision. But this would not defeat the fact that the covenant also restricted Dale's ability to "hire, engage, offer to hire, divert, [or] entice away" a current or former Hedgeye employee. *Id.*

Dale also argues that the provision was not breached because his actions did not cause de Rham to "to discontinue, terminate or adversely alter his . . . relationship [with Hedgeye]." ECF No. 804 at 32 (quoting Ds. Resp. Stmt. ¶ 1-9) (internal quotation marks omitted). The Court is unconvinced that this portion applies to the restriction on hiring or engaging. In fact the statement would mean little if it did, as it would forbid Dale from hiring a former employee "to discontinue, terminate or adversely alter his . . . relationship" with Hedgeye. Ds. Resp. Stmt. ¶ 1-9.

Under Connecticut law, "any ambiguity in a written instrument must emanate from the language used in the writing rather than from one party's subjective perception of the terms." *Murtha v. City of Hartford*, 35 A.3d 177, 182 (Conn. 2011) (internal quotation omitted). "Where the language of the writing is clear and unambiguous, the writing is to be given effect according

to its terms." *Id.* (same). The Court finds this provision lacks ambiguity. It clearly restricted Dale's ability to hire anyone who had been employed at Hedgeye within the past twelve months. The fact that de Rham began providing services to 42 Macro in April of 2021, *see* Ds. Resp. Stmt. ¶ 1-93, one month after his termination on March 26, 2021, *see id.* ¶ 1-87, and Dale's termination on March 28, 2021, is not disputed, *see id.* ¶ 1-21. It is additionally not in dispute that de Rham owned ten percent of 42 Macro as of December 20, 2021. *See id.* ¶ 1-85. Accordingly there is no issue of material fact precluding summary judgment on Dale's breach of the non-solicitation covenant.

5. Non-Competition Covenant

Hedgeye moves for summary judgment on its claim that Dale breached the non-competition covenant in his employment contract by developing plans for 42 Macro with Lamar and Terman in the weeks before his termination. *See* ECF No. 813 at 34–35. The covenant reads

> During the period that you render services to the Company, you agree to not engage in any employment, business or activity that is in any way competitive with the business or proposed business of the Company or its affiliates.
>
> You will not assist any other person or organization in competing (directly or indirectly) with the Company or any of its affiliates, or in preparing to engage in competition with the business or proposed business of the Company or any of its affiliates.

Ds. Resp. Stmt. ¶ 1-9.

Dale argues he did not breach the non-competition covenant because he was merely "taking steps to begin work with a new employer once he has already announced his plans to leave his old one." ECF No. 804 at 33. The only legal support Dale provides for this proposition is Connecticut's approach to the breach of an employee's fiduciary duty, which he argues is analogous. *See id.* (citing *United Components, Inc. v. Dowiak*, No. CV88-0274414-S, 1995 WL 500636 (Conn. Super. Ct. Aug. 15, 1995); *Charter Oak Lending Grp., Inc. v. Aug.*, No. CV054009529, 2013 WL 2923319 (Conn. Super. Ct. May 7, 2013)). It is unclear why the Court should be persuaded,

considering that this fiduciary relationship is explicitly analyzed "in the absence of a restrictive covenant." *Charter Oak Lending Grp.*, 2013 WL 2923319, at *14 (internal quotation omitted).

Even assuming this is an analogous context, Dale fails to address the fact that the covenant in his contract explicitly restricted preparatory activities. *See* Ds. Resp. Stmt. ¶ 1-9. This distinguishes the provision at issue from that *In re Document Technologies Litigation* analyzed. 275 F. Supp. 3d 454 (S.D.N.Y. 2017). In that case, Judge Rakoff considered whether a provision prohibiting competition or engagement with competitors applied to preparatory acts under New York law. *See id.* at 464. In finding that the provision did not include acts of preparation, the court made no conclusion regarding covenants which do restrict preparation, nor the similarities between the constructions of New York and Connecticut contract law. *See id.* Dale provides no support for the expansion of such a holding to the instant case.[13]

In the alternative, Dale focuses on the *de minimus* nature of the competitive activity he engaged in during his last days at Hedgeye. *See* ECF No. 804 at 34. The Court separately considers whether Hedgeye has adequately supported its entitlement to damages resulting from the breach of contract claims. *See infra* at III.d.6. The Court finds summary judgment in favor of Hedgeye is appropriate on Dale's breach of the non-competition covenant.

6. Damages

Under Connecticut law, "a plaintiff must prove damages 'with reasonable certainty,' which means that a trier of fact must have a 'sufficient basis for estimating their amount in money.'" *Van Natta v. Great Lakes Reinsurance (UK) SE*, 462 F. Supp. 3d 113, 136 (D. Conn. 2020) (quoting

[13] As the Court concludes that the covenant included Dale's preparatory actions, it will not evaluate Dale's contention that the disclosures he made prior to his termination were inadvertent. *See* ECF No. 804 at 34. Even his private activities to prepare to compete with Hedgeye would constitute a breach of the covenant.

*Am. Diamond Exch., Inc. v. Alpert*, 28 A.3d 976 (Conn. 2011)). Dale argues that Hedgeye fails to do so on its motion for summary judgment. The Court agrees.

First, Thomas Britven, Hedgeye's damages expert, only provides a damages analysis for 42 Macro's unjust enrichment. *See* Britven Rep. ¶¶ 60–81; *see also id.* ¶ 56 ("I understand that courts may award unjust enrichment in lieu of, or in addition to, actual damages."); *id.* ("I also understand that unjust enrichment can serve as a proxy for actual damages."). The Court has already determined that Britven lacks a reasonable basis to assume all of 42 Macro's profits are unjust. *See supra* at II.f. This is critical because "the law of contract damages limits the injured party to damages based on his actual loss caused by the breach." *Hees v. Burke Const., Inc.*, 961 A.2d 373, 378 (Conn. 2009) (internal quotation omitted). "[A] restitution claim, on the other hand, is not aimed at compensating the plaintiff, but at forcing the defendant to disgorge benefits that it would be unjust for him to keep. *Town of New Hartford v. Connecticut Res. Recovery Auth.*, 970 A.2d 592, 614 (Conn. 2009). Hedgeye fails to prove its loss with reasonable certainty or offer the Court an adequate reason to supplement with unjust enrichment damages. Accordingly, summary judgment in its favor is inappropriate at this time.

Dale's motion is granted as to the assignment of rights provision and otherwise denied. Hedgeye's motion is denied entirely as it fails to adequately support its claim for damages. [14]

e. Intentional Interference with Contractual Relations

[14] While several of its breach of contract claims survive, it is unclear how Hedgeye will be able to prove damages considering that Britven, its sole damages expert, only testifies to unjust enrichment damages. *See* Britven Rep. ¶ 56 ("I understand that courts may award unjust enrichment in lieu of, or in addition to, actual damages.") Because Dale does not challenge Hedgeye's ability to establish damages for its breach of contract claims in his motion for summary judgment, the Court need not formally reach any conclusion as to the viability of these claims at this time. *See* ECF No. 774 at 32–36; *see also* ECF No. 727 (Dale Defendants' motion to preclude Brtiven's testimony).

To prevail at trial on a claim for intentional interference with a contract, a plaintiff must prove: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of contract without justification; (4) actual breach of the contract; and (5) damages. *See RSM Production Corp. v. Fridman*, 643 F. Supp. 2d 382, 405 (S.D.N.Y. 2009) (citing *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006)). "Moreover, a plaintiff must prove that 'the contract would not have been breached but for the defendant's conduct.'" *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 399 (S.D.N.Y. 2023) (quoting *Burrowes v. Combs*, 25 A.D.3d 370, 808 N.Y.S.2d 50, 53 (N.Y. 2006)). In its fourth cause of action, Hedgeye asserts that Lamar, Terman, and 42 Macro interfered in Dale's employment contract and agreement to comply with the Code of Ethics. *See* FAC at 55–57. The parties cross move for summary judgment on this claim in its entirety. *See* ECF No. 813 at 36; ECF No. 767 at 9; ECF No. 778 at 12. The claim should be dismissed if Defendants satisfy their burden and establish there is no issue of material fact on "any individual element of a tortious interference with a contract claim." *RSM Production Corp.*, 643 F. Supp. 2d at 405.

In granting Defendants' motion to dismiss this claim on the Third Amended Complaint, the Court found that Hedgeye failed to "provide any factual detail as to how Defendants would have known the actual terms of the Employment Agreement and the Code of Ethics" and "allege that Defendants were the 'but for' causation of Dale breaching the Employment Agreement." *Hedgeye Risk Mgmt., LLC v. Dale*, No. 21CV3687 (ALC) (RWL), 2023 WL 6386845, at *13 (S.D.N.Y. Sept. 29, 2023). The Court found that the allegations supported the conclusion "that Dale quit Hedgeye and decided to form his own competing company because he was unhappy with

his compensation at Hedgeye, and not because any of the Defendants induced him to breach any of the relevant agreements." *Id.*

The Court has already determined that a valid contract existed, and that Dale breached his employment agreement and Hedgeye's Code of Ethics. *See supra* at III.d. Dale's breach was not to leave Hedgeye, but his violations of the confidential information provision, non-competition covenant, and Code of Ethics.[15] *See id.* Lamar and 42 Macro argue that Hedgeye cannot prove knowledge, but-for causation, or damages. *See* ECF No. 767 at 10–16. They separately argue that Hedgeye can only maintain this claim based on Lamar's knowledge. *See id.* at 15–16. In her motion for summary judgment, Terman similarly asserts that Hedgeye has failed to prove her knowledge, but-for causation, and damages. *See* ECF No. 778 at 12–15.

Lamar, Terman, and 42 Macro are entitled to summary judgment on the basis of damages alone. "Damages for tortious interference with a contract under New York law are those recognized under the more liberal rules applicable to tort actions." *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 401 (S.D.N.Y. 2023) (internal quotation omitted). These include

> (a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.

*Rich v. Fox News Network, LLC*, 939 F.3d 112, 128 (2d Cir. 2019). "[D]amages for unjust enrichment . . . are not available in New York for a tortious interference of a contract claim." *Better Holdco*, 666 F. Supp. 3d at 401 n.32. Hedgeye's only damages expert, Thomas Britven, solely provides an analysis of Defendants' unjust enrichment. *See generally* Britven Rep. As such,

[15] As the Court granted summary judgment to Dale on the breach of the Assignment of Rights provision, Hedgeye cannot maintain a tortious interference claim based on it. *See supra* at III.d. Additionally, Hedgeye concedes that it offers no evidence of to support a tortious interference claim based on the non-solicitation provision. *See* ECF No. 835 at 20–21 (failing to argue Lamar caused any breach of the non-solicitation provision); ECF No. 850 at 13–18 (failing to argue Terman knew of or caused Dale's breach of the non-solicitation provision).

Hedgeye fails to present any applicable damages theory to support its tortious interference claim. The absence of this required element entitles Lamar, Terman, and 42 Macro to summary judgment. *See Better Holdco*, 666 F. Supp. 3d at 402 (citing *Rich*, 939 F.3d at 127). [16]

Thus, the Court grants defendants' summary judgment on the intentional interference claim and denies Hedgeye's motion. Hedgeye's intentional interference claim is dismissed.

f. <u>Breach of Services Agreement</u>

"Under Connecticut law, to state a breach of contract claim, a plaintiff must plead 'the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages.'"[17] *Peterson v. Wells Fargo Bank, N.A.*, No. 22-1343-CV, 2023 WL 4363239, at *3 (2d Cir. July 6, 2023) (quoting *CCT Commc'ns, Inc. v. Zone Telecom, Inc.*, 172 A.3d 1228, 1240 (Conn. 2017)). Hedgeye's fifth cause of action is a breach of contract claim against Solstein individually for violating provisions in its subscriber agreement. *See* FAC at 57–58. Hedgeye asserts three ways Solstein violated the subscriber agreement: (1) its solicitation of Ben Ryan, a Hedgeye employee, to work for it in 2019; (2) its solicitation of Dale to work for Longbow in 2021; (3) its misuse of the Hedgeye products it received.

The parties do not dispute that Hedgeye and Solstein executed the subscriber agreement on July 1, 2017, *see* Ds. Resp. Stmt. ¶ 1-324, and that Hedgeye performed, *see* ECF No. 778 at 15. Hedgeye and Solstein cross move for summary judgment on whether a breach occurred and damages. *See* ECF No. 813 at 39; ECF No. 778 at 15. For the reasons that follow, the Court finds genuine issues of material fact preclude granting either party's motion.

---

[16] Hedgeye, Lamar, and 42 Macro all brief this claim under New York law. Terman briefs this claim largely under California law but only analyzes New York law in relation to the damages requirement. *See* ECF No. 883 at 14–16. Because of this, the Court applies New York law. *See supra* at n.10.

[17] The claim is properly analyzed under Connecticut law as the subscriber agreement provides that the governing law is that of the State of Connecticut. *See* ECF No. 821-30 ¶ 8.

1. Solicitation of Ryan

Section Six of Solstein's subscriber agreement contains a "Mutual Non-Solicitation" provision. *See* Ds. Resp. Stmt. ¶ 1-327. It reads:

> The Parties affirm that they will not solicit each other's employees for employment for the term of this Agreement. Further, if an employee of either Party shall leave that Party's employ, the other Party agrees not to employ such individual for a period of twelve months from the date of termination . . . except that this . . . shall not apply to responses to a general solicitation for applicants for employment.[18]

*Id.* It is undisputed that Ben Ryan worked as an analyst at Hedgeye, *see* ECF No. 852 ¶ 3-10, until he left in December of 2018, *see* Ds. Resp. Stmt. ¶ 1-328. It is similarly undisputed that Ryan began working for Solstein four months later, in March of 2019. *See id.* ¶ 1-329.

While Solstein disputes whether it in fact breached this provision, the Court need not reach this question because Hedgeye fails to make out its entitlement to damages. *See Van Natta v. Great Lakes Reinsurance (UK) SE*, 462 F. Supp. 3d 113, 136 (D. Conn. 2020) (Under Connecticut law, "[a] defendant is entitled to summary judgment based on a plaintiff's failure make out a *prima facie* case for damages only when no reasonable jury could set the amount of damages."). Hedgeye offers no evidence of the damages it sustained as a result of this supposed breach.

Hedgeye argues that "Solstein's breaches have resulted not only in the loss of customers, but in the creation of a competing business that is built upon Hedgeye's own trade secrets, and that has resulted in losses to Hedgeye." ECF No. 860 at 20 (citing Britven Rep.). But Hedgeye provides no support for the inference that Ryan's hiring contributed to these damages, which relate to Defendants' conduct nearly two years later. Additionally, Hedgeye's only damages expert, Thomas Britven, did not consider the impact of Ryan's hiring had on Hedgeye. *See generally* Britven Rep. (failing to mention Ryan or Solstein's alleged solicitation). Hedgeye's failure to

[18] For the same reasons the Court found the non-solicitation provision in Dale's employment contract to be enforceable, the Court likewise finds this provision reasonable and enforceable. *See supra* at III.d.

provide a sufficient basis to estimate damages entitles Solstein to summary judgment on its breach based on the solicitation of Ben Ryan. *See Van Natta*, 462 F. Supp. 3d at 136.

2. Solicitation of Dale

Hedgeye does not argue that Solstein violated the solicitation provision by recruiting or hiring Dale for a position at Solstein. Rather, Hedgeye argues that Solstein, through Terman, solicited Dale to work for Longbow, in which Solstein had a [redacted] ownership stake. *See* Ds. Resp. Stmt. ¶ 1-30; ECF No. 860 at 15–16. Solstein argues that it cannot be held liable for Terman's efforts to work with Dale on Longbow or 42 Macro. *See* ECF No. 778 at 16.

Both parties cite *Vogt v. Abish*, which found that "liability may be imposed on a corporation for acts of its agents, contrary to orders and without authority, express or implied, merely because they were committed in the course of the corporation's business and were within the scope of the agent's employment." 663 F. Supp. 321, 327 (S.D.N.Y. 1987). There is a factual issue as to whether Terman's actions fall within this definition. Solstein argues that "[a]n alleged solicitation to hire Dale for another company is not an act committed in the course of Solstein's business." ECF No. 883 at 16. Hedgeye counters that considering Solstein's ownership stake in Longbow and the financial benefits Solstein sought to gain from developing a company which provided the same services as Hedgeye. *See* ECF No. 860 at 15; Pl. Stmt. ¶ 1-35 ("Terman also reported that with Dale 'creating a site that offers risk ranges and the macro data,' Solstein could 'go to Hedgeye and remove that cost from our subscription.'"). Whether Terman's actions were in the course of Solstein's business is a question of fact on which reasonable jurors could disagree. Thus, it is inappropriate for the Court to decide the question on the parties' motions.

Even if the Court found Solstein to be liable for Terman's actions, an additional issue of fact arises as to whether Terman's actions constitute solicitation. Hedgeye points to evidence that

Terman engaged with Dale before he resigned and that Terman told others at Solstein that "Dale was going to 'join Longbow.'" Pl. Stmt. ¶ 1-34. While it is clear that Terman, along with Lamar, were engaged in conversations with Dale prior to his termination, *see supra* at I.d, it is not clear that these communications were about Longbow as opposed to the formation of a new company. It is also not necessarily true that Terman believed Dale would join Longbow, as her email in fact reads "[Dale] wants to join Longbow." ECF No. 818-12 at 2. That may still support the inference that Terman and Lamar were soliciting Dale to work for Longbow, but it is not conclusive enough to entitle Hedgeye to judgment as a matter of the law.

Solstein also argues that Hedgeye cannot sustain a claim for damages based on its supposed solicitation of Dale. *See* ECF No. 778 at 18. Unlike the solicitation of Ben Ryan, the Court cannot conclude that Britven's analysis provides no reasonable basis for a jury to estimate damages.[19] *See Van Natta*, 462 F. Supp. 3d at 136. Accordingly, summary judgment on Hedgeye's claim that Solstein solicited Dale and thereby breached its subscriber agreement is inappropriate.

3. Terms of Service

Section Five of Solstein's subscriber agreement limits Solstein's access to Hedgeye's products based on compliance with Hedgeye's Terms of Service ("Terms"). *See* Ds. Resp. Stmt. ¶ 1-326. Specifically, the provision reads "Subscriber's access to the Website will be subject to the Terms of Service for Web Service ('Terms of Service') available on the Website." *Id.* While the Terms changed over the course of Solstein's subscription, they always included contained prohibitions against infringing on Hedgeye's intellectual property in using the website and

[19] Nevertheless, the Court notes the limited nature of Britven's testimony and his failure to provide an analysis of actual damages. *See supra* at II.f, n.14. It is therefore questionable whether Britven's analysis will ultimately be helpful to the finder of fact. Still, summary judgment in the Terman Defendants favor would only be appropriate if there was "no reasonable basis" for the jury to determine damages, which the Court cannot conclude at this time. *See Van Natta*, 462 F. Supp. 3d at 136.

services, *see* ECF No. 853-2 at 4; ECF No. 853-1 at 7, modifying or creating derivative works of the website, services, and content, *see* ECF No. 853-1 at 7; ECF No. 853-2 at 4, and using one's license to copy or reproduce the website, services, and content, *see* ECF No. 853-1 at 6; ECF No. 853-2 at 3. The Terms defines "services" as those provided through its website, *see* ECF No. 853-1 at 2; ECF No. 853-2 at 2, and "content" as Hedgeye's published media relating to financial markets, *see* ECF No. 853-1 at 5; ECF No. 853-2 at 2.[20]

Hedgeye asserts Solstein breached the Terms when (1) she added an output model to a Dropbox folder shared with Dale and (2) Defendants used Hedgeye's proprietary information thereafter. *See* ECF No. 813 at 39 ("Solstein, acting through its principal Nadine Terman, breached Section 5 . . . by disclosing Hedgeye's materials to Dale, Lamar and 42 Macro, and by using Hedgeye's trade secrets."). Focusing on the latter first, the Court finds the subscription agreement and Terms only apply to Defendants' use of the materials procured through Solstein's license. The definitions of "services" and "content" clearly pertain to that published through the website and available to subscribers. *See* ECF No. 853-1 at 2, 5; ECF No. 853-2 at 2. This means the agreement's protections would not extend to any media obtained and shared by Dale.

The only piece of relevant content which Hedgeye contends Terman accessed using Solstein's license is an Excel file spreadsheet with a file name including the words "Hedgeye" and "US_&_Global_GIP_Models," which she uploaded to a Dropbox folder shared with Dale. *See* Pl. Stmt. ¶¶ 1-212–15. While Terman does not dispute that she uploaded this file, *see* Ds. Resp. Stmt. ¶ 1-215, There is a genuine, disputed issue of material fact regarding whether this file was accessed through a Hedgeye product. In fact, Dale seemingly emailed Terman and Lamar the same file five

[20] Solstein disputes the accuracy of the Terms provided to the Court and attested to by Anthony Parsio, Hedgeye's General Counsel. *See* ECF No. 883 at 18 n.4; ECF No. 853 ("Parsio Decl."). As Solstein provides no support for the Terms's inaccuracy, the Court will not contemplate this argument further.

days prior to the upload. *See id.* ¶ 1-208. This dispute bars summary judgment in either parties' favor.

Again, the Court concludes that Hedgeye provides a reasonable basis for a jury to estimate damages. *See Van Natta*, 462 F. Supp. 3d at 136. Accordingly, the motions for summary judgment filed by Hedgeye and Solstein are both denied as to Solstein's breach of the services agreement.

g. Connecticut Unfair Trade Practices Act (42M Counterclaim)

The Connecticut Unfair Trade Practices Act (CUTPA) "is, on its face, a remedial statute that broadly prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Cenatiempo v. Bank of Am., N.A.*, 219 A.3d 767, 781 (Conn. 2019) (internal quotation omitted). To be successful on its CUTPA violation counterclaim, 42 Macro must prove that Hedgeye's unfair or deceptive acts "occurred in the conduct of trade or commerce." *Id.* at 782. "Trade and commerce means the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, . . . and any other article, commodity, or thing of value in [Connecticut]." Conn. Gen. Stat. § 42-110a(4).

Hedgeye moves for summary judgment on 42 Macro's CUTPA counterclaim, arguing that 42 Macro fails to establish the harassment campaign was executed in the conduct of Hedgeye's trade or commerce. *See* ECF No. 815 at 7. Hedgeye maintains that the social media posts at issue were noncommercial speech and therefore outside the purview of CUTPA. *See id.* ("Hedgeye did not advertise or sell anything, rent or lease any property or services, nor offer to sell, rent, or lease any property or services in the State of Connecticut in connection with these Twitter statements."). Except as to one statement 42 Macro introduce, the Court agrees.

42 Macro does not dispute that the social media posts at issue were not advertising Hedgeye's products themselves. Rather 42 Macro argues that these posts were made in the course

of trade or commerce because Hedgeye considered social media a key advertisement tool. *See* ECF No. 810 at 18–19. This, however, is not the proper inquiry. Although there is limited jurisprudence to guide the Court's decision, a recent case from the Appellate Court of Connecticut is instructive.

In *Lafferty v. Jones*, the plaintiffs brought a CUTPA claim against Alex Jones and other defendants for promoting the lie that the Sandy Hook mass shooting was a hoax through various advertisements. *See* 327 A.3d 941 (Conn. App. 2024), *cert. denied*, 333 A.3d 106 (Conn. 2025). As in this case, the defendants in *Lafferty* "contend[ed] that they engaged in noncommercial speech outside of the scope of CUTPA." *Id.* at 541. The court agreed, noting that "[t]he conduct forming the basis of the plaintiffs' CUTPA claim was the defendants' propagation of lies that the Sandy Hook massacre was a hoax." *Id.* at 544. The court wrote

> That the defendants' speech was motivated by a desire to generate profit through sales of products that the defendants marketed is not adequate to satisfy the "trade or commerce" prong of CUTPA. Indeed, nothing in the defendants' speech, in and of itself, concerning the Sandy Hook massacre made any mention of their products.

*Id.* at 980. Because of this distinction, the court held "as a matter of law, [that] the acts in which the defendants engaged were not 'in the conduct of any trade or commerce' as required." *Id.* at 542 (citing Conn. Gen. Stat. § 42-110b(a)).

The Court finds this reasoning persuasive. The Court also notes that only one social media post offered by 42 Macro in support of its counterclaim mentions Hedgeye or 42 Macro products, rather than discussing Dale and his personal and professional history. *See* ECF No. 810 at 5–9. "On February 28, 2022, Hedgeye President Blum stated on Twitter that that Dale's statement that '[42 Macro's] models are better' was a 'lie,' and further claimed, 'They are our models, not his.'" Ds. Resp. Stmt. ¶ 1-447. The Court finds this is the only statement for which 42 Macro raises a question of fact as to whether it was made in the conduct of Hedgeye's trade or commerce.

This one statement is inactionable for the separate reason that it states an opinion and does not raise to the level of unfair or deceptive. Connecticut courts use

> Three criteria [to assess] whether a practice is unfair, although all three need not be proved: "(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businesspersons."

*Cent. Sports, Inc. v. Yamaha Motor Corp., U.S.A.*, 477 F. Supp. 2d 503, 512 (D. Conn. 2007) (quoting *Edmands v. Cuno, Inc.*, 892 A.2d 938, 955 n. 16 (Conn. 2006)). Nonactionable expressions of opinion cannot establish a viable CUTPA claim. *See NetScout Sys., Inc. v. Gartner, Inc.*, 223 A.3d 37, 59 (Conn. 2020) ("Because the defendant's statements . . . were nonactionable expressions of opinion . . . we are compelled to conclude that the plaintiff has failed to establish a viable claim within the purview of CUTPA."). The Connecticut Supreme Court previously found that "a reasonable purchaser . . . would understand that comparative ratings of products and services cannot be strictly objective," and held such comparative statements to be nonactionable expressions of opinion. *Id.* at 430, 59.

The Court finds that this statement from Blum is one of opinion in that he believed Hedgeye to have the better models. Even more clear is Blum's opinion regarding the origin of 42 Macro's models, for while 42 Macro is correct that Hedgeye knew the new companies' models were distinct at that point, *see* ECF No. 813 at 7, until earlier in this opinion the Court had not rendered a decision on Dale's alleged misappropriation. *See supra* at III.b. 42 Macro offers no basis for this Court to conclude it is impermissible for a company to publicly state on social media a position it is also prosecuting in a court of law. *Cf. infra* at III.l.

Accordingly, no factual issue precludes judgment in Hedgeye's favor. The Court grants its summary judgment motion on 42 Macro's CUTPA counterclaim and dismisses the counterclaim.

h. <u>Unfair Competition (42 Macro Counterclaim)</u>

Hedgeye also moves for summary judgment on 42 Macro's unfair competition counterclaim. Hedgeye initially analyzed this counterclaim under New York law, arguing the 42 Macro "assert[ed] a claim for common-law unfair competition without specifying the state." ECF No. 815 at 15. 42 Macro argues that this counterclaim is properly analyzed under Connecticut law. *See* ECF No. 810 at 23. Thus, Court must first determine which law governs this counterclaim.

1. Choice of Law

As this counterclaim was asserted pursuant to the Court's diversity jurisdiction, *see* ECF No. 674 at 55, New York's choice of law rules apply. *See Cotiviti, Inc. v. Deagle*, 501 F. Supp. 3d 243, 255 (S.D.N.Y. 2020) ("The choice-of-law rules that must be applied in a case brought under diversity jurisdiction are those of the forum state — in this case, New York."); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). "Under New York law, 'the first step . . . is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'" *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013) (quoting *GlobalNet Financial.com, Inc v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006)). An actual conflict may arise when "certain behavior does not subject an actor to tort liability [in one forum] while in [another] the same behavior would." *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 428 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016). If such a "conduct-regulating" conflict exists, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Id.* at 424 (quoting *Cooney v. Osgood Mach.*, 612 N.E.2d 277 (N.Y. 1993)) (internal quotation marks omitted).

There is a "conduct-regulating" conflict between New York and Connecticut unfair competition law. New York courts "recognize[] two theories of common-law unfair competition: palming off and misappropriation." *ITC Ltd. v. Punchgini, Inc.*, 880 N.E.2d 852 (N.Y. 2007).

Palming off "is, the sale of the goods of one manufacturer as those of another." *Id.* Connecticut courts, on the other hand, consider unfair competition to be an "umbrella term" which includes "such causes of action as tortious interference with business expectancy." *Larsen Chelsey Realty Co. v. Larsen*, 656 A.2d 1009, 1022 n.23 (Conn. 1995). 42 Macro asserts that this conflict is "conduct regulating" since Hedgeye's alleged actions would constitute unfair competition under a tortious interference theory and be unlawful in Connecticut but are not included under New York's more limited scope for the cause of action. *See* ECF No. 810 at 23. Hedgeye concedes as much in arguing that the conduct does not constitute misappropriation or palming off, *see* ECF No. 815 at 17, while solely opposing the counterclaim on the basis of damages under Connecticut law. *See* ECF No. 859 at 17. The authority Hedgeye cites to support its contention that "no actual conflict exists" is inapposite as only allegations of misappropriation were at issue. ECF No. 815 at 15–16 (citing *Czech Beer Importers, Inc. v. C. Haven Imports, LLC*, No. 04 CIV. 2270, 2005 WL 1490097, at *7 (S.D.N.Y. June 23, 2005) ("Plaintiff fails to allege that Defendant misappropriated the information.")).

The Court finds that the conflict between Connecticut and New York unfair competition law to be "conduct regulating," and as such will apply the law of the state where the conduct occurred. *See Reed*, 49 F. Supp. 3d at 424; *id.* at 428 ("[T]he principal locus of the defendant's conduct is ordinarily the controlling contact" for unfair competition claims.). The record indicates that the alleged harassment campaign was carried out from Connecticut, given the domiciles of Hedgeye and McCullough. *See* ECF No. 810 at 24 (citing Ds. Resp. Stmt. ¶¶ 1-481–82). Hedgeye does not rebut this. *See generally* ECF No. 859. Accordingly, Connecticut law applies.

2. Tortious Interference with Business Expectancy

To be successful on an unfair competition counterclaim based on tortious interference with a business expectancy, 42 Macro must prove

> "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss."

*Genworth Fin. Wealth Mgmt., Inc. v. McMullan*, No. 3:09-CV-1521, 2012 WL 1078011, at *20 (D. Conn. Mar. 30, 2012) (quoting *Hi–Ho Tower, Inc. v. Com–Tronics, Inc.*, 255 Conn. 20, 27 (2000) for the elements of tortious interference with a business expectancy and applying it under the plaintiff's unfair competition claim). "Unlike other torts in which liability gives rise to nominal damages even in the absence of proof of actual loss, . . . it is an essential element of the tort of unlawful interference with business relations that the plaintiff suffered actual loss." *Hi–Ho*, 255 Conn. at 33 (internal quotations omitted).

When applying Connecticut common law, Hedgeye moves for summary judgment on this claim entirely based on 42 Macro's failure to establish "that Hedgeye's tweets or other conduct caused any harm to its business." ECF No. 859 at 17. The Court finds Hedgeye is not entitled to summary judgment because an issue of fact must be resolved to establish causation.

"[T]he issue of proximate causation is ordinarily a question of fact . . . to be [determined] by the jury and not by the court." *Ruiz v. Victory Props., LLC*, 107 A.3d 381, 397 (Conn. 2015) (internal quotation omitted). "In order to survive summary judgment, [a claimant] must produce some evidence that, if credited by a jury, would allow a jury to conclude that the tortious conduct proximately caused actual harm." *Tommy's Supplies LLC v. Papillon Ink LLC*, No. 3:16-CV-1922, 2020 WL 1532367, at *11 (D. Conn. Mar. 31, 2020).

42 Macro offers evidence of its lost customers and that the harassment campaign may have motivated them to cancel their subscriptions. *See* Ds. Resp. Stmt. ¶¶ 1-474–79. The opinion of Kristopher Boushie, 42 Macro's damages expert, additionally supports a reasonable inference that

Hedgeye's conduct caused harm to 42 Macro's business. The extent to which the harassment campaign—as opposed to news coverage of the lawsuit or other factors, *see* ECF No. 859 at 12–13—impacted 42 Macro's business is a question of fact to be appropriately decided by the jury. As is the determination of whether any statement was a motivating factor for 42 Macro's exiting customers. The existence of these questions renders summary judgment inappropriate at this time. Accordingly, Hedgeye's motion on 42 Macro's unfair competition counterclaim is denied.

i. Fraud in the Inducement of a Contract (Terman Defendants Counterclaim)

"To prove fraudulent inducement under New York law, the plaintiff must establish by clear and convincing evidence '(i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by appellants; and (iv) resulting damages.'" *CCM Rochester, Inc. v. Federated Invs., Inc.*, 234 F. Supp. 3d 501, 506 (S.D.N.Y. 2017) (quoting *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012)).[21] The Terman Defendants bring a counterclaim against Hedgeye for fraudulent inducement into Solstein's subscriber agreement. *See* ECF No. 670 at 44–45. Hedgeye moves for summary judgment on each element of this counterclaim. *See* ECF No. 814 at 6–18. The Court grants Hedgeye's motion because there is no evidence that the Terman Defendants suffered any actual pecuniary loss as a result of Hedgeye's conduct.

"In New York, damages for claims of fraud and fraudulent inducement are subject to the 'out-of-pocket rule,' which confines plaintiffs to recovering actual losses sustained as the direct result of the wrong alleged." *In re Eugenia VI Venture Holdings, Ltd. Litig.*, 649 F. Supp. 2d 105, 121 (S.D.N.Y. 2008) (citing *Lama Holding Co. v. Smith Barney*, 668 N.E.2d 1370 (N.Y. 1996)), *aff'd sub nom. Eugenia VI Venture Holdings, Ltd. v. Glaser*, 370 F. App'x 197 (2d Cir. 2010). "In

[21] New York common law is proper to apply as both parties impliedly consent in their briefing. *See supra* at n.10.

accordance with this rule, the proper measure of damages recoverable for fraud is the 'difference between the value of the bargain which a plaintiff in a breach of contract claim was induced by fraud to make and the amount or value of the consideration exacted as the price of the bargain.'" *Lam v. Am. Exp. Co.*, 265 F. Supp. 2d 225, 233 (S.D.N.Y. 2003) (quoting *Sager v. Friedman*, 1 N.E.2d 971, 974 (N.Y. 1936)). To calculate "out-of-pocket" damages

> "First, the plaintiff must show the actual value of the consideration it received. Second, the plaintiff must prove that the defendant's fraudulent inducement directly caused the plaintiff to agree to deliver consideration that was greater than the value of the received consideration. Finally, the difference between the value of the received consideration and the delivered consideration constitutes 'out of pocket' damages."

*New York Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F. Supp. 3d 216, 236 (S.D.N.Y. 2020) (quoting *Kumiva Grp., LLC v. Garda USA Inc.*, 146 A.D.3d 504, 506 (N.Y. App. Div. 2017)).

The Terman Defendants assert that "as a consequence of Hedgeye's fraudulent inducement, Terman and Solstein agreed to make substantial quarterly fee payments to Hedgeye that they never would have agreed to pay absent the fraud." ECF No. 839 at 19–20. While they establish that these fees totaled at least $449,000, this is not sufficient to establish their "out-of-pocket" damages because they provide no evidence of the value Hedgeye's services actually provided, *see id.*; *Mammoet Holding*, 481 F. Supp. 3d at 236, let alone that this value was less than $449,000, *see Capax Discovery, Inc. v. AEP RSD Invs., LLC*, No. 1:17-CV-00500, 2020 WL 5815943, at *13 (W.D.N.Y. Sept. 30, 2020) ("Plaintiffs cannot establish either that they paid a greater amount of consideration than the actual value of Zovy as a result or that post acquisition they suffered a loss."), *aff'd sub nom. Baiocco v. AEP RSD Invs., LLC*, No. 21-2475-CV, 2022 WL 2902081 (2d Cir. July 22, 2022). In the absence of such, there is no information to determine the actual losses sustained as a result of the misrepresentations. Thus the counterclaim fails.

Accordingly, Hedgeye's motion for summary judgment with respect to the Terman Defendants' fraudulent inducement counterclaim is granted. The counterclaim is dismissed.

j. Tortious Interference with a Contract (Terman Defendants Counterclaim)

To prevail at trial on a claim for tortious interference with a contract, a plaintiff must prove: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of contract without justification; (4) actual breach of the contract; and (5) damages. *See RSM Production Corp. v. Fridman*, 643 F.Supp.2d 382, 405 (S.D.N.Y. 2009) (citing *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006)). "Moreover, a plaintiff must prove that 'the contract would not have been breached but for the defendant's conduct.'" *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 399 (S.D.N.Y. 2023) (quoting *Burrowes v. Combs*, 25 A.D.3d 370, 808 N.Y.S.2d 50, 53 (N.Y. 2006)).[22]

The Terman Defendants their counterclaim based on two separate contractual relationships: (1) Terman's contract to be a guest commentator on CNBC and (2) two Solstein client contracts. *See* ECF No. 670 at 45–46. Hedgeye moves for summary judgment on both. *See* ECF No. 814 at 18–22. The Court grants Hedgeye's motion as the Terman Defendants fail to prove the third parties breached their contracts.

1. Terman's CNBC Contract

"[A]n essential element of tortious interference with contractual relations claim is an actual breach of contract." *Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 627 (S.D.N.Y. 2014) (citing *NBT Bancorp, Inc. v. Fleet/Norstar Fin. Group*, 664 N.E.2d 492 (N.Y. 1996)). Under her contract, CNBC paid Terman [redacted] for each appearance she made during a one-year term. *See* ECF No. 821-29 ¶¶ 2(a), 3(a). The contract specified that "[w]hile it is anticipated that [her]

[22] The parties both brief this claim under New York law, which is sufficient to establish choice of law for the purposes of this motion. *See supra* at n.10.

services will be used throughout the Term, there is no guaranteed number of actual appearances." *Id.* ¶ 1. Additionally, CNBC had the right to terminate the contract

> [I]f you act in any manner inimical to the interests of CNBC, such acts including, but not being limited to, . . . the commission of any act or involvement in any situation that brings you into public disrepute, contempt, scandal, or ridicule, or otherwise shocks, insults, offends the community or a significant portion thereof, or reflects unfavorably upon you.

*Id.* ¶ 6(c). During the term of the agreement, Terman was subject to a non-compete clause regarding other media outlets. *See id.* ¶ 4.

Hedgeye argues that "[t]here is no evidence that CNBC breach[ed] its agreement Terman; at best, it simply allowed the agreement to expire according to its terms." ECF No. 814 at 20. The Terman Defendants respond that the contract "clearly contemplate[d] that appearances will occur throughout the Term," and CNBC's failure provide such defeated the contract's purpose. ECF No. 839 at 24. While the Court understands their point, the Terman Defendants are unable to point to any requirement or obligation for CNBC to provide Terman with appearances. *Cf. Seibert v. Fed. Deposit Ins. Corp.*, No. 24-CV-427, 2025 WL 950986, at *5 (S.D.N.Y. Mar. 28, 2025) ("The Handbook unambiguously provided that bonus payments were discretionary and not guaranteed—and therefore no express or implied in fact contract was formed on this basis."). The Terman Defendants do not argue that Terman appeared and was not paid for her work. Nor do they argue that CNBC violated the stipulated process for termination.

The Terman Defendants argue the non-compete continued to restrain Terman while she was unable to reap the benefits of appearances—such as compensation and exposure. *See* ECF No. 839 at 24 ("[T]he entire purpose of the contract is to secure Terman's appearances on CNBC, in return for which Terman agrees not to appear on competing programs during the term of the agreement."). But the Terman Defendants provide no support for the Court to find that a non-compete with a maximum term of one year, even without compensation, is unreasonable and

unenforceable. While it was under Connecticut law, the Court previously found a similar provision restraining Dale for the year following his termination, to be enforceable. *See supra* at III.d.

The Court notes that even reading the contract to be one pseudo-at will, given CNBC's complete discretion to offer Terman appearances, the New York Court of Appeals has explained that a claim for tortious interference with at will contract "should be treated as a claim for 'interference with prospective contractual relations,' . . . which is essentially synonymous with tortious interference with business relations." *Guzik v. Albright*, No. 16-CV-2257, 2018 WL 4386084, at *6 (S.D.N.Y. Sept. 14, 2018) (quoting *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 192 (N.Y. 1980)). As such, the counterclaim would be dismissed as duplicative of the tortious interference with prospective economic relationships claim. *See id.*

Even if there was a breach, the Terman Defendants are unable to prove causation. A claimant must prove that "the contract would not have been breached 'but for' the defendant's conduct." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 127 (2d Cir. 2019) (quoting *Burrowes v. Combs*, 25 A.D.3d 370, 808 N.Y.S.2d 50, 53 (N.Y. App. Div. 2006)) (internal quotation marks omitted). "If the breach would have occurred 'prior to any involvement by' the [defendants] or apart from their actions, then of course there would be no but-for causation." *Id.*

Hedgeye argues that the record indicates Terman was not offered further CNBC appearances because this litigation commenced, not because of any social media posts. To support this, Hedgeye cites the following portions of Terman's deposition testimony.

> Q: Did CNBC ever terminate this contract?
> A: No. But in effect, it did. It said that I can't go on because of the Hedgeye allegations until it's cleared up.
> Q: You're saying that in effect they terminated this agreement because they would not allow you on TV anymore?
> A: Until the lawsuit has been resolved.
> . . .
> Q: Did anybody at CNBC inform you that you would no longer be allowed on the network?

A: Yes. Not forever, just until the lawsuit is resolved.
. . .
Q: When did [CNBC] tell you that?
A: Several times.

ECF No. 818-5 at 232:12–19, 233:10–13, 233:16–17. The Terman Defendants highlight the timing of the social media posts and the discontinuance of Terman's appearances to argue this correlation supports causation. *See* ECF No. 839 at 21 ("Those appearances rapidly fell to zero after Blum's campaign of dishonesty."); *see also* ECF No. 818-5 at 233:1–4 ("[A]ll of a sudden, the lawsuit happened. Hedgeye put out press releases, tons of defamatory statements, incorrect statements, and then all of a sudden, I wasn't on air anymore.").

But the Terman Defendants fail offer any evidence, beyond conclusory statements, that CNBC was aware of the social media posts. There are no statements in the record from CNBC regarding their decision-making or what they knew about Terman. The only evidence before the Court on this issue cites the lawsuit, not the social media posts, as the cause of CNBC's decision. *See Pride Techs., LLC v. Khublall*, No. 21-2225, 2022 WL 17587755, at *2 (2d Cir. Dec. 13, 2022) (Claimant "provide[d] no evidence beyond 'conclusory allegations or denials' to suggest [defendant] was responsible for the termination of the business relationship, and such insinuations 'are not evidence and cannot themselves create a genuine issue of material fact where none would otherwise exist.'" (quoting *FTC v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019))). Given this, there is no triable issue of fact regarding the cause of Terman's termination at CNBC.

2. Solstein's Client Agreements

Regarding Solstein's contractual client agreements,[23] the Court finds that the Terman Defendants provide no evidence that they were breached. The agreements provide that they "may

[23] The Court notes that Hedgeye opposes the introduction of Solstein's client agreements entirely. *See* ECF No. 858 at 11–12. "Where a party wishes to have a court consider documents which are not yet part of the court's record, the documents must be attached to and authenticated by an appropriate affidavit and the affiant must be a competent

be terminated by either party upon sixty (60) days' written notice to the other party." ECF No. 844-1 at 10, 45. While the Terman Defendants allege that Hedgeye wrongfully solicited these clients to leave Solstein, they provide no evidence that the clients breached their obligations under these agreements. *See* Ds. Resp. Stmt. ¶¶ 1-522, 1-526–27.

Hedgeye's motion for summary judgment is granted on the Terman Defendants' tortious interference with a contract counterclaim. The counterclaim is dismissed.

k. Tortious Interference with Prospective Economic Relationships (Terman Defendants Counterclaim)

In New York, one suing for tortious interference with prospective economic relationships[24]

> [M]ust prove that "(1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured."

*Hadami, S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 602 (S.D.N.Y. 2017) (quoting *Goldhirsh Grp., Inc. v. Alpert*, 107 F.3d 105, 108–09 (2d Cir. 1997)). "[A] plaintiff must 'demonstrate both wrongful means and that the wrongful acts were the proximate cause' of the alleged injury." *Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 547 F.3d 115, 133 (2d Cir. 2008) (quoting *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 171–72 (2d Cir. 2004)).

The Terman Defendants bring counterclaims for tortious interference with prospective economic relationships based on (1) Terman's relationship with CNBC, (2) two Solstein client

witness through whom the documents could be received into evidence at trial." *White Diamond Co. v. Castco, Inc.*, 436 F. Supp. 2d 615, 624 (S.D.N.Y. 2006) (quoting *New York ex rel Spitzer v. St. Francis Hosp.*, 94 F. Supp. 2d 423, 426 (S.D.N.Y. 2000)) (internal quotation marks omitted). The Terman Defendants submitted a declaration from defendant Terman in opposition to Hedgeye's motion. *See* ECF No. 844. Terman declares that she located the client agreements to be produced and is prepared to authenticate them at trial. *See id.* ¶¶ 15–16. The Court finds this sufficient at this stage.

[24] The Court uses the terms "tortious interference with prospective economic relationships," "tortious interference with prospective economic advantage," and "tortious interference with business relations" interchangeably. *See, e.g.*, *Hadami, S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 602 (S.D.N.Y. 2017); *Guzik v. Albright*, No. 16-CV-2257 (JPO), 2018 WL 4386084, at *5 n.4 (S.D.N.Y. Sept. 14, 2018).

relationships, and (3) Solstein's prospective relationship with [redacted]. *See* ECF No. 670 at 47. Hedgeye moves for summary judgment on all three. *See* ECF No. 814 at 22–25. Having already determined the Terman Defendants cannot prove the social media posts caused Terman's relationship with CNBC to break down, *see supra* at III.j, the Court finds that they will be unable to prove tortious inference with business relations as well. As to the other two bases, the Court grants Hedgeye's motion because the Terman Defendants fail to provide any evidence that Hedgeye intended to interfere with these client relationships.

Hedgeye argues that the Terman Defendants fail to establish that Hedgeye intentionally interfered in Solstein's client relationships and that any interference used "improper means." *See* ECF No. 858 at 14–16. The Terman Defendants assert that the interference was perpetuated through Hedgeye's social media harassment and that this constitutes "improper means." *See* ECF No. 839 at 20–21.

While Terman maintains that the clients "informed Solstein that they had seen the comments made about [Terman] and Solstein by Hedgeye and [withdrew] their funds," ECF No. 844 ¶ 16, defendants offer no evidence to support the conclusion that Hedgeye made its statements "with the sole purpose of harming" Solstein. *Hadami*, 272 F. Supp. 3d at 602. In fact, if a party's "'interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed'" were improper. *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 206 (2d Cir. 1998) (quoting *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 269 (2d Cir. 1987)); *see also id.* at 206 n.9 (abrogating *PPX* based on *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 664 N.E.2d 492, 497–98 (N.Y. 1996), intervening precedent which recognized a more expansive definition of "improper means").

On Hedgeye's motion to dismiss the Terman Defendants' prior counterclaims, this Court found that "[i]mproper means entails any means that fall below the generally accepted standards of commercial morality." ECF No. 661 at 9 (citing *GateGuard, Inc. v. Amazon.com Inc.*, No. 21-CV-9321, 2023 WL 2051739, at *13 (S.D.N.Y. Feb. 16, 2023)). This Court noted that "improper means [may] include dishonesty in the form of false statements intended to undercut a contracting customer's opinion of the victim." *Id.* (citing *PKG Grp., LLC v. Gamma Croma, S.p.A.*, 446 F. Supp. 2d 249, 251 (S.D.N.Y. 2006)). On the instant motion, the Terman Defendants have introduced sufficient evidence that Hedgeye made false statements. *See infra* at III.l. The question is then whether the defendants provide evidence to establish that Hedgeye made these statements with the intention to undercut Solstein's client relationships.

While the Terman Defendants provide support for the inference that Hedgeye was motivated to interfere with Terman's CNBC contract, *see* Ds. Resp. Stmt. ¶ 1-518–20, they provide no evidence that Hedgeye made any social media post to specifically entice the two clients who closed their accounts. *See* ECF No. 839 at 21. The Terman Defendants cite a tweet by Blum, stating that he had "heard from a Solstein LP who is considering to pull money from the firm." ECF No. 838-20 at 2. Additionally, the Terman Defendants allege "[o]ne client specifically withdrew because of Hedgeye's accusations and two others contacted Blum after reviewing his social media attacks on Solstein and Hedgeye proceeded to convince them to leave Solstein and bring their accounts to Hedgeye." ECF No. 839 at 21.[25] This may support the conclusion that Hedgeye's comments *caused* clients to leave Solstein, but it does not infer that Hedgeye *made* its comments to specifically interfere with these client relationships.

[25] The Terman Defendants cite to Ds. Resp. Stmt. ¶ 1-525, which in turn cites to pages 250 and 251 of Solstein's deposition; pages which are not in the record for the Court's review. *See* ECF No. 818-5 (ending on page 233); ECF No. 885-3 (same).

In a claim for tortious interference with business relations, "[t]he defendant's interference must be direct: 'the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff.'" *B & M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 485 (S.D.N.Y. 2010) (quoting *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477, 482 (S.D.N.Y. 1997)); *see also G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 768 (2d Cir. 1995) ("It is axiomatic that, in order to prevail on this claim, the distributors would have to show that the appellees intentionally caused the retailers not to enter into a contractual relation with them.").

The Terman Defendants are likewise unable to support their claim based on any direct statements Blum made to Solstein clients, as there is no evidence to establish those statements were made. While the defendants allege that an "account holder [was] . . . solicited by Hedgeye to invest with Sierpinski" after closing their account with Solstein, Ds. Resp. Stmt. ¶ 1-526, the emails supporting that statement indicate that the account holder reached out to invest with Sierpinski and include no statements criticizing Solstein, *see* ECF No. 854-2 (emails about moving the account from Solstein and signing necessary paperwork to invest with Sierpinski).

The Court finds the Terman Defendants raise no triable factual dispute on the tortious interference with prospective economic relationships counterclaim. Given this, the Court grants Hedgeye's motion and dismisses the counterclaim.

l. Defamation (Terman Defendants Counterclaim)

A defamation claimant must establish five elements to prevail under New York law: "(1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or *per se* actionability."

*Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019).[26] "A defamatory statement is one that exposes the plaintiff 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or induces an evil opinion of one in the minds of right-thinking persons, and deprives one of confidence and friendly intercourse in society.'" *Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 453 (E.D.N.Y. 2013) (quoting *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012)).

The Terman Defendants bring a defamation counterclaim against Hedgeye based on McCullough and Blum's tweets.[27] *See* ECF No. 670 at 47–48. Hedgeye moves for summary judgment, arguing that (1) there is no evidence of malice; (2) the statements are privileged under Section 74 of the New York Civil Rights Law; (3) defendants are not the subject of many statements; (4) and several statements are unactionable opinion or true. *See* ECF No. 814 at 25–34. Finding disputed facts necessary to resolve this counterclaim, the Court denies the motion.

1. Actual Malice

"The level of fault that a defamation plaintiff must plead depends on the plaintiff's status." *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 287 (S.D.N.Y. 2016). "There are three recognized classes of plaintiffs: (1) 'general public figures,' i.e., public officials or persons whose conduct is generally a matter of interest to the public; (2) 'limited public figures,' i.e., persons whose conduct is of interest to certain portions of the public as to a limited range of issues; and (3) 'private figures.'" *Id.* Public figure plaintiffs bear a higher burden and must plead "actual malice," whereas private figure plaintiffs need only plead negligence. *See*

[26] That both parties brief this claim under New York law is sufficient to establish choice of law for the purposes of this motion. *See supra* at n.10.

[27] The Court notes that the Terman Defendants do not specify the exact statements which form the basis of their counterclaim. *See* ECF No. 670 ¶ 197 ("Hedgeye made false statements of purported fact about Terman and Solstein, as specifically described in Paragraphs ______ of these counterclaims, among others."). Therefore the Court considers the viability of the counterclaim based on the statements raised in the parties' briefing.

*Ratajack v. Brewster Fire Dep't, Inc. of the Brewster-Se. Joint Fire Dist.*, 178 F. Supp. 3d 118, 159–60 (S.D.N.Y. 2016); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 80 (1964). Whether a plaintiff is a public figure is a question of law for the Court. *Enigma*, 194 F. Supp. 3d at 287.

Hedgeye argues that the Terman Defendants must plead malice because Terman is a "limited public figure" due to her appearances on CNBC. *See* ECF No. 814 at 33. "The Second Circuit has adopted a four-part test to determine whether a plaintiff is a limited-purpose public figure. To qualify, a plaintiff must have:

> "(1) successfully invited public attention to [its] views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected [itself] into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media."

*Enigma*, 194 F. Supp. 3d at 287 (quoting *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136–37 (2d Cir. 1984)). To voluntarily inject oneself, "the plaintiff must take an affirmative step to attract public attention with respect to *the subject of the allegedly defamatory commentary*." *Id.* at 289 (internal quotation omitted) (emphasis in original).

Terman argues that she did not voluntarily inject herself into any public controversy related to these posts. *See* ECF No. 839 at 31. Hedgeye contends that Terman's statements on CNBC regarding the DUFRY investment display her voluntary choice to speak on "the economy and financial/investment matters." ECF No. 858 at 20. Since Hedgeye then reacted to these comments in several of the allegedly defamatory statements, it argues "Terman's media appearances directly relate to the alleged defamation." *Id.* This circular logic is unpersuasive.[28]

The subject of this litigation is whether the Terman Defendants copied Hedgeye's investment advice and proprietary information. Hedgeye does not argue that Terman's DUFRY

[28] Additionally, the Court notes that these statements pertain to a small portion of those at issue and Hedgeye provides no support for why Terman's burden to establish malice for the limited bucket of defamatory comments regarding her DUFRY pitch should subject her to that burden more broadly. *See generally* ECF Nos. 814, 858.

comments went so far as to speak on this issue. Likewise, that Hedgeye's reaction brought up this topic cannot properly be considered a "voluntary injection" by Terman. Even if the subject of this litigation were more broadly defined as "the economy and financial matters," Hedgeye provides no evidence that the DUFRY investment was so controversial as to amount to a "topic upon which sizeable segments of society have different, strongly held views." *Lerman*, 745 F.2d at 138.

The Court therefore declines to find that the Terman Defendants are limited-purpose public figures with regard to the subject of the statements at issue and to hold them to the higher burden of establishing malice.

2. True and Fair Report Privilege

"New York law recognizes certain privileges that shield an individual from liability for defamation." *Sheindlin v. Brady*, 597 F. Supp. 3d 607, 629 (S.D.N.Y. 2022) (citing *Stega v. New York Downtown Hosp.*, 107 N.E.3d 543, 549 (N.Y. 2018) ("Courts have long recognized that the public interest is served by shielding certain communications, though possibly defamatory, from litigation, rather than risk stifling them altogether.")). While in court statements are protected by a New York common law privilege, Section 74 of the New York Civil Rights Law governs out of court statements. It provides:

> A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.

N.Y. Civ. Rights Law § 74.

"A key test courts have adopted to resolve whether a report qualifies for the fair report privilege is whether the ordinary viewer or reader can determine from the publication itself that the publication is reporting on a judicial proceeding." *Kinsey v. New York Times Co.*, 991 F.3d 171, 178–79 (2d Cir. 2021); *see also Wenz v. Becker*, 948 F. Supp. 319, 323 (S.D.N.Y. 1996) ("If

the context in which the statements are made make it impossible for the ordinary viewer to determine whether defendant was reporting on a trial or simply from interviews and independent research, the absolute statutory privilege does not attach."). "This is not to say that 'the court filing, the court, or the jurisdiction be specifically identified in the article,' but 'the key question is whether the reader is able to determine that the report is of a proceeding.'" *Sheindlin*, 597 F. Supp. 3d at 630 (quoting *Kinsey*, 991 F.3d at 180). "Comments that essentially summarize or restate the allegations of a pleading filed in an action are the type of statements that fall within § 74's privilege." *Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 521 (S.D.N.Y. 2013) (internal quotation omitted) (collecting cases).

"The absolute privilege under Section 74 also extends to the release of background material with regard to the case, so long as the statement is a *substantially accurate description* of the allegation." *Id.* (emphasis added). "'A fair and true report admits of some liberality; the exact words of every proceeding need not be given if the substance be substantially stated.'" *Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 456 (E.D.N.Y. 2013) (quoting *Geiger v. Town of Greece*, 311 F. App'x. 413, 417 (2d Cir. 2009)). "A report is 'substantially accurate' if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." *Lan Sang*, 951 F. Supp. 2d at 520.

Hedgeye argues that a large portion of the allegedly defamatory statements are privileged under Section 74, because they relate to, or are substantially similarly to, statements made in this litigation. *See* ECF No. 814 at 28–29 (specifically mentioning paragraphs 116, 148, 151, 153, 154, 156, 158, and 161 of the Terman Defendants' counterclaims). The defendants contest whether these statements were clearly made in the context of this litigation. *See* ECF No. 839 at 27.

The Court finds that the statements contained in paragraph 148, bullet points one through four of paragraph 153, and bullet point two of paragraph 154 are essentially verbatim copies of allegations in Hedgeye's original complaint against the Terman Defendants. *Compare* ECF No. 670 ¶¶ 148, 153–54 *with* 22-cv-01113, ECF No. 1 ¶¶ 52, 76, 81, 112. As such, they are subject to Section 74's protections. *See Lan Sang*, 951 F. Supp. 2d at 521.

Of the remaining statements, other those in bullet points four and five of paragraph 153 and that in paragraph 161 of the counterclaims, there is no indication that they relate to this litigation in anyway. *See Fine*, 11 F. Supp. 3d at 217 ("If context indicates that a challenged portion of a publication focuses exclusively on underlying events, rather than an official proceeding relating to those events, that portion is insufficiently connected to the proceeding to constitute a report of that proceeding."). The retweeted statement alleged in the fourth bullet point of paragraph 153 is not a fair and accurate description of this litigation. Nor is the statement contained in paragraph 161.

The Court finds that Blum's tweet stating "Judge Carter already ruled @Hedgeye is likely to prevail on the merits"—alleged in the fifth bullet point of paragraph 153—is both clearly related to this litigation and a fair and true depiction of the preliminary injunction entered in Hedgeye's favor. *See* ECF No. 90 at 5:1–2 ("Plaintiff has also established the likelihood of success on the merits."). Therefore the Court finds Section 74 protects some, but not all, of the alleged statements.

3. Subject Matter

"In New York, a plaintiff cannot sustain a libel claim if the allegedly defamatory statement is not 'of and concerning plaintiff' but rather only speaks about a group of which the plaintiff is a member." *Chau v. Lewis,* 771 F.3d 118, 129 (2d Cir. 2014) (citing *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006)). "Plaintiffs in defamation proceedings bear the burden of

demonstrating that the libel designates the plaintiff in such a way as to let those who knew [him] understand that [plaintiff] was the person meant." *Kirch,* 449 F.3d at 398.

The Terman Defendants do not contest that some of the alleged statements are not directed at Terman or Solstein. *See* ECF No. 839 at 25. Accordingly the Court finds that they may not base a defamation claim upon them. However, the Terman Defendants do dispute whether some statements are directed at Terman, when read in the context of other tweets in the same given thread, *see id.* 25–26. The Court finds the question of whether this context demonstrates that Terman or Solstein were the subject of the specific statements is appropriate for the jury and not for the Court to determine on a motion for summary judgment.

4. Nonactionable Opinion

"New York law absolutely protects statements of pure opinion, such that they can never be defamatory." *Kirch*, 449 F.3d at 402. "[T]he inquiry into whether a statement should be viewed as one of fact or one of opinion must be made from the perspective of an ordinary reader of the statement." *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 292 (E.D.N.Y. 2015), *aff'd*, 670 F. App'x 731 (2d Cir. 2016). "[T]he Second Circuit has emphasized that courts should not consider the statement in question in isolation, but must analyze statements 'in the context of the entire communication and of the circumstances in which they were written.'" *Id.* at 293 (quoting *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 179 (2d Cir. 2000)).

The Court notes Hedgeye's belief that the Terman Defendants conceded this argument on numerous statements. *See* ECF No. 858 at 19. The Court reads the defendants' opposition differently, as they broadly contest Hedgeye's arguments. *See* ECF No. 839 at 28–30. Because of this the Court will still evaluate these statements.

While the portions quoted in Hedgeye's motion may be fairly read as opinions, *see* ECF No. 814 at 30–31, the more complete statements alleged in the counterclaims may assert factual claims. *See* ECF No. 670 ¶¶ 110 (stating that Terman copied Hedgeye language on CNBC), 113 (stating that Terman was using Hedgeye's "Quad language" on CNBC), 165 (stating that Terman is a thief). Additionally, Hedgeye has failed to establish that "a reasonable listener would be able to determine that [Hedgeye was] neither [a] disinterested nor unbiased observer[]." *Marom v. Pierot*, No. 18CIV12094VBJCM, 2020 WL 1862974, at *8 (S.D.N.Y. Jan. 16, 2020), *report and recommendation adopted*, No. 18 CV 12094 (VB), 2020 WL 1444938 (S.D.N.Y. Mar. 25, 2020). Although Hedgeye was certainly interested in the ongoing litigation and the use of its source models, it is not clear that a reasonable observer would view its statements as hyperbole, as was the case in *Marom v. Pierot*, where the defendants gave emotional statements at a Town Hall meeting. *See id.* Thus, the Court finds these statements do not amount to nonactionable opinion.

5. Falsity

"It is fundamental that truth is an absolute, unqualified defense to a civil defamation action, and 'substantial truth' suffices to defeat a charge of libel." *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir. 1986) (internal quotation omitted). "A statement is 'substantially true' if the statement 'would not have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Conti v. Doe*, 535 F. Supp. 3d 257, 272 (S.D.N.Y. 2021) (quoting *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 366 (S.D.N.Y. 1998)).

Hedgeye asserts a limited truth defense, largely relying on similarities between Terman's DUFRY comments on CNBC and some made by Hedgeye employee Brian McGough to establish that its statements were true. *See* ECF No. 858 at 26. Given that Terman disputes whether the

commentary was copied or even inspired by Hedgeye, *see* ECF No. 839 at 25, the Court finds it is inappropriate to grant summary judgment.

Hedgeye's summary judgment motion on the Terman Defendants' defamation counterclaim is granted as to the statements in paragraph 148, bullet points one through five of paragraph 153, and bullet point two of paragraph 154 in the counterclaims, and otherwise denied.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** 42 Macro's motion for summary judgment in full. ECF No. 766. The Court **GRANTS IN PART** and **DENIES IN PART** the other summary judgment motions. ECF Nos. 768, 777, 791, 793, 794. The only claims that present a genuine issue of material fact appropriate for resolution at trial are Hedgeye's breach of contract claims against Dale and Solstein, 42 Macro's unfair competition counterclaim, and the Terman Defendants' defamation counterclaim.

As for the *Daubert* motions, the Court **GRANTS** the motion to exclude the opinion of expert Hiller. ECF No. 754. The Court **DENIES** the motions to exclude the opinions of experts Chaput, Barbera, Boushie, Chen, and Milev. ECF Nos. 744, 757, 727, 760, 747. The Court **GRANTS IN PART** and **DENIES IN PART** the motions to exclude the opinions of experts Lacalle, Biachi, Britven, and Reilly. ECF Nos. 725, 736, 741, 751. The Court **DENIES** the motions to strike. ECF Nos. 729, 763. Furthermore, because the Court resolved these motions on the papers, the parties' requests for oral argument are **DENIED**. ECF Nos. 951, 953.

This opinion shall be temporarily filed under seal. The parties are directed to meet and confer, and advise the Court on or before **October 31, 2025** whether any portion of this Opinion

should be redacted prior to its public docketing. Any redactions shall be narrowly tailored, consistent with Judge Lehrburger's orders addressing the parties' motions to seal, *see* ECF Nos. 956–58, 965, 980, and supported with reference to the Second Circuit's opinion in *Lugosch v. Pyramid Company of Onondaga*, 435 F.3d 110 (2d Cir. 2006).

The Court will conduct a status conference in this action on **October 23, 2025, at 11:00AM**. All parties shall appear in person in **Courtroom 444**, Thurgood Marshall Courthouse, 40 Foley Square, New York, NY 10007.

**SO ORDERED.**

**Dated**: **September 30, 2025**
**New York, New York**

**ANDREW L. CARTER, JR.**
**United States District Judge**